**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| AMBASE CORPORATION AND CARTERET BANCORP, INC.,<br><br>Plaintiffs,<br><br>and<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No. 93-531<br>(Judge Loren Smith) |

**PLAINTIFFS' POST-TRIAL BRIEF**

Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:
Vincent J. Colatriano
David H. Thompson
Jesse Panuccio

COOPER & KIRK, PLLC
1523 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

July 1, 2008

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES ....... v

INTRODUCTION ....... 1

I. PLAINTIFFS ARE ENTITLED TO THE VALUE OF THE THRIFT ....... 6

A. The Loss of Carteret's Value Was Reasonably Foreseeable ....... 6

1. The Logic of the Contracts and the Government's Viability Analyses ....... 7

2. The Government's Understanding of Supervisory Goodwill's Uses ....... 8

3. The Magnitude of Carteret's Damage Was Foreseeable ....... 10

B. The Breach Caused the Loss of Carteret's Value ....... 12

1. The Substantial Factor Test Applies ....... 12

2. Government Regulators Admitted the Breach Caused Carteret's Seizure ....... 13

3. The Breach Devastated Carteret's Regulatory Capital Profile ....... 16

4. Adjusting *Solely* for the Loss of Goodwill, Carteret Survives ....... 17

*a. Securitization of Residential Loans* ....... 18

*b. Capital-Raising at the AmBase Level: $80-$100 Million* ....... 19

*c. Unlocking the Franchise* ....... 21

5. Adjusting for More of the Breach's Effects Further Proves Carteret Would Have Survived in the Nonbreach World ....... 23

*a. Carteret Was a Success Prior to the Breach* ....... 23

*b. The Breach's Many Harms* ....... 23

*i. Asset Shrink* ....... 25

*ii. Deposit Run-off* ....... 25

*iii. Increased Cost of Funds* ....... 26

*iv. Branch Sales* ....... 27

*v. Ultra-conservative Loan Loss Reserves* ....... 31

*vi. Other Harms* ....... 34

*c. A Conservative Counterfactual* ....... 35

6. The Government Prevented Mitigation ....... 36

*a. Carteret Had Turned a Corner by 1992* ....... 38

*i. Sustainable Profits and Stabilized Assets* ....... 38

*ii. Superior Management* ....... 39

iii. *Situated to Thrive* ....40

b. *The Government Exacerbated the Breach and Prevented Recovery* ....40

i. *Carteret's Seizure was Unreasonable and the Government Admitted that It Prevented Survival* ....40

ii. *Regulatory Risk Prevented Mitigation* ....44

7. The Government's Causation Arguments Are Meritless ....46

a. *Carteret's Exposure to Lending Losses* ....46

b. *Adding Back Goodwill as of the Time of Seizure* ....48

c. *Carteret's Supposed Mitigation* ....49

d. *Professor Saunders Was not a Credible Witness* ....51

C. AmBase Has Proved Expectancy Damages with Reasonable Certainty ....56

1. Carteret's Value in 1989: $251 Million ....57

a. *The AmBase Purchase Price* ....57

b. *Carteret's Market Value Just Prior to the Breach* ....59

2. The Undiscounted Stream of Carteret's Future Earnings in 1989: $782.2 Million ....62

3. Carteret's Current Fair Market Value in a Nonbreach World: $904 65 Million ....65

4. A Jury Verdict Award as an Alternative Measure of Damages ....67

III. PLAINTIFFS SUFFERED SIGNIFICANT WOUNDED BANK DAMAGES ....68

IV. PLAINTIFFS ARE ENTITLED TO RELIANCE DAMAGES ....70

V. AMBASE IS ENTITLED TO RESTITUTION DAMAGES ....72

VI. THE RECEIVERSHIP DEFICIT IS ARTIFICALLY OVERSTATED AND INVALID ....72

A. Section 1821 Does not Bar Review of the Validity of the Receivership Deficit ....73

B. The FDIC Repeatedly Breached its Fiduciary and Statutory Duties Toward Carteret and AmBase ....75

C. The FDIC's Estimates of Post-insolvency Interest Should Be Excluded from the Receivership Deficit ....76

1. If Interest Is Deducted, it Must be Calculated Pursuant to 12 C.F.R. § 360.3(b) ....78

a. *The Interest Rates Used by the FDIC are Contrary to Law* ....79

b. *The Interest Rates Used in the FDIC Calculations Upset Reasonable, Well-Settled Expectations* ....81

c. *The Interest Rates Used in the FDIC Calculations Have no Economic Justification* ....................82

2. If the FDIC's Interest Rates Are Used, its Calculations must be Corrected to Eliminate other Flaws ....................82

D. Congress Overinflated the Receivership Deficit by Breaching the Contracts and by Delaying RTC Funding ....................84

E. The Minority Preference Program Harmed Carteret and AmBase ....................85

1. The Minority Preference Program Violates the Due Process Clause ........85

a. *Congress Failed to Demonstrate a Compelling Interest for the MPP* ....................86

b. *The Minority Preference Program Is not Narrowly Tailored to a Compelling Interest* ....................87

2. The Minority Preference Program harmed Carteret and AmBase ............89

a. *Carteret's Assets Were Frozen to Effectuate the MPP* ....................89

b. *Minority Bids for Carteret were Preferred over Non-minority Bids* ....................91

F. The Tax "Liability" Is a Phantom Liability that Is a Creation of the FDIC's Numerous Errors and that Will Never be Paid by the FDIC ....................91

1. The FDIC Concedes that it Erroneously Overstated Taxable Income as a Result of its Treatment of Federal Financial Assistance ....................94

2. The IRS Will Allow the FDIC to Deduct up to $84 Million as an Interest Expense ....................95

a. *The FDIC Failed to Deduct Interest Actually Paid by Carteret*....96

b. *The FDIC Failed to Deduct Interest Accruing on Loans to Carteret* ....................96

3. The FDIC Failed to Carry Forward the 1992 Tax Return ....................100

G. Penalties for Nonpayment Will Not Be Assessed and thus Are Not a Proper Component of the Receivership Deficit ....................101

H. Interest on the Tax Liability Should Not be Included in the Deficit ....................102

VIII. DAMAGES SHOULD BE PAID TO AMBASE DIRECTLY ....................103

A. Even Discounting the Illegitimacy of the Receivership Deficit, Damages Should Be Paid Directly to AmBase ....................103

B. AmBase Is Entitled to the Legitimate Amount of the Surplus ....................104

C. AmBase Is Entitled to Direct Recovery on Its Derivative Claim ....................107

1. Federal Common Law Supplies the Rule of Recovery for AmBase's Derivative Contract Claim against the United States. ....................107

2. Federal Common Law Supports Direct Recovery when the Corporate Recovery would be Funneled Back to the Wrongdoers..........................109

3. New Jersey Law Supports the Pro Rata Recovery Doctrine....................114

D. AmBase Is Entitled to Direct Recovery Under the Closely-Held Corporation Exception. ..........................................................................................116

E. The Court Can Fashion a Remedy that Protects the Rights of Bona Fide Creditors.................................................................................................117

F. The FDIC's Renewed Challenges to this Court's Jurisdiction are Groundless...119

G. Direct Payment of Damages to AmBase Will Avoid Substantial Questions under the Takings Clause.......................................................................121

H. If the Court Awards Damages to the FDIC, AmBase Will Suffer a Taking .......122

IX. AMBASE IS ENTITLED TO A TAX GROSS-UP ......................................................123

CONCLUSION.....................................................................................................124

APPENDIX: THE EVOLVING LEXICON OF ANGELO VIGNA ........................................125

**TABLE OF AUTHORITIES**

**Cases** **Page**

*Abrams v. Occidental Petroleum Corp.*, No. 67-2858, 1975 U.S. Dist. LEXIS 12715 (S.D.N.Y. Apr. 23, 1975) ....109, 110, 111, 112

*Acceptance Ins. Cos. v. United States*, 503 F.3d 1328 (Fed. Cir. 2007)....121

*Acme Process Equip. Co. v. United States*, 347 F.2d 509 (Ct. Cl. 1965)....72

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)....85

*Allenfield Assocs. v. United States*, 40 Fed. Cl. 471 (Fed. Cl. 1998)....109

*AmBase Corp. v. United States*, 61 Fed. Cl. 794 (2004).... *passim*

*Ambase Corp. v. United States*, 58 Fed. Cl. 32 (Fed. Cl. 2003)....7, 8, 121

*American Capital Corp. v. United States*, 472 F.3d 859 (Fed. Cir. 2006)....32, 71, 77, 105, 106

*American Capital Corp. v. United States*, 66 Fed. Cl. 315 (2005)....32, 70

*Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. (2008)....10

*Aqua-Culture Techs. v. Holly*, 677 So. 2d 171 (Miss. 1996)....111

*Atheron v. FDIC*, 519 U.S. 213 (1997)....107, 108

*Atkinson v. Marquart*, 541 P.2d 556 (Ariz. 1975)....111

*Backus v. Finkelstein*, 23 F.2d 357 (D. Minn. 1927)....111, 112, 114

*Bailey v. Jacobs*, 189 A. 320 (Pa. 1937)....113

*Bailey v. United States*, 341 F.2d 1342 (2003)....74, 77, 106, 122

*Balsamides v. Protameen Chems.*, 734 A.2d 721 (N.J. 1999)....114

*Bank of Am. v. United States*, 67 Fed. Cl. 577 (2005)....20

*Barth v. Barth*, 659 N.E.2d 559 (Ind. 1995)....116

*Belmont Indus., Inc. v. Bechtel Corp.*, 425 F. Supp. 524 (E.D. Pa. 1976)....37

*Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341 (Fed. Cir. 2003)....67, 106

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001)..6, 13, 56, 57, 104

*Boggess v. Hogan*, 410 F. Supp. 433 (N.D. Ill. 1975) ....................111

*Bowker v. Nashua Textile Co*., 169 A.2d 630 (N.H. 1961) ....................113

*Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988) ....................107

*Branch v. FDIC*, 825 F. Supp. 384 (D. Mass. 1993) ....................114, 115, 116, 117

*Brown v. Brown*, 731 A.2d 1212 (N.J. App. Div. 1999) ....................123

*Brown v. Legal Found.*, 538 U.S. 216 (2003)....................123

*Carteret Sav. Bank v. OTS*, No. 91-661 (D.N.J. July 8, 1991) ....................27

*Carteret Sav. Bank, FA v. OTS*, 762 F. Supp. 1159 (D.N.J. 1991)....................4, 24, 26. 34, 43, 44

*Carteret Sav. Bank, FA v. OTS*, 963 F.2d 567 (3d Cir. 1992) ....................50

*Castle v. United States*, 301 F.3d 1328 (Fed. Cir. 2002) ....................121

*Caswell v. Jordan*, 362 S.E.2d 769 (Ga. Ct. App. 1987)....................116

*Cermak v. Babbitt*, 234 F.3d 1356 (Fed. Cir. 2000) ....................121

*Christian v. United States*, 46 Fed. Cl. 793 (2000)....................86

*Citizens Fed. Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007)....................12, 13

*Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507 (2004)....................13

*Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402 (2000) ....................13, 47

*Commercial Fed. Bank, FSB v. United States*, 59 Fed. Cl. (2004)....................13, 47, 67, 338

*Consolidation Coal Co. v. United States*, No. 07-5108, 2008 U.S. LEXIS 12426 (Fed. Cir. June 11, 2008) ....................122

*Crites, Inc. v. Prudential Ins. Co.*, 322 U.S. 408 (1944) ....................75

*Crosby v. Beam*, 548 N.E.2d 217 (Ohio 1989) ....................116, 117

*Derouen v. Murray*, 604 So. 2d 1086 (Miss. 1992)....................16

*Dill v. Johnston*, 179 P. 608 (Okla. 1919) ....................111, 113

*Downey v. Vernitron Corp.*, 559 F. Supp. 1081 (D. Mass. 1982) ....................111

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)....................12, 62

*Energy Capital Corp. v. United States*, 47 Fed. Cl. 382 (2000), *aff'd in part and rev'd*

*in part*, 302 F.3d 1314 (Fed. Cir. 2002) ....................12

*Fibelok, Inc. v. LMS Enterps., Inc.*, 976 F.2d 958 (5th Cir. 1992) ....................37

*Fifth Third Bank v. United States*, 518 F.3d 1368 (Fed. Cir. 2008) ....................52

*First Fed. Sav. & Loan Ass'n v. United States*, 76 Fed. Cl. 106 (2007)....................13

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1293 (Fed. Cir. 1999) ....................108, 122

*Geltman v. Levy*, 207 N.Y.S.2d 366 (N.Y. App. 1960) ....................114

*General Elec. Co. v. Bucyrus-Erie Co.*, 563 F. Supp. 970 (S.D.N.Y. 1983) ....................109, 111

*Glendale Fed. Bank, FSB v. United States*, 54 Fed. Cl. 8 (2002), *aff'd*, 378 F.3d 1308 (Fed. Cir. 2004) ....................68, 70

*Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308 (Fed. Cir. 2004) ....................56, 68, 69

*Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001) .................... *passim*

*Glendale Fed. Bank, FSB v. United States*, 43 Fed. Cl. 390 (1999), *aff'd in part and vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001) ....................16, 25, 26, 68

*Globe Sav. Bank , F.S.B. v. United States*, 65 Fed. Cl. 330 (2005), *aff'd in part and vacated in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006)....................7, 67

*Golden Pac. Bancorp v. FDIC*, 375 F.3d 196 (2d Cir. 2004) ....................75

*Granite Mgmt. Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005) ....................70

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ....................85, 86

*Hall v. Staha*, 858 S.W.2d 672 (Ark. 1993)....................111, 112

*Hall v. United States*, 69 Fed. Cl. 51 (2005) ....................49, 60, 112

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed. Cir. 2004) ....................71

*Holland v. United States*, 75 Fed. Cl. 483 (2007)....................13

*Home Sav. of Am., FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)....................13, 47, 69, 123

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ....................69

*In re PSE & G S'holder Litig.*, 801 A.2d 295 (N.J. 2002) ....................110, 111, 115

*In re Sharkey*, 272 B.R. 574 (Bankr. D.N.J. 2001)....................116, 119

*Interlake Porsche + Audi v. Blackburn*, 728 P.2d 597 (Wash. Ct. App. 1986), *reh'g denied*, 107 Wn.2d 1022 (Wash. 1987)..........118

*J.A. Croson Co.*, 488 U.S. 469 (1989)..........87, 88

*James v. James*, 768 So. 2d 356 (Ala. 2000)..........113, 118

*Jannes v. Microwave Commc'n, Inc*. 385 F. Supp. 759 (N.D. Ill. 1974)..........111

*Johnson v. American Gen. Ins. Co.*, 296 F. Supp. 802 (D.D.C. 1969)..........111

*Johnson v. Gilbert*, 621 P.2d 916 (Az. Ct. App.1980)..........116

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)..........108

*Kirk v. Denver Publ'g Co.*, 818 P.2d 262 (Colo. 1991)..........123

*Kirk v. First Nat'l Bank of Columbus*, 439 F. Supp. 1141 (M.D. Ga. 1977)..........116

*Koby v. United States*, 53 Fed. Cl. 493 (2002)..........37, 74, 108

*Kroese v. General Steel Castings Corp.*, 179 F.2d 760 (3d Cir. 1950)..........110

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001)..........7

*LaSalle Talman v. United States*, 462 F.3d 1331 (Fed. Cir. 2006)..........123

*Lawson Mardon Wheaton v. Smith*, 734 A.2d 738 (N.J. 1999)..........114

*Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234 (Fed. Cir. 2007)..........107, 108

*Longshore v. United States*, 77 F.3d 440 (Fed. Cir. 1996)..........123

*Lynch v. Patterson*, 701 P.2d 1126 (Wyo. 1985)..........111, 112

*Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86 (1st Cir. 1988)..........111, 113

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003)..........120, 121

*Massachusetts* v. *United States*, 435 U.S. 444 (1978)..........123

*Michigan Elec. Employees Pension Fund v. Encompass Elec. & Data, Inc.*, No. 07-140, 2008 U.S. Dist. LEXIS 40241 (W.D. Mich., May 19, 2008)..........108

*Miller v. Ruth's of North Carolina*, Inc., 322 S.E.2d 557 (N.C. 1984)..........116

*Montgomery v. Etreppid Techs., LLC*, No. 06-00056, 2008 U.S. Dist. LEXIS 35561 (D. Nev. Apr. 18, 2008)..........108

*NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871 (N.J. 2006) ............................................111, 115

*NLRB v. Catholic Bishop*, 440 U.S. 490 (1979) ...............................................................121

*Norte & Co. v. Huffines*, 288 F. Supp. 855 (S.D.N.Y. 1968) ..................................................114

*Nyquist v. Randall*, 819 F.2d 1014 (11th Cir. 1987)..............................................................37

*O'Melveny & Meyers v. FDIC*, 512 U.S. 79 (1994) ..........................................................107, 108

*Old Stone Corp. v. United States*, 63 Fed. Cl. 65 (2004), *aff'd in part and rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006) ...............................................................13, 39, 47, 52

*Perlman v. Feldman*, 219 F.2d 173 (2d. Cir. 1955)...............................................................113

*Phillips v. Wash. Legal Found.*, 524 U.S. 156 (1998), *dismissed on other grounds sub nom. Washington Legal Found. v. Texas Equal Access to Justice Found.*, 86 F. Supp. 2d 617 (W.D. Tex. 2000).........................................................................................123

*Prudential Ins. Co. v. United States*, 801 F.2d 1295 (Fed. Cir. 1986)................................107, 109

*Rankin v. Frebank* Co., 121 Cal. Rptr. 348 (Cal. Ct. App. 1975)..............................................118

*Reich v. Collins*, 513 U.S. 106 (1994) ..........................................................................73

*Richards v. Bryan*, 879 P.2d 638 (Kan. App. 1994) ...............................................................116

*Rothe Dev. Corp. v. United States Dep't of Def.*, 262 F.3d 1306 (Fed. Cir. 2001) ..........85, 86, 87

*Sale v. Ambler*, 6 A. 2d 519 (Pa. 1939)..........................................................................114

*Samia v. Central Oil Co.*, 158 N.E.2d 469 (Mass. 1969) .........................................................111

*Sartin v. United States*, 5 Cl. Ct. 172 (1984) ..................................................................99

*Schur v. Salzman*, 377 N.Y.S.2d 82 (N.Y. App. Div. 1975) .....................................................113

*Seaboard Lumber Co. v. United States*, 15 Cl. Ct. 366 (Cl. Ct. 1988)......................................107

*Shaw v. Hunt*, 517 U.S. 899 (1996) ..............................................................................86

*Slattery v. United States*, 69 Fed. Cl. 573 (2006) ........................................................ *passim*

*Smith v. Price Dev. Co.*, 125 P.3d 945 (Utah 2005) ..............................................................123

*Southern California Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319 13 (Fed. Cir. 2005) ..........................................................................................13

*Sovereign Bank v. Schwab*, 414 F.3d 450 (3d Cir. 2005) .........................................................75

*Steelman v. Mallory*, 110 Idaho 510 (1986) ....................116

*Strasenburgh v. Straubmuller*, 683 A.2d 818 (N.J. 1996)....................115

*Suess v. United States*, 33 Fed. Cl. 89 (1995) ....................105

*Suess v. United States*, 52 Fed. Cl. 221 (2002) ....................49, 57, 58, 62

*Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank*, 611 F.2d 465 (3d Cir. 1979) ........27, 74

*United States v. Burton Coal Co.*, 273 U.S. 337 (1927) ....................70

*United States v. McDonald & Eide, Inc.*, 865 F.2d 73 (3d Cir. 1989)....................108

*United States v. Sperry Corp.*, 493 U.S. 52 (1989) ....................123

*United States v. Virginia*, 518 U.S. 515 (1996) ....................86

*Vernon J. Rockler & Co. v. Minneapolis Shareholders Co.*, 425 F. Supp. 145 (D. Minn. 1977) ....................112

*Watson v. Button*, 235 F.2d 235 (9th Cir. 1956) ....................116

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) ....................77, 122

*Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005)....................71

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544 (2003) ....................13

*Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) ....................12

*Whitney Benefits, Inc. v. United States*, 25 Cl. Ct. 232 (1992) ....................6, 105, 106, 120

*United States v. Winstar Corp.*, 518 U.S. 839 (U.S. 1996)....................9, 10, 23

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ....................86

*Zouck v. Antlers Ranch, Inc.*, No. 94-8032, 1996 U.S. App. LEXIS 10226 (10th Cir. Apr. 27, 1996) ....................112

**<u>Other</u>**

5 U.S.C. § 701 ....................120

12 U.S.C. § 1441a(w)(17)(A) ....................88

12 U.S.C. § 1441a(w)(17)(E)(ii)....................88

12 U.S.C. § 1811....................88

12 U.S.C. § 1813(j) ....80
12 U.S.C. § 1821 ....73, 80, 122
12 U.S.C. § 1821(d)(6) ....120
12 U.S.C. § 1821(d)(11) ....101
12 U.S.C. § 1821(d)(11)(B) ....105, 107
12 U.S.C. § 1821(g)(2) ....82
12 U.S.C. § 1821(j) ....80, 107
12 U.S.C. § 1821(d)(13)(E)(i) ....75
12 U.S.C. § 1821(d)(13)(E)(ii) ....75
12 U.S.C. § 1821(d)(13)(E)(iv) ....88
26 U.S.C. § 448 ....101
26 U.S.C. § 461(h)(4) ....98
26 U.S.C. § 7507(b) ....93
26 U.S.C. § 597 ....94
26 U.S.C. § 6621(d) ....84
12 C.F.R. § 360.3 ....78, 101
12 C.F.R. § 360.3(b) ....79
12 C.F.R. § 563.13 ....10
12 C.F.R. § 1630.2 ....88

26 C.F.R. § 1.446-1(e)(2)(i) ....99
26 C.F.R. § 1.597-7(b) ....94
139 CONG. REC. H10,162, 10,175-76 (1993) ....86
139 CONG. REC. H10,897, 10,899 (1993) ....86
RESTATEMENT (SECOND) OF CONTRACTS § 344(b) ....70

RESTATEMENT (SECOND) OF CONTRACTS § 344(c) ....................72

RESTATEMENT (SECOND) OF CONTRACTS § 347 ....................68

RESTATEMENT (SECOND) OF CONTRACTS § 349 ....................71

RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981)....................7, 104

RESTATEMENT (SECOND) OF TRUSTS § 170(1)....................75

RESTATEMENT (THIRD) OF TRUSTS § 5 ....................75

LAWS OF CORPORATIONS § 373 (3d ed.1983) ....................110, 114

13 FLETCHER CYC. CORP. § 6028 (2007) ....................110, 112, 114

2 COX, HAZEN & O'NEAL, CORPORATIONS §15.4 (2002)....................109, 112, 114

24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:2 (4th ed. 2002)....................68

5 Arthur L. Corbin, CORBIN ON CONTRACTS § 1039 (1964) ....................37, 74

AMERICAN LAW INSTITUTE, 2 PRINCIPLES OF CORPORATE GOVERNANCE §7.01 (1992) ....................115, 116, 117, 119

Douglas G. Baird, *The Uneasy Case for Corporate Reorganizations*, 15 J. LEGAL STUD. 127 (1986)....................90

DEMOTT, SHAREHOLDER DERIV. ACTION L. & PRAC. § 7:6 (2007) ....................110, 112

H. HENN & ALEXANDER, LAWS OF CORPORATIONS § 373 (3d ed. 1983)....................110, 114

Note, *Individual Pro Rata Recovery in Stockholders' Derivative Suits*, 69 HARV. L. REV. 1314 (1956)....................110

John A. Gebauer, Annotation, *Action in Own Name by Shareholder of Closely Held Corporation*, 10 A.L.R. 6th 293, § 18 (2006) ....................110

MAGNUSON, SHAREHOLDER LIT. § 9:33 (2007)....................110

Revenue Ruling 70-367, 1970-2 C.B. 37 (1970)....................99

Treas. Reg. § 1.597-4(f) *Individual Pro Rata Recovery in Stockholders' Derivative Suits*, 69 HARV. L. REV. 1314 (1956)....................110

## INTRODUCTION

This Court and the Federal Circuit have noted the government's penchant for relitigating issues that have long since been decided. That tactic remains in full force in this case with claims by the government's expert, Professor Saunders, that supervisory goodwill is worthless and that it was irresponsible to leverage goodwill. But in this, the final *Winstar* case, the government has a new tactic: the wholesale repudiation of the sworn testimony of its own witnesses. Virtually every important argument advanced by Plaintiffs AmBase Corporation and Carteret Bancorp, Inc. (AmBase) is supported by sworn testimony of government officials and the government's own hand-picked expert, Professor Roy Smith. Thus, to rule in Ambase's favor, this Court need only credit the testimony of the government's own witnesses.

Professor Smith acknowledged that "[s]upervisory goodwill for Carteret was *akin to a license to continue to do business* since, without goodwill, Carteret would not meet its capital requirement." Tr. 3038:16-20 (emphasis added). Similarly, on the key issue of causation, the government regulators uniformly admitted that the "[loss of $180 million of regulatory capital] certainly was a *very severe consequence* of [FIRREA]." Vigna Dep. 80:6-14 (JX 1 at 589) (emphasis added). As the RTC put it, "CSB's regulatory capital levels were significantly damaged by the change in the banking laws in 1989." PX 4002 (Conservatorship Plan) at C-AM-A-0400815.

Given these facts, it should come as no surprise that the government regulators also made the critical admission that the breach caused Carteret's failure: William Day of the FDIC testified that the breach was a "significant factor" in Carteret's demise, Dep. 69:1-6 (JX 1 at 47); Russell Meyer of the OTS testified "[t]hey could have survived" in a non-breach world, Dep. 42:24-43:11 (JX 1 at 369). The third in command in the OTS northeast region, Michael Simone, testified that it was "very likely" that Carteret would have been able to operate beyond December 4,

1992, if it had had an additional $140 million in capital. Dep. 105:1-21 (JX 1 at 500-01). At the time of his deposition—when he was the Director of the OTS Northeast Region—Robert Albanese answered "no" when asked if Carteret would have been seized if it satisfied its tangible capital requirement. Dep. 160:13-17 (JX 1 at 13). The Regional Director of OTS at the time of Carteret's seizure, Angelo Vigna, stated unequivocally "no" when asked, under oath: "If Carteret had . . . tangible capital, for example, if Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized?" Dep. 158:6-11 (JX 1 at 599). Similarly, he again answered simply "no" when asked: "If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized?" *Id.* at 159:18-159:25 (JX 1 at 600). To be sure, at trial, Messrs. Albanese and Vigna attempted pirouettes worthy of Baryshnikov. But they offered no credible explanation for their recantations of their deposition testimony and, as demonstrated during their trial testimony, their recollection of events was much fresher in 1999, during their depositions.

Professor Smith put it succinctly when he stated that after the breach Carteret was "in jail." Tr. 3009:20-23; Dep. 282:22 (JX 1 at 527). The consequences of Carteret's prison term included a multi-billion dollar asset shrink for which the breach was "a principal reason." R. Smith Dep. 135:9-18 (JX 1 at 515). Mr. Zamorski, former deputy regional director for the FDIC, explained the consequences of this asset shrink: "[t]he concern was that they had bolstered equity by selling off some of their branches . . . . [but] that's only a limited means by which you can increase capital, because as you do that on a longer-term basis, you diminish the earning capacity of the franchise. And so that might stem losses on a short-term basis, but longer-term, it diminishes the earnings capacity of the bank." Tr. 2137:7-20.

In the aftermath of the breach, the OTS acknowledged that "Carteret . . . 'bidded up' its CD rates above its local competitors to solicit steady deposits inflows." DX 201 (OTS Draft Memo 3/8/91) at WOP3260183 (emphasis added). The highest-ranking OTS official called by the government as a witness at trial testified that Carteret was "paying a lot on their deposits . . . a premium in the market," and "[a]t one time . . . maybe the talk was 100 plus basis points over the market place." Tr. 2518:17-22 (Downey).

The need for capital also drove Carteret to, as Mr. Vigna put it, take "a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally." Dep. 109:25-110:7 (JX 1 at 592). *See also* Tr. 2221:10-2222:10. Mr. Vigna explained the role of discretion in setting reserves by stating that "[w]hen you're looking at these assets, there's sometimes a range of appropriate reserves, you know, 15 to 20 percent," and that within this range, Carteret was "taking 20 percent." Tr. 2273:7-10. On a billion dollar portfolio, this 5 percent range of reasonableness amounts to $50 million.

Government regulators made clear that, in the absence of a breach, Carteret could have raised a smaller amount of capital than the $200 million needed after the breach. Mr. Albanese explained that "if they had a smaller hole to fill," it "goes without saying" that "somebody [was] more likely to step in." Dep. 160:5-12 (JX 1 at 13). Carteret could have raised this capital by unlocking some of its considerable franchise value in its branches and mortgage operations. Indeed, witness after witness confirmed that "Carteret's franchise was extremely valuable," due to the "longstanding nature of its relationships with its customers," its "very good branch location," its "consistency" in customer support, and its "loyal customer base." Griffin Dep. 95:11-96:9 (JX 1 at 231). Alternatively, AmBase could have raised capital and infused it into Carteret.

Even the government's own investment banking expert testified that AmBase "might find investors" for this type of transaction. R. Smith Dep. 509:1-14 (JX 1 at 544).

In all events, even in the breach-affected world, the government regulators admitted that by 1992, Carteret "had turned a corner." Meyer Dep. 234:18-22 (JX 1 at 380). As Professor Smith explained, "the financial markets recognized that the worst was over and, indeed, improved real estate prices began making the recovery process much easier." Tr. 3096:13-18. And Carteret's management was well-suited to capitalize on these trends. Mr. Vigna described the Bianco team as "very strong," "exceptional," "outstanding," Tr. 2219:2-12, and acknowledged that "in all [his] 32 years as a thrift regulator, [he] had not seen a stronger management team particularly with respect to workouts," Tr. 2269:22-2270:1.

Unsurprisingly, Mr. Vigna concluded that "[t]here was **<u>no risk</u>** to the fund or the taxpayers by allowing this institution to see if they could raise this capital." Dep. 104:13-105:6 (JX 1 at 591-92) (emphases added). Thus, Mr. Albanese admitted in late 1992: "We strongly recommended that more time be given to Carteret's management because there was still considerable interest being expressed by investors in the institution." PX 2819. But the OTS in Washington rejected this advice, stating: "Although other investors are looking at the thrift, staff are prepared to transfer it as early as November 20." PX 4887 at 1. Mr. Albanese candidly lamented that it was "**foolish to rush a transfer**" in these circumstances. PX 4889 (R. Albanese to A. Vigna, 11/27/92) (emphasis added). And OTS examiner Russell Meyer explained the truth of the matter: the government "elected to use the shotgun approach and take everybody out." Dep. 181:13-19 (JX 1 at 378). It is little wonder that Judge Bissell concluded a year before seizure, that the OTS's conduct towards Carteret represented "agency discretion gone haywire." *Carteret Savings Bank, F.A. v. OTS*, 762 F. Supp. 1159, 1177 (D.N.J. 1991). In any event, this evidence (and

much more like it) that the decision to seize the **breach-affected** Carteret in the **breach-affected** world was not only far from an open-and-shut case but was in fact unreasonable only makes more compelling the conclusion that is compelling enough on its own—namely, that there is no way that Carteret would have been seized in a world in which the government actually **honored** its regulatory capital promises.

The government's "shotgun approach" also prevented Carteret's efforts to raise capital by creating significant regulatory risk. As Professor Smith acknowledged, "[n]othing affects finance and business more than the government." Tr. 3085:15-23. Specifically, investors at the time were concerned that "Congress is likely to re-address the [S&L] problem in 1991 and may well decide to tax and punish the thrifts even further." Tr. 3083:10-16 (R. Smith). According to Mr. O'Rourke these "were legitimate concerns, given the past." Dep. 40:11-22 (JX 1 at 449). Mr. Simone acknowledged that "one of the reasons [the investors] are giving for pulling out is the regulatory risk." Dep. 117:18-118:3 (JX 1 at 502).

As for the value of Carteret, which constitutes the essential building block for the primary damages sought by AmBase, Professor Smith acknowledged that the $266 million paid in 1988 represented the stock market price plus a control premium that was "within the realm of reason." Tr. 2927:1-18; 3050:10-12. Professor Smith also made clear that the losses sustained by Carteret in 1990-91 were not known in 1989. Tr. 3077:12-16, 3077:21-23. Carteret's regulators were of the same opinion. For example, FDIC Regional Director Zamorski testified that the commercial loan losses "didn't become really apparent, I think, until probably near the fall of 1990." Tr. 2066:21-23.

Finally, the entirety of the so-called receivership deficit is bogus, as revealed by the testimony of FDIC witneses, who admitted that the tax liability is "artificially created," Vordtriede

Dep. 388:2-18 (JX 1 at 696), and the interest claimed is more than is necessary to compensate the government. This phony receivership deficit would be of no moment if it were not being advanced as a means of funneling contract damages from one government coffer to another. This sleight-of-hand would, if accomplished, amount to a taking. That result need not obtain, however, because this Court can and should award damages directly to AmBase either under the logic of *Whitney Benefits, Inc. v. United States*, 25 Cl. Ct. 232 (1992), or established principles allowing damages to flow directly to shareholders where, as here, awarding damages to the corporation would result in damages flowing directly back to the wrongdoers. And, of course, because Carteret would have survived in a non-breach world, the entire receivership deficit is itself a creation of the breach.

In the face of this evidence, Professor Saunders opined that Carteret would have been seized absent the breach. He reached this conclusion by simply ignoring evidence inconsistent with his foreordained conclusions. Indeed, there was never a doubt as to what conclusions he would reach—for, in his opinion, every award of damages to every *Winstar* plaintiff has been an unjustified transfer of wealth. Tr. 3694:13-18. AmBase respectfully submits that the Court should credit the testimony of Mr. Bianco, Professor Calomiris, and the government regulators, not the views of an expert who takes issue with the very economic premises of *Winstar* contracts.

## I. PLAINTIFFS ARE ENTITLED TO THE VALUE OF THE THRIFT

"Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

### A. <u>The Loss of Carteret's Value Was Reasonably Foreseeable</u>

" 'Loss may be foreseeable as a probable result of a breach because it follows from the

breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.' " *Landmark Land Co. v. United States*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS (hereinafter RESTATEMENT) § 351(2)); *see also Globe Sav. Bank , F.S.B. v. United States*, 65 Fed. Cl. 330, 347 (2005), *aff'd in part and vacated in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006). "Here, the question is whether regulators foresaw, or should have foreseen, at the time of contract formation, that breaching the 'goodwill' portion of their contract with [Carteret] would have resulted in a significant or total loss of [Carteret's] net worth or market value." *Slattery v. United States*, 69 Fed. Cl. 573, 582.

