IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and
CARTERET BANCORP, INC.

Plaintiffs,

FEDERAL DEPOSIT INSURANCE
CORPORATION,

Plaintiff-Intervenor,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 93-531C

Senior Judge Loren A. Smith

**POST-TRIAL BRIEF OF**
**PLAINTIFF-INTERVENOR FDIC**

Federal Deposit Insurance Corporation
Legal Division
Andrew C. Gilbert
*Counsel of Record*
*for Plaintiff-Intervenor*
550 Seventeenth Street, NW, MB-3060
Washington, DC 20429
(202) 898-3871

Of Counsel:

John V. Thomas
*Deputy General Counsel*
D. Ashley Doherty
*Counsel*
Gary A. Kuiper
*Counsel*

July 1, 2008

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .................... iii
STATEMENT OF RELATED CASES .................... 1
JURISDICTIONAL STATEMENT .................... 2
STATEMENT OF THE ISSUES .................... 2
STATEMENT OF THE CASE .................... 4
I. The Nature of the Case and The Parties .................... 4
II. The Course of Proceedings .................... 5
A. Pre-Bailey: The Original Case .................... 5
B. Post-Bailey: The Receivership Deficit Claims .................... 5
C. The Nature of the Case Today .................... 7
1. The FDIC's Claims against the Government .................... 7
2. Shareholder Plaintiffs' Claims against the Government .................... 8
3. Shareholder Plaintiffs' Claims against FDIC .................... 9
STATEMENT OF RELEVANT FACTS .................... 10
SUMMARY OF ARGUMENT .................... 13
ARGUMENT .................... 14
I. Shareholder Plaintiffs Seek Total Damages of $1.8 Billion or More .................... 14
II. Regardless of Amount, Derivative Contract Damages Are Not Payable Directly to Shareholder Plaintiffs .................... 15
A. Shareholder Plaintiffs' Claim for Direct Payment Is Too Late .................... 15
B. Shareholder Plaintiffs Fail to State A Claim for Direct Payment of Derivative Damages .................... 15
1. New Jersey Law Applies to the Holding Company's Claim .................... 15
2. Derivative Damages Are Payable Only to the Thrift .................... 16
a. Under New Jersey Law, Derivative Damages Are Payable Only to the Thrift .................... 16
b. Corporate Law Generally Precludes Direct Payment of Derivative Damages .................... 18
c. *Slattery* Does Not Support Payment of Derivative Damages to Shareholder Plaintiffs .................... 19
d. The Thrift's Quest for Direct Damages Violates Its Commitment .................... 20
III. If Damages Exceed $321,434,394, this Case Would Remain Justiciable; .................... 21
A. The "Government Coffers" Test Would Be Me .................... 21
B. The Holding Company Fails to State a Direct Claim for a Surplus .................... 22
C. Damages May Not Be Apportioned Between FDIC and Shareholder Plaintiffs .................... 23
D. This Court Lacks Jurisdiction to Direct the FDIC to Pay a Surplus Claim .................... 25
IV. If Damages Exceed $318,136,600, This Case Would Remain Justiciable .................... 27
V. If Damages Exceed $23,897,697, This Case Would Remain Justiciable .................... 27
A. The Elements of the Projected Receivership Deficit Can Be Unbundled .................... 27
B. The Projected Receivership Income Taxes Are Non-Final for Justiciability Purposes .................... 28
C. The Projected Post-Insolvency Interest Is Non-Final for Justiciability Purposes .................... 31
1. Shareholder Plaintiffs Challenge FDIC's Post-Insolvency Interest Policies .................... 31
2. Shareholder Plaintiffs' APA-Based PII Challenges Are Unadjudicable Here .................... 31
3. The APA Challenge Renders the Post-Insolvency Interest Projections Non-Final Here .................... 33
VI. If Damages Are $23,897,697 or Less, This Case Is **Non**-Justiciable .................... 34

A. This Court Lacks Jurisdiction over Claims of Receivership Mismanagement ................ 34
B. This Court Lacks Jurisdiction to Conduct an Equitable Review ..................................... 36
VII. The FDIC's Management of the Thrift Receivership Was Proper.................................... 37
CONCLUSION......................................................................................................................... 37
CERTIFICATE OF FILING...................................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

Abbott Laboratories v. Gardner, 387 U.S. 136 (1967) .......... 33
AmBase Corp. v. United States, No. 3:08-cv-00651-WWE (D. Conn., Apr. 29, 2008) .......... 30
AmBase v. United States, 58 Fed. Cl. 32 (2003)("AmBase I") .......... passim
AmBase v. United States, 61 Fed. Cl. 794 (2004)("AmBase II") .......... passim
American Capital Corp. v. United States, 472 F.3d 859 (Fed. Cir. 2007) .......... 23, 24
American Renovation & Construction Co. v. United States, 65 Fed. Cl. 254 (2005) .......... 26
Anderson v. Merit Systems Protection Bd., 12 F.3d 1069 (Fed. Cir. 1993) .......... 37
Atherton v. FDIC, 519 U.S. 213 (1997) .......... 16
Banerjee v. United States, 77 Fed. Cl. 522 (2007) .......... 32
Benj. Franklin Shareholders Litigation Fund v. FDIC, 501 F.Supp. 2d 103 (D.D.C. 2007) .......... 30
Brazos Electric Power Cooperative v. United States, 52 Fed. Cl. 121 (2002) .......... 32
Brown v. Brown, 323 N.J. Super. 30, 731 A.2d 112 (App. Div. 1999) .......... 17
Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949) .......... 20
Ensher v. Ensher, Alexander & Barsoon, Inc., 187 Cal. App. 2d 407 (Cal. App. 3d Dist. 1960) 20
First Hartford Corp. Pension Plan v. United States, 194 F.3d 1279 (Fed. Cir. 1999) .......... 2, 18, 20
Glod v. Baker, 851 So.2d 1255 (La. App. 3rd Cir., Aug. 6, 2003) .......... 18
Great American Ins. Co. v. United States, 184 Ct.Cl. 520, 397 F.2d 289 (1968) .......... 26
Great American Ins. Co. v. United States, 203 Ct.Cl. 592, 492 F.2d 821 (1974) .......... 26
Hall v. United States, 69 Fed. Cl. 51, 56 (2005) .......... 32, 35
Hansen Bancorp., Inc. v. United States, 367 F.3d 1297 (Fed. Cir. 2004) .......... 23
Hindes v. FDIC, 137 F.3d 148 (3rd Cir. 1998) .......... 26, 32
In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co, 701 F.2d 604 (7th Cir. 1983) .......... 25
In re Ionosphere Clubs, Inc., 17 F.3d 600 (2d Cir. 1994) .......... 18
In re PSE & G Shareholder Litigation, 173 N.J. 258, 801 A.2d 295 (N.J. 2002) .......... 16, 17
In re Sharkey v. Emery, 272 B.R. 574 (Bankr. D.N.J. 2001) .......... 17
Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) .......... 15, 16
Klamath & Modoc Tribes v. United States, 174 Ct. Cl. 438, 1966 WL 8850 (1966). .......... 36
Lake Carriers' Assn. v. MacMullan, 406 U.S. 498 (1972) .......... 33
Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365 (Fed. Cir. 2001) .......... 21
Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003 .......... 32
Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941) .......... 33
McNabb v. United States, 54 Fed. Cl. 759 (2002) .......... 32
Muskrat v. United States, 219 U.S. 346 (1972): .......... 35
National Cored Forgings Co. v. United States, 126 Ct.Cl. 250, 115 F.Supp. 469, 474 (1953) .......... 32
Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) .......... 26
O'Melveny v. Myers, 512 U.S. 79 (1994) .......... 16
Pomeroy v. Simon, 17 N.J. 59, 10 A.2d 19, (N.J. 1955) .......... 16
Ross v. Bernhard, 396 U.S. 531 (1970) .......... 18
Russell v. United States, 78 Fed. Cl. 281, 288 .......... 32
Salovaara v. Jackson Nat. Life Ins. Co., 66 F. Supp. 2d 593 (D.N.J., 1999) .......... 20
Statesmen Savings Holding Corp. v. United States, 41 Ct. Cl. 1 (1998) .......... 18
Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) .......... 35
Suess v. United States, 33 Fed. Cl. 89 (1995) .......... 23, 24, 30

Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 483 F.3d 1330 (Fed. Cir. 2007) .......... 25
Trek Leasing, Inc. v. United States, 62 Fed. Cl. 673 (2004) .......... 32, 35
United States v. Federal Deposit Insurance Corporation, No. 02-1427 (D.D.C., May 2, 2006) .. 30
United States v. Kind, 395 U.S. 1 (1969) .......... 26
United States v. Winstar Corp., 518 U.S. 839 (1996).......... 4, 5, 6, 21
Valle v. North Jersey Automobile Club, 125 N.J. Super. 302, 301 A.2d 518 (N.J. Super. Ch. 1973) .......... 17
Wachsman v. Tobacco Products Corp. of New Jersey, 42 F. Supp. 174 (D.N.J. 1941).......... 18
Whitney Benefits v. United States, 18 Ct. Cl. 394 (1989), *modified*, 20 Cl. Ct. 324 (1990), *aff'd on other grounds*, 926 F.2d 1169 (Fed. Cir. 1969) .......... 24

**Statutes**

12 U.S.C. § 1281(j) .......... 26
12 U.S.C. § 1821(d)(11). .......... 26
12 U.S.C. § 1821(j) .......... 26, 32
28 U.S.C. § 1346(a)(1).......... 29
28 U.S.C. § 1367 .......... 35
28 U.S.C. § 1491(b) .......... 35
28 U.S.C. § 1491(b)(2) .......... 35
28 U.S.C. § 1492(a)(1).......... 32
28 U.S.C. § 2201(a) .......... 29
28 U.S.C. § 2517(a). .......... 26
5 U.S.C. §§ 701 et seq.......... 31, 32, 33
5 U.S.C. §704.......... 32
FIRREA, Pub. L. No. 101-73, Stat. 183 (1999).......... 4, 21

**Other Authorities**

U.S. Const., Art. III.......... 25, 35
U.S. Const., Art. III, § 2.......... 2

**Rules**

Fed. R. Civ. Pro. 13(g).......... 26
RCFC 13 .......... 26, 29
RCFC 15(a).......... 15
RCFC 15(b).......... 15
RCFC 23.1 .......... 2, 20
RCFC 57 .......... 35

**Treatises**

28 U.S.C. § 1346(b) .......... 35
28 U.S.C. § 1491(a)(1)( .......... 2, 35
5 J.W. Moore et al., Moore's Federal Practice § 23.1.02[1](3d ed. 2005) .......... 18, 25
American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(d) .......... 17
Restatement (Second) of Torts § 874 (1979) .......... 35
S. Aronson et al., "Shareholder Derivative Actions: From Cradle to Grave" § I.A.f. (Practicing Law Institute 2007) .......... 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMBASE CORPORATION and
CARTERET BANCORP, INC.

