**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, INC.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# DEFENDANT'S PROPOSED FINDINGS OF FACT

---

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Deputy Director**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20005**
**Tel: (202) 307-0309**
**Fax: (202) 514-7969**

**OF COUNSEL:**
**ELIZABETH M. HOSFORD**
**Senior Trial Counsel**

**VINCENT D. PHILLIPS**
**DELISA SANCHEZ**
**AMANDA L. TANTUM**
**Trial Attorneys**

**Date: September 12, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . vi

DEFENDANT'S PROPOSED FINDINGS OF FACT. . . . . . . . . . 1

I. BACKGROUND. . . . . . . . . . 1

II. CARTERET'S NEW BUSINESS STRATEGY. . . . . . . . . . 2

A. Carteret's 1981 Expansion And 1982 Supervisory Acquisitions.. . . . . . . . 2

B. Carteret's 1986 Supervisory Acquisitions. . . . . . . . . . 5

C. Carteret's Attempts To Raise Capital Through Stock Offerings. . . . . . . . . 6

D. Carteret's Capital Raisings Suggest The Market Understood Its Weak Position . . . . . . . . . . 7

E. Carteret's Commercial and Corporate Lending Strategy . . . . . . . . . . 7

1. When Carteret Decided To Establish A Commercial and Real Estate Lending Division In 1983, It Had No Experience In These Types Of Lending . . . . . . . . . . 10

2. Carteret Placed Approximately $1 Billion In Commercial And Real Estate Loans On Its Books Between 1983 And 1986 But Did Not Conduct Proper Underwriting Or Effective Monitoring. . . . . . . . . . 11

3. Carteret's Strategy Of High Risk Lending Also Extended To Mortgage Lending. . . . . . . . . . 18

4. Carteret Failed To Properly Classify Problem Assets Or Establish Adequate Loan Loss Reserves . . . . . . . . . . 19

5. Carteret Was Not Overreserved As Of September 1992 . . . . . . . 24

III. BY 1989, CARTERET HAD BECOME EFFECTIVELY INSOLVENT . . . . . . 29

A. Due To Its Poor Core Operating Earnings, Carteret Relied Upon Asset Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. FDIC Recommended Termination Of Deposit Insurance . . . . . . . . . . . . . 34

C. Carteret Experienced A Large Deposit Decline Between 1983 And 1989.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV. CARTERET'S CONDITION FROM 1990 THROUGH 1992. . . . . . . . . . . . . . . 36

A. The Regulators' Findings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B. The Actions Of Supervisory Officials. . . . . . . . . . . . . . . . . . . . . . . . . . 39

V. CARTERET'S SALE OF ASSETS FROM 1990 THROUGH 1992. . . . . . . . . . . 40

VI. AMBASE'S ACQUISITION OF CARTERET WAS FOR SELF-SERVING PURPOSES AND DID NOT BENEFIT CARTERET. . . . . . . . . . . . . . . . . . . . . 43

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B. Ambase Interfered With Carteret's Business And Wasted Carteret's Capital By Entering Into Unsound Employment Contracts And Engaging In Unsound Business Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

C. Ambase Was Unable To Assist Carteret As Required By The CMA .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

VII. CARTERET'S REAL ESTATE LOSSES PRECLUDED IT FROM RAISING CAPITAL TO CURE ITS INSOLVENCY. . . . . . . . . . . . . . . . . . . . . 55

A. By 1991, Carteret Was Unable To Access The Public Capital Markets Due To Its Loan Losses, The Poor Quality Of Its Portfolio, And Its Own Auditor's Concerns About Its Viability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B. Problems Faced By Other Thrifts Demonstrate That Carteret Would Have Been Unable To Raise The Needed Amount Of Capital.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

C. Carteret's Experience Demonstrated That It Could Not Raise Private Capital. . . . . 59

D. Regulators Did Not Pressure Potential Investors To Act Prematurely And Did Not Warn Them That Carteret Could Not Be Successful. . . . . 66

E. Plaintiffs' Repeated References To Carteret's Excellent Performance Ignore Regulators' And Investors' Conclusions . . . . . 71

VIII. PROFESSOR CALOMIRIS'S ESTIMATION OF CARTERET'S VALUE AT THE TIME OF THE BREACH IS UNSUPPORTED. . . . . 72

A. The $266 Million Purchase Price For Carteret Is Not A Good Starting Point For A Calculation Of Market Value. . . . . 72

B. Carteret's Market Value Would Have Declined Sharply Between It's Purchase By Ambase And The Breach And Cannot Be Determined Through Professor Calomiris's Comparison With 46 Other Thrifts . . . . . 74

IX. PROFESSOR CALOMIRIS'S CLAIMS FOR LOST PROFITS ARE UNSUPPORTED. . . . . 78

A. The Gordon Growth Model Is Inapplicable . . . . . 78

B. Even If The Gordon Growth Model Were Applicable, Professor Calomiris Has Misapplied The Model. . . . . 80

1. The Estimate Of Carteret's Market Value At The Time Of Breach. . . . . 80

2. The Model Improperly Excludes The 1990 and 1991 Losses And Non-Core Income From The Calculation of Carteret's Average Earnings. . . . . 81

3. The Discount Rate Is Inapplicable to Carteret. . . . . 83

C. Professor Calomiris's Terminal Value Measure Of Damages Is Not Actually An Ex-Ante Model And Is Fatally Flawed . . . . . 84

D. Professor Calomiris Erroneously Calculates Carteret's Market Value In 2008 . . . . . 84

X. CARTERET'S CONDITION WOULD HAVE BEEN NO BETTER IN THE NON-BREACH WORLD THAN IT WAS IN THE REAL WORLD. . . . . . . . . . 86

XI. THE DAMAGES CLAIMED COULD NOT HAVE BEEN ANTICIPATED. . . . . . . . . . 88

XII. WOUNDED BANK DAMAGES ARE NOT SUPPORTED. . . . . . . . . . 89

A. Claims By Former Executives Related To Severance Agreements. . . . . . . . . . 89

B. Costs Related To The Sale Of Florida Branches. . . . . . . . . . 91

C. Costs Incurred In Seeking Out Additional Capital. . . . . . . . . . 90

D. Legal Expenses Related To OTS Regulatory Actions And Investigations. . . . . . . . . . 91

XIII. THE RECEIVERSHIP DEFICIT WAS PROPERLY CALCULATED. . . . . . . . . . 93

A. Thrift Resolutions By The RTC Were Reasonable And Fair. . . . . . . . . . 93

B. Professor Calomiris's Assertions Related To Interest Costs Levied By The Government Are Unsupported. . . . . . . . . . 93

1. Professor Calomiris's Claims That No Interest Rate Or A Lower Interest Rate Should Have Been Charged Are Unfounded.. . . . . . . . . . 93

2. Professor Calomiris's Claim That The RTC/FDIC Intentionally Chose A High Interest Rate Is Unsupported.. . . . . . . 97

3. The RTC/FDIC's Pro Rata Payment Of The Three Loans Was Appropriate.. . . . . . . . . . 99

4. The Escrow Interest Calculation Is Consistent With The Virtually Risk-Free Nature Of Funds Held In Escrow.. . . . . . . . . 100

C. The Length Of Time Required To Resolve Carteret Did Not Reduce The Premium Realized From The Sale Of The Branches.. . . . . 101

1. Carteret Was Not A Relatively Healthy Failed Thrift. . . . . . . . . 101

a. Carteret Relied Upon Funding Support And Subsidies From The FHLB And The RTC. . . . . . . . . . . 101

b. Professor Calomiris's Choice Of Financial Measures Of Health Are Unsupported.. . . . . . . . . . . . . . 102

2. Professor Calomiris's Claim That The "Delay" Resulted In A Loss To The Receivership Is Disproved By Actual Marketplace Deposit Premium Data Showing A Gain To The Receivership. . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

3. Professor Calomiris Incorrectly Assumes That A Whole Bank Resolution Results In Higher Deposit Premiums Than A Branch Sale Resolution.. . . . . . . . . . . . . . . . . . . . . . . . . 107

D. The Minority Preference Program Did Not Reduce The Proceeds Recovered In The Resolution Of Carteret. . . . . . . . . . . . . . . . . . . . . . . . 108

E. Carteret's Federal Tax Liability Was Properly Calculated. . . . . . . . . . . 110

1. The Post Insolvency Interest Was Not A Deductible Expense In 1995.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

2. Federal Financial Assistance Was Reflected Properly On The Receivership's Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . 111

3. Carteret's 1992 Tax Loss Is Uncertain And Unavailable As A Deductible Expense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Ambase Corp. v. United States,
58 Fed. Cl. 32 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES, RULES, AND REGULATIONS

Financial Institutions Reform, Recovery and Enforcement Act,
Pub. L. 101-73, 103 Stat. 183 (1989) . . . . . . . . . . . . . . . . . . . . . 13

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | |
| **Plaintiffs**, | |
| and | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | No. 93-531C |
| | Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | |
| v. | |
| **THE UNITED STATES**, | |
| **Defendant**. | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT**

## I. Background

1. Prior to 1982, Carteret Savings Bank, FA ("Carteret"), a savings association chartered by the Federal Home Loan Bank Board ("FHLBB"), had historically engaged in traditional mortgage lending and deposit taking activities. DX 7171 at WOP298 0700. Its geographic focus was on central and northern New Jersey. DX 7171 at WOP298 0700.

2. In 1981, Carteret had approximately $1.9 billion in liabilities, a net worth ratio under 2.1 percent, PX 2433 at OAM006 0027, and had suffered a net loss of $9.2 million. DX 8000A at Exh. 3, Table 1, p. 2. In 1982, Carteret suffered a net loss of $23.3 million. DX 8000A, Table 1, p. 2.

## II. Carteret's New Business Strategy

3. In 1982, focusing on the need to raise capital and regain profitability, Carteret abandoned the traditional model of the thrift industry and embarked upon a highly risky business strategy. PX 6501 at WOR682 0670-671 (O'Brien Aff.); DX 8000A at ¶ 26 and n.21; DX 5038A at ¶ 13. In Carteret's Annual Report for 1982, Robert O'Brien, Carteret's Chairman and Chief Executive Officer ("CEO"), explained that Carteret had enlarged its office network, expanded its asset base and introduced new products in response to "new economic realities." PX 1 at AMB029912. Mr. O'Brien observed that new legislation allowed thrift institutions to compete on a more equal basis with commercial banks, and new investment powers allowed thrifts to diversify from their traditional "low-yield fixed rate asset [mortgage] portfolios and . . . costly fluctuating deposits." Id. at AMB029912-13. He stated that Carteret's goal was to remain "at the forefront of the rapidly changing financial services industry." Id.

4. Carteret's new strategy was to expand geographically by (1) acquiring the branches and assets of troubled savings and loan institutions (S&Ls), and (2) diversifying into new lending areas, such as commercial real estate and corporate loans. DX 8000A at ¶ 26.

5. Carteret pursued the branches and assets of troubled thrifts without addressing its critical state of undercapitalization. DX 8000A at ¶ 27. It exacerbated its severely undercapitalized position by acquiring assets of failing S&Ls. Tr. 2909:8-15, 2910:10-13 (R. Smith); DX 8000A at ¶ 26; PX 2433 at OAM006 0026-27.

### A. Carteret's 1981 Expansion And 1982 Supervisory Acquisitions

6. In the twenty-one months between January 1981 and September 1982, Carteret acquired six state-chartered thrifts with assets of approximately $227 million. PX 2433 at

OAM006 0026; PX 1 at AMB029922. Pursuant to an assistance agreement with the Federal Savings and Loan Insurance Corporation ("FSLIC") dated July 30, 1982, Carteret acquired River Edge Savings and Loan Association of River Edge, New Jersey ("River Edge"). The Government provided Carteret $4.6 million in cash assistance in connection with the River Edge acquisition. PX 1601 at CAM5240840.

7. In March 1982, Carteret switched from a state to a Federal charter to take advantage of the relaxed Federal banking environment and expand its markets. PX 2433 at OAM006 0026.

8. On September 30, 1982, Carteret acquired Barton Savings & Loan Association of Newark, New Jersey ("Barton") and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray"). PX 2433. With respect to the Barton merger, the FSLIC reimbursed Carteret for one-half the negative net worth of Barton – approximately $1 million – as of the date of the acquisition, PX 1 at AMB029922, and Carteret received an immediate cash contribution of $10.7 million. PX 2433 at OAM006 0020. Carteret neither asked for nor received cash assistance in connection with the Delray acquisition. PX 6501 at WOR6820672; PX 1 at AMB029922.

9. The Barton and River Edge assistance agreements provided Carteret with capital contributions totaling $15.3 million. PX 1 at AMB029922.

10. Carteret booked approximately $168 million in goodwill from the Delray acquisition, and approximately $46 million in goodwill from the Barton acquisition. Ambase Corp. v. United States, 58 Fed. Cl. 32, 26 (2003) ("Ambase I"). The goodwill resulting from the Delray and Barton acquisitions constitutes approximately 90 percent of the goodwill at issue in

this case. PX 6501 at WOR6820672.

11. At the time it acquired Barton and Delray, the ratio of Carteret's net worth ($36 million) to total assets ($2.3 billion) was only 1 percent, far less than the five percent generally viewed as the minimum for a healthy thrift under generally accepted accounting principles (GAAP). Tr. 3028:18-21 (R. Smith).

12. Carteret's primary motive in acquiring Delray was to gain a market presence in Florida, which it believed would complement its primary New Jersey market because many people from New Jersey owned second homes in, or retired to, Florida. PX 6501 at WOR 6820671. Carteret took on $212 million in net liabilities in acquiring Barton and Delray. As a result, Carteret's balance sheet absorbed substantial risk, and Carteret reported tangible net worth of negative $212.3 million following the acquisitions. DX 8000A, Exh. 3; DX 9501.

13. Regulators were aware of Carteret's highly leveraged condition at the time of the acquisitions, but were "reasonably confident that Carteret's management possess[ed] the necessary expertise to deal with any problems which might confront it as the result of the proposed mergers." PX 2433 at OAM006 0027. This view, however, was based upon Carteret's operating plan and historical business model, and did not anticipate that Carteret would seek out high-risk commercial and corporate lending to fill its capital shortfall. PX 2433 at OAM006 0028. Carteret had not engaged in high-risk lending prior to the acquisitions and did not indicate that this would be its strategy. Id.

14. At the beginning of 1983, following the Barton and Delray acquisitions, Carteret owned 29 new branch offices and its assets had increased by 87.8 percent. PX 1 at AMB029922.

**B. Carteret's 1986 Supervisory Acquisitions**

15. In June 1986, as part of a strategy to expand into Maryland, Virginia, and the District of Columbia, Carteret acquired First Federal Savings and Loan Association of Montgomery County, in Blacksburg, Virginia ("First Federal"), Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"), and Admiral-Builders Savings and Loan Association, of Parkville, Maryland. DX 8022 at FAM002 1782, 1784; PX 5 at AMB013889. As a state chartered thrift insured by the Maryland Deposit Insurance Fund, Admiral is not at issue in this case. Ambase I, 58 Fed. Cl. at 35, n.1.

16. At the time of the First Federal and Mountain Security transactions, FHLBB policy entitled a thrift that acquired a troubled out-of-state thrift to branching rights in the state of the insolvent thrift, as well as two contiguous states. PX 2490 at WOQ288 0327. Carteret acquired Mountain Security and First Federal to expand its branch network to Virginia, Maryland and the District of Columbia. In connection with the acquisitions, Carteret requested, and FHLBB approved, branching rights in Virginia, Maryland and the District of Columbia. PX 2490 at WOQ288 0327-0328.

17. FSLIC was Mountain Security's receiver and, in that capacity, entered into an acquisition agreement with Carteret. PX 2490 at WOQ288 0322. Carteret and First Federal agreed to merge, and the agreement was approved by the FHLBB. PX 2490 at WOQ288 0319-0320. As a result of the acquisitions of First Federal and Mountain Security, Carteret booked approximately $22 million in goodwill. PX 6501 at WOR682 0678. Approximately $20.3 million of the goodwill was generated by the Mountain Security acquisition, and the remainder was attributable to the First Federal acquisition. PX 6501 at WOR682 0678.

18. First Federal and Mountain Security had negative net worth and Admiral had a net worth of only 0.5 percent of assets. PX 2490 at WOQ288 0317. Thus, these acquisitions increased the leverage on Carteret's balance sheet, and further contributed to its undercapitalized condition, adding approximately $22 million of goodwill and hundreds of millions of dollars of below-market mortgages. Tr. 657:8-13 (Calomiris).

19. Carteret's branches in Maryland, Virginia and Washington, D.C. were never profitable, DX 8054 at WOQ699 0503 and, as reflected in the 1991 Business Plan presented to the Office of Thrift Supervision ("OTS"), were sold in 1990 in order to "allow . . . operations to be scaled back to strategically important markets." DX 7171 at WOP298 0703. Carteret's management wanted to reduce its "expensive retail funding network" by replacing expensive retail deposits with marginally less expensive wholesale funds. PX 2110 at WOQ698 1437; Tr. 1482:6-1483:7 (Day).

20. Carteret's management acknowledged that selling the branches, which were outside Carteret's "primary marketing area," DX 7171 at WOP298 0703, enhanced profitability. Tr. 1467:8-14 (Day); PX 2207 at CAM381 1344; DX 7340 at WOQ678 1963.

**C. <u>Carteret's Attempts To Raise Capital Through Stock Offerings</u>**

21. Carteret converted to stockholder ownership in August 1983 and raised $58.4 million through the sale of 6.82 million shares of common stock. PX 2 at AMB029930, AMB029932; PX 3 at AMBNP006935. Its stock was traded over-the-counter on the NASDAQ system. PX 2 at AMB029930.

22. Carteret raised a total of approximately $120 million through issuances of common and preferred stock between 1983 and 1986. PX 3 at AMBNP006935; PX 4 at

AMB030093; PX 5 at AMB013892; Tr. 2919:19-2920:3 (R. Smith). In addition to the conversion offering, Carteret raised approximately $11.0 million in a February 1985 common stock offering, $21.2 million in an August 1985 preferred stock offering, PX 4 at AMB030093, and $28.7 million in an April 1986 common stock offering. PX 5 at AMB013892. These capital raisings were insufficient to fill the gap created by the $212 million in negative tangible net worth resulting from the acquisitions of Barton and Delray. Tr. 2920:4-12 (R. Smith).

### D. Carteret's Capital Raisings Suggest The Market Understood Its Weak Position

23. Following its IPO, in which it raised $58.6 million, Carteret's stock traded at a price to earnings ("P/E") ratio of 1.78 to 2.17, whereas the average stock of Standard & Poor (S&P) 500 companies traded at a P/E ratio of 13.4. Carteret's price to book ("P/B") ratio ranged from .56 to .64, whereas the average stock of S&P companies traded at a P/B ratio of 1.4. DX 9502. The market's pricing of Carteret's stock relative to average stocks in the S&P 500 index indicated that the market did not accord the goodwill substantial value and believed Carteret's strategy of growth faced a troubled future. Tr. 2918:15-2919:18 (R. Smith). Although an investor might hope to achieve substantial earnings on Carteret's stock if the business strategy worked, "the price/earnings ratio discount[ed] the probability of all that happening." Tr. 2919:9-10 (R. Smith).

### E. Carteret's Commercial and Corporate Lending Strategy

24. In addition to expanding its branch network through acquisitions of struggling thrifts, Carteret sought to diversify into "significant new products" and "investment opportunities" like corporate and commercial real estate loans. PX 1 at AMB029912. Although diversifying into these higher yielding products had the potential to improve Carteret's interest

rate risk and profitability, such new products also exposed Carteret to higher credit risk. DX 8000A at 11, n.20; Tr. 2921:13-20 (R. Smith).

25. In April 1983, Carteret formed an Income Property Division and began commercial real estate lending. Carteret's Corporate Banking Division became operational after September 30, 1983, and, by October 31, 1983, had extended lines of credit and other loan commitments totaling $100 million. PX 2 at AMB029940. By the time OTS issued its October 26, 1984 report of examination, the Income Property Division had originated $500 million in commercial loans, primarily on projects located in New Jersey and Florida, and the Corporate Banking Division had $193.5 million in commercial loans outstanding. DX 8043 at WOR961 1188.

26. Carteret's expansion into commercial real estate and corporate lending was aggressive and not accompanied by the "needed credit administration capability in these new areas." DX 8000A at ¶ 32. Carteret failed to recruit competent staff to handle its commercial and corporate asset portfolios. PX 5331 at KH 033535-36, 033538; Tr. 1469:24-1470:16 (Day). For example, loan officers often misrepresented the quality of the prospective borrowers and the viability of the project to the thrift's credit review committee. PX 2106 at WOQ6750026. The internal loan review ("ILR") process did not employ objective criteria; instead, "the majority of the review function [was] vested in the loan officer." PX 2109 at KH 054207.

27. Carteret's Board of Directors failed to establish policies to guide the corporate and commercial lending divisions. PX 2106 at WOQ6750028-0029 (1989 OTS Report of Examination or "ROE"). After a thorough review of corporate lending policies in 1989, OTS concluded that Carteret lacked adequate policies concerning commercial lending objectives,

acceptable products and collateral, underwriting criteria for each type of loan, monitoring procedures, diversification, acceptable industry type, geographical location, credit mix, and acceptable financial statements. Id. at WOQ6750029.

28. Lacking policy guidance, the lending function became extremely haphazard. Thus, OTS examiners reviewing delinquent consumer and mortgage loans originated for at least $500,000 found the loan files to be "in a state of disorder[,]" which "could delay and/or jeopardize Carteret's ability to commence legal action against a borrower if deemed necessary." PX 2111 at C-AM-A-0320839. Further, appraisals were inadequate. Tr. 1471:11-12 (Day). With regard to construction/development loans, bank personnel failed to request the inclusion of a market or economic feasibility study in the appraisal reports. PX 2106 at WOQ6750032. Such studies were of vital importance given Carteret's "significant on-going construction projects in economically distressed or overbuilt regions of the country." PX 2106 at WOQ6750032. Further, OTS noticed instances in which the loan officer allowed the borrower to supply the appraisal instead of obtaining the appraisal himself. Id. Thus, Carteret's "underwriting proposals were overly optimistic[.]" Tr. 1470:7-8 (Day).

29. As a result of a due diligence conducted on behalf of Ambase in 1988, KPMG Peat Marwick concluded that "the commercial lending and commercial real estate portfolios represent a relatively high degree of prospective risk" and identified the primary factors to be "[a] credit process which has not been fully developed in the planning and monitoring segments[;] [t]he high concentrations . . . in categories generally considered to be of high risk . . . [and the fact that] specific individual credits [were] in the process of liquidation." PX 4804 at AM00089630. Peat Marwick advised that "increased investments in people and processes will

be required." Id. Indeed, as late as 1990, regulators concluded that Carteret's Executive Vice President for Commercial Real Estate Lending lacked an effective staff and employed an approach to evaluating problem credits that was "not realistic in this day and time." PX 2110 at WOQ698 1507.

30. By June 30, 1989, 23.6 percent of Carteret's balance sheet consisted of commercial real estate loans. This contrasted sharply with the rest of the industry. A study profiling the distribution of assets within the portfolios of healthy and insolvent thrifts found that, on average, healthy thrifts invested only 6.9 percent of their balance sheets in commercial real estate loans, and insolvent thrifts only invested 13 percent of their balance sheets in commercial real estate loans. DX 5038A at ¶ 135 and Exh. 19; DX 8098 at WOQ625 1633-37. Thus, in 1989, "Carteret itself looked at its own position . . . as part of its strategic planning exercise, and it realized that it was looking pretty risky compared to what might be called a solvent thrift. In fact, it looked pretty close - more close to an insolvent thrift than a solvent thrift." Tr. 3414:4-9 (Saunders). Carteret's 1990 Strategic Plan, created in 1989, recognized that the investment Carteret had made in commercial real estate loans was almost twice the investments even insolvent thrifts had made in commercial real estate loans. DX 8098 at WOQ626 1633-37. As a result, in 1989, when management absorbed the magnitude of the "potential losses in Carteret's commercial loans" in a deteriorating economy, Carteret decided to withdraw from commercial real estate lending "as rapidly as possible." DX 7171 at WOP298 0701.

**1. When Carteret Decided To Establish A Commercial and Real Estate Lending Division In 1983, It Had No Experience In These Types Of Lending**

31. Carteret hired executives who had been involved in corporate and commercial banking for other financial institutions when it created its Income Property and Corporate Banking Divisions, but it had no infrastructure to support corporate and commercial lending. DX 8043 at WOP300 2119; DX 8000A at ¶ 32. During the 1984 examination, the FHLLB observed that Carteret had grown from $2.1 billion to $5.4 billion in assets from 1982 to September 1984, but that "net operating results . . . were marginal." Id. at WOP300 2118-2119. The reason for the "marginal" performance was the high cost of funds as well as "[h]igh operating costs resulting from expansion and entry into new lending and service corporation areas." Id. at WOP300 2118. Thus, from the inception of commercial and corporate lending, these sectors did not appear to contribute profits to the thrift.

