**No. 93-531C**
**(Senior Judge Loren Smith)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**AMBASE CORPORATION AND**
**CARTERET BANCORP, INC.**

**Plaintiffs,**

**and**

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES OF AMERICA**

---

# POST-TRIAL BRIEF OF THE UNITED STATES

---

**MICHAEL F. HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Deputy Director**

**OF COUNSEL:**
**ELIZABETH M. HOSFORD**
**Senior Trial Counsel**

**VINCENT D. PHILLIPS**
**DELISA SANCHEZ**
**AMANDA L. TANTUM**
**Trial Attorneys**

**DAVID A. LEVITT**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20005**
**Tel: (202) 307-0309**
**Fax: (202) 514-7969**

**Date: September 12, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

POST TRIAL BRIEF OF THE UNITED STATES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Ambase's Claimed Damages Did Not Result From The Breach. . . . . . . . . 3

B. Professor Calomiris's "But-For" Model Is Unsupported.. . . . . . . . . . . . . . . 4

C. Professor Calomiris's Damages Estimates Are Invalid. . . . . . . . . . . . . . . . . 5

D. The RTC/FDIC's Management of Carteret's Receivership Has Been Consistent With Law And Regulation, And Any Delays Alleged By Ambase Benefitted Carteret, Rather Than Harmed It. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. CARTERET COULD NOT HAVE SURVIVED EVEN IF GOODWILL WAS COUNTED AS REGULATORY CAPITAL. . . . . . . . . . . . . 9

A. "But For" Causation Is The Appropriate Standard In This Case. . . . . . . . . 9

B. The Undisputed Contemporaneous Evidence Demonstrates That Carteret Would Not Have Survived In A No Breach World. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. Carteret's Financial Performance Deteriorated Significantly Before The Breach. . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. FIRREA Had No Material Impact On Carteret's Regulatory Capital Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . 15

a. The Period Prior To The Injunction. . . . . . . . . . . . . . . . . . . 15

b. Carteret Secures An Injunction. . . . . . . . . . . . . . . . . . . . . . 16

c. The Injunction's Aftermath. . . . . . . . . . . . . . . . . . . . . . . . 17

3. Carteret's Pre-Breach Financial Weakness Would Have Caused Carteret To Fail Regardless Of Goodwill. . . . . . . . . . . . . 19

a. Carteret's Poor Financial Health Resulted From Its Pre-FIRREA Risky Business Strategy. . . . . . . . . . . . . 19

b. In 1991, Ambase Realized That Carteret Was On The Brink Of Failure, Even Including Goodwill As Regulatory Capital. . . . . . . . . . . . . . . . . . . . . . . . . . . 20

c. The OTS Recognized That Carteret Was Severely Undercapitalized Due To Its Risky Corporate And Commercial Lending, But Gave The Thrift Time To Pursue An External Capital Infusion. . . . . . . . . . . . . . 21

(1) Kohlberg and Co. Letter Of Intent. . . . . . . . . . . . . . 22

(2) The Carlyle Group Letter Of Intent. . . . . . . . . . . . 22

(3) OTS's Renewal Of Its Recommendation To Transfer Carteret To The RTC. . . . . . . . . . . . . . 23

(4) OTS's Decision To Delay Transfer And Ultimate Transfer Of Carteret To The RTC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C. Because Carteret Would Not Have Survived In A No-Breach World, It's Damages Claims Are Precluded As A Matter Of Law. . . . . . 25

D. The Regulators' Testimony Does Not Suggest That Carteret Would Not Have Been Seized In The Absence Of The Breach. . . . . . . . 27

1. Mr. Vigna's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. Mr. Albanese's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3. Other Regulator's Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . 30

4. The Testimony Of Government Experts. . . . . . . . . . . . . . . . . . . . . 31

5. The Contemporaneous Records. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

E. The Regulators Acted Reasonably In Transferring Carteret to the RTC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

F. Professor Calomiris's Proposed "Adjustments" To Carteret's Regulatory Capital Are Baseless And Fail To Demonstrate Carteret Would Have Survived In The Absence Of The Breach. . . . . . . . 35

1. Professor Calomiris Overstates The Amount Of Goodwill On Carteret's Balance Sheet In The "But For" World.. . . . . . . . . . 36

2. "But For" Carteret Would Have Been In A Worse Position If It Had Retained The Branches Absent The Breach. . . . . . . . . . 40

3. The Breach Did Not Cause Carteret To Pay $17 Million More For Deposits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

4. "But For" Carteret Could Not Have Reduced Its Risk-Based Capital Requirement By Securitizing $1.5 Billion In Mortgages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5. The Breach Did Not Cause Carteret's Shrinkage And Additional Assets Would Not Have Rectified Carteret's Regulatory Capital Deficiencies. . . . . . . . . . . . . . . . . . . . . . . . . 47

6. Ambase Could Not Have Made Up Carteret's Capital Shortfall Absent The Breach. . . . . . . . . . . . . . . . . . . . . . . . . . . 49

7. Carteret Would Not Have Reserved $20-$50 Million Less In A "But For" World. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

a. Carteret's Board Of Directors And Outside Auditor Concluded, As Did The OTS, That The $150 Million Addition To Reserves Was Appropriate And Adequate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b. An Independent Evaluation Concluded That Mr. Moor's Analysis And Reserve Recommendation Were Fully Supported. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

c. The Evidence Refutes Ambases's Claim That Mr. Moor's Reserve Recommendation Was Based Upon Liquidation Values of Assets. . . . . . . . . . . . 54

d. The Evidence Does Not Support Ambase's Assertion That Carteret Could Not Provide Seller Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

e. Ambase's Claim That, In A "But-For" World, Carteret Would Have Sold The Assets Later Is Unsupported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

f. Carteret Would Have Incurred Substantial Additional Costs Had It Held Non-Performing Assets Longer. . . . . . . . . . . . 56

8. "But For" Carteret Could Not Have Raised Capital By Selling CMC Or Mortgage Servicing Rights. . . . . . . . . . . . . . . . . . 58

a. CMC.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

b. Mortgage Servicing Rights. . . . . . . . . . . . . . . . . . . . . . . . . . 60

9. "But For" Carteret Would Not Have Been Able To Raise Outside Capital To Satisfy Minimum Regulatory Capital Requirements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

a. In 1992, Carteret Continued To Fail Regulatory Capital Requirements And Experience Problems With Its Corporate And Commercial Loan Portfolios. . . . 61

b. Ambase's Claim That Regulators Impeded Carteret's Capital- Raising Effort Is Unfounded. . . . . . . . . . . . . . . . . 62

c. The Exclusion Of Goodwill From Regulatory Capital Had No Effect On Investors' Views Of Carteret. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

III. THE DAMAGES PLAINTIFFS SEEK WERE NOT REASONABLY FORESEEABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A. The Regulators Could Not Have Reasonably Foreseen Ambase's Alleged Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

B. Ambase's Foreseeability Arguments Lack Economic Logic And Are Inconsistent With The Case Law . . . . . . . . . . . . . . . . . . . . . . . . 67

IV. THE ALLEGED DAMAGES ARE NOT REASONABLY CERTAIN. . . . . . . . 69

A. The Evidence Does Not Support Professor Calomiris's $251.4 Estimate For "Market Value" At The Time Of Breach. . . . . . . . . . . . . . . . 69

1. Ambase Paid Too Much For Carteret In 1988. . . . . . . . . . . . . . . . . 70

2. Carteret's Value Dropped Precipitously Between Its Acquisition By Ambase And The Breach. . . . . . . . . . . . . . . . . . . . 71

3. The Sample Upon Which Professor Calomiris Relies To Estimate Carteret's Market Value Does Not Represent The Bank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

4. The Evidence Does Not Support Ambase's Claim That The Value Of Carteret's Stock Was Depressed By The Inability To Pay Dividends And FIRREA's Announcement. . . . . 73

5. The Evidence Refutes Professor Calomiris's Assertion That Former Carteret Directors Made A Bid To Purchase The Thrift. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

B. The "Current Market Value" And "Terminal Value" Damage Estimates Are Invalid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

1. The "Current Market Value" and "Terminal Value" Measures Incorrectly Assume Carteret Is Entitled To Its Value In 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

2. Professor Calomiris Has Failed To Provide A "But For" Model Of Alleged Future Cash Flows. . . . . . . . . . . . . . . . . . . . . . . 79

3. Even If A "But For" Model Was Not Required As A Matter Of Law, Carteret's "But For" Earnings Cannot Be Estimated By The Gordon Growth Model . . . . . . . . . . . . . . . . . . . . . . . . . . 81

4. Even If "But For" Carteret's Growth Could Be Estimated By The Gordon Growth Model, Professor Calomiris Uses Incorrect Inputs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

a. Professor Calomiris Overestates Carteret's Market Value At The Time Of Breach. . . . . . . . . . . . . . . . 83

b. The Model Improperly Excludes Carteret's 1990 and 1991 Losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

c. Professor Calomiris Improperly Measured Carteret's Cost Of Capital. . . . . . . . . . . . . . . . . . . . . . . . . 85

5. The Current Market Value and "Terminal Value" Measures Present Other Fatal Flaws. . . . . . . . . . . . . . . . . . . . . . . . 86

a. Defects In Estimation of "But For" Carteret's Current Market Value . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

b. Professor Calomiris's "Terminal Value" Analysis is Invalid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

C. The Alleged "Wounded Bank" Damages Are Invalid. . . . . . . . . . . . . . . . . 89

1. Ambase Cannot Recover Costs That Were Not Incurred By Carteret.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

2. Even If Carteret Had Incurred The Costs, They Resulted From Independent Business Decisions, Not The Breach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

D. There Is No Basis For A Tax Gross-Up.. . . . . . . . . . . . . . . . . . . . . . . . . 93

E. Professor Saunders Was A Credible Witness. . . . . . . . . . . . . . . . . . . . . . . 94

V. THIS COURT LACKS JURISDICTION TO REVIEW THE RECEIVERSHIP DEFICIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

A. The Prior Ruling Concerning Jurisdiction Should Be Revisited. . . . . . . . 98

B. The Tucker Act Does Not Accord This Court Jurisdiction To Review The Receivership Deficit.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

C. The FDIC Act Also Precludes Judicial Review Of The Receivership Deficit In This Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

VI. THE RTC'S/FDIC'S MANAGEMENT OF THE RECEIVERSHIP HAS BEEN CONSISTENT WITH LAW AND REGULATION. . . . . . . . . . . . 103

A. The Alleged Delay In Funding And Minority Preference Program Benefitted Rather Than Harmed Carteret. . . . . . . . . . . . . . . . . 103

1. If Carteret Had Been Resolved In 1993, The "But-For" Deposit Premiums Would Have Been Lower, Not Higher. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

2. The Duration Of The Receivership Did Not Result In Lower Deposit Premiums. . . . . . . . . . . . . . . . . . . . . . . . . . . 107

3. The Minority Preference Program Did Not Result In Lower Proceeds Or Other Injury To Carteret. . . . . . . . . . . . . 108

4. The "Freeze" On Assets Did Not Require Carteret To Borrow From The FDIC/RTC. . . . . . . . . . . . . . . . . . . . . . . 109

B. The Enactment Of FIRREA Did Not Enlarge The Receivership Deficit By Eliminating Supervisory Goodwill. . . . . . . . . 111

1. The Goodwill Could Have Not Have Been Transferred To An Acquiring Institution.. . . . . . . . . . . . . . . . . . . . . . . . . . . 111

2. Even If The Goodwill Could Have Been Transferred To An Acquirer, Professor Calomiris's Valuation Models Are Flawed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

C. The RTC Properly Shut Down The Mortgage Origination Unit To Reduce The Risk Of Loss To The Receivership. . . . . . . . . . . . . . . 114

D. The FDIC Properly Applied The Federal Judgment Interest Rate To Its Loans To Carteret. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

1. The FDIC Was Legally Required To Charge PII And The Rates Were Not "Excessive". . . . . . . . . . . . . . . . . . . . 116

2. The FDIC Selected The Federal Judgment Rate To Comply With Regulatory Policy.. . . . . . . . . . . . . . . . . . . . . . 118

3. The Federal Judgment Rate Was Economically Appropriate And The Administration Of The Loans Was Consistent With Normal Banking Practice. . . . . . . . . . . . . 122

E. There Is No Basis Upon Which To Recalculate The FDIC's Estimate Of Carteret's Federal Income Tax Liability. . . . . . . . . . . . . . . 123

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Ambase Corporation v. United States,
58 Fed. Cl. 32 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Ambase Corporation v. United States,
61 Fed. Cl. 794 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

American Capital Corp. v. FDIC,
472 F.3d 859 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Bailey v. United States,
341 F.3d 1342 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 98

Bluebonnet Sav. Bank, FSB v. United States,
266 F.3d 1348 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Bluebonnet Sav. Bank v. United States,
67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

California Fed. Bank, FSB v. United States,
245 F.3d 1342 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 69

Canfield v. Reynolds,
631 F.2d 169 (2d Cir. 1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Carteret Sav. Bank v. Office of Thrift Supervision,
762 F.Supp. 1159 (D.N.J. 1991), rev'd, 963 F.2d 567 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . . 20, 100

Carruth v. United States,
627 F.2d 1068, 224 Ct. Cl. 422 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003). . . . . . . . . . . . . . . . . . 26, 27, 90

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Citizens Federal Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Commercial Fed. Bank v. United States,
59 Fed. Cl. 338 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

De Bazan v. Sec'y of Health and Human Servs.,
2008 WL 3927499 (Fed. Cir. Aug. 28, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

El-Shifa Pharmaceutical Industries Co. v. United States,
378 F.3d 1346 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

FDIC v. Citizens State Bank of Niangua,
130 F.2d 102 (8th Cir. 1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Fifth Third Bank of W. Ohio v. United States,
55 Fed. Cl. 223 (2003), aff'd in part and rev'd in part,
402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 80

Fifth Third Bank v. United States,
518 F.3d 1368 (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98

First Federal Lincoln Bank v. United States,
518 F.3d 1308 (Fed.Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 77, 78

First Fed. Sav. and Loan Ass'n of Rochester v. United States,
76 Fed. Cl. 765 (2007). . . . . . . . . . 99

First Hartford Corp. Pension Plan and Trust v. United States,
194 F.3d 1279 (Fed. Cir. 1999). . . . . . . . . . 103

Freeman v. FDIC,
56 F.3d 1394 (D.C.Cir. 1995). . . . . . . . . . 100

Genmoora Corp. v. Moore Bus. Forms, Inc.,
939 F.2d 1149 (5th Cir. 1991).. . . . . . . . . . 81

Glendale Federal Bank v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vac. in part, and remanded,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . 60

Glendale Fed. Bank v. United States,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . 68, 80

Glendale Fed. Bank, FSB v. United States,
378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . 69

Golden Pac. Bancorp v. FDIC,
1997 WL 626374 (S.D.N.Y. 1997). . . . . . . . . . 121

Golden Pac. Bancorp v. Federal Deposit Ins. Corp.,
2002 WL 31875395 (S.D.N.Y. 2002),
aff'd, 375 F.3d 196 (2nd Cir. 2004). . . . . . . . . . 117

Granite Mgmt. Corp. v United States,
416 F.3d 1373 (Fed. Cir. 2005). . . . . . . . . . 69, 90

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006), aff'd, 511 F.3d 1360 (Fed. Cir. 2008). . . . . . . . . . *passim*

Hall v. United States,
69 Fed. Cl. 51 (2005). . . . . . . . . . 100

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 ( Fed. Cir. 2004).. . . . . . . . . . 84

Holland v. United States,
2008 WL 4053227 (Fed. Cl. 2008). . . . . . . . . . 79

Home Sav. of Am., FSB v. United States,
399 F.3d 1341 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 90, 92

In Re Receivership Of First Nat'l Bank in Humboldt,
523 N.W.2d 591 (Iowa 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Kidder Peabody & Co., Inc. v. IAG Int'l Acceptance Group,
28 F.Supp.2d 126 (S.D.N.Y. 1998), aff'd, 205 F.3d 1323 (2nd Cir. 1999). . . . . . . . . . . . . . . . . . 36

Landmark Land Co. v. FDIC,
256 F.3d 1365 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 90

LaVan v. United States,
382 F.3d 1340 (Fed Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LeBlanc v. United States,
50 F.3d 1025 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Locke v. United States,
283 F.2d 521 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Micro Chemical, Inc. v. Lextron, Inc.,
317 F.3d 1387 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Myerle v. United States,
33 Ct. Cl. 1 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 92

Nat'l Controls Corp. v. Nat'l Semiconductor Corp.,
833 F.2d 491 (3rd Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

O'Melveny & Myers v. FDIC,
512 U.S. 79 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Plaintiffs In All Winstar-Related Cases At The Court v. United States,
44 Fed. Cl. 3 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Precision Pine & Timber, Inc. v. United States,
81 Fed. Cl. 235 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Ramsey v. United States,
101 F.Supp. 353 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Seldovia Native Ass'n, Inc. v United States,
144 F.3d 769 (Fed. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Slattery v. United States,
69 Fed. Cl. 573 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 65

Southern Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Southwest Inv. Co., Inc. v. United States,
63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005).. . . . . . . . . . . . . . . . . . . 25, 26

Suess v. United States,
52 Fed. Cl. 221 (2002), aff'd, 535 F.3d 1348 (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 39, 85

Suess v. United States,
74 Fed. Cl. 510 (2006), rev'd on other grounds, 535 F.3d 1348 (Fed. Cir. 2008).. . . . . 93, 94, 125

Tecon Engineers, Inc. v United States,
343 F.2d 943 (1965).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101, 102

Three Crown Ltds., P'Ship v. Salomon Bros, Inc.,
906 F.Supp. 876 (S.D.N.Y. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Tyger Constr. Co. v. Pensacola Constr. Co.,
29 F.3d 137 (4th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Mitchell,
463 U.S. 206 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Testan,
424 U.S. 392 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Winstar Corp.,
518 U.S. 839 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 95

Village of Oakwood v. State Bank and Trust Company,
2008 WL 3876324 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996), cert denied, 520 U.S. 1116 (1997). . . . . . . . . . . . . . . . . . . . . 90, 92

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Whitney Benefits, Inc. v. United States,
25 Cl. Ct. 232 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

**STATUTES, RULES, AND REGULATIONS**

12 C.F.R. § 360.3 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118, 119, 120

12 C.F.R. § 360.3(d) (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

12 U.S.C. § 1818. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 99

12 U.S.C. § 1821(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

12 U.S.C. § 1821(d)(6)(A)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101, 102

12 U.S.C. § 1821(d)(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

12 U.S.C. § 1821(d)(13)(D)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

12 U.S.C. § 1842. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

28 U.S.C. § 1491. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Financial Institutions Reform, Recovery, and Enforcement Act,
Pub.L.No. 101-73, 103 Stat. 183 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Riegle-Neal Interstate Banking Act,
Pub. L. 103-325, Title III, ¶ 319(a), 108 Stat. 2160 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . 104

Section 8(a) of the FDIC Act,
Publ. L. 89-695, 64 Stat. 879 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## MISCELLANEOUS

1 Dobbs Law of Remedies, ¶ 38(2) (2nd ed. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Restatement (Second) of Contracts § 347 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Restatement (Second) of Contracts § 351 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 65

Restatement (Second) of Contracts § 352 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

U.S. Constitution, amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

U.S. Constitution, amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **AMBASE CORPORATION AND CARTERET BANCORP, INC.**, | ) | |
| **Plaintiffs**, | ) | |
| and | ) | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION**, | ) | No. 93-531C<br>Senior Judge Loren Smith |
| **Plaintiff-Intervenor**, | ) | |
| v. | ) | |
| **THE UNITED STATES** | ) | |
| **Defendant.** | ) | |

**POST-TRIAL BRIEF OF THE UNITED STATES**

**INTRODUCTION**

## I. Background

In this Winstar-related case, Ambase Corporation ("Ambase") and Carteret Bancorp, Inc. ("Carteret") (hereafter sometimes collectively referred to as "Ambase"),[1] as derivative plaintiffs, seek damages relating to the alleged breach of goodwill contracts.[2] Intervening plaintiff the Federal Deposit Insurance Corporation ("FDIC") also seeks damages for breach of these alleged

[1] Ambase and Carteret Bancorp are first and second tier shareholders of Carteret Savings Bank ("Carteret"), respectively.

[2] The alleged contracts involve Carteret's 1982 acquisition of Barton Savings & Loan Association of Newark, New Jersey ("Barton") and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray") and 1986 acquisition of First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal") and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security").

agreements as successor to the rights of Carteret and manager of the Federal Savings and Loan Insurance Corporation Resolution Fund ("FRF"). Complaint In Intervention dated March 28, 1997.

This long-running dispute involves a number of prior decisions. In 2003, the parties filed cross-motions for summary judgment on contract liability. Ambase Corporation v. United States, 58 Fed. Cl. 32, 41-49 (Fed. Cl. 2003) ("Ambase I").[3] This Court held that Carteret's 1982 and 1986 acquisitions involved contracts that were breached by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989). Ambase I, 58 Fed. Cl. at 41-49. Because Carteret reported a substantial regulatory capital deficiency that it was unable to remedy by the time OTS seized the thrift, even counting goodwill as regulatory capital, the Court questioned whether the breach could cause damage to Carteret. Ambase I, 58 Fed. Cl. at 39-40. The Court noted that it would review, in the damages stage of the proceeding, Ambase's claim that Carteret would have remedied the deficiency in a "but-for" world. Id.

In 2003, following the Federal Circuit's holding in Bailey v. United States, 341 F.3d 1342, 1346 (Fed. Cir. 2003), Ambase filed a "Motion To Define The Measure Of Carteret's Contract Damages." Ambase asserted that the Government caused Carteret's deficit and, therefore, any award for the Government's breach should be paid directly to Ambase. Motion To Define Measure of Carteret's Contract Damages at 20-25. The Court held that it could review

[3] Ambase also sought summary judgment on its claims that: (1) FIRREA effected a taking; (2) the Government illegally exacted $50 million pursuant to the Capital Maintenance Agreement ("CMA"), and $12.5 million pursuant to the settlement of a cease and desist proceeding. The Court awarded summary judgment to the Government on these issues. Ambase I, 58 Fed. Cl. at 52-54.

the administration of the receivership because Ambase had a right to recover any surplus from Carteret's resolution. Ambase Corp. v. United States, 61 Fed. Cl. 794, 796-98 (2004) ("Ambase II"). The Court later ruled that this review would be consolidated with the trial on damages. See Amended Order dated April 13, 2007.

The Court tried the issues relating to damages and the receivership deficit between February 11, 2008 and April 4, 2008.

## II. Summary Of The Argument

### A. Ambase's Claimed Damages Did Not Result From The Breach

The overwhelming evidence at trial proved that FIRREA's elimination of goodwill from Carteret's regulatory capital did not cause the damages alleged by Ambase. Due to operating problems and massive losses in its corporate and commercial real estate portfolios, Carteret fell out of regulatory capital compliance as of June 1991, even counting goodwill as regulatory capital, and, thus, would have been seized in the absence of the breach. See, e.g., PFF at ¶¶ 111-113.[4]

In addition, our experts in capital markets, the operation of financial institutions, and damages, Professors Anthony Saunders and Roy C. Smith, established that Carteret's massive operating problems and commercial real estate losses would have prevented Carteret from raising sufficient capital to comply with FIRREA's minimum regulatory capital requirements even if goodwill had been counted as regulatory capital. See DX 5038A; DX 8000A; and DX 7000A.[5]

---

[4] "PFF" refers to "Defendant's Proposed Findings Of Fact" filed on September 12, 2008.

[5] Conscious of this Court's doubts concerning Carteret's ability to survive in the absence of the breach, Ambase I, 58 Fed. Cl. at 39-40, Ambase has focused its post-trial brief on testimony it contends establishes that regulators believed "but-for" Carteret would have survived.

**B. Professor Calomiris's "But-For" Model Is Unsupported**

Ambase did not contest the fact that, as of June 30, 1991, Carteret was unable to comply with FIRREA's minimum regulatory capital requirements even counting goodwill as regulatory capital. Former Carteret Chief Executive Officer ("CEO"), Richard A. Bianco, and Columbia Business School Professor, Charles W. Calomiris, the only witnesses presented by Ambase at trial,[6] testified that, in a "but-for" world, Carteret would not have fallen out of regulatory capital compliance, or would have remedied the deficit by selling assets or raising outside capital. Professor Calomiris presented a "but-for" model quantifying alleged changes in Carteret's balance sheet that would have allowed Carteret to satisfy FIRREA's minimum regulatory capital requirements absent the breach. PX 9053A. Although he acknowledged that the changes quantified in the model did not allow Carteret to satisfy the risk-based or core minimum regulatory capital requirements, he opined that changes he could not quantify, including lost profits from asset shrinkage and deposit runoff, would have made up the deficit. PX 9053A. He also opined that Carteret could have made up the deficits in risk-based and core regulatory capital by raising outside capital, selling branches, or selling Carteret Mortgage Company ("CMC") or mortgage servicing rights. PX 9054.

At trial, we demonstrated that virtually all of the operational and regulatory capital

---

Ambase Brief at 1-5 and 13-36. As we demonstrated, however, these claims are false. Rather than believing Carteret would have survived in a "but-for" world, these regulators testified that "but-for" Carteret could not have survived without a significant contribution of outside capital which it was unable to secure.

[6] Ambase also designated deposition testimony from a number of regulators and Carteret officials. Although we opposed Ambase's motion to designate deposition testimony, the Court ultimately granted the motion. Def. Opp'n To Pl.'s Mot. To Designate Dep. Testimony For Trial, at 1-2 (Jan. 7, 2008).

"adjustments" to "but-for" Carteret hypothesized in Professor Calomiris's model could not have occurred or would have resulted in Carteret reporting a greater deficiency in minimum regulatory capital in the "but-for" world than it reported in the actual world. Furthermore, even if all the "adjustments" to "but-for" Carteret's regulatory capital balance were achieved, as Professor Calomiris and Mr. Bianco concede, "but-for" Carteret still would not have been able to satisfy FIRREA's minimum regulatory capital requirements without raising approximately $100 million from outside investors. DX 9760. Carteret was unable to raise any amount in the actual world; investors care about the potential of the firm to earn profits: because goodwill is irrelevant to a firm's ability to earn profits, investors would not have put their money in Carteret even if goodwill had continued to count as regulatory capital. Tr. 2217:16-2218:16 (Vigna); Tr. 2953:8-19; 3768:1-6; 3814:24-3815:10 (R. Smith); PFF at ¶ 180-183.

### C. Professor Calomiris's Damages Estimates Are Invalid

On damages, Professor Calomiris argued alternatively that Carteret was entitled to its market value at the time of breach ($251.4 million, PX 9013), its "terminal value" as of 2008 ($782.2 million, PX 9024), or, based upon his "preferred approach," Carteret's market value as of 2008 ($904 million including "but-for" dividends" of $183.9 million, PX 9031 and 9041, and "wounded bank damages of $16.8 million, PX 9043).[7] With respect to Carteret's alleged market

---

[7] The market value at the time of breach model applied Carteret's estimated market-to-book-ratio at the time of breach to Carteret's book value at the time of the breach ($251.4 million, PX 9013). The "terminal value" model added Carteret's alleged lost profits between the breach and 2008 ($595.6 million) to Carteret's book value and estimated franchise value at the time of the breach net of goodwill amortization between the time of the breach and 2008 ($782.2 million, PX 9024). The third model estimated Carteret's current market value by adding alleged lost profits ($595.6 million) to Carteret's book value at the time of the breach net of goodwill amortization. Professor Calomiris then capitalized Carteret's alleged 2008 book value by a market-to-book ratio derived from the growth of nine stand-alone thrifts between the breach and

value at the time of the breach, the evidence demonstrated that Professor Calomiris grossly exaggerated the value a willing buyer would have paid for Carteret at the time of the breach. Because Carteret's stock was wholly owned by Ambase, Carteret's value could not be determined by the market price of its stock. Instead, Professor Calomiris constructed a model which purported to derive Carteret's market value at the time of the breach by multiplying its market-to-book ratio at the time of the Ambase acquisition by the change in the market-to-book ratio of a sample of thrifts between the time of the Ambase acquisition and the breach. Because Ambase overpaid for Carteret, estimating Carteret's market value at the time of breach by reference to the price Ambase paid one year prior to the breach is invalid. PFF at ¶¶ 205-208. Indeed, Professor Calomiris concurred in the view that "the value of a thrift can change very significantly within a 12 month period." Tr. 1371:10-13 (Calomiris). Further, between 1988 and 1989, Carteret suffered massive losses, and neither its performance nor its balance sheet resembled the sample of thrifts Professor Calomiris used to estimate Carteret's market value at the time of the breach. Therefore, the growth of the market-to-book ratio of the sample of thrifts is not reflective of Carteret's condition, and cannot be used to estimate Carteret's market value at the breach. PFF at ¶¶ 209-217.

With respect to Professor Calomiris's current market value and terminal value measures of damage, Professor Calomiris assumes that Carteret is entitled to its alleged value in 2008. This is contrary to controlling authority, which provides that damages from the loss of an income-producing property, such as a thrift, must be calculated as of the time of the breach, not some future time. First Fed. Lincoln Bank v. United States, 518 F.3d 1308, 1316 (Fed. Cir.

---

2008 (i.e., $904 million, PX 9031 and 9041).

2008) ("First Fed. Lincoln").

Further, Professor Calomiris estimated Carteret's alleged current market value and terminal value by increasing Carteret's book value at the time of the breach by lost profits between the breach and 2008 ($595.6 million, PX 9022). He estimates the lost profits by applying a mathematical construct, the Gordon Growth Model, to Carteret's condition at the time of the breach rather than by constructing a "but-for" world and demonstrating profits Carteret earned in that "but-for" world. Assuming the existence of profits based upon the application of the Gordon Growth Model is contrary to the case law which requires that lost profits be demonstrated by the application of a model demonstrating the assets, liabilities, funding sources, interest rate risk, and other attributes of the "but-for" thrift. See, e.g., Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 170 (2006), aff'd, 511 F.3d 1360 (Fed. Cir. 2008); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 241 (2003), aff'd in part and rev'd in part, 402 F.3d 1221 (Fed. Cir. 2005).