**1. <u>The Logic of the Contracts and the Government's Viability Analyses</u>**

The very logic of the contracts in this case answers the question of foreseeability. "Prior to the merger, Carteret operated relatively free of supervisory concern and had operating ratios that were generally more favorable than those of like-sized institutions." *AmBase*, 58 Fed. Cl. 32, 45 (2003) (internal quotations omitted); Proposed Findings of Fact (FF) ¶¶ 1-2; PX 2433 (Mem. from H. Beesley, 9/30/82) at OAM0060016. *Cf. Slattery*, 69 Fed. Cl. at 582. Barton and Delray, on the other hand, "were thrifts in financial dire straights," *AmBase*, 58 Fed. Cl. at 45, and Carteret's absorption of their liabilities absent an agreement on supervisory goodwill would have left the resulting institution immediately and massively insolvent—to the tune of a negative net worth of $212 million, FF ¶ 7 & n.6. Consequently, the "goodwill provision . . . made the deal possible," and the "regulators clearly understood this" at the time. *Slattery*, 69 Fed. Cl. at 582. In the words of Brent Beesley, the Director of the FSLIC in 1982: "it's clear that absent the use of purchase accounting that neither . . . Carteret [n]or the FSLIC, would have wanted to do this transaction . . . because Carteret would have immediately had a negative net worth even on a

book basis." Dep. 45:3-10 (JX 1 at 16). Similarly, this Court has previously found that "Carteret's request to account for the resulting goodwill in a particular fashion," in the 1986 mergers, "was one of several important motivations surrounding the transactions." *AmBase*, 58 Fed. Cl. at 49. Indeed, were supervisory goodwill not counted in 1986, Carteret would have been significantly out of capital compliance immediately upon acquiring First Federal and Mountain Security. *See* FF ¶¶ 4, 8.

Thus, the government understood, at the time of the acquisitions, that Carteret could not survive without the use of the supervisory goodwill. Indeed, before approving the acquisitions, the government memorialized its grasp of this simple concept through viability analyses.[1] The purpose of these analyses, as Director Beesley explained, "was to make sure that the resulting institution would be healthy and would be able to stay in compliance with its minimum capital requirements." Dep. 22:22-23:2 (JX 1 at 15). Absent the use of supervisory goodwill, Carteret could not have satisfied this requirement, either in 1982 or 1986. The FSLIC's conclusions of viability, undergirded as they were by the inclusion of goodwill, show that the government understood that the exclusion of goodwill would render Carteret nonviable, and subject to seizure.

**2. <u>The Government's Understanding of Supervisory Goodwill's Uses</u>**

The government also understood that thrifts make money by leveraging their capital to support expanding their earning assets, creating a positive interest spread in the process. As Director Beesley testified: "[W]ith capital you have the option of leveraging and the expectation and hope of a positive spread." Dep. 63:5-7 (JX 1 at 19).[2] Both Carteret and the government

---

[1] *See* PX 2433 (Mem. from H. B. Beesley, 9/30/82), PX 2474 (Mem. from C. Fiol, 5/30/86), PX 2484 (Mem. from T. Connell, 6/5/86); FF ¶¶ 6-9.

[2] The FSLIC Acting Director in 1986, Thurman Connell, similarly affirmed that "excess capital and liquidity [were] things [he] felt were important to allow the thrift to . . . withstand any adverse economic terms and to grow their business." Dep. 120:7-11 (JX 1 at 26); *see also id.* at

understood, therefore, that the supervisory goodwill created by the Carteret mergers was extremely valuable because it gave Carteret the opportunity to profitably leverage that regulatory capital. *See United States v. Winstar Corp.*, 518 U.S. 839, 851 (1996) ("[T]he treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)."). Indeed, the very theory behind the supervisory goodwill device, as affirmed by government regulators in their testimony, was that it would provide the capital and time cushions necessary for healthy thrifts to eliminate the debt of the acquired, failing thrifts. FF ¶ 8-10, 156.[3] It was perfectly foreseeable, then, that yanking the supervisory goodwill rug out from under Carteret would hinder the thrift's ability to leverage its assets and could cause Carteret to fall out of capital compliance and be seized—thereby "lead[ing] to the loss of [Carteret's] net worth or market value." *Slattery*, 69 Fed. Cl. at 582.

As Director Connell testified, if the amortization period for goodwill were shortened in the fifth or sixth year from forty years to one year, "[i]t would have a very dramatic impact . . . it could have a pretty dramatic impact on what the viability of the institution would be." Dep. 85:7-86:4 (JX 1 at 25). Accordingly, the government cannot credibly dispute that it was reasonably foreseeable—indeed, that the government actually foresaw—that Carteret would fail if the government breached its contract.[4]

---

392:12-22 (affirming that "it would have been our expectation" that supervisory goodwill "would have been leveraged toward profit-making").

[3] *See* Beesley Dep. 45:24-46:1 (JX 1 at 16) ("Carteret would be able to take this supervisory goodwill and leverage it in an attempt to make profits and fill the tangible hole"); *id.* at 32:22-25 (JX 1 at 15).

[4] Judge Block aptly described the relationship between the government's goodwill promises, thrift leverage, and profitability in finding that foreseeability had been established in *Anchor*:

> [O]n several occasions the Federal Circuit and this court have recognized the ba-

**3. The Magnitude of Carteret's Damage was Foreseeable**

The government has argued that damages of the magnitude requested by AmBase were not foreseeable, either at the time of contract formation or at the time of the breach. As for foreseeability at the time of contract formation, the economics of the 1982 and 1986 mergers belie this contention. The government foresaw that Carteret was very likely to grow by leveraging the supervisory goodwill (indeed, the government counted on such growth). Therefore, the government knew that a breach could cause a failure of a much larger and more valuable bank than the one it contracted with in 1982 and 1986.

Indeed, the government was aware of several data points that made it reasonably foreseeable that Carteret would generate hundreds of millions in profits under the contract. First, the 1982 acquisitions left Carteret with a tangible capital deficit of approximately $212 million and total liabilities of approximately $3.3 billion. Yet, the government approved the deal only upon a finding of future viability. FF ¶ **7**. A prediction of Carteret's future viability had to be based on the premise that the thrift would earn enough profits to erase that debt and remain in capital compliance over the course of the goodwill amortization period. *See Anchor*, 81 Fed. Cl. at 78. The capital rules then in effect required Carteret to maintain capital net worth of three percent of total liabilities. *See* 12 C.F.R. 563.13 (1983); 47 Fed. Reg. 10511 (Mar. 11, 1982); *Winstar*, 518 U.S. 839, 845-46. Accordingly, the government predicted—that is, foresaw—that Carteret would earn *at least* $302 million after acquiring Barton and Delray, FF ¶ 7—enough to fill the

---

> sic equation embodied in the supervisory goodwill contracts in which, in the ideal environment, supervisory goodwill allowed increased thrift assets. Additional assets, in turn, enabled increased thrift profits, which were ultimately essential to replace the amortizing goodwill as regulatory capital. Given this circular interdependence, it was eminently foreseeable that a breach of the supervisory goodwill contacts would cause an acquiring thrift to sacrifice assets and forego the very profit opportunity that made the contracts appealing in the first place.

*Anchor Savings Bank, FSB v. United States,* 81 Fed. Cl. 1, 78 (2008).

hole and be in capital compliance at the end of the goodwill amortization. And this assumes *no* growth, even though the FSLIC expressly premised its viability conclusion on Carteret's "historical growth." PX 2433 at OAM0060028.

Second, aside from historical growth, FSLIC also based its viability conclusion upon the fact that Carteret had turned profits of $4.6 million in the last six months of 1982. *Id.* Assuming *no* growth, that translates into $368 million in profits over forty years. The same logic holds for the 1986 merger, but with even greater force. By 1986, Carteret was doing *exactly* what the government had predicted in 1982—turning substantial profits and erasing the debt it had assumed in the Barton and Delray acquisitions. *See* PX 9004. Indeed, in 1986, Carteret had earnings of $46.1 million, which translates into $1 billion of profits over the 25-year amortization period. *Id.*; PX 5 at AMB013858, 77. Thus, in 1986, the government had every reason to believe that Carteret would earn substantial profits if the contracts were honored. FF ¶ 8.

Third, Professor Saunders testified that for thrifts, "historically, over long periods of time, data shows [a return on assets] of about one percent has been . . . achieved on average." Tr. 3874:25-3875:3. In 1982, Carteret had assets of approximately $3 billion. DX 8000A (Smith Rpt.) ex. 3 at 1. A return of one percent per year on those assets—$30 million—translates into $1.2 billion over the 40-year amortization period of the contract.

Fourth, the government was well aware at the time of the 1982 acquisitions that it was reaping a huge benefit—namely, that it was avoiding a $187.4 million liability at a time when carrying costs were approximately between 12% and 15%, or between $22.5 and $28.1 million per year.[5] Over forty years, that totals between $900 million and $1.1 billion and suggests the

[5] *See* PX 2702A (Calomiris 5/07 Rpt.) at 10 n.15; PX 9102; Tr. 1050:1-1053:21 (Calomiris); PX 6014 (reporting 30-year Treasury bill rates of 15.2% on September 29, 1981, 13.81% on March 30, 1982, 14.11% on June 29, 1982, and 11.79% on September 30, 1982).

government knew quite well the value of the obligation it was putting off on Carteret specifically through its contractual promises regarding the capital treatment of supervisory goodwill. *See* PX 9102; Tr. 1053:22-1054:4 (Calomiris).

Fifth, Carteret's acquisition of the four failing thrifts allowed the government to avoid a total liquidation cost of $187.4 million. *See* PX 9102; Tr. 1050:1-21. Accounting for debt service on that value through 2007—by bringing the value forward using a one-year constant treasury yield—shows that the government saved $709 million.

**B. <u>The Breach Caused the Loss of Carteret's Value</u>**

**1. <u>The Substantial Factor Test Applies</u>**

AmBase must demonstrate that the government's breach caused the seizure of Carteret and the attendant loss of the thrift's value. *Slattery*, 69 Fed. Cl. at 581. The Federal Circuit has recognized both a "substantial factor" and a "but for" standard of causation. *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1319 (Fed. Cir. 2007). *Citizens* established that the selection of the appropriate standard "depends upon the facts of the particular case and lies largely within the trial court's discretion." *Id*. While the evidence establishes causation under either standard, in *Slattery* this Court applied the substantial factor test, *see* 69 Fed. Cl. at 582 (citing *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 159-60 (2002)), and that approach is equally appropriate here.

This Court's prior decisions in *Energy Capital* and *Citizens* establish that the substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages. As explained in *Energy Capital*, "[b]ecause often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that the defendant's breach was a substantial factor in causing the injury." *Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000), *aff'd in part and rev'd in part*, 302 F.3d 1314 (Fed. Cir. 2002) (internal

quotations omitted); *accord Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 514-16 (2004). This rationale especially applies in the *Winstar* cases because one of the purposes of regulatory capital is to help cushion financial institutions from the effects of recessions and many other nonbreach factors often cited by the government.[6] And in *Citizens*, the Federal Circuit acknowledged that this "standard has been adopted in numerous *Winstar*-related cases before other judges on the Court." *Citizens*, 474 F.3d at 1319-20 (quoting *Citizens,* 59 Fed. Cl. at 515).[7]

Ultimately, however, the question of which causation standard is appropriate here is of purely academic interest. The Court should find that AmBase has proven that its damages were caused by the breach under either standard.

**2. <u>Government Regulators Admitted that the Breach Caused Carteret's Seizure</u>**

Government regulators repeatedly confirmed that Carteret would have survived absent the breach. FF ¶ 65. For example, Russell Meyer, an OTS examiner, testified as follows:

> Q. Did you think that the new capital rules in FIRREA caused a lot of institutions to fail?
> A. A lot—I know that they caused institutions to fail, yes.
> Q. Do you recall thinking that it caused Carteret to fail?
> A. Yes.
> Q. Because of its disallowance of the ability to use goodwill towards capital?
> A. It was one of the things, yes. They could have survived, I thought.

---

[6] *See, e.g., Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Commercial Fed. Bank, FSB*, 59 Fed. Cl. 338, 347 (2004), *aff'd*, 125 Fed. Appx. 1013 (Fed. Cir. 2005); *Coast Fed. Bank, FSB v. United States,* 48 Fed. Cl. 402, 425-26 (2000); *Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 80-81 (2004), *aff'd in part and rev'd in part*, 450 F.3d 1360 (Fed. Cir. 2006).

[7] *See Citizens*, 59 Fed. Cl. at 514-15 (collecting cases); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 553 (2003) (collecting cases); *Coast*, 48 Fed. Cl. at 435. For decisions subsequent to *Citizens*, *see First Fed. Sav. & Loan Ass'n v. United States*, 76 Fed. Cl. 106, 113 (2007); *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007). The Federal Circuit has also indicated its approval of trial courts' use of the substantial factor standard in other *Winstar* cases, including *Southern California Federal Savings & Loan Association v. United States*, 422 F.3d 1319 (Fed. Cir. 2005), and *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

Dep. 13:4-7, 42:24-43:11 (JX 1 at 368-69); *see also id.* at 76:8-18 (JX 1 at 370). Likewise, Mr. Meyer's superior, Mr. Simone, was also an OTS official at the time of his deposition and testified that it was "likely" that Carteret would not have been seized if the thrift had positive tangible capital of $80 million. Dep. 19:9-11, 105:1-21 (JX 1 at 498, 500-01).[8]

Mr. Simone's superior, Mr. Albanese, went even further. While serving as Regional Director of OTS he testified that Carteret would not have been seized if it had met its tangible capital requirement. Dep. 160:13-17, 161:6-15 (JX 1 at 13-14).[9] Moreover, at the time of his deposition, Mr. Alabanese answered "no" when asked if "it was likely after enactment of FDICIA . . . that you may have closed an institution that actually satisfied its tangible capital requirement." Dep. 47:13-17 (JX 1 at 3). At trial, Mr. Albanese did not retreat from this exchange. And Mr. Albanese's superior and the OTS Regional Director at the time of Carteret's seizure, Mr. Vigna,

[8] Indeed, just a few years after Carteret's seizure, Mr. Simone indicated that even in the breach-affected world, "had [Carteret] approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing." PX 5331 (Mem. from R. Seiger to File, re OTS conclusions regarding Carteret failure, 2/15/95). If Carteret would have survived in the breach-affected world, there is no question it would have survived with the use of another $150 million in capital.

[9] At trial, Mr. Albanese was asked if he disagreed with this answer from his deposition. He first stated "no" and then stated "I just don't know" because he "may have been . . . thinking that the meeting of the tangible capital requirement was a proxy for being in capital compliance." Tr. 1763:19-1764:17. He made "clear," however, "that, regardless of all this, I believe the time should have been given to this institution." Tr. 1764:18-22. At no point, then, did Mr. Albanese disavow his deposition testimony—indeed, his first response at trial was to embrace his deposition answer. His slight equivocation—that he may not have understood the capital requirements at the time of his deposition—is wholly implausible given that, at that time, he was the Regional Director of OTS, "responsible for just about all the activity, supervisory activities of the OTS regulated institutions in the 13 states which comprise the Northeastern Region." Dep. 9:1-12 (JX 1 at 1). Indeed, at his deposition, Mr. Albanese testified that "[m]y recollections of what happened with Carteret start to get real clear around the time that Mr. Bianco took over." Dep. 58:24-59:1 (JX 1 at 4). Moreover, at several points in his deposition, Mr. Albanese demonstrated familiarity with the capital requirements and Carteret's exam reports, showing that he quite fully understood the difference between the capital requirements. *See, e.g.*, Dep. 76:22-77:8 (JX 1 at 5).

stated unequivocally "no" when asked, under oath: "If Carteret had . . . tangible capital, for example, if Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized?" Dep. 158:6-11 (JX 1 at 599). Similarly, he again answered simply "no" when asked: "If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized?" *Id.* at 159:18-159:25 (JX 1 at 600).[10] And at trial he stood by his deposition answer of "probably not" to the

[10] At trial, Mr. Vigna attempted to recant his answers to these (and several other) questions, claiming that he "must have misunderstood the question." Tr. 2209:4-8. *See* Appendix. These recantations are not credible. At no time during his deposition did Mr. Vigna ask for a clarification of this question—or any other question the answer to which he recanted at trial—despite the fact that he was a former regional director of OTS and had an intimate knowledge of Carteret and thrift regulation, despite the fact that he had previously been deposed and testified in numerous *Winstar* cases, Tr. 2188:23-2189:11, and despite the fact that he signed his deposition, *see* PX 9120; Tr. 2329:3-8. Indeed, later in the deposition, when Mr. Vigna's counsel repeated the testimony back to him, Mr. Vigna affirmed that it was "a fair recollection of [his] testimony." Dep. at 199:11-23 (JX 1 at 601); *see also* Tr. 2328:18-25 ("That was a fair recollection of the answer I gave to that question."). If Mr. Vigna actually had misunderstood the question, or thought he had answered erroneously, one would have expected him—a former OTS regional director—to say something. Yet Mr. Vigna uttered nary a word. Instead, he simply waited for counsel to ask another question. Indeed, at trial, counsel for AmBase queried: "You didn't correct it. You didn't . . . say, no, I must not have understood that question. Did I say yes to that?" Tr. 2324:21-23. Mr. Vigna responded "[a]pparently so" and offered no further explanation for his silence. Tr. 2324:25.

The government contended at trial that Mr. Vigna "corrected" his deposition answer at lines 199:24-200:12. But in that portion of the deposition, Mr. Vigna was shown PX 4867A, the *October 1991* S-memo, and then was asked: "[w]hy then would it have been any different in December of 1992 if goodwill would have been included then?" Dep. 200:9-12. The reason the analysis would have been different in *December 1992* was that, by that time, as Mr. Vigna admitted both throughout his deposition and trial testimony, Carteret was core profitable on a sustainable basis, had taken hold of its problem assets, and had excellent management. Tr. 2269:15-2270:1, 2278:14-22, 2280:22-2282:15, 2302:9-16. When confronted with this reality at trial, Mr. Vigna agreed that his "whole deposition answered [the] question" of why his answer would have been different in December 1992. Tr. 2330:16-23. Moreover, Mr. Vigna's alleged "correction" during redirect at his deposition actually stands as a refutation of his attempted blanket recantation at trial, for surely any such correction would have taken the form, as discussed above, of a straightforward statement that he had misunderstood the previous question.

As Mr. Vigna admitted at trial, his memory of the events important to this litigation was

question: "[I]f Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?" *See* Dep. 154:25-155:5 (JX 1 at 598); Tr. 2317:17-2318:19 ("I'll accept it . . . if it's there, it's there.").

As for the FDIC, examiner Day "remember[ed] thinking that without the ability to treat [supervisory] goodwill as capital, Carteret was going to have a very hard time staying in existence." Dep. 63:22-64:1 (JX 1 at 47). Thus, the answer to the causation question comes from the mouths of the government's own regulators: absent the breach, Carteret would have survived.

### 3. The Breach Devastated Carteret's Regulatory Capital Profile

Because supervisory goodwill allowed Carteret to satisfy its regulatory requirements prior to the breach, it was an asset of "substantial value." Tr. 3035:13-21, 3063:3-7 (R. Smith); FF ¶¶ 54-55.[11] The breach's negation of this valuable asset devastated Carteret's regulatory posture, eliminating $169.3 million—or more than 50%—of the thrift's pre-FIRREA regulatory capital. FF ¶¶ 60-61. This deduction was immediate for tangible capital purposes and, because Carteret's management and regulators could hardly ignore the thrift's posture on a going-forward and "fully-phased in" basis, was essentially immediate for core and risk-based purposes. FF ¶¶ 57-59, 61; Tr. 1524:7-12 (Day) ("a reasonable management would have to use [the impact of FIRREA] in their business planning"). Thus, on a fully phased-in basis, the breach put Carteret out of compliance with its 3% core capital ratio requirement. FF ¶ 61.

---

better at the time of his 1999 deposition than at the time of his trial testimony in 2008. *See* Tr. 2332:18-21. Given Mr. Vigna's highly implausible recantations at trial, and his equally implausible explanations for them, AmBase respectfully suggests that the Court should credit his 1999 statements rather than his 2008 recantations.

[11] *See also Glendale Fed. Sav. Bank, F.S.B. v. United States*, 43 Fed. Cl. 390, 394 (1999) ("[T]he supervisory goodwill and the long amortization was designed to fill the capital hole, permit Glendale to maintain its ability to leverage its exiting capital, give the thrift the ability to generate income to replace the amortizing goodwill and, ultimately, make the whole enterprise profitable."); Tr. 3039:2-10, 3040:10-18 (R. Smith) (agreeing with *Glendale*'s description of supervisory goodwill).

FIRREA's deleterious impact on Carteret's regulatory profile was recognized by OTS officials at every level, by the RTC, and by the government's own expert witnesses. FF ¶ 62. For example, Mr. Vigna testified that the elimination of supervisory goodwill "certainly put [Carteret] into a different regulatory category" and Mr. Meyer testified that it "presented a dramatically different picture." Tr. 2268:15-21 (Vigna); Meyer Dep. 156:4-10 (JX 1 at 377). *See also* Albanese Dep. 76:22-77:4 (JX 1 at 5). Accordingly, Carteret's regulators immediately took a "dramatically different" view of Carteret. FF ¶ 63. Following FIRREA's enactment, the OTS assessed Carteret at a MACRO 4 rating—down two levels from the previous year. *See* PX 2106 at 6; Dittenhafer Dep. 140:1-8 (JX 1 at 74). As Mr. Dittenhafer confirmed, "the fact that it drops from a two to a four rather than a two to a three . . . comes from the . . . precipitous drop in capital and the fact that they may not make the FIRREA minimum tangible capital requirement." Dep. 143:13-19 (JX 1 at 75). Mr. Albanese thus aptly testified that the breach "had a severe impact on Carteret," Tr. 1693:10-15. Similarly, Mr. Day testified:

> Q. Knowing what you know now about what happened in the economy in the year subsequent to this, would you agree that the loss of capital initiated by FIRREA was like a death blow to this institution?
> A. It was a significant factor.

Dep. 69:1-6 (JX 1 at 47); Tr. 1525:16-24 (Day). *See also* Tr. 1522:4-9 (Day); Day Dep. 63:18-21 (JX 1 at 47); FF ¶ 64.

#### 4. Adjusting *Solely* for the Loss of Goodwill, Carteret Survives

The collateral consequences of falling out of capital compliance were stark. As Professor Smith put it, Carteret was "in jail" after the breach, Tr. 3009:20-23, Dep. 282:22 (JX 1 at 527), and the thrift suffered a variety of harms—and eventually failure—because of its noncompliance with capital requirements. While those harms are discussed further below, consideration of their effect is ultimately unnecessary to a finding that the breach caused Carteret's seizure: for, even

accepting the government's fallacious notion that an unbreached Carteret in 1992 would have differed from a breached Carteret *only* in its ability to use supervisory goodwill, that one change alone would have been sufficient for Carteret's survival.

Assuming only this one change as of September 1992, Carteret would have had an additional $139.1 million to count towards regulatory capital requirements. FF. ¶ 113; PX 9053a; PX 9056; Tr. 761:6-764:19, 964:13-25 (Calomiris). That means Carteret would have satisfied its tangible capital requirement with a surplus of $3.8 million, fallen short of its core capital requirement by $69.7 million, and fallen short of its risk-based capital requirement by $107.3 million. *See* PX 9053a.[12] As Mr. Downey and other OTS officials noted, OTS did not seize thrifts that satisfied their tangible capital requirement, Tr. 2573:11-16.

As Mr. Bianco testified, Carteret "wouldn't have fallen out of capital compliance" in a nonbreach world because management "would have done everything in [its] power to protect this major franchise in a difficult environment." Tr. 268:10-16, 270:8-13; FF ¶ 121.

*a. Securitization of Residential Loans*

First, Carteret could have securitized all or a portion of its $1.561 billion in single-family residential mortgage loans, which would have moved them to a lower risk-weight category and resulted in a reduction of risk-based capital by $3.9 million (for underwriting fees) and a reduction in the risk-based capital requirement by $33.7 million. FF ¶ 118. Because Carteret was already servicing these loans, it would not have incurred any additional costs for servicing. *See*

[12] These calculations assume, for risk-based capital purposes, that supervisory goodwill would have received 100% risk weighting. Although it is perhaps a cruel irony given the actual course of history, this government-backed asset likely would have received a much lower risk weighting in the nonbreach world. Tr. 761:15-762:19 (Calomiris). These calculations also take into account the undisputed fact that in the nonbreach world, Carteret would have been able to apply General Valuation Allowances (GVAs) of up to 1.5% of risk-weighted assets to its risk-based capital requirement. FF ¶ 115; PX 9064. As of September 30, 1992, Carteret reported $43.3 million of GVAs, all of which would have counted as risk-based capital. *Id.*

PX 2807 (Company and Investment Opportunity Overview, 3/9/92) at 5; Tr. 766:18-23, 974:18-23 (Calomiris).[13] Moreover, sale of these assets could have generated capital to satisfy the decreased requirement (which would, in turn, further decrease the requirement). For example, in the 27 days following seizure, the RTC recognized a gain on sale of assets of $5.561 million. PX 3804 (CFSB Financial Rpt., 12/31/92) at 1. Professor Smith acknowledged that Carteret could have booked these gains in the nonbreach world. Tr. 3788:6-3789:10

*b. Capital-Raising at the AmBase Level: $80-$100 Million*

To meet any remaining deficit, two readily available alternative options could have been employed. First, AmBase could have raised $80 to $100 million and infused it into Carteret. FF ¶ 123. As Professor Smith acknowledged, "all other things being equal, it's easier for a company to raise a smaller amount of capital than a larger amount of capital." Dep. 167:17-21 (JX 1 at 520); *see also* Tr. 3113:11-15 (same); FF ¶ 122.[14] Based on his expertise as an investment banker, Mr. Bianco explained that AmBase, which by this time had no debt, could have used its $36 million in cash to cover the interest on a three- to five-year loan with at coupon rate of seven percent. Tr. 275:20-279:17 (Bianco). AmBase would have guaranteed the interest on the debt and, if necessary, Carteret could have been pledged as collateral, just as it had been in 1988 to secure a loan from Chase. PX 2611 (Credit Agreement, 6/10/88) at AMBNP013514-15. AmBase could have infused the proceeds from this transaction into Carteret. Professor Calomiris explained that this type of transaction is commonplace. Tr. 774:8-775:18. *See also Bank of*

[13] Professor Saunders was thus flatly wrong in criticizing Professor Calomiris for failing to account for additional servicing costs. It is no surprise that Professor Saunders was forced to admit that he knew *nothing* about Carteret's capacity to service these loans. Tr. 3858:2-11.

[14] *See also* Albanese Dep. 160:5-12 (JX 1 at 13) (acknowledging that "if they had a smaller hole to fill . . . somebody [was] more likely to step in"); Tr. 2319:14-21, 2320:13-19 (Vigna) (acknowledging that Carteret's ability to attract capital would have been enhanced if it had satisfied or nearly satisfied its tangible capital requirement).

*America v. United States*, 67 Fed. Cl. 577, 582 (2005) (describing similar transaction). Even the government's own investment banking expert conceded that this type of transaction would have been feasible. R. Smith Dep. 509:1-14 (JX 1 at 544).

Despite Professor Smith's admission, Professor Saunders insisted that AmBase could not have engaged in this type of transaction because the company would have been insolvent in the nonbreach world. Professor Saunders's credibility on this issue is suspect given that (1) he, unlike Mr. Bianco and Professors Calomiris and Smith, has virtually no experience raising capital, *infra* at 53, and (2) his opinion is based on a fundamental misunderstanding of the basic parameters of the transaction, c*ompare* Tr. 3580:2-6 (Saunders) (testifying that Mr. Bianco proposed borrowing "150 million by putting this 30 million with the bank"), *with* Tr. 276:1-14 (Bianco) (testifying that "AmBase had $36 million" with which it would "have been able to raise between $80 and $100 million"). More importantly, Professor Saunders is simply mistaken, both in premise and conclusion. His premise is mistaken because AmBase was *not* insolvent even in the breach-affected world, where its liabilities were highly contingent tax claims that AmBase's counsel contemporaneously (and the Tax Court later) deemed baseless. *See* FF ¶ 124; DX 1554 (AmBase 1992 10-K) at 40.[15] Moreover, AmBase was also due to receive a significant tax refund. FF ¶ 124. Additionally, in the nonbreach world AmBase would not have carried Carteret at zero value and would not have written off the value of goodwill, which far eclipsed the contingent liabilities. *See* DX 1554 (AmBase 1992 10-K) at 23 ("The 1990 loss was primarily attributable to a write-off of goodwill at December 31, 1990 aggregating $161,000,000.").

Professor Saunders's conclusion is mistaken because, even if one wrongly assumes that

---

[15] As Professor Smith explained, "a contingent liability isn't worth as much as an actual liability so you would have to give it a different valuation." Dep. 379:8-12 (JX 1 at 533); *see also* Tr. 3049:21-24. Indeed, Professor Smith stated that when he was at Goldman Sachs, "we probably wouldn't pay too much attention to" contingent liability. Dep. 379:16-21 (JX 1 at 533).

AmBase was insolvent, that fact would not have foreclosed investment. FF ¶ 125. As Professor Smith acknowledged, Carteret itself "was able to access the capital markets even though, on a tangible book basis, it was insolvent." Tr. 3047:4-7. Indeed, in 1983, Carteret raised $65 million through an initial public offering even though it was insolvent by approximately $212 million on a tangible basis. Tr. 3042:4-12 (R. Smith); PX 2 (Carteret 1983 Annual Report) at 22, 36. And from 1983 to 1987, Carteret raised approximately $120 million in the capital markets. Tr. 2919:19-2920:3 (R. Smith). Professor Smith also acknowledged that Citibank was "functionally insolvent" and "bankrupt" in 1990 and 1991, Tr. 3098:14-3099:3, yet he and many other investors purchased the bank's stock, Tr. 3105:5-9, 3106:23-3107:5. Investors are willing to make such purchases because, as Professor Smith acknowledged, they "make decisions based on expected after-tax cash flows." Tr. 3042:4-6.

*c. Unlocking the Franchise*

As an alternative to raising capital at the AmBase level, Carteret could have unlocked its "extremely valuable" franchise, what Professor Smith deemed a financial institution's "most important asset." Griffin Dep. 95:11-96:9 (JX 1 at 231); Tr. 3783:3-25 (R. Smith). FF ¶ 135. For example, Carteret could have sold its mortgage servicing and origination businesses, either together or separately. *See* FF ¶¶ 131-134; Tr. 3778:23-3789:5 (R. Smith); Tr. 3841:11-14 (Saunders). A sale of Carteret's servicing rights would have generated approximately $20 million in capital, and would not have diminished Carteret's franchise value because of Carteret's ability to replenish the supply through its origination business. FF ¶ 131; Tr. 200:3-14, 201:10-202:9, 570:24-571:1 (Bianco); PX 9069a; Tr. 986:8-987:12 (Calomiris). A sale of Carteret Mortgage Company—the thrift's valuable origination business—would have generated approximately $18 million. Tr. 982:19-984:13 (Calomiris); PX 9067; PX 9068; Tr. 317:25-318:6, 475:15-476:11

(Bianco). Because of synergies between servicing and origination, selling the two businesses together would likely have generated an even greater amount of capital. Tr. 982:2-18, 987:13-988:10; PX 9069a; PX 9070.

As a last resort, Carteret could also have sold branches, which had a very high franchise value. FF ¶¶ 136-139. As Professor Smith explained, franchise value "results from the institution's standing in the market, a synergistic combination of all competitive attributes in which the whole is greater than the sum of the parts." Tr. 3783:3-25. Just after seizure, the RTC explained that Carteret's branches were so valuable because they were "well positioned in strategic markets," enjoyed a "high degree of customer loyalty" and a "relatively stable deposit base," and were market leaders in New Jersey. PX 4002 (Conservatorship Strategic Plan) at 26-27. Actual branch sales provide empirical confirmation of this value: in 1990, Carteret sold twenty-six branches for a $41 million premium—"among the highest premiums received in the industry during 1990"—and following seizure the RTC sold Carteret's branches for a $143 million premium (*after* two years of deposit run-off). FF ¶¶ 137, 139; DX 7340 (Mem. from R. Walsh 6/14/91) at 1. Thus, if necessary, Carteret easily could have sold branches to maintain capital compliance. Tr. 270:8-18 (Bianco); Tr. 977:23-978:6 (Calomiris).

* * *

Thus, even if the government's faulty premise is accepted—that an unbreached Carteret would have been different in only one respect—the evidence shows that Carteret would have survived. Once the bank securitized its loans, the small remaining capital hole could have easily been filled through capital-raising at the AmBase level or through the sale of part of Carteret's franchise. The conclusion is clear: the breach caused Carteret's failure.

**5. Adjusting for More of the Breach's Effects Further Proves Carteret Would Have Survived in the Nonbreach World**

Once Carteret fell out of capital compliance, a series of harms rained down upon the thrift. Reversing just some of these harms in the nonbreach world shows even more forcefully that Carteret would have survived but for the breach.

*a. Carteret Was a Success Prior to the Breach*

Prior to the breach, Carteret was a healthy, growing thrift. By the end of fiscal year 1988, Carteret had grown to $6 billion in assets, up from just under $2 billion in 1981. From 1983 to 1988, Carteret generated more than $165 million in profits. *See* FF ¶ 11; PX 9003; PX 9004. As the President of the Federal Home Loan Bank of New York, Brian Dittenhafer, put it, "this was a reasonably strong institution." Dep. 93:1-8 (JX 1 at 69-70). *See also* FF ¶ 12; Tr. 1523:10-20 (Day) (affirming that Carteret was "a healthy institution prior to the passage of FIRREA"). The market likewise viewed Carteret as a strong institution. *See* PX 4 (Carteret 1985 Annual Rpt.) at 35. AmBase's willingness to pay $266 million for Carteret is further evidence of the thrift's strong pre-breach profile. FF ¶ 13. As Professor Saunders himself put it: "[o]utside investors aren't fooled." Tr. 3684:8-24.