Plaintiffs,

FEDERAL DEPOSIT INSURANCE
CORPORATION,

Plaintiff-Intervenor,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No. 93-531C

Senior Judge Loren A. Smith

**POST-TRIAL BRIEF OF**
**PLAINTIFF-INTERVENOR FDIC**

Plaintiff-Intervenor Federal Deposit Insurance Corporation ("FDIC") is the successor to the rights of Carteret Savings Bank, FA (the "Thrift"), and manager of the FSLIC Resolution Fund, which succeeded by operation of law to the assets and liabilities of the Resolution Trust Corporation ("RTC").[1] The FDIC filed a Complaint in Intervention in this action.[2] The FDIC submits this post-trial memorandum in accord with this Court's Order of June 12, 2008.

**STATEMENT OF RELATED CASES**

This case may be affected by the upcoming decision in Slattery v. United States, No. 2007-5070 (Fed. Cir.)(argued June 3, 2008).

[1] As successor to the rights of the Thrift, and manager of the FRF, the FDIC has standing to bring this action. Sprint Communications Co., L.P. v. APCC Services, Inc., -- U.S. --, 2008 WL 2484712 (June 23, 2008).
[2] Complaint in Intervention of Plaintiff of Federal Deposit Insurance Corporation, AmBase Corp. v. United States, No. 93-531C (Fed. Cl.)(Mar. 28, 1997).

## JURISDICTIONAL STATEMENT

Section 1491(a)(1) of Title 28 provides for jurisdiction over contract claims for money damages. Accordingly, this Court had jurisdiction to find that an express contract existed between the Thrift and the Government, and that the Government breached that contract. AmBase I, 58 Fed. Cl. at 34. This Court also has jurisdiction to determine the appropriate measure and amount of damages for that breach of contract.

Shareholders of a corporation may bring a derivative action to enforce a right that may properly be asserted by that corporation. RCFC 23.1; *see also* First Hartford Corp. Pension Plan v. United States, 194 F.3d 1279 (Fed. Cir. 1999). Therefore, this Court has jurisdiction over the Holding Company's derivative contract claim, which is asserted on the Thrift's behalf.

Article III, § 2, of the U.S. Constitution provides that the judicial power of the United States extends only to "Cases" and "Controversies," i.e., only to matters that are "justiciable." This case remains justiciable if damages are found to be greater than the amount that will flow "from one government coffer to another." H.C Bailey, Jr. v. United States, 341 F.3d 1342, 1346 (Fed. Cir. 2003).

## STATEMENT OF THE ISSUES

1. Would the Thrift have survived if the Government had not breached its goodwill contracts?
2. If so, what would the Thrift's value have been? Should damages for breach of contract be awarded in this amount? Should damages be awarded under any other theory, either in addition to or in lieu of damages awarded on the basis of the value of the Thrift?

3. Have Shareholder Plaintiffs stated a direct claim for payment to AmBase of all derivative contract damages?
4. Have Shareholder Plaintiffs stated a direct claim for payment to the Holding Company of any damages in excess of the amount projected to be paid to third party claimants and federal government entities (i.e., any surplus)?
5. If damages are awarded in an amount sufficient to compensate some of the third-party creditors, does this case remain justiciable?
6. If damages are awarded in an amount apparently too small to compensate the third-party creditors, does this case remain justiciable?
7. If damages are awarded in an amount apparently too small to pay the Thrift receivership's projected federal income taxes, does this case remain justiciable?
8. If damages are awarded in an amount apparently too small to pay all of the projected post-insolvency interest, does this case remain justiciable?
9. Does this Court have jurisdiction to "make findings of fact that the receivership deficit is at the level of fact and law invalid"?
10. Does this Court have jurisdiction to adjudicate Shareholder Plaintiffs' claims that the FDIC mismanaged the Thrift receivership?
    a. Does this Court have jurisdiction to determine the validity of the FDIC's actions in preparing federal income tax returns for the Thrift's receivership estate?
    b. Does this Court have jurisdiction to review the validity of FDIC's policies and regulations on post-insolvency interest?

c. Does this Court have jurisdiction to determine the merits of the FDIC's "shutter[ing] of Carteret Mortgage Company"?

## STATEMENT OF THE CASE

### I. The Nature of the Case and The Parties

The facts of this case have been set forth at length in prior opinions of this Court. AmBase v. United States, 58 Fed. Cl. 32 (2003)("AmBase I"); AmBase v. United States, 61 Fed. Cl. 794 (2004)("AmBase II").

Briefly, this is a Winstar-related[3] case, arising out of the failure of Carteret Savings Bank, F.A. ("Carteret" or "the Thrift"), of Morristown, NJ. In 1982, Carteret acquired two federally-insured thrifts; in 1986, Carteret acquired two more federally-insured thrifts. While the acquisitions were being carried out, Carteret was owned by a bank holding company, Carteret Bancorp, Inc. ("the Holding Company"). In 1988, AmBase Corporation ("AmBase"), itself a holding company, bought all of the outstanding stock of the Holding Company.

Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") on August 9, 1989.[4] This statute established new minimum regulatory capital standards and phased out the use of goodwill for that purpose. On December 4, 1992, the Office of Thrift Supervision ("OTS") found that Carteret was not in compliance with the new standards. OTS closed the Thrift and the Resolution Trust Corporation ("RTC") was appointed as its receiver. The assets and liabilities of the Thrift, including claims at issue in this case, were transferred to the newly-chartered Carteret Federal Saving Bank, for which the RTC was

---

[3] The term "Winstar-related" derives from the case of United States v. Winstar Corp., 518 U.S. 839 (1996). The history of the savings and loan crisis, and subsequent measures taken to resolve it, is extensively discussed in that case and well-known to this Court; therefore, it is not repeated here.
[4] Pub. L. No. 101-73, Stat. 183 (1999).

appointed conservator. Subsequently, RTC was appointed receiver of that institution, while the claims were transferred to RTC in its corporate capacity. Thereafter, the claims were transferred to the FSLIC Resolution Fund-RTC ("FRF-RTC").

Upon the "sunset" of the RTC, the FDIC became the Thrift's receiver. As such, the FDIC is the successor to the rights of the Thrift. The FDIC is also the manager of the FRF-RTC.

II. The Course of Proceedings

A. Pre-*Bailey*: The Original Case

AmBase and the Holding Company (collectively, the "Shareholder Plaintiffs") filed their first Complaint against the United States in 1993. In March 1997, after the Supreme Court's Winstar decision, the FDIC intervened. The Shareholder Plaintiffs then filed their First Amended Complaint.

On March 32, 1998, the FDIC moved for partial summary judgment on liability for breach of contract. On September 9, 1999, Shareholder Plaintiffs moved for partial summary judgment on their contract claim, Takings claim, and a new "illegal exaction" claim. The United States filed cross-motions against both parties.

On August 25, 2003, this Court denied the Shareholder Plaintiffs' motions. The Court granted the FDIC's motion with respect to liability, finding that Carteret had contracted with the government in 1982 and 1986 and that the government had breached those contracts. AmBase I, 58 Fed. Cl. at 49, 54.

B. Post-*Bailey*: The Receivership Deficit Claims

Two days later, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") decided Bailey v. United States, 341 F.3d 1342 (Fed. Cir. 2003). The Federal Circuit upheld the dismissal of the FDIC's and the thrift's claims in that case for lack of justiciability. *Id.* at 1346.

That court also upheld the dismissal of the Bailey shareholders' claim for direct recovery of any surplus, stating that the claim "must be brought by the FDIC because Bailey in his capacity as a shareholder was not party to the assistance agreements." *Id.*

The Shareholder Plaintiffs quickly began to convert this case into one about the Carteret receivership deficit. They moved to dismiss the FDIC,[5] claiming that the FDIC had misadministered the Carteret receivership and "created a [receivership] deficit that far exceeds what it would have been under a more responsible administrator, and threatens to preclude [them] from recovering any damages." AmBase II, 61 Fed. Cl. at 795.

This Court found that "the FDIC is an indispensable party as the successor to the rights of Carteret, which include the breach of contract claims that the shareholder Plaintiffs seek to pursue derivatively." *Id.* The Court also acknowledged that "Ambase's claim that the FDIC has mismanaged the Carteret receivership is a claim against the FDIC" and "not a claim against the government" for the purposes of Winstar litigation and thus "this claim between two non-governmental parties would seem to fall outside the jurisdictional limitations of the Tucker Act." *Id.* at 796-97.

Nevertheless, the Court found jurisdiction to conduct "an equitable review" of the receivership deficit "to permit inclusion of only those costs which are legitimately part of the receivership deficit." *Id.* at 800, 802; *see also id.* at 797 (CFC has "the power to determine the precise amount of [the receivership] surplus"). Shareholder Plaintiffs' motion was granted "to the extent that it requests the Court to consider the size and value of the FDIC's receivership deficit when calculating damages." *Id.* at 802.