32. Robert J. Mueller, who was installed as Chairman of the Credit Committee and established the Corporate Banking Division, was the subject of an OTS enforcement action in 1990 in connection with unsafe and unsound practices relating to retirement pay. In March 1992, Mr. Mueller consented to the entry of a Cease and Desist Order requiring the payment of $310,000 in restitution to Carteret. DX 804 at WOP300 2119; DX 9122 at WOR081 0285. On January 24, 1991, Carteret terminated the employment of Charles J. McCabe, Executive Vice-President For Commercial Assets, because Mr. McCabe was responsible for the improper classification of commercial assets and the corresponding understatement of valuation allowances. PX 2111 at C-AM-A-0320831.

33. In June 1991, Carteret hired J. Wayne Moor, a former executive of Amerifirst

Savings Bank in Miami, Florida to replace Mr. McCabe as Executive Vice-President For Commercial Assets. Mr. Moor had extensive experience in evaluating problem loan portfolios. Carteret tasked Mr. Moor with performing a realistic evaluation of Cartert's loan portfolio. DX 7000A at 20; PX 803 at CAM402 0341; Tr. 1498:18-1499:4 (Day); JX 1 at Tr. 14:25-16:3 (Moor); Tr. 1498:13-17 (Day). Mr. Moor and an experienced appraiser visited many of Carteret's larger borrowers. They reviewed detailed reports, prepared at Mr. Moor's direction, on credits accounting for 93.1 percent of the total commercial asset portfolio. DX 7000A at 23; Tr. 1499:8-11 (Day).

34. Mr. Moor concluded that the commercial lending portfolio "was a smoldering pile of dung." DX 9129 at Tr. 114:5-7. He also concluded the lending "was done on a shotgun basis." Id. at Tr. 65:12-13. "That means you have a salesman asking you for the loan . . . .There wasn't a lot of work done on the projections, obviously, because they all had the same projections, things were going to get better, better, better and the property was going to be worth more, more, more, more. And that was true in almost every situation, and almost every situation the opposite happened." Id. at Tr. 65:14-23. Mr. Moor also concluded that the internal classification system was "a joke," and that "the hole [which had to be filled with reserves] was at least $150 million." Id. at Tr. 89:24; 112:22-24.

**2. Carteret Placed Approximately $1 Billion In Commercial And Real Estate Loans On Its Books Between 1983 And 1986 But Did Not Conduct Proper Underwriting Or Effective Monitoring**

35. Carteret's corporate and commercial real estate lending increased from zero to approximately $500 million over an eighteen month period beginning in April 1983. DX 5038A at ¶ 21. Carteret "restructured its balance sheet from a traditional thrift lender into a diversified

financial services institution . . . [with significant investments in] commercial, consumer, and commercial real estate loan portfolios, as well as increased its service corporation and investment activity." PX 2104 at AMB019342. As OTS noted in its 1989 examination, "[T]he board approved underwriting policies for . . . all lending activity (exclusive of residential loans) are vague and general in terminology. As such, these policies are inadequate and cannot be construed as providing useful guidance for management to prudently underwrite or oversee this activity." PX 2106 at WOQ6750028.

36. Loan underwriting is the process of identifying the risk of an investment and then setting an appropriate return to compensate for taking the risk. Tr. 2354:17-25 (O'Rourke).

37. To properly engage in underwriting, a loan officer analyzes the proposed loan, prepares financial statements, and, in the case of real estate development loans, examines appraisal reports provided by the borrower. Tr. 1470:19-25 (Day). For larger loans, the bank should also have completed a marketability analysis to support the appraiser's rationale in arriving at the project's estimated valuation. Tr. 1470:25-1471:1 (Day); PX 2106 at WOQ675 0032. Considering this information, the loan officer determines whether the bank should make the loan or reject it by evaluating whether the loan will earn the bank money at low risk. Tr. 1471:1-8 (Day).

38. Carteret, however, failed miserably in the underwriting function for the new commercial lending strategy. In 1988, the OTS noted recurrent deficiencies in appraisals, including "[u]nsupported assumptions that have a significant effect on the final market value" and "[p]oor comparables that did not share important characteristics with the subject of the appraisal." PX 2104 at AMB019345. In fact, OTS examiners reviewed three appraisals that

were dated after the loan closings. Id.

39. For example, in the 1990 and 1991 examinations, the Federal Deposit Insurance Corporation ("FDIC"), Carteret's secondary regulator (following the enactment of the Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. 101-73, 103 Stat. 183 (1989) ("FIRREA")), and OTS analyzed a $51.8 million loan Carteret made in November 1988 to Swedeland Development Group for a large golf course and residential development in Northwest New Jersey. Tr. 1472:7-17 (Day); PX 2109 at KH054313. The developer contributed very little capital and had no experience in a project of that size. Tr. 1472:17-20 (Day). The project almost immediately experienced cost overruns, and, with the downturn in the economy, the developer could not sell the product and had no resources to complete the development effectively. Tr. 1472:20-25 (Day); PX 2109 at KH054315, KH054318. The 1990 OTS ROE noted that, out of a planned 140 units, only ten had been sold, and many of these were sold to insiders. PX 2109 at KH054314, KH054316. Carteret had failed to recognize these risks during its underwriting process. PX 2109 at KH054318.

40. OTS examiners concluded that "[i]nitial projections were obviously flawed and overall administration of the project is considered to have been lax." PX 2109 at KH054315. Although Carteret's Credit Committee approved this loan, its approval stipulated that the borrowings were to be partially secured by a $5 million letter of credit facility. PX 2109 at KH054313. This letter of credit, however, was never issued. PX 2109 at KH054313. In addition, Carteret did not place this loan on its internal watch list or adversely classify it, even though the project was running eight to twelve months behind scheduled sales and the development was "obviously in trouble." PX 2109 at KH054209, KH054315.

41. In addition, in May 1989, Carteret made a $16.7 million residential development loan for construction of Moore Estates, an upscale condominium and townhouse development in Convent Station, near Morristown, New Jersey. Tr. 1473:1-3 (Day); PX 2109 at KH054308. Carteret accepted the developer's theory that wealthy "empty nesters" would purchase smaller, yet upscale, homes to remain near family, but never did a marketability study to verify the theory. Tr. 1473:1-9 (Day). When Carteret did initiate a study in September 1990, it concluded that there was no market for that type of development. Tr. 1473:10-13 (Day). The study described the overall building concept as "totally flawed." PX 2109 at KH054309.

42. The 1990 OTS ROE noted that the revolving line of credit for the Convent Station development was based on the maximum balance occurring when 44 units were to be under construction. PX 2109 at KH054308. As of June 30, 1990, only 12 units were under construction, and only $1,074 remained available under the line of credit. PX 2109 at KH054308. There had been no closings, and only three sales contracts. PX 2109 at KH054308. OTS examiners conducted a site inspection and found "that the project was effectively abandoned by the borrower in a partial stage of completion and in a condition which is very unappealing and likely to raise concerns from the community." PX 2109 at KH054209. Despite these problems, the development's close proximity to Carteret's headquarters, and the borrower's acknowledgment that he could not complete the project without significant additional funding, Carteret did not adversely list this project in its March 31, 1990 Classified Asset Report. PX 2109 at KH054209, KH054309. The OTS examiners determined that a Doubtful classification was warranted. PX 2109 at KH054309.

43. Another example of Carteret's underwriting deficiencies was its loan relationship

with Paul V. Profeta, which reached nearly $60 million in loans as of June 30, 1990. PX 2109 at KH054211. Regulators found numerous instances where Mr. Profeta had dictated loan terms to Carteret's management. Tr. 2355:8-12 (O'Rourke). Carteret provided Mr. Profeta with one $30 million loan secured by a 21-story office building. PX 2106 at WOQ675 0142. Carteret accepted an appraisal from Mr. Profeta dated approximately three months after the loan was granted. The decision to grant the loan without an appraisal was as improper as the decision to let the borrower obtain and submit the appraisal. Carteret should have obtained it independently. Tr. 2356:3-5 (O'Rourke); PX 2106 at WOQ675 0158. Carteret also accepted financial information from Mr. Profeta without auditing it or scrutinizing it and accepted uncertified rent rolls for Mr. Profeta's office building at face value. Tr. 2355:3-2356:9 (O'Rourke); PX 2106 at WOQ675 0142, WOQ675 0147, WOQ675 0152. Mr. Profeta admitted that companies such as Xerox and AT&T, which he claimed were tenants, were either not tenants at the date the loan was originated or received major rent concessions. PX 2106 at WOQ675 0143.

44. Regulators concluded that Carteret's poor underwriting of commercial loans "began as early as 1986 and continued until lending activity was terminated in 1989." PX 5331 at KH 033535. As our expert on financial institutions and capital markets, Professor Roy Smith, stated, Carteret "made a lot of bad loans in a hurry without the skill to be able to evaluate the credit risk that those loans entailed. And they didn't monitor them very well to be able to address them before they got even worse." Tr. 2921:13-17 (R. Smith); DX 7063 at WOP814 0024 (the decline in asset quality noted in the 1989 OTS ROE was attributable in part to the lack of adequate underwriting). "These were bad loans or weak loans that were time bombs, in a sense, and which were ignited by the economic conditions prevailing in 1990 and '91." Tr. 2924:23-

2925:1 (R. Smith).

45. Regulators, along with Carteret's own accountants and other consultants, emphasized Carteret's inability to manage its credit exposures through adequate underwriting or other credit controls. Tr. 2921:6-10 (R. Smith). Therefore, OTS's 1989 ROE stated that Carteret's "loan underwriting policies (except for residential lending) are considered inadequate" and required that management "act to redefine its goals and objectives, as well as establish prudent lending guidelines for the bank's loan officers." DX 7063 at WOP814 0024. The FDIC noted that Carteret did not have any quantitative or qualitative guidelines for assessing credit risk and did not have defined goals for issuing credits. DX 8054 at WOQ699 0514.

46. In addition to criticizing Carteret's inability to underwrite commercial loans, regulators concluded that Carteret's internal loan review (ILR) function was inadequate and inept. Tr. 2357:6-13 (O'Rourke). Carteret's weak or nonexistent loan review function meant that there was no check to identify emerging problems, giving management a false sense of confidence that the portfolio was performing well because there was no independent review of existing risks or risk factors that were turning negative. Without a very robust internal independent process for identifying problems, those problems intensified and got out of control. Tr. 2357:19-2358:8 (O'Rourke).

47. The OTS examiners "determined that problem loans are not being identified in a timely manner and the institution's internal loan classifications do not accurately reflect the risk of nonrepayment." PX 2106 at WOQ675 0033. Examiners considered Carteret's practice of having the loan officer critique his or her own loans without adequate analysis on the part of the loan review staff to be the primary weakness in the ILR program. The loan review staff also

seemed to be more concerned with defending loans than with providing an independent review. PX 2110 at WOQ698 1438; Tr. 1479:2-1480:21 (Day). During the 1989 examination, OTS encountered a "breakdown in the loan approval process . . ." PX 2106 at WOQ6750029.

48. For example, during a 1990 site inspection of the Swedeland housing development and golf course, OTS examiners learned that the project was running eight to twelve months behind scheduled sales and that the golf course would not be ready for use on schedule. PX 2109 at KH054209. Given that the developer was to repay most of Carteret's loan through completed unit sales, the OTS examiners noted that these were significant concerns. Id. The ILR, however, had not monitored the project's progress and had not categorized the loan as subject to criticism or placed it on a watch list. Id. OTS examiners, on the other hand, adversely classified it and noted that the ILR's failure to identify this large and clearly troubled credit in a timely manner called into question the effectiveness of the entire ILR function. PX 2109 at KH054209, KH054318.

### 3. Carteret's Strategy Of High Risk Lending Also Extended To Mortgage Lending

49. In September 1987, Carteret's Board revised its loan policy to authorize one-to-four family "no documentation" or "limited documentation" loans. PX 2111 at C-AM-A-0320839. This new policy enabled Carteret to make loans without verifying a borrower's income and employment during the underwriting process. Thus, loans were extended without determining the borrowers' ability to repay them. Tr. 478:5-9 (Bianco); PX 2106 at WOQ675 0050-51.

50. From January to July 1989 alone, Carteret made $413 million in "no doc" mortgage loans. PX 2106 at WOQ675 0050-51; Tr. 478:5-16 (Bianco). Our expert on financial

institutions and damages, Professor Anthony Saunders, noted that these "limited documentation" mortgages are what today are referred to as sub-prime mortgages, which could not be securitized. Tr. 3577:4-3579:5 (Saunders).

51. In a targeted review of five "limited documentation" loans, OTS's 1991 examination revealed that "[g]enerally, the files were found to be in a state of disorder." PX 2111 at C-AM-A-0320839. The borrowers, who owed over $3.3 million, were delinquent in their payments by as much as 27 months. Id. The examiners found that the state of disarray of the loan files "could delay and/or jeopardize Carteret's ability to commence legal action against a borrower if deemed necessary." Id.

### 4. Carteret Failed To Properly Classify Problem Assets Or Establish Adequate Loan Loss Reserves

52. Examiners determine which loans are likely to have problems and, as a result, adversely impact earnings and capital. Tr. 1435:15-20 (Day). Examiners select certain credits for review, then request the credit files on these loans from the bank. Tr. 1435:21-1435:25 (Day). Examiners then review the files, discuss the loan with bank management, and come to a conclusion about whether the loan has weaknesses that warrant an adverse classification. Tr. 1435:25-1436:4 (Day). Examiners have to be able to defend their recommended classifications, so they do not classify assets until they have performed a thorough evaluation. Tr. 1497:18-1498:8 (Day).

53. Most of the OTS and FDIC examiners' time was spent on asset review. Tr. 2346:12-20 (O'Rourke) ("50 to 70 percent of our time [is spent] on asset quality"); Tr. 1426:16-19 (Day) ("probably the greatest amount of manpower is expended in evaluating the quality [of] assets"). FDIC relied upon OTS's review of loans in many cases, but on several examinations

OTS and FDIC worked as a team, splitting up the loan reviews and discussing their results. Tr. 1570:16 - 1572:14 (Day). The 1990 examination "was a joint effort of FDIC and Office of Thrift Supervision (OTS) personnel" "which centered primarily on commercial real estate loans and corporate lending activity . . ." PX 2110 at WOQ6981434. OTS acted as Carteret's primary supervisor, and the FDIC was the insurer. Tr. 1431:12-20 (Day). Mr. Day, one of the FDIC examiners, spent a great deal of time working with OTS personnel in loan evaluations, often on a daily basis, and believed that OTS personnel did a careful job in evaluating loans and making reserve recommendations. Tr. 1431:21-25, 1500:15-1501:12 (Day).

54. Adversely classified assets are divided into three categories: substandard, doubtful and loss. Tr. 1436:5-8 (Day). Substandard assets are not supported by the borrower's collateral, net worth, or ability to pay. Tr. 1436:12-14 (Day). They have significant operating defects that could jeopardize orderly liquidation, or, if the situation remains unresolved, could result in loss. Tr. 1436:14-17 (Day). They are characterized by the distinct possibility that the insured institution will sustain some losses if the deficiencies are not corrected. DX 7000A at § 3.1.2. "Doubtful" is a more severe level of classification for loans that will result in a significant loss that cannot yet be quantified to an exact point. Tr. 1436:18-23 (Day). Doubtful assets have weaknesses that make collection or liquidation in full highly questionable and improbable. DX 7000A at § 3.1.2. Assets classified as "loss" are non-bookable assets that should be charged off the bank's books. Tr. 1437:1-3 (Day).

55. The amount of a thrift's capital plays no role in determining whether an asset should be classified. Tr. 1437:24-1438:8 (Day); Tr. 2360:15-23 (O'Rourke). Further, the amount of capital that a thrift has plays no role in an analysis of the thrift's reserves. Instead, the

examiner looks at the individual assets and determines the fair value, net realizable value, or market value irrespective of the institution's capital levels. Tr. 3179:10-18 (Kennedy).

56. Thrifts are required to establish adequate valuation allowances in accordance with GAAP. DX 7000A at § 3.1.4. Under GAAP, a loss should be recognized when it is probable and can be reasonably estimated. Id. Valuation allowances are increased through charges to income (e.g., loan loss provisions) and recoveries. Valuation allowances are decreased by charge-offs. DX 7000A at § 3.1.1. The establishment of reserves reduces income and capital on a dollar-for-dollar basis. Tr. 3145:17-22, 3156:24-3157:5 (Kennedy). A valuation allowance is considered adequate if it is sufficient to cover both losses on specifically identified assets and losses inherent in the remaining asset portfolio. DX 7000A at § 3.1.1.

57. A high level of adverse classifications requires a high level of reserves to compensate for the risk in that portfolio. Tr. 1437:17-20 (Day). OTS and FDIC followed established methodologies for determining the appropriate level of reserves. Tr. 1437:20-23 (Day). The risk factors considered by the examiner in establishing reserves involve the adequacy of the ILR, the quality of management, changes in the asset portfolio involving a transition from lower to higher risk assets, historical losses, peer group comparisons, and current economic conditions. Tr. 1915:18-1916:20 (S. Smith); DX 5048. Peer group comparisons and historical losses are only marginally relevant because peer groups involve different geographic regions and different asset configurations. Tr. 1917:25-1918:7 (S. Smith).

58. To set loan loss reserves, the standard procedure is to provide a 20 percent reserve for a substandard asset, 50 percent for a doubtful asset, and total charge-off for items classified loss. Tr. 1438:9-1439:5 (Day). To determine the adequacy of a thrift's reserves, FDIC

examiners total up the indicated percentages of reserves and compare them to the thrift's actual reserves. Tr. 1441:19-1442:4 (Day). Adequacy of reserves cannot be determined by comparing them to the reserves of another thrift, because thrifts have differing investment philosophies, histories, and managements. Tr. 1442:9-17 (Day). In Carteret's case, a comparable thrift would have had to have had a high percentage of commercial real estate loans in the northeast and Florida, and a high concentration of commercial business loans. Tr. 2373:7-20 (O'Rourke).

59. Judgments related to reserves must be made in a disciplined manner based on a detailed analysis of the loan portfolio. Tr. 3186:12-3187:6 (Kennedy). Examiners should come up with similar recommendations as to overall reserve levels. Tr. 1569:4-23 (Day)

60. Carteret did not properly classify assets. DX 9129 at Tr. 112:24 (Moor). The responsibility for classifying an asset rests upon management. DX 7000A at § 3.1.2. Under the regulations issued both prior to and after the enactment of FIRREA, examiners also have the authority to identify and classify assets. Id. The effectiveness and thoroughness of a thrift's asset classification policy and practice play an integral role in ensuring that its reserves are adequate because an asset's classification affects the need for and appropriate amount of the reserve. DX 7000A at § 3.1.3. Internal loan review should be an independent audit-type process that ensures that management classifies assets properly. Tr. 2363:2-7 (O'Rourke).

61. From December 1987 to June 30, 1989, Carteret was required to increase its level of classified assets by approximately $400 million. Tr. 1904:4-10 (S. Smith). The result was that, as of 1989, Carteret's classified assets equaled 5.6 percent of its total assets, which was well above its peer group's average of 3.3 percent. DX 7000A at § 3.2.1. The 1989 discrepancy between Carteret's internally classified loans ($150 million) and the regulators' adverse

classifications ($397.721 million) indicated that Carteret's internal loan review system was "woefully inadequate" and failed to recognize problem loans. Tr. 1442:18-1443:9 (Day).

62. The enactment of FIRREA and Carteret's downsizing had no impact on the condition of Carteret's problem assets. Tr. 2356:24-2357:5 (O'Rourke).

63. Regulators concluded that Carteret did not take adequate provisions for loan losses, particularly because it was basing its reserves on historical losses even though its asset composition had evolved from primarily residential to significant commercial lending. Tr. 1445:1-1446:1 (Day). Basing reserves on historical losses was inappropriate for a bank that had evolved from making one-to-four-family residence loans to making multi-million dollar, acquisition development loans. Tr. 1445:1-1446:1 (Day). Management's failure to provide for adequate reserves resulted in an overstatement of earnings performance. PX 2110 at WOQ698 1434; Tr. 1445:1-1446:1, 1474:12-25 (Day). Indeed, regulators considered Carteret's reported earnings from as early as 1986 to be "misleading." PX 2110 at WOQ698 1438; Tr. 1480:22-1481:20 (Day).

64. Loan loss reserves established by management almost doubled between 1987 and 1988, rising from $8.4 million to $14.1 million. Tr. 2942:23-2943:13 (R. Smith); DX 9506. The reserves doubled again in 1989, rising to $27.5 million. Tr. 2943:4-11 (R. Smith); DX 7000A at § 3.2.1. In 1989, OTS concluded that Carteret still needed to increase its reserves by $77.2 million. DX 7000A at § 3.2.1; Tr. 1915:7-9 (S. Smith); Tr. 3412:5-9 (Saunders). Although this was later reduced to $54.3 million, Tr. 1921:16-1922:15 (S. Smith), Carteret failed to book either amount in 1989. DX 7000A at § 3.2.1.

65. Even if Carteret had booked the additional $77.2 million in reserves required by

OTS, the reserves would have been insufficient to cover the substandard and doubtful loss classifications. DX 8054 at WOQ699 0501.

66. Carteret's insufficient reserve position was based in large part on management's contention that classifications only had to relate to the portion of the asset "at risk" rather than the entire asset. Tr. 1904:10-1905:1 (S. Smith). This was not regulatory practice and was not approved by the regulators. Id.

67. Mr. Moor described Carteret's system of identifying adversely classified assets as "a joke." DX 9129 at Tr. 112:24 (Moor). He emphasized that his August 1991 "review was done in an organized fashion by experienced real estate people who [were] very aware of the accounting and regulatory rules that apply to the assets reviewed. The same things cannot be said about the existing reserve position." DX 44 (August 8, 1991 Moor Memo). Mr. Moor's review resulted in the addition of $120 million to reserves, which resulted in a total reserve for the second quarter of 1991 of $150 million. FDIC examiners considered even this level of reserves to be only marginally adequate. Tr. 1496:18-1497:17 (Day).

68. Because the loan losses resulted from poor underwriting and the economic downturn, these losses could have been and should have been recognized prior to FIRREA. The losses "were not just something that happened in the last minute," but instead were due to "bad loans or weak loans that were time bombs, in a sense, and which were ignited by the economic conditions prevailing in 1990 and '91." Tr. 2924:21-2925:2 (R. Smith).

### 5. Carteret Was Not Overreserved As Of September 1992

69. Professor Calomiris asserted that, in a world without the breach, Carteret would have taken $50 million less in reserves than the $150 million that Carteret recorded in the real

world in mid-1991. PX 2702A at Table 16; PX 2704A at Table 2; PX 9053a. Professor Calomiris, however, thought it "quite possible" that Carteret's reserves in 1989 should have been higher and acknowledged that he had not analyzed the required reserves to determine whether $77.2 million, the amount OTS initially ordered added to reserves, was in fact the correct figure. Tr. 1178:18-1179:4 (Calomiris).

70. David A. Kennedy, a Certified Public Accountant ("CPA") and real estate valuation expert, demonstrated that Carteret's reserves were not overstated by $50 million as of September 1992, as asserted by Professor Calomiris and Mr. Bianco. Tr. 262:5-264:17 (Bianco); DX 7000A at 26-27; PX 9053. Their views are "at odds with contemporaneous statements by management[,]" given Chief Financial Officer Donald Kramer's statement in July 1992 that Carteret was adequately reserved after the $150 million write-down. DX 7000A at 26-27; PX 2993 at C-AM-A-0243012. Also, Mr. Kennedy noted that "such an approach [i.e., reducing reserves by $50 million] would not have been acceptable to Carteret's auditors and would have been inappropriate under accounting principles and SEC reporting requirements." DX 7000A at 26. Mr. Kennedy noted that, if Carteret took reserves that were higher than needed in order to gain the confidence of new investors, then the financial statements would have been misstated under GAAP and Securities and Exchange Commission ("SEC") rules and regulations. Tr. 3188:10-3189:5 (Kennedy).

71. Mr. Moor, who was appointed by Mr. Bianco to review the commercial loan portfolio and recommend reserves in June 1991, conducted an extensive evaluation analysis which included site visits, discussions with individual borrowers, brokers and appraisers, and an evaluation of rent rolls and other relevant records. Tr. 3170:3-3171:6 (Kennedy); Tr. 3364:7-13

(Kennedy). Mr. Moor recommended the addition of $150 million in reserves. Tr. 3164:10-21 (Kennedy).