Finally, even if lost profits could be calculated by the Gordon Growth Model, Professor Saunders demonstrated that Professor Calomiris misapplied the model to Carteret. PFF at ¶¶ 221-230. In particular, Professor Calomiris failed to include Carteret's losses in 1990 and 1991 ($291.2 million, DX 8000A, Exh. 3, Table 1) in calculating alleged future earnings. Further, the Gordon Growth Model applies only to companies that demonstrate a steady growth in earnings. Carteret consistently lost money. DX 9726. Nonetheless, Professor Calomiris's application of the Gordon Growth Model predicted a 4.2 percent annual growth in earnings for Carteret absent the breach. As Professor Saunders demonstrated, given Carteret's lack of earnings and extremely weak tangible capital position, the Gordon Growth Model is simply inapplicable to Carteret. Tr.

3443:11-25 (Saunders); PX 9022.

### D. The RTC/FDIC's Management Of Carteret's Receivership Has Been Consistent With Law And Regulation, And Any Delays Alleged By Ambase Benefitted Carteret, Rather Than Harmed It

Finally, with respect to the receivership deficit, Professor Calomiris argued that, if Carteret had been resolved as a whole bank in 1993, as would have been the case if the resolution had not allegedly been delayed by the absence of Congressional funding, there would have been a surplus rather than a deficit. PX 2703A. Ambase argued, therefore, that it was entitled to be directly credited with any damage award in favor of Carteret. To the contrary, Professor Saunders demonstrated that, absent the delay, Carteret would have received approximately $100 million less for its deposits than it received in the actual resolution, DX 9790. Further, as to Professor Calomiris's contention that the receivership deficit was artificially inflated because of interest charged on loans by the Resolution Trust Corporation ("RTC") to the receivership, Professor Saunders demonstrated that the RTC simply passed on the costs it had incurred in raising funds, and did so without charging a risk premium to reflect the risk the loans to the receivership would not be repaid. Tr. 3620:25-3621:4 (Saunders). Rather than inflating the receivership deficit, the RTC subsidized the receivership. Id. As to the contention that the FDIC/RTC did not receive market returns on the receivership's assets, Professor Saunders concluded that Carteret's resolution was achieved on a least cost basis. DX 9778.

In short, the evidence demonstrated that Carteret would have failed absent the breach and Ambase failed to prove damages even if Carteret would have survived. Likewise, Ambase failed to prove any adjustments to the receivership deficit. As of December 31, 2007, the receivership deficit was $321.4 million. DX 9174, Report 3. Accordingly, Ambase's failure to

prove damages means the case is non-justiciable and must be dismissed.

## ARGUMENT

## I. INTRODUCTION

Plaintiffs seek expectation damages resulting from the seizure of Carteret on December 4, 1992. Expectation damages are only recoverable "provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."[8] As we demonstrate, plaintiffs have failed to demonstrate reasonable foreseeability, causation, or reasonably certain quantification.

## II. CARTERET COULD NOT HAVE SURVIVED EVEN IF GOODWILL WAS COUNTED AS REGULATORY CAPITAL

### A. "But-for" Causation Is The Appropriate Standard In This Case

The Federal Circuit has noted that "the standard applied by this court and our predecessor court in numerous cases . . . [requires] that the causal connection between the breach and the loss of profits must be 'definitely established.' The standard set forth in those cases ensures that the nonbreaching party will not be awarded more than it would have received if the contract had been performed." California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) ("CalFed").

This standard was clarified in Citizens Federal Bank v. United States, 474 F.3d 1314, 1320-22 (Fed. Cir. 2007) ("Citizens"), in which the Federal Circuit noted that it did not read its prior decisions "as announcing any broad rule that the 'but-for' theory of causation must always, or even generally, be used in determining damages in Winstar-related cases." Rather, the Court

[8] Bluebonnet Sav. Bank, FSB v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Bluebonnet"); see Restatement (Second) of Contracts §§ 347, 351, 352 (1981).

noted that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion. Id. at 1318. The "substantial factor" standard requires a greater showing than "but for" causation. De Bazan v. Sec'y of Health and Human Servs., No. 2008-5013, 2008 WL 3927499, at *2 (Fed. Cir. Aug. 28, 2008). The facts of this case suggest that "but-for" causation should determine whether or not Carteret is entitled to damages.

It is undisputed that the mere addition of supervisory goodwill to "but-for" Carteret's balance sheet would not have enabled the thrift to satisfy the minimum regulatory capital requirements of FIRREA.[9] Ambase's rebuttal is that "but-for" Carteret would have reported additional regulatory capital beyond the goodwill because of changes in operations. Thus, in this case, the parties have not framed the issue as whether the breach was a "substantial factor" in the thrift's failure. The causation issue, therefore, is whether "but-for" Carteret's balance sheet would have reported sufficient regulatory capital over and above the goodwill balance to enable the thrift to satisfy FIRREA's minimum regulatory capital requirements. Therefore, the "but-for" standard of causation is appropriate.

Regardless of the test applied, however, the evidence demonstrates that the cause of Carteret's failure was the losses in its corporate and commercial real estate portfolios. Ambase

---

[9] This case is like CalFed and LaVan v. United States, 382 F.3d 1340 (Fed Cir. 2004) ("LaVan"), where the question was whether the event would have occurred in the absence of the breach. In Citizens, by contrast, the Court had to determine whether the evidence demonstrated that the conversion of subdebt into preferred stock resulted because subdebt was no longer considered regulatory capital (a non-breach event) and or because the thrift desired to increase its regulatory capital following the breach. Citizens, 474 F.3d at 1320-22. The Federal Circuit affirmed the trial court's finding that the breach was a substantial factor in the decision to convert even though non-breach causes played a part as well. Id.

Brief at 13. These losses, which were charged against capital, exceeded $292 million in 1990 and 1991, DX 9754, while Carteret's supervisory goodwill balance was only $139 million when the thrift failed in 1992. DX 9754; PX 9053A.

As of September 30, 1992, Carteret failed to meet its minimum tangible, core and risk-based requirements by $133.2 million, $157 million, and $235.4 million, respectively. DX 8124 at FAM002 0538. The addition of $139 million in goodwill would not have remedied the core and risk-based deficiencies. Thus, because the loan losses in 1990 and 1991 had depleted its capital, Carteret could not have satisfied two of the three regulatory capital requirements even if all the goodwill had counted as capital. "These facts would indicate that Carteret suffered no damage from the alleged breach of contract . . . ." Ambase I, 58 Fed. Cl. at 39. Thus, the Court should not assess any damages regardless of the causation standard applied.[10]

[10] Although this Court applied the "substantial factor" test in Slattery v. United States, 69 Fed. Cl. 573, 583-84 (2006), there the thrift would have been in regulatory capital compliance for most or all of the period prior to the seizure if the goodwill had counted toward the minimum regulatory capital requirements of FIRREA. Thus, there was no dispute that the thrift would have exceeded the minimum regulatory capital requirement if the goodwill could have been counted toward the minimum requirement. In this case, by contrast, it is undisputed that the thrift was out of minimum regulatory capital compliance even counting all the supervisory goodwill as regulatory capital at the time of failure, and the only question is whether "but-for" Carteret would have had additional regulatory capital beyond the goodwill due to changed operating conditions between the time of the breach and the time of failure. As we have demonstrated, the "proximate cause" rather than "substantial factor" test is appropriate given the parties' acknowledgment that the addition of goodwill alone to "but-for" Carteret's balance sheet would not have enabled the thrift to satisfy the minimum regulatory capital requirements of FIRREA. Accordingly, Ambase's reliance on Slattery is misplaced, and the sole question for decision on causation is whether Carteret would have survived in the absence of the breach.

### B. The Undisputed Contemporaneous Evidence Demonstrates That Carteret Would Not Have Survived In A No Breach World

#### 1. Carteret's Financial Performance Deteriorated Significantly Before The Breach

From December 1987 to June 1989, prior to the breach, OTS required Carteret to increase its level of criticized assets from $274.6 million to nearly $479 million, an unheard of increase of almost 75 percent in eighteen months. DX 7000A at 16, § 3.2.1. The result was that, as of 1989, before the breach, Carteret's classified assets equaled 5.6 percent of its total assets, whereas its peer group's average of classified assets to total assets was only 3.3 percent. Id. at 16. In its 1989 report of examination ("ROE"), OTS noted that: "[t]his problem [in] . . . considerable part . . . is . . . caused by poor underwriting." PX 2106 at WOQ6750010.

Professor Calomiris conceded that, in 1988 and 1989, Carteret continued "to have poor underwriting practices for its commercial loan practices - commercial loan portfolio." Tr. 2713:6-10 (Calomiris). When asked whether "these problems were due, in large part, to underwriting deficiencies," he acknowledged that "[t]he documents I've read suggest that." Tr. 2713:21-25 (Calomiris). Professor Saunders agreed, stating:

> [Carteret] [b]asically had to stop making new commercial loans and commercial real estate loans by the time FIRREA was passed. So clearly, these are directly linked to the pre-89 situation, but the realization that occurred as the outcome of the bad underwriting and also the recession. So this is actually what's happening in the real world, and its completely independent of the breach.

Tr. 3463:3-11 (Saunders).

Carteret began recognizing losses from its corporate and commercial real estate portfolios long before the enactment of FIRREA. For example, Carteret added $14 million to loan loss

reserves in 1988, and $28 million to reserves in 1989. OTS required an additional $77.2 million to be added to reserves as of June 1989. DX 7000A at 17.[11]

The losses in its commercial and corporate real estate portfolios also adversely affected Carteret's operating performance. At the end of 1988, eight months before the enactment of FIRREA, Carteret's pre-tax income from lending became negative. PFF at ¶ 83. Between June 1988 and June 1989, Carteret suffered four quarters of core operating losses. PFF at ¶ 83. In 1989, Carteret suffered a net operating loss of $63.9 million. PFF at ¶ 87.

To maintain the appearance of steady earnings in the face of these losses, Carteret began to cannibalize its balance sheet of good assets and to report increasingly large non-recurring gains from the sales of loans and securities. PFF at ¶ 84. For example, from 1987 to 1989, Carteret reported $128.3 million in net gains on sales of loans and securities. Id. FDIC examiners noted that "[w]hat income the bank has been able to generate has come entirely from gains on asset sales." DX 8054 at WOQ 699 0501 (FDIC 1989 Report of Examination ("ROE")).

One of the reasons for Carteret's pre-breach net operating losses was its extremely high overhead expenses. PFF at ¶ 91. William Day, Chief Examiner for the Federal Deposit Insurance Corporation ("FDIC"), was concerned that Carteret's overhead expenses exceeded its net interest income. Tr. 1446:2-9; Tr. 1451:8-19 (Day). Indeed, as of September 30, 1988, Carteret's overhead expense represented 165 percent of its net interest margin. Mr. Day had never seen percentages in that range before. Tr. 1451:20-1452:23 (Day).

---

[11] Due to "continued shrinkage from asset sales by Carteret," DX 781A; Tr. 2001:14 (S. Smith), OTS eventually permitted Carteret to add $49.8 million in additional reserves, rather than the $77.2 million recommended in the 1989 examination.

Carteret itself recognized that it had invested too large a percentage of its assets in high-risk, commercial real estate loans to remain stable in a difficult economic environment. Thus, in a May 1989 draft strategic plan, management presented pie charts comparing the percentage of assets classes held by itself, healthy thrifts, and insolvent thrifts. DX 8098 at WOQ 6251634-36. The pie charts showed that Carteret held about the same percentage of single family mortgages as insolvent thrifts, even less cash investments than insolvent thrifts, and twice the land and commercial assets as insolvent thrifts (these are the riskiest asset classes). Id.; Tr. 3416:1-3 (Saunders). Thus, before the breach, Carteret acknowledged that its balance sheet resembled an insolvent thrift rather than a healthy thrift. PFF at ¶ 30.

Although Carteret did not recognize the majority of the losses from the pre-breach lending until 1990 and 1991, as Professor Smith noted, these were "bad loans or weak loans that were time bombs, in a sense, and which were ignited by the economic conditions prevailing in 1990 and '91." Tr. 2924:23-2925:1 (R. Smith); PFF at ¶44. In 1990 and 1991, Carteret recognized negative net income of $292 million for reasons totally unrelated to the breach. DX 8000A, Exh. 3, Table 1. The losses Carteret reported in 1990 and 1991 dwarfed Carteret's goodwill balances at the time of the breach ($169 million) and one quarter prior to failure ($139 million). DX 9760; PX 9056. Thus, Carteret's cumulative loan losses in 1990 and 1991 far exceeded the goodwill affected by the breach and meant that Carteret could not have continued as a going concern even if goodwill had been counted as regulatory capital. PX 4867a at WOP 3440545; DX 8124 at FAM002 0533.

### 2. FIRREA Had No Material Impact On Carteret's Regulatory Capital Compliance

#### a. The Period Prior To The Injunction

Although FIRREA required a phase out of goodwill from risk-based and core regulatory capital, at the end of 1989 Carteret reported a regulatory capital shortfall of only $19.6 million. Ambase I, 58 Fed. Cl. at 38. Ambase made up this shortfall at the end of 1989 by investing $20 million in Carteret pursuant to the CMA it executed at the time it acquired the bank. Id. Thus, when FIRREA became effective, Carteret complied fully with minimum regulatory capital requirements.

Carteret continued to remain in compliance with FIRREA's minimum regulatory capital requirements through June 30, 1990, despite the elimination of goodwill from tangible capital and the phase-out of goodwill from risk-based and core capital. As of June 30, 1990, Carteret calculated that, under FIRREA requirements, it had excess tangible capital of $24.4 million, excess core capital of $29.3 million, and excess risk-based capital of $13.1 million. PX 2109 at KH 054217. As a result of the continuing deterioration of the commercial and corporate real estate portfolios, however, OTS required Carteret to book an additional $77 million in losses in June 1990. With these added reserves, Carteret fell out of regulatory capital compliance by October 1990. Id. at KH054216-054220.[12] Although OTS ordered Ambase to provide the additional $30 million it was obligated to invest under the CMA, this investment only partially made up the capital shortfall resulting from the required valuation allowances. PX 2109 at KH 054219; PX 4837.

---

[12] Carteret was deficient by $76 million in tangible capital, $71 million in core capital, and $86 million in risk-based capital. PX 4867a at WOP 3440536.

Thus, Ambase's contention that "[t]he breach's negation of this valuable asset [goodwill] devastated Carteret's regulatory posture," Ambase Brief at 16, is incorrect. As we have demonstrated, the catastrophic losses in Carteret's commercial and corporate real estate portfolios, rather than the phaseout of goodwill, caused Carteret's inability to satisfy FIRREA's minimum regulatory capital requirements. As Mr. Day noted, even if goodwill had been added back to Carteret's tangible capital as of June 1989, its "very severe" asset quality, level of loan loss reserves, lack of core earnings and high overhead expenses would have made its survival extremely problematical. Tr. 1433:14-1434:10 (Day). As Mr. Day testified: "Well, my, you know, perception was, the primary problem was asset quality. The supervisory goodwill I was precluded by instructions from using in my analysis. But even if it had been, the asset quality problems were very severe." Tr. 1433:18-23 (Day); see Vigna Dep. Tr. 158:2-5 (JX 1 at 599) ("[R]ealistically, it's the same institution financially and economically whether you allow the goodwill or don't allow the goodwill").

**b. Carteret Secures An Injunction**

By the end of 1990, Carteret failed to comply with FIRREA's minimum regulatory capital requirements as a result of write-downs in the commercial and corporate loan portfolios. Accordingly, on January 17, 1991, OTS required Carteret's consent to a capital directive requiring the submission of a capital plan by February 28, 1991.[13] Carteret did not file its capital

[13] OTS also requested that Ambase invest $30 million under the CMA to partially alleviate Carteret's regulatory capital shortfall. PX 2109 at KH 054219; PX 4837. Because Ambase had suffered extensive losses in its insurance operations, as well as in Carteret, it lacked the money to comply with the CMA. In February 1991, OTS issued a cease and desist order against Ambase requiring payment of the $30 million. Ambase was finally able to invest the $30 million in Carteret after selling its primary subsidiary, Home Insurance Company ("Home"), in February 1991. Id.

plan. Instead, Carteret filed suit in United States District Court for the District of New Jersey seeking to require OTS to count supervisory goodwill as regulatory capital. On February 18, 1991, the district court issued a temporary restraining order and, on April 17, 1991, a preliminary injunction. DX 8124 at FAM 002. Thus, by February 18, 1991, the breach was mitigated and OTS withdrew the capital directive.[14]

**c. The Injunction's Aftermath**

During the quarter ended June 30, 1991, as a result of a change of control of Ambase, Ambase appointed a new Board of Directors and management team for Carteret. Mr. Bianco, who was part of a controlling shareholder group at Ambase ("Caribe Investment Group"), was appointed CEO of Carteret. He brought in a new team to operate Carteret and remedy the regulatory capital deficiencies flowing from the real estate and corporate loan losses.

Mr. Bianco appointed J. Wayne Moor, a former executive of Amerifirst Savings Bank in Miami, Florida to the position of Executive Vice-President For Commercial Assets. PFF at ¶ 33. Mr. Moor had extensive experience in evaluating problem portfolios. Mr. Bianco asked Mr. Moor to review and evaluate the entire real estate portfolio and recommend a course of action to stem the losses and improve Carteret's balance sheet. Id. Mr. Moor concluded that the

---

[14] Ambase contends the injunction did not fully mitigate the breach because OTS imposed a supervisory agreement which restricted Carteret's activities while the injunction was in place. Ambase Brief at pp. 34-35. It is true that, in February 1991, Carteret and OTS entered into a supervisory agreement, PX 4852, which required Carteret to mitigate the operational deficiencies uncovered in the course of the 1990 OTS examination. These operational difficulties, however, did not relate to regulatory capital levels but to the thrift's practices and procedures. PX 803 at CAM4020391; PX 4852; Tr. 1615:12-1616:16 (Albanese). Indeed, Carteret was in full regulatory capital compliance at the time it agreed to the supervisory agreement. Carteret recognized that it was operating unsoundly apart from shortages of capital and agreed to the supervisory agreement. Id.

commercial loan portfolio "was a smoldering pile of dung," and that lending "was done on a shotgun basis." Id. at ¶ 34. He also concluded that the internal classification system was "a joke," and that "the hole [that needed to be filled with reserves] was at least $150 million." Id.

As a result of Mr. Moor's review, Carteret's management and outside counsel advised OTS, on July 29, 1991, that the evaluation indicated that Carteret needed to recognize an additional $175 to $200 million in loan loss provisions. PX 4867a at WOP 3440537. In its June 30, 1991 10Q, Ambase reported that Carteret recognized $150 million in reserves for the quarter ended June 30, 1991. PX 1508 at WOT 6920154. Even counting goodwill as regulatory capital, as required by the injunction, these losses caused Carteret to fail the FIRREA minimum tangible capital requirement by $3 million, the core capital requirement by $81 million, and the risk-based capital requirement by $99 million. PX 4867a at WOP 3440532. Carteret reported its regulatory capital deficiencies to OTS in June 1991, and this prompted OTS to renew its Capital Directive in October 1991.

Thus, OTS did not reimpose the capital directive and require Carteret to augment its capital until Carteret reported, in June 1991, that, even counting goodwill as regulatory capital, it failed to meet minimum regulatory capital levels. Thus, the breach did not cause Carteret to fall out of capital compliance: to the contrary, the breach had been enjoined and Carteret's problems arose from the losses in its corporate and commercial real estate portfolio. Indeed, Carteret's 1991 Capital Plan, PX 2001, which it provided in response to the Capital Directive, reports that, as of June 1991, even counting goodwill as regulatory capital, Carteret failed all three minimum regulatory capital requirements by substantial margins (i.e., $3 million for tangible capital, $81.7 million for core capital, and $99.4 million for risk-based capital). In short, the breach did not

cause Carteret to fall out of regulatory capital compliance.

### 3. Carteret's Pre-Breach Financial Weakness Would Have Caused Carteret To Fail Regardless Of Goodwill

#### a. Carteret's Poor Financial Health Resulted From Its Pre-FIRREA Risky Business Strategy

Carteret's corporate and commercial real estate losses resulted from assets which adversely affected Carteret's financial health long before the enactment of FIRREA. As noted by Mr. Day, in 1989, Carteret was in a "precarious financial condition." DX 8054 at WOQ699 0499; Tr. 1432:3-1433:13 (Day). As noted in the FDIC's 1989 report of examination ("ROE"), which commented upon Carteret's anticipated condition following the likely enactment of FIRREA, as of June 30, 1989, tangible capital was well below expected minimums, asset quality was "deteriorating," the balance of classified loans exceeded the balance of tangible capital by a factor of "5," reserves were "severely inadequate," core earnings were poor, and overhead expenses were very high. Id. Absent a significant capital infusion, "there is serious doubt that Carteret can survive in its present financial form." Tr. 1432:3-1433:13 (Day), quoting DX 8054 (1989 FDIC ROE). Even if goodwill had been added to Carteret's tangible capital, Mr. Day still would have regarded Carteret's prospects as bleak or non-existent. Tr. 1433:14-1434:10 (Day).

In August 1991, FDIC Regional Director Nicholas Ketcha wrote to the FDIC's Board of Directors recommending that the FDIC withdraw Carteret's deposit insurance coverage under Section 8(a) of the FDIC Act, Publ. L. 89-695, 64 Stat. 879 (1950), codified at 12 U.S.C. § 1818; Tr. 2081:14-2084:15 (Zamorski). Mr. Ketcha noted that, in deciding whether to recommend Section 8(a) to the Board of Directors, FDIC counted the supervisory goodwill as regulatory capital but concluded, nonetheless, that the thrift's poorly configured balance sheet, lack of core

earnings, and high overhead expenses placed it in an unsafe and unsound condition. Tr. 2083:8-2084:6 (Zamorski); DX 8054; Tr. 1432:3-1433:13 (Day). FDIC's Deputy Regional Director at the time, Michael Zamorski, attributed this condition primarily to a "risky strategy of getting involved in commercial real estate loans [including] acquisition, development and construction lending . . . without proper infrastructure, without proper governance. And it ended up . . . in an unsafe and unsound condition . . ." Tr. 2066:10-20 (Zamorski). If goodwill had counted as regulatory capital, Carteret would nonetheless have suffered from a lack of capital, severe asset quality problems, the need for a high level of loan loss reserves, a lack of core earnings, and high overhead expenses. Id. Thus, the goodwill was not a factor in Carteret's inability to survive. Tr. 1433:14-1434:10 (Day).

**b. In 1991, Ambase Realized That Carteret Was On The Brink Of Failure, Even Including Goodwill As Regulatory Capital**

It is undisputed that OTS was required to count Carteret's goodwill as regulatory capital during the injunction's pendency. Carteret Sav. Bank v. OTS, 762 F. Supp. 1159, 1168-78 (D.N.J. 1991). The injunction remained in place from February 1991, until May 1992, when the Court of Appeals for the Third Circuit ruled that FIRREA overrode the contractual agreements relating to goodwill. Carteret Sav. Bank v. OTS, 963 F.2d 567 (3rd Cir. 1992). Long before a dissolution of the injunction and Carteret's seizure, both OTS and Ambase became aware that Carteret was unable to comply with minimum regulatory capital requirements even counting all the goodwill as regulatory capital. See, e.g., PX 1730. Ambase replaced Carteret's management in mid-1991 because it realized Carteret was on the brink of failure. Carteret's new CEO, Mr. Bianco, and other members of Carteret's Board of Directors, in correspondence with OTS,

admitted that Carteret's financial condition was precarious and that it was unlikely Carteret could satisfy its minimum regulatory capital requirement. DX 7351 at WOQ600 2025.

Thus, in August 1991, while the injunction was still in effect, Mr. Bianco and the Board acknowledged that "[w]ith the significant increase in reserves for losses on loans and real estate in the second quarter of 1991, Carteret does not meet any of the three minimum capital requirements of FIRREA at June 30, 1991." DX 7351 at 2026. Mr. Bianco and the Board attributed Carteret's financial difficulties principally to the "deterioration in the first mortgage portfolio . . . ." Id. at 2025. They also acknowledged that, based upon a "rapid and comprehensive review of Carteret's commercial real estate and corporate loan portfolios and related classifications and reserves," it was likely that Carteret would continue to experience "a deterioration in its loan portfolios due to the prolonged downturn of the real estate market," and that, out of a commercial real estate and corporate loan portfolio of approximately $1 billion, "Carteret's total internally criticized assets at June 30, 1991 totaled $986 million." Id. at 2026.

#### c. The OTS Recognized That Carteret Was Severely Undercapitalized Due To Its Risky Corporate And Commercial Lending, But Gave The Thrift Time To Pursue An External Capital Infusion

On October 25, 1991, Messrs. Angelo Vigna and Robert Albanese, Director and Deputy Director of OTS's Northeast Regional Office, recommended transferring Carteret to the RTC on the ground that Carteret was severely undercapitalized, "[is] not currently capable of generating core profits," and would require "a significant external capital infusion," which they did not believe likely to occur. PX 4867a at 4 and 16-18. They reported that "the deterioration of Carteret's [regulatory] capital position [was] primarily the result of the Savings Bank's

unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets." Id. at 4. Although the OTS Northeast Regional Office recommended that Carteret be transferred to the RTC in October 1991, it deferred the recommendation in order to allow Carteret's new management time to secure the outside capital necessary to satisfy FIRREA's minimum regulatory capital requirements.

**(1) Kohlberg and Co. Letter Of Intent**

On February 18, 1992, in an effort to raise capital, Ambase retained Kidder, Peabody & Co. ("Kidder") and Merrill Lynch & Co. ("Merrill") to seek interested private investors. DX 4118. On July 20, 1992, Ambase signed a conditional letter of intent with a private equity group of investors led by Kohlberg & Co. ("Kohlberg") to make a $200 million investment in Carteret. DX 40. After conducting extensive due diligence, Kohlberg decided not to invest and notified Carteret on August 21, 1992, that it was withdrawing its letter of intent. The problems cited in the due diligence report included the potential need for further write-downs in the commercial real estate and corporate loan portfolios, overly-optimistic projections on the time frame for disposing of real estate owned ("REO"), the need to refinance the Federal Home Loan Bank of New York ("FHLB-NY") advances that Carteret borrowed at a low rate in 1990, and overly-optimistic future income projections. DX 95 (due diligence report).

**(2) The Carlyle Group Letter Of Intent**

Following the withdrawal of Kohlberg's letter of intent, on October 15, 1992, another investor group, led by the Carlyle Investment Co. and Colony Capital ("Carlyle Group"), executed a letter of intent to invest $200 million in Carteret. PX 4886 at 2. On November 11, 1992, however, OTS "received verbal notification that the Carlyle Group was withdrawing its

conditional letter of intent because, following due diligence, it had concluded that it could not receive an adequate rate of return on its investment and had concerns about 'regulatory risk.'" DX 8124 at FAM002 0532.

### (3) OTS's Renewal Of Its Recommendation To Transfer Carteret To The RTC

On November 13, 1992, following the withdrawal of the Carlyle Group's letter of intent, OTS's Northeast Regional Office renewed its recommendation to transfer Carteret to the RTC due to a lack of capital and other deficiencies in the bank's financial condition and operations. DX 8124 at 2. As of September 30, 1992, immediately before the OTS reactivated its transfer recommendation, Carteret reported negative tangible capital of $61.7 million, negative core capital of $14 million, and negative risk-based capital of $15.1 million. DX 8124 at 3. Under FIRREA, Carteret failed to meet its minimum tangible, core, and risk-based regulatory capital requirements by $133.2 million, $157 million, and $235.4 million, respectively. Id. at 5. If the supervisory goodwill had counted as regulatory capital, Carteret still would have failed the minimum core capital requirement by approximately $70 million and the minimum risk-based requirement by approximately $107 million. DX 9760. Further, in the four quarters preceding the transfer to the RTC, Carteret's net income was only $520,000. DX 8124 at 3. Thus, in renewing the recommendation to transfer Carteret to the RTC on November 11, 1992, Messrs. Vigna and Albanese stated that "[e]ven if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver." DX 8124 at 8.

**(4) OTS's Decision To Delay Transfer And Ultimate Transfer Of Carteret To The RTC**

On November 17, 1992, OTS's Northeast Regional Office discussed a further delay of the transfer date with OTS's Washington Office because another potential investor, First Gibraltar Savings Bank, had commenced a due diligence of Carteret. PX 2819. As a result, the transfer decision was delayed until December 4, 1992, in order to allow First Gibraltar an opportunity to complete the due diligence and commit to investing in Carteret. Toward the end of November, OTS learned that First Gibraltar had withdrawn its letter of intent. PX 5281 at WOP3340680. Further, on November 27, 1992, after First Gibraltar withdrew its letter of intent, Mr. Bianco advised OTS's Northeast Regional Office that PNC Financial Corporation ("PNC") might be interested in investing in Carteret. PX 4889; Tr. 1674:11-18 (Albanese). OTS advised Mr. Bianco that PNC had to complete its due diligence and make a commitment by December 1, 1992, if Carteret was to avoid a transfer to the RTC as of December 4, 1992. Id. On December 1, 1992, OTS was informed that PNC, after performing a limited due diligence, decided not to invest in Carteret. On December 4, 1992, after concluding that there was no prospect an outside investor would recapitalize Carteret, OTS ordered Carteret transferred to the RTC. Tr. 1666:14-1667:2 (Albanese).