Carteret's successful performance prior to the government's breach provides powerful support for the proposition that the thrift would have survived absent the breach. While Carteret, like virtually every other member of the thrift industry, was ultimately not immune from the effects of the harsh economic environment of the late 1980s and early 1990s, the fact remains that prior to the breach, Carteret was a success story.

*b. The Breach's Many Harms*

The breach's impact upon Carteret was "swift and severe." *Winstar*, 518 U.S. at 857. It

devastated Carteret's regulatory capital profile and thus sparked a series of deleterious consequences that eventually led to seizure. As this Court has previously put it, the breach initiated a "downward death spiral." *Slattery*, 69 Fed. Cl. at 583 (internal quotations omitted). Recognition of this fact can be found in the testimony of nearly every witness in this case. *See* FF ¶ 64. To take just a few examples, government regulators noted that Carteret was "hit very hard" by the breach and that it had a "severe" and "negative" impact.[16] And in a contemporaneous document, the OTS essentially admitted that reinstatement of supervisory goodwill would stop the bleeding at Carteret. *See* DX 201 (Mem., M. Finn to J. Downey et al., 3/8/91) at WOP3260186 ("Carteret's current capital deficit will continue to grow absent an external capital infusion and assuming that Carteret is not victorious in the preliminary injunction hearing."). These conclusions parallel the finding of the district court, which in 1991 granted Carteret's request for preliminary injunctive relief precisely because of the irreparable harm that the breach was inflicting on Carteret. *Carteret*, 762 F. Supp. at 1181.

As Professor Calomiris explained, the breach had "the immediate effect of forcing the bank, on a forward-looking basis, to completely change its strategy." Tr. 743:6-744:1. Indeed, Carteret's reaction to the breach began even before FIRREA was signed into law. As the government's own experts explained, by the first quarter of 1989, "the air [was] flavored by the fear of FIRREA." R. Smith Dep. 447:20-448:1 (JX 1 at 541). *See also* FF ¶¶ 57-58; Tr. 3963:16-3964:18 (Saunders); Tr. 1524:7-12 (Day) ("a reasonable management would have to use [the im-

---

[16] Day Dep. 63:18-64:1 (JX 1 at 47); Tr. 1693:10-15 (Albanese); Meyer Dep. 71:20-72:20 (JX 1 at 369). *See also* Vigna Dep. 79:20-24 (JX 1 at 589) ("[FIRREA] was certainly an event that created a lot of problems for the institution."). That Professor Saunders stands alone in his insistence that the breach visited no harm upon Carteret—indeed that it *helped* Carteret—is suggestive of the extreme and unfounded nature of his opinions and the weight they ought to be accorded. *See* Tr. 3671:23-3672:3, 3672:13-3673:2 (Saunders).

pact of FIRREA] in their business planning").[17]

***i. Asset Shrink***

In just the last six months of 1989, Carteret shrank its total assets by almost $1.1 billion, from $7.17 billion to $6.10 billion. *See* PX 1711 (TFR, 6/30/89) at 1; PX 1713 (TFR, 12/31/89) at 1. All told, from the middle of 1989 and continuing through the end of the third quarter of 1992, Carteret shrank by more than $2.3 billion. FF ¶ 67.

As Carteret explained it at the time: "To meet the new [FIRREA capital] requirements . . . the 1989 strategy was altered to [among other things] significantly downsize the balance sheet . . . ." PX 1905 (Carteret Bancorp and CSB 1990 Business Plan) at 7. Indeed, the government's own expert testified that the need to raise additional capital was a "principal reason" for the shrink. Tr. 3017:3-11 (R. Smith). *See also* FF ¶ 68.

Carteret's asset shrink came at a steep cost. FF ¶ 69. As Mr. Bianco put it, the institution "cannibalized its future profitability through the sale or early realization of many of its most valuable assets, in order to remain in capital compliance." DX 7175 (R. Bianco to A. Vigna, 9/30/91) at CAM218002. *See also* PX 9055; Tr. 958:8-959:8 (Calomiris). AmBase's 10-Ks estimate that decreases in Carteret's asset volume had a "negative impact" of $8 million in 1990 and $20 million in 1991. PX 802 (AmBase 1990 10-K) at 11; PX 803 (AmBase 1991 10-K) at 9. Earnings on these assets would have readily provided the capital needed to support them.

***ii. Deposit Run-off***

Carteret's deposit base, on an absolute basis, grew throughout the 1980s. *See* FF ¶ 71; Tr. 3025:18-20 (R. Smith). The breach put a stop to that, triggering a fairly steady outflow of

---

[17] Another revealing measure of the breach's pre-enactment effects is the negative impact the Hyde Amendment's failure had on Carteret's stock price. *See* FF ¶¶ 568 & n.31, ¶ 59.

deposits that continued through the date of seizure. FF ¶ 71.[18] As the FDIC explained in 1990: "Primarily as a result of the impact of FIRREA, substantial growth of retail deposits . . . has effectively been reversed." PX 2110 (Exam Rpt.) at WOQ6981439. This reversal was the predictable result of the breach. FF ¶ 72.[19] As the government's experts admitted, uninsured depositors would rationally flee such a bank, and many insured depositors might leave simply because they did not know they were protected or because they did not want to deal with the RTC. Tr. 3024:5-3025:3, 3026:1-5 (R. Smith); Tr. 3659:12-15 (Saunders).

The deposit run-off was harmful to Carteret. FF ¶ 73. As Professor Smith acknowledged at trial, "deposits. . . are the lowest cost of funds for banks," and thus the "loss of deposit relationships is a negative for an institution." Tr. 2940:6-8, 3027:18-20.

***iii. Increased Cost of Funds***

As this Court has found, "a typical and logical response [to deposit run-off] is to raise rates both to attract and keep depositors." *Glendale*, 43 Fed. Cl. at 408. Carteret was no exception, and the evidence shows that the thrift raised its deposit rates in response to the breach. FF ¶ 74; Tr. 182:7-22 (Bianco); Tr. 969:7-14 (Calomiris). For example, in March 1991 the OTS recorded: "Carteret has 'bidded up' its CD rates above its local competitors to solicit steady deposit inflows." DX 201 (OTS Draft Mem., 3/8/91) at WOP3260183. Professor Calomiris quantified a portion of the increase by comparing Carteret's rate for 6- to 23-month CDs to an industry benchmark from January 1991 through the date of seizure. FF ¶¶ 75, 77-78. His analysis

[18] This Court has previously recognized "the effect on depositors when a bank falls out of compliance"—namely, they leave. *Glendale*, 43 Fed. Cl. at 408.

[19] *See also Carteret*, 762 F. Supp. at 1181; Tr. 3026:12-3027:11 (R. Smith) (endorsing Judge Bissell's statements regarding reputational harm to Carteret and agreeing that "rumors that [Carteret] may be experiencing difficulty are more likely to have impact upon it," and that "given that the market conditions during S&L crisis involving fraudulent transactions at other institutions, such rumors are even more likely to result in diminished business for Carteret and increased withdrawals").

shows that during that period the breach caused Carteret to pay 105.5 basis points more on these deposit instruments, for a total increased cost of $19.8 million. PX 9057; Tr. 966:22-967:9. The highest-ranking OTS official presented by the government at trial, Mr. Downey, confirmed this calculation, noting that Carteret "was paying . . . a premium in the market," and "[a]t one time . . . maybe the talk was 100 plus basis over the market place." Tr. 2518:17-22. This analysis, of course, captures only the increase on a subset of deposits for a truncated period of time and is thus a conservative measure of the harm caused by the breach. FF ¶ 76.

***iv. Branch Sales***

Carteret sold 23 branches in 1990 for a premium of $40.74 million. FF ¶ 79. The evidence shows that the breach was the driving force behind these sales. FF ¶ 80.[20] These branch sales came at the cost of future profitability. FF ¶ 81; Tr. (Bianco) 244:6-245:5; Tr. 2137:7-2138:12 (Zamorski). The substantial premiums paid by the purchasers of these branches attest to the fact that profits were to be expected from them.

Professor Saunders advanced a peculiar, and incorrect, theory at trial: that Carteret's replacement of the deposits from these branches with FHLB advances was a boon to the bank. Tr. 3563:19-21. As Professor Smith acknowledged, however, "deposits are usually the lowest cost of funds for banks," Tr. 2940:6-8, and the "average savings and loan does not choose to have half of its funding from the lender of last resort," Tr. 3019:22-3020:7.[21] Carteret's actual experi-

---

[20] For example, a December 1989 OTS memorandum listed "considering selling Florida, Virginia, and Maryland branches" as strategy for "Capital Compliance." PX 5301 at WOP3261203. And OTS examiner Finn testified that Cartert's "broad strategy" was to sell "both branches and assets . . . to help it meet capital requirements." Dep. 140:8-15 (JX 1 at 85). *See also* PX 802 (AmBase 1990 10-K) at 5. Presented with evidence such as this, a federal district court found "persuasive" Carteret's contention that it "would not have sold the branches . . . if OTS had not eliminated the benefit of retaining supervisory goodwill." *Carteret Savings Bank v. OTS*, No. 91-661, slip. op. at 9 (D.N.J. July 8, 1991).

[21] *See also* Tr. 2383:24-25 (O'Rourke) (replacing deposits with FHLB advances "defi-

ence confirms this point. In 1991, Carteret's weighted average cost of deposits was 6.71%, while the average cost of FHLB advances was 7.15%. *See* FF ¶ 82; PX 803 (AmBase 1991 10-K) at CAM4020318. For the eleven months in 1992 preceding seizure, the average cost of deposits was 5.03%, while the average cost of FHLB advances was slightly lower at 4.77%. *See* PX 3802 (CSB Financial Rpt. 11/30/92) at CAM4820013. Thus, during the twenty-three month period preceding seizure, the average cost of deposits was 18 basis points *less* than the average cost of FHLB advances. FF ¶ 82.

Professor Saunders' contrary conclusions represent either a fundamental misunderstanding of financial accounting or a questionable slight-of-hand. He presented two documents to the Court: Carteret's 1991 Annual Report (PX 10) and the Conservatorship Strategic Plan (DX 2257). *See* DX 9763. The rates reported in each of these documents, however, are simply one-day snapshots, not annual averages. *See* PX 10 at KH053789 (reporting rates at December 31, 1991); DX 2257 at AM50872870, 79 (reporting rates at December 31, 1992). These figures thus tell us very little about the overall effect of the 1990 branch sales. As the government's own regulator, Mr. O'Rourke, explained during his testimony: "It's very tough to look at this in a static approach like this....There's [sic] a lot of variables that go into this." Tr. 2384:17-19.[22]

nitely had the risk of introducing a lot more uncertainty into [Carteret's] cost of funds").

[22] Moreover, even if it were appropriate to examine a one-day snapshot of these rates, Professor Saunders looked at the wrong snapshots. Carteret's Financial Report for December 31, 1991, notes that the FHLB rate reported by Professor Saunders on DX 9763—that is 5.73%—"excludes the impact of hedge and swap activities." PX 6817 at CAM4731412 (note c). The document also reports the cost of funds including hedge and swap activities—5.9%. As OTS examiner O'Rourke testified, "[w]hen you hedge it there's an additional cost there that has to be factored in." Tr. 2384:14-16. Thus, for his one-day snapshot in 1991, Professor Saunders misleadingly reported a number that was quite a bit lower than the true cost of FHLB advances. The same holds for 1992. Professor Saunders reported the cost of FHLB advances on December 31, 1992 (3.67%). *See* DX 2257 at AM50862879. But Carteret was seized on December 4, 1992, and the RTC replaced $1.75 billion of the FHLB advances with RTC advances between the two dates. *See id.* ("RTC Advances are being utilized to replace the advances from the FHLB. As of

Moreover, a mere comparison of FHLB rates to deposit rates fails to capture the benefits of possessing deposits and the costs of carrying FHLB advances. First, deposits help to build a bank's franchise, while FHLB advances do not. As FDIC examiner Day affirmed, "one disadvantage of a Federal Home Loan Bank advance is that an institution loses its customer relationships." Tr. 1563:1-6. Second, branches generate fee income, while FHLB advances do not. Third, FHLB advances come encumbered with a collateralization requirement and deposits do not. *See* PX 10 (Carteret 1991 Annual Report) at KH053791.

At trial, Professor Saunders also represented to the Court that the 1990 branch sales reduced costs to Carteret by $18 million per year. *See* DX 9761; Tr. 3565:5-18. This argument suffers from two main flaws—one of them conceptual and one of them factual. The conceptual flaw is the same one that pervades the entirety of the government's argument: that nothing about Carteret would have been different in the nonbreach world. But the branches Carteret sold in 1990 were breach-affected, having suffered from the asset shrink and deposit run-off noted above. FF ¶ 83. Because branch overhead is a relatively fixed cost, growing branches benefit from economies of scale. Tr. 2846:22-2849:9 (Calomiris); Tr. 3736:7-3737:10 (Saunders); Tr. 3023:1-4 (R. Smith). If Carteret had not had to abandon its strategy of growth in 1989, the branches sold in 1990 would have been benefitting from these economies of scale and contributing to profits, not to costs. Tr. 2846:22-2849:9, 2849:22-25 (Calomiris). That these branches

---

December 31, 1992, CFSB had $1.75 billion of RTC Advances."). It is logical to assume that the RTC replaced the highest cost FHLBB advances first, thus resulting in a December 31 cost that is quite a bit lower than that carried by Carteret on the last day of its free-standing existence. Indeed, Carteret's December 31, 1992 financial report shows that the average cost of FHLB advances for the first four days of December was 4.05% (as was the average cost for the 30 days in November)—quite a bit higher than the 3.67% reported to the Court by Professor Saunders. *See* PX 3804 (CFSB Financial Rpt. 12/31/92) at AM00086970 (also showing that the average cost of FHLB advances *fell* in the 27 days following seizure); PX 3802 at CAM4820013. Thus, Professor Saunders's analysis is both conceptually flawed and factually erroneous.

had the potential to contribute profits to a growing bank is confirmed by the premiums paid by their purchasers. *See* FF ¶ 79; DX 7430 (Mem. from R. Walsh, 6/14/91) at 1 (reporting that the premiums were "among the highest premiums received in the industry during 1990").

As for the factual flaw, it results again from Professor Saunders's failure to fully review or fairly represent the evidence upon which he relies. Although he admitted that savings from the branch reorganization in 1990 occurred both because of consolidation and sales, Tr. 3980:21-24, he failed to account for the portion of savings that came from consolidation (which would likely have occurred even absent the breach). FF ¶ 84. Yet one of the documents Professor Saunders cited as support for this opinion, Carteret's 1991 Business Plan, readily explained:

> The size of the retail branch network was significantly reduced during 1990. Re-configuration was accomplished by consolidating branches within the system and by selling branches outside of Carteret's primary market area. By consolidating inefficient neighboring branches, nonearning fixed assets were reduced . . . and the franchise value was increased. . . . [T]he downsizing also improved capital ratios, reduced annualized operating expenses by approximately $18.1 million, and enhanced both the efficiency and future profitability of the branch system.

DX 7171 at WOQ6901716. Given that the overall downsizing included consolidation of ten branches, and that the *overall* downsizing is reported as having led to reduced operating expenses of $18.1 million, it follows that a substantial portion of that amount was attributable to the consolidation. Indeed, in an internal OTS memorandum from April 1991, examiner Finn reported that Carteret "anticipates a reduction of $11 million per year in operating expenses due to the sale of the 23 branches." DX 292 at WOO6850035. Thus, approximately $7 million of the reduced operating expenses likely resulted from the consolidation, not the branch sales.[23]

[23] Also open to question is Professor Saunders' underlying assumption that these branches were not profitable. The fact that acquirers paid a premium for the branches suggests that they were profitable. *See* Tr. 2455:14-25 (O'Rourke). Moreover, Professor Saunders fails to account for lost customer relationships, cross-selling opportunities, location presence, and fee opportunities. Tr. 2456:20-2457:20 (O'Rourke). Thus, a statement declaring a reduction in op-

***v. Ultra-conservative Loan Loss Reserves***

As the government never tires of pointing out, Carteret booked substantial losses on its commercial real estate (CRE) and commercial lending portfolios in the early 1990s. In particular, in August 1991, Carteret decided to book (as of June 30, 1991) $150 million in reserves on those portfolios. AmBase freely concedes that many of Carteret's asset quality problems at this time stemmed from non-breach factors, primarily the worsening economic and market conditions, but also, in part, poor underwriting and loan monitoring before Mr. Bianco took over at Carteret. But what the evidence also establishes is that unlike virtually all other financial institutions at the time, Carteret took a very aggressive and highly conservative approach to writing down the value of, and booking loss reserves on, its commercial lending and CRE portfolios. Absent the breach, and in particular the breach-caused need for Carteret to raise hundreds of millions of dollars of outside capital, Carteret would not have taken such an aggressive approach to writing down those assets, and it would therefore have booked at least $20 million, and more likely closer to $50 million, less in reserves on those assets.

The evidence is essentially undisputed that asset valuation and reserve decisions call for the exercise of a substantial amount of judgment and discretion. Thus, reasonable people often reach differing conclusions about the appropriate level of reserves for particular assets. FF ¶ 87. Indeed, every government witness, fact or expert, who was asked about this issue acknowledged the role of subjectivity in the reserving/valuation process, and further acknowledged that there is usually a range of reasonable reserves that can be booked in connection with particular assets. FF ¶ 88-89.[24] Even David Kennedy, the government's primary expert on this issue, recognized

---

erating expenses does not tell the whole story—for, as Mr. O'Rourke explained, "you've got to look at things on a net-net basis." Tr. 2458:6-7.

[24] *See, e.g.,* Tr. 2273:7-10, 2221:10-2222:10 (Vigna); O'Rourke Dep. 71:3-7, 12-15 (JX 1

the role of discretion and judgment in this area. FF ¶ 90. *See* Tr. 3186:21-23, 3310:20-3311:12, 3313:6-22, 3308:22-3309:9, 3312:8-10, 3325:4-10. He could hardly do otherwise, as the accounting pronouncements stress the same point. FF ¶ 90 & n.60.[25] The OTS itself acknowledged that appropriate reserves can fluctuate within a fairly substantial range of reasonable estimates. Following the 1989 examination, for example, the OTS first insisted that Carteret book $77 million in reserves, but it ultimately decided that a much smaller reserve should be booked. *See* FF ¶ 91; Tr. 2002:15-2003:20 (S. Smith).[26]

There can also be little doubt that Carteret under Mr. Bianco's leadership exercised the considerable discretion that it had with respect to valuation and reserve decisions in an ultraconservative manner. Again, much of the relevant evidence comes straight from the government, as there was virtual unanimity in the witness testimony and among the contemporaneous documents that Carteret took a much more conservative approach to its reserves than did other institutions. For example, Mr. Vigna made clear that Carteret "took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally." Dep. 109:25-110:7 (JX 1 at 592). *See also* FF ¶ 93-94.[27] That Carteret erred on the side of booking higher reserves is also demonstrated by the fact that, even in its weakened capital condi-

---

at 450); Tr. 2360:24-2361:11, 2438:22-2439:15 (O'Rourke); Tr. 1975:9-1977:14 (S. Smith).

[25] *See, e.g.*, DX 7441 (AICPA Audit and Accounting Guide) at DK-07 000035; DX 7446 (Reg. Bull. 6) at DK-07 000124; DX 5047 (Financial Accounting Standards No. 5) at ¶ 23.

[26] *Cf. American Capital Corp. v. United States*, 66 Fed. Cl. 315, 382 (2005), *aff'd in part, rev'd in part on other grounds*, 472 F.3d 859 (Fed. Cir. 2006) (noting that loan loss reserves are not a cash loss but are instead a "paper" loss).

[27] *See also* Tr. 2273:7-10 (Vigna) (noting that "[w]hen you're looking at these assets, there's sometimes a range of appropriate reserves, you know, 15 to 20 percent," and that within this range, Carteret under Mr. Bianco and Wayne Moor "were taking 20 percent."); PX 2805 (Mem. from A. Vigna to T. Ryan, 1/17/92) at 2 (noting that Carteret's valuation allowances "represent[ed] . . . the highest ratios in the Northeast Region and approximately triple the peer average for comparable size institutions nationally.").

tion, which gave it many characteristics of a distressed seller, it still managed to sell its CRE assets for, on average, more than their net book value. FF ¶ 95-96.[28] Mr. Kennedy's own analysis confirmed that Carteret's proceeds on sales of certain assets prior to seizure averaged 5-7 percent above those assets' net book value. *See* FF ¶ 95; Tr. 3333:17-3335:22, 3243:11-3244:3 (Kennedy). Given the overwhelming evidence that Carteret was much more conservative in its valuation/reserve practices than other institutions, Mr. Kennedy had little choice but to effectively concede the point. *See* Tr. 3325:11-3328:5 (Kennedy).

The question thus becomes whether Carteret would have taken the same conservative approach absent the breach. The evidence demonstrates that the answer is no. The primary reason Carteret erred on the side of conservatism stemmed from its need to raise substantial outside capital in the wake of the breach. As Mr. Bianco testified, in order to convince potential investors that there would likely be no surprises down the road, Carteret opted to take a much more conservative approach than it would have otherwise taken. *See* Tr. 251:16-253:24, 255:20-257:4 (Bianco). *See also* FF ¶ 99-100. Regulator testimony supports this conclusion.[29] In addition, Carteret based many of its valuation decisions on offers it received. Because the amounts of such offers are often influenced by the buyer's perception of the seller's financial condition, it

[28] *See also* Tr. 2283:4-8 (Vigna); Vigna Dep. 115:8-13 (JX 1 at 593) ("It was a very conservative approach, and I guess it was pretty obvious after they started selling these properties instead of booking the gains. Some of it was simply a consequence of them valuing them too low on their own books."); DX 505 (D. Kramer to K. Albert, 3/13/92) ("Finally, we have our records of disposals (which show gains vs. reserves and these gains have been realized on those of our worst properties.)").

[29] *See, e.g.,*Vigna Dep. 110:10-25 (JX 1 at 592) ("[A]s I recall, the feeling was if they're going to raise capital from outside investors, that they'd have to be very conservative in valuing the assets, so that after they brought in the investor money that there was no surprises, other big writedowns subsequent to that. . . . [I]t was, as I recall, and the view of management, necessary to raise capital."); *id.* at 115:2-7 (JX 1 at 593) (stating that "the need to establish credibility with potential investors" "was one of the, if not the most motivating factor for them" in taking the $150 million writedown). *See also* Tr. 1985:3-1986:9 (S. Smith); Tr. 3081:3-24 (R. Smith).

follows that Carteret's weakened capital profile in the wake of the breach very likely led to lower offers, which led to lower asset valuations and higher reserves. FF ¶ 104; Tr. 3792:4-8 (R. Smith) (stating that it's "generally a good idea, don't be desperate" when trying to sell an asset).

Given the central role that Carteret's breach-caused need to raise capital played in its reserve decisions, it follows that if there had been no breach, Carteret's approach would have been very different—that is, closer to the approach taken by the rest of the industry. FF ¶ 102. In particular, absent the breach, Carteret would have ended up booking at least $20 million, and likely close to $50 million, less in reserves on its commercial lending and CRE assets than it did in the breach-affected world. FF ¶ 103.

***vi. Other Harms***

As Professor Smith explained, Carteret was "in jail" after the breach caused it to fall out of capital compliance. Tr. 3009:20-23; Dep. 282:22 (JX 1 at 527). In other words, Carteret was forced to submit to an "arduous capital regime" and "had the regulators all over the place affecting [its] activities." Tr. 3804:25-3805:6 (R. Smith). As Judge Bissell put it at the time:

> This case constitutes an example of agency discretion gone haywire. Despite operating losses in 1990, Carteret has not exhibited financial instability or poor management; in fact, it has made considerable effort to come into compliance with the new requirements. Despite these facts, however, OTS apparently wants to charge in and micro-regulate the institution because OTS chooses not to honor a valid contract made by its predecessor.

*Carteret*, 762 F. Supp. at 1177.[30] This daily regulation of Carteret took the form of numerous restrictions, all of which cost the thrift money, resources, and time, and hampered efforts at mitigation. FF ¶ 105. Among other things OTS: (1) banned Carteret from paying dividends, which

[30] *See also id.* at 1181 (Carteret is "subject to considerable government regulations and control over its daily business operations, thus further complicating and hampering the business."); DX 7142 (CSB Board Minutes, 7/29/92) at RAM0100225 ("There have been severe restrictions placed on Carteret."); Tr. 160:12-18, 230:17-231:7 (Bianco).

created a disincentive for outside investors, FF ¶ 106; (2) required Carteret to file an endless series of reports and updates, FF ¶ 107; and (3) imposed increased liquidity requirements on Carteret, which served to decrease earnings due to lesser interest earned on liquid assets, FF ¶ 108.

*c. A Conservative Counterfactual*

If, in addition to adding back supervisory goodwill and GVAs, Carteret's September 1992 capital profile is also adjusted to reverse a portion of the increase in cost of funds, to reverse the 1990 branch sales, to temper the ultra-conservative writedowns, and to include loan securitizations and a $36 million capital infusion from AmBase, then Carteret would have exceeded its tangible capital requirement by $63.6 million, and fallen just short on core capital (by $10.8 million) and risk-based capital (by $18.2 million). *See* PX 9053a; PX 9054; Tr. 759:4-779:4, 956:7-957:24 (Calomiris). FF ¶¶ 112-120. As noted above, Carteret would never have fallen out of capital compliance because it could easily have filled such a small deficit. And if, instead of directly infusing its $36 million, AmBase used it to raise $80 to $100 million, then Carteret would not have faced any deficit even in this limited counterfactual.[31]

Moreover, Professor Calomiris explained that this is "a one-hand, maybe two hands behind your back but-for analysis" in that it does not fully account for many of the breach's effects. Tr. 759:5-11. In a fully-realized nonbreach world—that is, in a true counterfactual scenario—Carteret would not have faced any capital deficit at all. For example, Professor Calomiris's model does not account for the millions of dollars of foregone profits due to the breach-induced asset shrink. FF ¶ 120. Similarly, the model does not include foregone income from deposit

[31] Professor Calomiris assumed that Carteret would have reduced its loan loss reserves by $50 million in the nonbreach world and, indeed, the evidence shows that Carteret would have reduced these writedowns by $20-$50 million. FF ¶ 103. Even if, however, Carteret had reduced reserves by only $20 million, the $80 to $100 million that AmBase could have raised from the market more than makes up for the difference.

run-off, Tr. 759:16-18 (Calomiris), and does not account for the entire time period or set of debt instruments relevant to increased cost of funds, FF ¶¶ 75-76, 120. And, as noted above, in adding back the supervisory goodwill, Professor Calomiris conservatively assumed 100% risk-weighting. *See* Tr. 761:15-762:11. With all these conservatisms, it is thus easy to conclude that "[i]f there hadn't been the breach, [Carteret] never would have fallen out of compliance with their capital requirement in any kind of reasonable counterfactual scenario." Tr. 1139:23-1140:1 (Calomiris).[32]

Carteret's much-improved capital position in the nonbreach world would also have made it feasible for Carteret itself to raise funds. FF ¶ 127-28. Even in the breach-affected world, Carteret, by 1992, had worked out its loan loss problems, had begun generating sustained monthly profits, and had excellent management. FF ¶¶ 142-152. In a nonbreach world, profits would have been even greater because Carteret would not have been forced to "cannibalize[]" many of its most profitable assets and several profitable branches, DX 7175 at 1, and would not have suffered from an increased cost of funds, Tr. 980:14-981:9 (Calomiris). Nor would Carteret have been restricted from paying dividends. As both Professors Smith and Calomiris explained, investors care about future, not past, performance. Tr. 3042:4-6, 3106:24-3107:5; 3770:6-8 (R. Smith); Tr. 999:16-1000:3 (Calomiris). Thus, absent the breach, Carteret would have been a much more attractive investment or merger opportunity.

**6. <u>The Government Prevented Mitigation</u>**

Even in a world without supervisory goodwill, Carteret could have met its capital requirements but for the government's actions in blocking Carteret's attempts at mitigation. This fact further proves that it was the government that caused the total loss of Carteret's value. And

[32] *See also* PX 9054; Tr. 757:1-6, 957:9-24, 988:25-989:9 (Calomiris); Tr. 268:10-16 (Bianco) ("We wouldn't have fallen out of capital compliance."); Tr. 627:1-6 (Bianco).

it also serves to rebut, both factually and legally, the government's argument that Carteret's inability to raise capital in the actual world undermines the notion that Carteret could have raised capital in the nonbreach world. *See* Doc. 254 at 42.

The government seeks to avoid paying for its breach in this case by arguing that Carteret would not have survived in the nonbreach world. But the government oddly conceives of a nonbreach world that is hopelessly infected by the breach and the government's own breach-exacerbating policies and actions. The law cannot, and does not, countenance such a regime. To the contrary, where, as here, a breaching party exacerbates the breach and blocks efforts at mitigation, the breaching party is liable for the full extent of the harm it caused.[33]

This Court's decision in *Koby v. United States*, 53 Fed. Cl. 493 (2002) illustrates the point. In *Koby*, the Court found that the IRS breached its contract with Mr. Koby by voiding the sale of property he had won at auction. *Id.* at 494. The IRS argued that Mr. Koby failed to mitigate his damages because he did not participate in a second auction for the property. The Court rejected this argument, noting that Mr. Koby's failure to participate in the auction was due, in part, to actions by the IRS. The Court explained that "as the party in default, [the Government] was all the more duty-bound to minimize damages and thus should not be heard to complain of plaintiff's supposed failure to mitigate when that failure, at least in part, is attributable to its own employees[]. . . ." *Id.* at 500 (citing 5 CORBIN ON CONTRACTS § 1039, at 250-51).[34]

---

[33] *See* 5 ARTHUR CORBIN, CORBIN ON CONTRACTS § 1039, at 250-51 (1964) ("Losses are not regarded as avoidable if the defendant prevents the plaintiff from taking the steps necessary to avoid them."); 11 ARTHUR CORBIN, CORBIN ON CONTRACTS § 57.11 (same); *Nyquist v. Randall*, 819 F.2d 1014, 1019 (11th Cir. 1987) (same); *Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank*, 611 F.2d 465, 471 (3d Cir. 1979) (same).

[34] *See also* RESTATEMENT § 350, ill. 2 (breaching party's refusal to accept contracted-for item means that nonbreaching party made reasonable effort); *Belmont Indus., Inc. v. Bechtel Corp.*, 425 F. Supp. 524, 527 (E.D. Pa. 1976) (defendant's prevention of plaintiff's mitigation of damages "would affect the amount of damages recoverable if a breach of contract by defendants

Here, the government was likewise duty-bound to minimize the damages of its breach; instead, the government implemented a regulatory regime that exacerbated the breach and ultimately prevented Carteret's attempts to mitigate at every turn. Accordingly, the government is liable for the full extent of its breach—a breach which initially stripped Carteret of substantial value and, despite the thrift's significant efforts at mitigation, ultimately stripped it of all value.

*a. Carteret Had Turned a Corner by 1992*

The evidence demonstrates that despite the devastating effects of the breach and the asset problems experienced during the recession of 1990 and 1991, Carteret was well on its way to recovery. FF ¶¶ 142-152. As OTS examiner Russell Meyer put it: "They had shrunk, they had written off all the assets and they had started making a profit. I thought they had turned the corner." Dep. 234:18-22 (JX 1 at 380). That Carteret survived a severe recession in 1990 and 1991, notwithstanding the breach, is evidence of its financial strength and inherent franchise value, which Professor Calomiris has estimated was worth approximately $100 million at the time of the breach, and which the RTC took note of just after seizure. FF ¶ 137. Such indicators of Carteret's performance and value even in the breach-affected world serves as powerful evidence that Carteret would have survived in the nonbreach world.

***i. Sustainable Profits and Stabilized Assets***

By September 1992, Carteret's commercial loan portfolio had stabilized. FF ¶ 147. As Professor Smith put it, "the pig had passed through Carteret." Tr. 3812:3-5. Carteret returned to profitability even earlier than that: from the last quarter of 1991 through the time of seizure, Carteret reported profits for fourteen straight months, with total earnings during that period exceed-

---

is established"); *Fibelok, Inc. v. LMS Enterps., Inc.*, 976 F.2d 958, 965 (5th Cir. 1992) ("it would be unfair to penalize the seller for failure to mitigate when the inability to mitigate was due to the fault of the buyer").

ing $13 million. *See* FF 143; PX 9066. *Cf. Old Stone*, 63 Fed. Cl. at 88 (finding it "highly unlikely," given profits prior to seizure, that the government would have seized the thrift in the nonbreach world). Significantly, Carteret's regulators believed that these profits were sustainable, a conclusion buttressed by the fact that "a massive downward trend in interest rates" began in September 1992, which Carteret was well-poised to take advantage of. FF ¶ 144; Tr. 3572:22-24 (Saunders). Moreover, given that the loan losses reported in 1992 stemmed from loans made earlier, Tr. 3064:19-3065:7 (R. Smith), and are thus not representative of the expected income from the loans Carteret was making in 1992, Carteret's actual earnings power appears even greater. FF ¶ 145. As Professor Smith acknowledged, "the cash flow from lending operations rose from a little over [$]9 million in 1991 to [$]36 million in 1992." Tr. 3111:4-7.

Significantly, in its 1991 exam report, the OTS admitted that if supervisory goodwill counted toward regulatory capital requirements, then Carteret's *operating profits alone would fill the remaining capital hole*: "In OTS's view, excluding the disputed goodwill, this [$150 million capital infusion] would not cure the capital deficiency, but would bring the institution within approximately $45 million of its requirement. Carteret would make up the remaining deficiency by the end of 1994 through operating profits." DX 9061 at OAM0010522.

***ii. Superior Management***

That the Carteret ship was righted in 1991-92 was due in no small part to the captains at its helm, the Bianco management team installed in May 1991. FF ¶ 148-150. As Professor Smith acknowledged, "[h]uman capital can be viewed as a financial institution's most important asset," and "both credit and risk evaluation depend," inter alia, "on the intellectual caliber, experience and training of the decision maker." Tr. 3108:1-3109:18. As Carteret's regulators universally recognized, the human capital managing Carteret was superlative. FF ¶ 150. Mr. Vigna

affirmed that "in all [his] 32 years as a thrift regulator, [he] had not seen a stronger management team." Tr. 2269:22-2270:1. Similarly, examiner O'Rourke wrote: "I have never witnessed the efforts of a more capable and hard working group than the one I encountered at Carteret from May of 1991 forward." PX 4900 (T. O'Rourke to R. Bianco, 12/14/92).