[5] Plaintiff Ambase Corporation's Motion to Dismiss the FDIC and Motion to Define the Measure of Carteret's Contract Damages, AmBase Corp. v. United States, No 93-531 (Ct. Fed. Cl., Sept. 17, 2003).

This Court then raised the issue of the case's continued justiciability, given the increase in the projected net Thrift receivership deficit.[6] The parties were ordered to engage in discovery, to result in a "statement of issues" by the Shareholder Plaintiffs summarizing "the respects in which the [receivership] books allegedly overstate or misstate the receivership deficit" together with "the dollar amount" and "any statute, regulation or legal duty" that the FDIC violated with respect to the administration of the receivership."[7] After document discovery, depositions of FDIC employees (past and present), expert reports and depositions, and briefing, the trial court found, on December 13, 2006, that the case continued to be justiciable.[8] Damages discovery was followed by a trial, which concluded on April 4, 2008.

C. The Nature of the Case Today

1. The FDIC's Claims against the Government

The FDIC asserts four remaining[9] claims for relief. It alleges that the Government repudiated and abrogated the Thrift's contract by virtue of statutory and regulatory provisions that restricted the inclusion of supervisory goodwill for the purposes of *regulatory* capital requirements. (Counts I, II.) It alleges that the Government repudiated and breached the Thrift's contract by virtue of statutory and regulatory provisions that restricted the inclusion of supervisory goodwill for purposes of satisfying *minimum* capital requirements. (Count III.) And

---

[6] Transcript of Oral Argument, AmBase Corp. v. United States, No. 93-951C at 73-74 (Fed. Cl., Apr. 21, 2005).

[7] Order, AmBase Corp. v. United States, No. 93-951C (Fed. Cl., May 23, 2005).

[8] Order, AmBase Corp. v. United States, No. 93-951C (Fed. Cl., Dec. 13, 1006), *as amended by* Order, *id.*, (Fed. Cl., April 13, 2007).

[9] Counts I and II of the FDIC's Complaint in Intervention also alleged that repudiation, abrogation, and breach of its contracts (a) effected a taking of its property without just compensation and (b) effected a deprivation of its property without due process of law, both in violation of the Fifth Amendment to the U.S. Constitution. This Court has not ruled on the FDIC's Fifth Amendment claims.

it alleges that the Government frustrated the entire purpose of the Thrift's contracts with FHLBB and FSIC and deprived the Thrift of the consideration for which it had bargained. (Count IV.)

2. Shareholder Plaintiffs' Claims against the Government

The Holding Company asserts two remaining[10] complaint-based claims for relief. It alleges that it has a direct interest in, and is entitled to recover from the Government, the amount of any surplus resulting from compensation for the Government's abrogation and breach of the Thrift's contract rights. (First Amended Complaint ("FAC"), Count V.) It also alleges a derivative claim, on behalf of the Thrift, for damages for the abrogation and breach of the Thrift's contracts and the frustration of the purpose of those contracts. (Count VI.)[11]

The Shareholder Plaintiffs have not amended their complaint since 1997. However, they have, in various court papers, made additional allegations against the Government. They charge that Congress, in addition to breaching the Thrift's contracts, "artificially" and "radically inflated the [Thrift] receivership's deficit" by:

- Depriving the Thrift of the value of its supervisory goodwill;
- Failing properly to fund the RTC for most of 1993; and

[10] Shareholder Plaintiffs also asserted four contract-based claims for relief (Counts I-IV). This Court previously noted that "Ambase was not a party to the supervisory goodwill contracts that were subsequently breached by the government" and that the "government's breach of contract creates in the corporation, here Carteret"—i.e., not in the Shareholder Plaintiffs—"a cause of action against the government" AmBase I, 58 Fed. Cl. at 50, 51. In effect, this Court has dismissed the Shareholder Plaintiffs' direct contract claims.

Moreover, Shareholder Plaintiffs previously disavowed those claims, stating that "[T]he private plaintiffs are not asserting a contract claim." Transcript of Status Conference, AmBase v. United States, No. 93-951C (Fed. Cl., Oct. 2, 2000) at 5:1-9. Therefore, these four direct contract claims should be, if they have not already been, dismissed.

[11] Counts I-IV of the First Amended Complaint also alleged that the Government effected a taking of Shareholder Plaintiffs' property without just compensation, and effected a deprivation of their property without due process of law, both in violation of the Fifth Amendment to the U.S. Constitution. This Court has found, however, that Shareholder Plaintiffs failed to state either a Fifth Amendment takings claim or an "illegal exaction" claim. AmBase I, 58 Fed. Cl. at 52, 54. Therefore, those claims have been, or should be, dismissed.

- Imposing a Minority Preference Program on the RTC.

SHP Pre-Trial Br. at 20-21, 26-28, 83-84, 110-123.[12] Shareholder Plaintiffs seek damages from the Government, under a variety of theories, ranging from a low of $1.2 million to a high of $3 billion. *Id.* at 82, 74-75.

3. Shareholder Plaintiffs' Claims against FDIC

Shareholder Plaintiffs' various court papers also assert claims against the FDIC. They claim that the FDIC erred in:

- Projecting the amount of federal income tax owed by the Thrift receivership, because it allegedly made errors in preparing federal income tax returns after the Thrift was closed;
- Calculating the post-insolvency interest owed by the Thrift on monies advanced to the receivership by RTC-Corporate, by (a) concluding that interest is owed; and (b) using a fixed rate, based on the federal judgment rate, in projecting the amount of post-insolvency interest payable by the Thrift receivership; and
- "[S]hutter[ing] Carteret Mortgage Company."[13]

Because of these alleged errors, Shareholder Plaintiffs claim, the FDIC's projection of the Thrift's receivership deficit is erroneous. They ask this Court "to make findings of fact that the receivership deficit is at the level of fact and law invalid." SHP Pre-Trial Br. at 85. In addition, the Shareholder Plaintiffs claim that all damages due to the Thrift "should be paid, in their

[12] The Shareholder-Plaintiffs' attacks on Congressional action, particularly its alleged failure adequately to fund the RTC, are misstated as challenges to elements of the receivership deficit. In reality, these attacks are contentions that, in a "but for" world, events would have transpired otherwise: the value of the Carteret receivership would have been higher, and consequently there would have been no need for the receivership to borrow. As such, these contentions are claims that the Government, by its actions or inactions, inflated the damages caused by its breach of Carteret's goodwill contract. The claims have nothing to do with any projected net receivership deficit.

[13] SHP Pre-Trial Br. at 28; *see also id.* at 110.

entirety, directly to plaintiff AmBase," as the Thrift's "sole residuary claimant" rather than to the FDIC. SHP Br. at 124.

**STATEMENT OF RELEVANT FACTS**

The FDIC prepares a "Goodwill Financial Reporting Package," as of the close of each calendar year that includes, inter alia, a report on "Projected Receivership Results" using adjusted year-end balances. Each such Report 3 projects estimates of financial results for the receivership estate as of the applicable reporting period. This report's projections focus on the underlying net assets/(deficit) position of the receivership at various stages of potential claim distribution, based on assumed payment priority.

The most recent Carteret report, for calendar year 2007, shows (on Report 3 thereof) that virtually all reported Thrift assets have been liquidated. Total current assets, consisting of cash and investments, amount to $115,578.

Report 3 also projects total net deficit receivership results of $321,434,394. This figure includes, inter alia, projections of:

- Post-insolvency interest on the FDIC's subrogated deposit claim, in the amount of $180,304,049, payable to the FSLIC Resolution Fund-RTC (the "FRF");
- Potential federal income tax liability of $113,934,854, payable to the U.S. Department of the Treasury; and
- Third-party creditor claims, and estimated post-insolvency interest on those claims, totaling $3,297,794, which is payable to the general trade creditors of the Carteret pass-through receivership.

Exclusive of third-party claims, the most recently projected receivership position is a deficit of $318,136,600. Exclusive of third-party claims and potential federal taxes, the projected net

receivership result is a deficit position of $204,201,746. Exclusive of third-party creditor claims, potential federal tax liabilities, and estimated post-insolvency interest on proven claims, the currently estimated receivership deficit would be $23,897,697.[14]

Information contained in Report 3, testimony about the priority of payment of claims against the Thrift's receivership, and mathematical calculations based on projections of the receivership results as of year end 2007, are summarized as follows:

| CARTERET FEDERAL SAVINGS BANK | | | | |
|---|---|---|---|---|
| | **Description from CARTERET REPORTING PACKAGE, REPORT 3 (as of 12/31/07)** | **EXPLANATION** | **PROJECTED RECEIVERSHIP RESULT** | **ULTIMATE PAYEE** |
| **1** | Cash and investments on hand | | $115,758.00 | |
| **2** | Accounts/Notes Payable | | -$130.00 | FRF |
| **3** | Subtotal (line 1 - line 2) | | $115,628.00 | |
| **4** | Suspense Escrow Accounts | Uncashed dividend check from receivership to pass-through receivership (PTR) claimant; to be escheated to state | -$15,378.00 | State |
| **5** | Subtotal (line 3 - line 4) | | $100,250.00 | |
| **6** | Due to FDIC for Service-Billed Expenses | For accounting, investigation & asset management services | -$110,541.00 | FRF |
| **7** | Subtotal (line 5 - line 6) | | -$10,291.00 | |
| **8** | Due to FDIC for Borrowed Funds | For adjustments to valuation in 1998 residual interest sale | -$6,018,262.00 | FRF |
| **9** | Subtotal (line 7 - line 8) | | -$6,028,553.00 | |
| **10** | Due to FDIC Subrogated Deposit Claims | For funding of deposits at time of closings (multiple) | -$17,565,648.00 | FRF |
| **11** | Subtotal (line 9 - line 10) | | -$23,594,201.00 | |
| **12** | Other Creditor Claims | For payment of unused vacation time to Carteret employees | -$303,496.00 | FRF |
| **13** | Subtotal (line 11 - line 12) | | -$23,897,697.00 | |