72. Carteret's Board of Directors determined that Mr. Moor's estimate was an accurate reflection of Carteret's asset portfolio and accepted Mr. Moor's recommendation. Tr. 3195:25-3198:4 (Kennedy); DX 7227 at WOQ695 1029-30. The Board of Directors adopted a resolution noting that "the association's independent accountants have reviewed the level of valuation allowances at the most recent quarter-end and have indicated that the association's reserves were adequate at such date." Tr. 3195:8-12 (Kennedy); DX 7227 at WOQ695 1030. Mr. Kennedy opined that reserves could not be deemed adequate while at the same time being overstated because this would create a material misstatement. Tr. 3197:13-3198:4 (Kennedy).

73. Mr. Kennedy conducted an independent evaluation of Mr. Moor's reserve analysis and concluded that Mr. Moor employed a systematic and detailed analysis, and that he fully documented the rationale supporting the reserves. Tr. 3221:14-3222:1 (Kennedy). Tr. 3209:19-3210:11, 3234:6-24 (Kennedy). Further, Mr. Kennedy concluded that Carteret would have been required to take the same level of reserves in the absence of the breach because the asset quality dictated the required reserves. Tr. 3235:12-3237:3 (Kennedy).

74. Price Waterhouse, Carteret's outside auditor at the time Mr. Moor recommended the addition to reserves, approved Mr. Moor's recommendation to the Board of Directors. Price Waterhouse concluded that Carteret's financial statements, which presented the reserves in accordance with GAAP, were free of material misstatements. Tr. 3205:22 to 3206:1 (Kennedy). OTS compared the examiners' reserve analysis with Mr. Moor's and concluded that each confirmed the other. DX 427 at CAM152 1296; Tr. 2388:7-12 (O'Rourke). OTS Examiner

O'Rourke, who was stationed at Carteret at the time as a resident examiner, testified that Mr. Moor's recommendation as to reserve levels was based upon a fundamentally sound approach and was reasonable in light of the massive problems with the corporate and commercial real estate loan portfolios. Tr. 2393:6-17 (O'Rourke).

75. Even if Carteret were realizing 105 to 110 percent of the reserved amount on some of its classified assets, that does not indicate Carteret was over-reserved. Some assets resolve for more than their reserved value, others less. Tr. 2395:10-21 (O'Rourke). The proceeds of individual asset sales are irrelevant to the determination of reserves, which depends upon a broad measure of the value of the entire portfolio rather than a focus upon individual asset dispositions. Id.

76. The Resolution Trust Corporation ("RTC") did not receive liquidation value in its sale of Carteret's assets. As noted in the due diligence report prepared by Lyons, Zomback & Ostrowski ("LZO") for Kohlberg & Co., a potential Carteret investor, "[n]o attempt was made by either Carteret or LZO to measure these assets on a liquidation basis, which measurement would have additional valuation shortfalls from those determined by LZO." DX 95 at WOP338 1384; Tr. 3232:1-3233:3 (Kennedy). Further, OTS Examiner O'Rourke saw no evidence of a "fire sale" of Carteret's classified assets. Tr. 2397:19-24 (O'Rourke). Moreover, if the assets had been valued on a liquidation basis, the financial statements would have violated GAAP. As Mr. Kennedy observed, "[a] liquidation basis is not an appropriate basis for establishing reserves for an ongoing entity. And if you establish the reserves based on liquidation basis, your financial statements will be misstated." Tr. 3233:21-25 (Kennedy). Mr. Vigna acknowledged that Carteret's assets were carried "at close to market values." PX 2805 at WOP334 1036; Tr.

3238:1-3241:16 (Kennedy).

77. Carteret would have suffered immediate economic costs if it had held the non-performing and real estate owned ("REO") assets in the "but-for" world for a longer period than it held them in the real world. Between 1989 and 1991, Carteret suffered lost interest income of at least $62 million on non performing loans and negative cash flow of $6.3 million on foreclosed real estate because these assets were on Carteret's books. DX 9614; Tr. 3262:16-3263:11 (Kennedy). In addition, Carteret suffered out-of-pocket costs of $4.1 million between July 1, 1991, and September 30, 1992, for upkeep on the foreclosed property. DX 9614.

78. It is impossible to conclude that particular assets or areas would, if held, increase in value even if there is a general trend of increasing asset prices. Tr. 3266:16-3267:15 (Kennedy). Professor Calomiris has provided no analysis showing that Carteret's assets would have increased in value by a sufficient amount to offset the $73 million in cost that would be associated with holding those assets. Tr. 3267:5-10 (Kennedy). There are clear examples of Carteret assets which would not have increased in value even if market conditions improved. For example, Interstate Plaza II was an office building that had never been occupied and cost $150,000 per year to maintain. Further, appraisers determined that the highest and best use of the land was not as an office building. Tr. 3265:6-19 (Kennedy); DX 9615. Thus, it would have made no sense to hold this asset. Tr. 3265: 6-8 (Kennedy). Similarly, Hightstown Hotel, which had been closed, was in a depressed area, was physically degenerating, and was costly to maintain. Tr. 3265:20-3266:9 (Kennedy); DX 9615. If Carteret had not disposed of these assets, it would have incurred substantial holding and monitoring costs. Thus, these assets were not economically viable even if general market conditions improved. Id.

## III. By 1989, Carteret Had Become Effectively Insolvent

79. At the completion of the 1989 examination, Mr. Day recommended a composite rating of "5" for Carteret, which indicated an "extremely high immediate or near term probability of failure." DX 8054 at WOQ699 0508. Carteret's pre-FIRREA insolvency had its origins in the firm's historical performance.

### A. Due To Its Poor Core Operating Earnings, Carteret Relied Upon Asset Sales

80. Between 1983 and 1986, Carteret reported net earnings of $113 million. DX 8000A, Exh. 3, Table 1. The quality of the earnings, however, was extremely low. As regulators noted, core operating earnings are "the essential elements of a viable . . . institution." Tr. 2203:7-2204:14 (Vigna). Yet, out of $113.6 million reported income between 1983 and 1986, $42.8 million involved gains from the sale of branches, equipment and mortgages acquired in supervisory transactions. DX 9730. If such non-recurring income is netted out of reported income, Carteret's net income was only $70.8 million. This figure does not represent true economic gain because it included non-cash income resulting from the mismatch between the accretion of the discount on mortgage loans and the amortization of goodwill. DX 8000A at ¶ 29. Regulators noted that Carteret was "essentially unprofitable on a core basis since 1986[.]" DX 130 at WOT671 0671.

81. Between 1983 and 1987, this "paper profit" from the accretion of loan discount made up approximately $47 million of Carteret's earnings. PX 1601 at CAM5240849. Thus, Carteret enjoyed virtually no true income gains. Moreover, although Carteret continued to have depreciation costs related to goodwill, it projected that, in 1988 and forward, it no longer would have accretion income from the mortgages acquired in supervisory transactions. DX 8000A at ¶

41; Tr. 2940:18-2941:1 (R. Smith). As the discounts were fully accreted and the goodwill continued to be amortized, Carteret projected a net accretion loss of $137.2 million from 1987 forward. PX 1601 at CAM5240849.

82. During the two years in which Carteret had positive operating earnings, 1985 and 1986, Carteret's operating earnings were still small when compared with assets. Even considering the contribution of its mortgage origination division, Carteret Mortgage Company ("CMC"), Carteret's average annual core earnings between 1982 and 1988 were only $13,000, which is only approximately .0026 percent of average assets of approximately $5 billion. DX 9730; PX 9003. This is well below the 1 percent return on assets that is generally expected from healthy thrifts. Tr. 3874:21-3875:3 (Saunders).

83. As of 1987, the risks inherent in Carteret's corporate and commercial real estate portfolios began to affect net income. In 1987, as economic conditions began to deteriorate in Florida and New Jersey, Carteret's net income had decreased by 27.5 percent (i.e., from $46.1 million to $33.4 million). DX 8000A, Exh. 3, Table 1. At the end of 1988, eight months before the enactment of FIRREA, Carteret's pre-tax income from outstanding loans became negative. DX 9503; DX 9505; Tr. 2923:3-15 (R. Smith); Tr. 1927-28 (S. Smith); PX 2106 at WOQ675 0067. Between June 1988 and June 1989, Carteret suffered four quarters of core operating losses. PX 2106 at WOQ675 0067; Tr. 1927:20-21 (S. Smith).

84. To maintain the appearance of steady earnings in the face of these losses, Carteret began to cannibalize it balance sheet of good assets and to report increasingly large non-recurring gains from the sales of loans and securities. DX 9506; Tr. 2943:14-2944:20 (R. Smith); Tr. 1625:6-21 (Albanese); DX 8000A at ¶ 51. For example, from 1987 to 1989, Carteret reported

$128.3 million in net gains on sales of loans and securities. DX 9506. These gains robbed the balance sheet of profitable assets and masked the downward trend of Carteret's core earnings capability. DX 8054 at WOQ699 0528; Tr. 1460:6-1462:15 (Day).

85. In 1987, the vast majority of Carteret's reported net income of $33.4 million was derived from gains on the sales of assets of $21.8 million. Tr. 2944:15-17 (R. Smith); DX 8000A, at ¶ 36 and Exh. 3, Table 1, p. 2. In 1988, Carteret derived its net income of $20 million from gains from the $51.9 million sale of loans and securities. Tr. 2943:22-2944:2 (R. Smith); DX 9506; DX 8000A, Exh. 3, Table 1, p. 2.

86. During the first six months of 1989, prior to FIRREA, Carteret incurred a net operating loss of $14.6 million. PX 2106 at WOQ6750068. Carteret reported net income gains of approximately $20 million in July and August 1989. $30.5 million of these gains, however, resulted from asset sales. Without the gains on asset sales, Carteret had a net operating loss of $18 million. Tr. 1443:24-1444:25 (Day). Mr. Day highlighted this fact in the 1989 ROE to make it clear that Carteret's earnings were based upon the cannibalization of assets and could not be repeated in the future. Tr. 1443:24-1444:14 (Day). FDIC examiners noted that "[w]hat income the bank has been able to generate has come entirely from gains on asset sales." DX 8054 at WOQ699 0501. In 1990, FDIC examiners noted that this practice made downsizing Carteret problematic because few above-market assets remained available for sale. PX 2110 at WOQ698 1505.

87. In 1989, Carteret suffered a net operating loss of $63.9 million, DX 8000A, Exh. 3, Table 1, and was only able to report net pre-tax income of $7.6 million because of non-operating gains of $61 million derived from asset sales. PX 2109 at KH054232.

88. In 1990, Carteret lost $9.5 million, even setting aside $122.3 million in losses incurred in the commercial loan portfolio. DX 8000A, Exh. 3, Table 1. In 1991, Carteret suffered a $171.6 million loss in commercial lending, and the bank's pretax cash flow aside from these losses was "pretty small." Tr. 2923:13-15 (R. Smith); DX 9503; DX 8000A, Exh. 3, Table 1; Tr. 1446:2-9 (Day). According to regulators, the level of non performing assets that precipitated these losses indicated a problem never seen in viable institutions, but only in institutions on the verge of failure. PX 2110 at WOQ698 1444; Tr. 1484:17-1486:21 (Day).

89. In 1990 and 1991, Carteret took loan losses in excess of $290 million. DX 9503; Tr. 2923:9-23 (R. Smith). These were in addition to lending-related losses recognized between 1986 and 1990 of approximately $104 million. The losses Carteret recognized from commercial and corporate lending from 1986 through 1992 ($394 million) totaled 1.4 times its peak year-end net worth of $290 million. Tr. 2923:16-23 (R. Smith). In other words, by 1991 the commercial and corporate losses following the enactment of FIRREA ($290 million) exceeded the goodwill as of the time of seizure (approximately $139 million) by a factor in excess of two. Tr. 2924:1-4 (R. Smith).

90. Thus, Carteret's loan losses were sufficient to destroy all of its capital, including goodwill. Tr. 2946:21-2947:4 (R. Smith). Any other event, such as the inability to count goodwill as regulatory capital, became "irrelevant by simply the vast order of magnitude effect that this had." Tr. 2924:7-9 (R. Smith).

91. One of the reasons for Carteret's net operating losses was its extremely high overhead expenses. Regulators examining Carteret in 1989 noted that Carteret's overhead expenses were "excessive" and had "exceeded net interest income for the past three years." Tr.

1452:18-1453:9 (Day); DX 8054 at WOQ699 0499, WOQ699 0501. As of September 30, 1988, overhead expense represented 165 percent of net interest income. DX 8054 at WOQ699 0502. Mr. Day, the FDIC examiner conducting Carteret's 1989 examination, stated that he had never seen such a high ratio of overhead expense to net interest income, and, in fact, had never seen overhead expense exceed net interest income. Tr. 1451:8-12, 1452:21-23 (Day). Mr. Day noted that the level of overhead was a guideline to the effectiveness of the thrift's management, as it was one of the factors that they could control. Tr. 1451:13-19 (Day). Regarding overhead, Carteret's own internal planning studies concluded it was the worst performer among mid-Atlantic thrifts with respect to operating expenses. Tr. 1452:24-1453:3 (Day); DX 8054 at WOQ 699 0502.

92. The high overhead expenses were attributable, in part, to the geographical dispersion of Carteret's branches. Tr. 1454:7-9 (Day). Prior to the enactment of FIRREA, Carteret had identified the sale of certain of its branches as a major objective. JX 1 at 706-708 (Tr. 158:20-159:14, 194:11-196:12 (Walsh)). Robert Walsh, who served as Carteret's Chief Financial Officer, President, and CEO between 1989 and 1990, stated that the "retail branch system had gotten out of control at Carteret, because of the way that failed S&Ls were acquired by Carteret." JX 1 at 707 (Tr. 195:1-5 (Walsh)). Mr. Walsh noted that certain branch systems in New Jersey and "a fair amount of branches in Florida . . . were unprofitable." JX 1 at 707 (Tr. 195:6-9 (Walsh)).

93. Carteret closed fifteen branches in 1989 in order to improve profitability. PX 401 at C-AM-A-0394701; JX 1 at 366-67 (Tr. 176:22-178:4 (Manley)).

94. Mr. Bianco was not involved in Carteret's affairs at the time the corporate and

commercial loans were booked or during the 1989 and 1990 regulatory examinations which resulted in the establishment of significant additional loss reserves. Mr. Bianco first became an officer at Carteret in May 1991. Tr. 157:15-158:10 (Bianco). Indeed, he was not even an investor in Ambase until 1990. Tr. 155:1-5 (Bianco). Carteret's loss reserve troubles became evident in 1990, when OTS determined that Carteret should have allocated approximately $77.2 million of additional reserves in 1989. PX 5331 at KH033535. Mr. Bianco acknowledged that he was not at Carteret in 1990 and, therefore, was not certain whether the additional reserves required by OTS were allocated or not. Tr. 332:17-333:6 (Bianco). Mr. Bianco had only been CEO of Carteret for 18 months prior to the December 1992 seizure and had limited involvement in many of the decisions that led to Carteret's failure.

**B. <u>FDIC Recommended Termination Of Deposit Insurance</u>**

95. In August 1991, FDIC Regional Director Nicholas Ketcha recommended to the FDIC's Board of Directors that the agency consider commencing insurance termination proceedings against Carteret under Section 8(a) of the Federal Deposit Insurance Corporation Act, Pub. L. 89-695, 64 Stat. 879 (1950), codified at 12 U.S.C. § 1818. Tr. 2081:14-2084:15 (Zamorski). Section 8(a) allows the FDIC to terminate the insurance of thrifts in an unsafe and unsound condition. Tr. 2069:9-19 (Zamorski).

96. The FDIC counted goodwill as regulatory capital when it recommended a Section 8(a) action against Carteret. Tr. 2083:8-2084:6 (Zamorski); DX 8054; Tr. 1432:3-1433:13 (Day). It concluded that a Section 8(a) action should be considered because Carteret's lack of core earnings and high overhead rendered it in an unsafe and unsound condition. Tr. 2083:8-2084:6 (Zamorski). Mr. Michael Zamorski, who was FDIC Deputy Regional Director at the time,

attributed this condition primarily to a "risky strategy of getting involved in commercial real estate loans [including] acquisition, development and construction lending . . . without proper infrastructure, without proper governance. And it ended up . . . in an unsafe and unsound condition . . ." Tr. 2066:10-25 (Zamorski).

97. Even with goodwill, Carteret would still have suffered from a lack of capital, severe asset quality problems, a high level of loan loss reserves, a lack of core earnings, and high overhead expenses. Tr. 2066:10-26 (Zamorski). At the time the Section 8(a) action was recommended, the FDIC included goodwill in regulatory capital but concluded that Carteret was in an unsafe and unsound condition even counting the goodwill as regulatory capital. DX 47; Tr. 2066:10-2067:13 (Zamorski).

**C. <u>Carteret Experienced A Large Deposit Decline Between 1983 And 1989</u>**

98. Carteret suffered a five-year downward trend in its funding of liabilities from deposits. Tr. 2939:23-25 (R. Smith); DX 9505. Carteret's deposits as a percentage of net tangible assets fell from 86.9 percent to 69 percent between 1983 and 1988, indicating that the bank's financial condition increased the difficulty of attracting deposits. Tr. 2940:9-12, 2941:20-2942:7 (R. Smith); DX 9506. During this time, Carteret found it difficult to replace deposits that were withdrawn with new deposits at an interest rate that was as competitive as the earlier rate, due to depositors' concerns about Carteret, or the thrift industry in general. Tr. 2942:11-20 (R. Smith).

99. In 1989, Carteret gained some deposits, but then began to experience a more serious deposit run-off, due in part to the sale of deposits associated with certain branches. Tr. 2942:1-5 (R. Smith). Carteret's deposits as a percentage of net tangible assets declined even

further from 1990 to 1992, after Carteret recognized the losses inherent in its commercial real estate portfolio. DX 9506.

100. Carteret acknowledged, in a 1992 prospectus issued to potential investors, that publicity related to FIRREA did not cause the deposit run-off. PX 2807; Tr. 345:8-14 (Bianco). Carteret management never indicated to OTS that the breach caused the bank to pay higher costs for deposits. Tr. 2410:14-22 (O'Rourke).

101. In Mr. Day's experience, depositors in New York City and New Jersey do not react to negative publicity about banks by withdrawing their deposits. At Bowery Savings Bank, the bank gained deposits the week after reporting one of the biggest losses in history. Tr. 1511:8-20 (Day).

102. Carteret's management never told Mr. Day that the bank's capital problem was causing it to pay excessive rates on deposits. Tr. 1511:2-7 (Day).

## IV. Carteret's Condition From 1990 Through 1992

### A. The Regulators' Findings

103. In Mr. Day's experience with potential bank acquirers conducting due diligence, if Carteret had not recognized its asset problems and made adequate loan loss provisions in 1991 and 1992, investors would not have been interested in acquiring the bank. Tr. 1505:20-1506:7 (Day).

104. In the 1991 OTS ROE, Examiner Thomas O'Rourke concluded that Carteret's problems had progressively worsened since it was awarded a composite rating of "4" in the 1989 examination and "5" in its 1990 examination. Tr. 2375:12-16 (O'Rourke). He recommended a composite rating of "5," which meant that the institution should be transferred to the RTC unless

it could arrange a capital infusion. Tr. 2375:16-21 (O'Rourke).

105. Carteret sold approximately $1.8 billion of deposits in 23 branches in 1990 in order to "allow[] . . . operations to be scaled back to strategically important markets." DX 7171 at WOP298 0703. Carteret noted that "[b]y consolidating inefficient neighboring branches, non-earning fixed assets were reduced, operating efficiency was improved, and franchise value was increased." Id. The branch sales reduced Carteret's annual operating expenses by approximately $18.1 million, which improved its profitability. Id. Carteret replaced deposits in the sold branches with advances from the Federal Home Loan Bank ("FHLB") of New York. DX 9761; DX 5038A at ¶ 42. Interest on the FHLB borrowing was at a variable rate tied to LIBOR. DX 5038A at ¶ 42. In 1991 and 1992, short-term rates declined considerably, as did the cost of FHLB lending to Carteret. Id. The FHLB advances were advantageous to Carteret in the early 1990s because the advances lowered Carteret's cost of funds, increasing its profitability. Thus, the branch sales improved Carteret's profitability in 1991 and 1992. Tr. 2382:23-2385:16 (O'Rourke).

106. In 1992, at the time of its failure, Carteret's slightly positive cash flow (net of loss reserves) was primarily due to the decline in the cost of, and Carteret's reliance upon, FHLB borrowings rather than deposits. DX 5038A at ¶ 42.

107. In 1991, Carteret's management asserted that the branch sales had reduced annualized operating expenses by approximately $18 million and enhanced both the current efficiency and future profitability of Carteret's branch system. DX 7340 at WOQ678 1963. Carteret's management informed Mr. O'Rourke that they were eliminating underperforming branches. They also told him that the branch sales would improve Carteret's profitability going

forward. Tr. 2385:17-2386:17 (O'Rourke). Mr. O'Rourke could not recall Carteret personnel ever telling him that the branch sales reduced Carteret's profitability. Tr. 2386:18-21 (O'Rourke).

108. As of June 15, 1992, Mr. O'Rourke had been resident examiner for Carteret for a year, and he completely understood the institution's condition. Tr. 2396:4-12 (O'Rourke). His report of examination assigned Carteret a composite "5" rating, the third time in a row that the bank had been rated in the worst category, which was unusual in Mr. O'Rourke's experience. Tr. 2396:13-21 (O'Rourke).

109. Mr. O'Rourke concluded that Carteret would be unable to earn its way out of its problems without a significant capital infusion. Tr. 2398:6-2399:2 (O'Rourke). Carteret's asset quality had improved by November 1992, but the bank's asset portfolio was far from healthy. Tr. 2423:19-22 (O'Rourke). Carteret's profitability in 1992 was "very tenuous," with profits that could easily have been losses. Tr. 2398:6-2399:2 (O'Rourke).

110. Although Mr. O'Rourke recognized that it might be possible for Carteret to sustain the level of profitability achieved in the first quarter of 1992, this level of profitability was insufficient to permit the thrift to regain viability in the absence of a significant capital infusion. Tr. 2398:6-2399:2; 2424:9-2425:17 (O'Rourke). Mr. O'Rourke observed that the breach and branch sales had no impact on Carteret's problem assets, which existed because of poor underwriting exacerbated by a worsening of the real estate market in Carteret's primary marketing areas. Tr. 2356:24-2357:5 (O'Rourke).

**B. The Actions Of Supervisory Officials**

111. On October 25, 1991, OTS noted in an "S" memorandum that, even counting goodwill as regulatory capital, as required by an outstanding injunction, Carteret failed the core capital requirement by $81.714 million, the risk-based capital requirement by $99.4 million, and the tangible capital requirement by $3.009 million. PX 4867a at WOP344 0532. OTS noted that "[t]he deterioration of Carteret's capital position is primarily the result of the Savings Bank's unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets." PX 4867a at WOP344 0533. OTS recommended that Carteret be transferred to the RTC because of the bank's existing capital deficiencies and core operating losses. Id. at WOP344 0545-46.

112. OTS delayed transferring the institution because Carteret's management changed in June 1991; OTS decided to accord new management an opportunity to raise outside capital to cure the regulatory capital deficiencies. Tr. 2220:3-9 (Vigna); Tr. 1621:14-1622:5 (Albanese). After five highly sophisticated investment banking firms conducted due diligence and decided not to invest in Carteret, OTS reviewed its recommendation that Carteret be transferred to the RTC.

113. In the November 13, 1992 "S" memorandum recommending transfer to the RTC, OTS Regional Director Angelo Vigna and Regional Deputy Director Robert Albanese noted that Carteret was deficient in tangible capital by $133.171 million, in core capital by $156.997 million, and in risk-based capital by $235.405 million. DX 8124 at FAM002 0533. Even counting goodwill of $139.1 million as regulatory capital, PX 9053a, and adding it to Carteret's core and risk-based capital of -$14 million and -$15.18 million, respectively, Carteret would

have still failed its risk-based requirement ($220.2 million) by $96.3 million and its core capital requirement ($142.95 million) by $17.8 million. DX 8124 at FAM002 0533. (Adding the goodwill to tangible capital of -$61.694 million, the thrift satisfied the minimum tangible capital requirement – $71.477 million – by $5.9 million.) Id. In the memorandum recommending seizure, Messrs. Vigna and Albanese stated: "However, even if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver based on the grounds set forth below [which included the fact that 'Carteret's capital clearly is substantially insufficient']." DX 8124 at FAM 0020538. Thus, Carteret would have been seized in the absence of the breach.

## V. Carteret's Sale Of Assets From 1990 Through 1992

114. Mr. Bianco and Professor Calomiris incorrectly asserted at trial that, in the absence of the breach, Carteret would have retained many non-performing loans until the real estate markets had improved.