Therefore, Carteret's failure cannot be attributed to the breach. Carteret had embarked on a rapid expansion into high risk lending and multi-state operations, and the strategy resulted in massive losses that destroyed its capital and potential for profitable operations. The poorly underwritten commercial and corporate loans that proximately caused the failure were placed on Carteret's books long before the breach, and goodwill would not have altered the quality of

Carteret's assets, improved its ability to earn profits, or permitted it to achieve regulatory capital compliance even if the regulators had counted supervisory goodwill as regulatory capital.

### C. Because Carteret Would Not Have Survived In A No-Breach World, Its Damages Claims Are Precluded As A Matter Of Law

As demonstrated above, Carteret would not have survived even absent the breach. Thus, Carteret's damage claims are invalid.[15] The Federal Circuit's decision in Admiral is controlling here. In Admiral, after the thrift was seized, the investors claimed they were entitled to compensation for their contribution made pursuant to contracts with FSLIC. Although the goodwill alone would not have enabled the thrift to comply with FIRREA's minimum regulatory capital requirements, Admiral's investors, like Ambase, contended they could have raised the necessary additional capital if goodwill had counted as regulatory capital. Admiral, 57 Fed. Cl. at 433-435. This Court and the Federal Circuit rejected that argument because there was no evidence any investor would have agreed to invest the amount that was required to satisfy minimum regulatory capital requirements even if the goodwill had counted as regulatory capital. The Federal Circuit reasoned that the investors were not entitled to damages because the thrift "was running operational deficits long before FIRREA was proposed, and . . . was likely to continue running deficits in the future regardless of whether FIRREA was enacted." Id. at 1343. The Federal Circuit also ruled that the thrift would not have been able to raise sufficient regulatory capital to comply with FIRREA's minimum requirement even if the goodwill had counted as regulatory capital. Id. at 1344.

[15] See, e.g., Southwest Inv. Co., Inc. v. United States, 63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005) (damages are unavailable to a thrift whose insolvency could not be cured by counting goodwill as regulatory capital); Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004) (same).

The appellate court's holding in Admiral precludes Ambase's claims for damages because Carteret would have been unable to comply with FIRREA's minimum regulatory capital requirements even if goodwill had counted toward regulatory capital. Thus, as in Admiral, there is "no reason to relieve [plaintiff] of his investment's downside risks" because even absent the breach, Carteret, like Admiral, would have failed. See Admiral, 378 F.3d at 1345 (quoting Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980)).

The same principle was applied in Southwest Investment Co., in which this Court found that lack of profitability and a depressed economy prevented the thrift from satisfying minimum regulatory capital requirements even counting goodwill as regulatory capital. Southwest Inv. Co., 63 Fed. Cl. at 195-97. When the thrift became insolvent, the holding company was unwilling to provide capital to resuscitate the thrift. Id. Although the holding company attempted to find outside investors to save the thrift, such investors were unwilling to commit funds without substantial Federal assistance, which FSLIC refused to provide. The investors declined to invest and the goodwill alone would not have enabled the thrift to satisfy the minimum regulatory capital requirements. Id. Consequently, the Court held that the contract had no value to the thrift at the time of the breach and, therefore, the thrift suffered no damages as a result of being deprived of the contractual protections. Id. at 196 ("Like the Admiral bank, FIRREA caused First Louisiana no harm at all either at enactment or at seizure").

A similar situation arose in Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003). In that case, two investors sought reliance damages arising from their thrift's failure. Castle, 301 F.3d at 1341-42. The Federal Circuit acknowledged that FIRREA imposed stricter regulatory capital standards by excluding goodwill from the calculation

of regulatory capital, and thereby increased the thrift's risk of being unable to comply with minimum regulatory capital requirements. Nevertheless, the court rejected the investors' reliance damage claim because the court found that, in the absence of the breach, the investors would have needed to invest an additional $10 million to save the thrift from seizure, even if the goodwill had counted as regulatory capital. Id. Accordingly, the court denied the claims for damages, holding that "the government's alleged breach cannot be said to have caused the loss of Castle and Harlan's reliance interest[.]" Id.

In this case, Carteret's survival depended upon someone investing an enormous sum in a bank overwhelmed by its own poor underwriting. Therefore, as was the case in Castle, the breach did not cause the loss of Carteret's expectation interest (or Ambase's investment interest), and no damages are recoverable as a result of the breach.

### D. The Regulators' Testimony Does Not Suggest That Carteret Would Not Have Been Seized In The Absence Of The Breach

In its post trial-brief, Ambase contends that the regulators testified at their depositions that Carteret would not have been seized in the absence of the breach. Ambase Brief at 13-16 and Appendix. Ambase's contention is false. Contrary to Ambase's contention, the regulators did not testify at their depositions that Carteret would not have been seized in the absence of the breach. Further, they testified unequivocally at trial that Carteret's seizure was due to losses related to poorly underwritten corporate and commercial real estate loans that were unaffected by the breach. They also testified that the cause of Carteret's failure was the losses in the corporate and commercial real estate portfolios, and that OTS would have ordered Carteret transferred to the RTC even in the absence of the breach.

**1. Mr. Vigna's Testimony**

At his deposition, which was seven years after the seizure, Mr. Vigna testified "probably not" when asked by Ambase's counsel: "if Carteret had satisfied or nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized." Dep. 154:25-155:5 (JX 1 at 598). Mr. Vigna also testified "no" when asked whether Carteret would have been seized if the injunction that required OTS to count goodwill as regulatory capital had remained in place. Dep. 159:19-25 (JX 1 at 600). Mr. Vigna, however, testified at another point in his deposition that, "[i]f the institution is inadequately capitalized or insolvent and there's no reasonable prospect for them to raise capital, then you just transfer them to the RTC." Dep. 129:8-12 (JX 1 at 594). He testified, also at the deposition, that when OTS initially recommended transfer to the RTC in October 1991, the injunction requiring OTS to count goodwill as regulatory capital was in effect.

Based upon Mr. Vigna's statements taken out of context, Ambase argues that Mr. Vigna believed Carteret would not have been transferred to the RTC in the absence of the breach because it would have possessed tangible capital. Ambase implies that Mr. Vigna, at his deposition, based his testimony upon a regulatory policy mandating that a thrift with positive tangible capital would not be seized regardless of whether it complied with FIRREA's minimum regulatory capital requirements. Ambase Brief at 15-16.[16]

Plaintiff's deposition of Mr. Vigna was certainly unclear. Although Mr. Vigna seemed

---

[16] There is no evidence of such a policy in the history of pre-FIRREA or post-FIRREA regulation. To the contrary, as Professor Saunders pointed out at trial, 12 of 28 thrifts that were transferred to the RTC in 1992 had positive tangible capital. DX 9757; Tr. 3557:11-3558:4 (Saunders).

to suggest at one point that Carteret would not have been seized if the injunction had remained in place, he stated the opposite at another point. Vigna Dep. Tr. 199:11-200:12 (JX 1 at 601). Plaintiff's counsel failed to clarify the ambiguity during the deposition. At trial, however, Mr. Vigna explained that, in his deposition, he should have answered "yes" rather than "no" to the question whether Carteret would have been transferred if the injunction had been in place. Tr. 2209:5-8 (Vigna).[17] Thus, Mr. Vigna corrected any error he made at the deposition and confirmed that Carteret would have been transferred in the absence of the breach.[18]

**2. Mr. Albanese's Testimony**

Ambase also argues that Mr. Albanese, Mr. Vigna's deputy, testified at his deposition that Carteret would not have been transferred in the absence of the breach because he answered "no" to the following question: "Do you believe that Carteret would have been seized if they had satisfied their - its tangible capital requirement rather than having had, as it did, a tangible capital deficit." Dep. 160:13-17 (JX 1 at 13). Like Mr. Vigna, Mr. Albanese corrected this misstatement at trial, testifying that the error resulted from "connecting - or thinking that the meeting of the tangible capital requirement was a proxy for capital compliance." Tr. 1764:9-11 (Albanese). Mr. Albanese observed that Carteret would have been subject to seizure if it failed to satisfy the minimum risk-based or core capital requirements even if it was able to satisfy the

[17] As he stated at trial: "I must have misunderstood the question or thinking of it in a different context. But the answer then and now should be yes." Tr. 2209:5-8 (Vigna).

[18] The trial testimony is consistent with his 1992 "S" memorandum in which he stated that the seizure would have been recommended even if goodwill had counted as regulatory capital. DX 8124 at FAM002 0533. Counting goodwill as regulatory capital at the time of the seizure, Carteret would have failed its risk-based requirement by $96.3 million, and its core capital requirement by $17.8 million, and was in an unsafe and unsound condition. Id.; PFF at ¶ 113.

minimum tangible capital requirement. Tr. 1764:12-17 (Albanese).

Thus, these regulators simply failed to consider the questions concerning tangible capital compliance carefully enough at their depositions and clarified their responses at trial. Had Ambase highlighted the distinction between tangible capital compliance and full capital compliance at the depositions, the responses would have undoubtedly been different.

**3. Other Regulators' Testimony**

Further, contrary to Ambase's assertions otherwise, Ambase Brief at 13-16, other regulators did not testify at their depositions that the decision to transfer Carteret to the RTC would have been different in the absence of the breach. Quoting OTS Examiner Russell Meyer's deposition testimony that "[t]hey could have survived, I thought [in the absence of the breach,]" Ambase argues that Mr. Meyer believed Carteret would have survived in the absence of the breach. Ambase Brief at 13, quoting Meyer Dep. Tr. 42:24-43:11 (JX 1 at 369). In the passage quoted in Ambase's brief, Mr. Meyer also points out that the goodwill phase-out was only one of the conditions that caused Carteret to fail. Id. ("It was one of the things, yes."). Indeed, in a passage in his deposition that Ambase chose not to quote or reference, Mr. Meyer stated unequivocally that he was "deeply involved with the real estate assets . . . [and] always thought that was their main problem." Meyer Dep. Tr. 164:5-11 (JX 1 at 378). Thus, Mr. Meyer believed the primary cause of the failure was the poor condition of the real estate assets and not, as Ambase contends, the breach.

Likewise, Ambase distorts the record in suggesting that Mr. Meyer's superior, Mr. Simone, testified that it was "likely" Carteret would not have been seized in the absence of the breach. Ambase Brief at 14, quoting Dep. 19:9-11, 105:1-21 (JX 1 at 498, 500-01). Mr. Simone

testified at his deposition that it was "very likely" Carteret would have survived if its "tangible capital instead of being negative $60 million had been positive $80 million." Dep. 105:1-8 (JX 1 at 500). Contrary to the implication of Ambase's trial brief, this was not referring to supervisory goodwill as tangible capital but to actual tangible capital, such as cash. The inference in Ambase's trial brief is blatantly inconsistent with the opinion Mr. Simone expressed to the RTC during an interview in 1995, in which he emphasized that "poor underwriting was the prime cause of the institution's demise." PX 5331 at KH033539. Thus, Mr. Simone did not believe that Carteret would not have been seized in the absence of the breach.

Likewise, the remaining regulators who provided depositions, as well as the Government's experts, testified at trial that the cause of Carteret's failure was the poor condition of its corporate and commercial real estate portfolios rather than the breach. OTS Examiner Thomas O'Rourke testified that he fully agreed with OTS's November 13, 1992, recommendation to transfer Carteret to the RTC, even if goodwill had counted as regulatory capital "and fully agree[s] with it right now." Tr. 2409:11-12 (O'Rourke). Mr. Zamorski testified that the FDIC agreed with OTS that counting goodwill as regulatory capital would not have remedied Carteret's unsafe and unsound condition and it would have to be closed absent a capital infusion. Tr. 2125:15-25 (Zamorski). And FDIC Examiner Day testified that, after Carteret failed to raise capital, "it was time to close the bank." Tr. 1512:5-6 (Day).

**4. <u>Testimony Of Government Experts</u>**

The Government's experts echoed the regulators' testimony. When asked whether he agreed with Professor Calomiris's opinion that Carteret would have survived and even thrived in a "but-for" world, Professor Smith answered "I do not." Tr. 2905:21-2906:2 (R. Smith). He

opined: "My studies showed that [Carteret] was a troubled, worse-than-average thrift, relative to its peers. It would not have looked much better with supervisory goodwill included [in regulatory capital]. And it could not have raised the capital it needed to survive even with the supervisory goodwill included in their regulatory capital." Tr. 2986:13-19 (R. Smith). Professor Saunders testified that "[w]hen I add back the $139 million supervisory goodwill . . . I find core capital is still out of compliance by $69 million. And when I do the same thing with risk-based capital, I find negative $107 million." Tr. 3561:3-9 (Saunders). After observing that the thrift's losses in 1990 and 1991 greatly exceeded its tangible capital, Professor Saunders noted that a "[b]ank requires tangible book value capital to survive its losses." Tr. 3554:16-17 (Saunders).

**5. The Contemporaneous Records**

Finally, the contemporaneous records support the regulators' and experts' testimony that Carteret would have been seized even if goodwill had counted as regulatory capital. On October 25, 1991, the OTS noted in an "S" Memorandum that, even counting goodwill as regulatory capital as required by the outstanding injunction, Carteret failed the core capital requirement by $81.714 million, the risk-based capital requirement by $99.4 million, and the tangible capital requirement by $3.009 million. PX 4867a at WOP 344 0545. OTS noted that "[t]he deterioration of Carteret's capital position is primarily the result of the Savings Bank's unsuccessful extension into corporate and commercial real estate lending and its failure to internally identify and address problem assets." Id.

Although OTS delayed transferring Carteret to the RTC in the hopes that Mr. Bianco and his colleagues could raise sufficient capital to cure Carteret's regulatory capital deficiencies, as of November 13, 1992, when OTS's recommendation to transfer was renewed, the regulatory

capital deficiencies had only grown worse, not better. Thus, in the November 13, 1992 S Memorandum, Messrs. Vigna and Albanese noted that Carteret was deficient in tangible capital by $133.171 million, in core capital by $156.997 million, and in risk-based capital by $235.405 million. DX 8124 at FAM002 0533. Even counting $139.1 million of goodwill as regulatory capital, PX 9053A, Carteret would have failed its risk-based requirement by $96.3 million and its core capital requirement by $17.8 million. (It would have satisfied the minimum tangible capital requirement by $5.9 million). DX 8124.

The regulators stated emphatically that "[e]ven if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver . . ." DX 8124 at FAM 002 0538. These contemporaneous statements are the "best evidence" of whether Carteret would have been seized in the absence of the breach, and they indicate that the regulators' recommendation of what to do with Carteret would have been no different if goodwill had been counted as regulatory capital. See, e.g., Cienega Gardens v. United States, 503 F.3d 1266, 1291 (Fed. Cir. 2007) (contemporaneous records are "more reliable evidence of industry expectations"). Therefore, Carteret's failure was caused by the collapse of its commercial and corporate loan portfolios, and not the breach.

**E. The Regulators Acted Reasonably In Transferring Carteret To The RTC**

Contrary to Ambase's contention otherwise, the decision to order Carteret transferred in December 1992 was eminently reasonable. See Ambase Brief at 40-44. As demonstrated above, Carteret had been given 18 months to raise capital and OTS did not order the transfer until the last potential investor had withdrawn its letter of intent.

The regulators testified unanimously that, by December 1992, it was impossible to allow any more time to pass, and Ambase has provided no contrary testimony.[19] As Mr. Vigna noted, "[i]f the institution is inadequately capitalized or insolvent and there's no reasonable prospect for them to raise capital, then you just transfer them to the RTC." Dep. Tr. 129:8-12 (JX 1 at 594).

As Professor Calomiris recently noted with respect to the failures of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corp. ("Freddie Mac"): "The last thing you want to do is give a distressed borrower more time, because when people are in distress they tend to take a lot of risks. . . . You don't want zombie institutions floating around with time on their hands." Stephen Labaton & Andrew Ross Sorkin, "U.S. Rescue Seen At Hand For Two Mortgage Giants," N.Y. Times, Sept. 6, 2008, at A1. Thus, it was perfectly reasonable to order the transfer.

Further, as the regulators explicitly stated in the "S" Memorandum, they would have ordered the transfer even if the goodwill had counted as regulatory capital. DX 8124 at FAM 002 0538. Thus, the breach was not and could not have been the cause of the decision to transfer and Carteret is entitled to no relief based upon the reasonableness or lack thereof of the regulators' decision to order the transfer. See, e.g., Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001) (damages must be proximately caused by the breach); Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3rd Cir. 1987) (lost profits, to be recoverable, must be a "proximate consequence" of the breach).

---

[19] See, e.g., Tr. 1666:19-1667:2 (Albanese) ("It was a situation where we had - where they had exhausted a number of very extensive due diligence processes with some major investors. They hadn't worked out."); Tr. 2519:22-2520:12 (Downey) ("There was no longer any hope. . . . [T]he marketplace itself . . . came to a conclusion that there was no way possible that this institution was going to be recapitalized on an unassisted basis.").

**F. Professor Calomiris's Proposed "Adjustments" To Carteret's Regulatory Capital Are Baseless And Fail To Demonstrate Carteret Would Have Survived In The Absence Of The Breach**

Ambase argues that Carteret would have survived if the contract had been performed because Carteret's operations would have provided additional regulatory capital, and Ambase could have raised additional regulatory capital from investors or through a sale of assets. Thus, Professor Calomiris's damage model assumes a number of adjustments to Carteret's "but-for" regulatory capital based upon conditions that allegedly would have existed in the absence of the breach. PX 2702a at 47-63; PX 9053A.

Professor Calomiris concedes that, even taking into account his "adjustments," by September 30, 1992 "but-for" Carteret still fails FIRREA's risk-based capital requirement by $18.2 million and the core capital requirement by $10.8 million. PX 9053A. Further, as Professor Saunders points out, even counting goodwill as regulatory capital, once FDICIA became effective on January 1, 1993, "but-for" Carteret would have failed the minimum tangible capital requirement by $20.7 million, the minimum core capital requirement by $118.8 million, and the minimum risk-based capital requirement by $137.2 million. DX 9760. These facts, which are undisputed, indicate that even Professor Calomiris's "but-for" Carteret would have been seized due to a shortage of regulatory capital.

Professor Calomiris argues, without support, that "but-for" Carteret would have been larger and more profitable than actual Carteret and could have found investors to make up any shortfalls it would have experienced. At trial, however, we demonstrated that there is no basis in the evidence for Professor Calomiris's "but-for" world. The "but-for" world created by Professor Calomiris is contrary to the facts in the record and could not have existed. Accordingly, the

Court should reject this fanciful "but-for" world where Carteret survives and prospers.[20]

Each of the following "adjustments" assumed by Professor Calomiris are counterfactual: (1) that the 1990 branch sale would not have occurred; (2) that Carteret would have securitized its mortgage portfolio; (3) that Carteret's asset writedowns and deposit costs would have dropped; (4) that Carteret would have added profitable assets; and (5) that Carteret would have sold assets or been successful in raising outside capital. Even in a "but-for" world, losses in the bank's commercial real estate and corporate loan portfolios would have put Carteret in an extremely weak and undercapitalized position and caused it to fail minimum regulatory capital requirements. With these economic realities facing Carteret even in a no-breach world, it would have been impossible for Carteret to make any of the operational changes required to support the "adjustments" Professor Calomiris hypothesizes for Carteret's "but-for" capital.

**1. Professor Calomiris Overstates The Amount Of Goodwill On Carteret's Balance Sheet In The "But-for" World**

Professor Calomiris assumes that, in a "but-for" world, Carteret's regulatory capital balance would have been higher by $139.1 million as of September 30, 1992, because goodwill would have been counted as regulatory capital. PX 9053A. This assumption ignores the fact that Carteret sold 23 branches in 1990, resulting in a $57.2 million goodwill writeoff. PX 4867a at WOP344 0532. Although Professor Calomiris acknowledges that Carteret wrote off $57.2

[20] See, e.g., Bluebonnet Sav. Bank v. United States, 67 Fed. Cl. 231, 239-42 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) ("but-for" model which falsely assumed there would be no exchange of debt for equity and that the debt financing would not extend beyond 1992 cannot provide a basis for a damage award); Three Crown Ltd. P'ship v. Salomon Bros., Inc., 906 F. Supp. 876 (S.D.N.Y. 1995) ("but-for" model which falsely assumed coordinated activity that the record failed to support could not provide a basis for damages); Kidder Peabody & Co., Inc. v. IAG Int'l Acceptance Group, 28 F. Supp. 2d 126 (S.D.N.Y. 1998), aff'd, 205 F.3d 1323 (2nd Cir. 1999) (same).

million in goodwill when it sold the 23 branches, he claims that, in the absence of the breach, Carteret would not have sold these branches. PX 2702A at 56-58; PX 9053A. The Court should reject this contention as contrary to the evidence.[21]

Professor Calomiris's only basis for claiming that the branches would have been retained in the absence of the breach is a statement in Ambase's 1990 Annual Report and 10K, dated April 15, 1991, that "[a] significant factor considered in the decision to sell such branches in 1990 was that under capital regulations . . ., as interpreted by OTS, the goodwill recorded in connection with such acquisitions is required to be deducted from regulatory capital . . ." PX 802 at AMB030223; PX 2702A at ¶ 57. This statement occurs in the paragraph in which Ambase acknowledges that the branch sales were pursuant to a plan to "restructure its retail branch network." Id. Ambase also acknowledged that Carteret's "operating expenses will be reduced as a result of these branch sales and consolidations." Id. Thus, the 10K suggests that Carteret had an economic motive for selling the branches wholly apart from the breach.[22]

---

[21] Ambase incorrectly assumes that "but-for" Carteret could have counted the entire $139.1 million balance of goodwill toward regulatory capital even if, absent the breach, the branches would have been sold and the goodwill written off under GAAP. Ambase Brief at 18; see Ambase Pre-Trial Brief at 61. To the contrary, as a matter of law, this goodwill should not be counted toward regulatory capital if the sale of the branches was unrelated to the breach. Home Sav. Of Am., FSB v. United States, 399 F.3d 1341, 1351-52 (Fed. Cir. 2005) (goodwill associated with branches sold because of the breach should be counted as contractual goodwill); LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363, 1373-74 (Fed. Cir. 2003) (only events proximately related to the breach are relevant in calculating damages).

In the real world, Carteret wrote off $57.2 million of goodwill as a result of the branch sales. PX 4867a at WOP344 0532. Therefore, if the branches would have been sold in a "but-for" world, only $81.9 million in supervisory goodwill would have counted toward the minimum regulatory capital requirement, not $139.1 million as Professor Calomiris contends. PX 9053A.

[22] Certainly, Ambase's statement that the branch sale was related to FIRREA seems entirely driven by Carteret's pending litigation with the OTS. Ambase issued the relevant 10K when the bank and the OTS were disagreeing as to whether the existing injunction to count

The overwhelming evidence indicates the branches were sold to reduce expenses and improve profits, and not because the goodwill could not be counted toward regulatory capital. See, e.g., PX 1905 at C-AM-A-0264608; Dep. Tr. 194:22-195:1 (Walsh) (JX 1 at 707). At the time of the sale, Ambase acknowledged that the sale was pursuant to a plan to rationalize the bank's system and reduce expenses. PX 802 at AMB030223. For example, Robert Walsh, Carteret's president in 1989, testified that selling the branches in 1990 resulted from an effort to "rationaliz[e] . . . the retail branch system." Dep. Tr. 194:22-195:1 (Walsh) (JX 1 at 707). He suggested that the branches were not profitable and were sold to eliminate losses and not because of the breach. Dep. Tr. 195:2-196:12 (Walsh) (JX 1 at 707-708).

Likewise, Carteret's business plans indicate the branches were sold to eliminate inefficiencies. In 1990, Carteret stated: "Rationalizing and reducing the size of Carteret's retail branch network will significantly and permanently change cost structures, while providing a much needed addition to capital." PX 1905 at C-AM-A-0264608. The document does not express or imply that the branches would not have been sold in the absence of the breach.

Carteret's 1991 Business Plan provided the same rationale for the branch sales, stating that the "downsizing . . . reduced annualized operating expenses by approximately $18.1 million and enhanced both the efficiency and future profitability of the branch system." DX 7171 at 0703. Thus, although the improvement in Carteret's regulatory capital ratios may have been viewed as a beneficial byproduct of the branch sales, the weight of the evidence demonstrates that the primary motivation was to enhance efficiency and improve profitability. See DX 9762.

---

goodwill as capital required OTS to count only the goodwill that remained on Carteret's books, or the goodwill relating to the branch sales as well. Ambase's 10K appears to have been generated to support Carteret's motion on the issue.

Further, as Ambase acknowledges in its 1990 Annual Report and 10K, "[t]he transferred deposits were replaced in substantial part with similar or lower cost funding, primarily adjustable rate advances from the FHLB." PX 802 at AMB030223. These advances were a low-cost source of funding in the early 1990s and lowered Carteret's average cost of funds, thereby increasing profitability. Tr. 2382:23-2385:16 (O'Rourke). Indeed, Carteret's management explained to OTS Chief Examiner O'Rourke, in the course of examinations in 1991, 1992, and 1993, that Carteret was selling the branches in the mid-Atlantic region because they were underperforming and the sale would reduce overhead costs and improve profitability going forward. Tr. 2385:12-2386:17 (O'Rourke).

Although Professor Calomiris suggested that the sales of the branches reduced Carteret's overall profitability, he offered no proof, and his suggestion is belied by the contemporaneous statements of Carteret managers as well as the trial testimony of Mr. O'Rourke. Thus, Professor Calomiris's assumption that the branches would have been retained in the absence of the breach is inconsistent with the evidence and must be rejected. See, e.g., Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (lost profits model based upon false assumptions cannot support a claim for expectancy damages) aff'd, 535 F.3d 1348 (Fed. Cir. 2008); Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1994) (a model that is "based on assumptions which are speculative and are not supported by the record" cannot support a claim for damages).[23]

---

[23] Contrary to the statement in its 1990 Annual Report and 10K, Ambase argues in its brief that the branch sales did not reduce the average cost of funds. Ambase Brief at 28-30. Professor Saunders testified at trial, however, that Carteret's 1991 10K, upon which Ambase's post-trial brief relies, does not reflect a weighted average cost of funds. Instead, it reflects a simple average that overstates the cost of the advances in 1991. PX 803; Tr. 3983:11-12 (Saunders). Ambase also contends that Professor Saunders overstated the amount Carteret's 1991 Business Plan attributes to cost savings from selling the branches ($18 million, DX 7171 at

**2. "But-for" Carteret Would Have Been In A Worse Position If It Had Retained The Branches Absent The Breach**

Although Professor Calomiris assumes Carteret would have possessed additional regulatory capital in the absence of the breach if it had retained the 23 branches sold in 1990, as Professor Saunders demonstrates, reversing the branch sales would have resulted in less, rather than more, regulatory capital.

By reversing the branch sale transaction, Carteret would give up regulatory capital equal to the deposit premium that it received in the branch sales ($38.3 million) and would gain $53 million in supervisory goodwill associated with the branches. The net effect of reversing the transaction, therefore, is that the goodwill balance on Carteret's books increases by $14.9 million (i.e., $53 million minus a net deposit premium of $38.3 million). DX 5038A at ¶ 96. This calculation ignores the fact that, by retaining the branches, Carteret burdens itself with $18.1 million in annualized operating expenses which management acknowledged were savings from the branch sales. DX 7171 at 0703; see DX 7340 at WON678 1963; PX 2212 at C-AM-A-0231764; PX 4704 at 0612.

As demonstrated by Professor Saunders, between the fourth quarter of 1990 when the branches were sold, and September 30, 1992, which is the end of the last quarter prior to the transfer to the RTC, "but-for" Carteret would have incurred increased operating costs of $31.66

---

0703) because $11 million of the $18 million savings related to "branch consolidations." Ambase Brief at 29-30. Carteret's 1991 business plan states that "the downsizing . . . reduced annualized operating expenses by approximately $18.1 million . . ." DX 7171 at WOP 298 0703. The evidence upon which Ambase relies, DX 292, is an internal OTS memorandum that predates the 1991 business plan and only states that Carteret "anticipates a reduction of $11 million per year in operating expenses due to the sale of the 23 branches" but not the actual savings from the sale. Apparently the number in the OTS document is based upon an "estimate" whereas the number in Carteret's 1991 business plan is based upon an after-the-fact calculation.

million if it had not sold the branches. DX 5038A at ¶ 97. As explained by Professor Saunders, reversing the branch sales and taking account of the increased operating expenses actually "reduces capital of the 'but-for' bank by $16.76 million (i.e., $14.9 million minus $31.66 million")." Id. Further, "but-for" Carteret would not have realized at least $1.1 million of the interest earned on the deposit premium from selling the branches, DX 9761 and DX 9773, and would have incurred continuing amortization expenses associated with the additional goodwill. Thus, even in Professor Calomiris's "but-for" world, Carteret's retention of the branches worsens the regulatory capital of the "but-for" thrift rather than enhancing it. DX 5038A at ¶ 97.[24]

### 3. The Breach Did Not Cause Carteret To Pay $17 Million More For Deposits

Based solely upon an April 3, 1989, newspaper article, Professor Calomiris claims that, prior to the breach, Carteret's cost of certificates of deposit ("CDs") was 105 basis points below CDs sold in secondary markets, whereas, after the breach, this spread vanished. PX 2702A at ¶¶ 59-62; PX 2704A at ¶¶ 2-10. Mr. Bianco testified that he believed Carteret's cost of funds increased after the breach as a result of adverse publicity. Tr. 177-178 (Bianco). Both opinions are baseless.