***iii. Situated to Thrive***

Given its positive trends, Carteret was poised to capitalize on the macroeconomic recovery occurring at the time of the thrift's seizure. FF ¶¶ 152. As Professor Smith acknowledged, "the years after the 1991 recession were good years for the banking industry." Tr. 3103:11-3104:19. Similarly, Professor Calomiris explained: "1991 was the turning point. And all of us who were watching it knew that 1992 was a complete shift, a watershed in bank profitability." Tr. 979:15-980:13. *See also* PX 6910 (OTS Press Release, 11/8/92) at 3 (recognizing near universal profits in the thrift industry in 1992). Professor Saunders acknowledged that "since 1993, the thrift industry has been profitable." Tr. 3876:7-3877:1.

*b. The Government Exacerbated the Breach and Prevented Recovery*

***i. Carteret's Seizure was Unreasonable and the Government Admitted that It Prevented Survival***

OTS seized Carteret on December 4, 1992, despite the fact that the agency viewed an institution's trends as a critical factor in determining whether seizure was warranted and openly recognized that Carteret's trends were favorable. FF ¶ 173. Numerous OTS officials admitted that the seizure prevented Carteret from mitigating the breach and that Carteret would have survived but for the seizure. FF ¶ 174. For example, Mr. Simone, the third-in-command for OTS Northeast—in a meeting discussing the "OTS's conclusions and their findings concerning the failure of Carteret Savings"—"indicated that had the institution approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the

interest rate climate has been changing." PX 5331 (Mem. from R. Seiger, 2/15/95) at 1. And Director Vigna testified that "at some point in time they would have raised enough capital to restore viability in the institution." Dep. 151:20-152:3 (JX 1 at 597). Examiners O'Rourke and Meyer similarly testified that they thought, at the time, that Carteret would have achieved capital compliance had it not been seized. *See* Meyer Dep. 163:4-13 (JX 1 at 378); O'Rourke Dep. 199:20-25 (JX 1 at 453). In other words, by shutting Carteret down, the government stymied Carteret's efforts to mitigate and ensured that the breach destroyed the entire value of the thrift.

The unreasonableness of the premature seizure date is confirmed by Carteret's regulatory history in 1991 and 1992. FF ¶¶ 164-176. Throughout that period the OTS regional office recommended delaying Carteret's seizure in light of the institution's rebound. For example, on January 17, 1992, Mr. Vigna explained that Carteret had attained profitability in the previous quarter, "should be able to attain reasonable core profitability in 1992," and had "strong management" in place that had "the experience necessary to help raise capital." PX 2805 (Mem. from A. Vigna to T. Ryan, 1/17/92) at WOP 3341035, 37.[35] Similarly, in mid-1992, the OTS regional office again recommended against seizure, because "steady financial improvement has been demonstrated by the new management team" and "reasonable progress toward achieving a recapitalization" was being made. PX 2816 (R. Albanese to N. Ketcha, 7/7/92). The OTS felt that seizure "while progress is being made to recapitalize a troubled institution with assets of over $5 billion would not be effective supervision or good policy." *Id.*; FF ¶ 166. In the fourth quarter of 1992, just three weeks before seizure, the regional office again reaffirmed its position, noting that "the institution's financial condition continued to improve, and that supervisory risk of loss

[35] *See also* Vigna Dep. 104:13-105:6 (JX 1 at 591-92) (explaining that "there was *no risk* to the RTC and the public taxpayer to allow this institution to continue on in an effort to find capital") (emphasis added); Tr. 2280:9-2281:6 (Vigna); FF ¶ 165.

while it remained open was very low." PX 2819 (Mem. from R. Albanese to File, 7/17/92). As Mr. Albanese explained, the "point" of this recommendation was that if "the institution's condition [is] improving, then a date of December 4, January 4 . . . **or even March 4**, . . . [then] we ought to give them more time." Tr. 1716:20-1717:12 (emphasis added).[36]

Ten days later (on Friday, November 27), in the face of an impending seizure date (known only to OTS), Mr. Bianco informed OTS that Carteret and PNC were on the verge of a deal, but that PNC would need time to perform due diligence. PX 4889 (Mem. from R. Albanese to A. Vigna). Although Mr. Albanese recognized that "it would be **foolish** to rush a transfer on December 4" in light of this request, OTS insisted that PNC complete its due diligence over the weekend. *Id.* (emphasis added) As Professor Smith explained, this course of action was utterly unreasonable: "the regulators would know that, if they put them in that position, they would walk away." Tr. 2955:12-18. And, indeed, under the heavy thumb of OTS' extreme demands, PNC abandoned the deal. The OTS then rushed in to seize Carteret.

As Professor Calomiris explained, "if it didn't make sense to seize Carteret in 1991, it certainly didn't make sense to seize Carteret at the end of 1992." Tr. 978:23-979:22. By that point the thrift had demonstrated sustained profitability and the market conditions were very favorable. Mr. Albanese recognized this at the time (as his letters and memos attest) and at trial:

[36] Mr. Albanese's November 17 memorandum calls into serious question the basis behind the "S" memorandum filed just 4 days earlier. The regional office recommended seizure of Carteret, noting that the thrift had "incurred or is likely to incur losses there that will deplete all or substantially all of its capital." PX 6874 (Status Certification, 11/13/92). Yet, as recognized by regulators throughout 1992 and in the November 17 memorandum, Carteret had attained sustainable profitability. Thus, at trial Mr. Albanese admitted that there was no basis for this statement. Tr. 1741:23-1742:4, 1746:2-9. In other words, the second-in-command for the OTS regional office, both at the time and at trial, repudiated the reasoning undergirding the document relied upon by the national office in making its decision to seize Carteret. Rather than serving as a reasonable evaluation of Carteret, the memo thus appears to have been a cover tactic in anticipation of this litigation. *See* FF ¶ 168 & n.93.

> My statement is this. I believe they should be given more time to try to raise capital, equity capital, and to continue as an independent entity. Clearly, I would not have made a recommendation to give them more time if I thought that there was no reasonable prospect that they could raise capital.

Tr. 1746:2-9.

The government has been unable to provide a coherent rationale for the December 4 seizure date. The evidence suggests it was simply an arbitrary deadline set by OTS Washington officials—that is, by those in the agency with the least connection to the facts on the ground. Indeed, as early as October 2, 1992—more than a month before the issuance of the "S" memo recommending seizure, and while numerous investors were still interested in Carteret—an OTS Washington official wrote that "Carteret is currently scheduled for resolution on December 4, 1992." PX 4875 (Mem. from D. Garmus to T. Ryan, 10/2/92) at 1. *See also* PX 4887 (Mem. from D. Garmus to J. Fiechter, 11/13/92) at 1. As Mr. Vigna explained, "people were setting dates and not coordinating." Dep. 145:7-8 (JX 1 at 596).[37] This is not the record of a rational agency. It is, as Judge Bissell aptly noted some fifteen years ago, a record of "agency discretion gone haywire." *Carteret*, 762 F. Supp. at 1177. It is, as the government's own regulator explained, a reflection of the government's "elect[ion] to use the shotgun approach and take every-

[37] Messrs. Vigna and Albanese attempted to reconcile their position—that Carteret should not have been seized and would have survived absent seizure—with the decision actually made by claiming that the Washington office was responsible. But that hardly makes the decision more reasonable. If true, it merely shows that the seizure was ordered by the least-informed officials based on arbitrary reasons and in defiance of the strident recommendations of the regional office. Indeed, the lone witness from the Washington office stated that he could not recall *any* differences with Mr. Vigna about Carteret. Tr. 2529:16-19 (Downey). If that is so, what coherent reason could the government possibly offer for seizing Carteret on December 4?

Mr. Vigna also testified that OTS seized Carteret because FIRREA required as much. Tr. 2307:5-9. This assertion is belied by Mr. Vigna's own admissions that OTS had discretion. *See* Tr. 2308:20-2309:8; Tr. 2309:20-2310:14 ("Q. But you believed that the discretion to continue holding Carteret open . . . existed[?] . . . A. Yes. Yes. That's correct."). *See also* Albanese Dep. 86:14-18 (JX 1 at 6). Regardless, even if FIRREA had required seizure of Carteret, this would not negate the fact that the government, which of course enacted and enforced FIRREA, prevented mitigation of the breach.

body out." Meyer Dep. 181:13-19 (JX 1 at 378). And it is proof positive that the government caused the total loss of Carteret's value by preventing mitigation.

***ii. Regulatory Risk Prevented Mitigation***

Because of its positive trends, excellent management, and the favorable macroeconomic environment, Carteret caught the eye of numerous potential investors during late 1991 and 1992. The government's actions, however, ultimately made it impossible for Carteret to consummate a relationship with these suitors. As the government's own witnesses noted, regulatory risk is a critical factor for an investor. FF ¶¶ 177-178. The unreasonable regulatory environment created by the government in the wake of the breach was the single greatest impediment to Carteret's raising $200 million. FF ¶¶ 179-188.

The government created unreasonable regulatory risk and discouraged investment in Carteret in four principal ways. First, the breach itself led investors to conclude that the government was untrustworthy, and thus Carteret was not a safe environment for their funds. FF ¶¶ 180-181. As Mr. Vigna put it, "[n]obody would have put any money in knowing the Government was going to breach its contracts." Tr. 2260:15-18. Similarly, as the government's own investment-banking expert explained, FIRREA "created substantial confusion and disruption," ushered in an "arduous regulatory standard for Carteret," and created a fear among investors that Congress "may well tax and punish thrifts even further" in later years, Tr. 2994:14-16, Tr. 3002:20-3003:8, Tr. 3083:10-16 (R. Smith). Investors predictably viewed these atmospherics with a wary eye and shied away from involvement in the industry. FF ¶ 182.

Second, the government exacerbated the breach by imposing harsh and unrealistic requirements specifically on Carteret. FF ¶¶ 183-185. As Judge Bissell put it, the government "charge[d] in and micro-regulate[d]" Carteret to such an extent that the thrift faced "governmen-

tal control of and/or intervention in even the most basic day-to-day operation[s]." *Carteret*, 762 F. Supp. at 1177, 1165. *See also* Tr. 3804:25-3805:3 (R. Smith) ("we had the regulators all over the place affecting Carteret's activities"); DX 25 ("Timetable for Compliance"). Carteret's Board at the time characterized these restrictions as "severe," and Mr. Bianco characterized the regulatory environment as "very difficult" and "unreasonable." DX 7142 (CSB Bd. Minutes, 7/29/92) at RAM0100225; Tr. 160:12-18 (Bianco). Among the most detrimental of these micro-regulations were the truncated deadlines placed on investors' due diligence—a policy that flies directly in the face of the advice of the government's own investment-banking expert, who would have "recommended an extensive effort to conduct due diligence." Tr. 3084:15-20 (R. Smith). As noted, Mr. Albanese characterized such a deadline in the context of the PNC deal as "foolish." PX 4889 (Mem. from R. Albanese to A. Vigna, 11/27/92). But these arbitrary deadlines were not confined to the PNC deal—they spanned the whole period during which Carteret was trying to raise capital, and they greatly impinged on Carteret's ability to do so. Mr. Bianco informed OTS of this at the time, noting in a June 25, 1992 letter that Carteret was "burdened by the imposition of deadlines which are unrealistically short and which create artificial crises of confidence for the bank and for potential investors." PX 5303.

Third, government regulators refused to provide any assurances to potential investors. FF ¶ 186. Professor Smith testified that any reasonable investors would "try to get an understanding of how they're going to be regulated," and even if "there could be no guarantees, you would need an understanding as to what . . . you could reasonably expect." Tr. 3086:9-18, 3090:6-16. Indeed, the FDIC's own regional director testified that "key" to an investor's decision is "being able to figure out what the risk is." Tr. 2117:19-24 (Zamorski). Yet prior to Carteret's seizure, the FDIC rebuffed any such attempts, DX 412 (N. Ketcha to A. Vigna, 11/2/92) at

WOP3340706—a policy that ultimately led the Carlyle Group to walk away from Carteret because "they couldn't quantify" the risk, Tr. 289:16-292:21 (Bianco); *see also* PX 4886 (OTS "S" Mem., 11/13/92) at KH091238. Instead of encouraging investment, the FDIC lobbed at Carteret threats of revocation of deposit insurance. FF ¶ 154.

Fourth, through RTC fire sales the government created a strong disincentive against investment in Carteret while it was still a going concern. FF ¶ 187. As Professor Smith recognized, "there were many private equity investors who preferred just to wait for institutions like Carteret to die, and then they would buy the corpses and take the assets at big discounts from the RTC." Tr. 3090:21-3091:1. And the OTS, in an effort to induce investors into whole-bank transactions, often told investors that they could purchase assets from the RTC at liquidation prices. Tr. 573:15-17, 573:23-574:7 (Bianco). The evidence presented at trial suggests that several investors backed away from Carteret for this reason. FF ¶ 187.

**7. The Government's Causation Arguments Are Meritless**

Despite the compelling evidence demonstrating that its breach caused Carteret's failure, the government has contested nearly every element of Plaintiffs' contentions on this front. Below, we address some of the causation arguments the government has already advanced and those it may advance in its post-trial brief.

*a. Carteret's Exposure to Lending Losses*

The lynchpin of the government's causation argument is that Carteret's exposure to losses in its corporate and CRE lending portfolios, rather than the breach, caused Carteret to fail. To be sure, Carteret faced a serious challenge from these losses in the 1990-1992 period. It is simply not the case, however, that these asset quality problems led to Carteret's failure in the actual world or would have led to Carteret's failure in the absence of the breach.

The first and most significant flaw in the government's argument is that it assumes away a core purpose of the very contracts in this case. Supervisory goodwill provided thrifts with the time and capital cushions necessary to weather market downturns. Loan losses are measured relative to capital, and are only a serious problem if the institution does not have the capital to absorb them.[38] Prior to the breach, regulators considered Carteret's capital base, *including supervisory goodwill*, to determine whether loan losses could be absorbed. *See* Tr. 1965:18-1967:11 (S. Smith); PX 2104 (1988 FHLBB exam) at AMB019343. Thus, in the nonbreach world, Carteret's contractual capital would have provided Carteret a means of absorbing potential loan losses. As this Court explained in *Old Stone*, the government "cannot blame [the bank's] demise on a 'downturn in the economy' when the regulatory capital for which the bank contracted was intended partly to shield plaintiff from such losses." 63 Fed. Cl. at 83. *See also Home Savings*, 399 F.3d at 1353; *Commercial Fed.*, 59 Fed. Cl. at 347; *Coast*, 48 Fed. Cl. at 425-26. In a very real sense, therefore, the government's breach came at the worst possible time, depriving Carteret of its regulatory capital at its moment of greatest need.

Moreover, the scope of Carteret's reserves cannot be divorced from the breach. If Carteret had not been forced, as a result of the breach, to begin intensive efforts to raise external capital, it would have booked $20 to $50 million less in reserves and would not have sold as many assets as quickly into a the depressed market. FF ¶¶ 102-104.

It also bears pointing out that Carteret's commercial loan portfolio was neither atypical

---

[38] FDIC examiner Day acknowledged that "if the institution has inadequate capital, [then] bad assets for that institution pose a much greater threat than [they] do[] [for] an institution that has a large amount of excess capital," and that this "will lead an examiner to pay much closer scrutiny to an institution's assets." Dep. 180:11-22 (JX 1 at 53). *See also* O'Rourke Dep. 104:19-25 (JX 1 at 450) (agreeing that "[e]xcess capital would allow you to absorb problems and give you more time to work out problems in an institution," and stating that with "[e]xcess capital, an institution would be able to withstand a higher level of asset quality problems.").

nor inherently deleterious. Numerous banks with similar or worse portfolios survived the recession. *See* Meyer Dep. 83:25-84:7 (JX 1 at 371); Dittenhafer Dep. 85:10-21 (JX 1 at 69). That Carteret took a hit in the recession, just like most other institutions, is no great surprise.[39] As Professor Saunders acknowledged, "the position of the economy in the business cycle phase is enormously important to a financial institution in assessing the probability of borrower default." Tr. 3850:5-10. Carteret lost money due to the business cycle—but it survived and had turned a corner. If Carteret had use of its contractual capital to cushion these losses, there is no question it would have survived.

But even putting all of this to one side, there can be no doubt that Carteret would not have suffered any additional losses from its corporate and CRE lending. The evidence firmly establishes that Carteret, even in the breach-affected world, stabilized its portfolio by the last quarter of 1991. As Professor Smith colorfully noted, "the pig had passed through the python." Tr. 3105:10-24. And because Carteret discontinued CRE lending in 1989 (for non-breach reasons), the thrift was not facing any future threats from its commercial asset portfolio. *See* PX 802 (AmBase 1990 10-K) at 4-5; Tr. 2353:10-17 (O'Rourke).

*b. Adding Back Goodwill as of the Time of Seizure*

Permeating the government's causation argument is the facile assumption that even with supervisory goodwill, Carteret would not have satisfied all three regulatory capital requirements in late 1992 and therefore would have been seized. This argument fails on just about every level of serious analysis. As an initial matter, even assuming that such a static capital snapshot, per-

[39] *See* Tr. 1684:24-1685:9 (Albanese) (agreeing that the thrift industry as a whole faced a real estate crisis in the late 1980s and early 1990s); Tr. 3096:1-7 (R. Smith) (agreeing that "1990 was the worst year for banking since the Great Depression," and that "1991 was also a pretty bad time for banks"); Tr. 3096:25-3097:25 (R. Smith) (agreeing that "the Northeast was particularly hard hit by the recession of 1990 and '91," including "big sophisticated banks" such as Chemical, which had a "high percentage" of its real estate loans as nonperforming).

formed *three years* after the government's breach, was meaningful to the causation analysis, it would not help the government one bit. As noted above, Carteret would have had positive tangible capital if its contractual goodwill were added back as of September 1992, and the government's own regulators testified that thrifts with such a positive tangible capital profile were rarely, if ever, seized. FF ¶ 65.[40] Moreover, as is also explained above, Carteret had numerous feasible ways to fill the much smaller capital hole it would have faced in that situation.[41]

In any event, the government's calculations are irrelevant because they fail to take into account the harm that the breach inflicted on Carteret between 1989 and 1992 as a result of such things as the asset shrink, the increased cost of funds, the 1990 branch sales, the severe write down of commercial assets pursuant to an ultraconservative policy, and the forced sale of assets at the nadir of the commercial real estate market. *Cf. Slattery*, 69 Fed. Cl. at 583.

*c. Carteret's Supposed Mitigation*

The government has also suggested that Carteret was at all times shielded from the effects of the breach because it fully mitigated shortly after FIRREA was enacted when it received a $20 million capital infusion from AmBase and because it sought and obtained a preliminary injunction in 1991 that required the OTS to accord full regulatory capital treatment to Carteret's contractual goodwill. These arguments ignore and mischaracterize the facts.

First, it is ludicrous for the government to contend that AmBase's infusion of $20 million in 1989 somehow served as mitigation for the government's removal of more than $160 million

[40] *Cf. Slattery*, 69 Fed. Cl. at 583 ("Even assuming there were periods of minor [capital] noncompliance,…it is clear to the Court that had Meritor's goodwill been counted, it would never have been…seized.").

[41] *Cf. Suess v. United States*, 52 Fed. Cl. 221, 230 (2002) ("Although defendant did present evidence of Franklin's obvious capital problems regardless of the treatment of the goodwill, there is also ample evidence…that the problems could have been managed had Franklin had the capital cushion that goodwill provided.").

of regulatory capital. In any event, AmBase would have made that capital infusion even absent the breach. *See* Tr. 267:2-17 (Bianco). That infusion, therefore, does not count as even a partial mitigation of the breach, much less the complete mitigation that the government claims.

Second, it is true that in 1991 a federal district court granted Carteret a TRO and ultimately a preliminary injunction that effectively required OTS to count Carteret's supervisory goodwill for regulatory capital purposes. But as discussed above, by the time that relief was granted, the government's breach had already visited considerable damage upon Carteret. For example, Carteret had already shrunk its asset base by approximately $1.6 billion—from $7.2 billion to $5.6 billion—by the end of 1990. FF ¶ 67.

Third, the injunction was short-lived and quickly appealed, so it is fanciful to assume that all parties viewed Carteret through a non-breach prism. As OTS examiner O'Rourke tellingly explained, Carteret's lawsuit "was not viewed positively" by OTS, which "saw it as a device that old management was using to keep Carteret in existence." Dep. 147:22-148:2 (JX 1 at 451) (emphasis added); *see also* Tr. 2437:11-18 (O'Rourke) (same); PX 2111 (1991 OTS exam) at 827. As Mr. O'Rourke agreed, it was his "view at that time that regardless of the status of the judicial order and the injunction that Carteret won in court, that the institution needed to forecast capital compliance *without the use of its goodwill*." Dep. at 151:12-24 (JX 1 at 451). The government immediately and successfully appealed the grant of the injunction, *see Carteret Savings Bank, F.A. v. OTS*, 963 F.2d 567, 585 (3d Cir. 1992), and there was considerable uncertainty during the period of the injunction regarding whether it would be upheld.

For its part, the FDIC did not even pretend to honor the injunction. Its September 1991 exam report calculations do not include supervisory goodwill, and examiner Day testified that he did not "feel in any way constrained by the injunction." PX 2114 at 1; Tr. 1553:4-1554:7 (Day).

Indeed, the injunction prompted FDIC to up the ante. As Mr. Day explained, the FDIC's threat to pull Carteret's deposit insurance was "quite likely" the "FDIC's response to the fact that the OTS had its hands tied against Carteret." Dep. 343:11-344:13 (JX 1 at 62); *see also* Tr. 1534:18-1535:3. With regulator attitudes such as these, it is no wonder that even Carteret did not rely on the injunction and thus continued apace with its breach-induced mitigation measures. *See* Tr. 159:25-160:11 (Bianco) ("We didn't depend on it.").

Finally, it is more than a bit odd for the government to point to the preliminary injunction as somehow showing that Carteret would have been seized even absent the breach, because it was only *after* that injunction was vacated and the government's breach was allowed to continue that the government seized Carteret. If anything, therefore, the facts pertaining to the preliminary injunction support the proposition that absent the breach, Carteret would have survived.

*d. Professor Saunders Was not a Credible Witness*

The government bases much of its argument on causation—as well as much of the rest of its case—on the opinions of its expert, Professor Saunders. Ample evidence demonstrates that his opinions are not credible. First, Professor Saunders' opinions in this case are extremist and contradicted by precedent, the evidence presented in this case, and the shared understanding of the parties entering the contracts. The supervisory goodwill contracts were based on the notion of leveraging regulatory capital based on intangible assets. Professor Saunders believes that the parties to these contracts were "living in a fantasy world," Tr. 3681:5-14, and that Carteret was "erroneous in relying on goodwill in the first place." Tr. 3677:11-12.[42] In other words, he be-

[42] *See also* Tr. 3675:19-3676:4 (stating that supervisory goodwill should not count toward any capital requirement and that reliance upon it is a "house of cards"). Tellingly, the government's own regulators do not share the view of its expert witness. *See* Finn Dep. 11:3, 14-15 (JX 1 at 81) ("I don't think [supervisory goodwill] was a gimmick at all."); Dittenhafer Dep. 28:17-29:1 (JX 1 at 64); *id.* at 29:16-23 (JX 1 at 64) (stating that FIRREA's elimination of supervisory

lieves Carteret should not have relied on the government's contractual promise, and he testified that he would have seized Carteret in 1989, before the breach. Tr. 3673:3-7. That is, he would have shut Carteret down *before* its lending losses were known, FF ¶ 26, and solely because it was relying on supervisory goodwill. His entire analysis is thus premised on the idea that the breach was proper. It is no wonder, then, that Professor Saunders testified that this Court has ordered an "unjustified wealth transfer from the Government to individuals" in *every* case in which it has awarded *Winstar* damages. Tr. 3694:13-18.[43]

Professor Saunders's views are so extreme that, in contradistinction to virtually every other witness in this case, he testified that the breach did not inflict *any* harm on Carteret. *Compare* Tr. 3671:23-3672:3 (Saunders), *with* FF ¶¶ 62-65. Rather, it is his opinion that the breach was *good* for Carteret. Tr. 3672:13-3673:2. *But see Old Stone*, 63 Fed. Cl. at 88 (rejecting the notion that the government's breach of supervisory goodwill did thrifts a favor). And in contradistinction to the law of the Federal Circuit, Professor Saunders testified that supervisory goodwill is not capital, Tr. 3675:1-6, and that "supervisory goodwill is not worth very much."[44]

---

goodwill "was a bad policy."); *id.* at 69:6-12 (JX 1 at 67-68) (acknowledging that "the regulator's attitude in 1988 was that supervisory good[will] was a reliable asset that counted towards regulatory capital"); *id.* at 71:1-11 (JX 1 at 68) (agreeing that the regulators "didn't believe there was anything suspect about this asset").

[43] This is not the first time Professor Saunders has advanced his idiosyncratic theories. In *Fifth Third*, he likewise advocated for a denial of *any* damages. The Federal Circuit disagreed with his analysis and upheld an award of $77 million. *Fifth Third Bank v. United States*, 518 F. 3d 1368 (Fed. Cir. 2008). Yet Professor Saunders "still believe[s] it should be zero." Tr. 3694:19-3695:11.

[44] Oddly, Professor Saunders also testified that "[o]utside investors aren't fooled." Tr. 3684:8-24. Given that outsiders invested in Carteret throughout the 1980s, including in 1983 when the thrift would have been insolvent without the use of supervisory goodwill, it appears that the professor's opinions are irreconcilable. Moreover, Professor Saunders also testified that the elimination of accounting forbearances by the RTC made investors "more likely to pay fair market value, rather than being subsidized." Tr. 3888:25-3889:12. If the elimination of a forbearance—e.g., supervisory goodwill—alters the price an investor is willing to pay, then that forbearance, by definition, has value.

*Compare* Tr. 3675:1-6, 3678:3-5, *with Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1381-82 (Fed. Cir. 2001) (finding that supervisory goodwill had “substantial value”), *and* FF ¶¶ 54-56.

Second, Professor Saunders also lacks expertise and experience in topics critical to this case. He acknowledged that he has never valued a servicing portfolio and is not an expert in the area, Tr. 3391:1-7, that he has no expertise regarding commercial real estate valuations, Tr. 3391:20-22, that he has he never worked at a mortgage company, been involved in the sale of a mortgage company, or performed a valuation of a mortgage company, Tr. 3391:23-3392:9. Moreover, Professor Saunders has had virtually no experience raising capital. Tr. 3399:18-3400:23.[45] Juxtaposed against Professor Calomiris’s in-depth, real-world experience in the banking industry, Tr. 2859:6-20, Professor Saunders’s expertise appears especially shallow.

Worse yet, Professor Saunders willfully blinded himself to evidence that would detract from his conclusions. For example, Professor Saunders did not consider key regulator testimony and opinions and, in some cases, did not even know who these regulators were. Indeed, when asked whether he considered Mr. Meyer’s (the author of the 1989 OTS exam report) statement that Carteret knew it had to shrink to meet its new capital requirements, Professor Saunders responded that he “had no need to go beyond [the report] because it was sufficiently negative.” Tr. 3723:25-3725:7. Thus, rather than seeking to base his opinions in truth, it appears that once Professor Saunders found evidence that was “sufficient[]” to fit his extreme view, he refused to consider anything else.[46] Similarly, when performing calculations relevant to Carteret’s capital posi-

[45] Professor Saunders did claim to have been a consultant for the IPO of a Polish Bank sixteen years ago—a project about which he refused to divulge any details.

[46] *See also* Tr. 3691:22-3693:7 (did not consider FHLB President’s statement that breach would have “a major impact on the examiner’s rating”). Tr. 3694:1-12 (did not consider OTS Regional Director’s statement that loss of supervisory goodwill had a very substantial impact on

tion under FIDICIA, Professor Saunders simply ignored that act's elimination of 200% risk-weighting. When confronted with this fact, Professor Saunders stated that "[s]ometimes, you miss something." Tr. 4048:2-14. Sometimes you do, and he missed a great deal that was detrimental to his predetermined conclusions.

Other examples of Professor Saunders's lack of knowledge abound. With respect to Carteret's value in 1989, for example, Professor Saunders: did not perform an independent analysis of the thrift's book value or the P/E ratios of its peers, Tr. 3935:17-24; "didn't do a proper full valuation valuing the servicing portfolio," Tr. 3941:11-14; did not know whether Carteret's auditors required additional loan loss reserves as of June 30, 1989, Tr. 3942:7-24; did not conduct an independent examination of whether the examiners properly classified Carteret's assets in 1989, Tr. 3851:20-25, 3852:18-3854:2; and did not know that the OTS retreated from its initial recommendation of $77 million in reserves, Tr. 3943:6-9. Regarding Carteret's branches in 1990, Professor Saunders "didn't research independently the benefits of the consolidation," Tr. 3931:4-15, and did not investigate the franchise value of Carteret's retained branches, Tr. 3932:4-9. Regarding Carteret's ability to securitize loans in the nonbreach world, Professor Saunders did not know Carteret had the capacity to service all of those loans. Tr. 3858:2-15. Regarding the RTC's sale of Carteret's Florida branches, Professor Saunders did not know that the RTC did precisely "the opposite of what they recommended." Tr. 3915:20-22. With so many holes in his knowledge of critical issues in this case, Professor Saunders's opinions are dubious at best.

Third, in those areas about which Professor Saunders did purport to be knowledgeable,

---

regulators' assessment of safety and soundness); Tr. 3714:14-3715:8 (did not consider OTS Regional Deputy Director's statement that Carteret was very severely impacted by the breach); Tr. 3723:10-24 (did not consider examiner's statement that asset shrink and branch sales were undertaken to meet capital requirements); Tr. 3693:11-24 (did not consider examiner's statement that the breach caused a "dramatically different picture"); Tr. 3711:9-3712:3, 3712:15-19 (did not consider examiner's statement that FIRREA's capital rules caused Carteret to fail).

his assertions were often contradicted by the evidence or by binding law. For example:

- Professor Saunders was the *only* witness in this case who did not state, when asked, that the Bianco management team was excellent (or even good). *Compare* Tr. 3700:10-15, *with* FF ¶ 150. Indeed, Professor Saunders alone holds the view that Carteret's failure to raise capital resulted from mismanagement on Mr. Bianco's part. Tr. 3701:15-24. Yet the government's investment-baking expert testified that he could not point to a single strategic decision by Mr. Bianco with which he disagreed. Tr. 3100:22-25 (R. Smith).

- Professor Saunders stated that one of his criticisms of Carteret "is the fact they ran down the tangible book capital." Tr. 3554:14-15. As Professor Smith shows, Professor Saunders invented this "fact" from whole cloth. *See* DX 8000A (Smith Report) at Ex. 3 (demonstrating Carteret's increasing tangible net worth until the time of the breach).

- Professor Saunders testified that if he had been asked in 1982, he would have concluded that Carteret would not survive after the acquisitions. Tr. 3703:21-3704:3. The conclusions of the government's own regulators refute this notion. *See* ¶¶ 6-9.

- In attempting to explain away why he said at his deposition that he had not performed an evaluation of Carteret's franchise value, Professor Saunders claimed that he "hadn't seen Professor Calomiris' [calculation of franchise] value" at the time of his deposition. Tr. 3926:11-3729:9. This is false. The value was in Professor Calomiris' report. *See* PX 2702A at ¶¶ 49-52.

- Professor Saunders testified that Carteret's asset shrink was linked to the discontinuance of commercial lending and may not have been "willing shrinkage, but simply the market working and on the demand side." Tr. 3719:22-3721:17. But Carteret's shrinkage consisted primarily of mortgage-backed securities formed from *residential* loans. ¶ 67.

- He stated that "the [National Depositor Preference Statute (NDP)] changed the way in which

these loans were priced to a fixed T bill rate for one-year T bills from a three-month floating rate." Tr. 3622:9-12. This is false. The NDP does not apply to Carteret's resolution and, as even the FDIC's witnesses acknowledged, is silent on post-insolvency interest, let alone how to calculate it. *See* ¶¶ 209-11.

- After being read a statement by an RTC official asserting that the agency was in gridlock by the end of 1993, Professor Saunders insisted the agency was not. Tr. 3901:18-3902:15. Yet the FDIC itself had this to say on the issue: "Other times, the pace was painfully slow. The longest delay was a 21-month period from March 31, 1992, to December 17, 1993, when the RTC was without loss funding and resolution activity was severely reduced." PX 9162 (MANAGING THE CRISIS) at 124.[47]

**C. <u>AmBase Has Proved Expectancy Damages With Reasonable Certainty</u>**

The Federal Circuit has repeatedly held that " 'if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of damages.' " *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313-14 (Fed. Cir. 2004) (quoting *Bluebonnet*, 266 F.3d at 1356-57) (internal quotation marks omitted)). "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." *Bluebonnet*, 266 F.3d at 1355.

[47] Professor Saunders also asserted that RTC asset sales did not result in wealth gains for acquirers. After being confronted with the fact that a study he relied upon (Horvitz) had a sample ending more than two years before Carteret entered receivership, Professor Saunders suggested that other studies cited in his report covered the relevant time period. Tr. 3888:9-12. In fact, *none* of the cited studies covered the period of Carteret's receivership. *See* DX 5038A (Saunders Report) at ¶ 19; DX 6172 at AS-06-000260; DX 8463 at 331. When confronted with this fact, Professor Saunders insisted that the Gupta study, the sample for which ended in 1992, included Carteret. Tr. 3891:18-24. Yet the dataset for that study came from resolved conservatorship reports as of December 1992. DX 8463 at 331-333. Seized though it may have been, Carteret was not a resolved conservatorship as of December 1992.

In short, provided AmBase has demonstrated that it sustained some injury because of the government's breach, it need only demonstrate a fair and reasonable approximation of damages in order to recover.

Here, it cannot reasonably be doubted that the government's breach necessarily gave rise to severe injury. As the Federal Circuit has recognized, the government's supervisory goodwill promise had "substantial value." *Glendale*, 239 F.3d at 1381-82. FIRREA eliminated that value by breaching Carteret's contractual right to count its supervisory goodwill toward its regulatory capital requirements. This breach forced Carteret to shed assets and liabilities on which it was earning a positive spread. The loss of an item with "substantial value" establishes that Carteret sustained economic injury and more than demonstrates a reasonable probability of damage.