[14] DX 9174: FDIC, Goodwill Financial Reporting Package for Carteret Federal Savings Bank, Projected Receivership Results Using Adjusted 12/31/2007 Balances, at Report 3.

| | Description from CARTERET REPORTING PACKAGE, REPORT 3 (as of 12/31/07) | EXPLANATION | PROJECTED RECEIVERSHIP RESULT | ULTIMATE PAYEE |
|---|---|---|---|---|
| 14 | Estimated Interest on Claims | Post-insolvency interest on unpaid proven claims balance, computed by applying applicable federal judgment rate immediately prior to receivership's inception date; compounded annually; accrues until unpaid proven claims have been satisfied | -$180,304,049.00 | FRF |
| 15 | Subtotal (line 13 - line 14) | | -$204,201,746.00 | |
| 16 | Estimated Federal Income Tax Liability | Estimated potential claims of US for unpaid Federal income tax (deferred while there are insufficient assets to pay depositor claims in full); includes interest and penalties | -$113,934,854.00 | Internal Revenue Service |
| 17 | Subtotal (line 15 - line 16) | | -$318,136,600.00 | |
| 18 | Other Creditor Claims | (Outstanding Claims) Approx. 30% remainder owed after payment of liquidation share | -$1,578,552.00 | Carteret PTR general trade creditors |
| 19 | Subtotal (line 17 - line 18) | | -$319,715,152.00 | |
| 20 | Other Creditor Claims | (Claims not Fixed on Day of Default) Approx 30% remainder owed after payment of liquidation share | -$292.00 | Carteret PTR general trade creditors |
| 21 | Subtotal (line 19 - line 20) | | -$319,715,444.00 | |
| 22 | Estimated Interest on Claims | Post-insolvency interest on PTR claims, computed in accordance with 12 CFR 360.3(b); compounded daily; accrues until unpaid claims have been satisfied | -$1,718,950.00 | Carteret PTR general trade creditors |
| **23** | **PROJECTED TOTAL NET ASSETS (DEFICIT)** | | **-$321,434,394.00** | |

Sources: DX 9174; Trial Transcript, p. 932, line 8-p. 934, line 20; *see also* PX 6904.

**SUMMARY OF ARGUMENT**

The Holding Company has failed to state a direct claim for payment of any surplus. Shareholder Plaintiffs have also failed to state a claim for payment to AmBase rather than to the FDIC, to the detriment of the third-party creditors of the Thrift, of all derivative contract damages. Therefore, any damages awarded on the FDIC's contract claims or the Holding Company's shareholder derivative contract claims must be paid to the FDIC.

There is no need for this Court to evaluate the claims against the Thrift's receivership for federal income taxes or the claim for post-insolvency interest. As Shareholder Plaintiffs have stated, "[T]he receivership deficit has no relevance to an award of damages." SHP Pre-Trial Br. at 85. The size of the projected net Thrift receivership deficit is relevant only the issue of justiciability.

The actual federal income tax liability of the Thrift receivership is currently unknowable. Shareholder Plaintiffs vigorously contest, albeit in the wrong forum, the FDIC post-insolvency interest policy applied to the Thrift receivership; therefore, the amount (if any) of post-insolvency interest that will ultimately paid by the Thrift receivership is also currently unknowable. Both amounts should be disregarded for the purposes of determining justiciability. If damages in this case are greater than $23,897,697, this case remains justiciable and all damages should be paid to the FDIC.

This Court lacks jurisdiction to perform an "equitable review" of the alleged inadequacies in the FDIC's projection of the Thrift's receivership deficit. The Court also lacks jurisdiction to "make findings of fact that the receivership deficit is at the level of fact and law invalid." In particular, the Court lacks jurisdiction to adjudicate the validity of the FDIC's actions in filling out the Thrift's federal income tax returns; to adjudicate the validity of FDIC's policies and

regulations on post-insolvency interest; and to adjudicate the merits of the FDIC's "shutter[ing] of Carteret Mortgage Company."

## ARGUMENT

### I. Shareholder Plaintiffs Seek Total Damages of $1.8 Billion or More

With respect to questions relating to the amount of contract damages owed to the Thrift in this case—for example, whether the Thrift would have survived if the Government had not breached its contracts; what, if so, the Thrift's value would have been at the time of breach; the most appropriate method for measuring the Thrift's value at the time of breach—the FDIC relies upon the expert testimony and other evidence proffered by the Shareholder Plaintiffs. The FDIC objects to that evidence only to the extent that it supports the theory that the measure of damages in this case is losses allegedly suffered by the Shareholder Plaintiffs, in the past or in the future, as distinguished from losses suffered by the Thrift, and to the extent it supports the theory that the Thrift's projected net receivership deficit should be "reduced" in this action. [15]

At trial, Shareholder Plaintiffs advanced a number of damages theories and estimates, some of which are exclusive and some of which are cumulative. Their damages estimates range from a low of $1.2 million (wounded bank damages) to a high of $3 billion (expectancy damages). SHP Pre-Trial Br. at 71-82. Their expert's "preferred damages estimate," derived by "[a]pplying prevailing market-to-book ratios to Carteret's current book value, estimated at $474 million," is $1.097 billion. *Id.* at 74. A tax "gross-up" of this sum, in the amount of $188 million, is also requested. *Id.* at 75. Prior to trial, Shareholder Plaintiffs asked this Court to enter judgment for no less than $1.8 billion. *Id.* at 130.

[15] *See* Plaintiff-Intervenor FDIC's Response to Plaintiff's Motion to Designate Deposition Testimony for Trial (Jan. 7, 2007).

II. Regardless of Amount, Derivative Contract Damages Are Not Payable Directly to Shareholder Plaintiffs

A. Shareholder Plaintiffs' Claim for Direct Payment Is Too Late

Originally, Shareholder Plaintiffs asserted a claim for direct payment of damages only in the event that a damages award created a surplus in the Thrift receivership, and then only on behalf of the Holding Company. (Count V). More recently, Shareholder Plaintiffs have asserted that all damages due to the Thrift in this case "should be paid directly to plaintiff AmBase, as Carteret's sold residuary claimant, 'net of any receivership claims' and 'outside the statutory distribution scheme.' " SHP Pre-Trial Br. at 124, citing Slattery v. United States, 73 Fed. Cl. 527, 531 (2006). Shareholder Plaintiffs have not sought leave of this Court to amend their complaint to seek payment to themselves of the Thrift's contract damages, nor have they sought the consent of the parties to do so, as required by the Rules of this Court. RCFC 15(a). The FDIC does not consent to such an amendment, just as it did not consent to trial of this claim.[16] RCFC 15(b).

B. Shareholder Plaintiffs Fail to State A Claim for Direct Payment of Derivative Damages

1. New Jersey Law Applies to the Holding Company's Claim

In the absence of federal pre-emption, applicable state law governs shareholder derivative claims. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97 (1991). Choice of law clauses in the contracts at issue here specify that New Jersey law applies to the extent that federal law does not control. *See, e.g.*, Assistance Agreement between the Federal Savings and Loan Insurance Corporation ("FSLIC") and The Thrift § 19 (Sept. 29, 1982); Assistance Agreement between

---

[16] Plaintiff-Intervenor FDIC's Motion to Dismiss Carteret Bancorp's Claim for a Direct Award of Derivative Damages, AmBase Corp. v. United States, No. 93-531 (Fed. Cl., Dec. 21, 2007) at 4.

FSLIC and The Thrift § 22 (June 6, 1986).[17] There is no federal common law of corporations. O'Melveny v. Myers, 512 U.S. 79, 83-85 (1994); *see also* Atherton v. FDIC, 519 U.S. 213, 226 (1997)(no general federal common law standard of care for officers and directors of federal savings association). Given the absence of express regulation, Federal law does not control with respect to this shareholder derivative suit; New Jersey law thus applies to the Holding Company's claim for direct payment of some or all of a derivative award.

2. Derivative Damages Are Payable Only to the Thrift

a. Under New Jersey Law, Derivative Damages Are Payable Only to the Thrift

According to the New Jersey Supreme Court,

> '[a] shareholder derivative action permits a shareholder to bring suit against wrongdoers *on behalf of the corporation*, and it forces those wrongdoers to compensate the corporation for the injury they have caused.' In that circumstance, 'the cause of action actually belongs *to the corporation* . . . .'