115. Mr. Kennedy analyzed loans, REO, and real estate investments representing nearly 77 percent of the total loans Carteret compromised (that is, resolved at less than face value) between July 1, 1991 and September 30, 1992. DX 7000A at 76; DX 9613; Tr. 3258:20-24 (Kennedy). He concluded that Carteret received in excess of $80 million by disposing of these properties which allowed Carteret to "redeploy the assets from nonperforming assets to performing assets, which increase[d] profitability." Tr. 3260:18-21 (Kennedy). Thus, contrary to Mr. Bianco's and Professor Calomiris's contention that Carteret would have benefitted by holding nonperforming assets until markets improved, Mr. Kennedy pointed out that, between

1989 and 1991, Carteret suffered lost interest income of at least $62 million on loans, and negative cash flow of $6.3 million on REO, because these assets were on Carteret's books and were non performing. DX 9614; Tr. 3262:16-3263:11 (Kennedy).

116. Mr. Kennedy noted that Carteret's objective in 1989 was to unwind its commercial asset portfolio by selling off problem assets as promptly as possible to avoid the costs inherent in holding non-performing assets and the risk of a further decline in the market. Tr. 3254:23-2355:7 (Kennedy). As he observed, "[I]f you are unsure whether the market is improving or declining, you could have additional loan losses if you held on, or losses on REO if you held onto the assets versus getting rid of them before the prices decline even further." Tr. 3260:23-3261:3 (Kennedy).

117. By selling nonperforming assets and REO, Carteret improved its regulatory profile because it reduced the amount of classified assets and REO as a percentage of total assets on its balance sheet. Tr. 3261:18-3262:15 (Kennedy). This reduction resulted in an improved risk-based capital profile.

118. Although Mr. Bianco and Professor Calomiris contend many loans sold in 1991 and 1992 could have been retained until markets improved, this assumes that, in the absence of the breach, Carteret would have been able to "time the market." Carteret, however, had no way of knowing when improvements in the market would come about. As Professor Saunders noted, based upon the market value indices presented by Professor Calomiris, Carteret would have had to hold the assets until sometime after 1997 to recoup the principal amount of the loans. DX 5038A at ¶¶ 146-147. As Professor Saunders noted, Professor Calomiris's assumption that Carteret would have known, in 1991 or 1992, that the markets would improve after 1997 is

"sheer fantasy." Id. at ¶ 146.

119. Even if Carteret could have acquired a crystal ball to "time the market," it could not have held many of the loans and REO later than it did. For example, as Mr. Kennedy pointed out, four of the loans resolved at this time were subject to the jurisdiction of a bankruptcy court and, therefore, were subject to that court's orders. Tr. 3264:4-3265:4 (Kennedy). Carteret had no freedom to retain these loans indefinitely as suggested by Mr. Bianco and Professor Calomiris. DX 9615; Tr. 3264:4-3265:4 (Kennedy). One of the loans subject to the bankruptcy court was to General Development Corporation ("GDC"), an affiliate of Ambase's predecessor in interest City Investing Company ("CIC"). On March 16, 1990, GDC pleaded guilty to one count of conspiracy relating to the sale of property on the basis of inflated appraisals, and, on April 6, 1990, declared bankruptcy. DX 7000A at 79-80. Carteret compromised this loan because of uncertainty surrounding the GDC bankruptcy and the risk that it might be forced to continue a line of credit to GDC. Id. Like other such loans, Carteret had no alternative but to accept the compromise of the loan. DX 7000A at 83.

120. Carteret's decision to compromise loans not in bankruptcy proceedings was also prudent given the circumstances. In the cases of the Maitland Property, Shawnee, Sundial Joint Venture, and Tiffany House loans, the restructuring reduced the debt and enabled the borrower to service the loan. DX 7000A at 84. In the case of the Hovbilt loan, a foreclosure would have caused the first mortgage lender to assert its priority interest in the collateral and wipe out Carteret's position. DX 7000A at 83. Therefore, it was a prudent decision to restructure the loan. Id.

121. Mr. Kennedy also reviewed five REO assets sold in this time period (Bayfront

Fiesta Mall; Hightstown Hotel; Interstate Plaza II; The Lakes at Boca Raton; and Moore Estates), which consisted of approximately 76 percent of the total REO sold between July 1, 1991 and September 30, 1992. DX 7000A at 84. All these REO assets were non-earning, and Carteret was incurring expenses to maintain the properties. Id. at 87. By selling the assets, not only was Carteret able to eliminate these costs but also generate cash that could be invested in earning assets. Selling these assets was consistent with Carteret's objective of reducing its commercial asset portfolio. There is no evidence that Carteret expected that the benefits, if any, from potential future appreciation in value outweighed the costs of maintaining the assets. Therefore, Carteret acted prudently in disposing of these assets and would have done so in a "but-for" world as well.

## VI. Ambase's Acquisition Of Carteret Was For Self-Serving Purposes And Did Not Benefit Carteret

### A. Background

122. In 1985, The Home Group, a publicly-owned insurance holding company, had been up for sale for a year, but no purchasers could be found due to its record of poor performance. JX 1 at 361 (Tr. 13:9-16 (Manley)). The Home Insurance Company ("Home"), the Home Group's major subsidiary, was among the worst-performing major property casualty insurance companies in the United States. JX 1 at 363 (Tr. 61:9-12 (Manley)). In 1986, for example, Home lost $197 million in its insurance operations. DX 8000A at ¶ 38; DX 9504. As a result of losses in its insurance business, the company came under pressure to devise a business strategy that would satisfy its investor group. Tr. 2925:12-17 (R. Smith).

123. In March 1985, Marshall Manley became president and a director of The Home Group and chairman of Home. JX 1 at 361 (Tr. 8:5-9 (Manley). The Home Group hired Mr.

Manley to improve the insurance subsidiary, which had performed poorly. DX 8000A at ¶ 37. From 1966 to the mid-1980's, Mr. Manley was counsel to CIC, a conglomerate that had owned The Home Group, as well as CIC's subsidiary Southern California Savings and Loan Association. JX 1 at 360-61 (Tr. 6:16-8:15 (Manley)). Before joining Home, Manley had helped found Merchant Bank of California, JX 1 at 365 (Tr. 132:2-18 (Manley)), which became the target of Federal and state investigations. Mr. Manley also was affiliated with Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, a law firm which declared bankruptcy in the late 1980s. While president and CEO of CIC and president and Chief Operating Officer of Home, Manley was also co-managing partner of Finley, Kumble and received money from the firm during the time Finley, Kumble did work for Home. JX 1 at 361, 365 (Tr. 17:12-16, 133:8-19 (Manley)).

124. Mr. Manley and The Home Group's Board of Directors decided to convert the company into a diversified financial services company. JX 1 at 362 (Tr. 27:15-17 (Manley)); DX 8000A at ¶ 37. Various investment bankers recommended that The Home Group acquire a major savings and loan and recommended Carteret as the most appropriate acquisition. JX 1 at 363 (Tr. 28:16-29:9 (Manley)). Carteret and The Home Group entered into a merger agreement on August 4, 1987. PX 2106 at WOQ675 0016. The Home Group finalized its acquisition of Carteret in August 1988. PX 6202.

125. In addition to entering into a contract to acquire Carteret, in August 1987, The Home Group acquired Gruntal Financial Corp. ("Gruntal"), a second-tier retail brokerage and securities firm, for $145 million. PX 701 at OAM0062052; DX 8000A at ¶ 38; Tr. 2925:18-19 (R. Smith).

126. Mr. Manley expected that Carteret, Gruntal, and other financial services companies would maintain value for The Home Group's shareholders in times when its main subsidiary, Home, fared poorly. JX 1 at 364 (Tr. 71:16-72:10 (Manley)).

127. After the acquisition, The Home Group's primary asset continued to be Home. PX 302 at AM005100; PX 801 at C-AM-A-0395816; Tr. 155:12-18; 379:5-13 (Bianco); DX 5038A at ¶ 121. In 1987, The Home Group derived 96 percent of its revenues from insurance services. PX 401 at C-AM-A-0394683. In 1989, even after the acquisitions of Carteret and Gruntal, insurance services made up the vast majority of The Home Group's revenues. PX 401 at C-AM-A-0394683; Tr. 378:17-379:17 (Bianco).

128. The Home Group changed its name to Ambase Corporation on May 19, 1989. PX 801 at C-AM-A-0395816.

129. Because Ambase needed to do something to save its business, it was willing to overpay to acquire Carteret and assume the risks it knew were present in Carteret's real estate portfolio. DX 8000A at ¶ 42 (Report of R. Smith). The acquisition was "strategically impulsive[,] . . . overpriced[,] [a]nd . . . naïve." Tr. 2937:9-10 (R. Smith).

130. In 1987, Ambase agreed to pay $291.9 million in cash, 9.45 times the expected fully-diluted 1987 earnings and 92 percent of year-end book value. DX 8000A at ¶ 39. Prior to the announcement, Carteret was trading at $15.25 per share, 6.4 times 1987 earnings per share and 62 percent of its 1987 book value. DX 8000A at ¶ 39. Although Carteret's shares were trading at $15.25 prior to the announcement, Ambase offered $22.50 per share. DX 8000A at ¶ 39. Ambase thus agreed to pay a price for Carteret's shares that was 47 percent higher than the market price in order to gain the right to control the company. Tr. 2926:17-23, 2927:20-25 ®.

Smith). This "control premium" of 47 percent was well above the average control premium at that time and indicated the risks Ambase was willing to undertake to acquire Carteret. Tr. 2926:15-2927:3 (R. Smith).

131. On October 19, 1987, two months after Home began its efforts to acquire Carteret, the New York Stock Exchange's ("NYSE") Dow Jones Industrial Average fell by 508 points, or more that 20 percent. DX 8000A at ¶ 40. Soon thereafter, Carteret was trading at $11 5/8 per share and Home, at $14.50 per share, was approximately $4 down from the $18.50 per share it traded at when the merger was announced. Id. Home sought to renegotiate the deal, and Carteret filed suit in Delaware to force Home to complete the merger. Id.; PX 101 at C-AM-A-0395310. In January 1988, the parties agreed to a new price of $19.00 per share. PX 2612 at FAM0010006; Tr. 2927:2-18 (R. Smith). The purchase price was conditioned upon Carteret acquiring from Ambase Imperial Premium Finance ("IPF") for $65 million. DX 5038A at ¶¶ 47-48. IPF was a specialty insurance firm. This meant that Ambase's cash outlay for Carteret was $201 million. DX 9703. In other words, Ambase required Carteret partially to finance Ambase's takeover of Carteret. PX 2612 at FAM001 00010. Home received an option to acquire 18.5 percent of Carteret (which it exercised for $11.9 million to deter others from bidding on Carteret), and Carteret was given 30 days in which to seek a better offer. DX 8006 at WOR781 1021. No better offer emerged. DX 8000A at ¶ 40; PX 1611 at WOQ699 1023. Ambase and the FHLBB entered into a Capital Maintenance Agreement ("CMA") providing that Ambase would contribute up to $50 million to Carteret if Carteret was unable to comply with minimum regulatory capital requirements. Ambase I, 58 Fed. Cl. at 37.

132. By the time Ambase and Carteret renegotiated the terms of the acquisition

agreement, Carteret's loan losses were becoming evident. Peat Marwick, which conducted a due diligence in 1987, warned Ambase about the risks of Carteret's corporate and commercial real estate portfolios. PX 4804 at AM00089630; DX 8000A at ¶ 32; see also Tr. 2937 (R. Smith). Peat Marwick advised Ambase that "the commercial lending and commercial real estate portfolios represent a relatively high degree of prospective risk for Carteret[.]" As factors contributing to the risk, it highlighted "[t]he rapid growth in these portfolios over the past four years" and "[a] credit process which has not been fully developed in the planning and monitoring segments." PX 4804 at AM00089630. Peat Marwick also focused on the need for "increased investments in people and processes" and the establishment of "[f]ormalized credit planning and strategy to specify risk limits[.]" Id. Ambase chose to acquire Carteret despite the risks identified in KPMG Peat Marwick's due diligence.

133. In addition, through continued due diligence, Ambase "would have seen the increase in the problems of the lending portfolio . . . [and] would have seen that the interest from lending operations had declined substantially from 1987 to 1988 . . . ." Tr. 2937:19-23 (R. Smith); DX 8000A at ¶¶ 41-42. Ambase's shareholders, however, demanded action to improve the company's share price, and Ambase hoped access to Carteret's low-cost deposits could reverse Ambase's losses. Tr. 2937:12-17 (R. Smith); DX 8000A at ¶ 42 ("[T]hey bought it in a rush . . . with the idea that they could benefit from the leverage . . ."). Further, Ambase planned to take cash from Carteret to reinvest in Ambase. Tr. 2938:8-12 (R. Smith).

134. When it presented its change in control application to the FHLBB, Ambase represented that it had "a standing obligation to support the solvency and business success of all its subsidiaries" and that it would ensure that Carteret would meet regulatory capital

requirements by using its financial resources to supplement Carteret's internally-generated earnings. PX 2614 at ODD0120414; DX 8000A at ¶ 41 n.36. After the acquisition, contrary to the representations to the FHLBB, Ambase did not become a potential source of capital for Carteret, but, instead, began draining its new capital-strapped subsidiary of cash. DX 8000A at ¶ 41 n.36; Tr. 2926:1-14 (R. Smith).

### B. Ambase Interfered With Carteret's Business And Wasted Carteret's Capital By Entering Into Unsound Employment Contracts And Engaging In Unsound Business Practices

135. Ambase was not a useful owner and interfered with Carteret's business, requiring Carteret to purchase IPF, enter into transactions with Gruntal, and make management fee and dividend payments to Ambase. DX 8000A at ¶ 46; PX 2110 at WOQ698 1441. OTS and FDIC examiners recognized in 1989 that Ambase was weakening Carteret. Tr. 1456:11-1457:24 (Day).

136. Ambase acquired IPF, which provided premium financing for commercial insurance lines, in December 1986. PX 2110 at WOQ698 1496; DX 8054 at WOQ699 0511. On August 9, 1988, only four days after being acquired by Ambase, Carteret purchased IPF from Ambase for $65 million in cash. PX 2110 at WOQ698 1498. This purchase price was $11 million greater than the Home Group's historical cost for IPF, and this excess was charged directly to Carteret's capital. DX 8054 at WOQ699 0511; PX 2106 at WOQ675 0016. By 1990, however, Carteret recognized that it had no effective "synergies" with IPF and offered it for sale. PX 2110 at WOQ698 1498; PX 1905 at C-AM-A-0264645.

137. Immediately following the acquisition, Ambase also caused Carteret to repurchase $11.9 million of Carteret stock that Ambase had acquired prior to the merger. PX 7 at FAM002 1873. In addition, within just two months of its acquisition by Ambase in August 1988, Carteret

paid its new owner a $13 million dividend. DX 8054 at WOQ699 511; PX 1001 at AMB013967. Including the $11 million Carteret paid Ambase over IPF's historical cost, Ambase received $35.9 million from Carteret at a time when Carteret's net income for the year ended September 30, 1988 was only $20 million. DX 8054 at WOQ699 511; PX 2106 at WOQ675 0016. Thus, Ambase forced Carteret to effectively pay over $35 million in dividends at a time when the bank was extremely capital constrained. PX 2110 at WOQ698 1441.

138. In addition, Ambase forced Carteret to pay an annual "management fee" of $2.5 million to Ambase. DX 9504; PX 2106 at WOQ675 0016; PX 2110 at WOQ698 1441. After the 1989 examination, OTS ordered Ambase to reimburse this fee because the services provided by Ambase were ambiguous and undocumented, and because Carteret could ill afford to relinquish capital. PX 2106 at WOQ675 0017; PX 2110 at WOQ698 1441.

139. Ambase also required Carteret to enter into transactions with Gruntal, another of Ambase's subsidiaries. These transactions were not adequately documented and came at Carteret's expense. PX 2110 at WOQ6981498; PX 2109 at KH054204. OTS examiners concluded in 1989 and 1990 that management did not adequately document the securities transactions because, despite investment policy guidelines requiring at least three competitive bids, no documentation was kept. This indicated that Gruntal's transactions with Carteret may not have been on the same terms as transactions with non-affiliated entities. PX 2109 at KH054227; PX 2110 at WOQ698 1498.

140. In 1990, Ambase required Carteret to make an advance of $2.1 million to Chairman O'Brien against his accelerated retirement benefit. This enabled Mr. O'Brien to repay a mortgage he held with a Home subsidiary. DX 8000A at ¶ 43; PX 2111 at C-AM-A-0320829-

30. The advances were not approved by Carteret's Board of Directors, were not approved by OTS, were outside the scope of Mr. O'Brien's employment contract, and were not disclosed to OTS examiners in the course of the 1990 examination. PX 2111 at C-AM-A-0320829-30. OTS's examiner concluded that the advances constituted "blatant regulatory violations." PX 2111 at C-AM-A-0320829.

141. In total, Ambase drained $100 million in cash from Carteret between 1988 and 1989. Tr. 2926:1-5 (R. Smith). Regulators noted that Carteret's management was influenced by the financial problems at Ambase. PX 2110 at WOQ698 1505. Between the end of 1989 and the end of 1991, under pressure from the OTS, Ambase gradually returned $62.5 million to Carteret. Tr. 2926:5-10 (R. Smith); DX 7306 at OAM004 0062 (stating that Ambase made a capital contribution to Carteret of $20 million in December 1989); DX 8011 at PAM003 1540-41 (describing a $30 million payment required by the Consent Agreement with the OTS and made by Ambase). As Professor Smith noted, draining capital from Carteret and then replacing only a portion of it "wasn't very beneficial to a company [Carteret] which, obviously, was suffering from capital problems of its own." Tr. 2926:1-14 (R. Smith); see also DX 8011 at PAM003 1541.

142. In January 1990, Ambase, on behalf of itself and its subsidiaries, including Carteret, entered into Severance Agreements with nine Carteret executives and senior officers providing that, in the event Ambase changed control, the employees would receive (i) continued employment and benefits, or (ii) a lump sum payment in excess of three times base salary and bonus. DX 9122 at WOR081 0285-86. The obligation to fund these Severance Agreements was undertaken by the "Company[,]" which is defined as "Ambase 'and its [s]ubsidiaries'[.]" Id. at

WOR081 0286. Ambase solicited and approved these agreements and litigation to enforce the agreements was prosecuted against Ambase only. Id.; see PX 2702A at 88 n.165. The change in control that prompted the litigation under the agreements related to the Bianco group taking control of Ambase in 1990.

143. In addition, Carteret paid $875,000 in bonuses to certain senior officers pursuant to action taken on September 30, 1990, by the Compensation Committee of Carteret's Board of Directors. PX 4860 at WOP344 0604. OTS noted that "Carteret's board knew, or should have known, that Carteret's financial condition was rapidly deteriorating at the time when it took the extraordinary measures necessary to approve the bonuses." PX 4860 at WOP344 0605; Tr. 426:3-13 (Bianco). OTS concluded that, given Carteret's financial deterioration, increasing level of criticized assets, and regulatory capital deficiency, the payment of bonuses in 1990 was an unsafe and unsound practice and violated 12 C.F.R. §563.161(b) (1992). PX 4860 at WOP334 0605; Tr. 426:14-25 (Bianco).

144. Professor Calomiris claimed that the transaction costs related to the cease-and-desist actions were causally related to the breach; however, OTS Regional Director Angelo Vigna rejected this assertion, stating that even if goodwill were counted, Carteret would still have been undercapitalized and the OTS would have taken the same action. Tr. 2201:7-2202:24 (Vigna). Mr. Vigna testified that the enforcement action was warranted due to Carteret's unsafe and unsound condition. Tr. 2202:25-2203:6 (Vigna).

145. Beginning in 1990, at the direction of then CEO Robert Walsh, Carteret issued letters to several officers in the loan workout area granting them "stay bonuses." Carteret issued stay bonus letters to 12 employees, providing for approximately $550,000 in total payments. DX

9122 at WOR081 0286. The stay bonus letters constituted employment contracts which should have been, but were not, approved by Carteret's Board. Id. Slightly less than $100,000 was actually paid out before OTS directed Carteret not to make any further payments. Id. In 1992, three former Carteret officers sued Ambase in state court to collect the unpaid bonuses. They withdrew their suits after OTS informed them that the stay bonus letters violated OTS regulations. Id. at WOR081 0286-87.

146. In March 1990, certain Ambase officers (Jack R. Plaxe, Bruce W. Bean, Lester J. Mantel, Robert L. Woodrum, and Theodore A. Babcock) entered into severance agreements with Ambase. The severance agreements were authorized and approved by the Board of Directors and CEO Manley. DX 394. On December 28, 1990, the Directors and Manley authorized Ambase to pay, and Ambase did pay, $5,299,849 to the officers pursuant to the severance agreements. Id. Additionally, on or about January 31, 1991, the Board authorized Ambase to pay, and Ambase did pay, approximately $3,000,000 to Mr. Manley. Ambase also forgave Mr. Manley's $4,000,000 debt to Ambase. Id. at AM00014788 and AM00014791. At the time Ambase made these payments, Ambase owed $30 million to Carteret under the CMA and had an agreement to indemnify Carteret if Carteret sold IPF prior to August 8, 1991, for less than $65 million. Ambase lacked capital and the severance payments substantially reduced its ability to pay $30 million to Carteret or indemnify Carteret in the event of a sale of IPF.

147. On February 14, 1991, OTS issued a Notice of Charges on Temporary Order to Cease and Desist against Ambase and its Directors alleging that payments to Mr. Manley and other officers were unsafe and unsound banking practices. DX 394. OTS also filed a complaint for prejudgment attachment to enforce the Temporary Order to Cease and Desist. The U.S.

District Court for New Jersey granted this motion. On April 25, 1991, OTS, Ambase and its Directors entered into a settlement agreement with OTS. The agreement provided that OTS would withdraw the Notice of Charges and voluntarily dismiss the district court action in return for Ambase's commitment to (1) acquire IPF from Carteret for the greater of the appraised value or $65 million; and (2) immediately deposit $12.5 million in escrow which would be forfeited if Ambase was unable to close the transaction by August 9, 1991. PX 5271. Despite receiving a series of enlargements of time from OTS, Ambase was unable to close the transaction and forfeited the $12.5 million on deposit with Carteret. Id.

148. Ambase also misused Carteret's capital by engaging the thrift in transactions with GDC, a real estate developer that became the subject of a series of civil lawsuits and criminal investigations. PX 2109 at KH054208; PX 403 at CAM402 0335; Tr. 433:16-434:18 (Bianco). GDC had been a subsidiary of CIC, and GDC's Board of Directors included four members of Ambase's Board of Directors (George Scharffenberger, Edwin Hatch, Eben Pyne, and Marshall Manley). PX 2109 at KH054208.

149. Following Ambase's acquisition of Carteret, Carteret was required to purchase $68 million of mortgages from GDV Financial Corp. ("GDV"), a subsidiary of GDC, without the required appraisals. Id. OTS examiners reviewing the appraisals concluded that they were fraudulent and that, because of the questionable value of the collateral, the entire $68 million loan package "contains a significant threat of untimely and insufficient liquidation and therefore is classified Substandard." Approximately $8.3 million of the loans were classified as doubtful. Id. at KH054208, KH054251; PX 2110 at WOQ698 1467. The OTS examiners concluded that Ambase directors Scharffenberger, Hatch, Pyne, and Manley would have had knowledge of the

GDV's policies and procedures in improperly appraising loans, but nonetheless forced Carteret to purchase the loans. PX 2109 at KH054208. The loans were classified by the examiners.

150. Carteret also participated in a $175 million revolving credit agreement with GDC that was classified as 100 percent doubtful by OTS and FDIC examiners based on the uncertainty of the homeowners' lien positions and the ultimate liquidation value of the company's assets. PX 2109 at KH054269; PX 2110 at WOQ698 1466-67 (FDIC 1990 ROE).

151. Even more noteworthy was Carteret's extension of a $1 million real estate loan to David F. Brown, Chairman of GDC, without observing any of its normal underwriting standards, apparently at the direction of Mr. Manley. PX 2110 at WOQ698 1496. Regulators noted the "unclear connection" between Ambase, Carteret, and GDC. PX 2110 at WOQ698 1441.

**C. Ambase Was Unable To Assist Carteret As Required By The CMA**

152. As early as 1989, OTS examiners recognized the likelihood that Ambase would be incapable of infusing Carteret with capital as expected. PX 2106 at WOQ675 0059-60. In 1990, the FDIC examiners recognized that Ambase, the "only reasonable source" of a substantial capital infusion, would likely fail to provide assistance "as Ambase has other financial problems which have placed its own future in jeopardy." PX 2110 at WOQ698 1434. Ambase's 1991 OTS ROE again recognized the holding company's serious financial difficulties and its inability to provide Carteret with any assistance. DX 8053 at WOP774 2544.