Professor Calomiris assumes that, in the absence of the breach, Carteret would have maintained a 105 basis point advantage with respect to the cost of 6 to 23 months CDs. He calculates the alleged increased deposit costs by assuming an identical fraction of the year end

---

[24] As we explain below, because Carteret replaced the deposits associated with the 23 branches with lower cost advances from the Federal Home Loan Bank of New York, Carteret incurred no losses related to asset shrinkage as a result of selling the 23 branches. Thus, in a "but-for" world, there would have been no additional revenue to net against the increased overhead costs associated with the 23 branches. DX 5038A at ¶ 97.

balances of the CDs on Carteret's books would have repriced each month from January 1991, the time at which he contends the breach would have impacted the deposits, to September 1992. PX 2704A at ¶ 10. To quantify the alleged increased deposit costs, he multiplies the monthly balances on Carteret's books by 105 basis points and divides this number by 12 to get the monthly increase in costs. He then sums the alleged monthly increased costs, which he claims to be $17 million. Id.

Even a cursory examination of Professor Calomiris's "methodology" for calculating "increased deposit costs" demonstrates the invalidity of the approach. Although expert opinions must be based upon a "reliable foundation in principles and method," see, e.g., Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387 (Fed. Cir. 2003), Professor Calomiris's analysis lacks both reliable principles and methods. To the contrary, the analysis is extremely misleading. Thus, Professor Calomiris suggests that Carteret enjoyed a cost advantage over its competitors because some months prior to the breach, the average cost of Carteret's CDs was lower than the average cost of CDs traded on the secondary markets. This is both untrue and irrelevant. As Professor Saunders explained, CDs traded on secondary markets are wholesale rather than retail CDs, are not insured, and are traded not by thrifts, but by secondary dealers. Tr: 3570:9-3572:4 (Saunders); DX 9766. Thus, CDs traded on secondary markets and retail CDs sold by thrifts are wholly dissimilar products, and Professor Calomiris's comparison demonstrates nothing.

Indeed, the newspaper article upon which Professor Calomiris relies in comparing Carteret's rates to rates in the secondary market shows that Carteret had the third highest rates for retail CDs out of 13 competitors, and that the two institutions with even higher rates than Carteret's were investment banks rather than thrifts. Tr. 3566:19-3568:20 (Saunders); DX 9764.

Therefore, the newspaper article fails to support Professor Calomiris's contention that Carteret enjoyed a cost advantage over its competitors on retail CDs prior to the breach.

Further, there is no evidence Carteret was at a competitive disadvantage with respect to the cost of funds following the breach. To the contrary, minutes of Carteret's Asset, Liability Committee and Board of Directors' meetings demonstrate that Carteret paid market rates on its CDs before the breach and continued to pay market rates on retail CDs following the breach. Tr. 3568:21-3569:14 (Saunders); DX 9765. Indeed, the chart upon which Professor Calomiris relies shows that the rates Carteret paid on CDs did not change relative to the secondary wholesale market CDs until December 1990, approximately 18 months after the passage of FIRREA. Tr. 3573:13-3574:22 (Saunders); DX 9768. Even if one assumes, as Professor Calomiris does, that a comparison between the rates Carteret paid on CDs and the rates paid in secondary markets suggests a cost advantage for Carteret, the relative position of Carteret with respect to these rates did not change for at least 18 months following the breach. As Professor Saunders points out, the narrowing spreads could have been attributable to numerous factors, such as the recession, changes in interest rates in the market, and the declining quality of the thrift. Tr. 3575:10-14 (Saunders); DX 9768. Yet, "[Professor Calomiris] assumes a hundred percent is due to the breach." Tr. 3575:6-14 (Saunders). Thus, the assumption that Carteret's cost of funds was adversely impacted by the breach is unsupported. Tr. 3575:15-3576:1 (Saunders).

Professor Calomiris's quantification of the purported "disadvantage" suffered by Carteret is also invalid. He relies upon the counterfactual assumptions that, but-for the breach, Carteret would have enjoyed a 105-basis point competitive advantage regardless of the level of short term rates in the general economy, and that each month between January 1991 and September 1992,

an equal fraction of the year-end outstanding balances on Carteret's 6 to 23 month CDs would have repriced. As to the first assumption, because the rates on short term Treasury bills were 3.27 percent in September 1992, Professor Calomiris's analysis would mean that Carteret's rates would have been 2.22 percent, or 105 basis points, lower than United States Treasury Bills, even though Carteret was on the edge of failure. DX 9767. As Professor Saunders points out, customers would not have purchased CDs from Carteret when they could have purchased Treasury Bills or CDs from better capitalized thrifts paying higher interest rates. Tr. 3573:6-86 (Saunders). As stated by Professor Saunders: "As a CAMEL rated 5 bank, how can it possibly be that [Carteret] can actually get deposits roughly a third of the cost or more than a third lower cost than other banks in the market?" Tr: 3573:6-12 (Saunders). As Professor Saunders opined, it was not possible.

As to Professor Calomiris's assumption regarding the repricing of the CDs, Professor Saunders points out that the assumption that the months of origination of the various CDs are evenly distributed between January 1991 and September 1992 is purely "artificial." DX 5038A at ¶ 103. There is simply no basis upon which to assume that an equal amount of CDs would have sold in each month between January 1991 and September 1992. Yet, this patently arbitrary assumption forms the basis upon which Professor Calomiris quantifies the alleged cost of funds losses.

Finally, Mr. Bianco's contention that Carteret paid a higher cost of funds as a result of adverse publicity surrounding the breach is belied by the very evidence upon which the testimony is based. Tr. 177:1-182:23 (Bianco). The prospectus prepared by Kidder Peabody and Merrill Lynch to attract investors explicitly states: "Carteret has maintained a positive public image and

stability in its deposit base despite a fair amount of press coverage regarding it's capital deficiencies and problem assets." PX 2807; Tr. 177:1-6 (Bianco). Further, the prospectus goes on to advise potential investors that "Carteret has not experienced any material deposit run-off generally associated with such negative publicity." PX 2807; Tr. 345:8-14 (Bianco).

The OTS examiner in charge of Carteret's 1991, 1992, and 1993 examinations, Mr. O'Rourke, testified that he could not recall a single instance in which Carteret personnel complained to him that Carteret had to pay a higher cost of funds because of adverse publicity related to the breach. Tr. 2410:14-22 (O'Rourke). Thus, the evidence fails to support Mr. Bianco's claim that Carteret incurred an increased cost of funds because of adverse publicity related to the breach.

#### 4. "But-for" Carteret Could Not Have Reduced Its Risk-Based Capital Requirement By Securitizing $1.5 Billion In Mortgages

Professor Calomiris argues that, if "but-for" Carteret had a risk-based capital deficiency in spite of adding back the goodwill and reversing the sale of the 23 branches in 1990, it could have securitized $1.5 billion in single family mortgages and held these in its portfolio at a 20 percent risk weighting instead of holding the mortgages themselves at a 50 percent risk weighting. PX 2704A at ¶ 11. Pursuant to this analysis, "but-for" Carteret would have incurred transaction costs of 0.25 percent in securitizing the mortgages, and its risk-weighted assets would have been reduced by $468.4 million as a result of the securitization. According to Professor Calomiris, this adjustment would have eliminated the risk-based capital deficiency in his "but-for" world. Id.

Professor Calomiris's claim that "but-for" Carteret could have securitized the mortgages

to reduce its risk-weighted assets is unsupported. As Professor Saunders pointed out, mortgages can be risky due to interest rate risk and prepayment risk, and there is no evidence the market would have been responsive if Carteret had offered mortgage-backed securities in the 1990-1991 recession. DX 9770; Tr. 3577:16-21 (Saunders). Professor Saunders did not believe Carteret could have securitized any mortgages in the condition the bank was in, let alone a $1.5 billion mortgage portfolio. Tr. 3577:8-12 (Saunders) ("it sounds pretty easy, but 1.5 billion, one can imagine today's environment would be impossible"). Further, Mr. Bianco admitted that Carteret held at least $300 million in "low doc" mortgages, which are similar to today's "sub prime" loans. Tr. 478:5-16 (Bianco); see DX 5038A at 66. Professor Saunders opined that there would not have been a market for sub-prime loans in 1990 and 1991, just as there is no such market today.[25] Tr. 3577:16-21 (Saunders).

Finally, Professor Calomiris ignores additional costs involved in the securitization of mortgages. For example, Carteret would have incurred annual insurance costs of .25 percent of the face amount of the pool with respect to mortgages sold to Government-sponsored entities, and considerably more for sales to private packagers. Tr. 3578:5-3579:1 (Saunders). By failing to include these costs, Professor Calomiris understates the costs of securitizing the mortgages. Tr. 3579:2-3 (Saunders).

---

[25] Even assuming the mortgage pool could have been securitized in the absence of the breach, there is no evidence to support Professor Calomiris's claim that the transaction costs would only have been 0.25 percent of the pool's face value. PX 9053A; PX 2704A at ¶ 11. Professor Calomiris concedes that he has included only underwriting fees in his estimate, and that the percentage he relies upon is derived from a 1997 mortgage securitization by New Century Financial Corp. PX 2704A at n.8. Ambase, however, has provided no evidence that the market for underwriting was the same in 1989 and 1997, and Professor Saunders's research has shown it was quite different. Tr. 3578:1-4 (Saunders). Thus, Professor Calomiris's alleged transaction costs are unsupported.

In short, Professor Calomiris has failed to prove "but-for" Carteret could have reduced its minimum risk-based regulatory capital requirement by securitizing mortgages.[26]

**5. The Breach Did Not Cause Carteret's Shrinkage And Additional Assets Would Not Have Rectified Carteret's Regulatory Capital Deficiencies**

Professor Calomiris claims that Carteret shrank its asset base as a result of the breach, and that the shrinkage reduced its profits and capital. PX 9055. This is contrary to the evidence.

First, as Ambase conceded in its pre-trial brief, a large portion of the shrinkage between the breach and the seizure (approximately $2.3 billion) "was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets, and thus would have occurred even absent the breach . . ." Pre-Trial Brief at 49, 65. This concession is fully substantiated by the evidence at trial. As Professor Calomiris himself testified: "[A] substantial portion of this shrinkage was related to Carteret's efforts to discontinue corporate and commercial real estate lending and to dispose of related assets . . ." PX 2702A at ¶ 65.

Second, although Ambase attributes the remainder of the shrinkage to the breach, as Professor Saunders noted, the discontinuance or drastic reduction in housing starts in Carteret's primary marketing areas, and the rising unemployment rates nationwide, contributed significantly to Carteret's shrinkage. Tr. 3459:2-6 (Saunders); DX 9724 and DX 9725. Indeed, Carteret's 1990 Business Plan and Ambase's 1990 Annual Report and 10-K do not attribute the shrinkage

[26] Ambase incorrectly contends that Professor Saunders did not understand that Carteret was already servicing the mortgages it held. Ambase Brief at 19. To the contrary, Professor Saunders did not testify that Carteret would incur increased servicing costs, but only that it might incur such costs if it was not already servicing the entire securitized pool. Tr. 3858:2-11 (Saunders). Ambase also contends that Carteret's capital would have been increased by the sale of the mortgage-backed assets. There is no evidence to support this, and Ambase's brief provides no supporting reference. Id.

to the breach. Instead, these contemporaneous documents recognize the difficult operating environment caused by the recession and attribute the shrinkage primarily to the existing business environment. PX 1905; PX 802.

Third, Carteret understood that the shrinkage was necessary and that it could not add additional assets to its balance sheet and hope to grow back into capital compliance. To the contrary, the bank expressed doubt that it had the ability to meet minimum capital requirements at its then-current size, let alone at a larger size. Tr. 3473:6-12 (Saunders). As Carteret explained in its June 1991 10Q: "[Management is] uncertain whether Carteret Savings has the ability to attract the capital necessary to achieve and maintain minimum capital requirements after giving effect to all supervisory goodwill." PX 1508 at 12.[27]

Finally, Professor Calomiris argues that the breach caused a deposit runoff that reduced Carteret's ability to hold profitable assets. PX 2702A at ¶¶ 67-68. As we have already demonstrated, if runoff occurred, it was beneficial to Carteret because Carteret was capital-deficient even counting the goodwill as regulatory capital, and would have been even more so if the numerator of the regulatory capital ratio had been larger. PX 2001 at 29; Tr. 3471:24-3472:6 (Saunders). There is, however, no evidence of any deposit runoff attributable to the breach. As we have already demonstrated, the investment overview prepared by Kidder, Peabody and

---

[27] Further, Professor Calomiris simply assumes, without analysis or documentation, that "but-for" Carteret's incremental assets would have been profitable. Yet, he tells us nothing about the composition of those incremental assets, or how they would have been selected. Tr. 3473:18-3474:2 (Saunders). As Professor Saunders points out, there is no reason to assume that hypothetical incremental assets would have performed more capably than Carteret's actual assets, which lost in excess of $290 million in 1990 and 1991. Tr. 3474:5-19 (Saunders). Therefore, Carteret's incremental assets would likely have made its capital position worse, not better, in the period following the breach. DX 9727; Tr. 3476:9-3748:7 (Saunders).

Merrill Lynch to attract investors explicitly stated that "Carteret has not experienced any material deposit run-off generally associated with such negative publicity." PX 2807; Tr. 345:8-14 (Bianco).

Thus, the evidence does not support Ambase's claim that the breach caused shrinkage that reduced Carteret's profits.[28]

### 6. Ambase Could Not Have Made Up Carteret's Capital Shortfall Absent The Breach

Mr. Bianco and Professor Calomiris claimed that, absent the breach, Ambase could have avoided a regulatory capital shortfall by borrowing from $80 to $100 million, using $36 million in its treasury as security for the loan, and investing the loan's proceeds in Carteret. Tr. 276:1-279:18 (Bianco); Tr. 774:2-777:4 (Calomiris). Ambase provided no documentary evidence that it could have borrowed this money to invest in Carteret, and this claim is belied by the undisputed evidence concerning Ambase's financial condition at the time.

Ambase's 1992 10K, which provides the only evidence of its condition at the time of Carteret's failure, concedes that, as of December 31, 1992, Ambase's liabilities exceeded its assets by more than $53 million. DX 1554; DX 9771. Further, Ambase's auditor, Price Waterhouse, determined that "[t]hese factors [Ambase's excess liabilities] raise substantial doubt about the Company's ability to continue as a going concern." DX 1554 at AM00003010. Even

[28] Ambase cites only one FDIC report, PX 2110, to support is contention that depositors withdrew funds out of concern about Carteret's alleged weakened regulatory capital position following the breach. Ambase Brief at 26. The report, however, simply notes that Carteret discontinued growth following the breach. The report does not state that there was a deposit runoff as a result of negative publicity. PX 2110 at WOQ6981439. As we have already demonstrated, Carteret had no choice but to discontinue growth due to losses in its corporate and commercial real estate portfolios.

if some of the liabilities were contingent, as argued by Ambase, a lender would not have been able to justify making the loan. Tr. 3579:22-3580:1 (Saunders); Tr. 2947:25-2948:1 (R. Smith). In short, plaintiffs utterly fail to support their claim that a bank would have lent more than $80 million to an insolvent institution such as Ambase.[29]

Contrary to Mr. Bianco's testimony, Ambase could not have raised over $80 million by pledging the $36 million in cash to secure the interest payments on the loan. The $36 million would have left Ambase with zero cash and no operating capital. This would have been an untenable posture for Ambase. Tr. 3580:14-19 (Saunders). Further, no lender would have lent $80 million upon the strength of Carteret's stock. As of September 30, 1992, Carteret had negative tangible capital of $61.694 million; even assuming goodwill would have been worth $.35 on the dollar, as claimed by Professor Calomiris, the value of Carteret's stock would have been insufficient by a large margin to allow the hypothetical lender to recover on any loan to Carteret. See PX 2703A, Tables A4-A9 (valuing goodwill at between $40.1 million and $49 million).

Ambase assumes that, in a "but-for" world, it would have shouldered the risk of borrowing $80 million because an investment of this magnitude would have been sufficient to allow Carteret to comply with minimum regulatory capital requirements. This assumption is belied by the record. As Professor Saunders pointed out, once FDICIA became effective on

[29] Ambase points out that Carteret raised money when it had negative tangible capital and argues that other institutions raised money when they were insolvent on a book value basis. Ambase Brief at 20-21. These companies were major banks that generated cash flow and were supported by deposit insurance at the time they raised the funds. Tr. 3097:10-3099:6 (R. Smith). Ambase, however, had no ongoing businesses or substantial cash flow at the time Carteret was seized in December 1992.

January 1, 1993, Carteret would have been out of regulatory capital compliance with core and risk-based capital by well in excess of $80 million. DX 9760. Therefore, in a "but-for" world, Ambase would have lacked the incentive to invest million of dollars in Carteret even if Ambase could have borrowed the funds to do so.

Finally, if Ambase could have borrowed $80 million, it likely would have done so in the actual world because this would have reduced the amount of capital it would have needed from outside investors to save Carteret. The fact that Ambase never attempted to borrow the funds or make the investment thus critically undermines Mr. Bianco's and Professor Calomiris's claim that Ambase could have and would have borrowed these funds in a "but-for" world.[30]

### 7. Carteret Would Not Have Reserved $20 to $50 Million Less In A "But-for" World

Another "adjustment" in Professor Calomiris's "but-for" model assumes that, absent the breach, Carteret would have reserved between $20 and $50 million less than it did in the real world because the pressure to engage in conservative writedowns to interest investors would not have existed to the same extent in a "but-for" world. The evidence is overwhelming that Carteret would not have reserved less in the "but-for" world. Because reserves are based upon asset quality, and capital plays no role in establishing or analyzing a thrift's reserves, Carteret would have been required to set aside the same reserves in the "but-for" world as it set aside in the

[30] Professor Saunders did not misunderstand Mr. Bianco's contention that Ambase's $36 million in cash could have been used to collateralize the interest on the loan. Ambase Brief at 20. To the contrary, Professor Saunders testified about the idea of having the $36 million collateralize the loan, and he opined that "I've never heard of a bank taking [$]30 million of collateral which has all these obligations against it and lending [$]150 million." Tr. 3579:24-3580:1 (Saunders). Thus, Ambase is simply incorrect in contending that Professor Saunders misconstrued Mr. Bianco's testimony.

actual world. Tr. 3179:10-23 (Kennedy). Therefore, Professor Calomiris's "adjustment" to Carteret's "but-for" regulatory capital to reflect a $20 to $50 million reduction in reserves is simply invalid. PX 9053A. Indeed, Professor Calomiris performed no in-depth analysis of the reserves Carteret would have required in a "but-for" world, but simply relied upon Mr. Bianco's unsupported contention that Carteret's reserves would have been between $20 and $50 million less. Tr. 3180:16-21 (Kennedy).

**a. Carteret's Board Of Directors And Outside Auditor Concluded, As Did The OTS, That The $150 Million Addition To Reserves Was Appropriate And Adequate**

The evidence demonstrated unequivocally that Carteret was not over-reserved. For example, Mr. Moor, who was appointed by Mr. Bianco to review the commercial loan portfolio and recommended reserves in June 1991, conducted an extensive evaluation process that included site visits; discussions with individual borrowers, brokers and appraisers; and an evaluation of rent rolls and other relevant records. Tr. 3170:3-3171:6; 3364:7-13 (Kennedy). Mr. Moor recommended the addition of $150 million to reserves. Tr. 3164:10-21 (Kennedy). Each dollar added to reserves requires a one dollar reduction of capital. Tr. 3145:17-22; 3156:24-3157:5 (Kennedy).

Carteret's Board of Directors determined that Mr. Moor's estimate was an accurate reflection of the condition of Carteret's asset portfolio, and directed that Mr. Moor's recommendation be accepted and implemented. Tr. 3195:25-3198:4 (Kennedy); DX 7227 at WOQ695 1029-30. In a resolution provided to OTS in November 1992, Carteret's Board of Directors noted that the "reserves... for the quarter ended September 30, 1992... appropriately and adequately address[ed] the level of current and anticipated... risk exposure for the association's

loan and investment portfolios." Tr. 3195:25-3197:2 (Kennedy); DX 7227 at WOQ695 1030.

Price Waterhouse, Carteret's outside auditor at the time, approved Mr. Moor's recommendation to the Board of Directors relating to reserves. Price Waterhouse concluded that Carteret's financial statements, which presented the reserves in accordance with GAAP, were free of material misstatements. Tr. 3205:22-3206:1 (Kennedy). OTS compared its examiners' reserve analysis with that of Mr Moor and concluded that they were consistent. DX 427 at CAM152 1296; Tr. 2388:7-12 (O'Rourke). OTS Examiner O'Rourke, who was stationed at Carteret, testified that Mr. Moor's recommendations as to reserve levels were based upon a fundamentally sound approach and were reasonable in light of Carteret's massive problems. Tr. 2393:6-17 (O'Rourke). All the regulators involved with Carteret testified that the reserves Carteret booked were either adequate or "marginally adequate." Tr. 2274:3-4 (Vigna) ("[they] certainly weren't overreserved"); Tr. 2438:16-21 (O'Rourke) (by mid-1992, the reserves were "reasonable"); Tr. 1496:18-1497:17 (Day) (as of June 1991, the reserves were "marginally adequate").

**b. An Independent Evaluation Concluded That Mr. Moor's Analysis And Reserve Recommendation Were Fully Supported**

Mr. David A. Kennedy, who is a CPA and was qualified by the court as an expert in GAAP, regulatory accounting principles ("RAP"), asset valuation, and loan and investment reserves, Tr. 3136:1-4 (Kennedy), conducted his own independent evaluation of Mr. Moor's reserve analysis by reviewing the 114 loans Mr. Moor reviewed in 1991. Tr. 3210:12-20 (Kennedy). The workpapers Mr. Kennedy reviewed included loan books, reports of regulatory examinations, RTC asset disposition forms and commercial asset reviews, due diligence analysis

performed on behalf of Kohlberg by the investment banking firm of Lyons, Zomback and Ostrowski ("LZO Report," DX 95), and other relevant materials. Tr. 3221:14-3222:1 (Kennedy). Mr. Kennedy concluded that Mr. Moor employed a systematic and detailed analysis that fully documented the reserves. Tr. 3234:6-3235:17 (Kennedy). Further, Mr. Kennedy concluded that Carteret would have been required to take the same level of reserves in the absence of the breach. Id. The validity of Mr. Kennedy's study and conclusions was not materially challenged at trial.

The judgments involved in establishing reserves "are to be made in a disciplined manner, and [must be] based on a detailed analysis of the loan portfolio." Tr. 3187:1-6 (Kennedy). Mr. Bianco's claim that reserves would have been lower in the absence of the breach was completely unsupported. As Mr. Kennedy noted, this claim is "not supported by an analysis, either a current analysis or an analysis that was done 17 years ago [when the reserves were established]. All of the analyses that were done that I looked at supported a reserve level of 150 million, if not higher. Some recommended even a higher reserve. None lower." Tr. 3187:15-21 (Kennedy).

#### c. The Evidence Refutes Ambase's Claim That Mr. Moor's Reserve Recommendation Was Based Upon Liquidation Values Of Assets

Notwithstanding this evidence, Mr. Bianco contended the reserves were based upon liquidation values, which were less than market values. Tr. 258:13-261:25 (Bianco). The contemporaneous records demonstrate that the properties were valued at fair market values. For example, the due diligence report conducted on behalf of Kohlberg states that "[n]o attempt was made by either Carteret or LZO [on behalf of Kohlberg] to measure these assets on a liquidation basis, which measurement would have additional valuation shortfalls from those determined by LZO." DX 95 at 1384; Tr. 3232:1-3233:3 (Kennedy).

Mr. Kennedy noted that Carteret's assets were required to be valued in accordance with GAAP, and evaluating the assets on a liquidation basis would have been inconsistent with GAAP. Tr. 3233:4-25 (Kennedy). In addition, Mr. Vigna acknowledged, in a January 17, 1992 memo to the Director of OTS (Timothy Ryan), that, as a result of the aggressive writedowns, the assets were carried "at close to market values." PX 2805 at WOP334 1036; Tr. 3238:1-3241:16 (Kennedy). Finally, OTS Examiner O'Rourke saw no evidence of a "fire-sale" of Carteret's classified assets. Tr. 2397:19-24 (O'Rourke).

#### d. The Evidence Does Not Support Ambase's Assertion That Carteret Could Not Provide Seller Financing

Further, Mr. Bianco contended Carteret could have increased the proceeds of asset sales by providing seller financing, which actual Carteret allegedly was unable to do. Tr. 259:22-261:25 (Bianco). The contemporaneous evidence does not support Mr. Bianco. Tr. 3189:21-3191:2; 3230:25-3231:16 (Kennedy). As for the proposition that actual Carteret did not or could not provide seller financing, OTS Examiner O'Rourke testified unequivocally that Carteret provided such financing on its REO where buyers could not obtain third-party financing. Tr. 2401:5-2402:24 (O'Rourke). This testimony was supported by a memorandum written by Mr. O'Rourke during the course of the OTS 1992 examination of Carteret. PX 2316 at WOP317 1656. In a report on Carteret's lending and credit functions in April 1991, its auditor, KPMG, noted that seller financing might enhance the probability of sale, and recommended that Carteret provide such financing in its efforts to work through problem loans, which Carteret did. DX 8126 at 49; Tr. 3191:3-3192:5 (Kennedy).

**e. Ambase's Claim That, In A "But-For" World, Carteret Would Have Sold The Assets Later Is Unsupported**

Mr. Bianco and Professor Calomiris also contend that, in a "but-for" world, Carteret would have received greater proceeds from selling the assets than actual Carteret because the assets would have been sold later, after the market had improved. Tr. 258:13-259:17 (Bianco); PX 2702A at ¶ 82. Reserves must be taken in the quarter in which the reduction in the asset's value is deemed estimable and probable, and auditors would not have permitted Carteret to delay taking reserves even if its intention was not to sell the assets until the market improved. Tr. 3146:9-13 (Kennedy).

Even if, contrary to GAAP, Carteret's auditors would have permitted Carteret to book lower reserves if Carteret could have held the assets until markets improved, Carteret had no way of knowing when improvements in the market would come about. Carteret never expressed an intention to "time the market," as Mr. Bianco suggests, presumably because the bank knew it could not do so. Further, as Professor Saunders noted, based upon market value indices, "but-for" Carteret would have been required to hold the assets until sometime after 1997 to recoup the principal amount of the loans. DX 5038A at ¶¶ 146-147. Because Carteret's assets were acutely troubled, their recovery likely would have taken longer than the periods reflected in the indices. As Professor Saunders noted, Professor Calomiris's assumption that Carteret would have known, in 1992, that the markets would improve after 1997 is "sheer fantasy." Id. at ¶ 146.

**f. Carteret Would Have Incurred Substantial Additional Costs Had It Held Non-Performing Assets Longer**

Further, as Mr. Kennedy noted, Carteret's 1989 objective was to unwind its commercial asset portfolio by selling off problem assets as promptly as possible to avoid the costs inherent in

holding non-performing assets. Tr. 3254:23-3255:7 (Kennedy). Indeed, it would not have been in Carteret's economic interest to hold the assets in the "but-for" world for longer than Carteret actually held them. As Mr. Kennedy pointed out, between 1989 and 1991, Carteret suffered lost interest income of at least $62 million on loans, and negative cash flow of $6.3 million on REO, because these assets were on Carteret's books and were non-performing. DX 9614; Tr. 3262:16-3263:11 (Kennedy).

If Carteret had not disposed of the 40 assets it sold between July 1991 and September 30, 1992, it would have incurred substantial additional holding and monitoring costs that would have materially depressed its already poor economic performance in this period (Carteret lost approximately $190 million in 1991 and never had real earnings in 1992). Tr. 3262:6-15 (Kennedy). These costs would have been exorbitant even if Carteret could have foreseen market improvement after 1997 and held the assets until that time.

Finally, Carteret had no choice but to dispose of these assets quickly. Four of the assets were under the supervision of bankruptcy courts and thus were required to be sold by court orders. Other assets, such as Moore Estates, Interstate Plaza, and Hightstown Hotel, were simply not viable and were too costly to hold. Tr. 3263:22-3266:10 (Kennedy). In sum, Carteret realized immediate value in selling the assets and would have been much worse off by continuing to hold the assets.[31]

---

[31] In claiming Carteret was conservative in establishing reserves, Mr. Bianco relied upon a Merrill Lynch and Kidder Peabody prospectus for potential investors, dated March 9, 1992, stating that, in the liquidation of Carteret's commercial asset management division's portfolio, "liquidations have been on average 105 percent above reserve values." Tr. 257:15-19 (Bianco). In other words, according to the prospectus, when Carteret sold loans for which it had taken reserves, it was paid five percent more than the book balance of the loan. Mr. Kennedy testified that the receipt of these proceeds indicated only that Carteret was adequately reserved, but not

In short, Ambase's contention that Carteret could have booked fewer loan loss reserves in a "but-for" world disregards the contemporaneous evidence that the reserves were required in the quarters in which the writedowns occurred. If, despite these losses, Carteret had booked fewer dollars to reserves, it would have been in violation of GAAP as well as reporting requirements under SEC statutes and regulations. Further, Ambase's position is not based upon any detailed analysis by Professor Calomiris, but simply upon Mr. Bianco's unsupported statements that Carteret would have booked fewer reserves in the absence of the breach. These statements are not evidence that Carteret's reserves would have been less in a "but- for" world. Finally, Carteret benefitted by selling the assets when it did rather than holding them until the market improved. Carteret could not know when this would occur and would have faced enormous holding and monitoring costs in the meantime. Moreover, many assets were subject to decrees of bankruptcy courts and could not have been held even if Carteret had wanted to retain the asset. In short, the evidence does not support Ambase's contention that Carteret was over-reserved as a result of the breach.

### 8. "But-for" Carteret Could Not Have Raised Capital By Selling CMC Or Mortgage Servicing Rights

Ambase argues that "but-for" Carteret would have sold CMC for $18 million and mortgage servicing rights for a net gain of $20 million if it needed additional capital to satisfy minimum regulatory capital requirements. Ambase Brief at 21-22. There is no support for these positions.