The question thus becomes whether the evidence allows the Court to make a "fair and reasonable approximation" of damages. *Bluebonnet*, 266 F.3d at 1357 (quotation marks omitted). Professor Calomiris's analysis and the other evidence offered at trial easily satisfy this standard. At trial, Professor Calomiris demonstrated with reasonable certainty each of the alternative measure of damages sought by AmBase. The primary damages that AmBase seeks in the alternative are: (1) Carteret's value as of 1989; (2) the undiscounted stream of Carteret's future earnings as of 1989; (3) Carteret's current fair market value in a non-breach world.

### 1. <u>Carteret's Value in 1989: $251 Million</u>

#### *a. The AmBase Purchase Price*

This Court has recognized that a thrift's pre-FIRREA market capitalization is a viable measure of damages. *Slattery*, 69 Fed. Cl. at 585-86; *Suess*, 52 Fed. Cl. at 230-31. As this Court has explained, to account for the true effect of the breach, market capitalization must be measured at the point before informational leakage about FIRREA began affecting stock prices.

*See Slattery*, 69 Fed. Cl. at 585. "This amount establishes how the market valued future income . . . discounted to present value, and it presumably incorporates the value the market assigned to goodwill which remained on [the] books at the time of the breach." *Suess*, 52 Fed. Cl. at 231.

As the government's own expert acknowledged, the "actual sales price of a company is the best indication of the value of the company provided it's an arms-length transaction." Tr. 3048:15-23 (R. Smith). *See also* 378:13-15 (JX 1 at 533). Thus, the most powerful evidence of Carteret's fair market value prior to the breach is AmBase's arms-length acquisition of Carteret in August 1988 for $266 million. FF ¶ 18.

The applicability of this fundamental market principle in this case is backed up by ample evidence that speaks to the soundness of AmBase's valuation of Carteret. First, both CS First Boston and Salomon Brothers evaluated the deal and concluded it was fair. FF ¶ 18. Second, Chase Manhattan Bank entered into a $300 million credit agreement with AmBase for the specific purpose of funding the acquisition of Carteret. *See* PX 2611 (Credit Agreement, 6/10/88. Chase's acceptance of Carteret's stock as collateral suggests that AmBase's valuation was accurate. FF ¶ 18. Third, the stock market independently valued Carteret at $198 million just prior to the transaction. *See* DX 8000A (Smith Report) at 17. The remainder of the purchase price of $266 million reflects a control premium which Professor Smith acknowledged was "within the realm of reason." Tr. 2927:2-18, 3050:10-12.[48]

Moreover, $266 million is actually a conservative estimate of Carteret's value in 1988 because, as part of the acquisition, AmBase also assumed two other obligations: (1) a commitment to infuse up to $50 million in additional capital into Carteret in the event the thrift's capital fell below required levels, and (2) a commitment to purchase Imperial Premium Finance from

[48] In addition, OTS examiner Michael Finn testified that he did not remember thinking, at the time, that AmBase had paid too much for Carteret. Dep. 42:11-14 (JX 1 at 82).

Carteret should Carteret sell it to another entity at less than the price Carteret paid. FF ¶¶ 15-16. Professor Smith recognized that these obligations had value over and above the $266 million paid by AmBase for Carteret. ¶ 17.

*b. Carteret's Market Value Just Prior to the Breach*

After the AmBase acquisition, Carteret was no longer publicly traded. Thus, to determine Carteret's value at the time of the breach, Professor Calomiris applied the average rate of increase in the market-to-book-ratios of publicly-traded thrifts and found that Carteret's market-to-book ratio increased from 86.9% at the time of the AmBase acquisition to 93.4% as of July 31, 1989.[49] FF ¶¶ 19-20. Applying this ratio to Carteret's book value of $269.3 million on that same date yields a market value for Carteret of $251.4 million. PX 9012; PX 9013; FF ¶ 21.

Independent evidence introduced at trial confirms that this valuation is reasonably certain. FF ¶ 22. First, in May 1989, a group of outside investors (including former Carteret directors Harry Jacobs and General Alexander Haig) offered to purchase Carteret for $252 million. *See* PX 4836 (R. O'Brien to G. Scharffenberger, 8/29/90) at 2.

Second, Professor Smith's own analytics confirm that Carteret was worth at least $251 million in July 1989. He asserted that credit losses affect valuation at a greater than dollar-for-dollar rate, that Carteret's credit losses occurred after 1989, and that Carteret's value in 1992 was $22 million. Tr. 2985:13, 2985:19-20, 3075:10-3076:18, 3765:12-22. Thus, because Carteret had taken approximately $280 million in credit losses by 1992, FF ¶ 22, the thrift must have been worth at least $300 million according to the formula embraced by the government's own invest-

[49] Professor Calomiris's application of the average increase was conservative because it: (1) did not account for the mechanical increase in market-to-book ratio that came from Carteret's amortization of goodwill; (2) did not account for dividends paid during this period, which the market typically views favorably; (3) did not account for the $2 billion increase in Carteret's servicing portfolio during this period; and (4) did not account for Carteret's increase in deposits under $80,000. FF ¶ 20.

ment banking expert.

Third, a valuation of $251.6 million assumes that Carteret's franchise value was approximately $100 million, or 2.2% of deposits. But when Carteret and the RTC sold branches in 1990 and 1994, the deposit premiums received were much higher at 3.5% and 10% (and deposit premiums themselves represent only part of franchise value). FF ¶ 23; PX 9016; PX 9017; Tr. 681:4-684:5 (Calomiris).

Fourth, a value of $251 million also appears reasonably certain when viewed in light of the substantial discount it represents from Carteret's stated book value. FF ¶ 23. The $251 million value is inclusive of a control premium. Assuming the 47% control premium calculated by Professor Smith, DX 8000A (Smith Report) at 17,[50] Carteret's implied trading value was only $170 million ($170 million increased by 47% is $251 million). Given that Carteret's stated book value on July 31, 1989 was $269 million, PX 9013, Professor Calomiris's market value calculation thus represents a 37% discount from stated book value ($269 million decreased by 37% is $170 million). So, rather than a market-to-book ratio of 11, as hypothesized by Professor Saunders, Professor Calomiris's calculation actually represents a steep discount from book value.

Professor Saunders suggested at trial that the $251 million valuation implies an overly high market-to-book ratio. Tr. 3552:4-9. This criticism is unfounded, however, because Professor Saunders improperly excluded intangible values from his underlying calculation of Carteret's book value. As Professor Smith recognized, intangible capital is properly included in book value. Tr. 2913:8-10, 2915:15-21. Indeed, Professor Saunders himself included intangible capital when calculating market-to-book ratios elsewhere in his analysis. *See* DX 9745; Tr. 3944:3-6.[51]

---

[50] *See also Slattery* 69 Fed. Cl. at 585 (finding a control premium of 50% reasonable).

[51] Professor Saunders was also critical of the sample Professor Calomiris used in calculating the average increase in market-to-book ratio. Yet Professor Saunders could not identify a

Professor Saunders also maintains that Carteret's loan losses caused the market to devalue the thrift between the time of AmBase's acquisition and the time of the government's breach. Because the evidence squarely rebuts this premise—indeed, because it shows that virtually every underlying assumption of his opinion is fallacious—Professor Saunders's valuation of Carteret must be rejected.

Professor Saunders based his valuation on the notion that the 1989 exam report called for "an additional 77.2 million in loan loss reserves." Tr. 3412:2-3422:11. But the OTS subsequently lowered this recommendation to $49.8 million. *See, e.g.*, DX 781A (OTS Mem., S. Smith to File, 2/14/90). Incredibly, Professor Saunders was *completely unaware* of this very significant fact, Tr. 3943:6-12—a not so subtle clue that his opinions in this case are, at best, the product of willful blindness. Moreover, the 1989 exam—completed in November—is particularly suspect as a source for a pre-breach metrics. Given that the breach occurred in August—and had effects well before that time—the exam was hopelessly tainted by the breach. FF ¶ 29.[52]

Equally problematic for Professor Saunders's opinion is the fact that numerous government witnesses testified that the magnitude of Carteret's loan losses was not apparent until 1990 and 1991—after the breach and thus irrelevant to market value in 1989. FF ¶ 26. Messrs. Kennedy and O'Rourke testified that under FASB and GAAP, loan losses must be taken at the time the loss is identified. *See* Tr. 3165:17-3166:6, 3146:7-13 (Kennedy); Tr. 2371:17-24 (O'Rourke). The OTS stated that reserves had to be taken as of year-end 1989, *not* in the second quarter. *See* Tr. 1925:19-22 (S. Smith). Prior to that time, OTS "felt that monitoring of the

---

single additional thrift that should have been included in the sample. Tr. 3955:24-3956:4.

[52] And even if (1) the $77 million figure was an accurate reflection of OTS's views, and (2) the 1989 report was not breach-affected, this state of affairs *still* would not show that Carteret's *market* value had declined because, as Professor Saunders testified, the 1989 report was not public information. Tr. 3950:22-3951:9.

problem assets was pretty good." Tr. 2047:16-17 (S. Smith). Tellingly, Professor Saunders "d[id] not know exactly" when Carteret's auditors required additional reserves. Tr. 3942:7-24.

The last nail in the coffin for Professor Saunders's opinion on Carteret's pre-breach value comes from his own testimony. He averred that the market had downgraded AmBase's only other major holding at the time, Home Insurance, to junk status, and that this "would have a serious effect on AmBase value." Tr. 3435:7-8. Yet he also testified that the stock price of AmBase rose between FIRREA's introduction and passage. Tr. 3436:13-18. *A fortiori*, AmBase's only other major holding—Carteret—must have been the driving force behind that increase.

Thus, AmBase has proven, with reasonable certainty, that Carteret's value as of 1989 was at least $251.4 million.

### 2. **<u>The Undiscounted Stream of Carteret's Future Earnings in 1989: $782.2 Million</u>**

The Court's recognition that stock market capitalization is a measure that discounts to present value, *Suess*, 52 Fed. Cl. at 231, suggests that another step is necessary to arrive at the true value of the thrift at the time of breach. By way of example, if investors in 1989 believed that Carteret was likely to make $20 million for the next twenty years, the 1989 fair market value of those earnings would not be $400 million. Instead, the fair market value would be the present value of such earnings discounted back to 1989. Thus, awarding the fair market value of Carteret in 1989 is tantamount to discounting damages back to the date of the breach. In *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330 (Fed. Cir. 2002), however, the Federal Circuit clarified that only profits that would accrue **post-judgment** are to be discounted. Applying *Energy Capital* to the damages framework in *Slattery* yields the conclusion that Carteret's earnings should not be discounted back to 1989. Indeed, such discounting would serve no economic purpose. Instead, the face amount of these profits should be awarded as damages.

Professor Calomiris calculated the face amount of the pre-trial earnings implied by Carteret's 1989 stock market valuation. This calculation depends on two variables: (1) an appropriate discount rate (the required rate of return); and (2) the market price (the market's predictions about future earnings). FF ¶ 30. As shown above, Carteret's market price was $251.4 million as of July 31, 1989. Professor Calomiris calculated the required rate of return at 12.34%, a conservative estimate given that, according to Professor Smith, investors in 1989 were requiring a rate of return of 20 to 25%. FF ¶ 31; PX 9021; Tr. 3072:15-25 (R. Smith). Professor Calomiris also assumed that, based on Carteret's earnings history from 1982 through 1988, the thrift was expected to earn, on average, $20.5 million per year.[53] Based on these inputs, Professor Calomiris used the Gordon Growth Model to calculate a growth rate of 4.2%, a rate that is, according to Professor Saunders, only half the nominal rate of growth in the economy as a whole. *See* FF ¶ 32; Tr. 4014:15-21 (Saunders). To arrive at a final measure of *ex ante* damages in line with *Energy Capital*, Professor Calomiris added intervening cash flows to the terminal value investors would have expected (a figure derived by adding Carteret's franchise value to its book value at the date of the breach and subtracting amortized goodwill). FF ¶ 41. This calculation yields overall expected cash flows as of 1989 of $782.2 million. Tr. 705:4-706:21 (Calomiris).

The government has contended that Carteret's historical earnings were not an appropriate benchmark because they were not "core earnings" and because they include accretion income. The first objection is passing strange given the testimony of the government's own expert: that "nobody really knows what core income is," a contention confirmed by the fact that the OTS and FDIC utilize different definitions of core earnings. Tr. 3063:13-14 (R. Smith); FF ¶¶ 33, 35. In any event, given that investors pay attention to cash flows regardless of source, the objection is

[53] This measure also represents a conservatism because it includes Carteret's losses in 1982, an aberrational year for the thrift industry.

irrelevant. *See* Tr. 3060:11-18 (R. Smith); Tr. 2839:22-2840:9 (Calomiris).[54] The second objection is also unavailing because accretion—which reflects the amount of principal returned on loans that have been marked to market—mirrors the receipt of the principal balance of the loan over the long term. Thus, even if accretion income fluctuates from year to year, it is a stable source of income in the long run. Accordingly, the OTS itself included accretion income as operating income in its exam reports, and Professor Smith included it in his calculations. FF ¶ 34.

The government's own refutation of its arguments regarding earnings provides a clue to the strength of its argument regarding the propriety of using the Gordon Growth Model in this case. Professor Saunders was at pains to dismiss the model as nothing more than a rule of thumb that cannot be applied here because Carteret's earnings were not stable. But Professor Saunders himself has used the model *at least three times* in scenarios where there was no stable pattern of earnings. FF ¶ 38. Upon cross examination, he confusingly tried to explain that his employment of a "multi-stage" model (in which a different growth rate is assumed for different periods) somehow differentiates his prior work from that of Professor Calomiris. This is sheer nonsense given that the last stage of Professor Saunders's model assumes a single, perpetual growth rate for companies that did not have stable earnings. *See* FF ¶ 38. But even if the government's criticism of Professor Calomiris's growth rate had any legs, the most that could be said is that Carteret should be assumed to have had no growth. That would mean damages of at least $410 million would be appropriate—the outcome of a no-growth scenario with $20.5 million average annual earnings. FF ¶ 39; PX 9020.

[54] Because cash flows is the relevant measure, Professor Calomiris included gains on sales of assets—a regularly generated source of income for Carteret. FF ¶ 35. Indeed, both of the Smith witnesses—the professor and the OTS examiner—admitted at trial that gains on asset sales were a regular part of Carteret's business. Tr. 3061:15-3062:9 (R. Smith); Tr. 2018:23-2019:5, 2021:13-15 (S. Smith).

### 3. <u>Carteret's Current Fair Market Value in a Nonbreach World: $904 Million</u>

Even with this *Energy Capital* adjustment, Carteret's pre-FIRREA market capitalization does not capture the full measure of damages in this case. *Glendale*, 239 F.3d at 1380. As demonstrated above, Carteret would have survived absent the breach. And as the government's own experts have acknowledged, the last fifteen years have been a golden era of banking. *See* Tr. 3103:8-3104:19 (R. Smith); Tr. 3876:7-3877:1 (Saunders). If Carteret had not failed, it would have participated in this era of prosperity and would be a thriving franchise today. *See* Vigna Dep. 153:21-22 (JX 1 at 598) (stating that Carteret "would have been very successful"); Tr. 321:6-7, 321:15-322:3, 322:12-14 (Bianco). Thus, in order to fully compensate for the breach, damages should mirror Carteret's present value in the nonbreach world. Plaintiffs concede that awarding the value of Carteret as of 1989 has the virtue of virtually absolute certainty. But Professor Calomiris has calculated Carteret's *current* fair-market value through a variety of metrics that establish this amount with reasonable certainty. Tr. 662:3-16, 706:24-708:10 (Calomiris).

Professor Calomiris's analysis of Carteret's current value begins with its 1989 value of $251 million. Professor Calomiris then tracks the changes in that valuation that would have occurred since 1989 by analyzing market-to-book ratios and stock market returns both for specific thrift peers and for the overall S&L industry. FF ¶¶ 43-53. There are several reasonable methods of performing this valuation, and they yield a range of values. *See* PXs 9025-9027. That a range of values is produced does not undermine the reasonably certain nature of the valuation. As Professor Saunders noted, "hav[ing] a range of numbers" is "not unusual in valuation," Tr. 4019:14-4020:3 (Saunders), and it allowed Professor Calomiris to disqualify values that appear as unreasonable outliers based on known data and to choose, as a conservatism, the lowest remaining value in the range, Tr. 714:9-21 (Calomiris).

Professor Calomiris's preferred method of valuation utilizes the present book value of Carteret, FF ¶¶ 44-47, which he conservatively estimated as $463.1 million. PX 9029; Tr. 718:14-720:23. In essence, Professor Calomiris assumed that Carteret would have increased its book value by approximately $10 million a year over the last twenty years, even though actual earnings would certainly have been more robust. *See* PX 2702A (Calomiris 5/07 Report) at ¶ 41. To this value, Professor Calomiris applied a market-to-book ratio of 1.555, which he derived from a sample of stand-alone thrifts. FF ¶ 47; PXs 9030-9031; Tr. 322:15-18 (Bianco). This calculation yields a valuation of $720.1 million, PX 9031; Tr. 724:15-24. Professor Calomiris also noted that a book value projection based on all surviving thrifts yields a present value of $909.7 million. FF ¶ 48; PXs 9032-9033. This is a reasonable measure of Carteret's value because it is fair to assume that Carteret—with its high franchise value and superior management—would have done at least as well as the average thrift. Tr. 725:6-727:25 (Calomiris). Professor Calomiris's preferred value of $720.1 million thus appears conservative.

As a confirming analytic, Professor Calomiris also projected Carteret's current market value using the stock market return of thrifts since the breach. FF ¶¶ 50-51. Assuming Carteret's market value would have increased in an amount equal to the average of all remaining standalone thrifts, its present-day value would be $2.3414 billion. PX 9036; Tr. 732:10-733:12 (Calomiris). Assuming Carteret would have done only as well as the bottom decile of standalone thrifts, its market value would be $871.1 million. PX 9036; Tr. 733:13-734:2 (Calomiris); FF ¶ 50. When the stock market returns of all thrifts are used as a sample, Carteret's value falls somewhere between $947.7 million and $1.2863 billion depending on which market index is used. The average of all indices yields a value of $1.0739 billion. PXs 9038-9039; FF ¶ 51.

In addition to Carteret's market value increase, it is also necessary to account for the div-

idends the thrift would have paid in the nonbreach world, which Professor Calomiris calculated at $183.9 million. *See* FF ¶ 53; Tr. 322:4-11 (Bianco); PX 9041; Tr. 738:22-740:7 (Calomiris). Adding this amount to the value produced through Professor Calomiris's preferred book value projection yields a total value of $904 million.

The measure of Carteret's current value in a nonbreach world satisfies the reasonable certainty standard. FF ¶ 52. The 1990s presented a much better economic environment for thrifts than did the 1980s, and Carteret was poised to take advantage of that environment. *See, e.g.*, Simone Dep. 64:3-9 (JX 1 at 500); Tr. 3572:22-24 (Saunders). Thus, it stands to reason that Carteret would have turned greater profits in this latter decade than in the former, when it was generating $20 million per annum. Indeed, OTS examiner Meyer testified that he believed an unbreached Carteret could grow to become a $10 billion institution. Dep. 110:10-12 (JX 1 at 374).

**4. <u>A Jury Verdict Award as an Alternative Measure of Damages</u>**

If the Court does not agree that all aspects of Professor Calomiris' damages calculation have been proved with reasonable certainty, the Court has discretion to modify the calculation as the Court sees fit. The Court is not confronted with an all-or-nothing choice. In *Bluebonnet*, the Federal Circuit stated: "We have also allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages—but only where the evidence adducted was sufficient to enable a court or jury to make a fair and reasonable approximation." 266 F.3d at 1357; *see also Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1346 (Fed. Cir. 2003). Accordingly, in *Globe*, Judge Lettow combined components of two different lost profits damages analyses and then modified the hybrid before arriving at an appropriate measure of damages. 65 Fed. Cl. at 351-57; *see also Commercial Fed.*, 59 Fed. Cl. at 351.

## III. PLAINTIFFS SUFFERED SIGNIFICANT WOUNDED BANK DAMAGES

" '[W]ounded bank' damages are costs incurred by the thrift because of its status as a 'troubled' or under-capitalized institution—a status directly related to FIRREA's mandated removal of goodwill from the thrift's regulatory capital." *Slattery*, 69 Fed. Cl. at 578. The Court has characterized such damages as "incidental reliance damages." *Id.*; *see also Glendale*, 43 Fed. Cl. at 403, *aff'd in part and vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001). Because there is some overlap between damage measures, *see Glendale*, 43 Fed. Cl. at 408, wounded bank damages may also properly be considered expectancy damages. Indeed, the Federal Circuit has held that expectancy damages include any losses caused by the breach, including incidental losses. *Glendale*, 239 F.3d at 1380 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347); 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:2, at 30 (4th ed. 2002). Because the evidence demonstrates that the breach caused Plaintiffs to suffer significant wounded bank damages, that these damages were foreseeable, and that they can be measured with reasonable certainty, the label applied is inconsequential.

Most significant among the wounded bank damages caused by the breach were the huge increases in Carteret's relative cost of deposits. *See* FF ¶¶ 74-78. This Court has held that such costs "are actual, ascertainable damages suffered by [a thrift] as a result of the breach." *Glendale Fed. Bank, FSB v. United States*, 54 Fed. Cl. 8, 14 (2002), *aff'd*, 378 F.3d 1308, 1311-12 (Fed. Cir. 2004). As noted above, to combat the negative market reaction to the increased risk of Carteret's failure due to the breach, Carteret offered better rates to customers and thus experienced an increase in its relative cost of funds. An extremely conservative estimate of these extra costs is $19.8 million. FF ¶ 75.

The breach also necessitated several other incidental outlays. First, to avoid the addi-

tional harm that a mass exodus of Carteret's executive personnel would entail after the passage of FIRREA, AmBase had to induce these employees to remain with the thrift by entering into severance agreements in December 1989 and January 1990. The cost of these agreements, including litigation that ensued over them, was $12.5 million. FF ¶ 159.

Second, the breach-necessitated branch sales and capital-raising efforts generated significant transaction costs. The transaction costs attendant to the 1990 branch sales—including data processing, investment banking fees, accounting fees, severance payments, and legal fees—totaled $2.4 million. FF ¶ 160. Similarly, Carteret's efforts in 1992 to raise capital entailed transaction costs totaling $632,750. FF ¶ 161; PX 2702A (Calomiris 5/07 Report) at ¶ 104.

Third, significant costs were associated with the heightened regulatory scrutiny that accompanied Carteret's breach-weakened status. For example, OTS-initiated administrative cease-and-desist proceedings generated nearly $200,000 in legal fees. The total amount of such costs from the time of breach to the time of seizure ran to more than $1.3 million. FF ¶ 162.

Because the breach deprived Carteret of necessary regulatory capital, it was reasonably foreseeable that the thrift would incur costs related to its shortage of regulatory capital. *See, e.g., Home Savings*, 399 F.3d at 1355. Moreover, because the breach caused Carteret's capital constraints, the breach necessarily caused the thrift to incur the costs of addressing those problems. *See, e.g., Glendale*, 378 F.3d at 1311-12. And, as detailed in Professor Calomiris's report and testimony, Plaintiffs have proven these costs with reasonable certainty.

As to some of the incidental damages outlined above, the government has argued that Carteret did not incur the costs because AmBase paid them. This contention is foreclosed by the Federal Circuit's decision in *Hughes Communications Galaxy, Inc. v. United States*, which held that a non-breaching party to a contract can recover the costs of the breach even if those costs

were "passed through" to a third party. 271 F.3d 1060, 1072 (Fed. Cir. 2001) (internal quotation marks omitted). *See also United States v. Burton Coal Co.*, 273 U.S. 337, 340 (1927) (holding that a breaching party's "liability is not measured by [the non-breaching party's] losses or gains, if any, under its agreements" with third parties).[55]

## IV. PLAINTIFFS ARE ENTITLED TO RELIANCE DAMAGES

If for some reason the Court concludes that expectancy damages are not recoverable, Plaintiffs are still entitled to reliance damages measured by the value of Carteret at the time of the contracts. A party's "reliance interest is 'his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made.' " *Glendale*, 54 Fed. Cl. at 11 (quoting RESTATEMENT § 344(b)). "The central idea behind reliance damages is that 'a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise.' " *Slattery*, 69 Fed. Cl. at 576 (quoting *Glendale*, 239 F.3d at 1382).

In *American Capital Corp. v. United States*, this Court found that a thrift's reliance interest in a goodwill contract "was fixed as the cost of performance for the [agreement], *i.e.*, what was 'put on the table' by plaintiffs as consideration for FSLIC's agreement to convey to" the thrift the failing institutions and the permission to treat their net liabilities as supervisory goodwill. 66 Fed. Cl. 315, 333 (2005). On the table was "an ongoing business" with a fixed equity

[55] The Federal Circuit's decision in *Granite Management Corp. v. United States*, 416 F.3d 1373 (Fed. Cir. 2005) is not to the contrary. In that case, the court held that a thrift could not recover costs covered by a cash infusion from its parent corporation. The instant case differs in an important factual respect from *Granite*: here, the same party that breached the contract and caused the incidental costs also pressured the parent company to cover the thrift's costs. Nothing in *Granite* suggests, and indeed it cannot possibly be the law, that a breaching party can insulate itself from liability for the breach by coercing a third party to bear the costs. Moreover, to the extent *Granite* can be construed to block recovery in this case, it is inconsistent with the Supreme Court's holding in *Burton Coal*.

value on the date of the transaction, "which was the contract 'price' paid as performance for the benefits set forth in the [agreement]." *Id.* at 334. On appeal, the Federal Circuit reversed the decision, finding that the reliance claim in that case belonged to the thrift rather than the holding company. *See American Capital*, 472 F.3d at 865-67. Critically, however, the Court did not question the underlying basis for or calculation of those damages. Indeed, under Federal Circuit precedent, reliance damages measured by the value of businesses contributed to a supervisory merger are an appropriate measure of damages. *See e.g.*, *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1356 (Fed. Cir. 2005); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308-09 (Fed. Cir. 2004).

As in *American Capital*, Carteret put the value of its ongoing business on the table and at risk as consideration for the acquisition of severely troubled thrifts, and did so in reliance on the government's regulatory capital promises. The value of Carteret immediately prior to the 1986 transaction was $272.5 million. *See* PX 2702A (Calomiris 5/07 Rpt.) at ¶ 11. Accordingly, by relying on the government's promises, Carteret lost $272.5 million.

For the reasons already discussed, the government could foresee—indeed, the government foresaw—that stripping Carteret of its supervisory goodwill would cause the thrift to fail and thus be put in a position far worse than if the contract had never been made. And this is all Plaintiffs need to show for recovery. It is the government's burden to prove the breach did not cause this loss. As aptly stated in *American Capital*, "by choosing to breach the contract, the government chose to shoulder the burden of proof under the reliance theory of damages." 472 F.3d at 869 (citing RESTATEMENT § 352 cmt. a). *See also* RESTATEMENT § 349. For the reasons already discussed, the government cannot possibly show that Carteret would have lost the value of its equity if the government had honored the contract.

## V. AMBASE IS ENTITLED TO RESTITUTION DAMAGES

If nothing else, AmBase is entitled to restitution. Restitution damages seek to restore to a plaintiff "any benefit that he has conferred on the other party." RESTATEMENT § 344(c). "The applicability of restitution as an alternative remedy for breach is well-established in both the federal and state courts." *Acme Process Equip. Co. v. United States*, 347 F.2d 509, 528 (Ct. Cl. 1965). This Court has noted that restitution damages in *Winstar* cases may be appropriate, and has left open the possibility of awarding them. *See Slattery*, 69 Fed. Cl. at 586.

According to government reports prepared immediately prior to the Barton and Delray acquisitions, accepting the next best bid on Barton would have increased the cost to the government by $23.5 million, and accepting the next best bid on Delray would have increased the cost to the government by $20 million. PX 2702A (Calomiris 5/07 Rpt.) at ¶ 10. As for the 1986 acquisitions of First Federal and Mountain Security, contemporaneous government reports show that Carteret's involvement saved the government $5 million over accepting the next highest bids. *See id.* at ¶ 11. Accordingly, for the breach of the 1982 and 1986 contracts, Carteret is entitled to $48.5 million in restitution damages.[56]

## VI. THE RECEIVERSHIP DEFICIT IS ARTIFICALLY OVERSTATED AND INVALID

The government and the FDIC stand united in their insistence that any damages awarded in this case must, as a matter of law, be paid into the Carteret receivership, where they will presumably be diverted, through the mechanism of the so-called "receivership deficit," right back into the federal Treasury. For multiple reasons discussed below—not the least of which is the fact that it makes no sense for damages resulting from the breach and seizure of Carteret to be paid into a receivership that would not even exist absent the breach—the government's and

[56] We also note that the Government saved $709 million in liquidation costs as a result of Carteret's performance. *See* PX 2702A (Calomiris 5/07 Rpt.) at ¶ 11 n.15.

FDIC's legal arguments are simply wrong. In order to maximize the efficient use of resources and minimize the risks of a time-consuming remand, however, the Court should nonetheless make clear that the FDIC's calculation of the Carteret receivership deficit is so riddled with errors, and is based on so many inappropriate and questionable practices, that it essentially amounts to a liability that should "never [come] to pass." *Glendale*, 239 F.3d at 1382.

**A. <u>Section 1821 Does not Bar Review of the Validity of the Receivership Deficit</u>**

This Court has already held, correctly, that 12 U.S.C. § 1821 does not prevent it from reviewing the receivership deficit to determine whether and to what extent the deficit constitutes a valid offset to the damages owed by the United States. *AmBase Corp. v. United States*, 61 Fed. Cl. 794, 798-99 (2004). The evidence demonstrates that the bulk of the receivership deficit is a direct result of Congress's own actions. Section 1821 does not purport to bar review of actions taken by Congress to inflate the receivership deficit. If § 1821 did bar such review, it would violate due process. *Cf. Reich v. Collins*, 513 U.S. 106 (1994).

Congress caused Carteret to have to borrow funds to finance its resolution, and consequently to incur interest on those loans, in several ways. First, in order to comply with Congress's mandate that performing assets be made available to minority acquirers, the RTC refrained from selling or transferring Carteret's assets; Carteret could have used these assets to finance the resolution. *See* Held Dep. 69:3-8 (JX 1 at 244) (RTC was "simply trying to satisfy the congressional mandate in implementing the [MPP]"). In addition, the effort to afford minority bidders their congressionally mandated preference delayed the resolution so much that the winning bidders eventually reduced their bids by $19 million. Second, Congress also withheld funding from RTC for over a year, thereby reducing the resolution value of Carteret by $44 million. FF ¶¶ 231-234. Third, Congress eliminated supervisory goodwill, which reduced the resolution

value of Carteret by over $40 million. Fourth, in the FDIC's view, the exorbitant rate at which post-insolvency interest accrued on the loans was set by Congress. Carteret would have had a surplus, not a deficit, absent these acts of Congress.

In addition, even though the FDIC created the tax liability, this Court can exclude the entire putative liability from the receivership deficit without assessing the validity of the FDIC's actions with respect to that liability. The FDIC *agrees* that the liability reflected on Carteret's returns was inaccurately calculated, and the IRS has demonstrated a commitment to assessing only genuine tax liabilities. For example, in the Ben Franklin case, the tax liability that the IRS ultimately assessed was only 5 percent of what the FDIC had deemed it to be for purposes of measuring the receivership deficit. The tax issues relating to Ben Franklin apply equally here.

As this Court previously recognized, the government's reading of *Bailey v. United States*, 341 F.2d 1342 (2003), seems to empower the government to "prevent Plaintiffs from recovering *any* amount by compounding the interest owed on the receivership deficit and pursuing other actions which enlarge the deficit, and then simply relying on the passage of time to protect the government from recovery." *AmBase*, 61 Fed. Cl. at 802. By attempting to wipe out the entire receivership surplus by the creation of artificial liabilities, the government has, in effect, taken away one of Carteret's basic contract remedies, an action for damages. And, as discussed previously, certainly no principle of contract law permits the breaching party to exacerbate with impunity the damages from its breach.[57] Either these government-created liabilities must be ignored and damages paid directly to AmBase or a taking has occurred.

---

[57] *See, e.g.*, 5 Arthur L. Corbin, CORBIN ON CONTRACTS § 1039 (1964) ("Losses are not regarded as avoidable if the defendant himself prevents the plaintiff from taking the steps necessary to avoid them."); *Nyquist*, 819 F.2d at 1019 (same); *Toyota Indus. Trucks U.S.A., Inc.* , 611 F.2d at 471 (same); *Koby*, 53 Fed. Cl. at 500.

## B. The FDIC Repeatedly Breached Its Fiduciary and Statutory Duties toward Carteret and AmBase

As receiver for Carteret, the RTC (and later the FDIC) owed a fiduciary duty to Carteret's creditors and its owner, AmBase, just as any other receiver would.[58] The FDIC and RTC were also under a statutory duty to "maximize[] the net present value return from the sale or disposition of [Carteret's] assets," 12 U.S.C. § 1821(d)(13)(E)(i), and to "minimize[] the amount of any loss realized in the resolution of cases." 12 U.S.C. § 1821(d)(13)(E)(ii). The FDIC breached its fiduciary and statutory duties by engaging in a series of self-serving actions that were detrimental to Carteret and AmBase. First, as the FDIC has admitted, it artificially created a tax liability for Carteret by miscalculating its taxes in a variety of ways. FF ¶ 242. Second, the FDIC imposed post-insolvency interest on the subrogated claim, and then inflated the amount of interest accruing through several mechanisms. FF ¶¶ 189-227. The result of these actions was that the government enriched itself by increasing Carteret's debt to the government. Third, the FDIC is trying to charge Carteret for administrative expenses related to other receiverships, and has adopted a litigation expense allocation methodology that threatens to siphon any award to Carteret to pay for litigation expenses for other *Winstar* cases. FF ¶ 256-258. None of these actions were even arguably in the best interests of Carteret or its non-government creditors.