In re PSE & G Shareholder Litigation, 173 N.J. 258, 177-78, 801 A.2d 295, 307 (N.J. 2002)(internal citation omitted)(emphasis added); *see also* Pomeroy v. Simon, 17 N.J. 59, 64, 110 A.2d 19, 22 (N.J. 1955)(derivative action is "designed to redress the wrongs to the

---

[17] Other contract documents contained choice-of-law provisions to the same effect. See, e.g., Merger Agreement between First Federal Savings and Loan Association of Delray Beach and Carteret Savings and Loan Association, F.A., § 17 (Sept. 29, 1982); Merger Agreement between Barton Savings and Loan Association and Carteret Savings and Loan Association, F.A § 17 (Sept. 29, 1982); Federal Home Loan Bank Board Resolution No. 82-662 (Sept. 30, 1982); Combination and Merger Agreement between Admiral-Builders Savings and Loan Association and Carteret Savings and Loan Association, F.A. § 23 (Nov. 21, 1985); .Capital Contribution Agreement between Carteret Savings Bank, F.A. and the Maryland Deposit Insurance Fund § 16 (Feb. 27, 1986); Merger Agreement and Plan of Merger between First Federal Savings and Loan Association of Montgomery County and Carteret Savings Bank, F.A. § 16 (June 3, 1986); Acquisition Agreement between the Federal Savings and Loan Insurance Corporation , ad Receiver for Mountain Security Savings Bank, and Carteret Savings Bank, F.A. § 15 (June 6, 1986). That is hardly surprisingly, given that Carteret's principal office was located in Newark, New Jersey. *Id.* at § 1. In the absence of a choice of law provision, the law of the state of incorporation would apply. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991); *see also* Hicks v. Lewis, 2003 WL 22309482 (Tenn. Ct. App. Oct. 7, 2003)(after Kamen, all cases apply substantive law of state of incorporation to the demand requirement).

corporation itself . . . for the benefit of the corporation.").[18] As a result, the recovery in a derivative action "inures to the benefit of the corporation." In re Sharkey v. Emery, 272 B.R. 574 (Bankr. D.N.J. 2001); see also Valle v. North Jersey Automobile Club, 125 N.J. Super. 302, 307, 310 n. 4; 301 A.2d 518, 521, 522 n.4 (N.J. Super. Ch. 1973)("Any recovery by the representative plaintiff inures to the corporation's benefit, not the plaintiff's . . . The corporation is entitled to all, not just part, of the benefits.")

This is especially so in the case of corporation in receivership. In the case of a closely-held *open* corporation, it may be permissible to order an individual recovery, provided that " 'to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporations, and (iii) interfere with a fair distribution of the recovery among all interested persons.' " Brown v. Brown, 323 N.J. Super. 30, 36, 731 A.2d 112 (App. Div. 1999), quoting American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 7.01(d); *see also id.* at 38 ("Nor is there any suggestion in the record that [the corporation] has been left with assets insufficient to meet its obligations to creditors, who would therefore be prejudiced if [plaintiff] is permitted to recover damages that otherwise are due the corporation.") But the shareholders of a corporation in receivership, even one that is closely-held, will rarely (if ever) be able to meet that test, since direct recovery in that situation will necessarily "prejudice the interests of creditors" and "interfere with a fair distribution of the recovery among all interested person." Indeed, under New Jersey law, "[w]here the corporation is in the hands of a receiver, the right of action by the receiver to protect the interest of the corporation is exclusive." Wachsman v. Tobacco Products

[18] The New Jersey Court Rules furnish the procedural rules for bringing a shareholder derivative action; New Jersey common law furnishes the substantive law. In re PSE & G Shareholder Litigation, 173 N.J. 258, 287, 801 A.2d 295, 312 (discussing N.J.S.A. Rule 4:32-5, now 4:32-3).

Corp. of New Jersey, 42 F. Supp. 174, 178 (D.N.J. 1941). Thus the Holding Company may not, under New Jersey law, obtain a direct award of damages on the derivative claim.

b. Corporate Law Generally Precludes Direct Payment of Derivative Damages

New Jersey's rule is not anomalous. The general trend of state corporate law is to the same effect. Where goodwill contract claims are brought derivatively, "the only claim that can be heard is the corporation's contract claims against the government and the only beneficiary of any relief will similarly be the corporation." First Hartford Corp. Pension Plan & Trust v. United States, 194 F. 3d 1279, 1293 (Fed. Cir. 2000); *see also* Bailey v. United States, 341 F.3d 1342, 1347 (Fed. Cir. 2003). In other words, "[t]he proceeds of [a derivative] action belong to the corporation," Ross v. Bernhard, 396 U.S. 531, 538 (1970); *see also* 5 J.W. Moore et al., Moore's Federal Practice § 23.1.02[1](3d ed. 2005).

The same is true with respect to shareholder derivative claims brought by shareholders of bankrupt entities. In re Ionosphere Clubs, Inc., 17 F.3d 600, 606 (2d Cir. 1994), quoted in Statesmen Savings Holding Corp. v. United States, 41 Ct. Cl. 1, 17 (1998). Moreover, most states do not allow an exception in the case of closely-held corporations, even if the shareholders were " 'severely personally damaged ' " S. Aronson et al., "Shareholder Derivative Actions: From Cradle to Grave" § I.A.f. (Practicing Law Institute 2007), *quoting* Glod v. Baker, 851 So.2d 1255, 1264-67, 1276 (La. App. 3rd Cir., Aug. 6, 2003). Therefore, any and all damages awarded on the shareholder derivative claim in this case must be paid to the FDIC as successor to the Thrift.

c. *Slattery* Does Not Support Payment of Derivative Damages to Shareholder Plaintiffs

Shareholder Plaintiffs base their claim for direct payment to themselves of all derivative contract damages in this case upon their reading of this Court's decision in Slattery v. United States, 73 Fed. Cl. 517, 531 (2006). That reliance is mistaken.

At one point during the proceedings before the trial court, the Slattery shareholder plaintiffs sought payment to themselves of derivative damages.[19] The Government expressed concern that those shareholder plaintiffs were seeking to have the trial court's damages award "paid outside of the receivership framework." Transcript of Proceedings, Slattery v. United States, No. 93-280 (Ct. Fed. Cl., June 15, 2006) at 59-60. Eventually, however, the Court and all parties agreed that the damages award had to be paid to the FDIC as receiver for the thrift—even though the FDIC was not a party to the case—and the final order so provided.[20]

On appeal the Slattery shareholder plaintiffs, like the Government, agreed with the FDIC that "any final judgment in this case will be paid by the United States to FDIC-Receiver."[21] The Slattery shareholder-plaintiffs reiterated that position at oral argument in response to a query from the appellate judicial panel.[22] Thus, Slattery furnishes no support for the Shareholder Plaintiffs' claim that they are entitled to a direct award of the Thrift's contract damages in this case.

---

[19] At the time of the hearing, the Federal Circuit had not issued its decision in American Capital Corp. That decision was issued on October 30, 2006, 19 days after the Slattery hearing on October 30, 2006. The American Capital Corp. decision was not final until March 8, 2007.

[20] For a full discussion of this history, *see* Brief of Amicus Curiae The Federal Deposit Insurance Corp., Slattery v. United States, No. 2007-5063 (Fed. Cir., Aug. 13, 2007).

[21] Brief for Plaintiff-Cross Appellant Frank P. Slattery, Slattery v. United States, No. 2007-50063 (Fed. Cir., Nov. 20, 2007).

[22] Oral Argument, Slattery v. United States, No. 2007-5063 (Fed. Cir., June 3, 2008)(no transcript available; audio at http://www.cafc.uscourts.gov/oralarguments/searchscript.asp)

d. The Thrift's Quest for Direct Damages Violates Its Commitment

The Holding Company originally asserted that it would "fully and adequately represent" not only "the shareholder's interest" but also "the interests of The Thrift's creditors, in pursuing Carteret's claims against the United States." FAC, Count VI, ¶ 85. But in seeking to appropriate for itself the damages awarded on the derivative claim, the Holding Company is obviously not representing the interests of The Thrift's creditors, either governmental or non-governmental.

The Holding Company errs in putting its interests ahead of the interests of the Thrift and its creditors. A derivative plaintiff can be disqualified its interests are "antagonistic" to "the very parties he seeks to represent." Salovaara v. Jackson Nat. Life Ins. Co., 66 F. Supp. 2d 593, 603, 602 (D.N.J., 1999)(plaintiff was engaged in litigation with "the very entities that he purports to represent here derivatively"). In a derivative suit, shareholder plaintiffs "may be considered as trustees or guardians ad litem to the corporation's right of action." Ensher v. Ensher, Alexander & Barsoon, Inc., 187 Cal. App. 2d 407, 410 (Cal. App. 3d Dist. 1960); *see also* First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1293 (shareholders "file suit as fiduciaries on the corporation's behalf and for the corporation's benefit")(Fed. Cir. 1999), *quoting* Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 549 (1949)("[A] stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character").[23] In overlooking its duties to the Thrift and its creditors, The Holding Company is not acting like a trustee, guardian ad litem, or fiduciary of the Thrift.

[23] For that reason, the Holding Company may not settle or compromise the Thrift's breach of contract action without this Court's approval. RCFC 23.1; *cf*. First Hartford Corp. Pension Plan & Trust v. United States, 54 Fed. Cl. 298 (2002)(court-approved dismissal).

The Holding Company's claim for a direct award of derivative damages should be expressly dismissed and the Holding Company should be charged with the duty it assumed in the FAC: viz., representation of the interests of The Thrift as a whole, including the interests of its creditors, both governmental and non-governmental, as well as its shareholders. The Holding Company is entitled to share any derivative damages award but not to seize it.

III. If Damages Exceed $321,434,394, This Case Would Remain Justiciable

A. The "Government Coffers" Test Would Be Met

The most recent formulation of the justiciability test for Winstar cases is set forth in Bailey v. United States, 341 F.3d 1242 (2003). In that case, the maximum contract damages award was $64 million (the value of the thrift at the time the FIRREA was passed). Therefore, the contract claim was deemed "a nonjusticiable intra-governmental dispute because any damage award recovered from the government by the FDIC would flow to the FRF, from one government coffer to another." *Id.* at 1346, citing Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1380 (Fed. Cir. 2001).[24]

As shown above, the Thrift's total net liabilities, including third-party creditor claims and post-insolvency interest thereon, are currently projected to be $321,434,394. If damages are awarded in an amount greater than this, the receivership might—according to the most recent net projections—have a surplus. In that event, not all damages dollars will flow into government coffers and the case would remain justiciable. The Holding Company would have a claim against the Thrift's receivership for some or all of that surplus.[25]

---

[24] The maximum "takings" award, $14.8 million (the value of the thrift's equity) was also exceeded by the FDIC's subrogated claim of $66 million. Bailey v. United States, 341 F.3d at 1347. Therefore, "the takings claim was also an intra-governmental claim." *Id.*

[25] DX 9174: FDIC, Goodwill Financial Reporting Package for Carteret Federal Savings Bank, Projected Receivership Results Using Adjusted 12/31/2007 Balances, at Report 3, column 7

B. The Holding Company Fails to State a Direct Claim for a Surplus

Dissatisfied with this right, the Holding Company alleges that it is entitled to recover directly from the Government the amount of any surplus resulting from compensation for the Government's abrogation and breach of the Thrift's contract rights. (Count V.) It is mistaken, however. The Holding Company has failed to state a claim for direct payment by the Government of any surplus. And this Court lacks jurisdiction to order the FDIC to pass through any portion of the surplus to them. To the contrary, all damages paid by the Government in this case are payable only to the FDIC as receiver for the Thrift.