153. In fact, Ambase had a loss of $1.02 billion in 1990. Tr. 421:4-10 (Bianco); PX 802 at AMB030273. Under pressure from OTS, Ambase later replenished $62.5 million of Carteret's capital, but this was far less than the $100 plus million it took out of Carteret. Tr. 2926:11-14 (R. Smith); DX 9504. Indeed, by the time Ambase made its capital contributions to

Carteret, Carteret was already insolvent as a result of the massive losses it reported in its real estate portfolio in 1990 ($131.8 million) and 1991 ($160.3 million). DX 8000A at ¶ 55.

## VII. Carteret's Real Estate Losses Precluded It From Raising Capital To Cure Its Insolvency

154. Carteret was a troubled and, relative to its peers, worse-than-average thrift. Consequently, it could not have raised the capital that it needed with or without the inclusion of supervisory goodwill in capital. Tr. 2985:21-2986:22 (R. Smith); DX 9518.

155. Prior to the recognition of massive losses in its corporate and commercial real estate portfolios, Carteret might have been able to raise capital. Tr. 2945:18-2946:20 (R. Smith). From February 1990 until February 1991, however, Ambase was distracted by the difficulties in completing the sale of its insurance operations and other issues that caused it to report a $1 billion loss in 1990. DX 8000A at ¶ 46 n.44. Further, Ambase did not foresee the need for Carteret to raise capital between August 1988 and August 1989 and was distracted by the realignment of its operations. Id. From August 1987 until Ambase had completed its acquisition of Carteret, the bank was virtually prohibited from accessing the capital markets for a new stock issue because Ambase did not want Carteret to issue more shares that Ambase would be required to repurchase or tolerate as a problematic minority interest after its acquisition. Id.

### A. By 1991, Carteret Was Unable To Access The Public Capital Markets Due To Its Loan Losses, The Poor Quality Of Its Portfolio, And Its Own Auditor's Concerns About Its Viability

156. By 1991, Carteret had begun reporting losses and its auditor, KPMG, issued a qualified opinion as to its viability as of the end of 1990. Tr. 2947:5-2949:9 (R. Smith); PX 802 at AMB030271-030272. In the opinion, Carteret's auditors expressed uncertainty about whether

Carteret could comply with regulations in the future and continue as a going concern. Tr. 2947:12-24 (R. Smith); PX 802 at AMB030271-030272. The qualified opinion in 1990 was based upon Carteret's loss reports and its substandard capital position. PX 802 at AMB030271. The opinion would have been qualified because of Carteret's loss reports even if goodwill had counted as regulatory capital. PX 802 at AMB030271. At this point, any public offering by Carteret would have required the SEC's approval. The SEC, however, likely would have rejected any proposed offering due to the agency's customary concerns about qualified opinions. Tr. 2948:5-13 (R. Smith). A firm like Carteret, therefore, could not access public capital markets at this time without a "clean" auditor's opinion. Tr. 2947:5-10 (R. Smith). Even if the SEC did not reject the offering, to protect investors, the SEC would have required an extensive amount of additional disclosures about the operating losses and the quality of assets. Tr. 2948:12-20 (R. Smith).

157. If Carteret had attempted a public offering, its underwriters would have been required to report the poor condition of the bank's loan portfolio in a public filing with the SEC, which would have caused investors to shun the offering. Tr. 2948:21-2949:9 (R. Smith); DX 9507. The requirement that information revealing its true economic condition be disclosed would likely dissuade underwriters from taking on the offering in the first place. Tr. 2948:21-2949:9 (R. Smith); DX 9507.

### B. Problems Faced By Other Thrifts Demonstrate That Carteret Would Have Been Unable To Raise The Needed Amount Of Capital

158. Between 1989 and 1992, two hundred and eighty-one thrifts were approximately Carteret's size, and twenty-eight were much larger. Tr. 2964:19-21, 2965:23-2966:5 (R. Smith);

DX 9510. During this time, only seventeen of these thrifts obtained equity financing of more than $20 million. Tr. 2964:9-15 (R. Smith); DX 9509. All were public offerings except one. DX 9510. The large number of thrifts that did not receive any financing demonstrates the high quality standards that the market imposed to determine which thrifts would receive financing. Tr. 2966:6-10 (R. Smith). It was a difficult time for all thrifts to raise capital because of the widely understood problems in the industry. Tr. 2965:14-16 (R. Smith); DX 9510.

159. Carteret converted from a mutual to a stock thrift in 1983 and solicited investments through a public offering. Given that it had already conducted an initial public offering ("IPO"), Carteret could only offer stock pursuant to a follow-on offering. Tr. 2968:15-21 (R. Smith). Setting aside one issue of $75 million in December 1992, after Carteret failed, the thrifts that were able to raise capital through follow-on public offerings raised only $27 million on average, Tr. 2969:20-2970:12 (R. Smith); DX 9511, and the largest was $36 million. Tr. 2969:24-2970:5 (R. Smith); DX 9511. Seven of the fifteen issues were by thrifts that were much larger and better capitalized than Carteret. DX 9511. Furthermore, indicators of economic health – such as non-accrual loans plus real estate owned as a percentage of total assets, and net income after provisions for loan losses as a percentage of total assets – demonstrate that the thrifts that were able to complete follow-on offerings were initially much healthier than Carteret. Tr. 2970:13-2972:8 (R. Smith); DX 8000A, Exh. 4, Table 2; DX 9514. For example, although Sterling Savings Association, which raised $20.6 million in a follow-on offering, had non-accrual loans and real estate owned equivalent to approximately two percent of total assets, Carteret had over three times that, at 6.27 percent. DX 9512. Thus, it was unlikely that Carteret could have raised capital, but even if it had, it would have raised no more than $36 million,

which was insufficient to cure the thrift's capital deficiency in 1992 and ward off the inevitable insolvency. Tr. 2970:6-12 (R. Smith); DX 9511.

160. Goodwill would not have improved Carteret's ability to raise capital because investors would have discounted it from the balance sheet, understanding that it was not the same as cash capital. Tr. 2967:19-2968:14 (R. Smith). Furthermore, investors would consider the thrift's economic health, not its goodwill situation. Tr. 2968:6-14 (R. Smith). In addition, had supervisory goodwill been included in regulatory capital, Carteret still would have been in far worse shape than Sovereign Bank, FSB, the weakest of the thrifts that managed to conduct a follow-on offering for over $20 million. Tr. 2973:21-2974:15 (R. Smith); DX 9513.

161. The inclusion of supervisory goodwill in capital would not have affected three key measures of performance: net income to total assets, income before gain on sales of assets to total assets, and net interest income after loss provisions to total assets. Therefore, even in the "but-for" world, Carteret would have been significantly inferior to other thrifts with regard to these measures. Tr. 2976:14-22 (R. Smith); DX 9514.

162. Even before Carteret recognized the losses in its commercial and corporate portfolios, it would have been difficult to raise enough capital to regain compliance with minimum regulatory capital requirements. DX 9516. During this period, among the large thrifts that did not raise capital, Carteret ranked in the lowest third or fourth quartile in each quarter in significant measures such as net interest income after loan loss provisions to total assets, and the ratio of non-accrual loans plus real estate owned to total assets. These measures of performance would have been no different if supervisory goodwill had counted as regulatory capital. Tr. 2981:7-2982:10 (R. Smith); DX 9516; DX 8000A, Exh. 4, Table 3. Therefore, Carteret would

have had little chance of accessing the capital markets between 1989 and 1992. Tr. 2977:7-14 (R. Smith).

**C. Carteret's Experience Demonstrated That It Could Not Raise Private Capital**

163. At a September 30, 1991, meeting with the OTS and FDIC, Mr. Bianco and Carteret's CFO, Donald Kramer, acknowledged Carteret's need for recapitalization and proposed a Capital Plan that would include raising $150 million in external capital from a third-party investor by September 1992. DX 8124 at FAM002 1081. OTS's Northeast Regional Office rejected the Capital Plan. On October 25, 1991, the regional office sent an "S" memorandum to the OTS Washington office recommending appointment of a receiver for Carteret. DX 8124 at FAM002 1081. Carteret was scheduled to be seized by the RTC on November 15, 1991. DX 8124 at FAM002 1081.

164. On November 11, 1991, Carteret informed the OTS of a potential unassisted acquisition by American Stock Transfer and Trust Company that would include capital augmentation of $150 million. DX 8124 at FAM002 1081. OTS postponed RTC intervention based upon this possible acquisition. DX 8124 at FAM002 1081.

165. Carteret needed to raise $200 million in order to regain solvency. Tr. 2950:3-9 (R. Smith). Mr. Vigna testified that OTS did not tell Mr. Bianco and other members of the group that acquired Ambase (Caribe Investment Group) that only $100 or $150 million in capital was needed. Tr. 2197:9-2198:16 (Vigna).

166. In February 1992, Carteret retained Kidder Peabody and Merrill Lynch as investment bankers to advise it in identifying investors to make a private placement of equity.

Tr. 2949:16-19 (R. Smith). Kidder Peabody and Merrill Lynch searched extensively among qualified investors, but were unable to close a deal. Tr. 2949:16-2954:7 (R. Smith). The investors understood that investing in a thrift that might be seized was risky. Therefore, a thorough due diligence would be required to be sure that the RTC would not seize the institution. Tr. 2950:3-13 (R. Smith).

167. Although Kidder Peabody informed Carteret that "[i]f we accept what you say about a $30 million annual earnings run rate, then the 150 million capital raising target is feasible[,]" DX 49 at WOT692 1487, Mr. Bianco testified that Carteret never came close to a $30 million annual earnings run rate. Tr. 335:15-19 (Bianco).

168. On August 29, 1991, Mr. Bianco advised the personnel committee of Ambase's Board of Directors that he believed Carteret needed approximately $150 million in new capital, although OTS was asking Carteret to raise significantly more than $150 million. PX 3423; Tr. 577: 9-14 (Bianco). Mr. Bianco proposed that he and CFO Kramer be paid a commission of three percent of the amount of capital raised in order to provide an incentive for them to seek to raise the capital. Tr. 577:24- 579:2 (Bianco). The Ambase personnel committee unanimously passed a resolution providing that Mr. Bianco and Mr. Kramer would receive three percent of the amount of capital they were able to raise for Carteret. PX 3423.

169. Ambase's investment bankers contacted approximately 150 potential investors, but only approximately 10 to 15 investors undertook a second stage investigation to determine whether to invest in Carteret. DX 61; Tr. 583:4-16 (Bianco). Only three groups emerged from the second stage to indicate they might present a bid on Carteret, with one, Kohlberg & Co. ("Kohlberg"), clearly in the lead. DX 61; Tr. Tr. 584: 8-20 (Bianco). Any bid was to be

conditioned upon a third party evaluation of the commercial assets portfolio, a standard acquisition audit by an unaffiliated accounting firm, and the completion of the OTS and RTC examinations. DX 61.

170. Carteret's management projected that there would be no goodwill created as a result of the Kohlberg investment, which would be accounted for under the purchase method of accounting. PX 2118 at WOQ6730059. Management projected that the market value of assets would exceed the market value of liabilities by enough of a margin to offset the write-off of all goodwill and other intangible assets. Id. In essence, the market value of Carteret would be zero at acquisition and the investment would enable the firm to comply with then applicable regulatory capital requirements. Id.

171. On February 27, 1992, Carteret's Board of Directors entered into a Consent Agreement with OTS. Carteret consented to OTS's placement of the institution in the RTC's Accelerated Resolution Program in the event that efforts to effect an unassisted recapitalization were not progressing in a manner acceptable to OTS within 90 days of the date of the agreement. DX 8124 at FAM002 1081.

172. In addition to Kohlberg, the groups pursuing a possible investment in Carteret as of July 15, 1992, were Forstman, Little & Co. and First Fidelity Bancorp. DX 61. Although Ambase offered to contribute Carteret to First Fidelity in return for a percentage of the upside if the recapitalized thrift were successful, First Fidelity declined to invest in Carteret. Tr. 585:14-19 (Bianco). Forstman, Little & Co. also declined to invest. Tr. 585:1-3 (Bianco).

173. On July 20, 1992, Kohlberg signed a letter of intent with Carteret to invest $200 million in return for 90 percent of the equity of Carteret. DX 62; Tr. 579:3-9 (Bianco). This

meant that Kohlberg valued its 90 percent interest in Carteret at $200 million and Ambase's remaining 10 percent interest at approximately $22 million. Tr. 580:1-14 (Bianco). In addition, the letter of intent allowed Ambase or members of management to invest additional funds in return for equity shares in Carteret. DX 62. Mr. Bianco testified that he and Ambase would invest an additional $25 million and would collectively own 20 percent of Carteret, while Kohlberg would own approximately the remaining 80 percent of Carteret. Tr. 590:13-591:3 (Bianco).

174. Kohlberg withdrew its letter of intent on August 14, 1992, after four weeks of due diligence. DX 62; DX 8124 at FAM002 1082; DX 9508; Tr. 2951:9-2953:2 (R. Smith). Kohlberg did "significant studies of Carteret[,]" Tr. 301:21-302:11 (Bianco), and also retained the services of LZO to perform due diligence, although Ambase paid for LZO's work. DX 8124 at FAM002 1082; Tr. 2951:12-14, 2952:11 (R. Smith); Tr. 591:19-24 (Bianco). Although Mr. Bianco testified that he "didn't think much of the analysis" done by LZO, Tr. 302:12-25 (Bianco), Professor Smith testified that the two principal owners of Kohlberg were "very serious investors who would not retain somebody if they weren't going to listen to them," and "would pick somebody they thought would be able to root out what they would need to know about the interior operation of this S&L." Tr. 2952:11-20 (R. Smith).

175. LZO identified four areas of concern, including concerns regarding high interest rate risk exposure, questions as to the carrying value of purchased mortgage servicing rights, and questions about the amount of time that it would take to liquidate Carteret's commercial real estate and related asset portfolios. DX 8124 at FAM002 1083. LZO believed that the holding period for the remaining commercial real estate portfolio would be substantially longer than

Carteret's projections. DX 8124 at FAM002 1083.

176. Kohlberg's unwillingness to invest resulted from "Carteret's $502.2 million in nonperforming loans and REO (9.6 percent of total assets at June 30, 1992), possible overvaluation of purchased mortgage servicing rights, possible additional losses on the commercial loan and real estate owned portfolios, and lack of support for Carteret's financial assumptions and projected earnings." DX 8124 at FAM002 0532

177. After Kohlberg withdrew, other investors who had been affiliated with Kohlberg, including U.S. West, Pennsylvania Teachers Association and Rosedev Corporation, reviewed due diligence materials and also decided not to invest. Tr. 594:13-23 (Bianco). On October 19, 1992 Ambase announced that it had signed letters of intent with the Carlyle Group and Colony Capital ("Carlyle Group"). Tr. 593:5-22 (Bianco); DX 9120. The letter of intent proposed an investment of $200 million in Carteret in exchange for an 80 percent interest in the association. Tr. 1664:5-12 (Albanese); DX 8124 at FAM002 0532. On November 11, 1992, OTS received verbal notification that the Carlyle Group was withdrawing its conditional letter of intent because, following due diligence, it concluded that it could not receive an adequate rate of return on its investment and had concerns about "regulatory risk." DX 8124 at FAM002 0532. The concerns about "regulatory risk" related to whether, following the investment, the firm would be sufficiently well-capitalized going forward given the risk of additional losses in the commercial asset portfolio and other operational risks. Tr. 2953:24-2954:12 (R. Smith). Investors needed to be confident that the investment would solve Carteret's economic problems regardless of Government forbearances. Tr. 2961:23-2962:5; Tr. 2950:14-19 (R. Smith).

178. Kohlberg and The Carlyle Group were sophisticated investors who would have

provided funds had they believed that they could earn a reasonable return. Tr. 2953:10-19 (R. Smith). The fact that they withdrew letters of intent to make an investment showed that they each were inclined to go forward with an investment prior to learning more about Carteret's economic situation through due diligence. Tr. 2953:24-2954:7 (R. Smith). They each decided not to invest because of uncertainties in Carteret's balance sheet and its proven record of losses. Tr. 2953:10-19 (R. Smith). Investors stayed away from Carteret in 1991 and 1992 not because of regulatory capitalization problems caused by the breaching provisions of FIRREA, but because of the ongoing difficulties in Carteret's loan portfolio, and serious questions posed by the business plan submitted by Carteret management. DX 8000A at ¶ 63. Professor Smith found no evidence that either Kohlberg or Carlyle declined to invest in Carteret because of FIRREA's provisions regarding goodwill. Id. He also found no evidence that any other investor group would have invested in Carteret but-for the breaching provisions of FIRREA. Id.

179. First Gibraltar Savings and PNC Financial Corp. ("PNC") also performed due diligence, but they decided not to invest because of the uncertainties related to Carteret's balance sheet and uncertain future prospects. Tr. 2238:10-2239:7 (Vigna); PX 5281; DX 9508.

180. Investors' opinions of Carteret would not have changed if it had reported goodwill on its balance sheet. Tr. 2967:23-2968:14 (R. Smith). Investors care about the potential of the firm to earn profits, and goodwill was irrelevant to this conclusion. Tr. 2217:16-2218:16 (Vigna); Tr. 2953:8-19; 3768:1-6; 3814:24-3815:10 (R. Smith).

181. These potential investors were extremely sophisticated and knew of the regulatory risk before they examined Carteret's books. Tr. 2950:3-13, 2961:10-13 (R. Smith). They would not expect the government to be generous or conciliatory, but, would determine whether or not to

invest solely upon Carteret's future prospect as a viable financial institution. If investors were comfortable with Carteret's prospects following the investment, they would not worry about Government regulation. Tr. 2961:23-2962:4 (R. Smith). They found through due diligence, however, that their investment would not be sufficient.

182. The potential investors understood that a $200 million investment was required to cure Carteret's capital deficiency and bring it back into compliance with regulatory requirements. Tr. 2950:3-13, 2954:8-12 (R. Smith). Although they were initially willing to make this investment, the risks found in Carteret's books convinced them that they could not get the returns that they sought. Tr. 2954:13-22 (R. Smith).

183. Mr. Bianco testified that both Carteret and its possible investors faced a "very difficult commercial real estate environment" and a "very, very difficult economic environment." Tr. 162:13-14, 253:19-22 (Bianco). Mr. Bianco also testified that the United States was "in a recession or about to go into a recession" in 1991 and 1992. Tr. 162:12-14 (Bianco). Carteret, therefore, "had to kind of convince investors to make an investment in a company that was stagnant at best and operating in a very difficult economic environment[.]" Tr. 162:8-12 (Bianco) (emphasis added).

184. The restriction OTS placed on Carteret's payment of dividends would not have affected potential investors because they would have realized it would have stemmed from Carteret's lack of profitability. Tr. 2957:6-19 (R. Smith). As Carteret did not have the capital to pay dividends anyway, the restriction had no real effect. Tr. 2957:10-19 (R. Smith). The inability to pay dividends was based on Carteret's economic condition, more than regulatory constraints. Tr. 2958:18-20 (R. Smith). The issue for investors was whether, following the

investment, Carteret would be able to earn a return sufficient to enable it to pay dividends. Id.

185. Furthermore, investors would not expect Carteret to pay dividends when it was not meeting its regulatory capital requirements. Tr. 2958:20-25 (R. Smith).

186. In addition, investors like Kohlberg and The Carlyle Group care much more about the capital gains they can obtain by selling the stock of an improved business than any dividend income they might receive. Tr. 2959:22-2960:11 (R. Smith).

### D. Regulators Did Not Pressure Potential Investors To Act Prematurely And Did Not Warn Them That Carteret Could Not Be Successful

187. Mr. Vigna stated that the regulators' response to Carteret's troubles was "tough but fair." Tr. 2206:2 (Vigna). Mr. Vigna emphasized that Carteret was

> an institution that had very serious problems and an unsafe and unsound position to operate and needed outside capital. And, you know, demanding the capital, if it was possible, was I think our responsibility. You can label it tough, but I think from both sides, you know, they knew that they had to get capital, so asking for capital or asking them to go out and try to find capital I don't think was an unreasonable request.

Tr. 2206:5-14 (Vigna).

188. Mr. Vigna noted that, as of January 4, 1991, Carteret was in an "unsafe and unsound condition." Tr. 2194:5-8 (Vigna). As a result of the 1990 examination, in which OTS required that Carteret book sufficient reserves to cover the risk of loss in its commercial loan portfolio, Carteret fell out of regulatory capital compliance. DX 8124 at FAM002 1075. OTS made numerous requests of Ambase to immediately infuse $30 million into Carteret pursuant to the CMA. PX 4867a at WOP3440536; Tr. 2193:18-23 (Vigna); DX 813; PX 3412. Ambase refused to do so. Id. OTS determined that Ambase made substantial payments of bonuses, and provided other amenities, to officers and directors at a time Ambase had an obligation to

contribute funds to Carteret pursuant to the regulatory capital maintenance agreement and a "keep well" agreement that obligated Ambase to purchase IPF from Carteret for $62.5 million if Carteret was unable to sell the company by August 9, 1991. PX 3412 at AMB049394-395; DX 394 at AM00014788.

189. On January 17, 1991, OTS requested Carteret's consent to a capital directive. The directive required Carteret to submit, by February 28, 1991, a capital plan demonstrating that it would achieve a core capital of 5 percent by December 31, 1992. DX 8124 at FAM002 1075. On February 14, 1991, Carteret sued OTS in the U.S. District Court for the District of New Jersey, seeking to force OTS to count supervisory goodwill as a component of Carteret's capital. PX 803 at CAM4020391. On February 18, 1991, the court granted a temporary restraining order in Carteret's favor and, on April 17, 1991, a preliminary injunction in Carteret's favor. DX 8124 at FAM002 1075.

190. On August 14, 1991, Ambase filed its SEC Form 10Q for the period ending June 30, 1991. The 10Q disclosed second quarter losses at Carteret that resulted in a capital deficiency of more than $100 million, even including all supervisory goodwill as capital. DX 8124 at FAM002 1077. On September 11, 1991, OTS requested, and on October 7, 1991, Carteret consented to, the issuance of a capital directive. Id. In accordance with the capital directive, on September 30, 1991, Carteret submitted a capital plan and later submitted updates following discussions with OTS. PX 803 at CAM4020392. On March 2, 1992, OTS approved the capital plan, which required the infusion of approximately $215 million to achieve fully phased-in compliance with FIRREA. Id.

191. Following the 1990 examination, OTS also presented Carteret with a proposed

Stipulation and Consent to the Issuance of an Order to Cease and Desist relating to findings uncovered in the 1990 examination. PX 803 at CAM4020391. In lieu of an Order to Cease and Desist, on April 29, 1991, Carteret entered into a Supervisory Agreement with OTS. Id. at CAM4020391-92. Under the Supervisory Agreement, Carteret agreed to remedy unsafe and unsound practices that had been uncovered during the 1990 examination, including policies relating to internal asset review and establishment of valuation allowances, problem asset workout, trading activities, mortgage derivative securities activities, accounting for loan servicing, transactions with affiliates, compensation, and other similar activities. Id. at CAM4020392.

192. OTS presented Carteret with three separate Capital Directives on January 17, 1991, June 28, 1991, and September 11, 1991. PX 4867a at WOP3440534.

193. In October 1991, OTS determined, based upon a regulatory capital deficiency of approximately $100 million (even counting approximately $150.5 million of supervisory goodwill required by the district court's injunction), that "[t]he financial condition of Carteret has deteriorated to the point where recapitalization of the Savings Bank is not feasible absent direct government assistance." PX 4867a. OTS delayed transferring the institution to the RTC, to provide Carteret's new management with an opportunity to locate private recapitalization funds. Tr. 2220:3-9 (Vigna); Tr. 1621:14-1622: 5 (Albanese).

194. On February 27, 1992, Carteret's Board of Directors entered into an agreement with OTS consenting to a placement of the institution into the RTC's Accelerated Resolution Program within 90 days if Carteret had not made acceptable progress toward effecting a recapitalization. DX 8124 at FAM002 1059-66; DX 8202 at PAM010 1923. Mr. Vigna later

extended the deadline to July 6, 1992. DX 8124 at FAM002 1067-1068; PX 5303 at WOP332 0746.

195. On June 25, 1992, Mr. Bianco requested an extension of the July 6, 1992 deadline. PX 5303 at WOP332 0746. On July 3, 1992, Carteret and Ambase representatives met with OTS Director Timothy Ryan regarding this request. Tr. 340:3-341:11 (Bianco); DX 8124 at FAM002 1081. OTS granted Carteret an extension until August 28, 1992. DX 760 at KH084511; DX 8202 at PAM010 1923; Tr. 340:18-341:11 (Bianco).