---

excessively reserved. Further, he testified that it was improper to use the five percent difference "to assume that [Carteret was] going to achieve those same kind of results going forward. And that's why you have to do an individual asset-by-asset review to determine what the reserves should be." Tr. 3244:15-21 (Kennedy); Tr. 2395:10-21 (O'Rourke).

**a. <u>CMC</u>**

Ambase presented no evidence buyers were or would have been interested in CMC. As Professor Saunders pointed out, mortgage origination involves substantial risk because loans are committed in an uncertain environment and it is difficult to hedge against unexpected losses. Tr. 3587:20-3590:11 (Saunders). Therefore, it is highly unlikely that potential buyers would have acquired CMC if it had been offered for sale. Indeed, the fact that Carteret never tried to sell CMC before transfer to the RTC, and that the RTC immediately closed CMC to stem the risk of further loss, demonstrates that there would not have been a market for CMC in a "but-for" world. Tr. 2588:1-6 (Saunders).

Even if Carteret could have sold CMC, there is no evidence a buyer would have paid $18 million, as Professor Calomiris claims. Ambase Brief at 21. Ambase's valuation is based upon an event study of the stock price of Imperial Credit Industries, Inc. ("Imperial") after Imperial hired CMC employees. PX 2703A at ¶¶ 148-52. As Professor Saunders points out, Imperial did not take on any of the risks of CMC (it simply hired the staff). DX 9775; Tr. 3590:22-3591:5 (Saunders). Even if the event had been the sale of CMC rather than the hiring of employees, Imperial's stock price fell by more than the earlier increase after the CMC employees were unable to make their quotas at Imperial. Thus, the hiring more likely added no value to Imperial. DX 9775; Tr. 3590:6-3591:2 (Saunders).

Further, Imperial was a new public company whose stock was thinly traded. This meant an event study was unlikely to be able to connect a specific event, like the hiring of the CMC employees, to Imperial's stock price. DX 9775; Tr. 3592:5-13 (Saunders). Finally, even if CMC could have been valued through an event study, such a study, as a matter of law, cannot provide

definitive evidence of value. Glendale Fed. Bank v. United States, 43 Fed. Cl. 390, 402 n.5 (1999), aff'd in part, vac. in part, and remanded, 239 F.3d 1374 (Fed. Cir. 2001) (event studies are "speculative and unreliable" as a matter of law). Therefore, the event study is not sufficient evidence for the valuation of CMC.

**b. Mortgage Servicing Rights**

As for the sale of mortgage servicing rights, even Mr. Bianco conceded that a sale of mortgage servicing rights would have netted Carteret a pre-tax profit of only approximately $20 million. Tr. 202:4-6 (Bianco). Such a sale would not have enabled Carteret to meet its risk-based or core minimum regulatory capital requirements by any reasonable margin. PX 9053A. Indeed, the value of such rights is highly unstable, which suggests that the September 1991 third-party estimate relied upon by Ambase may not have measured the net gain Carteret could have realized from a sale in 1992. DX 5038A at ¶ 116; Tr. 3604:3-5 (Saunders). Further, because the minimum amount of regulatory capital increased as of January 1993 under FDICIA, a sale of the servicing rights would have done little good even if the third-party 1991 valuation remained applicable in 1992. See, e.g., DX 9760; Tr. 570: 14-17 (Bianco). Thus, the mortgage servicing rights are immaterial to "but-for" Carteret's ability to satisfy minimum regulatory capital requirements.

**9. "But-for" Carteret Would Not Have Been Able To Raise Outside Capital To Satisfy Minimum Regulatory Capital Requirements**

Ambase argues that Carteret had "turned the corner" in 1992 and, with the addition of goodwill as regulatory capital, could have raised additional capital from investors to the extent necessary to satisfy minimum regulatory capital requirements. Although Ambase concedes

actual Carteret was unable to raise capital, Ambase blames this on OTS. Ambase contends that, in a "but-for" world, OTS's behavior would have been more forgiving and investors would have been more willing to invest in reliance upon assurances they would have received concerning Carteret's prospects for the future. This argument simply stacks conjecture upon conjecture, imagining much, and proving little.

**a. In 1992, Carteret Continued To Fail Regulatory Capital Requirements And Experience Problems With Its Corporate And Commercial Loan Portfolios**

First, Carteret was not "relatively healthy," and had not turned the corner in 1992. To the contrary, in 1992, Carteret received the lowest possible rating (a "5" on the macro scale) from OTS and FDIC, PX 2118 at WOQ 6730044; PX 2119 at C-AM-A-005148, and reported a net loss of over $1.4 million. Tr. 1243:8-16 (Calomiris). In addition, it failed its regulatory capital requirements by substantial margins, and would have failed the risk-based and core minimum regulatory capital requirements by substantial margins even if the bank had been able to count goodwill as regulatory capital. DX 8124 at FAM002 0533.[32] Further, FDIC Examiner O'Rourke testified that the corporate and commercial loan portfolios, which were at the heart of Carteret's inability to earn profits, continued to be severely troubled. Tr. 2423:19-22 (O'Rourke). Indeed, OTS required Carteret to add $8 million to its loss reserves in 1992. PX 2119 at C-AM-A-0054146. Therefore, Carteret had not "turned the corner," and was not "relatively healthy" in

[32] As of September 1992, Carteret failed its risk-based requirement by approximately $235 million, its core requirement by approximately $156 million, and its tangible requirement by approximately $132 million. DX 8124 at FAM002 0533.

1992.[33]

**b. Ambase's Claim That Regulators Impeded Carteret's Capital-Raising Effort Is Unfounded**

Second, neither OTS's nor investors' attitudes toward Carteret would have been any different in the "but-for" world. With respect to OTS, the evidence demonstrates that the regulators actively participated in Carteret's capital raising efforts and actively assisted Carteret. Tr. 2955:12-22 (R. Smith); Tr. 2228:10-15 (Vigna); Tr. 1676:8-13 (Albanese). Deadlines were established because OTS could not allow an unsafe and unsound institution to continue to operate indefinitely. DX 8124 at FAM002 1059-68; DX 8202 at PZM010 1923; DX 760 at KH084511. The deadlines were extended whenever Carteret requested more time and presented a reasonable prospect to raise capital.[34] Tr. 340:18-341:11 (Bianco). Contrary to Ambase's contention, the regulators supported Carteret and delayed its transfer to the RTC for as long as possible. As Professor Smith observed, "[i]f I was interested in investing $200 million at an

[33] Ambase claims, based on a letter from Mr. Bianco to OTS, that Carteret would have been profitable in 1992 if it had not "cannibalized" its assets as a result of the breach. Ambase Brief at 25; DX 7175. At the time the letter was written (September 30, 1991), Mr. Bianco had been CEO only two months and had no personal knowledge that Carteret had "cannibalized" assets following the breach. FDIC Examiner Day testified that the cannibalization occurred in 1988 and earlier when Carteret sold valuable assets to mask substantial loan losses. DX 8054 at WOQ699 0528; Tr. 1460:6-1462:15 (Day); PFF, ¶¶ 84-86.

[34] In a February 27, 1992 agreement, Carteret consented to a transfer to the RTC if capital raising efforts were not successful by May 28, 1992. DX 8124 at FAM002 1059-66; DX 8202 at PZM010 1923. OTS extended this deadline at Carteret's request to July 6, 1992. DX 8124 at FAM002 1067-68; PX 5303 at WOP332 0746. On July 3, after a meeting between Carteret and OTS Director Ryan, OTS again extended the deadline, to August 28, 1992. DX 760 at KH084511; DX 8202 at PAM010 1923; Tr. 340:18-341:11 (Bianco). Thereafter, OTS extended the deadlines further to allow the completion of due diligence by Kohlberg, the Carlyle Group, PNC, and Gibraltar Savings Bank. PX 4879; Tr. 338:20-339:8 (Bianco). OTS did not order Carteret transferred to the RTC until it received word, on December 1, 1992, that the last potential investors had withdrawn their letters of intent to invest in Carteret. PX 5281.

S&L that the thrifts – that the regulators thought had to be seized, they would be better off having me buy it than them buy it . . . So I can't believe that that time pressure factor was too serious in the case of, certainly, Kohlberg or Carlyle or even the others." Tr. 2955: 4-22 (R. Smith); see Tr. 2228:10-15 (Vigna) ("[T]his was a process that ran well over a year, probably a year and a half . . . In fairness, I think, in my view, that's leniency"). Thus, Ambase's claim that OTS pressured Carteret to raise capital quickly is contrary to the facts.[35]

Third, the investors were not dissuaded by the regulatory environment or the fact that regulators refused to provide assurances concerning prospective regulatory treatment. Ambase Brief at 44-46. With respect to regulatory risk, the institutions that conducted due diligence did so notwithstanding the knowledge of the regulatory environment created by FIRREA. They decided not to invest because they had to be sure that, with the proposed investment, "we have stemmed the bleeding[,]" from Carteret's loan portfolios. Tr. 2950: 19 (R. Smith). The investors' belief that losses would continue, rather than the prospect of "regulatory risk," caused them to decline to provide capital to Carteret. Tr. 2950:3-20 (R. Smith).

Likewise, potential investors were not dissuaded because OTS was unable to provide

[35] Ambase's contention that OTS attempted to dissuade investors by telling them they could acquire properties directly from the RTC is wrong. When asked whether he was "aware of anyone at the OTS who told potential investors that they could buy Carteret's assets from the RTC rather than buying the whole bank," Mr. Vigna answered emphatically "no." Tr. 2240:20-24 (Vigna). Likewise, when Mr. Albanese was asked the same question, he answered an emphatic "no." Tr. 1675:22-25 (Albanese). Indeed, Mr. Albanese expanded his answer by testifying that giving potential investors this advice "would be pretty unethical . . . and nobody in the regional office was, anyway, to be looking to transfer them to the RTC." Tr. 1676:8-12 (Albanese). Thus, Ambase's charge is blatantly false.

assurances regarding future regulation.[36] As Professor Smith noted: "So they're not going to rely on the Government to be particularly agreeable or conciliatory or generous or anything for fear that - the main thing is really to get the economics straight. If we get that straight and we're in compliance, we don't have to worry about the Government. That's the way they would look at it, I think." Tr. 2961:20-2962:5 (R. Smith). It was the economics that counted, not regulatory assurances, and Carteret was simply unable to pass the cardinal test.

#### c. The Exclusion Of Goodwill From Regulatory Capital Had No Effect On Investors' Views Of Carteret

Finally, if goodwill had been reported as regulatory capital, it would have made no differences to the investors. As Professor Smith observed, investors "probably learned things in their due diligence endeavor that caused them to turn away." Tr. 2954:5-7 (R. Smith). The inability to count goodwill did not turn investors away; they were aware that goodwill could not be counted as regulatory capital before conducting due diligence. There is simply no evidence that investors would have regarded the thrift in a different light if goodwill had counted as regulatory capital. Professor Smith summed up investors' attitudes towards investing in thrifts: "I would say the goodwill issue is probably not too important in terms of whether - - who got to finance them." Tr. 2967:23-2968:14 (R. Smith).

In short, there is simply no evidence to support Ambase's claim that, but-for the breach, Carteret would have satisfied FIRREA's minimum regulatory capital requirements by raising capital from investors.

---

[36] As Deputy FDIC Regional Director Zamorski noted, FDIC had no authority "to provide assurances of a future Composite Rating." Tr. 2123:15-17 (Zamorski).

## III. THE DAMAGES PLAINTIFFS SEEK WERE NOT REASONABLY FORESEEABLE

To recover expectation damages, a plaintiff must demonstrate that both the type and magnitude of the damages sought at trial were reasonably foreseeable to the breaching party at the time of contract formation.[37] Plaintiffs seek as damages (1) Carteret's alleged 1989 market value: $251.4 million (PX 9006); (2) Carteret's alleged "Terminal Value" as of 2008: $782.2 million (PX 9006);[38] and (3) Carteret's alleged market value as of 2008: $920.7 million (PX 9006).[39] As we demonstrated at trial, these damages were not foreseeable to the regulators at the time of contract formation.

### A. The Regulators Could Not Have Reasonably Foreseen Ambase's Alleged Damages

In 1982, when Carteret acquired Barton and Delray, Carteret's tangible net worth was negative $212.3 million. DX 8000A at Ex. 3, p. 1. Professor Calomiris's lowest measure of Carteret's alleged damage, $251.4 million, would have required the Government to reasonably foresee average annual earnings of $66.2 million by Carteret between 1982 and the time of the

---

[37] Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1365 (Fed. Cir. 2005) ("[P]laintiff's loss must have been foreseeable to the party in breach at the time of contract formation", citing Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001)) ("In order to be entitled to . . . damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable"); see Slattery, 69 Fed. Cl. at 582 ("Foreseeability requires that both the type and amount of damages claimed were, at the time of contract formation, foreseeable consequences 'in the ordinary course of events,'" citing Restatement (Second) of Contracts, § 351).

[38] This consists of 1989 book value plus alleged lost profits of $595.6 million as of 2008, plus alleged franchise value of $99.9 million. PX 9024.

[39] This consists of the 1989 book value plus alleged lost profits of $595.6 million (net of alleged dividends of $183.9 million) plus alleged wounded bank damages of $16.8 million. PX 9031; PX 9041; and PX 9043.

breach ($212.3 plus $251.4 divided by 7). Id.

Such earnings could not have been reasonably foreseeable. Indeed, Carteret lost $9.2 million in 1981 and $23.3 million in 1982. Id. at 2.[40]

Regulators also could not have reasonably foreseen Carteret's "terminal value" or "current market value" measures of damages. As Ambase has noted, the implied estimate of Carteret's market value as of 1992, based upon the Kohlberg letter of intent, was $22 million.[41] Ambase Brief at 59; DX 62; Tr. 2984:25-2985:20 (R. Smith). Neither Kohlberg nor any other investor was willing to invest the $200 million that was required to satisfy FIRREA's minimum regulatory capital requirements. DX 8124 at FAM002 0535 (November 1992 S Memorandum). If these investors could have foreseen that, by investing $200 million, they would have had a thrift worth $782.2 million ("terminal value") or $920.7 million ("current market value") in 2008, they would have made the investment. Tr. 3539:20-3540:14 (Saunders). With respect to Carteret's alleged "terminal value," Professor Saunders observed: "I could have invested that tangible capital in assets and kept the [$]782 million over and above that . . . Unfortunately, nobody ever saw this other than Professor Calomiris . . ." Tr. 3540:4-10 (Saunders). If

---

[40] Likewise, regulators approving Carteret's acquisitions of First Federal and Mountain Security in 1986 could not reasonably have foreseen damages of $251.4 million from a breach in 1989. Carteret's tangible net worth in 1986 was only $21 million. DX 8000A at Ex. 3, p. 1. Regulators could not have foreseen that Carteret would have earned $78.6 million annually between 1986 and 1989, which was the amount necessary to raise its net worth from $21 million to $251.4 million (i.e., $251.4 million minus $21 million divided by 3). Indeed, in the three years prior to the 1986 acquisitions, Carteret's average annual core income was $17.7 million. DX 9730.

[41] Ambase incorrectly suggests that this is evidence Carteret must have been worth $251.4 million in 1989, given its losses in 1990 and 1991. Ambase Brief at 59-60. Kohlberg withdrew the letter of intent, thus indicating Carteret was not worth what Kohlberg thought it might be worth.

sophisticated investors in 1992 could not foresee Carteret's "terminal value" or market value in 2008, it goes without saying that regulators involved in forming contracts in 1982 or 1986 could not have reasonably foreseen Carteret's alleged growth either.

Finally, Professor Calomiris's current market value estimate ($920.7 million), which he admits is ex post, depends upon the market value of a sample of thrifts. This changes constantly. For example, the mean market to book ratio of the sample dropped from 67 percent as of September 30, 2007, to 24 percent as of December 31, 2007. DX 9745 and DX 9746. Thus, under Professor Calomiris's model, if Carteret's 2008 market value is calculated as of September 30, 2007, it is $720 million, whereas, if it is calculated as of December 31, 2007, it is $542 million. DX 9747. For regulators in 1982 or 1986 to be able to foresee the market value estimates in Professor Calomiris's model, they would have to be able to foresee changes in the market. That is simply not possible.

**B. Ambase's Foreseeability Arguments Lack Economic Logic And Are Inconsistent With The Case Law**

Ambase argues that, in 1982, the regulators could have foreseen $302 million in cash flow over 40 years because this would have replaced the amortizing goodwill and enabled Carteret to achieve a three percent core capital ratio. Ambase Brief at 10-11. Ambase assumes that regulators could have foreseen that Carteret would operate at the minimum regulatory capital requirement for the contract's 40 years without supporting documentation. This argument was not presented by Professor Calomiris in his expert reports or at trial, and was not raised in Carteret's pre-trial brief. There is simply no model substantiating the amount of cash flow Carteret would have had to realize to replace the goodwill and provide a three percent core

capital ratio. Nor is there evidence regulators would have been satisfied with this level of core capital. Therefore, the Court should reject this argument.[42]

Further, Ambase claims that regulators could have foreseen losses to the insurance fund of $900 million to $1.1 billion if Carteret had not acquired Barton and Delray because they would have had to have been liquidated. According to Ambase, liquidation proceedings would have required the FSLIC insurance fund to cover deposit liabilities exceeding the thrifts' assets, and FSLIC would have lost the funds paid out of the insurance fund, as well as the interest that allegedly would have been earned on these funds. Ambase Brief at 11. The alleged liquidation costs the Government would have incurred in the absence of the Carteret acquisitions are totally divorced from the damage theories advanced at trial, and thus are irrelevant.

Further, as a matter of law, Ambase's contention regarding these costs is pure speculation; there is no evidence that, in the absence of the 1982 transactions, FSLIC would have been required to liquidate Barton or Delray or would have incurred $900 million to $1.1 billion in expenses. Indeed, this theory of damages has been rejected each and every time it has been asserted in the Winstar-related cases. See, e.g., Glendale Fed. Bank v. United States, 239 F.3d 1374, 1381 (Fed. Cir. 2001) ("[T]he action taken by the purchasing S&L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net

---

[42] Ambase also appears to argue that the regulators could have foreseen "but-for" Carteret's alleged cash flow between the breach and 2008 ($595.6 million) because "FSLIC also based its viability conclusion upon the fact that Carteret had turned profits of $4.6 million in the last six months of 1982." Ambase Brief at 11. However, Ambase fails to mention the fact that Carteret lost over $10 million through August 1982, PX 2433 at OAM0060027, and, notwithstanding management's projection of net income of $4.6 million during the second half of the year, lost $23.3 million in 1982. DX 8000A, Exh. 3, p. 2. Given this financial performance in 1982, regulators had no basis upon which to project future cash flow of $595.6 million.

obligations of the thrift"); Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1380-82 (Fed. Cir. 2005) ("'benefit conferred' theories in Winstar-related cases . . . are 'too speculative and indeterminate' to succeed"). Therefore, this theory of foreseeability is invalid as a matter of law.

## IV. THE ALLEGED DAMAGES ARE NOT REASONABLY CERTAIN

As the Federal Circuit has noted, "the measure of damage must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" California Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005), quoting Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004), quoting Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960). As we have demonstrated, because "but-for" Carteret would have failed, plaintiffs have failed to establish a "reasonable probability of damage." Even assuming, arguendo, that Carteret would have survived absent the breach, Ambase has failed to establish the quantity of damages attributable to the breach. Indeed, Professor Calomiris offers three damage estimates, each more unlikely and unsupported than the next.

### A. The Evidence Does Not Support Professor Calomiris's $251.4 Estimate For "Market Value" At The Time Of Breach

The Court should reject Professor Calomiris's estimate that Ambase suffered a $251.4 million loss based upon Carteret's alleged market value at the breach.

To estimate Carteret's market value in 1989, Professor Calomiris's started with the $266 million that Ambase paid to acquire Carteret in 1988.[43] Professor Calomiris calculated the

[43] Carteret's stock was not traded at the time of breach because it was wholly owned by Ambase. Therefore, to estimate Carteret's market value at the time of breach, Professor Calomiris was required to rely upon a valuation model rather than actual trading data.

market-to-book ratio of the Ambase acquisition as .869. PX 9010. He then gathered data from 46 unrelated thrifts to calculate the percentage change in the mean market-to-book ratio between 1988 and the breach (7.4 percent). PX 9011. He then applied this 7.4 percent increase to Carteret's 1988 ratio of .869 and calculated a .934 ratio at the time of breach. PX 9012. Finally, he applied this ratio to Carteret's book value at the breach, and estimated Carteret's market value at $251.4 million. Tr. 3404:16-3405:21 (Saunders); DX 9702. This approach is factually invalid, and dramatically overvalues Carteret. Moreover, because the model's assumptions are unsupported by the evidence, the model's results are arbitrary.

### 1. Ambase Paid Too Much For Carteret In 1988

The $266 million purchase price Ambase paid for Carteret's stock is not a valid starting point for ascertaining Carteret's value at the time of the breach. Immediately after the acquisition, analysts at the time viewed the price Ambase paid as inflated. Indeed, these analysts described the purchase as a "monumental mistake." DX 9703; Tr. 3406:22-3407:25 (Saunders).[44]

Further, although Professor Calomiris concludes the price Ambase paid is "conservative" because of Carteret's obligation to acquire IPF, the opposite is true. Tr. 3405:22-3406:21

[44] Ambase had originally agreed to pay $291.9 million for Carteret but sought to renegotiate the deal after the New York Stock Exchange ("NYSE") fell 508 points, or more than 20 percent, on October 19, 1987. DX 8000A, ¶ 40. Carteret filed suit in a Delaware state court and the parties settled upon a new purchase price of $266 million. Id. During this period, Ambase's insurance operations, which lost $197 million in 1986, was underperforming, and management was under substantial pressure to diversify and regain profitability. Id. at ¶¶ 37-38. Thus, when Ambase agreed to pay $266 million for Carteret, Ambase was under duress from many quarters. Given the pressure Ambase faced from Carteret and its own stockholders, the analysts' claims that Ambase overpaid for Carteret is exceedingly credible.

(Saunders); DX 9703. The transfer of IPF from Ambase to Carteret for $65 million was a major benefit to Ambase because it put $65 million in cash in Ambase's pocket and allowed Ambase to continue to operate IPF through its 100 percent ownership of Carteret. Id. This is true whatever the market value of IPF. Thus, IPF is "an upward bias" in the $266 million price and not an indication that Ambase underpaid as asserted by Professor Calomiris. Id.[45]

### 2. Carteret's Value Dropped Precipitously Between Its Acquisition By Ambase And The Breach

Even assuming $266 million accurately measured Carteret's value in 1988, the bank's value dropped precipitously between 1988 and 1989. Although Carteret's classified assets more than doubled between the time of the $266 million purchase and the breach, DX 9705, Carteret's reserves barely changed. Tr. 3412:15-3413:15 (Saunders). Carteret was massively underreserved, DX 9706, and the regulators identified the need for an additional $77.2 million reserves in their May 1989 report of examination. DX 9704. Professor Calomiris does not dispute that additional reserves were needed. Tr. 1163:2-6 (Calomiris). Indeed, he acknowledges that the amount of reserves may have exceeded the $77.2 million identified by the regulators. Tr. 1178:24-1179:3 (Calomiris).

When Mr. Moor examined Carteret's commercial asset portfolio in June 1991, he corroborated the need for additional reserves. Describing Carteret's reserves as "a joke," DX 9129 at 112:4-24 (Moor), he believed this was the case because Carteret had a higher percentage

---

[45] Ambase also argues that the fact that it was able to borrow $300 million to acquire Carteret and use the Carteret stock as collateral indicates that the $266 purchase price was "conservative." Professor Saunders, however, demonstrated that the loan was to Ambase and was therefore backed up by all of Ambase and not just Carteret (which was a minority portion of Ambase). Tr. 3408:1-19 (Saunders). Thus, the lender was not lending simply upon the strength of the Carteret stock but also on the strength of Ambase as an diversified conglomerate. Id.

of poorly underwritten commercial loans than even failing thrifts. DX 9129 at 97:19-98:23 (Moor) (the underwriters were either incompetent or "crooked"). Mr. Moor testified that the bad loans were put on Carteret's books much earlier by poor managers who would not "admit a little mistake . . . [which then] becomes a real big mistake down the road, and that's exactly what happened." DX 9129 at 99:24-100:2 (Moor). If these reserves, which Professor Calomiris does not dispute, are deducted from Carteret's estimated market value, the valuation at the time of the breach is reduced from $251.4 million to $179.4 million, even assuming one accepts the legitimacy of remainder of Professor Calomiris's methodology. DX 9707; Tr. 3421:10-3422:11 (Saunders).

### 3. The Sample Upon Which Professor Calomiris Relies To Estimate Carteret's Market Value Does Not Represent The Bank

Professor Calomiris's valuation measures Carteret's market-to-book ratio at the time of the breach by reference to 46 "comparables," which are not comparable in any real sense. DX 9708. Professor Calomiris selected the sample based only on data availability, without even contending, let alone demonstrating, that the sample thrifts bear any relation to Carteret. Tr. 3422:12-3423:15 (Saunders). Thus, the sample bears no relationship to the size, profitability, location, risk, capital, strategic planning, or any other Carteret characteristics. Id. Because the performance and condition of these thrifts do not resemble Carteret in any meaningful way, the data offers no information at all regarding Carteret's value in 1989. Id. Professor Calomiris might just as well have picked numbers from a hat, given the randomness and irrelevancy of his data set.

Further, it is arbitrary to assume, as Professor Calomiris does, that Carteret's market to

book ratio in 1989 would have exceeded its market to book ratio in 1988, or exceeded the average market to book ratios of the 46 thrifts in the comparative sample. DX 9707 and DX 9709. Carteret suffered significant core losses for four consecutive quarters between June 1988 and the breach. PX 2106 at WOQ6750067-0068. Therefore, it makes no sense to suggest, as Professor Calomiris does, that, in a year in which Carteret suffered severe and consistent core losses and a doubling of its classified assets, its market to book multiples would have increased. Tr. 3424:14-3428:17 (Saunders).

Indeed, Professor Saunders noted, one would have expected Carteret's multiples to have decreased. Id. Even assuming Carteret's market to book ratio was identical to the average of the 46 thrifts in the sample, the estimate of Carteret's market value would drop from $251.4 million to $164 million. DX 9736. If the loan loss allowances required by OTS are factored into Carteret's book value and the market to book ratio is considered to be identical to the average of the sample, Carteret's estimated market value drops from $164 million to $121.6 million. DX 9709; Tr. 3423:23-3424:13 (Saunders). This highly variable result renders the estimating methodology insufficiently precise to calculate expectancy damages.

#### 4. The Evidence Does Not Support Ambase's Claim That The Value Of Carteret's Stock Was Depressed By The Inability To Pay Dividends And FIRREA's Announcement

Professor Calomiris also contends that the $251.4 million claim is "conservative" because: (1) if Carteret's stock had been freely traded, the dividends it paid to Ambase between 1988 and the breach would have signaled that Carteret was a strong thrift and would have increased the value of its stock; and (2) public information about the phaseout of goodwill depressed Ambase's stock price, as well as the price of thrifts in the sample. PX 2702A at ¶¶ 26

and 29-34. These are bogus claims. There is no evidence of a signaling effect from Carteret's dividend payments, nor can there be. DX 9710. The dividends were paid from the subsidiary to the parent and thus could not have signaled to the market that the subsidiary was on the cusp of profit-making opportunities. Id.; Tr. 3428:18-3433:9 (Saunders). Neither the academic literature nor the impact on Carteret's stock price of dividends paid prior to the Ambase acquisition suggest any signaling effect from the payment of dividends. DX 9710 and DX 9711.[46]

Professor Calomiris's contention that FIRREA had a negative effect on Ambase's stock price and, therefore, upon the stock prices of the 46 thrifts in the sample, is also wrong. DX 9712-DX 9715; Tr. 3433:10-3436:2 (Saunders). Ambase's stock price increased 29 percent from February 6, 1989, when FIRREA was introduced, until August 9, 1989, when FIRREA was enacted. Id. Moreover, during that time the market index for thrift stocks increased by only 18 percent. Thus, Ambase's stock price increased significantly and by a greater amount than the general market index. DX 9715. Thus, not only did news of FIRREA not harm Ambase's stock price, but it appears to have been regarded as positive news for Ambase and, presumably, the 46 thrifts in the sample. Tr. 3436:21-23 (Saunders) ("FIRREA . . . seems to have [had] a positive effect, not a negative effect as conjec[tu]red by Professor Calomiris").

### 5. The Evidence Refutes Professor Calomiris's Assertion That Former Carteret Directors Made A Bid To Purchase The Thrift

Professor Calomiris also contends that his estimate of $251.4 million is supported by the fact that two former Carteret directors, Alexander Haig and Harry Jacobs, allegedly submitted a bid to acquire Carteret for $252 million in May 1989. Professor Calomiris's reliance on the

[46] Carteret's announcement of its first dividend in 1984 had a positive effect. All other dividend announcements had no statistically significant effect. DX 9711.

Haig/Jacobs alleged "bid" as evidence of Carteret's market value is misplaced. The only "evidence" of a "bid" presented by Ambase at trial is a reference to a proposal in a letter from Robert O'Brien, Carteret's former CEO, to George T. Scharffenberger, Chairman and CEO of Ambase, complaining that Mr. O'Brien had been treated unfairly by Ambase's former CEO, Mr. Manley. PX 4836. Although the letter states that Mr. Manley had refused to receive an acquisition proposal Messrs. Haig and Jacobs purportedly were prepared to make, Mr. O'Brien's motive in writing the letter was to curry favor with Mr. Scharffenberger. PX 4836. Therefore, the portions of the letter concerning Mr. Manley's unwillingness to entertain a bid for Carteret are not credible. PFF, ¶¶ 215-216

In fact, there is no evidence Messrs. Haig and Jacobs ever made a bid or conducted due diligence. DX 9716; Tr. 3439:19-3440:22 (Saunders). Further, Messrs. Haig and Jacobs left the Carteret Board in 1988 and would not have been aware of Carteret's financial condition in 1989. Id. In short, Ambase has presented no credible evidence to suggest that such a bid was made or is reliable evidence of Carteret's value in 1989.