The RTC also violated its duties by, among other things, shutting down Carteret Mortgage Company. FF ¶¶ 252-54. CMC had a robust mortgage origination capability; it originated over a billion dollars of loans in the twelve months prior to seizure. FF ¶ 252. Despite CMC's

---

[58] *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004) ("It is undisputed that, as a receiver, the FDIC owes a fiduciary duty to the Bank's creditors and to [its holding company]"; *see also, e.g.*, *Sovereign Bank v. Schwab*, 414 F.3d 450, 454 (3d Cir. 2005) ("A receiver owes a fiduciary duty to the owners of the property under his care."); RESTATEMENT (THIRD) OF TRUSTS § 5, cmt. d ("The receiver is a fiduciary . . . ."). *See also Crites, Inc. v. Prudential Insurance Co.*, 322 U.S. 408, 414 (1944); RESTATEMENT (SECOND) OF TRUSTS § 170(1).

evident value, and despite the recommendation of Donna Cribbs, the RTC's expert on the matter, that CMC could have been marketed to an acquirer, the RTC abruptly shut down CMC upon seizing Carteret, and made no attempt to sell the company. As a result, the RTC squandered at least $18.4 million in value, which in turn increased the receivership deficit by $37.3 million.[59]

## C. <u>The FDIC's Estimates of Post-insolvency Interest Should Be Excluded from the Recevership Deficit</u>.

"Post-insolvency interest" is interest on the subrogated claim that the receivership supposedly owes to the FDIC in its corporate capacity—*i.e.*, the government. As of December 31, 2007, such post-insolvency interest amounts to more than $180 million. DX 9174 at Rpt. 3.

As the evidence overwhelmingly demonstrates, however, there are multiple problems with the government's attempt effectively to reduce its damages liability by the amount of such interest. To begin with, and as discussed in more detail below, were it not for the government's own improper actions, there would not have been a need for the RTC "loans" on which the subrogated claim is based. Because the RTC loan (and, *a fortiori*, any interest on that loan) is directly attributable to Congress's failure to fund the RTC during 1992 and 1993, FF ¶¶ 194, 231-34, and to Congress's imposition of the MPP, FF ¶¶ 195, 235-40, this Court should not deduct interest on this loan from the damages owed by the government as a result of its breach.

Even if the RTC loans were not wholly attributable to Congress's failings, this Court should not deduct interest on the subrogated claim from damages owed by the government given that 28 U.S.C. § 2516(a) bars this Court from adjusting those damages to reflect the time value of money. As Professor Calomiris explains, "by including the time value of money as a cost in the receivership deficit, *the government effectively is asking to be reimbursed for a cost that it does*

[59] PX 2703A (Calomiris 2006 Rpt.) ¶ 152-161; PX 9068; PX 9088; Tr. 982:19-984:13; Tr. 1022:4-1023:3.

*not bear*." PX 2703A (Calomiris 2006 Rpt.) at ¶ 21 (emphasis in original); *see also* Tr. 1076:22-1079:7 (Calomiris); FF ¶196; *Glendale*, 239 F.3d at 1382 (rejecting damages award "measured in terms of a liability that never came to pass").

Reading *Bailey*, 341 F.2d 1342, to countenance such inconsistent treatment of the time value of money would thus "have the economic effect of allowing the government to expropriate some (or perhaps all) of AmBase's and Carteret's damages." PX 2703A at ¶12. As the Court previously recognized, under such a reading, "the government may prevent Plaintiffs from recovering any amount by compounding the interest owed on the receivership deficit . . . and then simply relying on the passage of time to protect the government from recovery." *AmBase*, 61 Fed. Cl. at 802.[60] *Bailey* need not, and indeed must not, be read to sanction the naked expropriation of more than $180 million of AmBase's damages award. PX 2703A at ¶ 17 & Table 2.

The inappropriateness of deducting post-insolvency interest from the damages awarded in this case is also confirmed by FDIC's own representations, as reflected in information on its own website, about the true cost of the Carteret resolution. According to the FDIC's "Historical Statistics on Banking" database, the estimated cost to the FDIC of the Carteret resolution, including RTC interest expenses and overhead costs, amounted to less than $25 million as of December 31, 2006. FF ¶ 221; PX 6904; Tr. 842:15-848:22 (Green). This figure is obviously a far cry from the more than $180 million claim for post-insolvency interest asserted in this case.[61]

[60] *Cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162 (1980) ("Indeed, if the [government] were entitled to the interest, its officials would feel an inherent pressure and possess a natural inclination to defer distribution, for that interest return would be greater the longer the fund is held; there would be, therefore, a built-in disincentive against distributing the principal to those entitled to it.").

[61] At an absolute minimum, the Court should not allow the government to profit from the years of delay occasioned by the actions and positions taken by the FDIC regarding receivership deficit issues. To begin with, much of the information that demonstrates the invalidity of major components of the receivership deficit, and that was revealed through the discovery that took

**1. If Interest Is Deducted, It Must Be Calculated Pursuant to 12 C.F.R. § 360.3(b)**

But even if the government could somehow steer around the above problems and demonstrate an entitlement to post-insolvency interest, the fact remains that the FDIC has grossly inflated, through questionable accounting practices and even more questionable legal analyses, the amount of such interest. Most critical in this regard was the FDIC's 1999 decision to retroactively recalculate post-insolvency interest in such a manner as to increase the receivership deficit by tens of millions of dollars.

The RTC and FDIC originally calculated interest pursuant to 12 C.F.R. § 360.3(b),[62] which provides for interest "at a rate or rates adjusted monthly to reflect the average rate for U.S. Treasury bills with maturities of not more than ninety-one (91) days during the preceding three (3) months." *See* PX 5058 (Calculation of Accrued Interest on Priority 6 Claimants); PX 1105

---

place (over the government's and the FDIC's objections) in 2005-06, was actually responsive to discovery requests that were served years earlier, in 1999. *See, e.g.*, Tr. 833:2-11 (Green); Tr. 2468:12-2472:7. Had the FDIC produced that information earlier, it is likely that this case would have been resolved earlier. In addition, while it is true that today, after the 2005-06 discovery revealed the numerous serious problems with the FDIC's receivership deficit calculations, the FDIC takes the position that some components of those calculations are so contingent and/or so controversial that they should essentially be ignored for purposes of the justiciability analysis, *see, e.g.*, Tr. 100:9-101:14, before that discovery was allowed, the FDIC was singing a decidedly different tune. At that time, the FDIC all but acquiesced in the government's argument that the FDIC's receivership deficit calculations must be taken as conclusive for purposes of this Court's justiciability analysis. *See, e.g.*, Doc. 144 (11/20/03 hearing transcript) at 78-81, 96-97 (FDIC argument that Court does not have jurisdiction to look behind FDIC receivership deficit calculations, and acknowledgement that those calculations could eliminate the "standing" of the plaintiffs). Had the FDIC said then what it is saying now, much of the work done in connection with the so-called "show cause" proceedings ordered by the Court, and much of the time needed to complete those proceedings, could have been avoided. These delays resulted in tens of millions of dollars being added to the receivership deficit. Indeed, in 2005 and 2006 alone, the FDIC ran up interest of $23 million. *See* PX 1113 (12/31/05 CFSB Goodwill Package) at Report 3 and PX 1114 (12/31/06 CFSB Goodwill Package) at Report 3. It would truly be a perverse result if the damages awarded in this case were reduced because of the delays resulting from the government's and the FDIC's arguments and actions.

[62] This provision has been redesignated several times since its promulgation in 1988. For convenience, Plaintiffs refer to this provision by its current designation.

(Goodwill Package, 7/28/00). *See* FF ¶¶ 199-200.

In 1999, however, at the same time it was working to respond to AmBase's interrogatories probing into its receivership deficit calculations, the FDIC abruptly decided to radically change course, opting to recalculate *retroactively* the interest purportedly due on the loan, by switching from a floating, short-term rate of interest to a fixed, long-term rate of interest. *See* FF ¶¶ 201-02. As the FDIC's designated witness on interest issues conceded, it was readily knowable to the FDIC and to the United States that the effect of this *post hoc* recalculation was to lock in interest rates at their highest levels at any time since the initial seizure of Carteret in 1992. *See* FF ¶ 218. Indeed, the FDIC *actually knew* at the time it made this decision that the effect would be to increase the balance of post-insolvency interest supposedly owed to the government by more than $20 million. FF ¶ 219. At present, the impact of this change amounts to almost $80 million. *See* FF ¶ 222; PX 9097; Tr. 1046:8-17 (Calomiris).

Even if interest on the subrogated claim properly could be deducted from damages, it should be calculated, consistent with the FDIC's original methodology, using a floating rate tied to short-term Treasury bills as provided in 12 C.F.R. § 360.3(b). Indeed, not only are the FDIC's new—and likely litigation-inspired—interest calculations inconsistent with the methodology employed by the FDIC before 1999, they are also flatly inconsistent with the FDIC's *current* methodology for calculating post-insolvency interest for receiverships established since 2002.

*a. The Interest Rates Used by the FDIC Are Contrary to Law*

In abandoning its original methodology, the FDIC appears to have relied solely on a cursory legal analysis, as reflected in a 1999 email by an FDIC staff attorney who had never previously analyzed the issue, and who in turn relied on a short 1995 FDIC internal memo that never mentions 12 CFR § 360.3(b), of the National Depositor Preference statute (NDP). *See* FF ¶¶

203-08. This legal analysis is flawed in at least two fundamental respects. First, Carteret was placed in receivership in 1992, well before the NDP's effective date. The NDP, which was enacted in August 1993, applies "with respect to insured depository institutions for which a receiver is appointed after the date of the enactment of this Act." 12 U.S.C. § 1821 note. It is undisputed that Carteret was seized and the RTC appointed its receiver in December 1992. *See* FF ¶ 189. Notably, the same FDIC database which notes that Carteret's resolution cost the FDIC less than $25 million also makes clear that Carteret's date of failure was December 4, 1992. PX 6904 (Closings and Assistance Transactions); FF ¶¶ 210, 221.

The FDIC's classification of Carteret as a post-NDP receivership is based on the fact that at the same time Carteret was placed in receivership, a new institution—Carteret Federal—was created and placed into conservatorship, and that this institution was placed into three subsequently consolidated receiverships in conjunction with the branch sales in 1994 and 1995. Given that it cannot be disputed that Carteret was seized in 1992, *see, e.g.*, Green Dep. at 102:23-103:1, 231:10-15 (JX 1 at 116, 149), it is plainly arbitrary and irrational to treat Carteret as an NDP receivership simply because the RTC *chose* to resolve it through a series of artificial entities.

The FDIC's decision to accord dispositive significance to the fact that the RTC decided to place Carteret Federal into conservatorship rather than receivership in 1992 overlooks the fact that the statutory framework of which the NDP is a part equates a conservatorship with a receivership for this purpose. Thus, although the application of the NDP is tied to the appointment of a "receiver" for the insured institution, 12 U.S.C. § 1821 note, for purposes of the FDIC Act (which the NDP amends, *see* 66 Fed. Reg. at 65,144), "[t]he term *'receiver'* includes a receiver, liquidating agent, *conservator,* commission, person, or other agency charged by law with the duty of winding up the affairs of a bank or savings association." 12 U.S.C. § 1813(j) (emphases

added). Because it is undisputed that in December 1992 the RTC was appointed not only receiver for Carteret but also conservator for the Carteret Federal, FF ¶ 189, there can be no doubt that the FDIC's *post hoc* classification of Carteret as an NDP receivership is contrary to law.

Second, even if the Carteret receivership were subject to the NDP, absolutely *nothing* in that statute states or even implies that post-insolvency interest should be calculated at a fixed rate based on the federal judgment rate. Indeed, the statute does not even mention post-insolvency interest or the methodology for calculating it. The FDIC itself acknowledges that the "NDP does not address the issue of rate, payment or priority of post-insolvency interest distributions." PX 5036; *see also* FF ¶ 211.

*b. The Interest Rates Used in the FDIC Calculations Upset Reasonable, Well-Settled Expectations*

The FDIC's *post hoc* decision to calculate post-insolvency interest using a fixed rate based on the federal judgment rate also departed sharply from the established practice with former RTC receiverships in general and the government's course of dealing with the Carteret receivership in particular. This prior practice reflected the considered judgment of the FDIC that the methodology of §360.3 properly applied to all other RTC receiverships. *See* FF ¶ 200.

The government's entire course of dealing with the Carteret receivership up to 1999 reflected a mutual understanding that interest on Carteret's liabilities would be charged at a floating, short-term rate. Thus, a floating short-term rate was applied to advances made by the RTC in 1992, and interest on the remaining obligations of the 1992 "pass-through" receivership was, and continues to be, calculated pursuant to section 360.3(b). *See* FF ¶ 214. Reciprocally, when, as discussed more fully below, the government held the deposit premiums from the sales of Carteret's deposits in an escrow account for several months prior to crediting them to the receivership, it paid interest on these funds at a floating, short-term rate. *See* FF ¶ 216. The conservator-

ship relied on this mutual understanding in making cash investments with a rate of return greater than the rate of interest on the RTC loan as calculated pursuant to section 360.3(b) but less than the rate of interest subsequently calculated by the FDIC using its new methodology. FF ¶ 216.

*c. The Interest Rates Used in the FDIC Calculations Have no Economic Justification*

In addition, the "historically excessive" interest rates used by the FDIC "do not have any economic rationale." PX 2703A (Calomiris 2006 Rpt.) at ¶ 13. These rates plainly exceed (1) the RTC's own borrowing costs, as disclosed in its annual reports, *see* FF ¶ 220; (2) any actual cost of funds to the government, *see* PX 4431 (Mem. re FDIC Corporate and Receivership Transactions Subject to Interest) at 3; and, (3) the actual dividends that would have been due the depositors in whose shoes the FDIC stands on its subrogated claim, *see* Green Dep. at 116 (JX 1 at 119); 12 U.S.C. § 1821(g)(2).

Furthermore, the FDIC's new fixed-rate methodology has no economic justification as a measure of the realized time value of money during the receivership period. *See* FF ¶¶ 207, 224; PX 2703A at ¶¶ 23-28. Notably, neither the contemporaneous documentary evidence, nor the FDIC's fact witnesses, could even identify what the economic or financial rationale might have been for its decision, let alone demonstrate that the FDIC *actually had* a rationale. *See* FF ¶¶ 207-08. Indeed, the FDIC in a 2002 rulemaking recognized that even using a simple rather than compound interest calculation, a floating rate tied to short-term Treasury yields would "provide a reasonable amount of interest to compensate receivership creditors for the time value of money." PX 4316 at AM00096600; *see also* PX 6915 (Post-Insolvency Project, 5/9/01). *See* FF ¶ 217.

**2. If the FDIC's Interest Rates Are Used, Its Calculations Must be Corrected to Eliminate Other Flaws**

The RTC lent funds to the Carteret receivership in conjunction with each of the three

branch sales. In the FDIC's initial calculations based on § 360.3(b), the interest rate for all three loans was the same because all three rates were adjusted monthly to track changes in three-month Treasuries. Under the FDIC's new fixed-rate methodology, however, a different interest rate was locked in for each loan. *See* PX 5066 (E. Tama to W. Green, et al., 12/22/99). Furthermore, under the FDIC's accrual methodology, once the loan principal is paid off, no further interest accrues. *See* FF ¶ 226. Under these circumstances, payments from the proceeds of the sale of Carteret's assets should have been allocated to the highest-cost loan until its principal was paid off, then to the next highest-cost loan, and finally to the lowest-cost loan. PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 14, 43. The FDIC, however, misallocated payments by allocating payments on a pro-rata basis to all three loans. FF ¶¶ 225-226. The effect of the FDIC's misallocation of payments was to increase the interest claimed by the government by almost $66 million as of December 31, 2007. FF ¶ 226; Tr. 1047:15-1048:22 (Calomiris).[63]

As Professor Calomiris explained, on these facts "[t]here is no economic justification for a *pro rata* pay down of the debt." PX 2703A at ¶ 43. The FDIC itself has conceded that "economically it would make most sense to pay off the highest rate liability" before lower cost loans, and that the FDIC's method of allocating payments *pro rata* to the three loans "had the effect of increasing the cost of the receivership." Green Dep. at 292-95 (JX 1 at 163). Nor could the FDIC identify any policy, manual, or regulation supporting its allocation method. *See id*. at 296 (JX 1 at 164). *See* FF ¶ 225.

In addition, when the RTC sold Carteret's deposits in 1994 and 1995, it obtained deposit premiums totaling $143.8 million and transferred $43.5 million in Carteret assets to the acquir-

[63] Even under the assumption that interest would continue to accrue until the principal of all three loans was repaid, the FDIC's unsupported and unsupportable *pro rata* methodology has the effect of overstating interest by almost $17 million. *See* FF ¶ 226.

ers. This meant that although the acquiring institutions assumed responsibility for $1.37 billion of deposit liabilities, the government only needed to pay these institutions $1.18 billion. FF ¶¶ 190-91, 227; Tr. 809:25-806:5 (Green). The FDIC's interest calculations, however, treat the full $1.37 billion as principal for the RTC loan. FF ¶ 191. The deposit premiums were credited to an escrow account until April 1995, when they were credited to the receivership. The escrow account earned interest at a short-term Treasury rate. FF ¶¶ 216, 227.

Under the FDIC's new methodology for calculating post-insolvency interest, the rates charged to the receivership are substantially higher than the rate paid on the escrow account: although the interest earned on the deposit premiums while they were held in the escrow account was $1.9 million, the interest that accrued during the same period on the portion of the RTC loan corresponding to these premiums was $2.4 million under the FDIC's new methodology. FF ¶ 227. This $0.5 million difference between the two amounts has increased through time by accruing interest to approximately $1.1 million as of December 31, 2007. FF ¶ 227.

There is no economic justification for charging the receivership a higher interest rate on the loan than the interest rate credited to the receivership on the escrow account. FF ¶ 216; PX 2703A (Calomiris 2006 Rpt.) at ¶ 47. Not only was the FDIC unable to articulate any such rationale, but Congress has expressly rejected such governmental manipulation of the time value of money in other contexts. *See, e.g.*, 26 U.S.C. § 6621(d). Even assuming this Court determines that interest may be deducted from damages and approves the rates used in the FDIC calculations, it must correct the FDIC's improper treatment of the premiums from the branch sales.

### D. Congress Overinflated the Receivership Deficit by Breaching the Contracts and by Delaying RTC Funding

Actions taken by Congress had the result of reducing Carteret's value and thus ultimately increasing the amount of the receivership deficit. Aside from the application of the Minority

Preference Program to Carteret, discussed further below, other value-destroying actions included: (1) the government's breach of its regulatory capital contract, which prevented the RTC from realizing any value for Carteret's supervisory goodwill,[64] FF ¶ 230, and (2) congressional delays in funding the RTC, which significantly reduced Carteret's value by unduly extending the duration of Carteret's resolution, FF ¶¶ 231-234.[65] It is probable that had these actions not occurred, there would have been no need for an RTC loan in the first place. But at a minimum, the Court should reduce the receivership deficit by the amounts by which these actions reduced Carteret's value.

**E. <u>The Minority Preference Program Harmed Carteret and AmBase</u>**

**1. <u>The Minority Preference Program Violates the Due Process Clause</u>**

The Minority Preference Program (MPP) treats individuals differently solely on the basis of race, and is thus subject to strict scrutiny. *Grutter v. Bollinger*, 539 U.S. at, 326 (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). "Determining whether a racial classification satisfie[s] strict scrutiny require[s] an inquiry into whether the 'suspect classification' (*i.e*., race) serve[s] a 'compelling interest' and was 'narrowly tailored' in furtherance of that interest." *Rothe Dev. Corp. v. United States Dep't of Def. "Rothe I"*, 262 F.3d 1306, 1318 (Fed. Cir. 2001).

[64] Professor Calomiris has concluded that the goodwill had a value of $46-$49 million as of December 1993 (the time at which Carteret would likely have been resolved absent congressionally caused delays), and a value of $41-$44 million as of December 1994 (the time of the resolution transactions). PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 121-22, 131-33, Table 12.

[65] Had funding been available to the RTC in 1992 and 1993, Carteret would have been resolved in about one year instead of the more than two years it actually took for resolution to be completed. *Id*. at ¶ 82. If Carteret been resolved at this time in a whole bank transaction, the value of its assets plus the deposit premium would have exceeded the value of its deposits, and no resolution loan would have been required. *See id*. at ¶¶ 83-85; *see also id*. at ¶¶ 8, 52. At a minimum, had the RTC resolved Carteret in late 1993 rather than early 1995, it would have been able to recover at least $43.8 million in additional value. *Id*. at ¶ 83.

*a. Congress Failed To Demonstrate a Compelling Interest for the MPP*

"[C]ourts are not obligated to receive proffered remedial reasons as fact and rubber-stamp the government's race-based programs." *Christian v. United States*, 46 Fed. Cl. 793, 808 (2000). Congress's conclusions about whether a compelling interest exists must have been supported by a "strong basis in evidence." *Rothe I*, 262 F.3d at 1322; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986). And that evidence "must have actually been before the legislature at the time of enactment." *Rothe I*, 262 F.3d at 1327. As the Supreme Court and the Federal Circuit have emphasized, "the reviewing court must assess what 'actually' motivated the legislature, not what 'may have motivated it.' " *Id*. at 1327 (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996)); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996). "[T]he government bears the burden to produce evidence" of a compelling interest justifying the MPP. *Id*. at 1317.

Neither in the text of the RTC Completion Act, through which Congress created the MPP, nor in the accompanying joint explanatory statement in the conference report, did Congress attempt to identify a compelling interest for creating the MPP. *See* 139 CONG. REC. H10,162, 10,175-76 (1993). The only attempt in the legislative record to set forth the rationale for the MPP appears to be a statement by Representative Mfume, who argued that the MPP provided economic opportunities for minorities, promoted diversity, and remedied discrimination. 139 CONG. REC. H10,897, 10,899 (1993). Even assuming *arguendo* that these rationales can constitute compelling governmental interests for erecting a race-based legal regime, the requisite "strong basis in evidence" to support them is entirely absent here.

First, diversity has been held to constitute a compelling interest only in the context of higher education, where universities have made a showing that diversity was necessary to

achieve their mission. *Grutter*, 539 U.S. at 330. *See id*. at 330-31 (citations omitted). By contrast, the legislative history of the MPP is devoid of any explanation as to why the RTC could not adequately carry out its mission of resolving failing depository institutions in a cost-effective manner without engaging in race-conscious action.

The other rationale identified by Rep. Mfume—remedying discrimination—is equally unavailing. "[A] race-based classification may be enacted to remedy only identified systematic discrimination," and the evidence must show that "discriminatory conduct or effects were experienced in the specific industry." *Rothe I*, 262 F.3d at 1323, 1330. "[A] generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy," and is therefore inadequate to survive strict scrutiny. *J.A. Croson*, 488 U.S. 469, 498 (1989), *quoted in Rothe I*, 262 F.3d at 1323. Congress had before it absolutely no evidence that the RTC—or any other arm of the federal government—was discriminating against minorities who were in, or wanted to be in, the depository banking industry, or that the effects of such discrimination were still lingering.[66]

*b. The Minority Preference Program Is not Narrowly Tailored to a Compelling Interest*

"There are six factors commonly considered in the narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the overinclusiveness or underinclusiveness of the racial classification." *Rothe I*, 262 F.3d at 1331 (collecting decisions). As described in more detail in AmBase's Statement of Issues briefing,

[66] *See* Ramey Dep. 22:5-22:16 (JX 1 at 455) (witness was not aware of any racial discrimination by the RTC or FDIC in the selling of branches or any aspect of selling financial institutions); Held Dep. 70:11-18, 71:13-14 (JX 1 at 245) (same).

Docs. 193, 205, each of these factors demonstrates that the MPP is not narrowly tailored to a compelling governmental interest.

(1) As to the necessity of relief, both the Constitution and federal statutes prohibit governmental discrimination against minorities in the resolution of failed institutions. *See* 12 U.S.C. § 1821(d)(13)(E)(iv). There is no evidence that these prohibitions are inadequate to protect minorities against such discrimination. These race-neutral alternatives foreclose the MPP.

(2) The RTC has no flexibility in determining whether to apply the MPP to a given depository institution, and no waiver is available. 12 U.S.C. § 1441a(w)(17)(A) ("the RTC "shall give preference" to minority bids).

(3) The relationship of the stated numerical goals to the relevant market is difficult to assess in this case because the MPP has *no* numerical goals. The absence of such goals reflects the inherent inflexibility of the program: *every* minority gets a preference with respect to *every* depository institution in a predominantly minority neighborhood.

(4) The MPP can have a very substantial effect on innocent third parties, and in fact has had a devastating effect on the Plaintiffs, as detailed below.

(5) The MPP is substantially over-inclusive as a means of remedying discrimination. For purposes of the MPP, the term "minority" means "any Black American, Native American, Hispanic American, or Asian American." 12 U.S.C. § 1441a(w)(17)(E)(ii); 12 U.S.C. § 1811 note; *see also* 12 C.F.R. § 1630.2. There is no evidence in the legislative record that members of *each* of the statutorily defined minority groups have attempted to acquire or obtain loans from depository institutions, let alone that members of *each* group were unable to do so because of specific discriminatory acts. As the Supreme Court stated in *Croson*, "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the [re-

levant] industry . . . suggests that perhaps the [government's] purpose was not in fact to remedy past discrimination. . . . The gross overinclusiveness of [the government's] racial preference strongly impugns the [the government's] claim of remedial motivation." 488 U.S. at 506.

**2. The Minority Preference Program Harmed Carteret and AmBase**

Carteret was subjected to the MPP in two basic ways: its performing loan assets were held back for other minority acquirers, and minority bids for Carteret were afforded a preference over non-minority bids. As a result, the MPP substantially inflated Carteret's receivership deficit. Professor Calomiris has demonstrated that in the absence of the MPP, Carteret would not have needed a loan to fund its branch sales, and thus *no interest* would have accrued.[67]

*a. Carteret's Assets Were Frozen to Effectuate the MPP*

Due to its large size, Carteret's performing assets provided the RTC "the most readily available source of mortgages in one spot on which due diligence has been performed." PX 4919 at C-AM-A-0089837. Consequently, Carteret's performing assets became critical to the functioning of the MPP—as one RTC employee put it, Carteret was "an easy choice as the source of the loans" for minority purchasers. *Id*.; *see also* PX 4925; PX 4922. To preserve Carteret's cache of performing assets for minority acquirers, the RTC "froze" Carteret's performing assets, PX 4207 at 2; in order to sell them, Carteret's managing agents had to obtain approval from the Resolutions group to "release" them, *see, e.g.*, PX 4907.

This freeze precluded Carteret from selling its own performing assets as part of its own resolution. An RTC marketing specialist noted that Carteret's performing assets were "integral to both the franchise value and the marketability of this institution in a Purchase and Assumption transaction," and requested that the loans be released so that "they can be offered for sale with

[67] PX 2703A (Calomiris 2006 Rpt.) at ¶¶ 88-100; PX 9072; PX 9073; PX 9082; PX 9086; Tr. 993:21-994:15, 1008:16-1010:2, 1016:25-1018:17 (Calomiris).

the deposit franchise of Carteret. . . . Given the size of the portfolio, this would represent an excellent P&A marketing element." PX 4918. Mr. Ramey responded: "This won't fly. There are too many initiatives associated with Carteret. There is a securitization effort but it may be sidelined because they are pulling loans to furnish on the minority acquisitions." *Id*. On the eve of Carteret's resolution, Ann Richards, a member of the RTC's asset sales team, stated: "We're chomping at the bit waiting to sell securities out of Carteret. Should they still remain frozen?" PX 4973. Herb Held, a high ranking RTC official, replied, "We are still working with a minority whole bank bidder. We will need about $1.4 billion in loans. If Sandra has the loans [to satisfy the minority bidder] and does not need the securities th[e]n we should be able to release the securities." PX 4975 (Email from H. Held, 9/16/94); *see also* Ramey Dep. at 152:10-153:7 (JX 1 at 464-5) (conceding that the point of Mr. Held's email was that "as long as a minority might want to exercise its option to buy performing assets, [the RTC was not] going to sell these assets").

Because of the MPP, Carteret's performing assets were not released for its own resolution. Instead, Carteret had to borrow from the RTC $1.18 billion in order to finance its resolution. PX 4986 (Consolidated Florida Branch Resolution Summary). At the time of its resolution, Carteret still had a comparable amount of assets. PX 905 (Carteret Consol. Fin. Statements, 9/30/99) at 2. Thus, but for the asset freeze, it would not have needed a loan to finance the resolution. PX 2703A (Calomiris 2006 Rpt.) ¶¶ 88-100; PX 9072; PX 9073; PX 9082; Tr. 993:21-994:15, 1008:16- 1010:2 (Calomiris).[68]

---

[68] In fact, this calculation underestimates the true fair market value of Carteret. The RTC sold most assets under its control through competitive bidding, which is a reliable method for determining the market price. *See, e.g.*, Douglas G. Baird, *The Uneasy Case for Corporate Reorganizations*, 15 J. LEGAL STUD. 127, 136-38 (1986). But when the RTC sold performing assets for the benefit of minority acquirers, it eschewed competitive bidding in favor of setting the price unilaterally. This method is inherently prone to underpricing, especially since minority acquirers enjoyed a risk-free option: they could purchase the loans, but were under no obligation to

*b. Minority Bids for Carteret Were Preferred Over Non-minority Bids*

The piecemeal sale of Carteret necessitated by the MPP prevented the RTC from resolving Carteret in the more economically beneficial form of a whole institution.[69] Thus, by forcing Carteret to be resolved through a method that was economically inappropriate for it, the MPP reduced the premium value that Carteret would recover. *Id.*

In addition, the MPP's procedures caused delay in selling Carteret's branches. FF ¶¶ 236, 238-240. Meanwhile, Carteret's customers were withdrawing their deposits. FF ¶ 240. As Professor Calomiris demonstrated, the delay occasioned by the MPP reduced the deposit premium by at least $19.4 million, and thus increased the principal balance of Carteret's resolution loans. PX 2703A (Calomiris 2006 Report) at ¶ 88; PX 9082; Tr. 1008:16-1010:2 (Calomiris).

**F. <u>The Tax "Liability" Is a Phantom Liability that Is a Creation of the FDIC's Numerous Errors and that Will Never Be Paid by the FDIC</u>**

The FDIC includes a tax "liability" of $113.9 million on the receivership's balance sheet. DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3. The tax liability arises solely from the amended 1995 return, which purports to show taxable income of $85 million. But there were more than $160 million of deductions available to Carteret that could have been applied to eliminate this tax liability in its entirety, and the FDIC has admitted that it failed to take tens of millions of dollars of deductions that were available to Carteret in 1995. Vordtriede Dep. 361:15, 362:23 (JX 1 at 691). The FDIC has also candidly acknowledged that this tax liability was "artificially created." *Id.* at 388:2-18 (JX 1 at 696). And it is transparently so. It is self-evident that

---

do so. *See* FF ¶ 237.

[69] FF ¶ 238; PX 4961 (Hambric Email, 8/16/94); PX 2703A (Calomiris 2006 Report) ¶¶ 90-97; PX 9074, PX 9083, PX 9084, PX 9085, PX 9086; Tr. 994:16-996:18, 1010:4-1012:16, 1013:8-1015:14, 1015:20-1016:12, 1016:25-1018:17 (Calomiris). *See also* PX 5220 (Memo from S. Yore, 3/9/95) at C-AM-A-0130765 ("Carteret was designated as a PMN institution, however, no acceptable bid for the entire franchise was received from a qualified minority acquirer[]."); PX 5205 (Furash Rpt.) at CAM5370117, CAM5370121.

a receiver that claims to have a non-tax deficit of more than $160 million cannot also have been wildly profitable and owe tens of millions of dollars in taxes. The only way such a counterintuitive result could occur is if the receiver (1) improperly included non-taxable income on the tax returns or (2) failed to take permissible deductions. Here, the FDIC did both.

The evidence conclusively demonstrates that the ultimate tax liability bears no relation to the amounts currently reflected on the FDIC's books. The FDIC's 30(b)(6) tax witness admitted that the current tax liability improperly includes approximately $21.2 million of taxable income that should not have been included under the final rules governing the taxation of federal financial assistance (FFA) to seized thrifts. Vordtriede Dep. 166:23-167:15, 175:9-15 (JX 1 at 649, 651). In addition, internal FDIC emails, the sworn testimony of FDIC officials, and the IRS's position with respect to other receiverships confirm that $80 million of interest deductions could have been utilized to shield taxable income but were not. And finally, the FDIC has acknowledged that there were approximately $56 million of net operating loss carryforwards (NOLs) from 1992 that could have been utilized to shield income in 1995 but were not. FF ¶ 249. Taken together, these adjustments more than wipe out the taxable income of $85 million in the amended 1995 tax return that formed the entirety of the tax liability estimate reflected on the FDIC's books.[70]

[70] The FDIC has acknowledged that it is highly unlikely that the FDIC will have to pay the tax liability recorded on the receivership's books. All of the above errors can and should still be corrected through the amendment of the relevant returns. Steven Johnston, the FDIC tax analyst responsible for preparing the goodwill tax liability estimates, acknowledged that the statute of limitations for amending returns is the later of three years from filing the return or the payment of tax. Johnston Dep. 20:7-11 (JX 1 at 312). Here, because no tax has been paid, the statute of limitations remains open. And as Mr. Johnston admitted, it is FDIC policy to file amended returns whenever it is possible if it would reduce the tax liability. *Id.* at 20:12-17 (JX 1 at 312).; *see also id.* at 48:15-17 (JX 1 at 319). But the FDIC has indicated that "serious discussions" with the IRS about the appropriate amount of tax will take place only after there are funds available to pay the claim. Vordtriede Dep. 366:9-23 (JX 1 at 692). Thus, if damages are awarded

Tellingly, not even the IRS views the tax liability as fixed, given that the agency does not have a valid claim on file with the FDIC and is not even permitted to make an assessment against the receivership until sufficient funds are available to pay the subrogated claim. *See* PX 5051 (Email from J. Vordtriede, 7/21/98) ("No IRS proof of claim is currently on file."); 26 U.S.C. § 7507(b) (prohibiting the IRS from making any assessment against a receiver until sufficient funds are available to pay depositors).[71]

Just as the Federal Circuit has emphasized that plaintiffs cannot recover for a liability that never comes to pass, *see, e.g.*, *Glendale*, 239 F.3d 1382, so too defendants cannot evade payment for damages on the basis of a liability that will never come to pass. And this postulate should apply with particular force where, as here, the liability has been artificially created.

Before turning to the specifics of the FDIC's errors, two preliminary notes are important. First, it is common ground among the parties that Carteret is part of AmBase's consolidated tax group. *See* FF ¶ 251. Consequently, the FDIC's returns are "informational only" and are trumped by AmBase's returns. Vordtriede Dep. 65:12-17 (JX 1 at 622). In other words, because Carteret remains part of AmBase's consolidated group, the FDIC had no authority to file returns on behalf of Carteret, and thus the returns have no force or effect.[72] Second, the tax liability, even if valid, was the direct result of the breach. The 1995 return includes $134 million of in-

---

directly to the FDIC, AmBase will be held captive to a protracted negotiation between the FDIC and the IRS, just as occurred in the aftermath of *Suess*.