This Court has previously expressed skepticism with respect to the Holding Company's request that it "exercise its power to direct pro rata recovery by the shareholder." AmBase II, 61 Fed. Cl. at 796. The Court noted that the Shareholder Plaintiffs had not "pointed to a single example of such direct recovery" in a case brought before this Court. *Id.* Nevertheless, the Shareholder Plaintiffs subsequently disparaged the idea that a damages award here "must 'flow through the receivership.'"[26]

The Holding Company's direct claim for recovery of a surplus directly "from the United States" (FAC, Count V) is premised upon the proposition that such a surplus exists, may be determined by this Court, and may therefore be awarded directly. However, that is not possible. No surplus exists until after all claims against the Thrift receivership have been finally resolved. Bailey v. United States, 341 F.3d at 1346 (claim for surplus expectancy damages is contingent).

("Stockholders' Claims: Priority 10") and note [e] ("stockholders' claims are subordinate to all other claims reported in the preceding columns"). *See also* 12 C.F.R. § 360.3(a)(10)(claims by "holders of nonwithdrawable accounts, including stock").

[26] Plaintiffs' Reply in Support of Their Motion for Entry of an Order Setting Pretrial Schedule at 8, AmBase Corp. v. United States, No. 93-531(Fed. Cl., Mar. 8, 2007).

Moreover, no bank holding company may directly recover for breach of a goodwill contract unless it "has a 'direct personal interest in a cause of action.' " American Capital Corp. v. United States, 472 F.3d 859, 866 (Fed. Cir. 2007). A bank holding company does not have such an interest unless it was contractually required to commit resources (e.g., cash or stock) to a goodwill transaction, even if it actually did so and made promises in connection with the deal. *Id.* at 866, *citing* Hansen Bancorp., Inc. v. United States, 367 F.3d 1297, 1303-04 (Fed. Cir. 2004). In the absence of a required commitment, a bank holding company's rights to recover damages for a thrift's losses are "purely as a shareholder" of the thrift; the thrift's injuries that result "in its losses and ultimate downfall are properly its own." *Id.* at 867; *see also* Bailey v. United States, 341 F.3d at 1346 (shareholder's claim must be brought by FDIC where shareholder was not a party to the goodwill agreements).

The Holding Company has not alleged that it was contractually required either to make promise or contribute resources. It has not proffered evidence in support of that proposition. This Court has not found that the Holding Company was either required to or did make promises or contribute resources; to the contrary, only the Thrift itself has been found to have entered into goodwill contracts with the Government. AmBase I, 58 Fed. Cl. at 36. Therefore, the Holding Company's direct claim for payment of a surplus should be dismissed. RCRC 12(b)(6).

C. Damages May Not Be Apportioned Between FDIC and Shareholder Plaintiffs

As authority for the proposition that it has the power to apportion damages between the FDIC and the Shareholder Plaintiffs, this Court previously cited to the case of Suess v. United States, 33 Fed. Cl. 89 (1995), which arguably indicated that the Court "might have the power to award a surplus" in this case. AmBase II, 61 Fed. Cl. at 797. The Court then suggested that it would be

"surprising" if it did not, as a corollary, also have the power "to determine the precise amount of that surplus." *Id.*

As it happens, no "surplus" was ultimately awarded to the shareholder plaintiffs in the Suess case. Moreover, as demonstrated above, the Holding Company has failed to demonstrate the "direct personal interest" requisite for a direct award of damages. American Capital Corp., 742 F.3d at 866. Since the Holding Company has failed to meet the test for a direct award, it follows that the damages award in this case cannot be "apportioned."

As a result, Whitney Benefits v. United States, 18 Ct. Cl. 394 (1989), *modified*, 20 Cl. Ct. 324 (1990), *aff'd on other grounds*, 926 F.2d 1169 (Fed. Cir. 1969), is now inapposite. In that case, plaintiffs "were each seeking less than one hundred percent of the damages award, but the combined amounts sought by the parties exceeded the total damages award." AmBase II, 61 Fed. Cl. at 800. Each plaintiff had a direct claim for a share of a damages award, placing the Government in the position of a "stakeholder." *Id.* After American Capital, however, it is now clear that the Holding Company here does not have a direct claim. As a result, the Government is not in the position of a stakeholder and there is no possibility that the Government will incur double liability.

Moreover, no dispute between the Holding Company and the FDIC currently exists. Such a dispute will not exist unless and until damages are awarded to the FDIC on the Thrift's contract claims and Shareholder Plaintiffs' claim against the receivership deficit is resolved in a manner unsatisfactory to them. There is currently no way of knowing when or if either of those things will happen. In seeking to have this Court adjudicate their claim against the receivership, Shareholder Plaintiffs are seeking " 'an opinion advising what the law would be upon a hypothetical state of facts,'" in a dispute that does not " 'admi[t] of specific relief through a

decree of a conclusive character.'" Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 483 F.3d 1330, 1336 (Fed. Cir. 2007)(internal citation omitted); *see also id.* at 1337. Any decision by this Court with respect to the Shareholder Plaintiffs' claim against the receivership would violate not only the FDI Act, as they tacitly concede, but also the Constitutional requirement of ripeness. U.S. Const., Art. III; J.W. Moore et al., 15 Moore's Federal Practice § 101.75 at 101-152 (3d ed. 2007); Eurodif S.A. v. United States, 506 F.3d 1051, 1054 (Fed. Cir. 2007).

In a strikingly similar case, shareholders of a railroad in the midst of a reorganization sought a declaratory judgment that certificates of indebtedness held by the railroad were worthless. In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co, 701 F.2d 604 (7th Cir. 1983). The shareholders sought to have the certificates declared worthless because they had been issued pursuant to a federal statute, known as the "MRRA," that allegedly violated the Constitution. Given that future events might well render the shareholders' claims moot, the court found that the claims were not ripe for review and dismissed the case. *Id.* at 609, 610. Shareholder Plaintiffs here are in exactly the same position. Therefore, their claim for direct payment must be dismissed for lack of ripeness.

D. This Court Lacks Jurisdiction to Direct the FDIC to Pay a Surplus Claim

As an alternative to direct payment, the Shareholder Plaintiffs suggest that "awarding damages to the receivership and directing the receivership to distribute those damages without diversion to the receivership deficit might also serve to make the thrift whole." SHP Pre-Trial Br. at 127. They do not pursue that suggestion, noting that "the FDIC would likely argue that such distribution is barred by the statutory distribution framework set forth in 12 U.S.C. §

1821(d)(11). In addition, the FDIC may challenge this Court's authority to direct the FDIC's actions in this manner. See 12 U.S.C. § 1821(j)." *Id.*

Shareholder Plaintiffs are correct. The FDIC cannot be directed to pass through any specified amount to the Shareholder Plaintiffs. As this Court has reiterated, the FDIC is not "the government" in this case; thus, the FDIC is not the defendant. AmBase II, 61 Fed. Cl. at 797. The Rules of this Court make no provision for cross-claims between or among fellow plaintiffs. RCFC 13, 14; *cf.* Fed. R. Civ. Pro. 13(g). The jurisdiction of this Court does not extend to disputes between private parties. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 67 (1982); *see also* American Renovation & Construction Co. v. United States, 65 Fed. Cl. 254, 262 (2005); Great American Ins. Co. v. United States, 184 Ct.Cl. 520, 397 F.2d 289 (1968); Great American Ins. Co. v. United States, 203 Ct.Cl. 592, 492 F.2d 821 (1974).

As Shareholder Plaintiffs acknowledge, the FDI Act prohibits judicial action "to restrain or affect the exercise of powers or functions of the [FDIC] as conservator or receiver." 12 U.S.C. § 1281(j). "[T]his section is intended to prevent injunctive relief against the FDIC's actions as receiver." AmBase II, 61 Fed. Cl. at 799. The statute applies to this Thrift receivership, because the receivership is involved in an "ongoing administrative proceeding," viz., the resolution of the Thrift. Hindes v. FDIC, 137 F.3d 148, 165 (3rd Cir. 1998). Finally, the relief that this Court can give is "limited to actual, presently due money damages from the United States" and does not include injunctive relief like a directed payment to Shareholder Plaintiffs. United States v. Kind, 395 U.S. 1, 3 (1969). This Court may order payment of damages awards only from appropriated funds, not from the assets of a Thrift receivership. 28 U.S.C. § 2517(a). Therefore, the FDIC cannot be compelled to allow Shareholder Plaintiffs' claim against the receivership. Only if and when their claim is disallowed might judicial review be available.

IV. If Damages Exceed $318,136,600, This Case Would Remain Justiciable

The most recent projections indicate that, if damages awarded in this case total less than $321,434,394, there will not a surplus in which the Shareholder Plaintiffs will have an interest. Money would not necessarily flow from a government coffer to their private pockets. However, as noted above, 35 third party creditors have asserted claims against the Thrift receivership in the amount of $3,297,794 (including post-insolvency interest on those claims).