196. In October 1992, OTS again granted Carteret additional time to allow The Carlyle Group to complete due diligence, but The Carlyle Group withdrew its letter of intent after completing its review. PX 4879; Tr. 338:20-339:8 (Bianco). Moreover, the Government attempted to facilitate these discussions and did not order Carteret's seizure until prominent private investment groups, including Kohlberg, The Carlyle Group, and Colony Capital, following thorough due diligence examinations, decided not to invest in Carteret. DX 62; DX 8124 at FAM002 1082; DX 9508; Tr. 2951:9-2953:2 (R. Smith); Tr. 593:5-22 (Bianco); DX 9120.

197. At an October 16, 1992 meeting with the Ambase Board, Mr. Vigna stated that "[a]bsent a letter of intent, he will recommend to the OTS Director that the Bank be put into receivership . . . immediately[.]" The Board understood, based on Mr. Vigna's comments, that "the Company does not have much more time and as of December the Bank could be placed into receivership[.]" DX 8202 at PAM010 1932.

198. OTS commenced an examination of Carteret on June 15, 1992, and Mr. O'Rourke reported the findings to the Board of Directors on August 26, 1992. PX 2118; DX 8124 at

FAM002 1084. In the ROE, OTS stated that "[e]ven under the assumption that Carteret is recapitalized with a $200 million capital infusion, as is currently proposed, classified assets would represent 365 percent of tangible capital plus remaining general valuation allowances." PX 2118 at WOQ6730059. Because of the level of classified assets, the regulators, at a minimum, required a sufficient capital investment to ensure Carteret's ability to comply with the fully-phased minimum regulatory capital requirements of FIRREA. OTS also noted that "the proposed capital infusion would cure Carteret's current regulatory capital deficiencies, but would not ensure compliance with fully phased-in risk-based capital requirements without further augmentation or balance sheet restructuring." PX 2118 at WOQ7730059. Although Carteret Chairman Bianco and Director L. Austin Fitts sought to have this observation deleted from the report of examination, OTS explained that the examiner's comments could not be deleted from the report. DX 8124 at FAM002 1084. .

199. OTS determined, in 1992, that an additional $8 million in reserves were needed to account for problem loans, an amount that would wipe out the small profit Carteret reported for the first six months of 1992. PX 2118 at WOQ 6730054; Tr. 2441:7-12 (O'Rourke); DX 8124 at FAM002 0536. Kohlberg also concluded that, even given the large reserves already taken, Carteret continued to be underreserved and faced possible additional losses in its commercial loan and real estate owned portfolios, which would have exacerbated its capital problem. DX 8124 at FAM002 0532.

200. Mr. Vigna testified that OTS would have recommended Carteret's seizure even if goodwill had counted as regulatory capital. JX 1 at 601 (Tr. 199:11-200:12 (Vigna)). He also noted that goodwill was not relevant to the institution's economic viability or its profit-making

potential. Id. at 599 (Tr. 158:2-5 (Vigna)); Tr. 2209:4-8 (Vigna). He acknowledged that he made a mistake at his deposition by suggesting that Carteret would not have been seized if the injunction had remained in place because, even with the injunction, at the time of the seizure Carteret failed by substantial margins FIRREA's risk-based and core minimum regulatory capital requirements. Tr. 2208:16-2209:3 (Vigna). Mr. Vigna noted that this was consistent with the October 25, 1991 "S" memorandum which recommended that Carteret be transferred to the RTC even though OTS counted goodwill as regulatory capital pursuant to the injunction. Tr. 2209:15-2210:23 (Vigna).

201. The November 13, 1992 "S" memorandum resulted from the breakdown of investor interest. Messrs. Vigna and Albanese recommended that Carteret be placed with the RTC because of a lack of capital and other deficiencies in its financial condition and operations. DX 8124. They noted that the transfer to the RTC recommended in the October 25, 1991 "S" memorandum had been delayed in order to accord Carteret's new management an opportunity to raise capital; however, when it became clear that sophisticated investors such as Kohlberg, The Carlyle Group, and Colony Capital were unwilling to invest in Carteret, OTS ordered the institution transferred to the RTC.

### E. Plaintiffs' Repeated References To Carteret's Excellent Performance Ignore Regulators' And Investors' Conclusions

202. Professor Calomiris asserted that Carteret's performance during the fourteen months ending in 1992 demonstrated that it was turning the corner. Tr. 978:15-23; 979:15-980:13 (Calomiris). This is belied by Professor Calomiris's admission at trial that Carteret's financial report for the period ending December 31, 1992, indicates that Carteret suffered a net

loss of $1.4 million during the period. Tr. 1243:8-16 (Calomiris); PX 3804.

## VIII. Professor Calomiris's Estimation Of Carteret's Value At The Time Of The Breach Is Unsupported

203. Although Carteret's stock was not independently traded in August 1989 (it was a wholly owned subsidiary of Ambase), Professor Calomiris posited a pre-breach market valuation for Carteret of $251.4 million. PX 9013. To reach this pre-breach valuation, Professor Calomiris began by assuming that Carteret's market value as of July 31, 1988, was $266 million, the amount that Ambase paid for Carteret that day. PX 9013; PX 702 at C-AM-A-0395933. Professor Calomiris determined a market-to-book ratio of 0.869 for July 31, 1988, by dividing this $266 million amount by a book value of $306 million. The $306 million figure was calculated by Kaplan Smith, a financial consulting firm hired by Carteret. PX 9013; PX 2702A at ¶ 22; PX 5257 at PM 004274, PM004286.

### A. The $266 Million Purchase Price For Carteret Is Not A Good Starting Point For A Calculation Of Market Value

204. The $266 million amount paid by Ambase does not reflect Carteret's market value as of July 31, 1988. Analysts believed that Ambase paid this amount because it was fearful of a lawsuit if the transaction did not go through, and, thus, analysts concluded that Ambase had overpaid for Carteret. Tr. 3406:22-3407:25 (Saunders); DX 9703; DX 5038A at ¶ 48 n.43.

205. As noted above, the purchase price paid by Ambase was conditioned upon Carteret acquiring IPF from Ambase in 1988 for $65 million. The OTS required that, if Carteret sold IPF before August 9, 1991, for less than $65 million, Ambase would pay the difference between the amount Carteret received and the $65 million the thrift paid. PX 2618. Professor Calomiris claimed that the $266 million paid by Ambase was conservative given the OTS's

requirement. PX 2702A at ¶ 17; PX 2618. This rests on faulty logic because the transfer of IPF from Ambase to Carteret for $65 million was a major benefit to Ambase; Ambase retained control of IPF through its 100 percent ownership of Carteret, but still received $65 million from Carteret when IPF was transferred. Tr. 3405:22-3406:21 (Saunders); DX 9703. In effect, Ambase partially financed its acquisition of Carteret with Carteret's own money. Without the funds Ambase received from the IPF sale, Ambase would not have been willing to pay the $266 million for Carteret. DX 9703; DX 5038A at ¶ 48.

206. A $300 million credit agreement between Ambase and a consortium of banks led by Chase Manhattan Bank in June 1988 for the purpose of funding the Carteret acquisition also does not provide guidance as to the market value of Carteret at that time, contrary to Professor Calomiris's claim. Tr. 3408:1-19 (Saunders); Tr. 668:1-14 (Calomiris). Although Chase Manhattan received Carteret stock as explicit collateral, the bank also obtained implicit collateral based upon Ambase's abilility to back up the loan with its own earnings, collateral assets, and subsidiaries like Home and Gruntal. DX 9703; Tr. 3706:14-3707:2 (Saunders).

207. Professor Calomiris also asserted that Ambase's $266 million purchase price for Carteret was supported by an appraisal opinion by Kaplan Smith. PX 2702A at ¶ 14. Kaplan Smith's appraisal, however, involved a mark-to-market analysis of Carteret's assets and liabilities based upon the $265,440,000 purchase price; it did not purport to independently validate the purchase price based upon discounted cash flow, comparables, or other standardized methods for valuing income producing properties. PX 5257 at PM 004274-76. Moreover, even if the appraisal had attempted to ascertain Carteret's fair market value as a going concern, Kaplan Smith acknowledged that it "reviewed and relied upon several types of analyses prepared by

Carteret regarding the fair value of certain specific assets, including the market value of investment securities, mortgage-backed securities, premises and equipment, capitalized servicing, real estate owned and real estate ventures." Id. at PM 004275. Therefore, even if the valuation did relate to Carteret's market value, it was not unbiased and could not present a fair market value analysis of Carteret.

**B. Carteret's Market Value Would Have Declined Sharply Between Its Purchase By Ambase And The Breach And Cannot Be Determined Through Professor Calomiris's Comparison With 46 Other Thrifts**

208. Professor Calomiris assumed that Carteret's market-to-book ratio would have increased by 7.4 percent, the average increase for all publicly-traded thrifts between July 31, 1988, and July 31, 1989. PX 9011; PX 9013; Tr. 668:24-669:11 (Calomiris). Several factors, however, demonstrate that Carteret's value would have declined dramatically between the date of Ambase's acquisition and the breach. DX 9704. As described above, Carteret's classified assets more than doubled between January 19, 1988, when Carteret and Ambase agreed upon the $266 million purchase price, and the breach. Tr. 3411:15-3413:15 (Saunders). Although examiners determined in 1988 that Carteret had $177.8 million in classified assets, PX 2104 at AMB019342, Carteret's classified assets had more than doubled to $404.2 million by June 1989. DX 9705.

209. Carteret was also underreserved, and, in their examination beginning May 22, 1989, regulators identified the thrift's need for an additional $77.2 million in reserves. DX 9704; Tr. 1915:7-9 (S. Smith); Tr. 3412:5-9 (Saunders). Although OTS later agreed to allow Carteret to reserve $49.8 million because of "continued shrinkage from asset sales by Carteret," DX 781A; Tr. 2001:4-12 (S. Smith), as of June 1989 the regulators calculated that Carteret was

underreserved by $77.2 million. In fact, prior to the breach, FDIC examiners, working with OTS, had concluded, in a June 30, 1989 draft report, that Carteret required an additional $88 million in reserves. DX 8054 at WOQ699 0501; Tr. 1446:19-24 (Day). Subtracting the $77.2 million in reserves that Carteret should have taken from the July 31, 1989 book value of $269.3 million, and multiplying the total by the market-to-book ratio of 0.934 assumed by Professor Calomiris, PX 9013, yields a market value of $179.4 million, much lower than the $251.4 million estimated by Professor Calomiris. DX 9707; Tr. 3421:23-3422:11 (Saunders).

210. In addition, Carteret had core operating losses for the four quarters ending on June 30, 1989. DX 9704; PX 2106 at WOQ67500007; Tr. 1927:20-21 (S. Smith). Carteret also paid Ambase $24 million in dividends between the time of the acquisition and July 1989, which would have reduced Carteret's market value. DX 9704; Tr. 3412:10-14 (Saunders); DX 8054 at WOQ699 511; PX 2106 at WOQ675 0016, 0056.

211. Carteret identified its commercial lending and real estate exposure in its strategic plan for 1990, which was issued in September 1989. DX 8098 at WOQ625 1634-36; Tr. 3414:11-3416:16 (Saunders). Carteret's management used a pie-chart to demonstrate that a healthy thrift would have low levels of commercial lending (approximately 6.9 percent), and a large amount of cash investments (18.1 percent), and single-family mortgages (52 percent). DX 8098 at WOQ625 1634; Tr. 3414:22-3415:4 (Saunders). Cash investments and single-family mortgages are, thus, recognized as the safe investments of a healthy thrift. Tr. 3414:22-3415:4 (Saunders). Carteret viewed an insolvent thrift as having a much higher percentage of commercial lending (13 percent) than a healthy thrift, and lower percentages of cash investments (14.2 percent) and single-family mortgages (35.7 percent). DX 8098 at WOQ625 1635; Tr.

3415:10-15 (Saunders). Carteret's depiction of its own assets shows that it resembled the insolvent thrift, with even more commercial loans (23.6 percent), fewer cash investments (6.5 percent), and fewer single-family mortgages (39.4 percent) than the insolvent thrift. DX 8098 at WOQ625 1636; Tr. 3415:20-25 (Saunders).

212. Professor Calomiris calculated an increase in the market-to-book ratio between Carteret's sale to Ambase and the breach by determining the increase in the average market-to-book ratio of "the 46 thrifts with data available from Compustat [database] as of July 31, 1989[.]" PX 2702A at ¶ 24. The 46 thrifts that Professor Calomiris used in his analysis, however, are not comparable to Carteret, and Professor Calomiris does not claim that they are. Tr. 3422:17- 3423:19 (Saunders). The differences between Carteret and these thrifts include size, geographic markets, capital conditions, problem loans, risk profiles, and levels of goodwill. DX 9708; Tr. 3423:3-9 (Saunders). Given these differences, there is no reason to believe Carteret's market-to-book ratio would have increased in proportion to the 46 thrifts after Ambase purchased Carteret.

213. Indeed, not only would Carteret's market-to-book ratio not have increased proportionally to the 46, but Carteret's ratio would have been far smaller than the average thrift in 1989. As Professor Saunders noted, the peer group had a far smaller goodwill component of capital in 1989 than Carteret did, and this made Carteret's market-to-book ratio lower than average because the market discounts goodwill far more than real capital, such as cash. DX 9735; Tr. 3512:9-22 (Saunders); DX 5038A at ¶ 70. The goodwill component of Carteret's book

value, along with Professor Calomiris's estimate of the value of goodwill,[1] can be used to calculate Carteret's market-to-book value ratio as of July 1989 of only 0.609, far below the 0.934 ratio derived by Professor Calomiris from the percentage increase in thrift comparables. Tr. 3510:4-8 (Saunders); DX 5038A at 44-45, ¶ 71 (Professor Saunders's analysis prior to subtraction of the $77.2 million in additional reserves); PX 9011. If Professor Calomiris had taken account of the differences in the amount of goodwill Carteret had on its balance sheet versus the 46 thrifts in his sample, his calculation of Carteret's market value at the time of breach would be much lower than his estimate of $251.4 million. Tr. 3512:23-3513:13 (Saunders); DX 9736.

214. Contrary to Professor Calomiris's assumption, given Carteret's increasing classified assets, decreasing reserves and net operating losses for the four quarters ending June 1989, the thrift's market-to-book ratio would have declined from July 31, 1989, until the breach, rather than increased at the average of the 46 thrifts. Tr. 3428:3-17 (Saunders).

215. Professor Calomiris testified that his calculation of Carteret's value at the breach is validated by the fact that two former Carteret directors, Alexander Haig and Harry Jacobs, offered to purchase Carteret for $252 million in May 1989. Professor Calomiris based this testimony on a statement by Mr. O'Brien, Carteret's former CEO and Chairman, in an August 29, 1990 letter to George Scharffenberger, Ambase's Chairman. In the letter, Mr. O'Brien complained that Ambase's former CEO, Mr. Manley, had treated him unfairly. PX 9014; PX

[1] Professor Calomiris stated that goodwill is worth 35.5 cents on the dollar. DX 9736; DX 5038A at ¶ 71 (citing PX 2702A at Appx. A, Table A5). Professor Saunders considered this value to be too high, but used it as an example. Tr. 3513:21-3514:2 (Saunders).

4836 at KH 089941; Tr. 674:10-679:18 (Calomiris). Professor Calomiris claimed that letter demonstrated Messrs. Haig and Jacobs had made an offer for Carteret and this alleged offer demonstrated that Carteret's value did not change substantially between the time of its sale to Ambase and the breach. PX 2702A at ¶ 19; PX 9014.

216. Contrary to Ambase, the record refutes the contention that the vague reference in the letter from Mr. O'Brien to Mr. Scharffenberger is evidence of an offer. Had there been such an offer, the voluminous records would have contained an offer document; no such document exists. DX 9716; Tr. 3440:1-22 (Saunders). In addition, there is no evidence in the record of any due diligence, without which Messrs. Haig and Jacobs could not have had a full picture of the thrift's condition. Id. Furthermore, there is no evidence that Messrs. Haig and Jacobs continued to have knowledge of the thrift's condition after they resigned from Carteret's Board following the Ambase acquisition in August 1988. DX 9716; Tr. 3440:1-22 (Saunders); PX 2106 at WOQ675 0018. Finally, the comments about the alleged offer were in a letter meant to disparage Mr. Manley. Therefore, the fact that Mr. O'Brien claimed that there had been an offer which Mr. Manley refused to receive does not mean there had actually been such an offer, but, at most, only that Mr. O'Brien was using the alleged "offer" to attempt to disparage Mr. Manley.

## IX. Professor Calomiris's Claims for Lost Profits Are Unsupported

### A. The Gordon Growth Model Is Inapplicable

217. As a component of his estimate of Carteret's "but-for" market value in 2008, Professor Calomiris estimates that, absent the breach, Carteret's earnings would have grown annually by 4.2 percent, and the thrift would have earned $595.6 million between the breach and 2008. PX 9022. These estimates are based upon the Gordon Growth Model, which provides that

when a firm has stable earnings, an economist can calculate the firm's market value by multiplying earnings by the reciprocal of the difference between the cost of capital (i.e., the discount rate) and the growth rate. PX 9021; Tr. 3446:25-3447:6 (Saunders). The Gordon Growth Model, however, can only be used to estimate future earnings of firms that have experienced a stable growth rate. Tr. 3448:21-25 (Saunders).

218. Prior to the breach, Carteret did not enjoy stable earnings growth. Between 1983 and 1984, its earnings fell by 78.4 percent; between 1984 and 1985, its earnings increased by 235.4 percent; between 1985 and 1986, its earnings increased by 82.7 percent; between 1986 and 1987, its earnings decreased by 27.5 percent; and between 1987 and 1988, its earnings decreased by 40.2 percent. DX 9720. Thus, Carteret's earnings did not grow at a steady rate between 1982 and 1988. Instead, they increased in some years and decreased in other years. Id.

219. In 1990, Carteret's net income was negative $131.8 million, in 1991 negative $160.3 million, and in 1992 negative $1.4 million. DX 8000A, Exh. 3, Table 1, p. 1. This negative net income was the result of assets placed on Carteret's balance sheet prior to the breach. Tr. 2713:6-2714:10 (Calomiris). Thus, Carteret experienced no steady growth of earnings after the breach but, instead, losses resulting from pre-breach assets.

220. Given that Carteret did not enjoy a steady growth rate in earnings prior to or after the breach, "but-for" Carteret's projected earnings between the breach and 2008 could not be estimated based upon the Gordon Growth Model. Tr. 3441:24-3442:6 (Saunders); DX 9717.

## B. Even If The Gordon Growth Model Were Applicable, Professor Calomiris Has Misapplied The Model

221. The Gordon Growth Model provides that the market value of a firm in stable growth is a product of its earnings in the first year, divided by the discount rate, minus the growth rate. PX 9021. Professor Calomiris purports to estimate "but-for" Carteret's earnings between the breach and 2008 by applying the Gordon Growth Model to solve for the growth rate of "but-for" Carteret's earnings. PX 9021. To solve for the growth rate, he inputs his estimate of Carteret's market value at the time of the breach ($251.4 million), the average of Carteret's income between 1982 and 1988 ($20.5 million), and his estimate of Carteret's cost of issuing common stock (12.34 percent). Id. Using these inputs, and applying the Gordon Growth Model, he estimates that "but-for" Carteret's base earnings of $20.5 million would have grown annually by 4.2 percent. Id.

222. The inputs Professor Calomiris uses to solve for "but-for" Carteret's growth rate do not reflect Carteret's condition or performance and cannot result in a reasonable estimate of "but-for" Carteret's earnings between the breach and 2008.

### 1. The Estimate Of Carteret's Market Value At The Time Of Breach

223. As we have demonstrated, the $251.4 estimate of Carteret's market value at the time of breach is based upon the assumption that Carteret's market-to-book ratio would have grown at the same rate as 46 sample thrifts between 1988 and 1989. Carteret, however, had a larger proportion of goodwill on its balance sheet than any sample thrift, and there is no evidence the sample thrifts suffered from the same operating losses or increased classified assets as Carteret recognized during this period. Therefore, there is no evidence Carteret's market to book

ratio would have grown, and Professor Calomiris's $251.4 market value estimate lacks support in the record. DX 9703-DX 9709.

**2. The Model Improperly Excludes The 1990 and 1991 Losses And Non-Core Income From The Calculation of Carteret's Average Earnings**

224. The second input to the Gordon Growth Model is Carteret's average earnings between 1982 and 1988. In calculating average earnings, Professor Calomiris excludes Carteret's losses in 1990 and 1991. Because these losses resulted from bad assets that were placed on Carteret's books well before the breach, the losses cannot be ignored in any model purporting to project "but-for" Carteret's future earnings. Tr. 3465:12-15 (Saunders). That is, the losses from these assets were inevitable, regardless of whether Carteret was in capital compliance. If Professor Calomiris had included the 1990 and 1991 losses in his estimate of Carteret's average earnings, his model would have projected negative base year earnings of $13 million. Tr. 3465:16-3466:22 (Saunders). With negative base year earnings, the Gordon Growth Model would have projected a bankrupt "but-for" Carteret. Id.

225. Even assuming the 1990 and 1991 losses could be excluded in calculating Carteret's average base year earnings, Professor Calomiris exaggerates the earnings by failing to exclude non-core income from the estimate of average earnings. Tr. 3479:4-25 (Saunders); DX 9729. The average net base year income for these years, as calculated by Professor Calomiris, included gains and losses on the sales of acquired assets and gains on the sale of branches and equipment, totaling an aggregate of $12 million. Tr. 3479:4-25 (Saunders); DX 9729; DX 9730; PX 9020. Core bank income, on the other hand, "is income from marginal spread, which is the difference between the interest cost of your funds and the interest return on your loans[.]" Tr.

3479:11-16 (Saunders). This is the core banking activity of a thrift, unlike sales of assets, which can only occur once. Tr. 3479:16-25 (Saunders).

226. Likewise, the cash flow resulting from the accretion of the discount on mortgages acquired in supervisory transactions is not core income. The cash flow simply represents one time gains because a mortgage loan once sold cannot be sold a second time. Tr. 3490:12-25 (Saunders).

227. Furthermore, Professor Calomiris should have considered Carteret's situation on June 30, 1989, in order to conduct a valid ex ante projection from the time immediately preceding the August 9, 1989 breach. Tr. 3492:23-3494:3 (Saunders). Yet, Professor Calomiris's calculation of Carteret's net income immediately before the breach does not include the total net income of -$6.535 million reported in Carteret's Thrift Financial Reports ("TFR's") for December 1988, March 1989, and June 1989. DX 9731. Including these losses in the model, the average net income for 1982 through the time of the breach was $17.714 million, rather than the $20.546 million figure used by Professor Calomiris. DX 9731; Tr. 3493:7-15 (Saunders).

228. In addition, prior to June 30, 1989, regulators had concluded that Carteret was underreserved and would need to transfer $77.2 million from core income to create loan loss allowances. Tr. 3493:16-22 (Saunders). The reduction of Carteret's core income by these reserves and the loss of $6.5 million after September 30, 1988, reduces Cartert's core income from the $20.546 million used by Professor Calomiris to only $944,000. Tr. 3493:23-3494:3 (Saunders); DX 9731. In short, the base year earnings estimate Professor Calomiris applies to the Gordon Growth Model to determine "but-for" Carteret's future growth are counterfactual.

3. **<u>The Discount Rate Is Inapplicable to Carteret</u>**

229. As discussed above, one of the inputs in the Gordon Growth Model is the discount rate, for which Professor Calomiris uses the cost of issuing preferred stock. Tr. 3494:21-3495:11 (Saunders). Professor Calomiris stated that he:

> calculate[d] Carteret's rate of return on preferred stock of 12.34% using Carteret's characteristics as of June 1989 and a regression analysis of 33 preferred stock offerings and high-yield debt offerings from 1993-1994. See PX 2702A (94-98, 105-106). This estimate is conservative in light of the fact that Ambase issued $150 million in 14-7/8% senior subordinated notes in June 1988.

PX 9021. Professor Calomiris's use of data from 1993 and 1994 to determine the cost of capital in 1989 renders the proposed discount rate speculative given that the cost of preferred stock in 1993 or 1994 could not have been known in 1989. Tr. 3495:10-23 (Saunders); DX 9732. Further, the regression analysis used to calculate the discount rate improperly relied upon a small sample of common and preferred stock offerings. DX 9732. Professor Calomiris also substitutes another bank's tangible capital ratio for that of Carteret because Carteret's tangible capital ratio, or equity-to-assets ratio, was negative. Tr. 3497:24- 3498:24 (Saunders); DX 9732. Therefore, as Professor Saunders noted, even if the model could be relied upon as an estimating tool, what it was estimating was not Carteret's cost of issuing preferred stock, but that of another firm. Tr. 3498:20-24 (Saunders). Finally, many significant variables, such as size, maturity, and rating, were not significant to a 95 percent confidence level. Therefore, the regression could not meaningfully project Carteret's cost of capital. DX 9732.