Professor Calomiris has failed to support his $251.4 million estimate of Carteret's market value at the time of the breach.

### B. The "Current Market Value" And "Terminal Value" Damage Estimates Are Invalid

Professor Calomiris also presented two models that purport to estimate Carteret's value in 2008: a "current market value" model and a "terminal value" model. These models assume that Carteret is entitled to the value it would enjoy today if the breach had not resulted in seizure. The "terminal value" model estimates Carteret's value in 2008 by increasing the bank's book value in

1989 ($269.3 million) by lost earnings ($595.6 million) and "franchise value" ($99.9 million) and subtracting goodwill amortization ($182.5 million). PX 9024. Professor Calomiris claims this is an ex ante model because the primary elements of the model, Carteret's book value, "franchise value" and market value at the time of the breach, are all known at the time of the breach.[47]

Professor Calomiris's "current market value" damages model claims to measure the amount a willing buyer would have paid for Carteret in 2008 if it had survived the breach. Professor Calomiris's calculates Carteret's current market value in three ways: (1) by assuming Carteret's estimated market value at the time of the breach ($251.4 million) would have increased by the percentage increase in thrift market indices over the next nine years, PX 9037-PX 9039; (2) by increasing Carteret's book value and market-to-book ratio by the growth in book values and market-to-book ratios of a sample of thrifts reported in a database, PX 2702A at Table 8, p. 32;[48] and (3) by multiplying Carteret's estimated book value in 2008 by its estimated

---

[47] Professor Calomiris derives future cash flow by applying the Gordon Growth Model, a mathematical model for deriving the market value of a firm with steady earnings from its average earnings growth and discount rate. PX 9021. Based upon Carteret's estimated market value in 1989 ($251.4 million), base year earnings ($20.546 million) and estimated discount rate (12.34 percent), Professor Calomiris used the Gordon Growth model to solve for the growth rate of 4.2 percent. Id. Based upon this growth rate applied to base year earnings, Professor Calomiris estimated "but-for" Carteret's earnings between 1989 and 2008 to be $595.6 million. PX 9022.

[48] The sample involves 49 thrifts in 1989 and 181 thrifts in 2008. PX 2702A at Table 8, p. 32. The model calculates the average book values and market-to-book ratios of the 49 thrifts and the 181 thrifts and assumes the difference represents the growth of the 49 thrifts. As Professor Saunders explained, however, the increase in the book values and the market-to-book ratios of the average of the 181 thrifts compared to the average of the 49 thrifts could simply be due to mergers and acquisitions that create larger average thrifts by 2008. Tr. 3503:12-3505:23 (Saunders); DX 9735; PFF at ¶ 238. Thus, the fact that the average of the 181 thrifts had a larger book value and market-to-book ratio than the average of the 49 thrifts does not mean the average thrift grew in book value or market-to-book ratio during this period. Id.

market-to-book ratio in 2008 derived from a sample of nine thrifts which operated independently between 1989 and 2008. PX 9031-9033; PFF at ¶ 234.[49] The "current market value" and "terminal value" models are based upon information that could not have been known in 1989 and are, therefore, ex post rather than ex ante models.

Although Professor Calomiris argues that Carteret is entitled to its current value as damages from the breach, as we demonstrated at trial and below, the "terminal value" and "current market value" models are precluded by controlling authority and cannot be used to establish breach-related damages.

### 1. The "Current Market Value" and "Terminal Value" Measures Incorrectly Assume Carteret Is Entitled To Its Value In 2008

Although the breach occurred in 1989, the "terminal value" and "current market value" models assume that Carteret is entitled to the bank's value in 2008, absent the breach. Professor Calomiris assumes Carteret can be compensated for the alleged "market value" of "but-for" Carteret at the time of trial. The assumption that Carteret is entitled to damages based upon hypothetical lost cash flow between 1989 and 2008 is directly contrary to Federal Circuit precedent holding that damages from the loss of an income producing asset such as a thrift must be determined as of the time of breach and not some later time. First Fed. Lincoln, 518 F.3d at 1316.

---

[49] The model estimated "but-for" Carteret's book value in 2008 by adding the difference between lost profits derived from application of the Gordon Growth Model ($595.6 million) and "but-for" dividends ($180.3 million) to Carteret's book value as of 1989 ($269.3 million). PX 9031. This sum ($463.1 million, PX 9031) was multiplied by Carteret's market-to-book ratio as of 1989 (0.732) and increased by the market-to-book ratio of the average of the nine, stand-alone thrifts (0.67). Pursuant to this method, Professor Calomiris calculated the current market value as $720.1 million. PX 9031. This is his "preferred" damages estimate.

Plaintiffs' claim for the loss of Carteret is identical to that asserted by First Federal Lincoln Bank in First Federal Lincoln. First Federal Lincoln Bank sought lost profits based upon assets it sold to pay the depositors and assets it allegedly would have acquired through growth absent the breach. The trial court properly rejected the lost profits claims as speculative. Nevertheless, although the loss occurred at the time of the breach (i.e., between 1990 and 1993), the Court awarded damages based upon the "franchise value" of the deposits at the time of trial (2001). First Fed. Lincoln, 518 F.3d at 1316. The Federal Circuit reversed the award of the franchise value at the time of trial and held that, because the deposits were an income producing property, they should have been valued as of the time of the breach. Id. at 1316-1318. As the Federal Circuit stated:

> When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach - not the lost profits that the asset could have produced in the future.

First Fed. Lincoln, 518 F.3d at 1317.

The Federal Circuit distinguished Energy Capital Corp. v. United States, 302 F.3d 1314, 1330 (Fed. Cir. 2002) ("Energy Capital") upon the ground that Energy Capital sought lost profits it would have earned by performing the contract, whereas First Federal Lincoln sought the lost deposit premium it would have earned if the breach had not resulted in a loss of deposits. Id. at 1316-1319. This is consistent with the general rule that "in an action for breach of contract, 'the appropriate date for calculation of damages is the date of breach.'" First Fed. Lincoln Bank, 518 F.3d at 1316 (quoting Energy Capital, 302 F.3d at 1330).

This case is controlled by First Federal Lincoln because the plaintiffs' claim is for the loss

of an income producing asset, Carteret. Although the cash flow "but-for" Carteret allegedly would have earned between the breach and 2008 is an element of Professor Calomiris's estimate of "market value" and "terminal value" in 2008, the claim is not for these cash flows but-for the market value or terminal value in 2008. Therefore, First Federal Lincoln applies and plaintiffs' "current market value" and "terminal value" measures of damages are invalid as a matter of law.[50] See, e.g., Holland v. United States, 2008 WL 4053227, *6-7 (Fed. Cl. 2008) (damages for the loss of an income generating property cannot be based upon undiscounted future cash flows).

### 2. Professor Calomiris Has Failed To Provide A "But-for" Model Of Alleged Future Cash Flows

Even assuming, arguendo, that Carteret is entitled to its value at the time of trial as breach-related damages, the "current market value" and "terminal value" models fail to establish Carteret's value in 2008. The models depend upon the Gordon Growth Model to estimate lost cash flow between 1989 and 2008. A simple mathematical model such as the Gordon Growth Model, however, is not competent evidence of lost profits in a Winstar-related case. See, e.g., Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 430 n.25 (2000) ("[w]ith respect to explaining its expectancy damages . . . plaintiff bears the burden of propounding a realistic but-for scenario . . ."); Southern Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 633 (2003) (explaining that "establish[ing] a 'but-for' world . . . is ordinarily required to state a valid claim for expectancy damages"); Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006), aff'd, 511 F.3d 1360 (Fed. Cir. 2008) ("because plaintiff in this case is seeking

[50] As we have already demonstrated, plaintiffs' claim for Carteret's market value at the time of breach has not been quantified to a reasonable certainty and, therefore, must be rejected as well.

expectancy damages, it is incumbent upon it to establish a plausible 'but-for' world").

In order to prove lost profits damages in Winstar-related cases, a plaintiff must demonstrate what the "plaintiff . . . would have looked like in the 'but-for' world." Granite Mgmt., 74 Fed. Cl. at 170; see Glendale Fed. Bank, 239 F.3d at 1380 (lost profits in a Winstar context must be based upon "what might have been"); California Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001) (plaintiff must provide "specific documentation . . . [of] the actual post-sale performance of [foregone loans]"); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 241 (2003), aff'd in part and rev'd in part, 402 F. 3d 1221 (Fed. Cir. 2005) (a lost profits model must "account for . . . real-world events other than the [assumed] profitability [of the thrift]").

Contrary to the requirements of the case law, Professor Calomiris admitted that he did not perform a lost profits analysis for the "but-for" thrift:

> Q. Okay. Did you do a but-for lost profits analysis
> for any period of time – any period of time at all?
>
> A. Not a complete one.
>
> Q. Okay. You've never attempted in any particular
> quarter to tell us what the assets would have – of
> the but-for bank would have been or what the liabilities
> would have been, have you, sir?
>
> A. No. I didn't do a thorough but-for analysis of each
> quarter trying to carry the bank forward, figure out what
> its profits would be and its balance sheet. I didn't do that.

Tr. 1264:24-1265:11 (Calomiris).

Thus, Professor Calomiris admitted that he did not construct a "but-for" model for determining lost profits. Tr. 1265:12-1266:14 (Calomiris); see DX 9717; 9719; Tr. 3443:9-25

(Saunders). Instead, to calculate lost profits, he substituted the Gordon Growth Model, which is incapable of demonstrating the investment opportunities, sources of funding and other characteristics of "but-for" Carteret absent the breach. PX 9021. It further ignores a variety of market changes and challenges from 1989 to 2008. Accordingly, the "terminal value" and "current market value" models are entirely speculative and cannot be relied upon to establish lost profits. See, e.g., Genmoora Corp. v. Moore Bus. Forms, Inc., 939 F.2d 1149, 1157 (5th Cir. 1991) ("[an] expert's testimony will not support a verdict if it lacks an adequate foundation in the facts of the case").

### 3. Even If A "But-for" Model Was Not Required As A Matter Of Law, Carteret's "But-for" Earnings Cannot Be Estimated By The Gordon Growth Model

Even if controlling authority recognized a mathematical model such as the Gordon Growth Model as competent evidence of lost profits, Professor Calomiris improperly assumed the Gordon Growth Model could predict lost profits in this case. As Professor Saunders noted, "the Gordon Growth Model . . . can only be used with firms with what's called stable growth, very stable growth over time," Tr. 3446:25-3447:6 (Saunders); DX 9721, because stable growth is important for "any type of model that's predicting the future." Tr. 3448:21-25 (Saunders).

Carteret never enjoyed steady earnings. For example, between 1983 and 1984 Carteret's earnings decreased by 78 percent; between 1984 and 1985 they increased by 235.4 percent; between 1985 and 1986, they increased by 82.5 percent; between 1986 and 1987 they decreased by 27.5 percent; and between 1987 and 1988 they decreased by 40.2 percent. DX 9720. Thus, not only did Carteret's earnings not grow at a steady rate, they declined in three out of five years (i.e., between 1983 and 1984, between 1986 and 1987, and between 1987 and 1988). Id. As

Professor Saunders noted, "no textbook . . . would support a single growth rate going forward for a company whose earnings [were] as volatile as [Carteret's]." Tr. 3450:25-3451:2 (Saunders).[51] Because Carteret never had stable earnings, the Gordon Growth Model is simply inapplicable to Carteret.

### 4. Even If "But-for" Carteret's Growth Could Be Estimated By The Gordon Growth Model, Professor Calomiris Uses Incorrect Inputs

As demonstrated above, the Gordon Growth Model provides that the market value of a firm in stable growth is a product of its earnings times one, divided by the discount rate minus the growth rate. PX 9021. Professor Calomiris purports to use the Gordon Growth Model to solve for "but-for" Carteret's future growth by plugging in estimates of Carteret's market value, earnings, and discount rate at the time of the breach. Id. As we demonstrate, all of these inputs are invalid and result in a gross overstatement of "but-for" Carteret's future earnings.

---

[51] Ambase claims that, as an expert witness in the Enron fraud trial, Professor Saunders estimated Enron's market value in the absence of the fraud by applying the Gordon Growth Model even though Enron did not have stable earnings. Ambase Brief at 64. This is blatantly incorrect. As Professor Saunders explained, he did not use the Gordon Growth Model to estimate Enron's growth but, instead, used a multi-stage model which relied upon empirical research concerning what analysts believed Enron's future growth would likely be. Tr. 4021:18-4022:15 (Saunders) ("He's not doing an analysis. I've got to see what analysts said, what the IBES analysts say, what did Ibbotson say about Carteret's growth rate, what did anybody say about Carteret's growth rate"). In Enron, Professor Saunders calculated the growth rate based upon empirical evidence, and applied a three stage model based upon empirical research. Tr. 4015:13-4016:15 (Saunders). As Professor Saunders noted, Professor Calomiris simply assumed the Gordon Growth Model applied although Carteret did not exhibit stable earnings and, by 1985, had converted from operating a retail bank to operating a wholesale bank having very different growth potentials. Tr. 4015:17-4016:7 (Saunders).

**a. Professor Calomiris Overstates Carteret's Market Value At The Time Of Breach**

The first input to calculate the growth rate from the Gordon Growth Model is Carteret's estimated market value at the time of breach. PX 9021. As we have already demonstrated, the $251.4 million estimate overstated the bank's value. This improper input renders it impossible to estimate an accurate growth rate for "but-for" Carteret.

**b. The Model Improperly Excludes Carteret's 1990 and 1991 Losses**

The second input for the Gordon Growth Model is "but-for" Carteret's base year earnings. PX 9021. Because the breach occurred in 1989, Professor Calomiris assumes "but-for" Carteret's earnings in the year following the breach would have equaled the average earnings between 1982 and 1988. This assumption is flawed.

In the actual world, Carteret incurred massive losses of $131.8 million in 1990 and $160.3 million in1991. DX 8000A, Exh. 3, Table 1. These losses were not breach-related, but were caused by bad assets, which Carteret acquired long before the breach, as reported by the bank's 10K reports. Tr. 2713:6-2714:10 (Calomiris); PX 10 at 21. These losses could not be ignored in a rational model predicting future activity, and should not have been excluded from Professor Calomiris's model. As noted by Professor Saunders, "[These] losses... should have been inputted into any reasonable model of lost profits after FIRREA since these were directly due to pre-FIRREA activities of the bank." Tr. 3465:12-15 (Saunders); Tr. 3461:20-24 (Saunders) ("the actual outcome [in 1990 and 1991] was hugely negative, and that outcome was a precondition prior to FIRREA and fully known prior to FIRREA").

If Professor Calomiris had inputted Carteret's undisputed, actual losses in 1990 and 1991,

his model would project negative damages. Tr. 3465:16-3466:22 (Saunders) ("If you'd inputted these number[s], then you're losing [$]13 million a year for every year"). Thus, the effect of Professor Calomiris's model is to render Carteret better off by an award of damages than it would have been if the breach had not occurred. This result is contrary to the Federal Circuit's instruction that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet, 339 F.3d at 1345; see Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004) ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement").

Even if one could justify Professor Calomiris's exclusion of Carteret's actual performance in 1990 and 1991 from his estimate of future cash flow, the model is invalid nonetheless because his calculation of "but-for" Carteret's base earnings is wrong. Professor Calomiris averages Carteret's net income between 1982 and 1988, and calculates a projected first year net income of $20.5 million. PX 2702A at ¶ 35; PX 9021. As Professor Saunders noted, however, "Professor Calomiris [$]20.5 million doesn't distinguish between what I've called core bank income, which is income from marginal spread, which is the difference between the interest cost of your funds and the interest return on your loans . . . [and non-operating income]." Tr. 3479:11-20 (Saunders). Only "core earnings" should be included in a model which projects future earnings growth because "sales or losses on assets on the balance sheet . . . can never be repeated." Tr. 3479:19-25 (Saunders). Further, paper gains from accreting the discount on mortgages absorbed in supervisory acquisitions are simply "forgetting the liabilities" and are not part of core income. Tr.

3490:3-8 (Saunders).[52]

#### c. Professor Calomiris Improperly Measured Carteret's Cost Of Capital

The third input into the Gordon Growth Model is Carteret's cost of capital. PX 9021. Professor Calomiris calculates Carteret's cost of issuing preferred stock in 1989 by examining 21 preferred stock offerings and 12 high-yield debt offerings between 1993 and 1994. Tr. 3495:24-3496:8 (Saunders).[53] Professor Saunders challenged this, stating "[h]ow can I estimate a cost of capital in '89 using data from '93 to '94, five years into the future?" Tr. 3495:14-16 (Saunders). Further, even if there was a correlation between the cost of capital in1993 and 1994 and 1989, there were over 500 preferred stock offerings in 1993 and 1994: 21 is too small a sample to make relevant comparisons. Tr. 3496:19-25 (Saunders). Also, preferred stock and high-yield debt have different tax and default characteristics and, therefore, cannot be combined to yield meaningful results about the cost of preferred stock. Tr. 3496:9-16 (Saunders).

---

[52] See United States v. Winstar Corp., 518 U.S. 839, 852-53 (1996) ("The difference between amortization and accretion schedules . . . allowed acquiring thrifts to seem more profitable than they in fact were); Suess, 52 Fed. Cl. at 227 (recognizing that accretion gains should not be included in lost profits models).

[53] Professor Calomiris argues that the "terminal value" is an ex ante measure of damages. This contention is incorrect because the model uses a discount rate, derived from 1993 and 1994 capital raisings, that would not have been known at the time of the breach. Tr. 3495:16-23 (Saunders); DX 9732. Both the "terminal value" and "current market value" measures of damages are ex post measures that would not be foreseeable to the party in breach at the times the contracts were formed.

### 5. The Current Market Value and "Terminal Value" Measures Present Other Fatal Flaws

#### a. Defects In Estimation of "But-for" Carteret's Current Market Value

Professor Calomiris's first approach, to grow Carteret's estimated market value at the time of the breach ($251.4 million) by the growth in thrift indices, assumes that "but-for" Carteret would be comparable to average thrifts in the indices. As Professor Saunders notes, "[Carteret] was a bad thrift, badly performing thrift, and you can't use it to - use averages to induce what a value would be in 2007." Tr. 3501:18-21 (Saunders).[54]

The second model, which calculates the growth in book values and market-to-book ratios of a shifting sample of thrifts and applies the percentage change to Carteret, is equally invalid. DX 9735. Although the average book value of the 181 thrifts in the 2007 sample is 60 percent higher than the average book value of the 49 thrifts in the 1989 sample, this does not mean the book values of the 49 thrifts increased by 60 percent over this period. As Professor Saunders established, comparing the book values of different groups of thrifts in 1989 versus 2007 is meaningless. Any purported increase in book value could simply be due to the fact that mergers and acquisitions have resulted in larger banks in 2007. Tr. 3503:12-3505:23 (Saunders); DX 9735. Also, because the market discounts goodwill, and the amount of Carteret's goodwill exceeded the amount held by the average thrift in the samples, "but-for" Carteret's market to book ratio would grow more slowly than the thrifts in the sample. Tr. 3506:1-6 (Saunders).

[54] Further, the projections are based entirely upon 20/20 hindsight and damages "will depend on the day we decide to meet in court and decide on the damages, because every day [the market] changes." Tr. 3502:1-7 (Saunders). The implication of the model is that regulators in 1982 and 1986 could foresee market developments through 2008, which requires a "leap of faith" Ambase has failed to support with relevant evidence.

Professor Calomiris's "preferred approach" applies the growth in market-to-book ratios of nine stand-alone thrifts to Carteret's estimated book value in 2008. DX 9737.[55] This methodology falsely assumes that Carteret and the nine-stand alone thrifts are comparable and would have grown at commensurate rates. Professor Saunders demonstrated, however, that the nine are not comparable. DX 9739.[56] Further, because the nine were well-capitalized, whereas Carteret was not, there is a "survivorship bias" in the sample. As Professor Saunders explained:

> Let me calculate the return I get on mutual funds. But they have to be there in 89. They have to be there in 2007. I find only 10, but they are the l0 best ones because they survived. Only bad thrift, bad mutual funds have gone. So is that really a good measure of return? The answer is no. Very few of us would have got that return, because we would have picked some of the bad ones and some of the good ones. So we call this survivorship, which really biases the whole numbers upward.

Tr. 3516:6-17 (Saunders). Thus, Professor Calomiris's "preferred approach" presented an invalid measure of "but-for" Carteret's current market value.

**b. <u>Professor Calomiris's "Terminal Value" Analysis Is Invalid</u>**

The "terminal value" analysis includes the alleged "but-for" earnings estimated by the Gordon Growth Model. PX 9024. As discussed in Section IV.B.4, above, these "but-for" earnings are grossly overstated due to the use of invalid inputs in the Gordon Growth Model.

---

[55] As discussed previously, Carteret's estimated 2008 book value is calculated by adding lost profits derived from application of the Gordon Growth Model to Carteret's book value at the time of the breach.

[56] For example, only one is from Florida or New Jersey. Tr. 3523:6-7 (Saunders). On average, they are much smaller than Carteret, have higher equity-to-asset ratios, and lower classified assets-to-total asset ratios. DX 9739; DX 9740; Tr. 3523:1-3525:1 (Saunders). In terms of return on assets, Carteret is next to last in 1989, next to last in 1990, last in 1991, and last in 1992. DX 9741; Tr. 3526:11-14 (Saunders). The nine are "far better capitalized banks than is Carteret." Tr. 3527:8 (Saunders); DX 9742.

Therefore, the "terminal value" analysis is invalid for this reason alone. Further, in the "terminal value" model, Professor Calomiris estimated Carteret's 1989 "franchise value" of $99 million by improperly assuming that the value of the tangible assets on Carteret's books in 1989 was an accurate measure of their market value. DX 9751.

Professor Saunders points out, however, that the market value of the tangible assets was much less than the book value in 1989 because the losses in the commercial real estate and corporate loan portfolios prevented Carteret from "collecting any rents on these leases . . . any income from these mortgages." Tr. 3544:8-10 (Saunders). Professor Saunders demonstrated that if the assets are marked down by 1.3 percent, the so-called franchise value disappears. Tr. 3544:15 (Saunders). This is a conservative writedown because the OTS required $77.2 million in loss reserves in 1989 and Carteret lost over $290 million on its portfolio assets in 1990 and 1991. Tr. 3546:18-25 (Saunders). If the book value of assets had recognized the loss reserves required by OTS, the book value would have been $192.1 million which, under Professor Calomiris's methodology, would have reduced the calculated franchise value to near zero. DX 9752.

In summary, because Carteret had no history of steady earnings growth, Professor Calomiris's use of the Gordon Growth Model to predict future "market value" and "terminal value" was misguided at best. DX 9733; Tr. 3500:14-17 (Saunders) ("I can have no faith here if these three other variables are mis-measured in the accuracy of G, the growth rate"). Further, even if the Gordon Growth Model were applicable to Carteret, because the inputs Professor Calomiris uses for the model are not indicative of Carteret's performance or condition, and because Professor Calomiris ignores Carteret's massive losses in 1990 and 1991, the model cannot yield accurate predictions concerning Carteret's growth absent the breach. PX 9024.

Therefore, Ambase has failed to establish its "current market value" and "terminal value" measures of damages with reasonable certainty.

**C. The Alleged "Wounded Bank" Damages Are Invalid**

Ambase seeks a variety of wounded bank damages totaling $16.8 million. These consist of $12.5 million in employment severance agreement payouts, Tr. 740:15-19 (Calomiris); $2.4 million in costs related to the 1990 branch sales, Tr. 741:4-9 (Calomiris); $600,000 in costs related to unsuccessful attempts to raise capital, Tr. 741:15-20 (Calomiris); and $1.3 million in fees to defend against RTC and OTS investigations. PX 2702A at ¶ 105 & Table 23; PX 9043. Separately, Ambase seeks as wounded bank damages the deposit costs it claims Carteret would not have incurred in the absence of the breach ($17 million). As we demonstrate below, each of these wounded bank damages claims is invalid.

**1. Ambase Cannot Recover Costs That Were Not Incurred By Carteret**

Professor Calomiris conceded that the wounded bank damage claims related to employee severance payments ($12.5 million), costs to raise capital for Carteret ($600,000), and costs to defend Ambase officers and directors against OTS investigations and cease and desist proceedings ($1.3 million) were paid by Ambase, not Carteret. PX 2702A at ¶¶ 102 and 104.[57] Ambase, however, does not claim to be a party to the contract between the Government and Carteret.

---

[57] Thus, Ambase was the sole defendant in a case in which it paid $12.5 million to settle severance payment litigation commenced by Carteret officers. PX 2702A at ¶ 102 & n. 165; see DX 9122 at WOR081 0286 ("Carteret did not experience any loss due to these Severance Agreements"); Tr. 243:7-23 (Bianco) (Ambase, not Carteret, paid these costs). Ambase also incurred expenses to defend its officers against OTS investigations ($1.3 million), Tr. 289:3-9 (Bianco), PX 9043; see also PX 6401, Tr. 243:24-244:5 (Bianco); and paid investment banking fees ($600,000) relating to Carteret's efforts to raise capital. PX 2702A at ¶ 104; see also PX 4873A at WOP344 1831 (the costs of the Kohlberg due diligence report were "paid by Ambase").

Ambase II, 61 Fed. Cl. at 797. Thus, the costs Ambase paid are not damages to Carteret and are not recoverable.[58]

Ambase argues that Carteret may recover Ambase's costs because, under Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1072 (Fed. Cir. 2001), a non-breaching party may recover costs which are passed on to a non-party. Ambase Brief at 69-70. Although it is true that a non-breaching party can recover costs passed on to a non-party, Carteret never incurred the relevant costs. Ambase did. Thus, Hughes Communcations has no relevance to this case.

**2. Even If Carteret Had Incurred The Costs, They Resulted From Independent Business Decisions, Not The Breach**

It is beyond dispute that costs which would have been incurred even if the contract had been performed are not compensable as contract damages.[59] Professor Calomiris asserts that, absent the breach, Carteret would not have entered into severance agreements, defended against OTS or RTC charges relating to the payment of bonuses, sold branches in 1990, or attempted to raise capital in 1992. The record refutes these assertions. These costs were incurred as a result of

---

[58] See, e.g., Granite Mgmt., 416 F.3d at 1381-83 (thrift holding company could not recover capital raising costs incurred by its parent, Ford Motor Company); American Capital Corp. v. FDIC, 472 F.3d 859, 865-67 (Fed. Cir. 2006) (thrift could not recover costs incurred by its non-party parent); Castle, 301 F.3d at 1340-41 (contracting party cannot recover for costs incurred by non-contracting party).

[59] See, e.g., Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996) (plaintiff cannot recover damages that are not the "direct and immediate results" of the breach) (quoting Ramsey v. United States, 101 F. Supp. 353, 357-58 (Ct. Cl. 1951) (quoting Myerle v. United States, 33 Ct. Cl. 1, 26 (1897)); LaSalle, 317 F.3d at 1373 ("The general rule is . . . that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong"); 1 Dobbs Law of Remedies, ¶ 38(2) (2nd ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable").

the losses sustained by Carteret's corporate and commercial real estate loan portfolios and would have been incurred in the absence of the breach.

For example, the severance costs would have existed in the "but-for" world to the same extent as they existed in the actual world. The severance contracts Ambase executed with various Carteret officers and employees stemmed from the fear that these employees would seek out new employment if Carteret appeared to be on the brink of failure as a result of the massive losses in the commercial and corporate loan portfolios. Tr. 3548:4-23 (Saunders). Thus, these agreements were not breach-related. Id. Further, as Professor Saunders pointed out, the individuals terminated had been involved in the aggressive lending that depleted capital. Tr. 3547:23-3548:23 (Saunders); DX 9759. Therefore, these individuals would have been terminated in the absence of the breach and would have asserted the same claims in the "but-for" world.

Professor Calomiris also seeks compensation for costs Ambase incurred in defending against OTS's cease and desist orders relating to (1) bonuses Carteret paid to various officers in 1990, when it suffered massive losses and was unable to comply with the minimum regulatory capital requirements; and (2) bonuses Ambase paid to various officers following the sale of Home, when it lacked capital to comply with the CMA or repurchase IPF from Carteret. Tr. 742:1-8 (Calomiris).

Contrary to Professor Calomiris's assumption otherwise, OTS would have complained about the bonuses in the absence of the breach. As Mr. Vigna noted, the basis for OTS's objection was not the breach, but Carteret's commercial real estate and corporate loan portfolio losses and other operational deficiencies. Tr. 2202:03-2203:6 (Vigna). Accordingly, the costs of defending against OTS and RTC charges relating to these payments would have been present even

in the absence of the breach, and are therefore not recoverable as breach-related damages.[60]

The remaining so-called "wounded bank damages" are also not breach-related. As we have demonstrated above, the decision to sell the branches in 1990 stemmed not from the breach but from Carteret's desire to rationalize the branch system. DX 8054 at WOQ699 0503-04; Tr. 1463:15-1467:20 (Day); PX 2207 at CAM381 1344; DX 7340 at WOQ678 1962-63. Likewise, as Professor Calomiris conceded, transaction costs related to the efforts to raise capital in 1992 would have been incurred even if there had been no breach because "but-for" Carteret would have needed additional capital even if all the goodwill had been counted as regulatory capital. PX 9053A; see Tr. 3549:16-3550:3 (Saunders). Finally, although Ambase argues that the alleged deposit expenses of $17 million between 1990 and 1992 resulted from the breach, as we have already demonstrated, these alleged deposit expenses do not exist and have not been proven. Professor Calomiris admitted that he knew of no document that described any deterioration in Carteret's cost of funds relative to any matrix. Tr. 1225:3-23 (Calomiris) (no documents record a deterioration in Carteret's cost of funds); DX 9765; Tr. 3568:21-3569:14 (Saunders) (Carteret deposit costs were in line with competitors). Thus, there were no increased deposit costs and Ambase cannot be compensated for such alleged costs.