[71] Under these circumstances, the inclusion of any tax liability on receivership books is inconsistent with FDIC policy. As an internal email from an FDIC tax analyst acknowledged, "current practice is to record only those IRS liabilities where the IRS has a proven claim (*i.e.* the IRS's filed a claim and it's been accepted by FDIC). There are many receivership tax liabilities that are not booked because [a receiver's certificate] hasn't been issued for the claim." PX 4419 (Email from K. Hughes, 6/22/00) at AM0010644; Johnston Dep. 48:7-24 (JX 1 at 319) (explaining IRS and FDIC interests).

[72] *See* Treas. Reg. § 1.597-4(f) (providing that, in the absence of an affirmative election to disaffiliate, a newly created entity such as Carteret Federal is required to continue as a member of the same consolidated group of its predecessor company).

come from the branch sales premium. FF ¶ 243. In the absence of the breach, Carteret would not have sold its branch network in 1995, and thus this income would not have been realized, and no tax would be due.

### 1. The FDIC Concedes That It Erroneously Overstated Taxable Income as a Result of Its Treatment of Federal Financial Assistance

The FDIC concedes it mishandled the taxation of FFA. Section 597 of the Internal Revenue Code (IRC) governs the tax ramifications of FFA, which are government contributions used to resolve insolvent thrifts and banks. 26 U.S.C. § 597. Congress enacted § 597 in 1989 because it was concerned that parent companies of seized thrifts would claim huge tax deductions as a result of the losses sustained by their insolvent subsidiaries even though the federal government was picking up the tab for these losses. Accordingly, Congress limited parent companies' deductions to the parent company's tax basis in the insolvent subsidiary. *See, e.g.*, Vordtriede Dep. 233:3-4 (JX 1 at 662).[73]

This regime was established in the IRS's final regulations under § 597, which were promulgated on December 20, 1995 and were effective for all tax years ending on or after April 22, 1992. 26 C.F.R. § 1.597-7(b). The final regulations thus plainly apply to all of the tax returns filed by the RTC and FDIC on behalf of Carteret. *Id*. But the FDIC admits that *none of the key tax returns filed prior to 1997 conformed to the regulations*. *See, e.g.*, Vordtriede Dep. 174:17-175:8 (JX 1 at 651). The FDIC simply never went back and amended the prior returns to

[73] A simple example illustrates how § 597 operates. If, for example, a bank had net tax basis in its assets of $400 million at the time of seizure, then the maximum possible taxable loss sustained by the bank while in receivership would be $400 million. This result is achieved through a straightforward mechanism: additional losses beyond the tax basis are offset by the inclusion in taxable income of a like amount of FFA income. So, for example, if the bank in the foregoing example had a taxable loss of $500 million during the life of its receivership, tax deductions of $400 million would be generated, but the final $100 million in losses would be offset by $100 million of taxable income under the heading of FFA. No tax would be due on this $100 million in "income"; rather it would simply offset a loss.

conform to the governing regulations. Moreover, even after the final regulations were in place, the FDIC continued to misapply the FFA rules.

In light of these acknowledged errors,[74] the FDIC has maintained in an internal memorandum that "regardless of whatever mistakes may have been made in the past by the RTC or FDIC, or by the IRS in being slow to enact regulations, *there are still compelling reasons for the IRS to abate these taxes*." PX 4418 at AM0010656 (emphasis added). And the IRS has evidenced its willingness to work with the FDIC in "determining the proper tax over the period [rather] than . . . hiding behind statute, closed statute dates, old regulation rules which were more punitive than finalized regs." Vordtriede Dep. 362:6-23 (JX 1 at 691). The IRS dramatically reduced the tax owed by Ben Franklin by agreeing to the application of the final regulations, rather than its prior guidance. PX 5106 (Fairness Hearing) at 16:9-17.

The FDIC has recalculated the amount of tax that is due under the final regulations, admitting that for the years 1992 to the present, Carteret should not have included any FFA as taxable income in any of its tax returns. Under the FDIC's revised calculations, the taxable income for Carteret in 1995 should be reduced by $21.2 million. FF ¶ 248.

### 2. <u>The IRS Will Allow the FDIC To Deduct up to $84 Million as an Interest Expense</u>

The fundamental economic principle underlying the banking industry is that banks generate profit by borrowing money at a low rate and lending it out at a higher rate. And it is an equally fundamental principle that banks pay tax only on the income, if any, derived from a positive interest spread—obviously, a bank does not owe tax on all of its interest income without de-

[74] An internal memo from the head of the FDIC's Tax and Accounting Section acknowledged these problems: "[I]t is less clear as to why amended returns were not filed to comply with the final regulations. Even after the final 597 regulations were issued, there were opportunities missed." PX 4418 (Mem. from J. Anderson) at AM0010655. And the FDIC's designated tax witness has agreed with this statement. Vordtriede Dep. 361:15-62:5 (JX 1 at 691).

ducting its interest expense. But this is precisely what Carteret's 1995 tax return did. Incredibly, although the FDIC claims that Carteret owes it $48 million in interest for 1995 and more than $80 million in interest over the period in which such interest expense could have offset Carteret's 1995 income, the FDIC did not deduct any of this interest on Carteret's 1995 tax return.

*a. The FDIC Failed To Deduct Interest Actually Paid by Carteret*

In 1995, Carteret operated thirty branches and paid $3.1 million in interest to depositors. PX 3829 (CFSB Financial Rpt., 1/31/95) at 2, 5. The 1995 return submitted by the FDIC for Carteret did not take a deduction for this interest. The FDIC has offered no justification for this failure to deduct interest that was actually paid. PX 4406a (Amended 1995 Income Tax Return) at AM00090144, ln. 18.

*b. The FDIC Failed to Deduct Interest Accruing on Loans to Carteret*

At the time of Carteret's branch sales, Carteret's funding for its loan portfolio switched from deposits to RTC loans, which form the basis of the FDIC's subrogated claim. The FDIC claims that Carteret owes interest of more than $180.3 million on these loans (through the end of 2007). DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3. But the FDIC failed to deduct one penny of this interest in 1994, 1995, 1996, or 1997, all of which could have been utilized to reduce taxable income in 1995. Under the FDIC's current methodology for calculating interest, $80.5 million in interest accrued on the subrogated claim during these years; under its initial methodology for calculating interest, $63.7 million in interest accrued in those years.[75]

The FDIC claims that the 1995 tax return simply mirrored the non-tax books for Carteret. But the FDIC's Goodwill Reporting Packages reflect the accrued interest from 1994-1997. *See*

[75] *See* PX 5112 (Calculation of Accrued Interest) at AM0097219-235; PX 5113 (Calc. of Accrued Interest) at AM0097273-288; PX 5114 (Calc. of Accrued Interest) at AM0097326-340; PX 1103 (Goodwill Package, 12/31/97) at AM00097039; PX 5058 (Calc. of Accrued Interest, 1/26/99) at AM00092190-205.

PX 1103 (Goodwill Package, 12/31/97) at AM00097039. Internal documents and witnesses confirmed that the FDIC had an internal policy of booking such interest only when 95 percent of the principal balance of the loan had been repaid. Significantly, this policy was not borne out of consideration for the requirements of the IRC. Rather, it reflected a decision to reduce the administrative burden on the FDIC that allegedly would have resulted from having to calculate interest for each institution. Tama Dep. 86:11-21, 117:22-118:1, 122:15-123:11 (JX 1 at 573-5). But in Carteret's case, it is undisputed that the RTC and the FDIC *had* calculated post-insolvency interest, and thus had already incurred the administrative burden. *See, e.g.*, Tr. 942:6-944:23 (Green); Tr. 2687:18-2688:15 (Hughes). Inexplicably, however, the FDIC in 1997 did not deduct the interest it had already calculated. Rather, it waited until 1998, when the deduction did Carteret no good in reducing its 1995 tax liability because NOLs in the 1998 return could be carried back only two years. Vordtriede Dep. 93:22-94:5 (JX 1 at 630).

The FDIC has acknowledged that the IRS's position is that the FDIC may deduct interest as of the date the loan was made to the institution in receivership, Johnston Dep. 40:2-24 (JX 1 at 316-17), which here would be 1994 for the loan for the Florida branches and 1995 for the loans for the New Jersey branches. Indeed, an email from Steven Johnston, an FDIC tax accountant, acknowledged this point with respect to Carteret. The email reads:

> Legal asked that we review Carteret Savings and verify the $76 million tax liability we reported on our 2002 Goodwill estimate. This is another case where had we accrued PII [post-insolvency interest] from the date of our closing [*i.e.*, 1995], *we could have significantly reduced our tax exposure*, and, maybe more importantly, our litigation exposure. In this case, the subrogated claim was nearly $1 billion and it closed very early in 1995. *Had we accrued PII the tax liability would have been approximately $9 million instead of $32 million.* This $32 million has now grown to over $76 million with penalties and interest.
>
> While in Dallas, we found a few other examples of where PII accruals from the beginning could have reduced the tax liability. Santa Barbara was one. *It should be noted that the IRS agrees that this is a valid tax deduction available*

*from the date of closing [i.e., 1995].*

PX 5171 (emphasis added). It is precisely because this deduction was available that the FDIC has admitted the tax liability was "artificially created." Vordtriede Dep. 388:2-18 (JX 1 at 696).

During the fairness hearing for the Ben Franklin tax settlement, the FDIC's lawyer acknowledged that the IRS allowed it to take the deduction from the year the loan was made. PX 5106 (Fairness Hearing) at 13:18-23. *See also* Vordtriede Dep. at 385:1-4 (JX 1 at 695). And every FDIC witness confirmed in discovery that post-insolvency interest is properly deductible under the IRC from the date of closing. Tama Dep. 113:1-114:2 (JX 1 at 572); Johnston Dep. 40:2-43:9 (JX 1 at 316-17). The FDIC's Rule 30(b)(6) representative on tax matters, Mr. Vordtriede, offered the same opinion in a 2004 email. He wrote that "the way I see it, we ought to go ahead and accrue and deduct PII from inception [*i.e.*, 1995] as if it will be paid." PX 5079 at AM0010608. Mr. Vordtriede agreed under oath that the interest had accrued from 1994 through 1997. Dep. 87:14-89:2, 92:15-94:5 (JX 1 at 628-30).[76]

As Mr. Vordtriede acknowledged, the propriety of deducting the accrued interest is governed by 26 U.S.C. § 461(h)(4), which allows deductions "if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." Dep. 88:15-22, 89:17-20 (JX 1 at 629). Mr. Vordtriede also stated that there are three separate requirements to satisfy the standard: first, the taxpayer must have an obligation to pay the amount; second, the amount of the debt must be fixed or readily capable of determination; third, there must have been "economic performance" of the underlying debt. *Id*. at 275:6-

[76] During cross-examination by the Department of Justice, however, Mr. Vordtriede suggested that "I think I would take the position" that post-insolvency interest should not be deducted until it was reflected on the financial statements. Dep. 279:3-15 (JX 1 672-3). This self-serving testimony by the so-called fiduciary of Carteret is inconsistent with his contemporaneous statements, his sworn testimony, the position of the IRS, and, as demonstrated below, dispositive case law. Accordingly, it should be disregarded.

18 (JX 1 at 672). Here, it is clear that Carteret's deduction for the interest accruing on the subrogated claim satisfies all three standards. First, the receivership agreed to pay interest on the loan it received from the RTC. *Id*. at 89:1-10 (JX 1 at 629). Second, as Mr. Vordtriede acknowledged, the amount of interest is readily ascertainable. *Id.* at 89:11-16 (JX 1 at 629). Third, as the regulations make clear, economic performance occurs when the interest obligation accrues. 26 C.F.R. § 1.461-4(e). Thus, the interest has been accruing since the date of the loan.[77]

The impact of this deduction is seismic. As noted above, a deduction for the post-insolvency interest as calculated by the FDIC would eliminate $80.5 million of the $85 million of taxable income reported on the amended 1995 return.[78] With $3.1 million of deductions for interest actually paid, a deduction for the interest alone would all but wipe out the tax liability.

Finally, even if the FDIC's arbitrary practice of deducting post-insolvency interest only after repayment of 95 percent of the principal had been mandated by the IRC, which it was not, it was inexcusable for the Carteret receivership not to take action to come within this policy by the end of 1997. Specifically, at year-end 1997, Carteret had repaid 94.95% of the principal balance

[77] Mr. Vordtriede suggested that the liability may have been "too contingent" to satisfy the requirements of § 461 because it was unclear whether Carteret would have the ability to repay the principal and interest. Dep. 385:1-12 (JX 1 at 695). But the IRS and the courts have made clear that a debtor's financial condition does not preclude it from taking a deduction for interest. In Revenue Ruling 70-367, 1970-2 C.B. 37 (1970), the IRS considered the propriety of a deduction where "the financial condition of the corporation is such that there is no reasonable expectancy that it will repay the accrued interest." The IRS ruled that the likelihood of payment, even though impaired, did not matter, and concluded that "[t]he doubt as to the payment of such interest is not a contingency of a kind that postpones the accrual of the liability until the controversy is resolved." *Id*. Likewise, in *Sartin v. United States*, the Claims Court confirmed that the possibility that a debtor may not be able to repay interest is not a basis for denying a deduction. The court held that: "Courts have consistently recognized that an accrual basis taxpayer must accrue expenses upon maturity of both the liability and the amount, even if it may never be paid because of insolvency." 5 Cl. Ct. 172, 177 (1984) (citations omitted). This authority makes clear that Carteret was entitled to, and indeed required to, deduct the interest that was accruing on the subrogated claim.

[78] Under the FDIC's original methodology for calculating interest, the amount of interest that could have been deducted on the 1995 return would equal $63.7 million.

of the subrogated claim.[79] If the FDIC had simply rounded up by 0.05 percent, it would have satisfied the 95 percent policy and recorded the liability on its 1997 books. No policy prevented the FDIC from rounding up from 94.95% to 95%. *See* Tr. 2688:16-2690:10 (Hughes). In any event, even if, for some incredible reason, the FDIC could not round up, the receiver in 1997 had more than $20 million in cash and no remaining operational expenses.[80] If the FDIC had simply used $712,000 of that cash to repay the subrogated claim, it would have brought the repayment to the 95 percent level and enabled the FDIC to take the $80 million deduction. The FDIC's failure to take either of these simple steps to avoid this massive tax liability is a blatant example of self-dealing: the United States Treasury directly benefits from this manufactured tax liability. No fiduciary is allowed to enrich itself at the expense of its beneficiaries in such a manner.[81]

**3. <u>The FDIC Failed To Carry Forward the 1992 Tax Return</u>**

In 1992, the IRC allowed taxpayers to carry forward NOLs for fifteen years into the future to offset income. But the 1995 return neglects to utilize Carteret's NOLs of approximately $73 million generated in 1992. Here again, this failure to take a permissible deduction had the direct effect of artificially increasing the receivership deficit. Carteret cannot be made to pay this government-manufactured liability, and Carteret's 1992 NOL should be applied to reduce, and indeed eliminate, the 1995 tax liability. FF ¶ 249.[82]

---

[79] The amount of dividends paid as of December, 16, 1997, was $1,300,502,797. PX 5090 (Liability Register, 3/1/05) at AM00095016. The initial subrogated claim in the annual goodwill reporting packages and FDIC financial statements was $1,369,700,396. *Id.* at AM00095015.

[80] The receivership had $20,242,349 in cash and $164,416 in receivables at the end of 1997. PX 1103 (Goodwill Package, 12/31/97) at AM00097038.

[81] Of course, if the Court concludes that the receivership is not required to pay accrued interest, then no deduction for such accrued interest would be available. If the bulk of the 1995 tax liability were eliminated through the adjustments to FFA and the use of NOLs, however, then only a limited amount of accrued interest would be included as income.

[82] There are numerous other errors in the 1995 return. As the return itself acknowledges,

**G. <u>Penalties for Nonpayment Will Not Be Assessed and Thus Are Not a Proper Component of the Receivership Deficit</u>.**

The estimated tax liability also includes $10.3 million of penalties. If the taxable income for 1995 had not been artificially created, there would be no penalties. But even if Carteret owed tax for 1995, no penalty can be imposed upon the receivership. As an internal memo from the head of the FDIC's tax policy unit explained, "with regard to the late payment penalties, both the interagency agreement (for RTC fins) and [IRC §] 7507 justify deferred payment of income taxes." PX 4418 (Mem. from J. Anderson, 5/17/00) at AM0010657; *see also* Vordtriede Dep. 356:1-3 (JX 1 at 689). Additionally, under the priority scheme, the FDIC is not permitted to pay the IRS until the subrogated claim has been retired. 12 U.S.C. § 1821(d)(11); 12 C.F.R. § 360.3. Thus, Mr. Vortriede acknowledged "essentially by law we're not allowed to pay the IRS so they shouldn't be penalizing us for following the law." Dep. 351:10-18 (JX 1 at 688).

The FDIC's internal documentation and the IRS's conduct confirm that the IRS will not impose penalties on Carteret. Specifically, an internal FDIC memo documented a high-level meeting between the IRS and the FDIC in which "the IRS indicated that the penalties would probably be eligible for abatement." PX 4418 (Mem. from J. Anderson, 5/17/00) at AM0010656. Mr. Vordtriede confirmed that the IRS "tend[s] to be reasonable with respect to

---

"no depreciation was computed," and "books and records of most subsidiaries were not available." PX 4406 at AM00090090. The return also acknowledged that the method of accounting had been changed because "records are not kept by the FDIC, successor of the RTC, as to the income and expense on the accrual method of accounting. Consequently, the hybrid method was used on the December 31, 1995, federal corporation income tax return." *Id.* at AM00090089. The failure to use a pure accrual method accounting violates 26 U.S.C. § 448, and the failure to receive permission to switch accounting methods violated treasury regulations. *See* 26 C.F.R. § 1.446-1(e)(2)(i). This impermissible change in accounting methodology gave rise to pro forma adjustments necessitated by the switch from a pure accrual method to the hybrid method, which triggered taxable income included in a $19 million "post resolution equity adjustment." PX 5038 (Tax Detail) at AM00090002; Vordtriede Dep. 287:3-24, 392:4-19 (JX 1 at 675, 697). Additionally, no deduction was taken for supervisory goodwill or any other basis in the sale of the branches that generated a premium of $134 million, all of which was taken into taxable income.

these types of penalties as they should be." Dep. 355:2-20 (JX 1 at 15 689). Indeed, the IRS agreed to waive *the entirety* of the more than $200 million in penalties that could have been imposed upon Ben Franklin. PX 5106 (Fairness Hearing) at 13.

**H. <u>Interest on the Tax Liability Should Not Be Included in the Deficit</u>**

FDIC financial statements currently reflect $113.9 million in interest on the tax liability. DX 9174 (Goodwill Package, 12/31/07) at Rpt. 3. There are four reasons why this interest is not properly included as a component of the receivership deficit. First, it is entirely derivative of the tax liability, and so no interest will be charged when the tax liability is eliminated.[83]

Second, even if the tax liability were valid, the FDIC "routinely requests and receives abatement of penalty and interest assessments." PX 6859 (Letter from D. Colley, 10/22/97). The IRS Handbook states "that penalties and interest will not be asserted against agencies or instrumentalities of the United States." *Id.* Thus, there is no basis to include an interest component in the tax liability in the receivership deficit. *See* PX 6855 (Letter from J. Vordtriede, 11/15/99).

Third, even if the tax liability were genuine, the interest charge would be entirely attributable to the actions of the government and thus cannot be an offset to Carteret's damages. Specifically, if Congress had not diminished the franchise value of Carteret by delaying the funding for Carteret's resolution, imposing racial preferences, and eliminating supervisory goodwill, then Carteret would have had sufficient funds to pay the tax liability in 1995. *See* FF ¶¶ 230-240; PX 2703A (Calomiris 2006 Rpt.) at ¶ 9; PX 9069; PX 9088; Tr. 1022:4-1023:3 (Calomiris).

Fourth, in the context of the FDIC's claim for interest, Professor Calomiris has explained that the FDIC incurs no cost in connection with the subrogated claim because it has the use of

[83] By way of example, in Ben Franklin, the IRS initially sought interest of $770 million, but then settled with the FDIC for only $38 million in interest because the underlying tax liability had been reduced. *See* PX 5106 (Fairness Hearing) at 11-14.

Carteret's damage award interest-free. *See* PX 2703A (Calomiris 2006 Rpt.) at ¶ 12; Tr. 1076:11-1079:7 (Calomiris). The government cannot charge Carteret interest on the tax liability because there is no cost to the government, nor any benefit to Carteret, from the failure to pay.

* * *

Given that the government seek to use the receivership deficit as a shield against the government's actually paying damages in this case, it is critical for the Court to render findings regarding the legitimacy of that deficit. As demonstrated, the entirety of that deficit is bogus.

## VIII. DAMAGES SHOULD BE PAID TO AMBASE DIRECTLY

If the government and the FDIC were to have their druthers, the story of this case would run as follows: (1) the government breached its contract, which caused the seizure of Carteret and the total loss of the thrift's value; (2) the government created a phony receivership deficit; (3) the government is found to owe damages for the loss of Carteret's value; (4) the government pays those damages to the FDIC; and (5) the FDIC immediately hands the damages payment *right back to the government*. Fortunately, our law is not so naïve.

### A. Even Discounting the Illegitimacy of the Receivership Deficit, Damages Should Be Paid Directly to AmBase.

As an initial matter, elementary principles of logic and fairness dictate that, even if all or part of the receivership deficit were valid, it would be appropriate for the Court to require that the thrift's damages be paid "net of any receivership claims," *Slattery*, 73 Fed. Cl. at 531 (final order, Oct. 11, 2006), and "outside the statutory distribution scheme," *id.* (as amended, Dec. 18, 2006). "Any value lost in the receivership and liquidation process would not have been lost, but for the breach. If the breach had not occurred, there would have been no receivership." *Slattery*, 69 Fed. Cl. at 586. By breaching the contract, the government thus caused Carteret to incur liabilities that it otherwise would not have incurred. It is well settled that when "a breach of con-

tract results in claims by third persons against the injured party[,] [t]he party in breach is liable for the amount" of any foreseeable expenses incurred by the injured party in paying or settling those third party claims. RESTATEMENT § 351 cmt. c (1981). Similarly, the Federal Circuit has held that when the government breaches a contract, it is responsible for increased costs paid by the plaintiffs to third parties as a result of the breach. *See, e.g.*, *Bluebonnet*, 266 F.3d at 1355-57 (increased financing costs). Because the receivership deficit resulted from the government's breach of contract, it is the government that must shoulder the responsibility for that deficit. *See Slattery*, 73 Fed. Cl. at 531.

Requiring the thrift, rather than the government, to bear the cost of the receivership deficit would be especially inappropriate here, where the thrift's predominant creditor is the government itself. As this Court has previously recognized, the law does not compensate a party for expenses that it suffers as a result of its own breach. *AmBase*, 61 Fed. Cl. at 802. Simply put, the law directs that the breaching party make the injured party whole, not that the injured party make the breaching party whole. The government should not be allowed to turn this well-settled principle on its head.

Not only will an award of this sort result in damages being paid "net of any receivership claims" to the thrift's sole residuary claimant, it will also place responsibility for the receivership deficit where it should lie—with the government—which may either reimburse the receivership for the deficit or, if it chooses not to do so, will still bear the cost of the unpaid deficit indirectly as the receivership's predominant creditor.

**B. AmBase Is Entitled to the Legitimate Amount of the Surplus.**

Even though, for the reasons discussed above and in this Court's decision in *Slattery*, simple logic dictates that damages should be awarded net of any receivership claims, the gov-

ernment's insistence that *Bailey* forecloses such a result, though incorrect, counsels that the Court should make alternative findings that would allow AmBase to directly recover the amount of the receivership surplus, properly calculated.

The government and FDIC first tried and failed to shield the bogus receivership deficit from challenge in 2003 by contesting this Court's jurisdiction to review the validity of the deficit in fashioning a remedy for the government's breach. Deciding the jurisdictional question, the Court noted that it had the power, under 12 U.S.C. § 1821(d)(11)(B), to award to AmBase "any surplus after the payments of all claims and expenses" and thus found "surprising" the government/FDIC notion that the Court might have "the power to award a surplus . . . but not the power to determine the precise amount of that surplus." *AmBase*, 61 Fed. Cl. at 797 (citing *Suess v. United States*, 33 Fed. Cl. 89 (1995)); *accord Branch v. FDIC*, 825 F. Supp. 384, 404-405 (D. Mass. 1993). The Court quite rightly characterized the government/FDIC posture as "the assertion of a judicially non-reviewable administrative power," which "is not the norm of our constitutional system." *AmBase* 61 Fed. Cl. at 797. Citing to its prior ruling in *Whitney Benefits, Inc. v. United States*, 25 Cl. Ct. 232 (1992), the Court held that it "had jurisdiction over the apportionment of damages even though the overall liability of the government would not change." *Id.* at 799. The Court explained that it "must accurately and fairly determine the amount of claims that are otherwise 'plainly within our jurisdiction' and determine 'monetary awards in fair and efficient fashion.' " *Id.* at 801 (quoting *Quinault Allottee Assoc.*, 453 F.2d at 1274). Because AmBase has demonstrated in the course of that review that the receivership deficit is invalid, it is thus appropriate, under the logic of *Whitney Benefits* and its forbearers, for the Court to apportion the damages and award directly to AmBase the legitimate surplus.

The FDIC has argued that the Federal Circuit's holding in *American Capital Corp. Unit-*

*ed States*, 472 F.3d 859 (Fed. Cir. 2006) somehow negates AmBase's right under 12 U.S.C. § 1821(d)(11)(B) to receive the legitimate amount of the surplus. Doc. 236 (Mot. to Dismiss Claim for Surplus) at 4-5. But *American Capital* merely held that "allow[ing] a shareholder to recover the same breach of contract damages both individually and through the corporation would result in an impermissible double recovery." *Am. Cap.* 472 F.3d at 866. AmBase does not dispute this common-sense proposition and is not requesting a double recovery; instead, AmBase requests the legitimate surplus to which it is statutorily entitled. Given the government and FDIC's demonstrated pattern of misfeasance with respect to the Carteret receivership, a direct award to AmBase is the best way to promote judicial economy and ensure that the legitimate surplus amount is paid to its legitimate owner without the need for additional litigation. *See Whitney Benefits*, 25 Cl. Ct. at 234 ("It would be unfair to place the burden of apportioning the damages on another court when this court is already familiar with the extensive facts of this large and complex case."); *AmBase*, 61 Fed. Cl. at 800-01.

The logic of the Federal Circuit's decision in *Bailey v. United States*, 341 F.2d 1342 (2003), confirms the appropriateness and necessity of awarding damages directly to AmBase. As this Court has explained, *Bailey* held that a " 'receivership deficit may not be included in any recovery' " because it is not " 'an asset available for recovery by the [thrift].' " *AmBase*, 61 Fed. Cl. at 801 (quoting *Bailey*, 341 F.2d at 1345-46). Thus, because, by the government's lights, the "AmBase Plaintiffs are to have their recovery reduced by the size of the receivership deficit, the Court must determine the size of the deficit or surplus in order to determine the just amount which puts them in 'as good a position as [they] would have been in, had the breaching party fully performed its obligation.' " *Id.* at 802 (quoting *Bluebonnet*, 339 F.3d at 1344-45).[84] Once the

[84] This case is distinct from *Bailey* in at least two critical respects. First, neither the

Court makes those findings, it is appropriate to apportion the award consistent therewith.

Furthermore, an order directing the *government* to pay damages would not be directed to the FDIC *as receiver*, and would therefore not impermissibly "restrain or affect the exercise of powers or functions of the Corporation *as a conservator or a receiver*." 12 U.S.C. § 1821(j) (emphasis added).

### C. AmBase Is Entitled to Direct Recovery on Its Derivative Claim.

AmBase is also entitled to direct recovery under the long-established rules governing shareholder derivative actions. Where, as here, awarding damages to the corporation would funnel damages back to the wrongdoer, it is appropriate to award damages directly to the shareholders. This conclusion obtains under both federal common law and New Jersey law.

#### 1. Federal Common Law Supplies the Rule of Recovery for AmBase's Derivative Contract Claim Against the United States.

Federal law governs the obligations and rights of the United States under its contracts. *See, e.g.*, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988); *Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1245 (Fed. Cir. 2007) ("In short, federal common law governs this [*Winstar*] action."); *Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986); *Seaboard Lumber Co. v. United States*, 15 Cl. Ct. 366, 369 (Cl. Ct. 1988).[85] AmBase's use of the derivative suit "procedural device" does not alter the nature of the suit as a

---

plaintiff nor the Federal Circuit questioned the validity of the receivership deficit in *Bailey*. Here, however, the entirety of the deficit is invalid. Second, the alleged deficit here resulted from congressional policies such as the MPP and the nonfunding of the RTC. As discussed above, when a breaching party exacerbates the harm caused by the breach, it is the breaching party who must bear the cost.

[85] The Court's decisions in *O'Melveny & Meyers v. FDIC*, 512 U.S. 79 (1994), and *Atheron v. FDIC*, 519 U.S. 213 (1997), are not to the contrary. In those cases, the FDIC stepped into the shoes of the thrift and the suits were, practically speaking, between private parties. As the *O'Melveny* Court explained, the "rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors." 512 U.S. at 88. In this case, however, the rules of decision will govern the conduct of the United States as a contracting party.

contract claim against the United States. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1293-94 (Fed. Cir. 1999). As the Supreme Court has made clear, the rules governing a derivative suit founded on federal law are governed by federal common law. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100 n. 6 (1991) ("[T]he principles recognized in *Erie* place no limit on a federal court's power to fashion federal common law rules necessary to effectuate a derivative remedy founded on federal law.").[86] The application of a patchwork of state law rules in the *Winstar* context would ill serve the federal interest in uniform regulation of federal savings and loans and the particular interest in a single regime for just disposition of receivership assets. It is therefore unsurprising that this Court did not apply state law to govern the derivative action in *Slattery*. 53 Fed. Cl. 258 (2002); 69 Fed. Cl. 573 (2006).

The FDIC has argued that New Jersey law applies, basing its contention on the choice-of-law provisions found in the acquisition agreements. *See* Doc. 238 (Mot. to Dismiss Derivative Claim) at 5. This argument is squarely foreclosed by Federal Circuit precedent. In *Long Island*, the court understood an *identical* choice-of-law provision to mean that federal common law applied. 503 F.3d at 1245. Moreover, given that this Court has interpreted and applied these contracts without a single reference to New Jersey law—and without a single objection from either

[86] The FDIC has nevertheless asserted that "[t]here is no federal common law of corporations." Doc. 238 at 5. To the extent the allocation of damages in a contract action can be considered corporate rather than contract law, this argument has no force. The cases cited by the FDIC in no way stand for the blanket proposition advanced; rather, the Court in each case simply opted not to fashion a federal common law rule in that particular circumstance. *See O'Melveny*, 512 U.S. at 89 (concluding that the case was not one in which "the judicial creation of a federal rule of decision is warranted"); *Atherton*, 519 U.S. at 217-25 (1997) (declining to create a federal common law standard of care where test for creation of federal common law was not satisfied). Aside from *Kamen*, numerous federal courts have recognized the existence of, and created, federal common law of corporations. *See, e.g., United States v. McDonald & Eide, Inc.*, 865 F.2d 73, 76 (3rd Cir. 1989); *Michigan Electrical Employees Pension Fund v. Encompass Electric & Data, Inc.*, No. 07-140, 2008 U.S. Dist. LEXIS 40241 at *61 (W.D. Mich., May 19, 2008); *Montgomery v. Etreppid Techs., LLC*, No. 06-00056, 2008 U.S. Dist. LEXIS 35561 at *22 (D. Nev. Apr. 18, 2008).

the FDIC or the government—it is more than a little peculiar for the FDIC to now claim that this *single* aspect of the case is governed by New Jersey law. Indeed, the FDIC has not even argued that other aspects of the damages phase of this trial—such as the rules for expectancy damages—are governed by New Jersey law. Regardless, the choice-of-law issue is inconsequential: as discussed below, the principles of New Jersey law fully support shareholder direct recovery.

**2. <u>Federal Common Law Supports Direct Recovery When the Corporate Recovery Would Be Funneled Back to the Wrongdoers.</u>**

Because there is no existing federal law on this issue, the Court has the power to draw from "the best in modern decision and discussion" to devise an appropriate rule governing direct recovery in derivative actions. *Prudential Ins. Co. v. United States*, 801 F.2d at 1298; *Allenfield Assocs. v. United States*, 40 Fed. Cl. 471, 481 (Fed. Cl. 1998). The overwhelming weight of corporate law authority recognizes the need for, and propriety of, direct recovery when corporate recovery would result in funneling damages back to the wrongdoers.