The projected Thrift receivership deficit, exclusive of third-party claims, is $318,136,600. Like the Shareholder Plaintiffs, the third party creditors are private, not governmental, entities. Therefore, if damages were awarded in an amount more than $318,136,660 (that is, an amount greater than the projected net receivership deficit less all claims of all third party creditors), a portion of those damages would flow not "from one government coffer to another" but to one or more third-party creditor pockets. This case would continue to be justiciable.

V. If Damages Exceed $23,897,697, This Case Would Remain Justiciable

A. The Elements of the Projected Receivership Deficit Can Be Unbundled

In the Bailey case, the Federal Circuit did not hold that the damages award should be compared to the entire "receivership deficit" of $68.2 million. Rather, it held that the "subrogated claim owned by the FRF" of $66 million was the relevant comparison. Bailey v. United States, 341 F.3d at 1346. The subrogated claim was a claim "for funds provided to cover deposit liabilities" that the receivership had been unable to repay out of recoveries on assets. *Id.* The rationale for the Federal Circuit's decision was that "the FRF's subrogated claim of $66 million" would exceed the "maximum potential damages award of $64 million" and thus "any damage award . . . would flow to the FRF." *Id.*

In reaching the decision that Bailey was non-justiciable, the court in that case did not take into account either “expenses, including FDIC operating expenses, and taxes,” or interest, which brought the receivership deficit to “$71.1 million as of December of 200.” Bailey, 341 F.3d at 1344-45. The logical inference is that, for the purposes of determining justiciability, it is appropriate to consider the various elements of a receivership deficit separately.

Exclusive of third-party claims, the projected Thrift receivership deficit here is $318,136,600. As noted above, a damages award greater than that amount could result in the flow of federal dollars to third-party creditors (and, depending on whether it results in a surplus, possibly to Shareholder Plaintiffs as well). Whether a damages award less than that would fare the same depends on whether the income taxes ultimately paid are more, or less, than the amounts currently projected.

B. The Projected Receivership Income Taxes Are Non-Final for Justiciability Purposes

As noted above, the Thrift receivership’s projected liabilities include unpaid federal income tax of $113,934,854. Federal income taxes are payable to the Internal Revenue Service, part of the U.S. Department of the Treasury. Any damages allocated to the payment of federal income taxes will flow from one government coffer to another. The Government can be expected to assert, therefore, that this case has become non-justiciable, if damages awarded are $318,136,600 or less—that is, less than the receivership deficit exclusive of third-party claims.

Anticipating that assertion, Shareholder Plaintiffs have urged this Court to review the federal tax returns filed by the Thrift receivership with IRS on their merits. SHP Pre-Trial Br. at 24-26 & 86-96. They ask this Court to impose “adjustments” to the receivership’s expenses, income, and deductions, which would “eliminate” and “wipe out the tax liability” “in its entirety.” *Id*. at 25, 26, 87 & 92. “[T]he appropriate tax liability for Carteret is,” they assert,

"zero." *Id*. at 26. The Shareholder Plaintiffs' goal is presumably to inflate the amount of damages that, in their view, should be paid directly to them.

As discussed above, that is not possible: Shareholder Plaintiffs have failed to state a claim for direct payment of any surplus, and the Thrift's derivative contract damages must be paid to the FDIC. Moreover, this Court's jurisdiction over tax-related claims is limited (as is that of the federal district courts) to suits for tax refunds. 28 U.S.C. § 1346(a)(1). This Court (again, like the federal district courts) also lacks jurisdiction to enter declaratory or injunctive relief with respect to tax controversies. 28 U.S.C. § 2201(a). Shareholder Plaintiffs' attacks on the Thrift receivership's federal income tax returns also constitute, like their claim for direct payment of derivative damages, an impermissible cross-claim against the FDIC, as well as an untimely amendment of their complaint. RCFC 13, 14, 15. Therefore, this Court lacks jurisdiction over the Shareholder Plaintiff's claims regarding alleged errors in preparing the Thrift receivership's federal income tax returns.

Nevertheless, this case would not necessarily become non-justiciable if the damages awarded were $318,136,600 or less. As this FDIC has consistently stated, "[t]he amount of taxes, penalties, and interest, if any, due to the IRS has not been finally determined."[27] The FDIC's projections of the Thrift receivership's federal income tax liability are necessarily non-final because that liability ultimately will depend, inter alia, on the amount of damages awarded in this case.

[27] Response of Plaintiff Federal Deposit Insurance Corporation to AmBase's Motion to Dismiss the FDIC, AmBase Corp. v. United States, No. 93-351 (Fed. Cl., Sept. 30, 2003); *see also* FDIC's Response to AmBase's Statement of Issues at 19, AmBase Corp. v. United States, No. 93-351 (Sept. 13, 2006); Plaintiff-Intervenor FDIC's Pre-Trial Objections to Witnesses and Exhibits and Pre-Trial Motion in Limine at 10, AmBase Corp. v. United States, No. 93-351 (Dec. 21, 2007).

As in other goodwill cases, the ultimate tax liability of the Carteret receivership is dependent upon, inter alia, a substantial award of damages and upon the results of negotiations with the Internal Revenue Service. *See, e.g.*, Suess v. United States, 33 Fed. Cl. 89 (1995); Suess v. United States, 52 Fed. Cl. 221 (2002); Benj. Franklin Shareholders Litigation Fund v. FDIC, 501 F.Supp. 2d 103, 107 (D.D.C. 2007)(approving tax settlement following fairness hearing). The estimate of this Thrift receivership's potential future tax liability that is projected in the Thrift's goodwill reporting package is thus irrelevant for the purposes of determining justiciability. The Thrift receivership's projection of federal income liabilities does not constitute an amount that is both reasonably certain and due (i.e., fixed), and reasonably certain to flow back to the "coffers of the Government."

Shareholder Plaintiffs and the Government are both well aware of the fact that taxpayer calculations of taxes due, as reflected in federal income tax returns, are not dispositive. In fact, shortly after the completion of the trial in this action, AmBase sued the Government for a refund of federal income taxes that, it alleged, had been improperly imposed. Complaint, AmBase Corp. v. United States, No. 3:08-cv-00651-WWE (D. Conn., Apr. 29, 2008)(suit for refund based in part on Thrift's net operating losses).

If (as in Suess) the Thrift receivership's federal income tax liability is ultimately less than currently projected, then third-party creditors, Shareholder Plaintiffs, or both, might well receive more on their receivership claims than current projections indicate. Given the non-finality of the projections of the Thrift receivership's federal income tax liability, this case should be deemed justiciable even if damages awarded are less than $318,136,600.

C. The Projected Post-Insolvency Interest Is
Are Non-Final for Justiciability Purposes

1. Shareholder Plaintiffs Challenge FDIC's Post-Insolvency Interest Policies

The Thrift receivership's projected liabilities also include post-insolvency interest on the FDIC's subrogated claim in the amount of $180,304,049. The Thrift receivership's projected net deficit, exclusive of third-party claims and federal income taxes, is $204,201,746. The Government can be expected to argument that, even if federal income taxes are disregarded, this case is non-justiciable if damages awarded are less than or equal to this amount.

Post-insolvency interest on the subrogated claim will, like reimbursement for the subrogated claim itself, flow to a government coffer. Therefore, in the ordinary case, where post-insolvency interest is not disputed, a damages award in the range covered by post-insolvency interest (here, $204,201,746 to $23,897,697) would be non-justiciable.

In this case, however, the Shareholder Plaintiffs are vigorously challenging the FDIC's policy with respect to post-insolvency interest on the subrogated claim. They argue that the correct interest rate is zero or, in the alternative, an amount calculated pursuant to 12 C.F.R. § 360.3(b). SHP Pre-Trial Br. at 98, 100-101. They urge this Court to declare the interest rate used by the FDIC in its projections "contrary to law," contrary to "reasonable, well-settled expectations," and without economic justification. *Id.* at 101, 103, 105. They also contend that, regardless of the rate used, the FDIC's projections contain miscalculations. *Id.* at 106.

2. Shareholder Plaintiffs' APA-Based PII Challenges Are Unadjudicable Here

This Court lacks jurisdiction to adjudicate Shareholder Plaintiffs' claims with respect to the FDIC post-insolvency interest policies and regulations. The only statutory basis for attacking those policies is the Administrative Procedure Act, 5 S.C. §§ 701 et seq. ("APA"), which provides a remedy for administrative action that is "arbitrary, capricious, or irrational." But

claims under the APA are not adjudicable in the Court of Federal Claims. Hall v. United States, 69 Fed. Cl. 51, 56 (2005)(CFC lacks jurisdiction to review an agency decision under the APA), citing Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003)(CFC lacks APA jurisdiction) and McNabb v. United States, 54 Fed. Cl. 759 (2002)("APA reviews are conducted in federal district court rather than the Court of Federal Claims, since the APA addresses 'relief other than money damages.' ").[28] *See also* Banerjee v. United States, 77 Fed. Cl. 522, 534 (2007)(citing Martinez); Russell v. United States, 78 Fed. Cl. 281, 288 (citing Martinez).

The Shareholder Plaintiffs' attack on the FDIC's policies also fails to comply with the statutory limitations on APA actions. *See, e.g.*, 5 U.S.C. §§ 702 (APA actions must seek "relief other than money damages") and 704 (APA actions limited to "final agency action for which there is no other adequate remedy in a court"); *see also* 28 U.S.C. § 1492(a)(1)(CFC jurisdiction re contract claims limited to claims for "liquidated or unliquidated damages").