230. Professor Saunders concluded that each input used in Professor Calomiris's Gordon Growth model was mismeasured, leading to an unreliable growth rate and an unreliable

estimate of "but-for" earnings. Tr. 3498:25-3500:17 (Saunders); DX 9733.

### C. Professor Calomiris's Terminal Value Measure Of Damages Is Not Actually An Ex-Ante Model And Is Fatally Flawed

231. Professor Calomiris claimed that his "terminal value"approach measured damages on an ex ante basis.[2] Professor Calomiris, however, uses the cost of capital used to determine lost income under the Gordon Growth Model, based upon data from 1993 through 1994. This information was not known in 1989. Tr. 3538:5-16 (Saunders); DX 9749. Therefore the model's claim to be an *ex ante* estimate is invalid.

232. Further, the $99.9 million estimate of franchise value mistakenly assumes that the market value of Carteret's assets would equal their book value in 1989. This assumption ignores factors such as interest rate risk, credit risk, and the need for additional reserves of $77.2 million, which would have reduced the market value of Carteret's assets. Tr. 3544:2-3546:10 (Saunders); DX 9751; DX 5038A at ¶¶ 86-90.

### D. Professor Calomiris Erroneously Calculates Carteret's Market Value In 2008

233. Professor Calomiris estimates "but-for" Carteret's market value as of 2008 in three ways: (1) by growing Carteret's estimated market value at the time of breach by the percentage growth in thrift indices between 1989 and 2008, PX 9037-PX9039; (2) by increasing Carteret's book value and market to book ratio by the growth in book values and market to book ratios of a shifting sample of thrifts, PX 9034-PX 9036; and (3) by applying a market-to-book

[2] The "terminal value," as measured by Professor Calomiris, consists of Carteret's market value at the time of breach; plus lost earnings between the breach and 2008, calculated by the Gordon Growth Model; plus alleged franchise value at the time of breach. PX 9024.

ratio derived from a sample of nine stand alone thrifts to Carteret's estimated book value in 2008. PX 9031-9033.[3] The first approach assumes "but-for" Carteret would have grown at the same rate as the average thrift in thrift indices. The second and third approaches assume that Carteret would have grown at the same rate as a sample of thrifts if it had survived the breach. Each of these approaches is invalid.

234. First, in applying a growth rate based upon general thrift indices, Professor Calomiris assumes that "but-for" Carteret was comparable to the average thrifts in the indices. This is invalid because, as Professor Saunders noted, "[Carteret] was a bad thrift, badly performing thrift, and you can't use it to - use averages to induce what a value would be in 2007." Tr. 3501:18-21 (Saunders).

235. Second, "but-for" Carteret was not comparable to the sample of thrifts used in Professor Calomiris's second and third calculations. For example, only one of the sample thrifts is from Florida and none are from New Jersey. Tr. 3523:6-7 (Saunders); DX 5038A at ¶ 76. On average, they are much smaller than Carteret, have higher equity-to-asset ratios, and lower classified assets-to-total asset ratios than Carteret. DX 9739; DX 9740; Tr. 3523:1-3524:1 (Saunders). With respect to return on assets, Carteret ranks next to last in 1990, and last in 1991 and 1992. DX 9741; Tr. 3526:11-14 (Saunders).

236. Further, the nine are "far better capitalized banks than is Carteret." Tr. 3527:8 (Saunders); DX 9742. Therefore, the sample is inherently biased because thrifts that were

[3] Carteret's estimated 2008 book value is calculated by increasing Carteret's 1989 book value by the stream of income derived from application of the Gordon Growth Model. PX 9029-PX 9031.

undercapitalized and failed like Carteret are not included. Tr. 3512:6-17 (Saunders). If failing thrifts had been included in the sample, the alleged rate of change in market-to-book ratios would have been significantly lower. Id.

237. In addition, the increase in the market-to-book ratios of the shifting sample between 1989 and 2008 could simply be due to mergers and acquisitions that created larger thrifts by 2008. Tr. 3503:12-3505:23; DX 9735. Thus, the growth in the sample does not indicate that "but-for" Carteret would have grown between 1989 and 2008 as a stand-alone thrift. Id.

## X. Carteret's Condition Would Have Been No Better In The Non-Breach World Than It Was In The Real World

238. Professor Calomiris asserted that, if Carteret had been able to use supervisory goodwill, it would have put additional assets on its balance sheet, which would have generated profits to offset the losses suffered on the loans it already had made. PX 9054; PX 9055; PX 9055a. Carteret, however, would have been unable to add incremental assets because it was out of capital compliance, even with goodwill. Tr. 3470:16-22 (Saunders); DX 9727. Carteret's September 30, 1991 capital plan concluded that Carteret was out of capital compliance even including all supervisory goodwill claimed by Carteret in its suit against the OTS. PX 2001 at C-AM-A-0100370. Furthermore, because capital compliance is measured by the ratio of capital to assets, any attempt by Carteret to grow its assets would have reduced the ratios and made it even less capital compliant. Tr. 3470:23-3471:1, 3472:2-6 (Saunders). In its June 30, 1991 10Q, Ambase acknowledged that it was having difficulties maintaining a sufficient level of capital with only its current assets in place. Tr. 3472:7-3473:12 (Saunders); PX 1508 at WOT692 0155-

56.

239. Professor Calomiris provided no model detailing the alleged incremental assets – for example, whether they would be real estate, equities, bonds, or mortgage-backed securities. Tr. 3473:19-23 (Saunders); DX 9727. Professor Calomiris also failed to explain these assets' volume, their source, any credit losses, interest rate risk, incremental G&A, or the funding source. Tr. 3473:23-3474:2 (Saunders); DX 9727.

240. Given that Carteret's actual assets were unprofitable, there is no reason to assume that the incremental assets assumed by Professor Calomiris would have been profitable. DX 9727. As a company tries to expand its assets, asset returns tend to decline. Tr. 3474:5-19 (Saunders). Had Carteret attempted to expand its assets, therefore, it would not necessarily have increased its profits. Tr. 3474:5-19 (Saunders).

241. Professor Calomiris also asserted that Carteret would have been more successful in the absence of the breach because it could have paid dividends. PX 2702A at ¶¶ 28, 46. Paying a dividend, however, would have shrunk Carteret's book value and tangible capital. Tr. 3476:9 - 3477:6 (Saunders); DX 5038A at ¶ 54.

242. Professor Calomiris's final assertion was that in the non-breach world, Carteret might have retained its troubled assets longer in the hopes of receiving a better price. PX 2702A at ¶ 82. Had Carteret retained its troubled assets longer, however, its capital requirements would have been much higher. Tr. 3477:7-3478:7 (Saunders); DX 9727. Under the OTS risk-based capital regulations, non-interest-earning assets carry a 200 percent risk weight, which requires a bank to have twice as much capital for a non-earning loan as would be required for a loan that earns interest. Tr. 3477:13-19 (Saunders). Professor Calomiris's report also demonstrated that

the real estate market did not improve until 1996, which would have required Carteret to retain troubled assets for many years. Tr. 3477:7-12, 3478:3-7 (Saunders).

## XI. The Damages Claimed Could Not Have Been Anticipated

243. Professor Calomiris claimed that, at the time Carteret was seized, the market could foresee a "golden era" of banking lasting 14 years after the bank's closure, which Carteret was prevented from enjoying. PX 2702A at ¶ 37. The so-called "golden era" did not apply to all banks and could not have been anticipated in advance. DX 9743; Tr. 3528:15-3529:5 (Saunders). For example, Professor Calomiris's own bank lost money in six out of eight years during this alleged golden era. Tr. 3528:25-3529:5 (Saunders). Thus, the so-called "golden era" did not apply to Professor Calomiris's own thrift. In addition, as discussed above, if the market could have foreseen Carteret's growth as estimated by Professor Calomiris's models, investors would have been irrational not to substitute real cash capital for the goodwill in order to reap the anticipated rewards of the so-called "golden era." That no investors offered such investments demonstrates that no "golden era" was foreseen or could have been anticipated in 1989. Likewise, the damages estimates, which are based upon current market conditions, fluctuate as the market fluctuates and depend on the date on which the analysis is performed. Tr. 3529:6-14 (Saunders); DX 9743. For example, the nine thrifts Professor Calomiris relies upon in his preferred damages calculation lost half their market value between December 31, 2006, and December 31, 2007. DX 9744; Tr. 3529:15-3530:13 (Saunders).

244. Further, the market-to-book ratios for the nine thrifts used in Professor Calomiris's preferred damages calculation are estimated as of September 2007. Updating this estimate to December 31, 2007, yields an increase of 24 percent in the simple average of the

market-to-book ratios and a decrease of 19 percent in the weighted average of the ratios. DX 9746; Tr. 3533:22-3535:3 (Saunders). These changes between Professor Calomiris's September 2007 estimates and the December 2007 estimates demonstrate how dramatically damages calculations can change from day to day and how misleading an ex post analysis can be. Tr. 3533:24-3534:2 (Saunders); DX 9747. All these changes, from 1989 on, simply could not have been foreseeable at the time of contract formation.

## XII. Wounded Bank Damages Are Not Supported

245. Professor Calomiris claimed that Carteret suffered wounded bank damages of (1) $12.5 million in claims related to employment contracts and severance costs; (2) $2.4 million in costs related to the 1990 sales of branches in Florida; (3) $0.6 million in transaction costs from unsuccessful efforts to raise capital following the breach; and (4) transaction costs related to the OTS cease-and-desist proceedings. PX 2702A at ¶¶ 101-105. These damages are not supported.

### A. Claims By Former Executives Related To Severance Agreements

246. First, Professor Calomiris asserted that Carteret offered severance agreements to eight of its former executives in order to convince them not to leave Carteret after FIRREA. PX 2702A at 88, ¶ 102. Professor Calomiris's only support for this explanation are the complaints filed by the former executives when seeking to enforce these severance agreements. PX 2702A at ¶ 102 and 88, n.164 & 165. Two of these executives did not even allege that they were offered severance packages because of the Government's breach. PX 2702A at ¶ 102.

247. Given Carteret's operating difficulties and capital deficiencies, even counting goodwill as regulatory capital, the former executives would have felt the same pressures in the absence of the breach as in the real world. Thus, if the severance agreements were prompted by

concerns that Carteret might fail, the agreements would have been offered in the but-for world, just as they were in the real world. Further, Carteret would have incurred the costs of claims brought by employees related to their contracts and severance packages in the absence of the breach, given that the terminated employees were poor managers who would have been fired anyway. Tr. 3547:23-3548:23 (Saunders); DX 9753. These managers were responsible for the huge underwriting losses for commercial and real estate loans, a "5" CAMEL rating, the payment of unwarranted performance bonuses to themselves, and insider lending. Tr. 3547:23- 3548:23 (Saunders); DX 9753. FIRREA's passage was unrelated to their firing. Tr. 3548:19-23 (Saunders).

248. In addition, Ambase, not Carteret, was the only defendant in the litigation, and Ambase paid Carteret's officers $12.5 million to settle severance payment litigation. PX 2702A at ¶ 102, n.165; DX 9122 at WOR081 0286 ("Carteret did not experience any loss due to these Severance Agreements"). Thus, these payments were not costs to Carteret, but to Ambase.

**B. <u>Costs Related To The Sale Of Florida Branches</u>**

249. Second, Professor Calomiris claimed that Carteret would not have sold certain branches in Florida in 1990 in the absence of the breach and that Carteret incurred costs for data processing, investment banking fees, accounting fees, severance payouts, and legal fees of $2.4 million in connection with these sales. PX 2702A at ¶ 103; Tr. 3548:24-3549:2 (Saunders).

250. Analysis by Carteret management at the time of the sales, however, indicates that the bank sold these branches to reduce operating costs and improve the thrift's profitability. Tr. 3549:2-15 (Saunders); DX 9753. Mr. Walsh, for example, noted that "a fair amount of branches in Florida that were unprofitable." JX 1 at 707 (Tr. 195:6-9 (Walsh)). Thus, the branches would

have been sold in the absence of the breach, and Carteret incurred no costs because the sale resulted in an increase in overall profitability.

**C. Costs Incurred In Seeking Out Additional Capital**

251. Third, Professor Calomiris asserted that the breach caused Carteret to seek additional capital and, therefore, incur transaction costs in these unsuccessful efforts. PX 2702A at ¶ 104. Given that Carteret was out of capital compliance even if goodwill was counted, Carteret would have had to seek out capital even in the absence of the breach. Tr. 3549:16-3550:3 (Saunders). Thus, these costs were not proximately related to the breach. Further, Ambase, not Carteret, paid investment banking fees ($600,000) relating to Carteret's efforts to raise capital. DX 4118.

**D. Legal Expenses Related To OTS Regulatory Actions And Investigations**

252. Fourth, Professor Calomiris claimed that Carteret incurred $1.3 million in legal expenses when the OTS (1) brought regulatory actions against Carteret, Ambase, and former officers and directors for Carteret's unlawful incentive payments and employment dispute settlement; (2) challenged compensation paid to officers, directors, and employees; and (3) investigated certain losses at Carteret beginning on December 4, 1992. PX 2702A at ¶ 105. Professor Calomiris asserted that, due to FIRREA, "government regulators scrutinized [Carteret] much more carefully than they would have absent the breach[.]" PX 2702A at ¶ 105. Regulators, however, began examining Carteret's management, loan portfolio, and internal loan review more carefully prior to the breach when they detected massive asset quality problems. Several regulators testified that these problem loans and underwriting and loan review issues, which resulted in the need for additional reserves, had no relation at all to capital or FIRREA.

Tr. 1437:24-1438:8 (Day); Tr. 2360:15-23 (O'Rourke); Tr. 3179:10-18 (Kennedy).

253. The investigation of losses beginning on December 4, 1992, resulted from Carteret's failure to properly supervise the lending function and provide and enforce adequate lending policies, procedures, and controls. PX 404 at AMB030568. Prior to the breach, examiners identified Carteret's out-of-control lending policies; accordingly, these losses were unrelated to the breach. DX 8054 at WOQ699 0514.

254. OTS brought the cease-and-desist proceeding against Ambase's officers and directors on February 14, 1991, when these officers and directors refused to infuse $30 million into Carteret and thus failed to comply with the regulatory maintenance agreement. Tr. 3550:10-23 (Saunders); PX 6401 at AM00023055-56. Despite Carteret's need for capital beginning in March 1990 and Ambase's obligation to make the $30 million infusion, Mr. Manley, and other directors, approved severance agreements with certain officers only three days before this infusion was due. PX 6401 at AM00023056, 23058-59. Ambase eventually paid over $5 million to these officers in December 1990, and $3 million to Mr. Manley under severance agreements and in employment dispute settlement, despite its obligations under the regulatory maintenance agreement and Ambase's obligations under the IPF keep-well agreement. PX 6401 at AM0003059-61. Ambase also forgave a $4 million debt owed by Mr. Manley. PX 6401 at AM0003061. Given Ambase's lack of compliance with the Capital Maintenance Agreement and OTS regulations relating to officer and director compensation, the OTS proceedings were required and were unrelated to the breach. Further, Ambase alone paid $174,348.10 to defend its officers against the OTS cease-and-desist proceeding; thus, these costs are not recoverable by Carteret as wounded bank damages. PX 6401.

## XIII. The Receivership Deficit Was Properly Calculated

### A. Thrift Resolutions By The RTC Were Reasonable And Fair

255. After its creation in 1989, the RTC faced a crisis of monumental proportions, given the failure of one in six federally-insured depository institutions controlling 20.5 percent of the assets in the banking system. DX 9779; DX 9780; DX 5038A at ¶ 16; Tr. 3610:14:22 (Saunders). Nevertheless, the RTC was generally successful in resolving the thrift crisis at a relatively low cost to the American taxpayer. Tr. 3610:23-3611:3 (Saunders); DX 5001A at ¶¶ 16, 22-24. Researchers have estimated the cost of the RTC resolution at $92.7 billion, which was much less than expected. Tr. 3612:1-6 (Saunders).

256. Empirical evidence demonstrates that the RTC sold assets of thrifts in receivership at fair market value. DX 9779; DX 9781; DX 5038A at ¶ 19; Tr. 3612:7-10 (Saunders). Academic studies evaluating RTC pricing in auctions and sales to publicly-traded acquirers found no evidence of significant wealth gains for asset acquirers. DX 9781; DX 5038A at ¶ 19; Tr. 3612:22-3613:15 (Saunders). Professor Calomiris did not cite any authority to the contrary. Tr. 3613:24-3614:3 (Saunders).

### B. Professor Calomiris's Assertions Related To Interest Costs Levied By The Government Are Unsupported

#### 1. Professor Calomiris's Claims That No Interest Rate Or A Lower Interest Rate Should Have Been Charged Are Unfounded

257. As of December 31, 2007, the projected size of the Carteret receivership deficit, after adjusting for pass-through liabilities, was $321.4 million. DX 9174 at Report 3. The largest component of this deficit was the interest owed on the money the receiver borrowed from the RTC to finance the sales of Carteret's Florida and New Jersey branches. DX 9174 at Report

4; DX 5001A at ¶ 25.

258. Professor Calomiris asserted that, because prejudgment interest is not applied to damages claims, the Government should not impose interest on the Carteret receivership. Tr. 3614:11-16 (Saunders); DX 5001A at ¶ 34; PX 2703A at ¶¶ 20-21. The Government, however, pays interest on funds it raises to finance receiverships and, therefore, must charge interest to recoup its financing costs. DX 9782; Tr. 3614:17-22 (Saunders). The Government raises these funds by issuing interest-bearing Treasury bonds; this interest is a cost that is passed on to the receiverships. Tr. 3614:23-3615:6 (Saunders).

259. On August 10, 1993, Congress enacted the National Depositor Preference Act, 12 U.S.C. § 1821(d)(11) ("NDPA"). Prior to NDPA's enactment, the interest charged on thrift receiverships was governed by 12 C.F.R. § 360.1 (1988), which was a regulation issued by the FHLBB and adopted by the FDIC following the enactment of FIRREA. The regulation governed the order of priority for distributions from thrift receiverships, and also provided that interest on loans to receiverships would accrue at a floating three-month Treasury Bill rate. The regulation, however, did not differentiate depositors from other creditors; NDPA superseded the regulation and mandated that depositors have first priority to distributions after the recoupment of administrative expenses. 12 C.F.R. § 360.1; see PX 1105; Tr. 3621:25-3622:8 (Saunders); DX 9784; DX 5001A at ¶ 35.

260. In 1995, the FDIC determined that it could not apply 12 C.F.R. § 360.1 to thrift receiverships created after the enactment of the NDPA (August 10, 1993). PX 5036. The reason was that Section 360.1 did not incorporate the distribution priorities of the NDPA and, therefore, was superseded by the NDPA. The FDIC made a new determination of the interest rate to apply

to thrift conservatorships and concluded that the fixed Federal judgment rate was appropriate. The stated reasons for the change included: (1) FDIC had applied the Federal judgment rate to loans to national bank receiverships; (2) a fixed rate such as the Federal judgment rate would not favor creditors or debtors; and (3) the rate was readily available. In a June 8, 1995 policy memo, FDIC specified that the Federal judgment rate should be applied to institutions that entered receivership after August 10, 1993. DX 9784; DX 5001A at ¶ 35; DX 2019 at AM00096532-34.

261. Given that the Carteret branches were sold in 1994 and 1995, the RTC/FDIC should have applied the one-year Federal judgment rate as of the time the receiverships were created. Tr. 3622:13-20 (Saunders). From 1995 through 1999, however, the FDIC accounting personnel responsible for Carteret's receiverships continued to apply the three-month floating rate. Tr. 3622:21-3623:11 (Saunders); DX 9784. In 1999, while implementing a new dividend processor system to calculate post-insolvency interest ("PII"), the FDIC liability accounting unit noted that PII was calculated using the old three-month floating rate and contacted Elaine Tama, an FDIC Division of Finance employee, for guidance. Tr. 872:4-873:20 (Green).

262. On November 12, 1999, Ms. Tama sent an e-mail to James K. Igo and Wayne Green asking whether Carteret's interest calculations should be computed using a fixed or floating rate. DX 9784; PX 5065; Tr. 3622:21-3623:3 (Saunders). After FDIC legal counsel Michael Saran reviewed the NDPA, the June 8, 1995 policy memo, and previous FDIC rulings, he concluded that the Carteret receivership should be charged the fixed rate. This analysis was also applied to four other receiverships for which similar calculation issues had been raised. Tr. 3623:8-11 (Saunders); DX 5001A at ¶ 38; PX 5066; Tr. 2623:3-2625:9, 2626:12-18 (Saran). Carteret was not singled out for any special treatment. DX 5001A at ¶ 38. Mr. Saran concluded

that the PII for each of the three Carteret branch sales should be based upon the Federal judgment rate in effect on the dates of the sale. PX 5066; Tr. 2629:1-12 (Saran). He reported this conclusion to Ms. Tama on December 1, 1999. DX 9784; PX 5066.

263. In the 1999 Goodwill Package, dated December 31, 1999, the FDIC noted the change from floating to fixed rates. DX 9784; DX 5001A at ¶ 38. The FDIC repriced the loans at Federal judgment rates in effect when the loans were made. These rates were higher than the floating interest rate in 1999. Tr. 3623:12-17 (Saunders).

264. Professor Calomiris claimed that the RTC and the FDIC should have applied the floating, three-month Treasury-Bill rate from 1995 through 1999, rather than the fixed, Federal-judgment rate. PX 2703A at ¶¶ 12-15; Tr. 3615:8-24 (Saunders). The rates charged on the loans from the RTC/FDIC to the receiver could have been based upon the prevailing market rates for prime rate commercial loans and 30-year conventional mortgage loans, both of which were comparable to the loans to Carteret because they involve market risk. DX 5001A at ¶ 30; DX 9782; DX 9783; Tr. 3617:25-3619:12 (Saunders). Thus, the RTC/FDIC choice of interest rate was appropriate given that the recovery rates on the loans were uncertain and a risk premium could have been charged on the loan. Tr. 3618:12-21 (Saunders); DX 9782; DX 5001A at ¶ 30. In fact, a risk premium of roughly three percent existed between the 90-day Treasury Bill rate and the rates for 30-year mortgages and prime bank loans. Tr. 3619:19-3621:4 (Saunders). Although a private lender would have charged a much higher rate to make a loan to the receivership, the FDIC, by not charging a risk premium, gave a three percent subsidy to the receivership. Tr. 3619:5-3621:16 (Saunders).

265. The rate on three-month Treasury Bills, the use of which Professor Calomiris

advocated, was an outlier and substantially lower than other interest rates during the October 1994 through December 2005 period. DX 5001A at 13, ¶ 30; DX 5001A, Exh. 3.

266. Further, by advocating the use of a three-month Treasury yield as the floating rate, Professor Calomiris ignored the long-term nature of the loans at issue here, although he acknowledged that ". . . the repayment of the loans has lasted longer than one year . . . ." DX 5001A at ¶ 33. The loans were long-term loans, and the variability in the time-to-resolution for failed banks was large. Id. Although a receivership's average life span is three to six years, some may require more time. Id.

**2. Professor Calomiris's Claim That The RTC/FDIC Intentionally Chose A High Interest Rate Is Unsupported**

267. Professor Calomiris suggested that the RTC/FDIC believed that interest rates would fall and therefore chose a fixed rate in order to maintain a higher rate. Tr. 3615:25-3616:7 (Saunders). Professor Calomiris also implied that the NDPA was an excuse for the FDIC to change the interest calculation methodology, presumably to lock in higher interest rates. PX 2703A at ¶¶ 35-36; DX 5001A at ¶ 36. He provided no documentary evidence, however, to support this contention. As described above, the evidence supports no such plotting by the RTC/FDIC and shows that the FDIC applied a rate that it believed to be consistent with the law and regulations. Tr. 3616:8-18 (Saunders). The evidence demonstrates that the FDIC analysis related to the law and appropriate regulatory policy, without any discussion of the level of or trends in interest rates, or how the Government might somehow maximize the interest owed by receiverships. DX 5001A at ¶ 39. Professor Saunders concluded that the FDIC simply applied the law correctly after it realized that it had not correctly applied it beginning in 1994. Tr. 3623:22-3624:22 (Saunders); DX 5001A at ¶ 39.

268. As described above, FDIC employees testified that the FDIC did not change the methodology for computing PII for the purpose of raising the interest rate, but instead to correct an error, consistent with Mr. Saran's legal analysis. Tr. 874:25-875:5 (Green); Tr. 2631:8-17 (Saran). Mr. Saran did not know if his advice to use the Federal judgment rate would increase or decrease Carteret's PII obligation and noted that this "wasn't the point of the question or of . . . the request for my opinion." Tr. 2630:21-2631:7 (Saran). Further, the FDIC did not make this change in methodology as a result of Ambase's filing of the present action. Tr. 875:25-876:5 (Green).