---

[60] See, e.g., Hughes Commons, 271 F.3d at 1071 (independent business decisions break the causation chain and negate the recovery of damages); Myerle, 33 Ct. Cl. at 26 (an "independent and collateral undertaking" is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach"); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996), cert denied, 520 U.S. 1116 (1997) (lost profits stemming from collateral undertakings are "too uncertain and remote to be taken into consideration").

**D. <u>There Is No Basis For A Tax Gross-Up</u>**

Ambase argues that Carteret will be entitled to a tax gross-up if it pays tax on a damage award and on the income reported by the FDIC in the 1995 tax return. Ambase Brief at 123-24. The claim for a potential tax gross-up lacks merit.

Although Ambase does not seek a specific amount of gross-up, Professor Calomiris contends that, apart from the wounded bank damages, the damages should be grossed up by 32.375 percent to reflect the taxes he contends Ambase is likely to pay if the Court awards damages for breach of contract. PX 9007. The evidence relating to taxation demonstrates that the proposed gross-up amount of 32.375 percent is excessive. As Professor Saunders noted: "[I]n 1988 and 1989 Ambase's effective tax rates were 9% and 20% respectively." DX 5038A, ¶ 84. This is a far cry from the requested gross-up of 32.375 percent. Further, the evidence suggests that the award, if any, is likely to be sheltered by over $135 million in net operating losses, which primarily result from Carteret. Thus the effective tax rate will be similar to what Ambase paid in 1988 and 1989, and much lower than the proposed gross-up amount. Tr. 607:11-25 (Bianco); DX 9132 at 51-54. Ambase has earned very little, if any, operating income since 1992, which further indicates the gross-up amount is likely to be much lower than 32.375 percent.

Further, Carteret is not entitled to a gross-up reflecting taxes it may pay on the proceeds received on the branch sales in the course of the resolution. As we have demonstrated, the resolution would have occurred in the absence of the breach, which means the taxes would not be breach related. Further, like the Federal Financial Assistance ("FFA") discussed in <u>Suess v. United States</u>, 74 Fed. Cl. 510, 515-16 (2006), <u>rev'd on other grounds</u>, 535 F.3d 1348 (Fed. Cir. 2008), because the premiums conferred "a significant benefit on the receiver," and could be

realized only because the FDIC was able to make advances to Carteret, the taxes simply reduce the benefit advanced by the FDIC. Under the holding in Suess, no gross up is appropriate "for taxes [relating to benefits] while in receivership." Id. For these reasons, plaintiffs' claim for a potential tax gross-up must be rejected.

**E. Professor Saunders Was A Credible Witness**

Professor Saunders is the John M. Schiff Professor of Finance at the New York University Stern School of Business and is the world's most-published professor in finance over the past 50 years. Tr. 3375:22-24; 3378:4-10 (Saunders). In addition to articles in all the major finance journals, he has published ten books, including the world's number one text book on financial institutions, Financial Institutions Management, A Risk Approach. Tr. 3378:16-24 (Saunders). Professor Saunders has served as an advisor and consultant to the FDIC, Office of Comptroller of the Currency, the Federal Reserve Board, the World Bank, and the International Monetary Fund. Tr. 3881:8-3383:21 (Saunders). Professor Saunders has been a member of the Nominating Committee for the Nobel Prize In Economics since 2000. Tr. 3384:21-3385:7 (Saunders). The Court qualified Professor Saunders as an expert in the fields of finance, economics, banking, management of financial institutions, regulation of financial institutions, the performance of thrifts in the 1980s and 1990s, valuation, and damages. Tr. 3386:4-9; 3402:21-3403:1 (Saunders).

Ambase's contentions that Professor Saunders' views are "extremist," "in contradistinction to virtually every other witness in this case," and "in contradistinction to the law of the Federal Circuit," and that he "willfully blinded himself to evidence that would detract from his conclusions," Ambase Brief at 51-53, are blatantly false. With respect to the value of goodwill, a topic upon which Ambase contends his views are "extremist," Professor Saunders

testified that goodwill has value "in a world in which the minimum capital ratio was in force and they had insufficient capital to meet their capital ratio . . ." Tr. 3677:15-20 (Saunders). This view echoes the Supreme Court's comment, in Winstar, that the acquisition of a thrift whose liabilities exceed its assets "is rational only because of the accounting treatment of the shortfall." 518 U.S. at 854. As the Court stated, "[t]his treatment [of goodwill] was, of course critical to make the transaction possible in the first place, because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory capital." Id. at 850. In testifying that goodwill had value to fill the gap created by the capital shortfall presented by a supervisory transaction, Professor Saunders echoed these comments precisely.[61]

Professor Smith and the regulators who testified at trial mirrored Professor Saunders' views concerning the value of supervisory goodwill. For example, Professor Smith testified that "the goodwill issue is probably not too important" to an investor considering investing in a thrift like Carteret. Tr. 2968:12-14 (R. Smith). Mr. Vigna testified that whether or not you allow

---

[61] Contrary to Ambase's representation, Professor Saunders did not testify he "believed Carteret should not have relied on the government's contractual promise . . ." Ambase Brief at 52. He stated that it was highly risky for thrifts like Carteret to grow their assets without sufficient tangible capital to make up for the expected and unexpected losses. As he stated: "[T]here's a very big difference between leveraging real capital, tangible capital and leveraging goodwill, which is not real capital. And leveraging real capital is what we normally think about in terms of leverage. We don't think of leveraging an intangible asset called "goodwill" as leverage - as normal leverage." Tr. 3680:20-3681:3 (Saunders). Contrary to Ambase's contention otherwise, this view of the leveraging of goodwill is mainstream. See, e.g., Granite Mgmt., 74 Fed. Cl. at 170 ("it is counter-intuitive to compute the value of supervisory goodwill in the same manner as you would a tangible asset"), aff'd, 511 F.3d 1360 (Fed. Cir. 2008); Commercial Fed. Bank v. United States, 59 Fed. Cl. 338, 354 (2004) ("Due to its nature, any supervisory goodwill . . . would have been the last increment of capital leveraged"). This Court has simply not regarded goodwill to have the same leveraging capacity as tangible capital. Id.

goodwill to count as regulatory capital, "realistically it's the same institution financially and economically." Dep. 158:2-5 (JX 1 at 599). Mr. Vigna also noted that supervisory goodwill is "an accounting number, not even - its not real, it has no return. I mean cash can be invested for a return." Dep. Tr. 159:9-11 (JX 1 at 599). Mr. Albanese testified that:

> goodwill is something that is on the books as an asset. But an investor wasn't going to be comforted frankly by the fact that that goodwill was there or not. They were going to want to see what kind of performance they could expect out of the institution after they acquired it and made their investment.

Tr. 1637:10-16 (Albanese). Thus, the regulators' views of the value of supervisory goodwill essentially mirrored those of Professor Saunders.

Ambase's contentions that Professor Saunders willfully overlooked evidence or contradicted witnesses on other matters are invalid as well. Professor Smith did not endorse Mr. Bianco's stewardship of Carteret, as Ambase contends, and, therefore, Professor Saunders did not "contradict" Professor Smith in this regard. To the contrary, like Professor Saunders, Professor Smith indicated concern that Mr. Bianco was "an investment banker with no previous experience in the S&L industry." DX 8000A at ¶ 54. As to Mr. Bianco's tenure at Carteret, Professor Smith was noncommittal, stating that he did not "have very much information about what happened in the year and half that Mr. Bianco . . . was there." Tr. 3110:19-21 (R. Smith).

Further, Professor Saunders did not, as Ambase claims, willfully overlook evidence when he testified that Carteret "ran down the tangible book capital." Ambase Brief at 55. This capital was wiped out by losses in 1990 and 1991. DX 8000A, Ex. 3, Table 1, p. 1. Nor did Professor Saunders say he did not perform an evaluation of Carteret's franchise value because there was no estimate in Professor Calomiris's expert report, as contended by Ambase. Ambase Brief at 55.

Professor Saunders did not perform the analysis because Professor Calomiris did not present his "terminal value" theory, which presents the valuation of Carteret's alleged franchise, until two weeks prior to trial and well after Professor Saunders had been deposed. Defendant's In Limine Motion To Exclude Expert Testimony Concerning Ex Ante Damage Calculation And Motion For Leave To Depose Professor Calomiris, at 2-5 (Feb. 4, 2008).

When Professor Saunders indicated that some post-FIRREA shrinkage might have "simply [been] the market working on the demand side," Tr. 3719:22-3721:17 (Saunders), he was not attributing the entire shrinkage to the cessation of commercial lending, as Ambase claims, but was highlighting the reduced market demand for mortgage lending. Tr. 3721:6-24 (Saunders). Finally, Professor Saunders's claim that the RTC was not in gridlock and did resolve thrifts in 1993 is not contradicted by the report "Managing the Crisis," as Ambase claims. Ambase Brief at 56. As Professor Saunders noted, that report stated that RTC "did not have sufficient funding to resolve additional failed savings and loan institutions," and not that RTC had ceased all resolution activities during this period. Tr. 3879:5-9 (Saunders).[62]

In short, Professor Saunders was fully credible and his opinions on valuation, damages, and causation should be accepted.[63]

---

[62] Professor Saunders did not assert, as Ambase claims, that the National Depositor Preference Act ("NDPA"), 12 U.S.C. § 1821(d)(11), imposed a legal requirement that the FDIC charge interest on receivership advances at the Federal judgment rate. Ambase Brief at 55-56. He simply observed that the enactment of the NDPA "changed the way these loans were priced" and resulted in a legal review which determined that pre-NDPA receiverships should pay interest at the Federal judgment rate on their advances. See DX 9784; Tr. 3621:20-3624:22 (Saunders).

[63] Ambase contends that Professor Saunders advocated zero damages in Fifth Third although the Federal Circuit "upheld an award of $77 million." Ambase Brief at 52, n.43. In fact, Professor Saunders's opinion concerning the claims for lost profits, reliance damages, replacement costs and restitution were fully accepted by this Court. See Fifth Third Bank v.

## V. THIS COURT LACKS JURISDICTION TO REVIEW THE RECEIVERSHIP DEFICIT

Ambase incorrectly claims that this Court has jurisdiction to review the receivership deficit (estimated to be $321,434,394 as of December 31, 2007). DX 9174.[64] In reliance upon its incorrect assertions regarding jurisdiction, Ambase challenges FDIC's calculation of the receivership deficit. Primarily, Ambase contends that Carteret would not have required a loan if the resolution had occurred in December 1993 and, therefore, this Court should disallow $180,304,049 in post insolvency interest owed on FDIC advances. Ambase Brief at 76-84; PX 9072-PX 9087. In addition, Ambase contends that if the FDIC had properly calculated Carteret's tax liability, there would be no tax liability and, therefore, the estimated tax liability (estimated to be $113,934,854 as of December 31, 2007), should be eliminated from the calculation of the receivership deficit

### A. The Prior Ruling Concerning Jurisdiction Should Be Revisited

This Court ruled, in Ambase Corp. v. United States, 61 Fed. Cl. 794, 797 (Fed. Cl. 2004) ("Ambase II"), that it posses equitable jurisdiction to review the receivership deficit because it is required to award the surplus, if any, to the shareholders of Carteret and, therefore, must have the power "to determine the precise amount of that surplus." Id. ("A deficit, of course, is the flip side

---

United States, 518 F.3d 1368, 1372-73 (Fed. Cir. 2008).

[64] Other than "other creditor claims" totaling $303,496, the entire receivership deficit consists of claims of Government entities. DX 9174, Report 3. Therefore, unless a damage award to Carteret exceeds approximately $320 million, the contract claims are non-justiciable. Bailey, 341 F.3d at 1345-46.

of a surplus"). That decision was interlocutory and may be reconsidered.[65] Because the decision in Ambase II is inconsistent with the Tucker Act, 28 U.S.C. § 1491, and the FDIC Act, 12 U.S.C. § 1818 et seq., we respectfully urge this Court to reconsider Ambase II.

**B. The Tucker Act Does Not Accord This Court Jurisdiction To Review The Receivership Deficit**

As this Court has acknowledged, "the Tucker Act does not grant this Court jurisdiction over tortious claims, nor does it permit this Court to hear claims between private parties." Ambase II, 61 Fed. Cl. at 796-98. The claims Ambase asserts against the receiver do not sound in contract, but instead assert that the FDIC breached its fiduciary duty to Carteret in the administration of the receivership. Claims for breach of a fiduciary duty are not cognizable in the Court of Federal Claims.[66] Further, even if Ambase had asserted contract or other money-mandating claims, they would not be justiciable in the Court of Federal Claims because the FDIC is not the United States when it administers receiverships pursuant to the FDIC Act.[67] Only suits against the United States are justiciable in this Court. Therefore, Ambase's receivership deficit

---

[65] See Precision Pine & Timber, Inc. v. United States, 81 Fed. Cl. 235, 245 (2007) (Court may "revisit any of its interlocutory orders and make any modifications that it deems necessary"); First Fed. Sav. and Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 765, 767 n.2 (2007) (Court has wide discretion to reconsider and modify an interlocutory order).

[66] See, e.g., United States v. Mitchell, 463 U.S. 206 (1983); Seldovia Native Ass'n, Inc. v United States, 144 F.3d 769, 783-84 (Fed. Cir. 1998); see also United States v. Testan, 424 U.S. 392, 400 (1976).

[67] O'Melveny & Myers v. FDIC, 512 U.S. 79, 85 (1994) (the FDIC is not the United States when it serves in a receivership capacity); Plaintiffs In All Winstar-Related Cases At The Court v. United States, 44 Fed. Cl. 3, 7 (1999) (same).

claims are outside this Court's jurisdiction under the Tucker Act.[68]

### C. The FDIC Act Also Precludes Judicial Review Of The Receivership Deficit In This Court

The FDIC Act provides for judicial review of "(ii) any claim relating to any act or omission of such institution or the Corporation as receiver," only in "the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia." 12 U.S.C. § 1821(d)(6)(A)(ii). According to Ambase II, "[r]ather than create an impossible Catch-22 situation, this section only serves to prevent claimants from seeking a judicial remedy outside of this established procedure; it requires claimants 'to first exhaust administrative remedies [by filing a claim with the FDIC].'" Ambase II, 61 Fed. Cl. at 798 (quoting Freeman v. FDIC, 56 F.3d 1394, 1400 (D.C. Cir. 1995)).

Contrary to the Court's holding in Ambase II, 61 Fed. Cl. at 798, Ambase did not exhaust its administrative remedies pursuant to 12 U.S.C. § 1821(d) by filing suit against OTS in the District Court for New Jersey. Carteret Sav. Bank v. Office of Thrift Supervision, 762 F. Supp. 1159 (D.N.J. 1991), rev'd, 963 F.2d 567 (3rd Cir. 1992). As the FDIC pointed out in its Motion to Dismiss Carteret Bancorp's Claim For A Surplus ("Motion To Dismiss"), dated December 21,

---

[68] If Ambase's receivership deficit claims are construed as asserting violations of the Administrative Procedure Act ("APA"), they are nonetheless not cognizable in the Court of Federal Claims. See, e.g., Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003) (Court of Federal Claims lacks APA jurisdiction); Hall v. United States, 69 Fed. Cl. 51, 56 (2005) (Court of Federal Claims lacks jurisdiction to review an agency decision under the APA). Likewise, if they are construed as asserting violations of the due process or equal protection clauses of the Constitution, U.S. Const. amends. V & XIV, they are not justiciable in this Court. LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995); Carruth v. United States, 627 F.2d 1068, 1081 (Fed. Cir.1980) (no jurisdiction based upon claims of due process or equal protection violations).

2007, when Carteret sued OTS in 1991 prior to its seizure, it sued to enjoin OTS from construing FIRREA to apply to contractual goodwill. It did not sue to enjoin the FDIC's administration of the receivership, which had not commenced at the time. Motion To Dismiss at 8. Therefore, contrary to this Court's assumption in Ambase II, the prior litigation in district court did not effectively exhaust administrative remedies under 12 U.S.C. § 1821(d).

Further, the Court's conclusion that application of 12 U.S.C. § 1821(d)(6)(A)(ii) in a manner that precludes its review of the receivership deficit would place Ambase in a "Catch 22" situation is simply incorrect. This Court assumed that transferring the receivership deficit claims to the United States district court would divest this Court of jurisdiction over Carteret's contract claims, thus depriving Carteret of a remedy for breach of contract, because the transferee court would lack authority to adjudicate Carteret's contract claims under the Tucker Act. As this Court noted:

> [T]he Plaintiffs cannot be required to go back to a District Court now to pursue this particular aspect of their damages suit, because that would then divest this Court of Jurisdiction over the rest of the litigation. Such a result, of course, would deprive the Plaintiffs of any remedy since the District Court could not award monetary relief. This variation of the "heads I win, tails you lose" argument comes closer to "heads I win, tails I keep your money regardless."

Ambase II, 61 Fed. Cl. at 799.

The fundamental premise of Ambase II - that this Court could not rule on the contract claims if it dismisses the receivership deficit claims or transfers them to a district court - is flawed. Contrary to the assumption of Ambase II, the Court of Federal Claims would not be deprived of jurisdiction over the contract claim if it was required to transfer the receivership deficit claim to a United States district court. Pursuant to Tecon Engineers, Inc. v United States,

343 F.2d 943, 170 Ct. Cl. 389 (1965), the Court of Federal Claims is not deprived of jurisdiction over a contract claim if a related claim involving the same parties is transferred to or pending in a United States district court. See El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346 (Fed. Cir. 2004) (affirming Tecon Engineers as the law of the circuit). Thus, the Catch-22 situation this Court relied upon to conclude that 12 U.S.C. § 1821(d)(6)(A)(ii) did not prevent it from exercising jurisdiction over the receivership deficit simply does not exist.[69]

Finally, contrary to Ambase II, Ambase and the FDIC are not two claimants with claims against the United States, as was the case in Whitney Benefits, Inc. v. United States, 25 Cl. Ct. 232 (1992), in which the Court exercised equitable jurisdiction to allocate the recovery between two co-plaintiffs. Although both the FDIC and Ambase are plaintiffs in this case, only the FDIC has a claim against the United States as the receiver of Carteret. Ambase seeks relief solely in a derivative capacity. See Ambase II, 61 Fed. Cl. at 795 ("In this case, the FDIC is an indispensable party as the successor to the rights of Carteret, which include the breach of contract claims that the shareholder Plaintiffs seek to pursue derivatively"). Therefore, Whitney Benefits is inapplicable.

In short, the governing statutes do not accord jurisdiction to this Court to adjudicate the receivership deficit claim. Instead, exclusive jurisdiction over that claim resides in the district

---

[69] As the FDIC pointed out in its motion to dismiss, if this Court dismisses the receivership deficit claims, and there is a damage award in favor of Carteret, the FDIC will establish a scheme of distribution for the various claimants to the award. Motion to Dismiss at 4. If Ambase disagrees with the proposed distribution, it can seek administrative review with the FDIC, or file suit against the FDIC in a district court. Pursuant to 12 U.S.C. § 1821(d)(13)(D)(ii), the district court would have jurisdiction because the claim would relate to an "act or omission of . . . the Corporation as receiver." Thus, there is no Catch-22 if this Court declines jurisdiction to review the receivership deficit. See, e.g., Village of Oakwood v. State Bank and Trust Co., 2008 WL 3876324 (6th Cir. 2008) (claims against the receiver must be pursued in U.S. district court after exhaustion of administrative remedies).

court. Therefore, we respectfully request reconsideration of Ambase II.[70]

## VI. THE RTC'S/FDIC'S MANAGEMENT OF THE RECEIVERSHIP HAS BEEN CONSISTENT WITH LAW AND REGULATION

If this Court concludes it has jurisdiction to consider the RTC's and FDIC's management of the receivership, a position with which we disagree, the Court should still conclude that the management has been lawful and has not injured Ambase or Carteret.

### A. The Alleged Delay In Funding And The Minority Preference Program Benefitted Rather Than Harmed Carteret

Ambase contends that if Congress had not imposed a moratorium on RTC funding through December 1993, Carteret would have been resolved as a whole bank at the end of 1993. According to Ambase, the RTC would have received sufficient proceeds from the sale of deposits in 1993 to eliminate the receivership deficit. PX 9073; PX 9074. Moreover, the lack of funding allegedly delayed the resolution, which Ambase claims led to deposit runoff. Further, Ambase contends that if Congress had not imposed a minority preference program giving minority bidders the right to match the highest non-minority bid for deposits and requiring performing one-to-four-family mortgages to be offered to successful minority bidders, Carteret would have received a higher premium for its deposits and higher prices for its one-to-four-family performing mortgages. The evidence fails to support Ambase's claims.

---

[70] Ambase seeks a reconsideration of Ambase II's holding that the award, if any, must be paid to the FDIC as receiver. Ambase Brief at 103-119. As this Court noted, "such cases [of paying an award directly to the stockholder] are rare exceptions to the well-established rule in shareholder derivative suits that 'the only claim that can be heard is the corporation's contract claim against the government and the only beneficiary of any relief will similarly be the corporation.'" Id. at 796 (quoting First Hartford Corp. Pension Plan and Trust v. United States, 194 F.3d 1279, 1293 (Fed. Cir. 1999)). Ambase has not presented new evidence or arguments to justify a reconsideration of this position and its claim to a direct payment should be rejected.

### 1. **<u>If Carteret Had Been Resolved In 1993, The "But-For" Deposit Premiums Would Have Been Lower, Not Higher</u>**

Ambase claims that, if Carteret had been resolved in 1993, the RTC would have realized a deposit premium of 10.5 percent on its total deposits ($187.6 million). PX 9081. In the actual sales of the deposits in 1994 and 1995, the RTC realized a deposit premium of $143.8 million, or $43.8 million less. Tr. 994:20-995:23 (Calomiris); PX 9073; PX 9074. According to Professor Calomiris, if Carteret had been resolved in 1993, the bank would have received the same premium per dollar of deposits as it realized for the New Jersey deposits in 1995.

As Professor Saunders explained, when customers of the selling bank are likely to transfer their allegiance to the buying bank, branch deposits are a source of potential business and, for this reason, the buying bank is willing to pay a premium to acquire the deposits of the selling bank. Tr. 3629:22-3630:1 (Saunders) ("Why does anybody pay a premium? Because deposits have franchise value and you're transferring franchise valuable deposits to another bank who thinks it can use these deposits to generate other business"). The amount a buyer is willing to pay depends upon the amount of deposits to be transferred and the value the buyer ascribes to each dollar of deposits. Tr. 3629:13-16 (Saunders); DX 9787. The value per dollar fluctuates with conditions in the marketplace. Tr. 3629:22-3630:1 (Saunders).

In 1994, Congress enacted the Riegle-Neal Interstate Banking Act, Pub. L. 103-325, Title III, ¶ 319(a), 108 Stat. 2160 (1994), codified at 12 U.S.C. § 1842, which allowed interstate banking. According to Professor Saunders, larger banks began acquiring smaller banks in order to extend their franchises. Tr. 3631:19-3632:18 (Saunders). As a result of this "merger wave," the amount buyers were willing to pay for deposits increased dramatically between 1993 and 1995. DX 9788 and DX 9789. Even if a seller had fewer deposits in 1994 or 1995, it could achieve a

higher deposit premium because of the higher per dollar value of the deposits. Tr. 3628:18-3630:25 (Saunders).

In arguing that "but-for" Carteret would have received more for its deposits in 1993 than actual Carteret received in 1994 and 1995, Professor Calomiris assumes that "but-for" Carteret, due to its alleged high franchise value, would, in 1993, have received the same 10.5 percent deposit premium that it received for the New Jersey branches in 1995. Because there were fewer deposits in 1995 than 1993, Professor Calomiris claims Carteret would have benefitted if the deposits had been sold in 1993. The 10.5 percent deposit premium Professor Calomiris claims Carteret would have received in 1993 would have been more than three times higher than the average national premium in 1993 for whole bank transactions (only 2.29 percent, DX 9790) and more than two times higher than the average national premium for branch transactions (only 4.46 percent, DX 9790). PX 9081.

Professor Calomiris does not present any empirical evidence to support his claim that "but-for" Carteret could have exceeded these averages. Instead, he contends that Carteret could have achieved a higher deposit premium than the average thrift because the FDIC, in 1994, estimated that it would have achieved an "expected premium" equal to 37.4 percent of total deposits if it resolved the thrift in a least-cost resolution, as opposed to a deposit payout (i.e., the costliest form of resolution). PX 9083. In other words, Professor Calomiris incorrectly assumes that the FDIC's "expected premium" is a reliable indicator of the deposit premiums that could be obtained in a private market transaction.

As Professor Saunders points out, Professor Calomiris's claim is counterfactual because the empirical evidence demonstrates that the 1995 market for deposit premiums was much higher

than the 1993 market due to the passage of the Riegle-Neal Interstate Banking Act. Tr. 3638:11-17 (Saunders) ("What he seems to be doing is taking the branch premium for sale of New Jersey branches in 95 and arguing that could have been used in the whole bank transaction in 93, which is really counterfactual because of the whole structural change in the financial system and the financial banking markets after the Riegle-Neal in 1994"); DX 9788 and DX 9789. Further, although Professor Calomiris assumes that there is a relationship between the "expected premium" or savings the FDIC achieved in 1994 from a least cost resolution and the amount of deposit premium Carteret could have received if it had been resolved as a whole bank in 1993, as Professor Saunders points out, "[the savings as a percentage of total deposits has] nothing to do with a free market price that would be paid by another bank to acquire the branches of Carteret." Tr. 3641:11-13 (Saunders).

Although the percentage is referred to by the FDIC as the "expected premium," it is not a prediction of what investors would pay for deposits in a free market transaction. Tr. 3641:11-13 (Saunders). As Professor Saunders noted, the "expected premium" is simply an estimate of the difference in cost between a deposit payoff, which is the most costly form of resolution, and the least costly form of resolution (generally branch sales). DX 9791. Thus, claiming that a 10.5 percent premium for a whole bank transaction in 1993 is "conservative" because the FDIC had calculated the "expected premium" to be 37.4 percent is mixing apples with oranges, and is totally unfounded.[71]

---

[71] Indeed, even Professor Calomiris acknowledges that there is a disconnect between the "expected premium" calculated by the FDIC and the amount a willing buyer would pay a willing seller in a market transaction because he admits that "it is not clear whether this measure ['expected premium'] is an unbiased forecast of the realized premium." PX 2703A at 58, n.97.

In short, as Professor Saunders noted, "there's no evidence to support the argument that somehow the delay in the resolution cost Carteret lost premiums. In fact, to the contrary, the delay actually benefitted Carteret." Tr. 3639:11-15 (Saunders).[72]

**2. The Duration Of The Receivership Did Not Result In Lower Deposit Premiums**

Professor Calomiris purports to find a direct relationship between the duration of a receivership and the amount of deposit runoff in a regression analysis of eleven thrifts with between $4 and $6 billion in assets that were resolved between 1980 and 2004. PX 9080. Professor Calomiris's regression study fails, however, to provide evidence that there is a linear relationship between deposit run-off and the number of days to resolution. As Professor Saunders noted, the study does not demonstrate a relationship between the resolution time and deposit runoff because it simply plots resolution time and deposits and fails to consider other relevant factors, such as the interest rate environment, competitive conditions, and the economic environment. Tr. 3654:2-21 (Saunders). Further, if a thrift that was resolved in zero days was

[72] Professor Calomiris also suggests that "but-for" Carteret would have benefitted by being sold as a whole thrift because whole thrift sales command higher premiums than branch sales. This is refuted by the market data in 1993: the average deposit premium for branches was 4.46 percent, whereas the average deposit premium for whole thrifts was 2.29 percent. DX 9700. Professor Calomiris does not rely upon market data, however, but relies upon the FDIC failure transaction data base, which purports to show that the majority of resolutions between 1980 and 1994 in which the expected premium exceeded 30 percent were whole bank transactions. PX 9084. This disguises the fact that, since 1989, when the RTC took over resolutions under a least cost mandate, virtually no resolutions have been whole bank transactions (i.e., private recapitalizations or mergers). Tr. 3642:10-3645:1 (Saunders); DX 9793. The RTC adopted a new resolution strategy because FDICIA mandated a least cost resolution. Tr. 3544:12-16 (Saunders). Contrary to Professor Calomiris's understanding, least cost resolutions are branch transactions rather than whole bank transactions. Tr. 3644:17-20 (Saunders); DX 6188 at 88; DX 9794; DX 6172. Thus, Professor Calomiris is wrong in contending Carteret would have received a higher premium if sold as a whole bank.

removed from the sample, the regression would not show any relationship between deposits and the duration of the receivership. Tr. 3655:2-8 (Saunders). Therefore, there is no evidence indicating a relationship between deposit run-off and the duration of the receivership.[73]

**3. The Minority Preference Program Did Not Result In Lower Proceeds Or Other Injury To Carteret**

Ambase claims Carteret's receivership deficit was inflated by the minority preference program ("MPP") because: (1) majority bidders were likely to bid less for deposits knowing that high bids could be matched; and (2) performing mortgages held for minority bidders would not be priced on an auction basis. PX 9086.[74] The evidence fails to support these claims.