AmBase is entitled to a direct, *pro rata* recovery to prevent the Defendant from merely "reimbursing" itself by funneling the corporate award back into its own coffers. *Abrams v. Occidental Petroleum Corp.*, No. 67-2858, 1975 U.S. Dist. LEXIS 12715 at *21 (S.D.N.Y. Apr. 23, 1975). It is well-established that direct recovery is appropriate "where special circumstances exist" and "where it is the most effective means of dealing with inequities that would otherwise result." 2 COX, HAZEN & O'NEAL, CORPORATIONS §15.4 (2002).[87] The *pro rata* recovery doctrine is an exception to the general rule that derivative awards inure to the corporation, but it is hardly the "aberrational" device of the FDIC's protestations. *See* Doc. 142 (Sur-Reply to Pltf's Mot. to Dismiss FDIC) at 15. Corporate law authorities uniformly recognize that courts award direct

[87] *See also General Elec. Co. v. Bucyrus-Erie Co.*, 563 F. Supp. 970, 974 (S.D.N.Y. 1983) ("[T]here is ample precedent for distributing damages won in a derivative suit directly to deserving shareholders.") (citation omitted).

payment to injured shareholders when wrongdoers are poised to capture the corporate recovery. *See, e.g.*, AMERICAN LAW INSTITUTE, 2 PRINCIPLES OF CORPORATE GOVERNANCE §7.18(e), cmt (a) (1992) (endorsing the judicial power supported by "clear authority" to award a *pro rata* recovery when equitable principles so dictate, particularly to prevent "diversion of the corporate recovery by a wrongdoer"); 13 FLETCHER CYC. CORP. § 6028 (2007) (noting six circumstances in which "[c]ourts have been willing to award a pro rata recovery to shareholders," including "where it is necessary to avoid injustice or fraud").[88]

Derivative actions are meant to "force[] . . . wrongdoers to compensate the corporation for the injury they have caused." *In re PSE & G S'holder Litig.*, 801 A.2d 295, 307 (N.J. 2002) (internal quotation marks omitted). And while "[p]ure theory would have it that the funds should [be] . . . paid to the corporation, the directors of which would then order distribution to the shareholders," this assumption unravels when the corporate award will be diverted to or controlled by the parties to the wrongful conduct. *Kroese v. Gen. Steel Castings Corp.*, 179 F.2d 760, 766 n.5 (3d Cir. 1950). Thus, by preventing diversion of a corporate award, courts do not deviate from, but rather vindicate, the purpose of shareholder derivative suits. Here, a corporate recovery

---

[88] *See also* DEMOTT, SHAREHOLDER DERIV. ACTION L. & PRAC. § 7:6 (2007) ("In some cases, courts have been willing to depart from the conventional rule that only the corporation may benefit from a judgment in a derivative suit and to order instead that damages be paid directly to certain of the corporation's shareholders."); *id.* ("Courts may also be persuaded to authorize direct recovery when no other structure for the judgment would otherwise be feasible, and the circumstances of the case cause the court to see it as presenting a wrong in need of redress."); MAGNUSON, SHAREHOLDER LIT. §9:33 (2007) ("The most appropriate case [for shareholder direct recovery] is where recovery to the corporation would directly benefit the wrongdoer."); H. HENN & ALEXANDER, LAWS OF CORPORATIONS, § 373, at 1096-97 (3d ed. 1983); John A. Gebauer, Annotation, *Action in Own Name by Shareholder of Closely Held Corporation*, 10 A.L.R. 6th 293, § 18 (2006) (noting that courts have held in shareholder derivative actions that "the award will not be paid directly to the corporation but passes only to the shareholders who had not engaged in wrongdoing"); Note, *Individual Pro Rata Recovery in Stockholders' Derivative Suits*, 69 HARV. L. REV. 1314 (1956); *Abrams*, 1975 U.S. Dist. LEXIS 12715 at *20 (finding "substantial authority" for the direct recovery doctrine).

would allow the government to escape its responsibility to "compensate the corporation for the injury [it has] caused." *In re PSE & G S'holder Litig.*, 801 A.2d at 307.[89] As one Court has put it: " 'For obvious reasons, it may be highly improper to direct that the moneys here recovered on behalf of the corporation shall be paid into the treasury thereof. That might be paying the moneys back into the custody and control of those from whom the recovery is had.' " *Lynch v. Patterson*, 701 P.2d 1126, 1130 (Wyo. 1985) (quoting *Backus v. Finkelstein*, 23 F.2d 357, 366 (D. Minn. 1927)). In this case, the wrongdoer's anticipated benefit from a corporate recovery is the repayment of debts generated through self-dealing transactions between the FDIC and the breaching party. A corporate award would make but a detour through the receiver before being siphoned back into the Defendant's own coffers to satisfy a massive, invalid debt and a fictitious tax liability—both of which are owed to the Defendant, and neither of which would exist were it not for the very act by the Defendant that creates its liability.

The FDIC's assertion that AmBase "plucked" a handful of "extreme cases" to support direct recovery cannot be taken seriously. Doc 142 at 15. The cases recognizing and applying the doctrine are many and hail from jurisdictions across the nation.[90] *General Elec. Co. v. Bucyrus-*

---

[89] *See also Jannes v. Microwave Communications, Inc*. 385 F. Supp. 759, 760 (N.D. Ill. 1974) ("[T]he interests of equity would certainly demand that the wrongdoer should not profit from his own wrong."); *NCP Litig. Trust v. KPMG LLP*, 901 A.2d 871, 885-86 (N.J. 2006) ("[N]o one should profit from a fraud he himself perpetrated.") (internal quotation marks omitted).

[90] *See, e.g.*, *Lynch*, 701 P.2d at 1130; *Jannes*, 385 F. Supp. at 760; *Hall v. Staha*, 858 S.W.2d 672, 678-79 (Ark. 1993); *Backus*, 23 F.2d at 366; *Samia v. Central Oil Co.*, 158 N.E.2d 469, 482-83 (Mass. 1969); *Atkinson v. Marquart*, 541 P.2d 556, 559 (Ariz. 1975); *Abrams*, 1975 U.S. Dist. LEXIS 12715, at *21-22; *Downey v. Vernitron Corp*., 559 F. Supp. 1081, 1086 (D.C. Mass. 1982); *Vernon J. Rockler & Co. v. Minneapolis Shareholders Co.*, 425 F. Supp. 145, 150 (D. Minn. 1977); *Boggess v. Hogan*, 410 F. Supp. 433, 441 (N.D. Ill. 1975), opinion supplemented, 410 F. Supp. 443 (N.D. Ill. 1976); *Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 92 n.5 (1st Cir. 1988); *Aqua-Culture Techs. v. Holly*, 677 So. 2d 171, 186 (Miss. 1996); *Johnson v. American Gen. Ins. Co.*, 296 F. Supp. 802, 809 (D.D.C. 1969); *Dill v. Johnston*, 179 P. 608, 609-10 (Okla. 1919); *Zouck v. Antlers Ranch, Inc*., No. 94-8032, 1996 U.S. App.

*Erie Co.*, 563 F. Supp. at 974 ("[T]here is ample precedent for distributing damages won in a derivative suit directly to deserving shareholders."). All of these cases recognize the rule that personal, *pro rata* recovery by shareholders is appropriate in a derivative action where corporate recovery would, in effect, deliver the award into the hands of the party responsible for the wrong.

Attempting to cabin this venerable and flexible doctrine, the FDIC has asserted that in most cases awarding direct recovery "majority shareholders had misused their power at the expense of minority stockholders," and that here, "neither the Thrift nor its receiver is a wrongdoer." Doc. 142 at 16. These distinctions are of no moment. First, one consistent rationale for awarding direct recovery is that the wrongdoers are in a position to capture the award.[91] The wrongdoer is often a controlling shareholder who can convert the award into a cash dividend, but the creativity of theft does not blot out the wrong.[92] Wrongdoers can just as easily "reimburse[] themselves," *Abrams*, 1975 U.S. Dist. LEXIS 12715 at *21, by repaying bogus debts they ran up to themselves or entities they control. There can be no doubt that the government—through its nonfunding of the RTC, through its MPP mandate, and through the interest-rate policies established by FDIC-corporate—controlled the nature and amount of the receivership deficit. Indeed, there can be no doubt that the government, through its breach, is responsible for the seizure of Carteret and thus for the very *existence* of the receivership deficit. And there can be no doubt that the government, through the priority scheme it enacted in § 1821, controls exactly how the

LEXIS 10226 (10th Cir. Apr. 27, 1996) (unpublished opinion).

[91] *See, e.g.*, MAGNUSON § 9.33 ("The most appropriate case is where the recovery to the corporation would directly benefit the wrongdoer."); *Lynch v. Patterson*, 701 P.2d at 1130; *Hall v. Staha*, 858 S.W.2d at 678-79; *Backus v. Finkelstein*, 23 F.2d at 366.

[92] *See, e.g.*, DEMOTT § 7:6 (noting that "[t]he cases reaching this result tend to be responses to particular factual situations"); FLETCHER § 6028 ("Courts have been willing to award a pro rata recovery . . . where it is necessary to avoid injustice or fraud."); COX § 15.4 ("Generally, direct recovery is granted where it is the most effective means of dealing with inequities that would otherwise result.").

damages in this case are distributed if the damages are paid directly to the FDIC. The central concern remains that the "corporate recovery would only be funneled back" to the wrongdoer. *Downey v. Vernitron Corp.*, 559 F. Supp. at 1086. In this case, there is not only the *risk* that the malefactors will seize the entire corporate recovery, but a *promise* to do so.

Second, AmBase has proved that the FDIC *qua* receiver certainly is a wrongdoer, because it and the breaching party together ran up a bogus receivership deficit. The FDIC now promises to consummate the wrong by paying the damages to the breaching party. It does not matter that the FDIC is not a defendant, nor that the government is not a majority shareholder, because direct recovery is appropriate to prevent payment of a corporate recovery to a third party who has collaborated with the defendant. Indeed, in the canonical case of *Perlman v. Feldman*, 219 F.2d 173 (2d Cir. 1955), minority shareholders brought a derivative action against a former director and controlling shareholder who had wrongfully obtained a control premium. This was not a claim against the control-block purchaser who stood to receive the corporate recovery, but the court nonetheless awarded direct recovery precisely because the control block purchaser had participated with the defendant in transactions that damaged the corporation. *Id.* at 178.[93]

Moreover, and contrary to the FDIC's assertion, Doc. 238 at 6-7, direct shareholder recovery is *especially* appropriate to facilitate equitable distribution when a corporation is "no longer a going concern." *See, e.g., Marquis Theatre Corp. v. Condado Mini Cinema*, 846 F.2d 86, 92 n.5 (1st Cir. 1988) (citing LAWS OF CORPORATIONS § 373 at 1097 (3d ed.1983)).[94] Indeed,

---

[93] *See also Schur v. Salzman*, 377 N.Y.S.2d 82, 84 (N.Y. App. Div. 1975) (modifying judgment in derivative action to direct recovery to individual shareholders where corporate recovery would otherwise reach the new controlling stockholder who "had worked through defendant's improper acts, to achieve that control," and noting that allowing the collaborating corporate authority to "reap[] a reward for its own . . . misdeeds . . . is unthinkable").

[94] *See also*, COX §15.4 ("Courts have decreed individual pro rata recovery . . . where the corporation is in the process of liquidation . . ."); *James v. James*, 768 So. 2d 356, 359-360 (Ala.

a corporate liquidation alone provides independent and sufficient grounds for direct recovery. Courts have reasoned that direct recovery is appropriate in suits involving defunct corporations because a corporate award would result in "unnecessary circuity" of recovery by the liquidated entity followed by immediate distribution to the shareholders. *Geltman v. Levy*, 207 N.Y.S.2d 366, 369-70 (N.Y. App. 1960). That rationale assumes a greater urgency when, as in this case, the liquidated corporation is in the hands of a wrongdoer who has promised to divert the award from the innocent shareholders. Here, a corporate award would only be a prelude to a new round of litigation concerning the very same issues. *See Norte & Co. v. Huffines*, 288 F. Supp. 855, 864 (S.D.N.Y. 1968) (direct recovery has been awarded "to avoid unnecessary litigation, such as when a corporation is in process of liquidation"); *Backus*, 23 F.2d at 366 (warning that corporate recovery in control of wrongdoers "might defeat effectually the purpose of the suit and be the beginning of another prolonged cycle of litigation."). In short, corporate recovery would prolong litigation concerning a dispute the Court has the power resolve in these proceedings.

**3. <u>New Jersey Law Supports the Pro Rata Recovery Doctrine.</u>**

Though the New Jersey Supreme Court has had no occasion to consider the *pro rata* recovery doctrine, its existing case law, as well as lower court precedent, leave little doubt that New Jersey's high court would apply this widely-accepted doctrine. That court has drawn its common law of corporations from authorities that adopt the *pro rata* recovery doctrine. *See, e.g., Lawson Mardon Wheaton v. Smith*, 734 A.2d 738, 749 (N.J. 1999) (adopting " 'extraordinary circumstances exception' in 2 *ALI Principles*, § 7.22(a)").[95] And in related areas of corpo-

---

2000); *Dill v. Johnston*, 179 P. at 610-11; *Sale v. Ambler*, 6 A.2d 519, 522 (Pa. 1939); *Bailey v. Jacobs*, 189 A. 320, 330-31 (Pa. 1937). *Cf. Bowker v. Nashua Textile Co.*, 169 A.2d 630, 633 (N.H. 1961) (citing FLETCHER § 5953, 6028).

[95] *See also Balsamides v. Protameen Chems.*, 734 A.2d 721, 734 (N.J. 1999) (applying ALI § 7.22); *Brown v. Brown*, 731 A.2d at 1216 (adopting ALI § 7.01), *certif. denied*, 743 A.2d

rate law, the New Jersey Supreme Court has not hesitated to distinguish between deserving shareholders and those complicit in wrongdoing. *See NCP Litig. Trust*, 901 A.2d at 885-86. And at least one New Jersey appellate court has adopted a doctrine even more sweeping than direct recovery to ensure that injured shareholders are made whole in derivative actions. *See Brown*, 731 A.2d at 1216 (adopting the closely-held corporation exception to derivative actions).

New Jersey has long recognized that the purpose of a shareholder derivative action is to "force[] . . . wrongdoers to compensate the corporation for the injury they caused." *In re PSE & G Shareholder Litigation*, 801 A.2d at 307 (internal quotations marks omitted); *see also Strasenburgh v. Straubmuller*, 683 A.2d 818, 828-29 (N.J. 1996). As New Jersey's sister courts have recognized when the occasion arose, that purpose is undermined when the wrongdoers gain control over the very damages their misfeasance caused. Delivering a corporate award into the hands of the wrongdoer makes a mockery of derivative actions intended to protect shareholders from the "misfeasance and malfeasance of 'faithless directors and managers.' " *Strasenburgh*, 683 A.2d at 828-29 (citation omitted). The principles expressed by the New Jersey Supreme Court in *NCP Litigation Trust* are instructive on this point. In a direct action by a shareholder trust on behalf of a defunct corporation against outside auditors, the New Jersey Supreme Court explained that "under our laws, a shareholder cannot and should not benefit from his or her own wrongdoing." 901 A.2d at 885. The court held that if shareholders were complicit in wrongdoing, then the recovery should be limited to innocent shareholders. *Id.* at 885-886 (internal citation omitted). This principle applies no less forcefully in this case.

This existing corpus of New Jersey corporate law led one court to adopt a more marked departure from the normal derivative rules: the closely-held corporation exception found in ALI

---

851 (1999).

§ 7.01.[96] This exception is more sweeping than the *pro rata* recovery rule because it entirely converts what would otherwise be a derivative action into a direct action for the purposes of *every* procedural and substantive requirement, including remedies. *See Brown*, 731 A.2d at 1216 (quoting ALI § 7.01(d)); *see also In re Sharkey*, 272 B.R. 574, 581-83 (Bankr. D.N.J. 2001) (quoting *Brown*). Under both the *pro rata* recovery doctrine (ALI § 7.18) and the closely held corporation exception (ALI § 7.01), recovery inures to the plaintiff-shareholders in a derivative action. A federal district court aptly distinguished between merely "decreeing a *pro rata* recovery in a derivative suit" (§ 7.18) in contrast to "changing the nature of the suit" (§ 7.01). *Downey*, 559 F.Supp. at 1086. Thus, in praying for direct *pro rata* recovery, AmBase seeks an approach that is at once consistent with and considerably more modest than the §7.01 approach which the *Brown* court, and courts in many other jurisdictions,[97] have adopted. In effect, the direct shareholder recovery doctrine in §7.18 is a "middle road between a direct and a derivative action," as it mirrors a direct action only at the remedy stage. Gebauer, *supra*, at § 18.

**D. <u>AmBase Is Entitled to Direct Recovery Under the Closely-Held Corporation Exception</u>.**

The closely-held corporation exception and the direct-recovery doctrine share a common rationale. As the Ohio Supreme Court explained, a rigid requirement that shareholders bring a

---

[96] "In the case of a closely held corporation . . . the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons." ALI, 2 PRINCIPLES OF CORP. GOVERNANCE §7.01

[97] *See Barth v. Barth*, 659 N.E.2d 559, 562 (Ind. 1995); *Richards v. Bryan*, 879 P.2d 638, 648 (Kan. App. 1994); *Derouen v. Murray*, 604 So. 2d 1086, 1091 n.2 (Miss. 1992); *Johnson v. Gilbert*, 621 P.2d 916, 918 (Az. Ct. App.1980); *Watson v. Button*, 235 F.2d 235 (9th Cir. 1956); *Crosby v. Beam*, 548 N.E.2d 217 (Ohio 1989); *Caswell v. Jordan*, 362 S.E.2d 769 (Ga. Ct. App. 1987); *Steelman v. Mallory*, 110 Idaho 510 (1986); *Miller v. Ruth's of North Carolina*, Inc., 322 S.E.2d 557 (N.C. 1984); *Kirk v. First Nat'l Bank of Columbus*, 439 F. Supp. 1141 (M.D. Ga. 1977).

pure derivative suit against wrongdoers in control of a closely held corporation means that "any recovery would accrue to the corporation and remain under the control of the very parties who are defendants in the litigation. Thus, a derivative remedy is not an effective remedy because the wrongdoers would be the principal beneficiaries of the recovery." *Crosby*, 548 N.E.2d at 221.

AmBase's derivative claim meets the requirements of the closely-held corporation exemption. *See Brown*, 731 A.2d at 1216 (discussing standards under ALI § 7.01). Carteret Savings Bank is a closely held corporation, as Carteret Bancorp is its sole shareholder. *See* ALI § 7.01 cmt. e (defining a "closely held corporation" as a corporation with "a small number" of shareholders and the absence of an active trading market). With both Carteret Bancorp and its sole shareholder, AmBase, as parties to this action, direct recovery will not spawn a multiplicity of actions or leave any interested parties out in the cold. *See Brown*, 731 A.2d at 1217. Nor will treating this as a direct action, for the reasons set forth below, materially prejudice creditors. It is not a prerequisite that the corporation have *no creditors*, but rather that their interests be adequately protected. *See* ALI § 7.18. AmBase is therefore entitled to *pro rata* recovery under the closely-held corporation exception, which permits the Court to "treat the action as a direct one [under § 7.01] and still order that all or some portion of the recovery be paid to [the corporation] to protect the interests of its creditors." ALI cmt. f, illus. 3.

**E. <u>The Court Can Fashion a Remedy that Protects the Rights of Bona Fide Creditors</u>.**

The FDIC has suggested that the claims of Carteret's non-governmental creditors bar direct recovery in this case. That contention is plainly wrong. The existence of creditors is *not* an absolute bar to direct recovery so long as "adequate provision has been made for the creditors of the corporation." ALI § 7.18(e). In awarding direct recovery, courts have recognized that it is often possible to at once make the injured shareholders whole, avoid enriching the wrongdoer,

and protect bona fide creditors. "A rule which permits a court to equitably distribute damages in a derivative action safeguards the interests of creditors while simultaneously protecting the interests of shareholders." *Rankin v. Frebank* Co., 121 Cal. Rptr. 348, 362 (Cal. Ct. App. 1975); *see also James*, 768 So. 2d at 359 (courts in derivative claims have the power to "adjust the equities of all parties and to meet the obvious necessities of each situation").

The Court can fashion a remedy that protects the rights of the bona fide third party creditors, who hold a mere 2% of the receivership IOUs. *See* DX 9174 (Goodwill Reporting Package, 12/31/07) at Rpt. 3 (listing "outstanding claims—priority 6" of $1,578,552 and post-insolvency interest of $1,718,950 on that principal amount). The most certain method of assuring that these creditors obtain their funds would be for the Court to appoint AmBase as a trustee for the receiver's bona fide non-governmental creditors, a practice courts have employed in derivative suits. For example, in *Interlake Porsche + Audi v. Blackburn*, 728 P.2d 597 (Wash. Ct. App. 1986), *reh'g denied*, 107 Wn. 2d 1022 (Wash. 1987), the court found that a corporate recovery would reward the wrongdoer, but direct recovery to the shareholder "on behalf of himself and other shareholders" would prejudice the rights of corporate creditors. Instead, the court modified the lower court judgment and entered an award in favor of the injured shareholder "as a trustee for [the corporation] and its creditors and shareholders." *Id*. at 612. The wrongdoer was shut out of recovery, the shareholders made whole, and the creditors protected.

Alternatively, the Court could award a portion of the damages to the receiver in the amount of the valid receivership debt to third party creditors and deduct that amount from AmBase's *pro rata* recovery. *Cf. Rankin*, 47 Cal. App. at 96-97 (awarding direct recovery to shareholders and providing for claims of bona fide creditor); ALI §7.01 cmt. f, illus. 3 (noting that a court can treat a derivative action "as a direct one and still order that all or some portion of the

recovery be paid to [the corporation] to protect the interests of its creditors."). If the receiver chooses not to pay the bona fide creditors with that award, then those creditors will have an independent takings claim to pursue against the FDIC.[98]

AmBase in no way seeks to deprive the receivership's bona fide creditors of their due, and would welcome the Court's fashioning a remedy appropriate to accommodate this goal. AmBase does oppose, however, allowing the FDIC to perpetrate a massive injustice by shielding itself behind the relatively minor claims of third-party creditors. With valid options readily available to the Court, there is no reason to allow the tail to wag the dog in this case.

**F. The FDIC's Renewed Challenges to this Court's Jurisdiction are Groundless.**

Undeterred by the Court's earlier jurisdictional holding, the FDIC protests that AmBase is asserting an impermissible cross-claim. Doc. 238 at 3-4. The FDIC also cryptically argues that such a "[c]hallenge" to the receivership deficit is not ripe. Doc. 236 at 9. These arguments constitute (yet another) request for reconsideration of the Court's determination that "Plaintiffs in this case ask nothing more of this Court than the exercise of its equitable power incident to their claim for money damages against the federal government, a claim which lies squarely within our jurisdiction." *AmBase*, 61 Fed. Cl. at 797. Like the co-plaintiffs in *Whitney Benefits*, AmBase is simply asking this court to "resolve the parties' competing rights in money held by the government." 25 Cl. Ct. at 233. The long catalogue of the government's and FDIC's misfeasance figures prominently in this equitable review, for the Court cannot rely on the FDIC's "naked asser-

[98] New Jersey law also embraces the power to fashion a remedy in a derivative action that accommodates shareholders and creditors of a liquidated corporation. As a bankruptcy court applying New Jersey law noted, the court can craft a remedy that meets the equities of the situation. *Sharkey*, 272 B.R. at 581-83. The court explained, "[a]ny recovery could be fashioned to account for the interests of the creditors of [the defunct corporation] and to distribute proceeds fairly among interested persons. Therefore, neither the procedural hurdles normally required for shareholder derivative actions nor the concern that the corporation is the appropriate recipient of any remedy will impede consideration of the substance of the plaintiff's cause." *Id.* at 582-83.

tions" as to the size and legitimacy of the receivership deficit. *AmBase*, 61 Fed. Cl. at 797.

Nor is there merit to the FDIC's argument that AmBase failed to exhaust administrative remedies under §1821(d)(6). Doc. 236 at 8. Subsection (d)(6) "establishes a scheme for the determination, review and payment of claims" brought against a "failed financial institution." *Coast-to-Coast Fin. Corp. v. United States*, 51 Fed. Cl. 358, 360 (2002). But as this Court already explained, "[AmBase's] claim [i]s not *against* the receivership, but rather against the United States for breach of a goodwill contract. . . . §1821(d) does not prevent this court from exercising jurisdiction over the Plaintiff's claims relating to the size of FDIC's receivership deficit in the present case." *AmBase*, 61 Fed. Cl. at 799.

The FDIC also argues that this Court lacks subject matter jurisdiction because AmBase challenges the receivership deficit based in part on actions attributable to the FDIC in its corporate capacity, including the post-insolvency interest rate and the MPP. Doc. 236 at 10-11. The FDIC contends that the only statutory basis for questioning these policies is the Administrative Procedure Act, 5 U.S.C §§ 701 et seq. But as this Court has held, the inquiry into the legitimacy of the deficit is part and parcel of the Court's power to "fairly determine the amount of claims that are otherwise 'plainly within our jurisdiction.' " *AmBase*, 61 Fed. Cl. at 801 (quoting *Quinault Allottee Assoc.*, 453 F.2d at 1274). The FDIC deforms the rule that "the Court of Federal Claims lacks APA jurisdiction," *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003), into a rule that divests this Court of jurisdiction over contract claims implicating issues that might also be addressed under the APA.

The FDIC's own authorities undermine this invention. In *Hall v. United States*, the Court noted that jurisdiction over the plaintiff's claims would be lacking if it were "*solely* . . . dependent on the APA." 69 Fed. Cl. 51, 56 (2005) (emphasis added). Since the plaintiff in *Hall* as-

serted a contract claim, however, the court denied the government's motion to dismiss. *Id.* And in *Martinez v. United States*, the Federal Circuit noted that this Court routinely considers agency actions in the course of adjudicating money claims within its Tucker Act jurisdiction. 333 F.3d at 1313-14. As the Federal Circuit has explained, this Court can assert jurisdiction over a money damages claim stemming from an agency action regardless of whether the underlying agency decision could have been reviewed "by bringing an APA action in district court." *Cermak v. Babbitt*, 234 F.3d 1356, 1364 (Fed. Cir. 2000). The APA thus presents no bar to this Court's just resolution of this case. Indeed, to the extent that the Court does not award direct recovery, AmBase has a renewed takings claim over which this Court certainly has jurisdiction. *See Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007).

**G. Direct Payment of Damages to AmBase Will Avoid Substantial Questions under the Takings Clause.**

Awarding damages directly to AmBase will also allow this Court to avoid "the difficult and sensitive questions" that would arise under the Takings Clause if the government is allowed to confiscate Carteret's and AmBase's damages in order to defray expenses that were both illegitimately incurred and caused by the government's breach in the first place. *NLRB v. Catholic Bishop*, 440 U.S. 490, 507 (1979).

This Court previously granted the government's motion for summary judgment on AmBase's takings claim, Doc. 29 at 31-32, reasoning:

> If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. . . . If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action.

*AmBase*, 58 Fed. Cl. at 51 (citing *Castle v. United States*, 301 F.3d 1328, 1341-42 (Fed. Cir. 2002)). If the Court finds that the government caused the loss of Carteret's value, then the gov-

ernment cannot avoid compensating for that loss by hiding behind the shield of a bogus receivership deficit. But that is precisely the course the government and the FDIC have commended to this Court. Under such a regime, the corporation would most certainly not be restored to the position it would have been in absent the breach and the shareholder would still have lost the value of its bank. Essentially, the government and FDIC are advancing a scheme by which the government can avoid paying compensation for taking the value of the bank once by taking it twice. Such an unconstitutional result cannot possibly be required under *Castle*, *Bailey*, or 12 U.S.C. § 1821. *See Consolidation Coal Co. v. United States*, No.07-5108, 2008 U.S. LEXIS 12426, at *4 (Fed. Cir. June 11, 2008). But this Court need not resolve that question. Rather, the Court can and should follow controlling authorities that support awarding damages directly to AmBase.

**H. <u>If the Court Awards Damages to the FDIC, AmBase Will Suffer a Taking</u>.**

Should, however, the Court decide not to award damages directly to AmBase, then the Court must hold that AmBase has suffered a taking. AmBase "possesses a direct and cognizable property interest in a potential liquidation surplus." *First Hartford*, 194 F.3d at 1296; *see also id.* at 1288; *accord Bailey*, 341 F.3d at 1347. The government and FDIC, through their treatment and operation of the receivership, exercise substantial control over the size and even existence of AmBase's surplus. *See AmBase*, 61 Fed. Cl. at 797 ("A deficit, of course, is the flip side of s surplus."). Only valid costs reasonably related to the benefits conferred by the government may be deducted from the potential litigation surplus. *Compare Webb's Fabulous Pharmacies*, 449 U.S. at 163-64 (retention of interest earned on an interpleader fund was "not reasonably related to the costs of using the courts" and thus constituted a taking), *with United States v. Sperry Corp.*, 493 U.S. 52, 58-60 (1989) (1.5 % deduction from award rendered by the Iran-United States Claims Tribunal for expenses incurred in connection with arbitration was a " 'fair ap-

proximation of the cost of benefits supplied' ") (quoting *Massachusetts* v. *United States*, 435 U.S. 444, 463 n.19 (1978)); *accord Longshore v. United States*, 77 F.3d 440, 444 (Fed. Cir. 1996) ("In *Webb's* there was no justification for the withholding, and it was held wrongful; in *Sperry* there was justification, and it was not.").[99]

As detailed above, the government and FDIC seek to reduce AmBase's liquidation surplus by charging to the receivership a number of costs that are not reasonably related to costs that have been or need be borne by the government. Simply put, this is not a case where the government merely seeks "reimbursement of the cost of government services" from AmBase's potential liquidation surplus. *Sperry*, 493 U.S. at 63. Rather, this is a case where the government seeks to "appropriate[] all, or most, of the [surplus] to itself and label[s] the booty as" a receivership deficit. *Id*. at 62. The Takings Clause, however, does not permit such naked confiscation.

## IX. AMBASE IS ENTITLED TO A TAX GROSS-UP

The Federal Circuit has consistently upheld the right of a plaintiff to receive a gross-up for taxes where it is necessary to make plaintiffs whole. *See, e.g.*, *Home Sav.*, 399 F.3d at 1356; *LaSalle Talman*, 462 F.3d at 1338. Here, a gross-up will be necessary if taxes are imposed either on an award of damages or on the receivership deficit. A tax on damages tied to the value of Carteret, for example, would amount to a tax on " 'lost monies that would not have been taxable.' " *Suess*, 74 Fed. Cl. at 515 (quoting *Home Savings*, 399 F.3d at 1356). Likewise, any tax on the receivership deficit flows from the premium of $134 million realized on the sale of Car-

[99] Other cases have likewise recognized that government deductions from private property interests analogous to Carteret's potential liquidation surplus constitute takings unless the deductions are reasonably related to the cost of benefits actually conferred by the government. *See, e.g.*, *Brown v. Legal Found.*, 538 U.S. 216, 235 (2003); *Phillips v. Washington Legal Found.*, 524 U.S. 156, 171 (1998), *dismissed on other grounds sub nom. Washington Legal Found. v. Texas Equal Access to Justice Found.*, 86 F. Supp. 2d 617 (W.D. Tex. 2000); *Smith v. Price Dev. Co.*, 125 P.3d 945, 953 (Utah 2005); *Kirk v. Denver Publ'g Co.*, 818 P.2d 262, 265 (Colo. 1991).

teret's branches in 1995, which was itself the result of the breach. FF ¶ 243. Thus, a gross-up for any such tax is also necessary to make Plaintiffs whole. Nevertheless, because the amount of taxes owed on any award or the receivership deficit has not been finally determined, we request a ruling from the Court that a gross-up will be appropriate if such taxes are imposed. As the Court noted in *Suess*, "if logic and pure common sense governed, it would make far greater sense for the Government to simply not tax Plaintiffs." *Suess*, 74 Fed. Cl. at 515.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment awarding AmBase damages of no less than $920.7 million, representing Carteret's current market value but for the breach ($720.1 million), the dividends that would have been distributed but for the breach ($183.9 million), and wounded bank damages ($16.8 million). The Court should also make clear that, in the event the damages award or the receivership becomes subject to taxation, the judgment can be modified, under RCFC 60 or any other applicable rule of this Court, in order to be "grossed up" so as to place AmBase in the same position it would have occupied absent the breach.

Respectfully submitted,

Dated: July 1, 2008

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
*Counsel of Record*

Of Counsel:

Vincent J. Colatriano
David H. Thompson
Jesse Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

**Appendix: The Evolving Lexicon of Angelo Vigna**

| **In 1999, Mr. Vigna said…** | **In 2008, Mr. Vigna says he meant…** |
|---|---|
| **“No.”** *See* Vigna Dep. 159:19-25 (JX 1 at 600) (“Q. If the injunction . . . had . . . continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret’s unamortized supervisory goodwill, would Carteret have been seized in your opinion? A. No.”). | **“Yes.”** *See* Tr. 2209:4-8 (“The answer should have been yes. I don’t know why I answered no to that. I must have misunderstood the question or thinking of it in a different context. But the answer then and now should have been yes.”). |
| **“No.”** *See* Vigna Dep. 156:17-20 (JX 1 at 599) (“Q. Can you recall a thrift that satisfied or very nearly satisfied its tangible capital requirement that was seized? A. No.”). | **“I can’t answer yes or no.”** *See* Tr. 2318:20-2319:5 (“Q. Can you recall a thrift that satisfied or nearly satisfied its tangible capital requirement that was seized? At that time?. . . A. I can’t answer yes or no.”). |
| **“No.”** *See* Vigna Dep. 158:6-11 (JX 1 at 599) (“Q. If Carteret . . . had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized, in your opinion? A. No.”). | **“I believe so.”** *See* Tr. 2320:2-11 (“If Carteret had . . . raised 150 million to replace dollar for dollar the supervisory goodwill that it had lost as a result of the breach, would Carteret have been seized in your opinion? A. I believe so.”). |
| **“Ultraconservative.”** *See* Vigna Dep. 109:25-110:7 (JX 1 at 592) (Q. “Do you recall why Carteret’s valuation allowances were so high? A. They took a very, very aggressive and I would say ultraconservative view of the valuation of their portfolio and their real estate assets; far, far more conservative than any of the other institutions, at least in our region, and probably nationally.”). | **“Realistic.” or “Conservative.”** *See* Tr. 2213:25-2214:5 (“Q. Now, during your deposition, you testified that Carteret took an ultraconservative view toward valuation in establishing loan loss reserves. What did you mean by that? A. My recollection is that their approach was aggressive but I think realistic.”); Tr. 2270:8-12 (“Well, in reflection, ultra is probably the wrong word. They took a . . . conservative approach...”); Tr. 2282:15-17. |
| **“Overreserved.”** *See* Tr. 2276:19-22 (quoting Vigna Dep. 115:16-19) (“Q. So would you say that with respect to some of these assets they may have been overreserved…? A. Probably.”). | **“Weren’t Overreserved”** *See* Tr. 2273:21-22 (“Overreserved was probably the wrong word for me to use.”); Tr. 2274:3-4 (“[A]s it turned out, they . . . certainly weren’t overreserved.”). |
| **“Rather overconservative.”** *See* Tr. 2271:22-2272:6 (quoting Dep. 118:19-119:3) (“Q. And the strategy was to attract capital, as you described earlier? A. That’s my recollection of he fact that a rather overconservative posture was taken as to valuations. Q. Do you recall expressing the view that the reserving policy was overconservative to the management of Carteret. A. I have some recollections of the fact that I did.”). | **“Conservative.”** *See* Tr. 2272:25-2273:2 (You know, I don’t know if overconservative was the right word. They certainly took a conservative approach.”). |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of July, 2008, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

David Levitt, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.—Room 12006
Attn: Classification Unit—8th Floor
Washington, DC 20530

Andrew Gilbert, Esq.
FDIC Legal Division
550 17th Street, N.W.
Room 2098
Washington, DC 20429

/s/Jesse Panuccio