The Court of Federal Claims " 'has no jurisdiction over suits against a government corporation acting in its corporate capacity,' " as the FDIC does when it adopts a policy or enacts a regulation. Brazos Electric Power Cooperative v. United States, 52 Fed. Cl. 121 (2002)(re Federal Financing Bank), *quoting* National Cored Forgings Co. v. United States, 126 Ct.Cl. 250, 115 F.Supp. 469, 474 (1953). Moreover, APA review is not available for actions taken by FDIC in its corporate capacity (such as issuing policy statements) "where the result is such that the relief 'restrain[s] or affect[s] the exercise of powers or functions of the [FDIC] as a conservator or receiver.' " Hindes v. FDIC, 137 F.3d 148, 160 (3rd Cir. 1998), *quoting* 12 U.S.C. § 1821(j)(alternation & emphasis in original). That is true "particularly where the relief would

[28] 28 U.S.C.§ 1367, which provides for "supplemental jurisdiction," is not applicable to the Court of Federal Claims. Hall v. United States, 69 Fed. Cl. at 57, citing Trek Leasing, Inc. v. United States, 62 Fed. Cl. 673 (2004).

have the same practical result as an order directed against the FDIC in [its receivership] capacity." *Id.* at 161.

Even if APA claims were adjudicable in this Court, this Court's review would be limited to the administrative record.[29] The remedy would not be a judicial determination of the "exact value" of the receivership deficit. Rather, the Court would send any invalidated policies back to the FDIC for revision, thus further delaying resolution of this action. See, e.g., Eurodif S.A. v. United States, 506 F.3d at 1053. That remedy, even if this Court could impose it, would serve no purpose here.

3. The APA Challenge Renders the Post-Insolvency Interest Projections Non-Final

Shareholder Plaintiffs have vigorously challenged almost every component of the FDIC's post-insolvency interest policy. Although this Court lacks jurisdiction to adjudicate those challenges on the merits, it can take note of them in evaluating the finality, or lack thereof, of the projected receivership deficit. If Shareholder Plaintiffs indicate their intention to continue to contest the post-insolvency interest policy, or to contest the FDIC's resolution of their administrative claim against the Carteret receivership estate after the FDIC's final reconciliation of that estate, the finality of the PII policies will be adversely impacted. Therefore, the FDIC's projections of the post-insolvency interest to be paid on the subrogated claim here should be disregarded for the purposes of determining finality. *See generally* Lake Carriers' Assn. v. MacMullan, 406 U.S. 498 (1972), quoting Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)(substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality, required for ripeness); *see also* Abbott Laboratories v. Gardner, 387 U.S. 136 (1967).

---

[29] Plaintiff-Intervenor FDIC's Response to Plaintiff's Motion to Designate Deposition Testimony for Trial at 11-13, AmBase Corp. v. United States, No. 93-351 (Jan. 7, 2007).

As this Court has noted, the projected post-insolvency interest is decidedly non-final with respect to growth, since the passage of time continues to cause it to increase. AmBase II, 61 Fed. Cl. at 802. Similarly, the passage of time might cause the Thrift's projected post-insolvency interest to shrink. In fact, if Shareholder Plaintiffs successfully challenge the FDIC's post-insolvency interest policies in a later proceeding, the third-party creditors and the Shareholder Plaintiffs might (as with federal income tax) recover more on their claims against the Thrift's receivership estate than now appears likely. As long as that remains possible, this action would remain justiciable, even if the damages awarded was less than or equal to $23,897,697.

VI. If Damages Are $23,897,697 or Less, This Case Is **Non**-Justiciable

A. This Court Lacks Jurisdiction over Claims Alleging Receivership Mismanagement

Exclusive of third-party creditor claims, projected federal income taxes, and post-insolvency interest on the FDIC's subrogated deposit claim, the projected net receivership deficit currently amounts to $23,897,697. The subrogated deposit claim (unpaid principal only) is the largest part ($17,565,648) of this amount; the remainder is made up of various administrative liabilities.

Shareholder Plaintiffs claim that the Thrift's receivership estate was mismanaged. In particular, they claim that the Thrift's mortgage subsidiary, Carteret Mortgage Company, was improvidently shut down, resulting in a $20 million loss in the value of this receivership asset. SHP Pre-Trial Br. at 29. They ask this Court to make "findings of fact that the receivership deficit is at the level of fact and law invalid." SHP Br. at 85.

Such findings would constitute an advisory opinion, in the form of a declaratory judgment. As the Supreme Court notes, the courts of this country have "disapproved" of advisory

opinions "since the beginning." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998), citing Muskrat v. United States, 219 U.S. 346, 362 (1972):

> The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restring the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition for a court to act ultra vires.

*Id.* (citations omitted); *see also* U.S. Const., Art. III, § 2 ("case or controversy" requirement).

The power of this Court to issue declaratory judgments in federal contract cases is limited to bid protest cases. 28 U.S.C. § 1491(b)(2); RCFC 57. "Supplemental jurisdiction" is not available. 28 U.S.C. § 1367; Hall v. United States, 69 Fed. Cl. 51, 57 (2005), *citing* Trek Leasing, Inc. v. United States, 62 Fed. Cl. 673 (2004). The Court's ancillary jurisdiction to "provide an entire remedy and to complete the relief afforded by the judgment" is limited to personnel matters. 28 U.S.C. § 1491(b).

The Shareholder Plaintiffs contend that, in allegedly mismanaging the Thrift receivership, the FDIC "breached repeatedly its fiduciary and statutory duties toward Carteret and AmBase." *SHP Pre-Trial Br. at 85.* But a breach of fiduciary duty is not a contract claim; it is a tort. *See,* e.g., Restatement (Second) of Torts § 874 (1979). A breach of a statutory duty is also tort, existing when a private right of action is supplied by a statute or inferred from it. *Id.*

This Court lacks jurisdiction over Shareholder Plaintiffs' claims of alleged FDIC mismanagement. Its jurisdiction is expressly limited by statute to claims "against the United States . . . *not* sounding in tort." 28 U.S.C. § 1491(a)(1)(emphasis added). Moreover, the federal district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government [etc.]." 28 U.S.C. § 1346(b).

Shareholder Plaintiffs' purported claims of FDIC mismanagement are actionable, if at all, in federal district court.[30]

B. This Court Lacks Jurisdiction to Conduct an Equitable Review

Shareholder Plaintiffs' claim for mismanagement has been characterized as a request for this Court to "conduct an equitable review, which is 'an incident of [its] general jurisdiction.'" AmBase II, 61 Fed. Cl. at 800, quoting Klamath & Modoc Tribes v. United States, 174 Ct. Cl. 438, 488, 1966 WL 8850 (1966). Nothing in Klamath, however, authorizes this Court to adjudicate the merits of the Shareholder Plaintiffs' claim for mismanagement. To the contrary, that case holds that, although this Court "has the power to require an accounting in aid of its jurisdiction to render a money judgment on [a] claim," such an accounting may be required only if, "after a trial on the issue of liability, it is held that defendant has violated its statutory fiduciary obligations." *Id*. at WL 8850 *6.

In this action, the Shareholder Plaintiffs are not suing the FDIC for alleged violations of statutory duties; rather, they are suing the Government. The Court may have jurisdiction to "exercise equitable powers" as an incident of its "general jurisdiction" over the Government; it has no such jurisdiction over the FDIC and thus no jurisdiction to exercise any equitable powers in relation to it. Moreover, it is improper to broaden the scope of the Court's authority to include "equitable review" when the actions for which Shareholder Plaintiffs seek judicial review are "unreviewable . . . on a plain reading of the statute." Anderson v. Merit Systems Protection Bd.,

[30] Given the FDI Act's prohibition of judicial review of any "claim relating to any act or omission of [the FDIC] as receiver," it is unlikely that the Shareholder Plaintiffs' claims of FDIC mismanagement are actional anywhere, except in the context of a review of claims asserted against the Thrift receivership's estate. 28 U.S.C. § 1281(d)(13)(D).

12 F.3d 1069, 1071 (Fed. Cir. 1993).[31] Therefore, it would be improper for this Court to adjudicate the Shareholder Plaintiffs' claims of FDIC mismanagement of the Thrift receivership.

VII. The FDIC's Management of the Thrift Receivership Was Proper

The Shareholder Plaintiffs' claims against the FDIC, with respect the projected net receivership deficit, have undergone numerous permutations during the course of this litigation. Once the FDIC is aware of their latest form, which will presumably be revealed in Shareholder Plaintiffs' opening post-trial brief, the FDIC will respond to these claims in further briefing. The FDIC also reserves its proposed findings of fact, pursuant to RCFC 52, until that time.

However, the FDIC can and does state now that it has handled Carteret, and the hundreds of other receiverships it dealt with during the crisis of the late 1980's and early 1990's, effectively, legally, and well. If and when Shareholder Plaintiffs' claims against the FDIC are addressed in a court that has jurisdiction over them, FDIC expects them to be summarily dismissed.

**CONCLUSION**

For the reasons set forth above, this Court should dismiss the Holding Company's claim (Count V) for direct payment of a surplus. Any and all damages awarded on the FDIC's contract claims, and the Shareholder Plaintiffs' derivative claim for breach of the Thrift's contracts, should be awarded to the FDIC. The measure of damages for that breach should be the losses suffered by the Thrift, not the Shareholder Plaintiffs.

If damages awarded are greater than $23,897,697, this case will remain justiciable.

---

[31] *See also* Weidel v. Dep't of Labor, 230 F.3d 1280, 2000 WL 133845*4 (Fed. Cir. 2000)(unpublished), citing Anderson.

Respectfully submitted,

Federal Deposit Insurance Corporation
Legal Division

s/ *Andrew C. Gilbert*
Andrew C. Gilbert
*Counsel of Record*
*for Plaintiff-Intervenor*
550 Seventeenth Street, NW, MB-3060
Washington, DC 20429
(202) 898-3871

Of Counsel:

John V. Thomas
*Deputy General Counsel*
D. Ashley Doherty
*Counsel*
Gary A. Kuiper
*Counsel*

July 1, 2008

**CERTIFICATE OF FILING**

I hereby certify this 1st day of July 2007, that I caused a copy of the foregoing to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and that parties may access this filing through the Court's electronic filing system.

s/ *Andrew C. Gilbert*