269. It is a generally accepted proposition that no one can effectively predict interest rates, and that the ability to do so would make an individual wealthy beyond belief. In November 1999, short term interest rates were rising relative to long term rates. Tr. 3624:18-20 (Saunders); DX 5001A at ¶ 39. The FDIC could not have known whether this trend would continue or whether short-term rates would stabilize or decline, thus making it impossible to determine whether its own decisions would ultimately increase or decrease the amount of interest due to it on loans to the Carteret receivership. DX 5001A at ¶ 39. For a period, short-term rates rose above the Federal judgment rates. Tr. 3624:13-16 (Saunders). In fact, in November 1999, when Ms. Tama raised the issue of whether to use the Federal judgment rate, the average three-month Treasury Bill rates were actually rising well above the Federal judgment rate. DX 5001A at ¶ 39 and Exh. 5.

270. In an effort to demonstrate FDIC's motive in changing the rate, Professor Calomiris points to an increase of $64.7 million in the amount of PII owed by the Carteret receivership as a result of the FDIC's change in interest calculation methodology. DX 5001A at

¶ 40. Most of the difference resulting from the different accrual methods, however, occurred after 1999. DX 5001A at ¶ 40 and Exh. 6. In early 1999, the year the change was made, the cumulative difference in the fixed versus floating methods stood at $20.2 million, less than one-third of the $64.7 million that Professor Calomiris calculates as excessive. DX 5001A at ¶ 40 and Exh. 6. By including the additional $44.5 million in cumulative interest after 1999, Professor Calomiris engages in 20/20 hindsight. DX 5001A at ¶ 40.

### 3. The RTC/FDIC's Pro Rata Payment Of The Three Loans Was Appropriate

271. The RTC/FDIC made three major loans to the receivership (one for the Florida branches and two for New Jersey branches), at three different fixed rates, on three different dates. DX 5001A at 20, ¶ 43. The interest rate on the $256 million October 1994 loan was set at 6.06 percent per annum; the interest rate on the $616 million January 1995 loan was set at 7.34 percent per annum; and the interest rate on the $598 million March 1995 loan was set at 6.57 percent per annum. DX 5001A at ¶ 43.

272. Professor Calomiris argued that repayment of the debt for these three different loans should have been based upon paying off the highest-cost loan first, followed by the second-highest-cost loan, and then the lowest-cost loan. Tr. 3616:19-25 (Saunders); DX 5001A at ¶ 43; PX 2703A at ¶¶ 42-43. In banking, however, a bank or lender normally pay loans off on a pro rata basis, as the RTC/FDIC did, paying down the principal of each of the three loans in an equal amount. Tr. 3617:1-8, 3626:25-3627:6 (Saunders); DX 9782; DX 5001A at ¶ 43. Because the three loans were of equal seniority in terms of their claim to the receivership's assets, they would be pari passu. DX 5001A at ¶ 43. In contrast to Professor Calomiris's debtor-friendly approach, a bank could also choose a "creditor-friendly" approach by paying off the lower-cost loans first.

Tr. 3626:19-24 (Saunders). The RTC's even-handed approach of pro rata payment favored neither the debtor nor the creditor. DX 9785; Tr. 3627:7-13 (Saunders).

#### 4. The Escrow Interest Calculation Is Consistent With The Virtually Risk-Free Nature Of Funds Held In Escrow

273. The FDIC established an escrow account for the deposit premiums received from Carteret's branch sales and recoveries from Carteret's assets, and paid interest on the escrow balance based on the three-month Treasury Bill rate. Tr. 3617:9-14 (Saunders); Tr. 810:9-24, 811:11-16 (Green); DX 5001A at ¶ 44. This interest rate was based upon the interest that the receiver earns on its cash at the Federal Home Loan Bank of Chicago. Tr. 811:11-16 (Green).

274. Professor Calomiris claimed that the interest rate that the FDIC paid on the escrow account was too low, and asserted that it was inconsistent to levy this short-term risk-free rate on the escrow account while charging higher Federal judgment rates on the Government's loans to the Carteret receivership. Tr. 3617:9-12 (Saunders); DX 5001A at ¶ 44. The FDIC, however, chose a low-risk investment in order to protect the funds in the escrow account. Tr. 3617:16-21 (Saunders); DX 9782. Further, the principal in the escrow account's balance is virtually risk-free. By definition, funds in an escrow account are held at arm's length from the general assets of the receivership. DX 5001A at ¶ 44. In contrast, the principal and interest that the Government could expect to receive on its loans to the receivership depended on the uncertain value that they believed (ex ante) would be generated from the sale of Carteret's assets. Id. When there is uncertainty in a loan's collateral, normal lending practices instruct that the lender should charge an additional risk premium on the loan above the risk-free rate. Id. Professor Saunders thus concluded that fundamental concepts of financial economics supported the use of a higher rate on risky loans made to the receivership, and a lower rate on cash balances

held by the receivership in an escrow account. Id.

### C. The Length Of Time Required To Resolve Carteret Did Not Reduce The Premium Realized From The Sale Of The Branches

275. FDIC, after closing Carteret in 1992, sold its branches in 1994 and 1995. Tr. 3627:23-24 (Saunders). Professor Calomiris argues that this was an unduly long delay and that Carteret should have been sold as a whole bank in December 1993. Tr. 3627:21-3628:2 (Saunders). According to Professor Calomiris, the RTC could have received a higher price for Carteret's branches than they did in 1994 and 1995 if it had sold the whole bank in 1993. Tr. 3628:2-7 (Saunders); DX 5001A at ¶ 45. Although Professor Calomiris asserts that the delay was due to a lag in Congressional funding, the RTC could not control when Congress decided to provide this funding. DX 5001A at ¶ 45.

#### 1. Carteret Was Not A Relatively Healthy Failed Thrift

##### a. Carteret Relied Upon Funding Support And Subsidies From The FHLB And The RTC

276. Professor Calomiris asserted that the RTC should have resolved Carteret more quickly because it was a relatively "healthy" failed thrift and, in fact, "one of the healthier institutions resolved in that time period." PX 2703A at ¶ 69. Carteret's history of indebtedness and the degree of funding subsidies provided by the FHLB of New York and the RTC (which improved the thrift's apparent performance) demonstrate, however, that Carteret was not a relatively healthy thrift. DX 5001A at ¶ 46.

277. Carteret's sales of 21 branches in Florida, Maryland, and New Jersey were funded principally by loans and variable rate, LIBOR-based borrowings from the FHLB, at considerable risk to the FHLB. DX 5001A at ¶ 47; PX 10 at KH053790-91. Carteret's deposits declined by

about $1.1 billion, while its advances from the FHLB increased by a comparable $1.0 billion. DX 5001A at ¶ 47. Short-term rates on deposits decreased considerably in 1991 and 1992, leading to a decline in the cost of, and Carteret's reliance upon, FHLB borrowings. Id. Due at least in part to this decline, Carteret's net profits were slightly positive in late 1992, before the thrift established the additional $8 million in reserves required by the OTS. Id.

278. When the RTC took over Carteret in December 1992, the RTC began replacing $1.8 billion in FHLB advances with RTC advances. DX 5001A at ¶ 48. The RTC rate was based upon the three-month Treasury bill plus 25 basis points, adjusted weekly. This rate was less than the rate on the FHLB advances, which was based upon three-month and six-month LIBOR rates. Id. Carteret, therefore, continued to reap the benefits of the lower rates for some time. Id.

279. The extensive and relatively cheap funding by the FHLB from 1990 through 1992, and the continued funding by the RTC after 1992, contributed positively to Carteret's performance both before and after the receivership. DX 5001A at ¶ 49. The low interest to expense ratio, and positive 1992 return on assets noted by Professor Calomiris as evidence of Carteret's health, were, therefore, due, at least in part, to funding support and subsidies provided by the FHLB and the RTC. DX 5001A at ¶ 49.

**b. Professor Calomiris's Choice Of Financial Measures Of Health Are Unsupported**

280. Professor Calomiris chooses three financial ratios – past-due and nonaccruals to total loans, return on assets, and deposit interest expense to deposits – that purportedly show Carteret's relative health at its failure, when compared with 28 other failed thrifts. DX 5001A at ¶ 50; PX 2703A at 41, Table 5. Professor Calomiris's ratios, however, date from September 30,

1992, one quarter prior to Carteret's failure, making them inapplicable to the situation as of December 1992. DX 5001A at ¶ 50.

281. Carteret's heavy reliance on FHLB borrowings from 1990 through 1992 also makes it difficult to compare it with Professor Calomiris's 28 "comparable" thrifts. DX 5001A at ¶ 51. Due to these FHLB borrowings, Carteret could afford to be less competitive in the deposit market and rely less on "hot money" deposits offered at higher interest rates. Id.

282. Further, Professor Calomiris's interest expense ratio is misleading because it focuses only on the cost of deposits. Because a large part of Carteret's interest expense involved the FHLB advances, Professor Calomiris understates Carteret's interest expense relative to the sample. DX 5001A at ¶ 50.

283. Had Professor Calomiris considered other financial ratios, Carteret would not have appeared to be healthier than an average thrift as of September 30, 1992. DX 5001A at ¶ 51. Carteret's tangible capital ratio, which is the litmus test of financial health, was negative, with a tangible capital to tangible assets ratio of -1.29 percent. Id. at ¶ 51 and Exh. 7. Because Carteret was insolvent, it had to be transferred to the RTC whether or not various financial ratios compared favorably or unfavorably to a sample.

**2. Professor Calomiris's Claim That The "Delay" Resulted In A Loss To The Receivership Is Disproved By Actual Marketplace Deposit Premium Data Showing A Gain To The Receivership**

284. Contrary to Professor Calomiris's assumptions, the revenues actually generated from Carteret's sale of branches was higher than it would have achieved in 1993. Tr. 3628:18-24 (Saunders).

285. When a branch or bank is sold, the selling thrift will normally receive a deposit

premium that reflects the privately assessed value of the deposits that are transferred to the acquiring bank or thrift. Tr. 3629:3-3630:15 (Saunders); DX 5001A at 27, ¶ 53. This premium reflects the acquiring thrift's view of the value of its absorption of long-term customer relationships established by the target bank or branch, potential future lending and mortgage business, and potential demographic synergies from acquiring a bank outside an acquirer's current business area, including the potential diversification of local or geographic risk. Tr. 3629:23-3630:15 (Saunders); DX 5001A at ¶ 53.

286. Professor Calomiris claims that Carteret could have fetched a higher sales price in 1993, than it did 1994 and 1995 because the thrift lost deposits after 1993. Tr. 3631:6 (Saunders); PX 2703A at ¶¶ 75-81. The deposit premium, however, will not necessarily decrease with a decline in transferable deposits if the deposit premium has increased due to improved economic conditions, an increase in potential buyers, or increased synergies. DX 9787; Tr. 3630:16-3631:16 (Saunders); DX 5001A at ¶ 54. Although Carteret lost deposits between 1992 and 1995, it could generate more revenue from the sale of the deposits that remained because the market increased the value of each dollar of deposits after the passage in 1994 of the Riegel-Neal Act, which allowed full interstate banking. Tr. 3631:1-18 (Saunders).

287. Professor Calomiris claims that Carteret would have received a higher deposit premium if it had been sold as a whole bank in December 1993, but provides no hard evidence about actual changes in the deposit premiums in the marketplace. DX 5001A at ¶ 56. In fact, he acknowledges that he provides no such evidence in his report: "Although I do not provide any specific estimates of the sizes of the losses of premium per deposit dollar in this report, I present logic and evidence that these losses were significant economically." PX 2703A at ¶ 88. The

"expected premium" employed by Professor Calomiris to estimate lost revenues, is calculated using payout and resolution cost data from the FDIC, rather than the readily-available direct evidence of actual deposit premiums. The data is, therefore, irrelevant. DX 5001A at ¶¶ 56-57.

288. An analysis of this transaction-based premium data from actual marketplace branch sales demonstrates that percentage premiums were considerably higher, on average, in 1994 and 1995 than they were on average in either 1992 or 1993, when Professor Calomiris assumes the sale would have occurred absent purported Congressional funding delays. Tr. 3634:12-3636:3 (Saunders); DX 5001A at ¶¶ 57, 71-80. On a national level, the weighted mean deposit premiums in 1995 increased from 1993 levels by 1.9 times (from 4.46 percent to 8.35 percent). Tr. 3634:19-3635:18 (Saunders); DX 9788; DX 5001A at ¶ 73 and Exh. 12. For New Jersey branches, the weighted mean deposit premiums doubled from 5.25 percent in 1993 to 10.82 percent in 1994. Tr. 3634:25-3635:18 (Saunders); DX 9788; DX 5001A at ¶ 74 and Exh. 12. For Florida branches, the weighted mean deposit premiums rose dramatically from 4.48 percent in 1993 to 10.85 percent in 1995. Tr. 3634:25-3635:20 (Saunders); DX 9788; DX 5001A at ¶ 75 and Exh. 12.

289. Professor Calomiris also asserts, without proof, that the proceeds to the receivership would have been greater had Carteret been sold as a whole bank, rather than separately as clusters of branches. DX 5001A at ¶ 82. Academic evidence, however, suggests that branch sales generated greater proceeds for the RTC, not lower proceeds, as contended by Professor Calomiris. Id. Furthermore, marketplace data shows that the weighted mean deposit premium for whole bank transactions in 1993 was 2.29 percent nationally. Tr. 3636:15-3637:17 (Saunders); DX 5001A at ¶ 83. Applying this percentage premium to the $1.787 billion in

deposits that Carteret had in December 1993 would result in a premium of only $40.9 million, considerably less than the RTC actually achieved in selling Carteret in clusters of branches. Id. The RTC sold the New Jersey and Florida branch deposits in 1994 and 1995 for a $143.8 million deposit premium. DX 9790; Tr. 3637:20-24 (Saunders).

290. Professor Calomiris asserts, however, that deposits would have been sold in 1993 for the same percentage premium as that received by the RTC for Carteret's own New Jersey branches in 1995 – 10.5 percent. DX 9790. Multiplying $1.787 billion in deposits by the 10.5 percent deposit premium percentage would result in a premium of $187.6 million, or $43.8 million more than the RTC actually received. DX 9790. The 1995 premium, however, is over twice as large as the 1993 mean and median of deposit premiums nationwide or for New Jersey or Florida, which reached only 4.46 percent nationwide, 5.25 percent for New Jersey, and 4.48 percent for Florida. DX 9790; DX 9788; Tr. 3634:17-3635:3 (Saunders). The use of the 10.5 percent deposit premium percentage is counterfactual because of the vast structural changes in the financial system and banking markets after the passage of the Riegel-Neal Act in 1994. Tr. 3638:11-17 (Saunders). If, instead, the mean of actual real-world premiums in 1993 – 4.46 percent – is applied to Carteret's deposits of $1.787 billion, the result is a premium of only $80 million, much less than the RTC actually realized. Tr. 3638:23-3639:3 (Saunders); DX 9790. As noted above, using, as advocated by Professor Calomiris, the mean percentage premium from whole bank transactions in 1993 – 2.29 percent – would result in revenue of only $40.9 million, over $100 million less than the amount actually received by the RTC. Tr. 3639:4-9 (Saunders); DX 9790.

291. In conclusion, there is no evidence to support the assertion that Carteret's sale as a

whole bank in 1993 would have resulted in additional deposit premiums, enabling it to avoid a loan. DX 9790; Tr. 3639:10-3640:1 (Saunders). In fact, any delay benefitted Carteret. Tr. 3639:10-3540:1 (Saunders).

### 3. Professor Calomiris Incorrectly Assumes That A Whole Bank Resolution Results In Higher Deposit Premiums Than A Branch Sale Resolution

292. Professor Calomiris assumes that, in a "but-for" world, Carteret would have been sold as a whole bank in 1993 in a particular type of whole bank transaction called a merger or reprivatization. Tr. 3642:11-15 (Saunders). In a merger or reprivatization, Carteret would have been merged into another bank in the private market or would have received a capital infusion, allowing it to be reprivatized. Tr. 3642:16-20 (Saunders). Professor Calomiris asserts that, through this type of transaction, Carteret would have received a greater premium than the RTC received by selling the branches in clusters (a purchase and assumption transaction). PX 2703A at ¶ 94; Tr. 3642:21-3643:2 (Saunders). Professor Calomiris, however, does not acknowledge that mergers and reprivatizations are costly compared with other forms of resolution and were almost never used after 1989. Tr. 3643:3-5, 3644:23-3645:1 (Saunders). After the RTC came into existence in 1989, the merger and reprivatization form of transaction was only used three times between 1989 and 2004. DX 9793; Tr. 3643:6-3644:11 (Saunders). The RTC had to use the least-cost method of resolution, which was purchase and assumption, not mergers and reprivatizations. Tr. 3644:12-20 (Saunders); DX 9794. Professor Calomiris's assumption is therefore inconsistent with historical facts. DX 5001A at ¶¶ 67-68.

**D. The Minority Preference Program Did Not Reduce The Proceeds Recovered In The Resolution Of Carteret**

293. The Minority Preference Program ("MPP"), mandated by the RTC Completion Act of 1993, Pub. L. No. 103-204, ¶ 3(a), 107 Stat. 2369, 2375-76 (codified at 12 U.S.C. § 1441a(w)(17)(A), accorded minority bidders who bid within ten percent of the winning price in the first round of an auction for failed thrift deposits an opportunity to rebid and match the winning bid. Tr. 3647:17-23 (Saunders); DX 6189 at AS-06-000513. Further, the MPP provided that the winning minority bidder was entitled to acquire at fair market prices performing mortgages whose value matched the liabilities being assumed in the resolution of the failing thrift. Id. Professor Calomiris asserts that the MPP may have resulted in assets being sold at below fair market value, but provides no evidence to support this assertion.

294. The evidence demonstrates that the MPP did not injure, but instead benefitted, Carteret. The MPP broke up the near-monopoly that non-minority banking institutions had exercised over troubled institutions. DX 5001A at ¶ 91. Encouraging a greater number of bidders by encouraging the entry of minority bidders likely increased demand and, thus, the price at which branches were sold. Tr. 3648:5-17, 3648:21-23 (Saunders).

295. Carteret received over 100 bids in auctions for its New Jersey and Florida branches. Tr. 3648:18-20 (Saunders); DX 9795; DX 5001A at ¶ 93; PX 4981 at C-AM-A-008742.

296. Contrary to Professor Calomiris's contention, the MPP did not result in delaying thrifts' resolutions or allow minority purchasers to acquire performing mortgages at below market prices. Studies by the General Accounting Office ("GAO") found no fault with the MPP. Tr. 3649:1-13 (Saunders); DX 9795. In its analysis of the RTC's 1993 resolution experience, the

GAO found that the RTC had followed appropriate procedures and guidelines. DX 5001A at ¶ 88. Any delay in resolutions was the result of the RTC actively following the "least cost resolution" policy as required by Congress, as well as implementing the depositor preference requirements of the NDPA by giving depositors a higher preference for future resolution proceeds than other creditors. DX 9796; Tr. 3649:20-3650:9 (Saunders); DX 5001A at ¶ 88. In fact, the GAO noted that the MPP's "premise was that the matching minority bid would result in the least possible resolution cost to RTC, since it is to be considered only after RTC has determined the least costly resolution alternative based on its review of all bids received." DX 6189 at AS-06-000513. The GAO did not view the MPP's requirements as either delaying the sale process or resolution or producing lower premiums, concluding that "RTC's implementation of a policy to extend a preference to minority bidders when making resolution decisions appeared consistent with FDCIA's least-cost requirements." DX 9796; DX 5001A at ¶ 88; DX 6189 at AS-06-000511.

297. Another 1995 GAO study specifically considered whether sales of performing mortgages to minority acquirers occurred at fair market prices. Tr. 3650:13-20 (Saunders); DX 6190. The GAO asked firms experienced in pricing large volumes of mortgage loans to evaluate the loans prior to their sale, and concluded that "RTC had established a reasonable process anchored to agency and mortgage securities market standards." DX 6190 at AS-06-000522; DX 5001A at ¶ 89; Tr. 3650:21-24 (Saunders). In the context of pricing mortgage loans, the study found that the RTC "was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total return on the disposition of assets as required by law." DX 6190 at AS-06-000523; DX 5001A at ¶ 89; Tr.

3650:25-3651:4 (Saunders). By October 1995, 11 minority acquirers had purchased over 4,000 loans, and 64 percent of those assets were sold for between 91 and 100 percent of their book value. DX 9797; DX 6190 at AS-06-000532-33.

### E. Carteret's Federal Tax Liability Was Properly Calculated

#### 1. The Post Insolvency Interest Was Not A Deductible Expense In 1995

298. Pursuant to FDIC policy, which was applied to Carteret and all other receiverships, post insolvency interest ("PII") would not be recognized as an expense on a receivership's financial statements until 95 percent of the principal of the claims asserted against the receivership had been paid to creditors. Tr. 857:6-19 (Green); Tr. 2684:17-2685:24 (Hughes). Under the NDPA, 12 U.S.C. § 1821 note, receivership assets could not be used to pay PII until the principal claims had been paid. PX 4314; Tr. 2680:12-18 (Hughes). Therefore, until 95 percent of the principal claims had been paid, the FDIC regarded PII as too contingent to record as an accrued expense on the receivership's financial statements or a deductible expense for purposes of tax accounting. Dep Tr. 88:19-22; 90:10-24 (Vortreide) (JX 1 at 629).

299. In 1998, after 95 percent of the principal claims had been paid to creditors, FDIC filed amended federal tax returns on Carteret's behalf to take advantage of the net operating losses ("NOLs") created by the PII being recognized as a deductible expense on the 1998 Federal tax return. Under the Internal Revenue Code ("IRC"), however, NOLs could be carried back only two years. Dep. Tr. 93:22-94:5 (Vortreide) (JX 1 at 630). Therefore, because of the two-year carryback rule with respect to NOLs, FDIC could not amend the 1995 return. Id.

300. Although the IRS allowed PII to be recognized as a deductible expense from its inception in the tax settlement of the Ben Franklin receivership, the IRS has not taken a formal

position on the appropriate time to accrue PII on receivership tax returns. PX 5106 at Tr. 13:13-16 (Gill). The FDIC continues to apply the rule that, under the NDPA, PII is too contingent and uncertain to be recognized as an accrued expense until 95 percent of the principal claims are paid to creditors of the receivership.

### 2. Federal Financial Assistance Was Reflected Properly On The Receivership's Tax Returns

301. The Federal Financial Assistance ("FFA") recorded as income on Carteret's 1995 Federal tax return was calculated in accordance with interim IRS regulations issued in 1992. Dep. Tr. 9:14-11:1 (Vordreide) (JX 1 at 609-10). Although a final regulation governing FFA was issued in 1995, FDIC's model was based upon the 1992 regulation and was interpreted as being applicable under the 1995 regulation as well. The IRS has conducted audits of receivership tax returns and has not questioned the calculation of FFA on the 1995 return. Dep. Tr. 266:4-13 (JX 1 at 669-70). Indeed, the IRS affirmatively "accepted the FAA calculations [reflected in the Carteret tax returns]." Dep. Tr. 269:16-24 (JX1 at 670-71).

302. The IRS model for calculating the amount of FFA to be recognized as income is more conservative than the approach used by the FDIC in preparing Carteret's 1995 tax return. Dep. Tr. 269:16-24 (JX 1 at 670-71). There is no reason to believe the IRS would calculate FFA at a lower level than the FDIC if the decision was made to allow Carteret to amend the 1995 tax return. Id.

### 3. Carteret's 1992 Tax Loss Is Uncertain And Unavailable As A Deductible Expense

303. Contrary to Ambase's contention, although the Carteret 1992 tax return indicates a tax loss of $73.9 million, the consolidated return filed by Ambase on behalf of itself and

subsidiaries, including Carteret, shows a net loss of $12,837,065 for the consolidated group. PX 4402; PX 4404. The loss reflected in the consolidated Ambase return for 1992 is substantially lower than the net loss reflected on the Carteret 1992 return. The difference is approximately accounted for by virtue of bad debt deductions that total $118.2 million on the Carteret return and only $58 million on the consolidated return.

304. There is no evidence in the record to explain the difference in the bad debt deductions on the two federal tax returns. Further, there is no evidence to explain why the loss on the consolidated return for the 1992 tax year is less than the loss on the Carteret return. That the consolidated return reflects a small loss indicates on its face that the Carteret's loss sheltered other Ambase subsidiary income in 1992. Accordingly, the $73.9 million loss recognized by Carteret on its 1992 return is not now available as a net loss carryforward.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ David A. Levittt
DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

OF COUNSEL:
ELIZABETH HOSFORD
Senior Trial Counsel

DELISA SANCHEZ
AMANDA L. TANTUM
Trial Attorneys

Date: September 12, 2008

CERTIFICATE OF FILING

I hereby certify that on this 12th day of September 2008 a copy of the foregoing Proposed Findings of Fact was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access these filings through the Court's system

/s/ David A. Levitt.

.