With respect to the effect of the MPP on deposit premiums, as Professor Saunders points out, the MPP actually opened up the bidding process and approximately 100 bidders, including many minorities, participated in the auction of Carteret branches. DX 9795. This resulted in higher premiums than otherwise would have been achieved because there was more competition at the auction. As noted by Professor Saunders, "general economics would suggest the more bidders the better, and the more likely the price is going to be higher than lower." Tr. 3648:18-23

[73] Likewise, the regression analysis does not establish that Carteret should have been resolved in 365 days, as claimed by Professor Calomiris. The standard deviation from the 365 days is 212 days which means that even with respect to Professor Calomiris's limited sample of eleven thrifts, there was no "average" resolution time. Further, the sample is very small in comparison to the number of thrifts resolved during this period and the regression study does not take into account obvious factors that could affect resolution time, such as whether the resolution was before or after FIRREA, the complexity of the thrift, the interest rate environment, and the thrift's location. Tr. 3652:21-3653:14 (Saunders). Thus, according to Professor Saunders, "there are a number of reasons to be concerned about this experiment." Tr. 3653:1-2 (Saunders).

[74] Pursuant to the MPP, minority bidders within 10 percent of the highest bid could exercise a right of first refusal and win the auction by matching the highest non-minority bid. Tr. 3647:17-23 (Saunders).

(Saunders).

Finally, with respect to whether the MPP resulted in sales of assets to minority bidders at below market prices, as Professor Saunders points out, two GAO reports examined the resolution process of the RTC in May 1995 and the resolution of 4000 loans acquired by 11 minority bidders in December 1995, and found no inconsistency between the least cost resolution requirement and the implementation of the MPP. DX 9795; DX 9796; DX 9797; Tr. 3649:17-3651:4 (Saunders). As the GAO concluded in its December 1995 report, the RTC "was committed to establishing a process that was equitable and fair to minority acquirers but that, at the same time, attempted to maximize total returns on the disposition of assets as required by law." DX 9797; DX 5001A at ¶ 89. Thus, there is no evidence that the MPP inflated Carteret's receivership deficit.

#### 4. The "Freeze" On Assets Did Not Require Carteret To Borrow From The FDIC/RTC

Professor Calomiris claims that the MPP caused a "freeze" on the sale of Carteret's assets. PX 2703A at ¶ 85-99. Ambase further contends that, in the absence of the "freeze," Carteret could have funded the sales of deposits in 1994 and 1995 through the sales of assets and thus would not have had to borrow from the FDIC/RTC to finance the resolution.

The MPP required the RTC to offer performing one-to-four-family mortgages to successful minority bidders who acquired the deposits of failing thrifts at auctions. Contrary to Professor Calomiris's claim, even if performing one-to-four family mortgages had not been subject to a freeze, Carteret would not have been able to finance the sale of deposits by liquidating its assets. Indeed, Professor Calomiris concedes that, even in a world without the alleged delay in Congressional funding, Carteret would have had to make up a deficit of approximately $400 million arising from the difference between the proceeds it would have received from disposal of

assets ($1.393 million) and selling deposits ($1.787 billion). PX 2703A at ¶ 84. Therefore, even under Professor Calomiris's calculation, it was not the need to hold one-to-four family performing residential mortgages that caused Carteret to seek advances from the FDIC/RTC but, rather, the fact that Carteret was an insolvent institution.

Finally there is no evidence the asset "freeze" on performing one-to-four-family mortgages was due to the MPP's enactment. In fact, the RTC's decision to freeze the sale of Carteret's performing residential mortgages was made well before the passage of the MPP and apparently resulted from concern regarding the profitability of conservatorships. For example, prior to March 1993, it was RTC's policy to liquidate both performing and non-performing assets. In March 1993, however, RTC apparently changed direction regarding asset sales and decided that, in general, while it would continue to liquidate nonperforming assets, it would no longer sell performing assets.

The reason cited for the change was a "concern for how net interest margins have dwindled as a result of selling-off higher yielding assets and redeploying sales proceeds into low-yielding liquidity oriented assets . . . . These declining net interest margins and resulting unprofitable or only marginally profitable operations are deemed to not be in the best interests of taxpayers or the RTC." PX 4905. Consistent with this policy shift, Carteret's performing assets were apparently frozen as early as April 1993, or well before the MPP was enacted in December 1993. Thus, the asset "freeze" would have existed to advance the interests of the receivership independent of the MPP.

## B. The Enactment Of FIRREA Did Not Enlarge The Receivership Deficit By Eliminating Supervisory Goodwill

### 1. The Goodwill Could Have Not Have Been Transferred To An Acquiring Institution

Professor Calomiris assumes that "but-for" Carteret could have sold its goodwill contracts in the course of the resolution, thus decreasing the size of the receivership deficit. Such a sale assumes the regulators would have approved the transfer of the goodwill from the receiver to a buyer,[75] but Ambase has presented no evidence that the regulators would have approved such a goodwill transfer. As Professor Saunders has explained, "[A]ny institution in need of supervisory goodwill would not have been an acceptable bidder [because only well capitalized institutions would be acceptable to the RTC]." DX 5001A at ¶ 102. Therefore, the issues are whether the regulators would have approved the transfer to a well-capitalized buyer and, whether such a buyer would have been willing to pay to acquire supervisory goodwill.

These questions were definitely resolved in favor of the Government in Granite Management, 74 Fed. Cl. at 168. First, the Court held the regulators would not approve the transfer of supervisory goodwill to a well-capitalized acquirer because doing so would increase the risk to the acquiring institution. Id. at 162 ("Clearly, the transfer of supervisory goodwill from FNB to First Madison would have been completely counter to the purpose of regulatory forebearances, and the regulators, therefore, would have had many reasons to reject the transfer"). With respect to whether a well-capitalized institution would likely be willing to pay for supervisory goodwill, the Court held that it would have been "illogic[al] [for] a healthy

[75] The Assistance Agreements require the approval of the regulators for the transfer of the goodwill. PX 2429 at ¶ 21; PX 2488 at ¶ 25.

corporation [to] pay . . . a significant sum for an unnecessary and likely useless asset that amortized and would, therefore, be an expense." Id.; see DX 5001A at ¶ 102 ("[I]t is unclear why an acquirer with considerable tangible capital would pay anything much to acquire the supervisory goodwill of a failed bank like Carteret"). Thus, it is improbable that "but-for" Carteret could have earned additional proceeds by selling supervisory goodwill.

**2. Even If The Goodwill Could Have Been Transferred To An Acquirer, Professor Calomiris's Valuation Models Are Flawed**

As Professor Saunders noted, both of Professor Calomiris's models for valuing goodwill, the "cash equivalent model" and the "replacement cost model" are flawed and do not demonstrate that the goodwill would have been worth $0.35 on the dollar, as Professor Calomiris asserts. Tr. 3663:8-3668:10 (Saunders). In both models, Professor Calomiris assumes that the goodwill's value can be determined by subtracting from the book balance of goodwill the amount of cash flow the thrift would receive if the goodwill were replaced by a like amount of cash. According to Professor Calomiris, the difference between the value of the cash substitute for the goodwill and the goodwill balance represents the value of the goodwill. PX 2703A at ¶¶ 105-131.

As Professor Saunders points out, in calculating the value of the cash flows, Professor Calomiris assumed that the cash would be invested in 20-year Treasury bonds paying 6.31 percent per annum, while the cost of capital to Carteret was between 11.59 percent and 13.32 percent per annum. DX 5001A at ¶ 113. Thus, "he [Professor Calomiris] hypothesizes a situation in which the thrift intentionally sets up a guaranteed negative spread on its assets of between 5.28% per annum (6.31% minus 11.59%) and 7.01% per annum (6.31% minus 13.32%) . . . [This is] a clearly illogical proposition and a strategy which no financial intermediary could survive." Id. If, instead of assuming a negative spread between the cash investments and the cost of capital,

Professor Calomiris had assumed a positive spread, the value of the cash flow would likely exceed the book balance of the goodwill. As Professor Saunders observed, "[t]he higher that spread, the more the cash equivalent value will be and the lower the goodwill value would be . . ." Tr. 3655:12-16 (Saunders); see Tr. 3667:11-16 (Saunders). Thus, the value Professor Calomiris attributes to the goodwill in 1993 is not supported by the evidence.

Finally, Professor Calomiris's alternative "event study" to value the goodwill based upon changes in market valuation following the announcement that goodwill could not be counted as regulatory capital is, as Professor Saunders points out, simply based upon a misunderstanding of the timing of the public announcement concerning the changes in accounting for Carteret's goodwill. DX 5001A at ¶ 133-135. Professor Calomiris assumed that, on May 22, 1989, OTS made a public announcement that the removal of goodwill from the calculation of regulatory capital would leave Carteret critically undercapitalized. PX 2703A at ¶ 101; DX 5001A at ¶ 135. In fact, there was no such announcement; on this date, OTS simply began an examination that concluded in November 1989. While the warning regarding capital levels was contained in the examination report provided to Carteret, it would not have been public and the report would have been provided some months after the commencement of the examination. Therefore, the warning "is irrelevant to AmBase's stock price behavior around May 22 . . . and [Professor Calomiris's] estimated losses should be given no credibility at all." DX 5001A at ¶ 135.

In short, in assuming, contrary to fact and law, that the receivership would have retained a goodwill balance as of December 1993, the valuation models are built upon fatally flawed premises, and, accordingly, do not establish the goodwill's market value.

## C. The RTC Properly Shut Down The Mortgage Origination Unit To Reduce The Risk Of Loss To The Receivership

Although Ambase contends that the FDIC/RTC could have increased the proceeds of the receivership by selling, rather than shutting down, CMC, the evidence demonstrates that allowing CMC to continue originating mortgages would have posed grave risks to the receivership. Therefore, the FDIC/RTC correctly decided to close CMC and thereby avoid the risk of future losses which would have exacerbated the receivership deficit.[76]

As Professor Saunders established, originating mortgages involves substantial risk because interest rates may rise between the time the loan is committed and the closing of the loan. Tr. 3587:20-3590:11 (Saunders). This can cause significant losses even if the lender receives a fee for holding the rate because an institution might not be able to sell the product into secondary markets and may suffer losses if interest rates rise. As Professor Saunders observed: "[B]y allowing CMC to keep creating mortgages, there's always this risk that interest rates could turn against them . . . . So mortgage origination is not a risk-free option. And it also raises extra mor[al] hazard for the regulator, because the regulator would have had to pick up those assets on insolvency." Tr. 3589:13-22 (Saunders). To avoid these risks, the FDIC/RTC allowed the pipeline of mortgage loans to be funded, but otherwise declined to continue to add mortgage assets to the balance sheet. PX 4904.

After extensive review, RTC/FDIC concluded that CMC's books did not properly value the loans to be securitized, the product would not be readily saleable into secondary markets, the flow of mortgages was inadequately hedged, and the contracts from correspondent originators,

[76] We have already demonstrated that Professor Calomiris's valuation of CMC lacks factual support.

which contributed 60 percent of CMC's volume, had dried up. PX 4898. After discussions with CMC personnel, FDIC/RTC decided to close CMC and cease all further acceptance of mortgage applications on December 11, 1992. As Professor Saunders opined: "The loss of many of the correspondent relationships was a clear indication to the RTC that CMC had already lost its franchise value and should be closed." DX 5001A at ¶ 141. Given the defections of the correspondent brokers and the desire to minimize risk from the continuation of mortgage originations, the RTC made the rational decision to close CMC.

Thus, although Professor Calomiris claims that the RTC could have sold CMC along with Carteret's mortgage servicing rights, Tr. 983:88-18 (Calomiris), he offered no evidence that CMC would have had any value.[77]

**D. The FDIC Properly Applied The Federal Judgment Interest Rate To Its Loans To Carteret**

The RTC made advances to the receivership in 1994 and 1995 to finance the sale of the branch deposits. Ambase contends that it was improper for the FDIC to charge post insolvency interest ("PII") on loans to the receiver because the court is precluded from awarding prejudgment interest on claims against the Government. PX 9090 and PX 9091. Ambase also contends that the Federal judgment rate (i.e., the 52-week Treasury Bill ("T-Bill") rate) was too high. Further, Ambase contends the Government breached its fiduciary duty to Carteret by applying payments to the loans on a pro rata basis instead of paying them down according to the level of interest charges. PX 9090 and PX 9092. Finally, Ambase contends it was a breach of fiduciary duty to pay less interest on the escrow accounts than on the loans to fund the deposit transfers. PX 9092.

[77] As discussed previously, his event study involved the transfer of CMC employees rather than CMC itself.

Ambase's contentions are invalid because the FDIC Act required the FDIC to charge interest on loans to the receiver. Further, charging interest based on a 52-week T-Bill rate did not violate law or regulation. The FDIC did not "artificially" manipulate interest rates. To the contrary, there was and is a clear economic rationale for basing interest rates on a fixed 52-week T-Bill rate. Finally, the FDIC did not violate a fiduciary duty by differentiating between the loans and escrow account payments or paying down the loans on a pro rata basis.

### 1. The FDIC Was Legally Required To Charge PII And The Rates Were Not "Excessive"

Based upon Professor Calomiris's economic analysis, Ambase argues that it was unjust for the FDIC to charge interest on its loans to the receivership because Carteret is unable to collect prejudgment interest on its claims against the United States. PX 9090. According to Ambase, the FDIC/RTC incurred no costs on its loans to Carteret and, therefore, should recover no interest on these loans. PX 9091. Further, even if the RTC/FDIC was justified in charging interest on the loans, Ambase contends that the rates charged (6.06 percent, 7.34 percent, and 6.57 percent, respectively) were excessive. Id. According to Ambase, these rates exceeded the average three-month T-Bill rates over the course of the receivership. Id. As we demonstrate, Ambase's contentions are belied by the facts and the relevant law.

First, as Professor Saunders has observed, the FDIC incurred real costs in making these loans whether or not Congress agreed to waive the sovereign immunity of the United States with respect to prejudgment interest on goodwill claims asserted by the receiver. DX 5001A at ¶ 27. As stated by Professor Saunders:

> This legal prohibition [against prejudgment interest] has no relevance to calculating the RTC's deficit (or surplus) relating to its seizure of Carteret. In economic terms, there was a real cost to

> the government of having to use taxpayer funds, as well as funds borrowed through issuing Treasury bonds, bills, and other government securities, to help resolve Carteret. Indeed, every $1.00 borrowed to finance Carteret's loans added $1.00 (plus interest) to the national debt. As a result of these financing costs, it is economically rational to compute and include interest in assessing the cost of loans made in resolving Carteret (i.e., the receivership deficit).

Id.; Tr. 3614:4-3615:6 (Saunders).

Contrary to Professor Calomiris's claim, FDIC/RTC is legally required to charge PII on loans to the receiver. In Golden Pacific Bancorp v. FDIC, No. 95 Civ 9281, 2002 WL 31875395 at *4-6 (S.D.N.Y. Dec. 26, 2002), aff'd, 375 F.3d 196 (2d Cir. 2004), the Court held that the FDIC was required to charge interest on the loans to the receiver because the FDIC had a fiduciary duty to maintain the integrity of the insurance fund. As the Court noted, "money in the deposit insurance fund [must] bear interest in order to protect the fiscal integrity of the fund . . ." Id. at *6; see In Re Receivership Of First Nat'l Bank in Humboldt, 523 N.W.2d 591 (Iowa 1994) (interest must be charged on loans from the FDIC to the receiver); FDIC v. Citizens State Bank of Niangua, 130 F.2d 102 (8th Cir. 1942) (same). Under the FDIC Act, interest was required to "protect the fiscal integrity of the fund." Id. The fact that Carteret is not entitled to prejudgment interest is irrelevant because the FDIC Act requires that interest be charged on loans from the FDIC/RTC to Carteret. PX 5033. Thus, there is no legal basis for Professor Calomiris's opinion that the loans should have been interest free.[78]

With respect to the amount of PII, Ambase argues that the rates charged on the loans were

[78] If Ambase's contention were valid, the United States could not collect interest on any loan to an individual or entity that held a judgment against the United States. Ambase has cited no authority that any individual or entity has been excused from paying interest on a loan from the United States because it had a judgment against the United States.

excessive because the average three-month T-Bill rate over the duration of the receivership was lower than the rates charged on the Carteret loans. PX 9095-PX 9097. Ambase claims that the rate of interest should have been the floating three-month T-Bill rate, rather than the fixed Federal judgment rate, which is based upon the 12-month (52 week) T-Bill rate. As a matter of economics, even the 12-month T-Bill rate was too low, and provided an explicit subsidy to Carteret. As Professor Saunders noted, because loans to the receiver were risky, charging a treasury rate, which was risk-free, provided an average 3 percent subsidy per annum because the rates did not include any risk premium. Tr. 3619:18-3621:17 (Saunders). Further, it was perfectly appropriate for the RTC to charge the fixed rate because the average receivership did not terminate for three to six years, and the receiver is hedged against rising interest rates over the receivership's duration. DX 5001A at ¶¶ 33 and 41.

#### 2. The FDIC Selected The Federal Judgment Rate To Comply With Regulatory Policy

In addition to questioning whether PII should be charged at all, Ambase attacks the 12-month T-Bill rate charged upon the ground that it was selected upon a retrospective. PX 9092. This contention is belied by the facts. The FDIC did not impose a fixed 12-month T-Bill rate because it concluded that the FDIC would receive more interest based upon that rate than upon a three-month floating rate. The rate was based upon legal and policy considerations relevant to the calculation of PII for Federally-insured depository institutions. DX 9784; Tr. 3621:19-3624:22 (Saunders).

Although, as Ambase points out, the RTC/FDIC made its loans in November 1994, January 1995 and March 1995, and originally applied 12 C.F.R. § 360.3 (1988), which required a floating rate based upon the three-month T-Bill to calculate interest, this regulation was

superseded by the NDPA. NDPA accorded depositors a higher priority on distributions than general creditors. Because 12 C.F.R. § 360.3, which was issued by the FHLBB in 1988, did not accord depositors this higher priority, it was inapplicable following the enactment of the NDPA. PX 1105. Thus, the three-month T-Bill rate, which was applied to all Federally insured Savings and Loans under the FHLBB regulation, was inapplicable to receiverships created after the NDPA. This included the Carteret receivership, which was created in January 1995. Tr. 870:15-871:7 (Green). When NDPA superceded 12 C.F.R. § 360.3, the FDIC/RTC had to determine the rate of interest to apply to post-NDPA Federally insured thrifts. Id.

In 1995, the FDIC/RTC engaged in legal and policy analysis relating to the rates of PII imposed upon various types of receiverships. PX 5036. The FDIC/RTC concluded that, with respect to Federally insured Savings and Loans, 12 C.F.R. § 360.3's requirements applied if the receiver was appointed prior to August 10, 1993 (the date of enactment of the NDPA), but not to receivers appointed after that date. In July 1995, this was made explicit by the addition of a provision to 12 C.F.R. § 360.3 indicating that it did not apply to post-NDPA thrifts. 12 C.F.R. § 360.3(d) (2005 ed.).

FDIC/RTC concluded that the Federal judgment rate should be applied to post-NDPA receiverships because (a) it was publicly available; (b) it reflected applicable Supreme Court precedents applying the Federal judgment rate to national banks; (c) it was consistent with legal precedents in bankruptcy proceedings which analogized an approved claim to a Federal court judgment; and (d) it would not favor or disfavor any particular class of creditor. PX 5036.

The FDIC examined whether the rate should be fixed or floating and determined that its policy at the time required a fixed rate. The FDIC had always applied a fixed rate to PII

calculations for national banks. PX 5173; Tr. 868:9-17 (Green). While the FDIC recognized that the FHLBB had chosen a floating rate for Savings and Loans, FDIC concluded that recalculating the rate could be complex and involve a risk of error. Id. Further, FDIC believed it would be impossible to make reasonable financial projections if the rate was floating, and this would be inconsistent with the receiverships' interests. Id.

In June 1995, the FDIC issued a memorandum requiring that, for savings and loan receiverships created after August 10, 1993, the 12-month T-Bill rate existing when the receivership was created would be the applicable rate. PX 5022. Accordingly, it advised the operating divisions of the policy through a joint memorandum.

As Ambase points out, through 1998, PII was reported on the Carteret receivership's financial statements in accordance with 12 C.F.R. § 360.3. PX 9092-PX 9094. This was an error, as the operating divisions had been advised on June 8, 1995 that the PII should be based upon the Federal judgment rate. Tr. 871:13-18 (Green). The division responsible for reporting the calculation simply failed to comply with the directive. Although the record does not reveal the cause of the error, it was discovered between the preparation of Carteret's December 31, 1998, and December 31, 1999, financial statements, when it first became necessary to report PII because 95 percent of the principal claims had been satisfied. PX 1104; PX 1105. The 1999 financial statement acknowledged the error and reported that the Federal judgment rate was the applicable rate. PX 1105; Tr. 818:1-819:10 (Green).

At that time, the yield on 3-month T-Bills was trending upward and, at times over the following year, exceeded the one year T-Bill rate, which was the basis for the Federal judgment rate. DX 5001A at ¶ 39. Between November 1994, when the FDIC made its first loan to Carteret,

and December 1999, when PII was calculated upon the basis of the Federal judgment rate, the average yield of 3-month T-Bills was less than the average yield for one year Treasuries. Ambase suggests that the FDIC calculated PII upon the basis of the Federal judgment rate because it wished to ensure a higher payout to the FDIC. In 1999, it was impossible to know which rates would be higher or lower over the future course of the receivership. Id. Further, as noted by FDIC senior accountant Wayne S. Green, "[t]here were two receiverships where the PII actually was reduced [as a result of applying the Federal Judgment Rate rather than a floating three month rate from the commencement of the receivership until 1999]." Tr. 828:9-10 (Green).

Further, as indicated by Mr. Green, the FDIC Finance Staff examined the rates in 1998, when the agency's dividend processing software was revised to accommodate PII payouts. Tr. 872:4-874:2 (Green). The issue of PII was raised by the Finance Staff because the dividend system could not apply different rates to different loans. Id.[79]

The Finance Staff asked attorneys for Carteret to examine the rate. Tr. 816:4-25 (Green); Tr. 2623:3-24 (Saran). Michael Saran, an FDIC Senior Attorney, advised that, on the basis of the June 8, 1995 memorandum, the PII should be calculated upon the basis of the Federal judgment rate. Tr. 819:24-820:18 (Green); Tr. 2623:25-2624:6 (Saran); PX 5066; Tr. 2626:12-2629:12

---

[79] Although Professor Calomiris argues that the change in the methodology for calculating PII increased total interest costs by $64.7 million, PX 2703A at ¶ 41, he is using 20-20 hindsight in order to paint the FDIC in as negative a light as possible. When the decision to correct the PII calculation to conform to the 1995 policy was made in 1999, the increase in amount was only $20.2 million. Moreover, in 1995, when the FDIC changed its policy, there was no possible way that the FDIC or anyone else could have known whether, over the long term, that change would result in more or less PII being charged to the receivership. DX 5001A at ¶ 40. In short, because the FDIC merely applied a preexisting policy to the calculation of PII for the Carteret loans, there is no basis upon which to adjust the receivership deficit. See Golden Pac. Bancorp, 1997 WL 626374 at *3 (no judicial review of the applications of established policy to receivership operations).

(Saran). He made the determination based solely upon his reading of the June 8, 1995 memorandum. Id. Mr. Saran testified that, at the time he rendered the advice, he did not know how PII was calculated for Carteret. Tr. 2630:15-263:7 (Saran). Nor did he know if changing the calculation would increase or decrease interest expense to the receivership. Tr. 875:25-877:22 (Green); Tr. 2630:15-2631:7 (Saran). Therefore, the FDIC acted in accordance with law and policy when it adjusted the rate in 1999. DX 5001A at ¶ 39 ("There appears to be no discussion of the level of or trends in interest rates or how the government might somehow maximize the interest owed to receiverships . . . ").[80]

### 3. The Federal Judgment Rate Was Economically Appropriate And The Administration Of The Loans Was Consistent With Normal Banking Practice

Relying upon the analysis of Professor Calomiris, Ambase contends that the fixed 12-month T-Bill rate applied to the Carteret loans was too high, that it is "illogical and inconsistent" for the FDIC to charge a 12-month T-Bill rate on its loans to the receiver while providing a lesser rate on loans in the escrow accounts, PX 2703A at ¶ 38, 46-48, and that "there is no economic justification" for paying down the loans pro rata instead of in order of the largest interest charges on the loans. Id. at ¶ 43. These contentions lack support in the record and are incorrect.

With respect to the pay-downs of the loans, Professor Calomiris contends that the pro-rata distributions increased interest expense by approximately $51 million. PX 2703A, at ¶45. In response, Professor Saunders observed that the allocation of dividends was neutral as between the borrower and the lender, and thus favored neither the debtor nor the creditor. This was

[80] To suggest this was self-enriching is unreasonable. The probability that the FDIC would recover the principal, let alone interest on the principal, was remote. If it were not, the bailout of the Savings and Loan industry would not have cost taxpayers billions of dollars.

"consistent with normal practice in banking." DX 5001A at ¶ 43; Tr. 3617:1-8 (Saunders); Tr. 3625:20-3627:13 (Saunders). Thus, the FDIC/RTC did not breach any duty to Carteret by paying the loans down on a pro-rata basis.

Professor Calomiris also contends that it was "illogical and inconsistent" to charge a higher interest rate on the loans to Carteret than the receiver received on the loans in the escrow accounts. PX 2703A at ¶ 37-38. The escrow accounts, however, were not subject to the general claims of FDIC creditors, whereas the loans to the receiver were. DX 5001A at ¶ 44. Further, as Professor Saunders notes, the premiums were held by the "FDIC acting as a fiduciary . . . [and] [t]hat fund has to be protected . . . [A] normal way to protect such a fund is to choose . . . Treasury bill investments." Tr. 3617:16-21 (Saunders). Therefore, "it is entirely consistent with fundamental concepts in financial economics that the rate on the risky loans made by the RTC to the receivership would be higher than the rate paid on cash balances held . . . in an escrow account." Id.

**E. There Is No Basis Upon Which To Recalculate The FDIC's Estimate Of Carteret's Federal Income Tax Liability**

Ambase also claims that, in estimating Carteret's Federal income tax liability, the FDIC failed to deduct PII from the income realized from the sales of the branches and miscalculated Federal Financial Assistance ("FFA"). Ambase Brief, 92-100. Ambase argues that the Federal tax claims are invalid and inflate the receivership deficit. These arguments are erroneous, and should be rejected.

First, with respect to the deduction of PII, FDIC acted consistently with its policy by not recording PII as a deductible expense until 95 percent of the principal balance of the RTC advances had been paid in 1998. Tr. 857:6-19 (Green); Tr. 2684:17-2685:24 (Hughes). By 1998,

a net operating loss carryback provision allowed a carryback of only two years and, therefore, FDIC could file an amended return for 1996, which it did, but not for 1995. The 95 percent threshold for the Carteret receivership, which applied to all receiverships, not just Carteret, was not reached until 1998. Tr. 857:6-19 (Green). Therefore, even though FDIC failed to file an amended return for 1995, when it recorded the deposit premiums from the branch sales as income, it could not do so under relevant statutes and regulations.

Likewise, there is no evidence the FFA income recorded in the 1995 Federal tax return is improper. Although the regulation concerning the computation of taxable FFA was revised in 1995 and the computation for the 1995 Carteret return was based upon an interim draft regulation, the IRS has reviewed Carteret's tax returns and has not questioned the calculation of PII on the 1995 return. Dep. Tr. 9:14-11:1 (Vortreide) (JX 1 at 609-10). With respect to the FFA reported on Carteret's returns, Mr. Vortreide testified that the model used to prepare the returns "was used from 1993 through 2003 and it survived many audits, and no revenue agent ever made a complaint about it until 2003 [when he noted the IRS had a different model]." Tr. 266:4-13 (JX 1 at 669-70). Indeed, according to Mr. Vortreide, the IRS "has accepted the FFA calculations [reflected in the tax returns]." Tr. 269:16-24 (JX 1 at 670-71). Further, if there were to be discussions between the FDIC and the IRS about the calculation of FFA, Mr. Vortreide acknowledged that the IRS model is "much simpler than [his] model" and "might be taking a more conservative approach than I am." Id. In other words, there is no reason to believe the IRS would calculate the FFA at a lower level than Mr. Vortreide if the decision was made to allow Carteret to amend the 1995 return.

Ambase suggests that, because the IRS allowed PII to be recognized from the inception of

the receivership to settle the tax claim raised by stockholders of Ben Franklin Savings and Loan (the plaintiffs in Suess, 74 Fed. Cl. 510), it would necessarily allow the same treatment to Carteret. Ambase Brief at 98. As previously noted, however, in Suess, the IRS had not taken a formal position on the issue and Mr. Gill, the attorney for the FDIC at the fairness hearing on the Ben Franklin tax claim, emphasized that the IRS had allowed the PII deduction only to settle the litigation, and "obviously if we're back in the litigation arena, all bets are off and the IRS and the Department of Justice will certainly pursue the maximum tax case possible." PX 5106, Tr. 13:13-16. Therefore, there is no reason to believe the IRS's settlement strategy in Ben Franklin will apply to Carteret or any other receivership.[81] In short, because the Court lacks jurisdiction over the receivership deficit, and Ambase has failed to identify any defects in the deficit, the Court should not adjust the amount of the receivership deficit.

## CONCLUSION

For the foregoing reasons, the Court should reject Carteret's damages models, and the case should be dismissed as non-justiciable.

[81] Ambase also claims the FDIC should have taken Carteret's 1992 operating loss of $73.9 million as a deduction on the 1995 return. Ambase Brief at 100. There is no evidence to support this operating loss or evidence that it has not already been taken as a deduction by Ambase.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tel: (202) 353-7972
Fax: (202) 514-8640

OF COUNSEL:
ELIZABETH M. HOSFORD
Senior Trial Counsel

VINCENT D. PHILLIPS
DELISA SANCHEZ
AMANDA L. TANTUM
Trial Attorneys

Date: September 12, 2008

.