# In the United States Court of Federal Claims

Case No.  93-531C
FOR PUBLICATION
Filed: August 31, 2011

* * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| | * | |
| **AMBASE CORPORATION and** | * | |
| **CARTERET BANCORP, INC.,** | * | |
| | * | |
| *Plaintiffs*, and | * | |
| | * | |
| **FEDERAL DEPOSIT INSURANCE** | * | *Winstar Corp. v. United States*, 518 U.S. |
| **CORPORATION,** | * | 839 (1996), FIRREA, Damages Opinion, |
| | * | Expectancy Damages |
| *Plaintiff-Intervenor,* | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * *

*Charles J. Cooper*, with whom were *Vincent J. Colatriano, David H. Thompson*, and *Jesse Panuccio*, of Cooper & Kirk, PLLC, Washington, D.C., for Plaintiffs.

*Andrew Gilbert*, with whom was *Ashley Doherty*, Federal Deposit Insurance Corporation, Washington, D.C., for Plaintiff-Intervenor.

*David A. Levitt*, Attorney, Civil Division, Department of Justice, Washington, D.C., with whom were *Tarek Sawi, Arlene Pianko Groner, Elizabeth M. Hosford, F. Jefferson Hughes, Delisa M. Sanchez*, and *Amanda Tantum*, for Defendant.

## OPINION AND ORDER

**SMITH**, Senior Judge.

This case is one of the last *Winstar*-related cases before the Court, the background of which is well described in *Winstar Corp. v. United States*, 518 U.S. 839 (1996).  For the reasons set forth in the Court's previous opinion in this matter, Defendant is liable for its breach of

contract with Plaintiffs in connection with the elimination of supervisory goodwill as a component of regulatory capital. *AmBase Corp. v. United States*, 58 Fed. Cl. 32 (2003). Specifically, in its 2003 liability opinion the Court held that: (1) Carteret and the FHLBB intended, negotiated, and entered into agreements permitting Carteret to count supervisory goodwill toward meeting its regulatory capital requirements; (2) contracts arose between Carteret and the FHLBB concerning the Barton, Delray, First Federal, and Mountain Security transactions, and the contracts were breached as a result of Financial Instituions Reform, Recovery, and Enforcement Act ("FIRREA'); (3) the Government's enforcement of FIRREA against Carteret did not effect a taking from AmBase and did not require payment; and (4) the Government lawfully required AmBase to make capital contributions to Carteret after the implementation of FIRREA. *Id.* at 41-54. Subsequently, the Court ruled against Plaintiffs' Motion to Dismiss the FDIC as Plaintiff-Intervenor and granted Plaintiffs' Motion to consider the size and value of the FDIC's receivership deficit when calculating damages. *Ambase Corp. v. United States*, 61 Fed. Cl. 794 (2004).

This opinion disposes of the calculation of damages owed to Plaintiffs. Taken into consideration in this opinion are damages trial testimony, deposition testimony, expert reports, exhibits, post-trial briefs, and closing arguments. For the reasons stated below, Plaintiffs are awarded lost value expectancy damages in the amount of $205,013,000 dollars, plus tax gross-up if applicable.

## I. BACKGROUND AND OVERVIEW OF CASE

### A. The Parties

This suit was brought against the United States by Plaintiffs, AmBase Corporation and Carteret Bancorp, Inc. (collectively, "AmBase") and Plaintiff-Intervenor, the Federal Deposit Insurance Corporation ("FDIC"), as receiver and successor to the rights of Carteret Savings Bank, F.A. ("Carteret"). Carteret was originally incorporated as a state-chartered savings and loan association, Carteret Building and Loan Association of Newark, New Jersey, on September 15, 1939. The thrift was converted to a federally-chartered mutual association on May 5, 1982, and to a federally-chartered stock association on September 7, 1983. It was then renamed Carteret Savings Bank, F.A. on January 15, 1986.

In 1982, Carteret acquired two Federal Savings and Loan Insurance Corporation ("FSLIC") -insured thrifts, Barton Savings & Loan Association of Newark, New Jersey ("Barton") and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray"). In 1986, Carteret acquired two more FSLIC-insured thrifts, First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal"), and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"), along with a third thrift insured by the Maryland Deposit Insurance Fund. In 1988, AmBase Corporation purchased 100 percent of the outstanding stock of Carteret Bancorp, Inc., the holding company of Carteret.

AmBase operated Carteret until December 4, 1992, when Carteret was seized by the Office of Thrift Supervision ("OTS") for failure to satisfy capital requirements. The FDIC then became the successor to the rights of Carteret.

## B. The Supervisory Mergers in 1982 and 1986

In the spring of 1982, government regulators began approaching potential acquirers to take over two FSLIC-insured failing thrifts, Barton and Delray. Carteret was a healthy institution at this time with a positive net worth of nearly $37 million. Carteret entered into supervisory mergers with Barton and Delray in September 1982. The Barton acquisition was an "assisted" transaction, with FSLIC providing $10.7 million cash in a capital contribution. As a result of the two transactions, Carteret recorded approximately $46 million and $168 million, respectively, for a total of approximately $214 million, in goodwill that was to be amortized over a period of 40 years. Had the supervisory goodwill not counted towards Carteret's regulatory capital, at the close of the transaction Carteret would have had a *negative* net worth of $212 million and would have been immediately insolvent as a result of acquiring the two failing thrifts.

In the mid-1980s, FSLIC also solicited acquirers for two other failing thrifts, First Federal and Mountain Security. Carteret entered into supervisory mergers with First Federal and Mountain Security in June 1986, recording approximately $1.7 million and $20 million, respectively, in goodwill on its books as a result of these transactions. This supervisory goodwill was to be amortized over a period of 25 years. Consequently, as a result of the 1982 and 1986 transactions, Carteret had booked approximately $235.7 million in goodwill that was included in its regulatory capital position per the terms of the supervisory mergers.

## C. The Acquisition of Carteret by AmBase Corporation

Throughout the mid-1980s, Carteret expanded its franchise into new states, expanded its asset base, and ventured into new lines of business such as commercial real estate and corporate lending. Between 1983 and 1986, Carteret reported net earnings of $113 million. Of this amount, $42.8 million involved gains from the sale of branches, equipment, and mortgages acquired in supervisory transactions. Carteret also raised a total of approximately $120 million through issuances of common and preferred stock between 1983 and 1986.

In August 1987, AmBase Corporation (then known as The Home Group) began negotiations for the acquisition of Carteret's holding company, Carteret Bancorp, Inc. The parties settled on a total transaction price of $266 million following the stock market crash in October 1987. As a condition of Federal Home Loan Bank Board ("FHLBB") approval of the acquisition, AmBase Corporation stipulated pursuant to a Regulatory Capital Maintenance/Dividend Agreement ("RCMA") that it would infuse up to $50 million in additional capital into Carteret in the event that the thrift should fall below regulatory capital level minimums.

AmBase Corporation also agreed to sell its existing subsidiary, Imperial Premium

3

Finance ("IPF"), to Carteret for $65 million as part of the acquisition. However, if Carteret subsequently sold IPF back to AmBase Corporation or to another entity at a lower price prior to August 9, 1991, then AmBase Corporation would (under certain conditions) be obligated to pay Carteret the difference between $65 million and the lower sale price. AmBase Corporation closed the acquisition of Carteret on August 5, 1988. Subsequent to the acquisition, Carteret repurchased $11.9 million of its stock held by AmBase Corporation and paid a $13 million dividend to AmBase Corporation.

During this period, Carteret nearly tripled in size and had grown by 1988 to be the 19th largest savings and loan association in the United States, with assets of almost $6 billion from under $2 billion in 1981. As of March 31, 1988, Carteret's net regulatory capital was $321.9 million, of which over $182 million was comprised of supervisory goodwill. Carteret's book value was estimated to be $306 million at the time of its acquisition by AmBase Corporation.

## D.  The Breach and Its Effects

Congress passed the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), on August 9 of 1989. Immediately prior to the passage and implementation of FIRREA, Carteret had over $168 million of supervisory goodwill remaining on its books from the original goodwill amount of approximately $235.7 million. After the implementation of FIRREA and the elimination of supervisory goodwill, Carteret was $80 million short of its minimum required regulatory core capital. Carteret shrank its assets from $7.17 billion as of June 30, 1989 to $6.1 billion by December 31, 1989. The bank disposed of approximately $2.3 billion dollars' worth of assets from June 1989 to September 1992, including mortgage-backed securities, commercial real estate, and part of its retail deposit franchise. Carteret also increased its loan loss reserves from $8.4 million in 1987 to $27.5 million in 1989, but fell short of booking the additional $54.3 million required by regulators at the time. The bank then further increased its loan loss reserves to $150 million during the second quarter of 1991 and sought Federal Home Loan Bank of New York advances to replace deposit runoff. Deposit runoff occurred due to the fact that after the breach, depositors became uncertain as to whether they were insured. Further, the depositors did not want to deal with the Resolution Trust Corporation ("RTC").

Carteret took other measures to improve its capital position. Pursuant to the RCMA, AmBase contributed $20 million to Carteret to bring the bank into capital compliance by the end of 1989. Carteret also raised $40.74 million in capital over a period of three months from October to December 1990 by selling thirteen of its Florida branches, five of its New Jersey branches, and five of its Maryland branches. On December 28, 1990, Carteret reported to OTS that it would fail to meet the minimum requirements for tangible, core, and risk-based capital on December 31, 1990. Consequently, on February 12, 1991, OTS required AmBase to infuse $30 million of expected proceeds from the sale of a subsidiary, Home Insurance Company, into Carteret.

In connection with actions OTS was taking directly against certain officers and directors of Carteret and AmBase regarding the sale of Home Insurance Company, AmBase agreed to acquire Imperial Premium Financial ("IPF") from Carteret by August 9, 1991, for the greater of $65 million or the appraised value of IPF, and to transfer $12.5 million to Carteret as a deposit for the acquisition of IPF. AmBase further agreed that the deposit would be forfeited if the deal did not close by August 9, 1991. AmBase was unable to secure adequate financing for the acquisition and consequently Carteret received $12.5 million in escrowed funds pursuant to the agreement.

## E.  The Seizure of Carteret by The Regulators

From 1987 to 1988, Carteret was profitable, derived in part from gains on asset sales. However, in 1989 and 1990, Carteret posted net losses, including large losses in its commercial real estate and corporate loan portfolio as a result of poor asset quality. In January 1991, OTS required Carteret's consent to a capital directive requiring the submission of a capital plan. Instead, Carteret filed and was granted a preliminary injunction in federal district court preventing OTS from disregarding Carteret's supervisory goodwill towards its regulatory capital requirements. *Carteret Sav. Bank, FA v. Office of Thrift Supervision*, 762 F. Supp. 1159 (D.N.J. 1991). OTS withdrew its capital directive, but imposed operating restrictions on Carteret and increased the bank's reporting requirements in April 1991.

As a result of a change of control, AmBase appointed a new board of directors and management team for Carteret. Mr. Richard Bianco, an investor and part of a controlling shareholder group of AmBase, was appointed CEO of Carteret. Following the new management's review of real estate and corporate loan losses, Carteret recognized $150 million in loan loss reserves for the quarter ended June 30, 1991. After recognizing these reserves and without securing any new capital, Carteret failed the FIRREA minimum tangible capital requirement by $3 million, the core capital requirement by $81 million, and the risk-based capital requirement by $99 million, although goodwill was included in regulatory capital as required by the district court injunction. In August 1991, the FDIC recommended insurance termination proceedings. However, Carteret returned to profitability by September 1991, partly as a result of its sale of deposits and the corresponding decrease in operating expenses. Nonetheless, OTS renewed its capital directive in October 1991.

Due to Carteret's noncompliance with regulatory capital minimums, on February 27, 1992, Carteret signed an agreement with OTS that placed the bank in the OTS Accelerated Resolution Program ("ARP"). The ARP provided that a receivership would not be imposed for at least 90 days if Carteret permitted OTS to market the institution and progress was made in securing outside capital. In June, August, and October 1992, various investors considered investing in Carteret, but subsequently withdrew their preliminary agreements to invest. At the end of November 1992, Carteret was profitable and recorded net income of $11 million. However, Carteret was unable to maintain sufficient regulatory capital and on December 4, 1992, the OTS placed Carteret into conservatorship with the RTC.

## II.  WITNESSES

At trial, the case began with Mr. Richard A. Bianco.  Mr. Bianco was part of Caribe Investment Group, a controlling shareholder group at AmBase, and was Chairman of the Board and CEO of Carteret.  Next, Charles W. Calomiris, who is both a Professor of Financial Institutions at Columbia University's business school as well as the academic director of Chazen Institute of International Business at Columbia University, took the stand as the Plaintiffs' expert witness.

Several witnesses were called that had previously or were currently working for the FDIC.  William J. Day, Jr. and Michael Zamorski, both of the FDIC testified.  Mr. Day had been an examiner with the FDIC since 1970.  Mr. Zamorski was a former Regional Director of the FDIC and had a primary role in FDIC's oversight of thrift institutions in the New York region between 1989 and 1995.  Mr. Michael Saran, an attorney for the FDIC, was also called to testify regarding receivership and supervisory issues and Karen Hughes also testified from the FDIC.  Wayne Green, an official at the FDIC, was called to testify regarding the FDIC conservatorship and receivership accounting.

From the OTS, several other witnesses were called.  Mr. Robert C. Albanese was the Regional Deputy Director of the Northeast Region from 1996 until he retired in the summer of 2007.  From the mid-1970s until the enactment of FIRREA, he rose through the ranks of the Federal Home Loan Bank (FHLB) of New York and eventually became Senior Vice President and Director of Examinations.  Also from the OTS was Scott B. Smith, who worked at the FHLB of New York and later the OTS's New York office.  Mr. Smith was the field manager responsible for Carteret's examinations from 1989 through 1992.  Mr. Angelo Vigna was the Senior Executive Vice President and Director of Agency Function of the FHLB of New York, and after FIRREA, became the Northeast Regional Director of the OTS until he retired in 1996.  Thomas J. O'Rourke took part in the 1990 examination of Carteret and served as Examiner-In-Charge during the OTS's examinations of Carteret in 1991 and 1992.  John F. Downey was also a district director after the passage of FIRREA.  In 1990, Mr. Downey became OTS's Senior Deputy Director for Supervision and subsequently became the Director of Regional Operations for the agency.  In 1995, he became the Executive Director.

David A. Kennedy, the Government's expert witness on reserves, was called to testify regarding Regulatory Accounting Principles ("RAP") and Generally Accepted Accounting Principles ("GAAP") accounting.

Lastly, Professors Anthony Saunders and Roy C. Smith, were called as expert witnesses for the defense. Professor Saunders is the Ron M. Schiff Professor of Finance at the New York University Stern School of Business.  Professor Smith is the Kenneth Langone Professor of Entrepreneurship and Finance and a Clinical Professor of Finance and International Business at the same institution.

Other witnesses did not appear, but their deposition testimony entered into the record. Wayne J. Moor, Executive Vice-President For Commercial Assets of Carteret was not called, but his deposition testimony was offered and entered into the record accordingly.  In addition, former FSLIC Director H. Brent Beesley, OTS Director O'Connell, Brian Dittenhafer, President of the FHLBB, Russell Meyer, Michael Finn, Michael Simone, OTS examiners, as well as Robert Walsh, the past president of Carteret, all had deposition testimony entered into the record.

## III.  DISCUSSION

After hearing all the witnesses' trial testimony, as well as reviewing the deposition testimony entered into the record and expert reports, the Court finds that the Plaintiffs' witnesses proved that Carteret's successful performance prior to the Government's breach demonstrated that the thrift would have survived absent the breach.

Carteret's successful performance prior to the Government's breach provided support for the proposition that the thrift would have survived absent the breach.  While Carteret, like virtually every other member of the thrift industry, was ultimately not immune from the effects of the economic environment of the late 1980a and early 1990s, it is true that prior to the breach, Carteret was a success story.  Furthermore, Mr. Bianco's excellent reputation and extensive experience in the financial institutions industry, as evidenced by his previous work as an investment officer at Bankers Trust, the vice president and principal at Morgan Stanley, and the head of fixed income at Dillon Read, could have helped Carteret attract investments or could have facilitated a merger.  Thus, better allowing Carteret to survive the downturn of the economy.

The Court, therefore, finds that the Plaintiffs are entitled to expectancy damages.

### A.   EXPECTANCY DAMAGES

Expectancy damages make a non-breaching party whole by providing the benefits expected to be received under the contract in the absence of the breach.  *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); *see also Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379-80 (Fed. Cir. 2001) (*Glendale I*) (citing RESTATEMENT (SECOND) OF CONTRACTS (hereinafter RESTATEMENT) § 344(a) (1981)).  Expectancy damages may include measures other than lost profits.  *Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008); *see also Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed. Cir. 2001) (citing Restatement § 347).  In order to recover expectancy damages, a party must prove that the damages are "actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."  *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (citing Restatement §§ 347, 351, 352 (1982)).  The question to be answered, as in other *Winstar* cases, "is whether regulators foresaw,

or should have foreseen, at the time of contract formation, that breaching the 'goodwill' portion of their contract with [the bank] would have resulted in a significant or total loss of [the bank's] net worth or market value." *Slattery v. United States*, 69 Fed. Cl. 573, 582 (2006), *aff'd*, 583 F.3d 800 (Fed. Cir. 2009), *as modified by reh'g en banc*, 635 F.3d 1298 (Fed. Cir. 2011). The Court will first discuss foreseeability then causation and will discuss certainty in the damages section.

### 1. Foreseeability

It is well settled that in order to recover damages, a plaintiff must show that the claimed damages were within the realm of reasonable foreseeability at the time the contract was entered into by the parties. *Fifth Third*, 518 F.3d at 1374; *see also Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (*Cal. Fed. II*). The question to be answered, as in other Winstar cases is, "whether regulators foresaw, or should have foreseen, a tht time of contract formation, that breaching the 'goodwill' portion of their contract with [the bank] would have resulted in a significant or total loss of the [the bank's ] net worth or market value." Slattery v. United States 69 Fed. Cl. 573, 582, *aff'd* 583 F.3d 800 (Fed. Circ.), as modified by Reh'g en banc 635 F.3d 1298 (Fed. Cir. 2011). "What is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (quoting 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 56.7, at 108 (2005 rev. ed.)). Further, a party need not demonstrate that the Government could have foreseen at the time of contracting that the market conditions might be less than favorable when it later breached the contract. *Fifth Third*, 518 F.3d at 1376. It is clear to the Court that the evidence presented as well as the very logic of the contracts establishes the element of foreseeability.

In the early 1980s, Carteret "operated relatively free of supervisory concern and had operating ratios that were generally more favorable than those of like-sized institutions." *AmBase*, 58 Fed. Cl. 32, 45 (2003) (internal quotations omitted); PX 2433 (Mem. from H. Beesley, 9/30/82) at OAM0060016.[1] When the landscape began to change in the thrift industry and thrifts began to fall out of regulatory compliance, federal regulators stepped in to facilitate mergers and/or acquisitions of unhealthy institutions by healthy institutions. To that end, Carteret was approached by regulators with the hope that Carteret could acquire two failing thrifts. *AmBase*, 58 Fed. Cl. at 45. These two thrifts, Barton and Delray, "were thrifts in financial dire straights." *Id.* Without supervisory goodwill, the acquisition of Barton and Delray in 1982 would have made Carteret immediately insolvent, with a negative net worth of $212 million. The acquisitions were only made possible by the grant of supervisory goodwill.

---

[1] For consistency throughout this Opinion, the Court shall refer to Plaintiffs' trial exhibits as "PX __" and Defendant's trial exhibits as "DX __." For particularly lengthy exhibits, the Court shall include a pinpoint citation where possible. In addition, the Court shall refer to the Trial Transcript as "Tr. __ ([Witness])."

Similarly, Carteret acquired First Federal and Mountain Security in 1986 and would have been significantly out of capital compliance upon acquiring these institutions without the inclusion of goodwill. Thus, by the very nature of the 1982 and 1986 transactions, the Government understood at the time of the acquisitions that Carteret could not survive without the use of supervisory goodwill.

Further, as part of government approval of the 1982 and 1986 acquisitions, Carteret's regulators performed viability analyses. The purpose of these analyses, as former FSLIC Director Beesley explained, "was to make sure that the resulting institution would be healthy and would be able to stay in compliance with its minimum capital requirements." Dep. 22:22-23:2 (JX 1 at 15). The viability analyses in connection with the 1982 transactions found that Carteret would be profitable and projected that "net worth [would] be positive at all times." PX 2433 at 0028. Similarly, the FSLIC viability analyses for the 1986 transactions found that Carteret was "projected to be a viable institution as a result of the acquisition of Mountain Security and First Federal." PX 2484 at 0347. It is inherent in these predictions of Carteret's future viability that Carteret would be sufficiently profitable to overcome the debt assumed in the acquisitions and remain in capital compliance over the course of the goodwill amortization period.

Although the Government does not dispute that, at the time of contracting, it well understood the importance supervisory goodwill would have for Carteret and the uses to which it would be put, the Government argues that it could not and did not foresee the magnitude of Carteret's loss from the breach. The Government's argument is not persuasive. Before approving the 1982 and 1986 transactions, the evidence is clear that the Government concluded in its contemporaneous viability analyses that Carteret would be profitable and remain in capital compliance, notwithstanding Carteret's absorption of the enormous liabilities of the failing thrifts, *with* the inclusion of supervisory goodwill. Therefore, it was reasonably foreseeable and actually foreseen by the Government that the elimination of supervisory goodwill would result in, at the very least, significant loss, and is the case here, in the total loss of Carteret.

### 2. Causation

A party must establish causation of damages as a result of the breach in order to obtain recovery. *Fifth Third*, 518 F.3d at 1374; *see also Cal. Fed. II*, 395 F.3d at 1267. Use of the "substantial-factor" test rather than a "but-for" theory of causation in a *Winstar*-related case is within the trial court's discretion and depends upon the facts of the particular case. *Citizens*, 474 F.3d at 1318-19; *see also Bluebonnet*, 266 F.3d at 1356. The "substantial factor" standard is properly invoked when the parties assert multiple possible causes for the claimed damages. *See Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 514-16 (2004), *aff'd*, 474 F.3d 1314 (Fed. Cir. 2007). A defendant will be liable under the substantial-factor test for causation where the breach of a contract by the defendant was a "substantial factor" in causing the damages the other party to the contract suffered. *Citizens*, 474 F.3d at 1318; *see also Slattery*, 69 Fed. Cl. at 582. It is not necessary for the breach to be the "sole factor or the sole cause" of the plaintiff's loss. *Anchor*, 597 F.3d at 1366. Though the evidence presented at trial leaves the Court

understanding that if the breach had not occurred, AmBase would have survived into the present day.

The Government argues that the "but-for" standard is appropriate here, because the causation issue is whether but-for the breach Carteret would have survived. The Government asserts that the cause of Carteret's failure was the losses in its corporate lending and commercial real estate portfolios. The Government further asserts that even if goodwill had counted as regulatory capital, Carteret would have suffered from a lack of capital, severe asset quality problems, the need for a high level of loan loss reserves, a lack of core earnings, and high overhead expenses. Accordingly, the Government argues that goodwill was not a factor in Carteret's inability to survive after the breach and that the "but for," rather than "substantial factor" test for causation, is appropriate. The Court disagrees and adopts the substantial-factor test in this case. It is clear to the Court from the evidence presented that the breach significantly impacted Carteret's regulatory capital profile and set off a resulting chain of negative events that eventually led to the bank's seizure, although it may not have been the sole cause of Carteret's post-breach difficulties. Therefore, the Court finds that the breach was a substantial factor in Carteret's loss and Plaintiffs have established causation. However, it also appears that but for the breach Carteret would have survived.

### a.      Carteret Prior to the Breach

On balance, Carteret was a healthy, growing thrift in the years prior to the breach. From 1983 to 1988, Carteret generated more than $165 million in profits. *See* PX 9003; PX 9004. By the end of fiscal year 1988, Carteret had grown to $6 billion in assets from under $2 billion in 1981. OTS Examiner Day testified that Carteret was "a healthy institution prior to the passage of FIRREA." Tr. 1523:10-20. Although Carteret's regulatory examination in 1988 noted weaknesses in the bank's operations and criticized its commercial real estate and corporate loan portfolios, regulators gave Carteret a MACRO rating of "2" prior to the breach,[2] indicating that they did not believe Carteret posed a serious risk of failure. In further support of Carteret's pre-breach health, Plaintiffs argued and presented evidence that Carteret was able to access the capital markets between 1982 and 1986 and reported solid earnings prior to the breach, the losses reported in Carteret's commercial real estate did not become significant prior to the breach  and Carteret's diversified balance sheet indicated an ability to absorb risk. Plaintiffs also highlighted AmBase's $266 million purchase price for Carteret in 1987, even after the stock market crash in 1987, as indicative of the bank's value and strength.

The Government presented evidence to rebut Plaintiff's contentions, including that Carteret began recognizing losses from its commercial real estate and corporate loan portfolios before the enactment of FIRREA in August 1989. In 1988, Carteret added $14 million to loan

---

[2]   The FHLBB staff's recommendation approving AmBase's application to acquire Carteret references a "2" rating. PX 2614 at ODD0120414. However, no MACRO rating is set forth in the 1988 Report of Examination. PX 2104.

10

loss reserves, and in 1989, it added $28 million to reserves.  However, in June 1989 OTS required Carteret to book an additional $77.2 million in loan loss reserves and to also factor the losses into the bank's second quarter thrift financial reports.  DX 7000A at 17; PX 2106 at WOQ6750055.  Carteret challenged the amount of reserves, and on December 19, 1989, OTS reduced the amount of reserves required to be booked by December 31, 1989 to $54.3 million. DX 7302; DX 7303.  Later in December 1989, OTS reduced the amount further to $51.4 million. PX 4826 at WOT692 1264.  Finally, in February 1990 OTS determined that the amount of reserves required to be booked was only $49.8 million, due to a revision of the treatment of one-to-four family mortgages and continued shrinkage from asset sales.  DX 781A; Tr. 1922:6-9, 2000:8-13, 2001:14, 2001:24-2002:9 (S. Smith).

>    **b.    The Effect of the Breach on Carteret**

By not allowing the inclusion of supervisory goodwill in regulatory capital levels, the breach eliminated $169.3 million, or more than 50%, of Carteret's pre-FIRREA regulatory capital and put the bank out of compliance with its core capital requirement on a fully phased-in basis.  OTS officials and other government regulators recognized FIRREA's impact on Carteret's regulatory profile.  The bank's MACRO rating dropped to a "4" from a "2" the year before.  PX 2106 at 6.  Mr. Vigna testified that the elimination of supervisory goodwill "certainly put [Carteret] into a different regulatory category," and Mr. Meyer testified that it "presented a dramatically different picture."  Tr. 2268:15-21 (Vigna); Meyer Dep. 156:4-10 (JX 1 at 377). Mr. Albanese testified that the breach "had a severe impact on Carteret."  Tr. 1693:10-15. Mr. Day, an FDIC examiner testified:

Q.  Knowing what you know now about what happened in the economy in the year subsequent to this, would you agree that the loss of capital initiated by FIRREA was like a death blow to this institution?
A.  It was a significant factor.

Dep. 69:1-6 (JX 1 at 47); Tr. 1525:16-24 (Day).  *See also* Tr. 1522:4-9 (Day); Day Dep. 63:18-21 (JX 1 at 47).

Plaintiffs argued that, in a non-breach world, the use of supervisory goodwill towards regulatory capital requirements alone would have been sufficient for Carteret's survival. Plaintiffs argued and presented evidence that as of September 1992, assuming the use of goodwill, Carteret would have had an additional $139.1 million to count towards regulatory capital requirements.  PX 9053a; PX 9056; Tr. 761:6-764:19, 964:13-25 (Calomiris).  Carteret would have satisfied its tangible capital requirement with a surplus of $3.8 million, fallen short of its core capital requirement by $69.7 million, and fallen short of its risk-based capital requirement by $107.3 million.  *See* PX 9053a.12.  Mr. Downey, OTS's Director of Regional Operations, testified that OTS did not seize thrifts that satisfied their tangible capital requirement.  Tr. 2573:11-16.  Accordingly, Plaintiffs argued that Carteret would not have been seized by OTS if it had the use of goodwill because it would have satisfied its tangible capital

requirement.  Nonetheless, Plaintiffs also argued and presented evidence that as a result of the breach's elimination of supervisory goodwill and Carteret's falling out of capital compliance, Carteret shrank assets, sold branches, experienced deposit run-off, took out FHLB advances, and had increased cost of funds, all of which weakened the bank to its detriment and eventual seizure.  The Court will further examine some of these arguments below.

### i)      Carteret Shrank Assets

As a result of the breach, Carteret shrank its total assets by almost $1.1 billion, from $7.17 billion to $6.10 billion, in the last six months of 1989.  *See* PX 1711; PX 1713.  From mid-1989 through the end of the third quarter of 1992, Carteret shrank by more than $2.3 billion.  Bank documents reflected that the asset shrink was a result of the breach, stating "[t]o meet the new [FIRREA capital] requirements . . . the 1989 strategy was altered to [among other things] significantly downsize the balance sheet . . . ."  PX 1905 (Carteret Bancorp and CSB 1990 Business Plan) at 7.  In addition, the Government's expert witness Prof. Roy Smith testified that the need to raise additional capital was a "principal reason" for the shrink.  Tr. 3017:3-11 (R. Smith).

Plaintiffs presented additional evidence that the breach caused Carteret to shrink assets.  *See* Tr. 2053:11-14 (S. Smith) (acknowledging that he "believe[s]" that "Carteret shrank its assets to improve capital ratios as a result of FIRREA"); Finn Dep. 140:8-15 (JX 1 at 85) (recalling Carteret's "broad strategy" "of selling both branches and assets throughout the post-FIRREA period as something which was undertaken in order to help it meet capital requirements"); Meyer Dep. 100:12-19 (JX 1 at 373) (affirming that Carteret "knew they had to shrink" as a result of new capital requirements).  However, the Government argued and presented evidence that part of Carteret's asset shrink in 1989 and 1990 was caused by the bank's decision to discontinue corporate and commercial real estate lending and resolve outstanding nonperforming loans.  While the Court finds that a portion of the shrinkage was related to the Government's contentions, the asset shrink was primarily driven by Carteret's efforts to improve its capital position as a result of the breach.

Although the asset shrink was necessary to try to bring Carteret into capital compliance, Mr. Bianco testified that Carteret "cannibalized its future profitability through the sale or early realization of many of its most valuable assets, in order to remain in capital compliance."  DX 7175 (R. Bianco to A. Vigna, 9/30/91) at CAM218002.  Mr. Albanese testified that in selling assets, Carteret was "cherry-picking" its best assets which had "the effect of bolstering capital."  Tr. 1625:6-14.  Therefore, the asset shrink ultimately weakened the bank.

### ii)     Carteret Sold Branches

In 1990, Carteret sold 23 branches for a premium of $40.74 million.  Plaintiffs presented evidence demonstrating that the breach was the primary reason for these sales.  For example, a December 1989 OTS memorandum listed "considering selling Florida, Virginia, and Maryland

branches" as strategy for "Capital Compliance." PX 5301 at WOP3261203. OTS Examiner Finn testified in deposition that Carteret's "broad strategy" was to sell "both branches and assets . . . to help it meet capital requirements." Dep. 140:8-15 (JX 1 at 85); *see also* PX 802 (AmBase 1990 10-K) at 5. Mr. Walsh, former CEO of Carteret, stated, "Complying with the new OTS mandated capital requirements was a critical factor in our decision to proceed with these branch dispositions." DX 7340 at WOQ6781962. However, the branch sales, like the shrink of other assets, came at the cost of future profitability. Tr. 244:6-245:5 (Bianco), 2137:7-2138:12 (Zamorski).

Although the Government argued and presented evidence that Carteret sold the branches in order to "restructure its retail branch network," PX 802 at AMB030223 (AmBase 1990 10-K), and to "significantly and permanently change cost structures, while providing a much needed addition to capital," PX 1905 at C-AM-A-0264608 (Carteret 1990 Business Plan), the Court does not find these purposes necessarily exclusive to Carteret's need to improve its capital position. The value of the branches is evident from the substantial premiums paid by their purchasers. *See* Tr. 3997:20-3998:4 (Saunders), 3021:25-3022:6 (R. Smith). It is clear that these branches were sold as a result of the breach.

### iii)      Carteret Experienced Deposit Run-Off

Throughout the 1980s, Carteret's deposit base grew on an absolute basis. Tr. 3025:18-20 (R. Smith). After the breach, from June 30, 1989 to September 30, 1992, Carteret suffered nearly $815 million in deposit outflows. An FDIC examination report in 1990 linked deposit run-off to FIRREA: "Primarily as a result of the impact of FIRREA, substantial growth of retail deposits . . . has effectively been reversed." PX 2110 (Exam Rpt.) at WOQ6981439. The Government's experts acknowledged at trial that uninsured depositors would rationally flee such a bank, and many insured depositors might leave simply because they did not know they were protected or because they did not want to deal with the RTC. Tr. 3024:5-3025:3, 3026:1-5 (R. Smith); Tr. 3659:12-15 (Saunders). It is clear that the deposit run-off was harmful to Carteret. As Professor Smith acknowledged at trial, "deposits. . . are the lowest cost of funds for banks," and thus the "loss of deposit relationships is a negative for an institution." Tr. 2940:6-8, 3027:18-20.

### c.      Carteret After the Breach

To support the Government's argument that the breach did not cause the seizure of Carteret, the Government presented evidence that post-breach, the FDIC's negative findings in its 1989 examination of the bank and its threatened revocation of Carteret's deposit insurance in August 1991 demonstrated that Carteret would have failed absent the breach. The Government also presented evidence that losses in Carteret's commercial real estate and corporate loan portfolios caused the bank's failure, not the breach. The Court does not find these arguments persuasive. Regarding the FDIC, the Court finds that the agency's actions were breach-affected and, therefore, not a credible assessment of Carteret's condition.

As for Carteret's commercial real estate and corporate loan portfolios, the Government relied on the $150 million in loan loss reserves that Carteret recognized in the quarter ended June 30, 1991 to demonstrate that the losses Carteret sustained were a result of factors not related to the breach.  However, at the time, AmBase had appointed a new management team for Carteret. Under the leadership of Mr. Bianco, an investment banker and former head of fixed income for Dillon Read and member of the firm's Executive Committee, Carteret's new management team aggressively addressed the regulatory capital deficiencies flowing from the real estate and corporate loan losses.  Mr. Bianco appointed J. Wayne Moor, a former executive of Amerifirst Savings Bank in Miami, Florida, as the bank's Executive Vice-President For Commercial Assets. Mr. Moor had extensive experience in evaluating problem portfolios and Mr. Bianco requested that he recommend a course of action to stem the losses and improve Carteret's balance sheet.

As a result of Mr. Moor's review, Carteret's management and outside counsel advised OTS on July 29, 1991, that the evaluation indicated that Carteret needed to recognize an additional $175 to $200 million in loan loss provisions.  PX 4867a at WOP 3440537.  In its June 30, 1991 10Q, AmBase reported that Carteret recognized $150 million in reserves for the quarter ended June 30, 1991.  PX 1508 at WOT 6920154.  Even counting goodwill as regulatory capital these losses caused Carteret to fail the FIRREA minimum tangible capital requirement by $3 million, the core capital requirement by $81 million, and the risk-based capital requirement by $99 million.  PX 4867a at WOP 3440532.  Carteret reported its regulatory capital deficiencies to OTS in June 1991, and this prompted OTS to renew its Capital Directive in October 1991.

Carteret recorded $150 million in reserves in August 1991 on its CRE and commercial lending portfolios. Given the central role that Carteret's breach-induced need for capital played in its reserve decisions, it follows that if there had been no breach, Carteret would not have taken such an aggressive approach to writing down its assets. In addition, it is clear from the testimony that Carteret based many of its valuation decisions on purchase offers it received for certain assets.  As Mr. Kennedy conceded, the terms of such offers are often influenced by the buyer's perception of the seller's condition. *See* Tr. 3299:14-3302:23. Thus, it follows that Carteret's breach-weakened capital profile very likely led to lower offers for Carteret's assets, which led to lower valuations and higher reserves.  Because Carteret had many of the attributes of a distressed seller, there can be little doubt that Carteret received lower offers than it otherwise would have. Tr. 3846:24-3847:3 (Saunders) (agreeing that the "price that the asset holder must accept for immediate sale may be for less than it would receive with a longer horizon over which to negotiate a sale."). *Cf.* Press Release, U.S. Sec. & Exch. Comm'n, No. 2008-234, SEC Office of the Chief Accountant and FASB Staff Clarifications on Fair Value Accounting (Sept. 30, 2008) ("The results of disorderly transactions are not determinative when measuring fair value. . . . Distressed or forced liquidation sales are not orderly transactions, and thus the fact that a transaction is distressed or forced should be considered when weighing the available evidence."), *available at* http://www.sec.gov/news/press/2008/2008-234.htm.

Most of the Government's arguments assume that AmBase is suggesting either (1) that Carteret intentionally and materially *over*-reserved in the breach-affected world, or (2) that it would have intentionally and materially *under*-reserved in the no-breach world. *See, e.g.,* DOJ Br. 52. What AmBase has actually argued, and what the evidence establishes, is that in the breach-affected world, Carteret chose to be very conservative when it came to writing down its assets, and that, absent the breach, it would have taken a less conservative approach that would have placed Carteret more in the mainstream. That Carteret took a much more conservative approach does not at all mean that Carteret had "overstated" those reserves. Of course, even if AmBase's argument is construed to mean that it is suggesting that in the breach-affected world, Carteret "over-reserved," the fact that Carteret's regulators and auditors did not protest should not be interpreted to mean that Carteret did not over-reserve. The regulators themselves had no problem with institutions that erred on the side of over-reserving. *See, e.g.,* Tr. 1985:3-1986:2 (S. Smith) (OTS was comfortable with over-reserves); Tr. 2173:18-21 (Zamorski) (agreeing that he "can't recall a single institution in [his] 29 years at the FDIC that was criticized for overreserving"). *See also* Dittenhafer Dep. 84:25-85:2 (JX 1 at 69).

It further appears that the Government's causation argument is that Carteret's exposure to losses in its corporate and commercial real estate lending portfolios, rather than the breach, caused Carteret to fail. For certain, Carteret faced a serious challenge from these losses in the 1990-1992 period. However, the Court finds that it is simply not the case that these asset quality problems led to Carteret's failure in the actual world or would have led to Carteret's failure in the absence of the breach. The first and most significant flaw in the Government's argument is that it assumes away a core purpose of the very contracts in this case. Supervisory goodwill provided thrifts with the time and capital cushions necessary to weather market downturns. Loan losses are measured relative to capital, and are only a serious problem if the institution does not have the capital to absorb them. FDIC examiner Day acknowledged that "if the institution has inadequate capital, [then] bad assets for that institution pose a much greater threat than [they] do[] [for] an institution that has a large amount of excess capital," and that this "will lead an examiner to pay much closer scrutiny to an institution's assets." Dep. 180:11-22 (JX 1 at 53). *See also* O'Rourke Dep. 104:19-25 (JX 1 at 450) (agreeing that "[e]xcess capital would allow you to absorb problems and give you more time to work out problems in an institution," and stating that with "[e]xcess capital, an institution would be able to withstand a higher level of asset quality problems."). *Id.*

Prior to the breach, regulators considered Carteret's capital base, *including supervisory goodwill*, to determine whether loan losses could be absorbed. *See* Tr. 1965:18-1967:11 (S. Smith); PX 2104 (1988 FHLBB exam) at AMB019343. Thus, in the nonbreach world, Carteret's contractual capital would have provided Carteret a means of absorbing potential loan losses. As explained in *Old Stone*, the Government "cannot blame [the bank's] demise on a 'downturn in the economy' when the regulatory capital for which the bank contracted was intended partly to shield plaintiff from such losses." 63 Fed. Cl. at 83. *See also Home Savings*, 399 F.3d at 1353; *Commercial Fed.*, 59 Fed. Cl. at 347; *Coast*, 48 Fed. Cl. at 425-26. In a very real sense,

therefore, the Government's breach came at the worst possible time, depriving Carteret of its regulatory capital at its moment of greatest need.

It is also true that Carteret's commercial loan portfolio was neither atypical nor inherently deleterious. Numerous banks with similar or worse portfolios survived the recession. *See* Meyer Dep. 83:25-84:7 (JX 1 at 371); Dittenhafer Dep. 85:10-21 (JX 1 at 69). That Carteret took a hit in the recession, just like most other institutions, is no great surprise. As Professor Saunders acknowledged, "the position of the economy in the business cycle phase is enormously important to a financial institution in assessing the probability of borrower default." Tr. 3850:5-10. Carteret lost money due to the business cycle—but it survived and had turned a corner. Thus, if Carteret had use of its contractual capital to cushion these losses, the Court finds that Carteret would have survived.

The evidence presented established that Carteret, even in the breach-affected world, stabilized its portfolio by the last quarter of 1991. As Professor Smith colorfully noted, "the pig had passed through the python." Tr. 3105:10-24. Because Carteret discontinued commercial real estate lending in 1989, the thrift was not facing any future threats from its commercial asset portfolio. *See* PX 802 (AmBase 1990 10-K) at 4-5; Tr. 2353:10-17 (O'Rourke). While AmBase readily acknowledges that Carteret faced a challenge from loan losses in the 1990-92 period, the suggestion that these losses would have led to failure absent the breach is untenable. Absent the breach, Carteret would have had both supervisory goodwill and more profits to help offset loan losses. And, as discussed above, the magnitude of Carteret's loan losses cannot be divorced from the breach, and an unbreached Carteret would have booked $20 to $50 million less in reserves. Carteret's commercial loan portfolio was not atypical, and numerous banks with similar or worse loan losses survived the recession.

### i)      Carteret Was Profitable

By 1992, Carteret itself had turned a corner and was generating profit. There was no risk of further losses from Carteret's commercial loan portfolio. The evidence demonstrates that despite the devastating effects of the breach and the asset problems experienced during the recession of 1990 and 1991, Carteret was well on its way to recovery. As OTS examiner Russell Meyer put it: "They had shrunk, they had written off all the assets and they had started making a profit. I thought they had turned the corner." Dep. 234:18-22 (JX 1 at 380). That Carteret survived a severe recession in 1990 and 1991, notwithstanding the breach, is evidence of its financial strength and inherent franchise value.

Further, by September 1992, Carteret's commercial loan portfolio had stabilized. Carteret returned to profitability even earlier than that, from the last quarter of 1991 through the time of seizure, Carteret reported profits for fourteen straight months, with total earnings during that period exceeding $13 million. PX 9066. Significantly, Carteret's regulators believed that these profits were sustainable, a conclusion buttressed by the fact that "a massive downward trend in interest rates" began in September 1992, which Carteret was well-poised to take advantage of. Tr. 3572:22- 24 (Saunders). As Professor Smith acknowledged, "the cash flow

from lending operations rose from a little over [$]9 million in 1991 to [$]36 million in 1992." Tr. 3111:4-7.

Significantly, in its 1991 exam report, the OTS admitted that if supervisory goodwill counted toward regulatory capital requirements, then Carteret's operating profits alone would fill the remaining capital hole: "In OTS's view, excluding the disputed goodwill, this [$150 million capital infusion] would not cure the capital deficiency, but would bring the institution within approximately $45 million of its requirement. Carteret would make up the remaining deficiency by the end of 1994 through operating profits." DX 9061 at OAM0010522.

On the other hand, the Government denies that in the fifteen months prior to seizure, Carteret had turned a corner. *Compare* DOJ Br. 61 ("Carteret . . . had not turned the corner in 1992."), *with* Meyer Dep. 234:18-22 (JX 1 at 380) ("I thought they had turned the corner."). *See also* FF ¶ 151. Yet, the thrift had returned to profitability, had written down its commercial loan losses, was poised to take advantage of interest rate spreads, and had a new management team. Instead of acknowledging this, the Government contends Carteret's profits at this point were very tenuous, relying on the testimony of Mr. O'Rourke. However, Mr. O'Rourke wrote in June 1992: "In summary, I believe that sustainable core profitability can be demonstrated at roughly the level reported in the first quarter of 1992." DX 314 at WOP3330463. Additionally, at trial Mr. O'Rourke admitted profits were at "a sustainable level." Tr. 2425:17. Thus, the Court finds that indeed Carteret had returned to sustainable profitability.

### ii)      Carteret Could Have Had Potential Investors

Although the OTS Northeast Regional Office recommended that Carteret be transferred to the RTC in October 1991, it deferred the recommendation in order to allow Carteret's new management time to secure the outside capital necessary to satisfy FIRREA's minimum regulatory capital requirements. Because of its positive trends, new management, and the favorable macroeconomic environment, Carteret caught the eye of numerous potential investors during late 1991 and 1992. The Government's actions, however, ultimately made it impossible for Carteret to consummate a relationship with these suitors.  As the Government's own witnesses noted, regulatory risk is a critical factor for an investor. The regulatory environment was the single greatest impediment to Carteret's raising $200 million.

On February 18, 1992, in an effort to raise capital, AmBase retained Kidder, Peabody & Co. ("Kidder") and Merrill Lynch & Co. ("Merrill") to seek interested private investors. DX 4118.  On July 20, 1992, AmBase signed a conditional letter of intent with a private equity group of investors led by Kohlberg & Co. ("Kohlberg") to make a $200 million investment in Carteret. DX 40.  After conducting extensive due diligence, Kohlberg decided not to invest and notified Carteret on August 21, 1992, that it was withdrawing its letter of intent.  The problems cited in the due diligence report included the potential need for further write-downs in the commercial real estate and corporate loan portfolios, overly-optimistic projections on the time frame for disposing of real estate owned ("REO"), the need to refinance the Federal Home Loan Bank of

New York ("FHLB-NY") advances that Carteret borrowed at a low rate in 1990, and overly optimistic future income projections. DX 95 (due diligence report).

Following the withdrawal of Kohlberg's letter of intent, on October 15, 1992, another investor group, led by the Carlyle Investment Co. and Colony Capital ("Carlyle Group"), executed a letter of intent to invest $200 million in Carteret. PX 4886 at 2.  On November 11, 1992, however, OTS "received verbal notification that the Carlyle Group was withdrawing its conditional letter of intent because, following due diligence, it had concluded that it could not receive an adequate rate of return on its investment and had concerns about 'regulatory risk.'" DX 8124 at FAM002 0532.

On November 13, 1992, following the withdrawal of the Carlyle Group's letter of intent, OTS's Northeast Regional Office renewed its recommendation to transfer Carteret to the RTC due to a lack of capital and other deficiencies in the bank's financial condition and operations. DX 8124 at 2.  As of September 30, 1992, immediately before the OTS reactivated its transfer recommendation, Carteret reported negative tangible capital of $61.7 million, negative core capital of $14 million, and negative risk-based capital of $15.1 million. DX 8124 at 3. Under FIRREA, Carteret failed to meet its minimum tangible, core, and risk-based regulatory capital requirements by $133.2 million, $157 million, and $235.4 million, respectively.  *Id*. at 5.  Even counting goodwill of $139.1 million as regulatory capital, Carteret still would have failed the minimum core capital requirement by approximately $70 million and the minimum risk-based requirement by approximately $107 million. DX 9760.  However, adding the goodwill to tangible capital of negative $61.694 million, the thrift satisfied the minimum tangible capital requirement by $3.8 million.  *Id.*  Further, in the four quarters preceding the transfer to the RTC, Carteret's net income was only $520,000.   DX 8124 at 3.   Thus, in renewing the recommendation to transfer Carteret to the RTC on November 11, 1992, Messrs. Vigna and Albanese stated that "[e]ven if supervisory goodwill were included as of September 30, 1992 for purposes of determining the Association's compliance with minimum capital requirements, we would still recommend the appointment of a receiver." DX 8124 at 8.24

Yet, on November 17, 1992, OTS's Northeast Regional Office discussed a further delay of the transfer date with OTS's Washington Office because another potential investor, First Gibraltar Savings Bank, had commenced a due diligence of Carteret. PX 2819.  As a result, the transfer decision was delayed until December 4, 1992, in order to allow First Gibraltar an opportunity to complete the due diligence and commit to investing in Carteret.  Toward the end of November, OTS learned that First Gibraltar had withdrawn its letter of intent. PX 5281 at WOP3340680.

Further, on November 27, 1992, after First Gibraltar withdrew its letter of intent, Mr. Bianco advised OTS's Northeast Regional Office that PNC Financial Corporation ("PNC") might be interested in investing in Carteret. PX 4889; Tr. 1674:11-18 (Albanese).  OTS advised Mr. Bianco that PNC had to complete its due diligence and make a commitment by December 1, 1992, if Carteret was to avoid a transfer to the RTC as of December 4, 1992.  *Id*.  On December

1, 1992, OTS was informed that PNC, after performing a limited due diligence, decided not to invest in Carteret. On December 4, 1992, after concluding that there was no prospect an outside investor would recapitalize Carteret, OTS ordered Carteret transferred to the RTC. Tr. 1666:14-1667:2 (Albanese).

It is clear to the Court that Carteret was unable to find a match as the Government imposed harsh and unrealistic requirements making it impossible for any investors to invest. As Judge Bissell put it, the Government "charge[d] in and micro-regulate[d]" Carteret to such an extent that the thrift faced "governmental control of and/or intervention in even the most basic day-to-day operation[s]." *Carteret*, 762 F. Supp. at 1177, 1165. See also Tr. 3804:25-3805:3 (R. Smith) ("we had the regulators all over the place affecting Carteret's activities"); DX 25 ("Timetable for Compliance"). Carteret's Board at the time characterized these restrictions as "severe," and Mr. Bianco characterized the regulatory environment as "very difficult" and "unreasonable." DX 7142 (CSB Bd. Minutes, 7/29/92) at RAM0100225; Tr. 160:12-18 (Bianco). Among the most detrimental of these microregulations were the deadlines placed on investors' due diligence—a policy that was contrary to that of the Government's own investment-banking expert, who would have "recommended an extensive effort to conduct due diligence." Tr. 3084:15-20 (R. Smith). As noted, Mr. Albanese characterized such a deadline in the context of the PNC deal as "foolish." PX 4889 (Mem. from R. Albanese to A. Vigna, 11/27/92). But these arbitrary deadlines were not confined to the PNC deal—they spanned the whole period during which Carteret was trying to raise capital, and they greatly impinged on Carteret's ability to do so. Mr. Bianco informed OTS of this at the time, noting in a June 25, 1992 letter that Carteret was "burdened by the imposition of deadlines which are unrealistically short and which create artificial crises of confidence for the bank and for potential investors." PX 5303.

Adding more difficulties to Caretert's ability to attract investors, the Government regulators refused to provide any assurances to potential investors. Professor Smith testified that any reasonable investors would "try to get an understanding of how they're going to be regulated," and even if "there could be no guarantees, you would need an understanding as to what . . . you could reasonably expect." Tr. 3086:9-18, 3090:6-16. Indeed, the FDIC's own regional director testified that "key" to an investor's decision "being able to figure out what the risk is." Tr. 2117:19-24 (Zamorski). Yet prior to Carteret's seizure, the FDIC rebuffed any such attempts, DX 412 (N. Ketcha to A. Vigna, 11/2/92) at WOP3340706—a policy that ultimately led the Carlyle Group to walk away from Carteret because "they couldn't quantify" the risk, Tr. 289:16-292:21 (Bianco); *see also* PX 4886 (OTS "S" Mem., 11/13/92) at KH091238. Instead of encouraging investment, the FDIC threatened the revocation of deposit insurance.

Through RTC fire sales, the Government created a strong disincentive against investment in Carteret while it was still a going concern. As Professor Smith recognized, "there were many private equity investors who preferred just to wait for institutions like Carteret to die, and then they would buy the corpses and take the assets at big discounts from the RTC." Tr. 3090:21-3091:1. The evidence presented at trial suggests that several investors backed away from Carteret for this reason. For example, the Government's own internal documents demonstrate

19

that Carlyle sought assurances about regulatory risk and was rebuffed. *See* DX 412 at 4; *see also* Tr. 292:16-21 (Bianco).   All of this occurred in large part because of the Government's breach and subsequent actions caused by the breach.

The Government cites to the decision of Kohlberg & Co. not to invest, and highlights "[t]he problems cited in the due diligence report [(the "LZO report")] include[ing] the potential need for further write-downs in the [CRE] and corporate loan portfolios." DOJ Br. 22. But Mr. O'Rourke later testified that the "methodology they used was cursory," and was "not as reliable as the work that Wayne Moor's people did." Dep. 195:3-6 (JX 1 at 453); DX 9124 at 4. Indeed, Mr. O'Rourke concluded that the LZO report reflected that the LZO Report was not as reliable as Carteret's own analysis of reserves. *See* Tr. 2443:2-15 (O'Rourke); DX9124. *See also* O'Rourke Dep. at 195:9-11 (JXl at 453). David Kennedy agreed with this assessment. *See* Tr. 3346:14-19. Thus, it is unsurprising that, according to an OTS memorandum, by "the middle of the week of 9/28, all of the primary potential investors in Carteret . . . had overcome the operating and other concerns they had raised in relation to Carteret's business (including issued raised in the LZO report).") PX 4879 at 1.   This clearly indicates it was the post-breach regulatory treatment caused by the breach.

The Government also claims that PNC's decision not to invest was rooted in "uncertainties related to Carteret's balance sheet." DOJ FF ¶ 179. *See also* DOJ Br. 24. *But see* FF ¶¶ 169-170; Br. 42. The Government cites three pieces of evidence for its conclusion. However, none of these documents support the Government's theory.   The first piece of evidence relied upon by the Government is Mr. Vigna's statement that certain "developments confirmed the belief that, absent federal assistance, there was no reasonable possibility for Carteret to secure $200 million in capital by December 31, 1992." Tr. 2239:3-7. Yet, had Carteret been able to count goodwill the amount of capital needed would not be close to $200 million and more possibile to achieve. The second piece of cited evidence is a December 1, 1992 addendum to the November 13 "S" memo that simply states: "Today we were notified that PNC Financial Corp., after performing more limited due diligence, has reached the same conclusion." This statement hardly concludes that there were uncertainties in the balance sheet.   The third piece of evidence is a citation to DX 9508, a demonstrative of Professor Smith's.   Professor Smith's demonstrative states that "PNC performed limited due diligence and also determined not to proceed." DX 9508.   This statement does not give rise to uncertainties in the balance sheet either.   On the other hand, Mr. Albanese warned OTS that it would be "foolish" to rush PNC, PX 4889, yet OTS insisted on a short deadline.   As PNC was only able to perform limited due diligence, and as Professor Smith explained, the regulators knew PNC would "walk away" when put in such a position.   Tr. 2955:12-18.   Thus, at the point of its decision not to invest, it can reasonably be concluded that it was the unreasonably short deadline, and not a concern over Carteret's balance sheet, that turned PNC away.

Thus,  the Government contends that the breach had no effect on investors.  DOJ Br. 64; DOJ FF ¶ 180.  However, as the Government's own witnesses explained, FIRREA "created substantial confusion and disruption," Tr. 2994:14-16 (R. Smith), and "[n]obody would have put

any money in knowing the Government was going to breach its contracts." Tr. 2260:15-18 (Vigna). Professor Smith explained that goodwill was akin to a license to do business. Tr. 3038:16-20. Hence, the evidence, and common sense, show that investors were not indifferent to the revocation of that license and their commitment to invest waned.

### d.    Seizure of Carteret

OTS seized Carteret on December 4, 1992, despite the fact that the agency viewed an institution's trends as a critical factor in determining whether seizure was warranted. OTS, however, openly recognized that Carteret's trends were favorable. Numerous OTS officials admitted that the seizure prevented Carteret from mitigating the breach and that Carteret would have survived but for the seizure. For example, Mr. Simone, the third-in-command for OTS Northeast—in a meeting discussing the "OTS's conclusions and their findings concerning the failure of Carteret Savings" indicated that had the institution approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing." PX 5331 (Mem. from R. Seiger, 2/15/95) at 1. And Director Vigna testified that "at some point in time they would have raised enough capital to restore viability in the institution." Dep. 151:20-152:3 (JX 1 at 597). Examiners O'Rourke and Meyer similarly testified that they thought, at the time, that Carteret would have achieved capital compliance had it not been seized. See Meyer Dep. 163:4-13 (JX 1 at 378); O'Rourke Dep. 199:20-25 (JX 1 at 453). In other words, by shutting Carteret down, the Government stymied Carteret's efforts to mitigate and ensured that the breach destroyed the value of the thrift.

The unreasonableness of the premature seizure date is confirmed by Carteret's regulatory history in 1991 and 1992. Throughout that period the OTS regional office recommended delaying Carteret's seizure in light of the institution's rebound. For example, on January 17, 1992, Mr. Vigna explained that Carteret had attained profitability in the previous quarter and, "should be able to attain reasonable core profitability in 1992," as well as  had "strong management" in place that had "the experience necessary to help raise capital." PX 2805 (Mem. From A. Vigna to T. Ryan, 1/17/92) at WOP 3341035, 37. See also Vigna Dep. 104:13-105:6 (JX 1 at 591-92) (explaining that "there was no risk to the RTC and the public taxpayer to allow this institution to continue on in an effort to find capital"); Tr. 2280:9-2281:6 (Vigna). Similarly, in mid-1992, the OTS regional office again recommended against seizure, because "steady financial improvement has been demonstrated by the new management team" and "reasonable progress toward achieving a recapitalization" was being made. PX 2816 (R. Albanese to N. Ketcha, 7/7/92). The OTS felt that seizure "while progress is being made to recapitalize a troubled institution with assets of over $5 billion would not be effective supervision or good policy." *Id.*

In the fourth quarter of 1992, just three weeks before seizure, the regional office again reaffirmed its position, noting that "the institution's financial condition continued to improve, and that supervisory risk of loss while it remained open was very low." PX 2819 (Mem. from R. Albanese to File, 7/17/92). As Mr. Albanese explained, the "point" of this recommendation was

that if "the institution's condition [is] improving, then a date of December 4, January 4 . . . or even March 4, . . . [then] we ought to give them more time." Tr. 1716:20-1717:12 (emphasis added).  Mr. Albanese's November 17 memorandum calls into serious question the basis behind the "S" memorandum filed just 4 days earlier. The regional office recommended seizure of Carteret, noting that the thrift had "incurred or is likely to incur losses there that will deplete all or substantially all of its capital." PX 6874 (Status Certification, 11/13/92). Yet, as recognized by regulators throughout 1992 and in the November 17 memorandum, Carteret had attained sustainable profitability. Thus, at trial Mr. Albanese admitted that there was no basis for this statement. Tr. 1741:23-1742:4, 1746:2-9; PX 6874.   In other words, the second-in-command for the OTS regional office, both at the time and at trial, repudiated the reasoning undergirding the document relied upon by the national office in making its decision to seize Carteret.

Ten days later (on Friday, November 27), in the face of an impending seizure date (known only to OTS), Mr. Bianco informed OTS that Carteret and PNC were on the verge of a deal, but that PNC would need time to perform due diligence. PX 4889 (Mem. from R. Albanese to A. Vigna).  Although Mr. Albanese recognized that "it would be foolish to rush a transfer on December 4" in light of this request, OTS insisted that PNC complete its due diligence over the weekend.  *Id.* (emphasis added)  As Professor Smith explained, this course of action was utterly unreasonable: "the regulators would know that, if they put them in that position, they would walk away."  Tr. 2955:12-18.  And, indeed, under the heavy thumb of OTS' extreme demands, PNC abandoned the deal and the OTS seized Carteret.

Mr. Albanese recognized that it did not make sense to seize Carteret at the time (as his letters and memos attest) and at trial stated "My statement is this. I believe they should be given more time to try to raise capital, equity capital, and to continue as an independent entity. Clearly, I would not have made a recommendation to give them more time if I thought that there was no reasonable prospect that they could raise capital."  Tr. 1746:2-9.

The Government has been unable to provide a coherent rationale for the December 4 seizure date. The evidence suggests it was simply an arbitrary deadline set by OTS Washington officials—that is, by those in the agency with the least connection to the facts on the ground. Indeed, as early as October 2, 1992—more than a month before the issuance of the "S" memo recommending seizure, and while numerous investors were still interested in Carteret—an OTS Washington official wrote that "Carteret is currently scheduled for resolution on December 4, 1992." PX 4875 (Mem. from D. Garmus to T. Ryan, 10/2/92) at 1. See also PX 4887 (Mem. from D. Garmus to J. Fiechter, 11/13/92) at 1. As Mr. Vigna explained, "people were setting dates and not coordinating." Dep. 145:7-8 (JX 1 at 596)  As Judge Bissell aptly noted   "[it seems] agency discretion [has] gone haywire." *Carteret*, 762 F. Supp. at 1177.   It was, as the Government's own regulator explained, a reflection of the Government's "elect[ion] to use the shotgun approach and take everybody out." Meyer Dep. 181:13-19 (JX 1 at 378).

### e.      Carteret "but-for" the Breach

AmBase argues and presented evidence at trial that Carteret would have survived if the contract had been performed because Carteret's operations would have provided additional regulatory capital, and that AmBase could have raised additional regulatory capital from investors or through a sale of assets.  AmBase makes two arguments supporting its contention that Carteret would not have been seized in a "but-for" world.  First, AmBase contends that, under OTS policy, Carteret would not have been seized if it satisfied its tangible capital requirement in November 1992, even if it did not satisfy its risk-based or core regulatory capital requirements. Second, AmBase argues that Carteret would have made up the regulatory capital shortfalls in core capital and risk-based capital by securitizing mortgages, raising private capital, or selling branches or other assets.  Carteret had numerous paths to avoid even this capital shortfall, AmBase could have infused $80 to $100 million, and Carteret could have sold its servicing, its mortgage company, or a portion of its branches.

In contrast, the Government argues that with the implementation of FDICIA[3] in 1993, Carteret would have faced larger capital deficits of $20.7 million for tangible, $118.8 million for core, and $137.2 million for risk-based.   DOJ Br. 35.   However, government regulators repeatedly confirmed that Carteret would have survived absent the breach.  For example, Russell Meyer, an OTS examiner, testified as follows:

Q. Did you think that the new capital rules in FIRREA caused a lot of institutions to fail?
A. A lot—I know that they caused institutions to fail, yes.
Q. Do you recall thinking that it caused Carteret to fail?
A. Yes.
Q. Because of its disallowance of the ability to use goodwill towards capital?
A. It was one of the things, yes. They could have survived, I thought.

Dep. 13:4-7, 42:24-43:11 (JX 1 at 368-69); see also id. at 76:8-18 (JX 1 at 370).

In an effort to sidestep this admission, the Government quotes Mr. Meyer's statement that Carteret had had problems with commercial real estate.   Putting aside the fact that such losses threaten viability only if there is insufficient capital to absorb them, the full context of that quote reveals that the government misrepresents Mr. Meyer's opinion:

A. . . . [The Bianco management team] went in and did a good job, and I was against anybody taking them over.  I always liked Carteret.  I thought they could still make it.
Q. Did you think that if they had been given a little more time that, that maybe they could make it? . . .
A. In my opinion, yes . . .

_____

[3]  Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, 105 Stat. 2236 ("FDICIA").

Q. The real estate market was at that time rebounding a little bit, was it not?
A. I think so, yes.
Q. Recession was easing and the economy started to gradually improve?
A. I don't recall all of the external things. I was deeply involved with the real estate assets.  I always thought that was their main problem, *and I think they did what they had to do*.
Dep. 162:24-164:11 (JX 1 at 378) (emphasis added).

Likewise, Mr. Meyer's superior, Mr. Simone, who was also an OTS official at the time of his deposition, testified that it was "likely" that Carteret would not have been seized if the thrift had positive tangible capital of $80 million. Dep. 19:9-11, 105:1-21 (JX 1 at 498, 500-01).  For instance, just a few years after Carteret's seizure, Mr. Simone indicated that even in the breach-affected world, "had [Carteret] approximately another two (2) weeks or a month of existence prior to takeover by OTS, the institution may have survived as the interest rate climate has been changing."   PX 5331 (Mem. from R. Seiger to File, re OTS conclusions regarding Carteret failure, 2/15/95).

Mr. Simone's superior, Mr. Albanese, went even further. While serving as Regional Director of OTS he testified that Carteret would not have been seized if it had met its tangible capital requirement. Dep. 160:13-17, 161:6-15 (JX 1 at 13-14). Moreover, at the time of his deposition, Mr. Albanese answered "no" when asked if "it was likely after enactment of FDICIA. . . that you may have closed an institution that actually satisfied its tangible capital requirement."  Dep. 47:13-17 (JX 1 at 3).  At trial, Mr. Albanese was asked if he disagreed with this answer from his deposition.  He first stated "no" and then stated "I just don't know" because "[I] may have been . . . thinking that the meeting of the tangible capital requirement was a proxy for being in capital compliance." Tr. 1763:19-1764:17.   He made clear, however, "that, regardless of all this, I believe that time should have been given to this institution."  Tr. 1764:18-22.

Furthermore, Mr. Vigna, Mr. Albanese's superior and the OTS Regional Director at the time of Carteret's seizure, also stated unequivocally "no" when asked, under oath: "If Carteret had . . . tangible capital, for example, if Carteret had raised $150 million to replace dollar for dollar the supervisory goodwill that it lost, would Carteret have been seized?"  Dep. 158:6-11 (JX 1 at 599).  Similarly, he again answered simply "no" when asked "If the injunction that Judge Bissell entered had not been vacated but continued to be in effect, requiring OTS to accord full regulatory capital treatment to Carteret's unamortized supervisory goodwill, would Carteret have been seized?"  *Id.* at 159:18-159:25 (JX 1 at 600).   Furthermore,  at trial he stood by his deposition answer of "probably not" to the question "[I]f Carteret had satisfied or very nearly satisfied its tangible capital requirement at the time it was seized, would it have been seized?" See Dep. 154:25-155:5 (JX 1 at 598); Tr. 2317:17-2318:19

At trial, Mr. Vigna recanted his answers to these questions, claiming that he "must have misunderstood the question." Tr. 2209:4-8.  The Court finds these recantations incredible.  At no time during his deposition did Mr. Vigna ask for a clarification of this question—or any other

question the answer to which he recanted at trial— despite the fact that he was a former regional director of OTS and had an intimate knowledge of Carteret and thrift regulation, despite the fact that he had previously been deposed and testified in numerous *Winstar* cases, Tr. 2188:23-2189:11, and despite the fact that he signed his deposition. *See* PX 9120; Tr. 2329:3-8. Indeed, later in the deposition, when Mr. Vigna's counsel repeated the testimony back to him, Mr. Vigna affirmed that it was "a fair recollection of [his] testimony." Dep. at 199:11-23 (JX 1 at 601); see also Tr. 2328:18-25 ("That was a fair recollection of the answer I gave to that question.")

As for the FDIC, examiner Day "remember[ed] thinking that without the ability to treat [supervisory] goodwill as capital, Carteret was going to have a very hard time staying in existence." Dep. 63:22-64:1 (JX 1 at 47). The Government cites Mr. Day's trial testimony that after Carteret failed to raise capital in 1992, "it was time to close the bank." DOJ Br. 31 (citing Tr. 1512:5-6). It is clear to the Court that this statement simply reflects Mr. Day's opinion that the *breach-affected* Carteret should have been seized.

The evidence is clear that Carteret would have had positive tangible capital if its contractual goodwill were added back as of September 1992, and that the Government's own regulators testified that thrifts with such a positive tangible capital profile were rarely, if ever, seized. Moreover, with a much smaller capital hole to fill, Carteret would have had more options at its disposal to raise such capital as stated below.

### i)       Securitization of residential loans

Carteret presented evidence that it could have securitized all or a portion of its $1.561 billion in single-family residential mortgage loans. In doing so, this would have moved them to a lower risk-weight category. It would have reduced the risk-based capital requirement by at least 33.7 million. Further, as Carteret was already servicing these loans, it would not have incurred any additional costs for servicing. *See* PX 2807 (Company and Investment Opportunity Overview, 3/9/92) at 5; Tr. 766:18-23, 974:18- 23 (Calomiris). Moreover, the sale of these assets could have generated capital to satisfy the decreased requirement (which would, in turn, further decrease the requirement). For example, in the 27 days following seizure, the RTC recognized a gain on sale of assets of $5.561 million. PX 3804 (CFSB Financial Rpt., 12/31/92) at 1. Professor Smith acknowledged that Carteret could have booked these gains in the non-breach world. Tr. 3788:6-3789:10. In the first quarter of 1993 this trend continued and the RTC recognized a gain of $6.1 million on the sale of $204 million of MBSs. *See* PX 1738 at CAM4040727, 735.

Professor Calomiris argues that, if "but-for" Carteret had a risk-based capital deficiency in spite of adding back the goodwill and reversing the sale of the 23 branches in 1990, it could have securitized $1.5 billion in single family mortgages and held these in its portfolio at a 20 percent risk weighting instead of holding the mortgages themselves at a 50 percent risk weighting. PX 2704A at ¶ 11. Pursuant to this analysis, "but-for" Carteret would have incurred transaction costs of 0.25 percent in securitizing the mortgages, and its risk-weighted assets would

have been reduced by $468.4 million as a result of the securitization. According to Professor Calomiris, this adjustment would have eliminated the risk-based capital deficiency in his "but-for" world. *Id.*

However, the Court finds Professor Calomiris's claim that "but-for" Carteret could have securitized the mortgages to reduce its risk-weighted assets as unsupported. As Professor Saunders pointed out, mortgages can be risky due to interest rate risk and prepayment risk, and there is no evidence the market would have been responsive if Carteret had offered mortgage-backed securities in the 1990-1991 recession. DX 9770; Tr. 3577:16-21 (Saunders). Professor Saunders did not believe Carteret could have securitized any mortgages in the condition the bank was in, let alone a $1.5 billion mortgage portfolio. Tr. 3577:8-12 (Saunders) ("it sounds pretty easy, but 1.5 billion, one can imagine today's environment would be impossible"). Further, Mr. Bianco admitted that Carteret held at least $300 million in "low doc" mortgages, which are similar to today's "sub prime" loans. Tr. 478:5-16 (Bianco); see DX 5038A at 66. Professor Saunders opined that there would not have been a market for sub-prime loans in 1990 and 1991, just as there is no such market today. Tr. 3577:16-21 (Saunders). Thus, Carteret could have realized some gain, but the Court finds that it could not have realized as much as Professor Calomiris projected.

### ii)    Capital raising by AmBase

AmBase claims that to meet any remaining deficit after securitizing the residential loan portfolio, two readily available alternative options could have been employed. First, AmBase could have raised $80 to $100 million and infused it into Carteret. As Professor Smith acknowledged, "all other things being equal, it's easier for a company to raise a smaller amount of capital than a larger amount of capital." Dep. 167:17-21 (JX 1 at 520); see also Tr. 3113:11-15 (same). See also Albanese Dep. 160:5-12 (JX 1 at 13) (acknowledging that "if they had a smaller hole to fill . . . somebody [was] more likely to step in"); Tr. 2319:14-21, 2320:13-19 (Vigna) (acknowledging that Carteret's ability to attract capital would have been enhanced if it had satisfied or nearly satisfied its tangible capital requirement). Based on his expertise as an investment banker, Mr. Bianco explained that AmBase, which by this time had no debt, could have used its $36 million in cash to cover the interest on a three-to-five-year loan with at coupon rate of seven percent. Tr. 275:20-279:17 (Bianco). AmBase would have guaranteed the interest on the debt and, if necessary, Carteret could have been pledged as collateral, just as it had been in 1988 to secure a loan from Chase. PX 2611 (Credit Agreement, 6/10/88) at AMBNP013514-15. AmBase could have infused the proceeds from this transaction into Carteret. Professor Calomiris explained that this type of transaction is commonplace. Tr. 774:8-775:18. See also *Bank of America v. United States*, 67 Fed. Cl. 577, 582 (2005) (describing similar transaction). Even the Government's own investment banking expert conceded that this type of transaction would have been feasible. R. Smith Dep. 509:1-14 (JX 1 at 544).

Therefore, AmBase argues that, if Carteret could have counted the goodwill as regulatory capital in late 1992, AmBase would have made up a portion of the risk-based regulatory capital

shortfall of $107.3 million, and the core capital regulatory capital shortfall of $69.7 million, by using $36 million in its treasury as collateral for an $80-100 million loan.  It would also of had a positive tangible capital of 3.8 million.  See DX 9760 (showing "but-for" Carteret's regulatory capital shortfalls).  However, the Government contends that no bank would have lent AmBase even $80 million because AmBase was effectively insolvent and could not have used the $36 million in cash in its treasury as collateral for a bank loan because the money was already subject to prior claims and was necessary to operate the business.  As Professor Saunders observed: "I know of no bank . . . that would take that type of collateral [the $36 million] and lend fivefold against it when its really got contingent liabilities and contingent claims, so I think that's a really, really farfetched argument." Tr. 3580:7-12 (Saunders).

AmBase countered this testimony alleging that Professor Saunders misunderstood the mechanics of the proposed transaction because, when he rebutted the contention that AmBase could have raised capital to assist Carteret, he referred to AmBase raising $150 million upon the strength of $30 million in collateral, whereas AmBase had proposed raising $80-100 million upon the strength of $36 million in collateral.  Reply at 17-18.  The Government claims that AmBase could not have used its $36 million to secure a loan because it would have left the company with no operating capital.  However, this ignores both the significant tax refund due to AmBase, *see* FF ¶ 126, and the fact that AmBase's operating expenses were quite low—only $4.76 million in 1993.  PX 805 at 17.  Further, the Government contends that no lender would have relied on the value of Carteret's stock in the nonbreach world because, in the Government's view, the thrift would have been balance-sheet insolvent. This argument depends upon the Government's  theory that nothing about the unbreached Carteret would be different save for the inclusion of goodwill.  Moreover, it ignores that Carteret's balance sheet did not reflect the franchise value of branches, conservatively estimated at $100 million.

### iii)      Mortgage Servicing and Origination Business

As an alternative to raising capital at the AmBase level, Carteret argues that it could have unlocked its "extremely valuable" franchise, what Professor Smith deemed a financial institution's "most important asset." Griffin Dep. 95:11-96:9 (JX 1 at 231); Tr. 3783:3-25 (R. Smith). FF ¶ 135.  For example, although AmBase acknowledges that there are substantial risks in the origination and servicing business, and that values can fluctuate dramatically depending upon market conditions, it contends that Carteret could have realized a $20 million gain on the sale of servicing rights and an $18 million gain on the sale of Carteret Mortgage Company ("CMC").  Carteret could have sold its mortgage servicing and origination businesses, either together or separately.  Tr. 3778:23-3789:5 (R. Smith); Tr. 3841:11-14 (Saunders). Because of synergies between servicing and origination, selling the two businesses together would likely have generated an even greater amount of capital. Tr. 982:2-18, 987:13- 988:10; PX 9069a; PX 9070.

However,  for the sale of mortgage servicing rights, even Mr. Bianco conceded that a sale of mortgage servicing rights would have netted Carteret a pre-tax profit of only approximately

$20 million. Tr. 202:4-6 (Bianco). Such a sale would not have enabled Carteret to meet its risk based or core minimum regulatory capital requirements by any reasonable margin. PX 9053A. Indeed, the value of such rights is highly unstable, which suggests that the September 1991 third-party estimate relied upon by AmBase may not have measured the net gain Carteret could have realized from a sale in 1992. DX 5038A at ¶ 116; Tr. 3604:3-5 (Saunders). Further, because the minimum amount of regulatory capital increased as of January 1993 under FDICIA, a sale of the servicing rights would have done little good even if the third-party 1991 valuation remained applicable in 1992. See, e.g., DX 9760; Tr. 570: 14-17 (Bianco).

It is not clear whether there were or would have been buyers interested in CMC. As Professor Saunders pointed out, mortgage origination involves substantial risk because loans are committed in an uncertain environment and it is difficult to hedge against unexpected losses. Tr. 3587:20-3590:11 (Saunders). Therefore, it is highly unlikely that potential buyers would have acquired CMC if it had been offered for sale. Indeed, the fact that Carteret never tried to sell CMC before transfer to the RTC, and that the RTC immediately closed CMC to stem the risk of further loss, this demonstrates that there would not have been a market for CMC in a "but-for" world. Tr. 2588:1-6 (Saunders). Even if Carteret could have sold CMC, there is no evidence a buyer would have paid $18 million, as Professor Calomiris claims. AmBase's valuation is based upon an event study of the stock price of Imperial Credit Industries, Inc. ("Imperial") after Imperial hired CMC employees. PX 2703A at ¶¶ 148-52. As Professor Saunders points out, Imperial did not take on any of the risks of CMC (it simply hired the staff). DX 9775; Tr. 3590:22-3591:5 (Saunders).

### iv)    Branch sales

As a last resort, Carteret put in evidence that it could also have sold other branches, which had a very high franchise value. As Professor Smith explained, franchise value "results from the institution's standing in the market, a synergistic combination of all competitive attributes in which the whole is greater than the sum of the parts." Tr. 3783:3-25. Just after seizure, the RTC explained that Carteret's branches were so valuable because they were "well positioned in strategic markets," enjoyed a "high degree of customer loyalty" and a "relatively stable deposit base," and were market leaders in New Jersey. PX 4002 (Conservatorship Strategic Plan) at 26-27. Actual branch sales provide empirical confirmation of this value: in 1990, Carteret sold twenty-six branches for a $41 million premium—"among the highest premiums received in the industry during 1990"—and following seizure the RTC sold Carteret's branches for a $143 million premium (after two years of deposit run-off). DX 7340 (Mem. from R. Walsh 6/14/91) at 1. Thus, if necessary, Carteret easily could have sold branches to maintain capital compliance. Tr. 270:8-18 (Bianco); Tr. 977:23-978:6 (Calomiris).

Even in the breach-affected world, Carteret, by 1992, had worked out its loan loss problems, had begun generating sustained monthly profits, and had new management. In a non-breach world, profits would have been even greater because Carteret would not have been forced to "cannibalize[]" many of its most profitable assets and several profitable branches, DX 7175 at

1, and would not have suffered from an increased cost of funds, Tr. 980:14-981:9 (Calomiris). Nor would Carteret have been restricted from paying dividends. As both Professors Smith and Calomiris explained, investors care about future, not past, performance. Tr. 3042:4-6, 3106:24-3107:5; 3770:6-8 (R. Smith); Tr. 999:16-1000:3 (Calomiris). Thus, absent the breach, Carteret would have been a much more attractive investment or merger opportunity and could have been successful.

      **f.**     **Mitigation**

      The Government has also suggested that Carteret was at all times shielded from the effects of the breach because it fully mitigated shortly after FIRREA was enacted when it received a $20 million capital infusion from AmBase and because it sought and obtained a preliminary injunction in 1991 that required the OTS to accord full regulatory capital treatment to Carteret's contractual goodwill.  This is just not true.

      Following the breach, AmBase invested $20 million in Carteret to enable the thrift to comply fully with FIRREA's minimum regulatory capital requirements.  Thus, the investment fully mitigated the breach until Carteret's commercial real estate losses caused the thrift to fall out of compliance. In 1991, AmBase invested $30 million to partially mitigate the breach. AmBase argues that, absent the breach, it would have had the money to invest in Carteret after Carteret fell out of regulatory capital compliance in June 1991.

      The Government further argues that Carteret would have been out of compliance by an additional $50 million if the money had not been invested in 1989 and early 1991; therefore, the timing of the investment was irrelevant to Carteret's inability to satisfy the minimum regulatory capital requirements. As the Federal Circuit observed in *Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006), the Government is not responsible if an economic downturn causes the thrift to be seized after the holding company has mitigated the breach.  By June 1991, Carteret could not satisfy its minimum regulatory capital requirements even if AmBase could have infused cash to replace all the goodwill affected by FIRREA. Therefore, under *Old Stone*, the Government is not responsible for the losses Carteret allegedly suffered after AmBase mitigated the breach. *Old Stone*, 450 F.3d at 1375.  The Court finds that this argument without merit.  It is clear, that absent the breach, Ambase would have had $30 million left in its pockets to invest in Carteret in 1991.

      **3.**     *Reasonable Certainty*

      "The measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'"  *Fifth Third*, 518 F.3d at 1374-75.  *See also Cal. Fed. II*, 395 F.3d at 1267 (quoting *Glendale II*, 378 F.3d 1308, 1313 (Fed. Cir. 2004)).  "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ." *Bluebonnet*,

266 F.3d at 1355.  The Federal Circuit has interpreted the "reasonable certainty" standard to apply only to the fact of damages, after which the court may "make a fair and reasonable approximation of the damages." *Fifth Third*, 518 F.3d at 1379.  *See also Bluebonnet*, 266 F.3d at 1356-57.  However, Plaintiffs' damages model must not be based upon mere speculation or hypotheticals. *Franklin Fed. Sav. Bank v. United States*, 55 Fed. Cl. 108 (2003).

Here, it cannot reasonably be doubted that the Government's breach gave rise to injury. As the Federal Circuit has recognized, the Government's supervisory goodwill promise had "substantial value." *Glendale*, 239 F.3d at 1381-82.  FIRREA eliminated that value by breaching Carteret's contractual right to count its supervisory goodwill toward its regulatory capital requirements. This breach forced Carteret to shed assets and liabilities on which it was earning positive spread. The loss of an item with "substantial value" establishes that Carteret sustained significant economic injury. The question thus becomes whether the evidence allows the Court to make a "fair and reasonable approximation" of damages.  *Bluebonnet*, 266 F.3d at 1357 (quotation marks omitted).

### a.   The Experts

Both parties put on expert witnesses at trial to testify about the damages award, if any. Professor Calomiris testified on behalf of Plaintiffs regarding an award based on three different damages models: (1) Carteret's alleged 1989 market value: $251.4 million (PX 9006); (2) Carteret's alleged "Terminal Value" as of 2008, representing the undiscounted stream of Carteret's future earnings as of 1989: $782.2 million (PX 9006); and (3) Carteret's alleged market value as of 2008 in a non-breach world: $920.7 million (PX 9006).  Professor Saunders and Professor Roy Smith testified on behalf of the Government regarding Prof. Calomiris' assumptions and methodologies.   After weighing the evidence, the Court finds that the testimony, expert reports, and opinions of Professor Calomiris, with regard to Carteret's market value damages model, to be generally credible and the methodology sound.  However, the Court does find Professor Saunders' testimony and certain of his criticisms of Professor Calomiris' damages model to be persuasive.  Therefore, the Court finds it appropriate to modify Professor Calomiris' market value damages model to incorporate certain of Professor Saunders' criticisms. The Court adopts a mixed model as further described to determine Carteret's market value as of the breach, in a fair and reasonable approximation of Plaintiffs' loss.

As to Professor Calomiris' other damages models, the Court is not persuaded.  The Court does not find persuasive Professor Calomiris' expert opinion of damages based upon the Gordon Growth Model (a mathematical growth model).  The Court does not agree with the application of this model in this case.[4]  Further, the Court finds that the Gordon Growth Model did not and

---

[4]  On December 15, 2009, the Government filed a Motion to Take Judicial Notice of the Failure of Greater Atlantic Bank.  Prof. Calomiris was the Chairman of the Board of Directors of Greater Atlantic Bank, which was seized by regulators in December 2009.  The motion is hereby **GRANTED**. The Court notes that Prof. Calomiris testified that as Chairman,  he used the

could not show investment opportunities, sources of funding, and other characteristics of "but-for" Carteret absent the breach.  PX 9021.  Further, as Professor Saunders noted, "the Gordon Growth Model . . . can only be used with firms with what's called stable growth, very stable growth over time."  Tr. 3446:25-3447-6.  As the evidence showed, earnings varied considerably over the years. DX 9720; Tr. 4015:17-4016:7.  Thus, in light of this, the Court finds that Plaintiffs' damages award is more appropriately valued by using the market value of Carteret at the time of the breach.

### b.    The Market Value of Carteret at the Time of the Breach

A "lost value" calculation of damages based upon market valuation of a thrift at the time of the breach is an acceptable measure of expectancy damages.  *Slattery v. United States*, 583 F.3d 800, 817 (Fed. Cir. 2009) ("[W]hen the breach of contract results in the complete destruction of a business enterprise and the business is susceptible to valuation methods, such an approach provides the best method of calculating damages[.]") (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d. Cir. 1995)).  Where the value of a thrift was lost by the chain of consequences initiated by the Government's breach, recovery of the thrift's market valuation before the breach is appropriate.  *Slattery*, 583 F.3d at 817.  To account for the true effect of the breach, market capitalization must be measured at the point before informational leakage about FIRREA began affecting stock prices.  *See Slattery*, 69 Fed. Cl. at 585.  "This amount establishes how the market valued future income . . . discounted to present value, and it presumably incorporates the value the market assigned to goodwill which remained on [the] books at the time of the breach."  *Suess*, 52 Fed. Cl. at 231.

The Plaintiffs argued and presented evidence that AmBase's arms-length acquisition of Carteret in August 1988 for $266 million represents the fair market value of the bank at that time.  Both CS First Boston and Salomon Brothers evaluated the deal and concluded it was fair.  In addition, the stock market independently valued Carteret at $198 million just prior to the transaction.  *See* DX 8000A (Smith Report) at 17.  Further, Chase Manhattan Bank entered into a $300 million credit agreement with AmBase for the specific purpose of funding the acquisition of Carteret, accepting Carteret's stock as collateral.  *See* PX 2611 (Credit Agreement, 6/10/88).

Plaintiffs also argued and presented evidence that AmBase also assumed two other obligations as part of the acquisition that had value in excess of the $266 million paid for Carteret: (1) a commitment to infuse up to $50 million in additional capital into Carteret in the event the thrift's capital fell below required levels, and (2) a commitment to purchase Imperial Premium Finance from Carteret should Carteret sell it to another entity at less than the price Carteret paid.  At trial, Professor Smith acknowledged the value of these obligations and that the purchase price of $266 million reflected a control premium that was "within the realm of

Gordon Growth Model.  As the Court has found this Model unpersuasive, the failure of Greater Atlantic has no bearing on his expert opinion based on the market value approach.

reason." Tr. 2927:2-18, 3050:10-12.  The Court agrees that the $266 million purchase price of Carteret, which AmBase actually paid in August 1988, is a reasonable measure of the fair market value of Carteret prior to the breach.

Both parties' experts agreed that market-to-book ratios tied to a firm's book net worth are a common valuation metric.  After the AmBase acquisition, however, Carteret was no longer publicly traded.  Thus, to determine Carteret's market value at the time of the breach, Professor Calomiris started with the $266 million that AmBase paid to acquire Carteret in 1988 and applied the average rate of increase in the market-to-book ratios of publicly-traded thrifts.  Professor Calomiris calculated the market-to-book ratio of the AmBase acquisition as 0.869.  PX 9010.  He then gathered data from 46 unrelated thrifts to calculate the percentage change in the mean market-to-book ratio between 1988 and the breach (7.4%).  PX 9011.  He then applied this 7.4% increase to Carteret's 1988 ratio of 0.869 and calculated a 0.934 ratio as of July 31, 1989.  PX 9012.  Finally, he applied this ratio to Carteret's book value of $269.3 million on that same date to estimate that at the time of the breach, Carteret's market value was $251.4 million.  PX 9012; PX 9013.  *See also* Tr. 3404:16-3405:21 (Saunders); DX 9702.  Plaintiffs argued that Professor Calomiris' use of the July valuation date was conservative because the market became aware of the coming elimination of supervisory goodwill "as of the February introduction of the FIRREA legislation in '89."  Tr. 3963:13-3964:18 (Saunders).

The use of an industry index for valuation purposes is appropriate.  *Slattery*, 69 Fed. Cl. at 585.  Professor Calomiris also demonstrated that as FIRREA was making its way through the legislative process, news about the coming breach had a negative impact on the thrift industry, thus suppressing value.  PX 2702A at ¶ 30-34.  This suggests that tracking the industry growth in 1989 was conservative because it does not discount the full effects of the breach.

The Government argued and presented evidence that Carteret's value "declined dramatically" between July 31, 1988, and July 31, 1989, including that the market value of Carteret must have decreased in this period not because of changes to Carteret's net book worth, but because the bank's classified assets increased.  However, Plaintiffs presented evidence that the pre-breach increase in such assets was less than $1 million and that as of March 31, 1989, Carteret had $178.8 million of classified assets.  PX 1710.  In addition, Professor Calomiris captured that increase in classified assets, which was common to the thrift industry, by measuring any value lost by Carteret in relative terms by comparing Carteret to an industry average.  *See* DX 8000A at ¶ 59.  Plaintiffs also argued and presented evidence that classified assets are not necessarily nonperforming and that the more relevant measure for valuation purposes is loan loss reserves.

Professor Saunders testified at trial regarding Professor Calomiris' market value damages model.  Professor Saunders stated that the $269.3 million book value of Carteret, as of July 31, 1989, should be diminished by $77.2 million to reflect the additional loan loss reserves identified by OTS prior to the breach that were to be booked by Carteret, resulting in an adjusted book value of $192.1 million.  Tr. 3422:1-11.  Professor Calomiris applied the market-to-book ratio of

0.934 which would result in an adjusted market value of $179.4 million for Carteret at the time of the breach.  Tr. 3424:1-13; DX 9709.  Thus, Professor Saunders' revision to Professor Calomiris' market value damages model is as follows:

[Carteret book value as of 7/31/89] – [additional loan loss reserves] = [adjusted book value]

[adjusted book value] x [mean market-to-book ratio] = [adjusted market value]

*See* DX 9709.

The Court notes that Professor Saunders based his valuation on the notion that the 1989 exam report called for "an additional 77.2 million in loan loss reserves" and that he believes that than an adjustment to Professor Calomiris' market value damages model is appropriate to reflect the additional reserves identified by OTS prior to the breach. Tr. 3412:2-3422:11.  However, the parties are in dispute over the amount of loan loss reserves required to be booked.  Plaintiffs argued that in 1989 Carteret booked only $49.8 million of reserves and did not do so until the quarter ended December 31, 1989, which was after the breach, and therefore the market value calculation should not be diminished by any loan loss reserves amount.  PX 1713.  The Government argued that beginning in May 22, 1989, regulators identified the thrift's need for an additional $77.2 million in reserves and that amount should be factored into the market value calculation.  The Court notes that Carteret's regulators identified the need to take additional loan loss reserves prior to the breach, during the quarter ended June 30, 1989.  But, OTS eventually revised the amount of reserves required to be booked down from the original $77.2 million amount.  The Court finds that a adjustment to Carteret's book value in Professor Calomiris' market value damages model is appropriate, and the actual 1989 figure of $49.8 million best reflects the bank's pre-breach need to book additional reserves without being substantially tainted by the post-breach shrinkage in the underlying portfolios.

Therefore, by using Professor Saunders' revision of Professor Calomiris' market value damages model to incorporate the loan loss reserves identified by OTS prior to the breach, but substituting the figure of $49.8 million in additional reserves instead of $77.2 million, the adjusted book value of Carteret is $219.5 million.  After applying the  market-to-book-value-ratio of 0.934 to the adjusted book value, the formula yields an adjusted market value of Carteret at the time of the breach to be $205,013.000.

## B.  WOUNDED BANK DAMAGES

Plaintiffs claim "wounded bank" damages in the form of increased cost of funds ($19.8 million); cost of employee severance packages ($12.5 million); costs attributable to branch sales ($2.4 million); costs of transaction fees to raise capital ($632,750); and costs in connection with heightened regulatory scrutiny that accompanied Carteret's breach-weakened status ($1.3 million).  However, wounded bank damages are duplicative where lost value expectancy damages have been awarded. *Slattery*, 583 F.3d at 820-21.  Therefore, because AmBase has

been awarded the lost value of Carteret at the time of the breach, Plaintiffs cannot recover wounded bank damages.

## C.  RELIANCE DAMAGES

Plaintiffs further argue in the alternative for reliance damages in the form of the value of Carteret's ongoing business as of the date of the 1986 mergers in the amount of $272.5 million, which Carteret staked on the Government's promise of supervisory goodwill in the First Federal and Mountain Security transactions.  Because AmBase has been awarded the lost value of Carteret at the time of the breach, Plaintiffs cannot recover reliance damages in addition to expectancy damages.

## D.  RESTITUTION DAMAGES

Plaintiffs also argue in the alternative for restitution damages of $48.5 million.  This damages figure allegedly represents the benefit conferred to the Government by Carteret in the form of increased costs of $23.5 million in the Barton transaction and $20 million in the Delray transaction had the Government accepted the next best bids, as well as savings of $5 million in the 1986 transactions had the Government accepted the next cheapest bid.  Because AmBase has been awarded the lost value of Carteret at the time of the breach and restitution is incompatible with expectancy damages, Plaintiffs cannot recover restitution damages.  *Slattery*, 583 F.3d at 820 ("Upon entering the contract, the costs of entry, at least for contracts that are performed for a reasonable period prior to breach, are subsumed in the value when the contract is breached."). *See also Glendale*, 239 F.3d at 1380.

## IV.  RECEIVERSHIP DEFICIT

Carteret's assets and liabilities were placed into a "pass-through receivership," whereby almost all the assets and liabilities of the bank were placed by the RTC into a conservatorship, Carteret Federal Savings Bank.  Subsequently, RTC was appointed receiver of that institution, while the claims were transferred to RTC in its corporate capacity.  Thereafter, the claims were transferred to the FSLIC Resolution Fund-RTC ("FRF").  Upon the "sunset" of the RTC, the FDIC became the thrift's receiver and is the successor to the rights of Carteret.  The FDIC is also the manager of the FRF.

The resolution of Carteret by the RTC took 826 days over three separate transactions and proceeded in accordance with the Minority Preference Program ("MPP") enacted by Congress in 1993.  After Carteret's branches and remaining deposits were sold in late 1994 and early 1995, Carteret Federal was placed into a final receivership.

The RTC made three major loans to the receivership (one for the Florida branches and two for the New Jersey branches), at three different fixed rates on three different dates:  the interest rate on the $256 million October 1994 loan was set at 6.06% per annum; the interest rate

on the $616 million January 1995 loan was set at 7.34% per annum; and the interest rate on the $598 million March 1995 loan was set at 6.57% per annum. DX 5001A at 20, 43.

The total amount of deposits transferred from the disposition of Carteret Federal were approximately $1.369 billion, for which the RTC delivered $1.183 billion to the acquirers. The paid amount reflected deposit premiums totaling $143.8 million and the sale of Carteret assets totaling another $43.5 million. The RTC booked the full amount of the transferred deposits, $1.369 billion, as the principal amount of the RTC's (and now the FDIC's) subrogated claim against the Carteret receivership estate. *Id.* The principal amount has been accruing post-insolvency interest to date, as well as federal income tax liability and Internal Revenue Service ("IRS") interest and penalties. As of December 31, 2007, the receivership deficit was estimated to be $321,434,394. DX 9174, Report 3.

Currently, the FDIC prepares a "Goodwill Financial Reporting Package," as of the close of each calendar year that includes a report on "Projected Receivership Results" using adjusted year-end balances. Each such Report 3 projects estimates of financial results for the receivership estate as of the applicable reporting period. This report's projections focus on the underlying net assets/(deficit) position of the receivership at various stages of potential claim distribution, based on assumed payment priority.

The most recent Carteret report, for calendar year 2007, reflects that virtually all reported thrift assets have been liquidated. Total current assets, consisting of cash and investments, amount to $115,578.

Report 3 also projects total net deficit receivership results of $321,434,394. This figure includes projections of the following:

- Post-insolvency interest on the FDIC's subrogated deposit claim, in the amount of $180,304,049, payable to the FRF;
- Potential federal income tax liability of $113,934,854, payable to the U.S. Department of the Treasury; and
- Third-party creditor claims, and estimated post-insolvency interest on those claims, totaling $3,297,794, which is payable to the general trade creditors of the Carteret pass-through receivership.

Exclusive of third-party claims, the most recently projected receivership position is a deficit of $318,136,600. Exclusive of third-party claims and potential federal taxes, the projected net receivership result is a deficit position of $204,201,746. Exclusive of third-party creditor claims, potential federal tax liabilities, and estimated post-insolvency interest on proven claims, the currently estimated receivership deficit would be $23,897,697. DX 9174 (FDIC, Goodwill Financial Reporting Package for Carteret Federal Savings Bank, Projected Receivership Results Using Adjusted 12/31/2007 Balances, at Report 3).

This Court earlier granted AmBase's Motion to Define the Measure of Carteret's Contract Damages, to the extent that it requests the Court to consider the size and value of the FDIC's receivership deficit when calculating damages, in light of the Federal Circuit's holding in *Bailey v. United States*, 341 F.3d. 1342 (2003). This Court reasoned that, "since the AmBase Plaintiffs are to have their recovery reduced by the size of the receivership deficit, the Court must determine the size of the deficit or surplus in order to determine the just amount which puts them in 'as good a position as [they] would have been in, had the breaching party fully performed its obligation.'" *AmBase*, 61 Fed. Cl. at 802 (quoting *Bluebonnet*, 339 F.3d at 1344-45).

The Government argues here, as in *Slattery*, that the FDIC as receiver for Carteret is entitled to recover its asserted "receivership deficit" from any damages award to AmBase, with priority over any other distribution. The Court disagrees. It is within this Court's discretion to order that damages be paid "net of any receivership claims" and thus "outside the statutory distribution scheme as advanced by the government in 12 U.S.C. § 1821(d)(11)[5]." *Slattery*, 583 F.3d at 825 ("The Government caused [the bank] to be forced into receivership which it would otherwise not have been forced into and it is well settled that a breaching party has to put the party in the same position as it would have been but for the breach.") (quoting *Slattery v. United States*, 73 Fed. Cl. 527, 531 (2006)). As this Court found in *Slattery* and affirmed by the Federal Circuit, the Government is liable for any receivership deficit where the bank's seizure, and thus the subsequent administration costs of the receivership, is a result of the Government's breach of contract. *Slattery*, 583 F.3d at 825. Awarding damages net of the receivership deficit does not "'restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver,' 12 U.S.C. § 1821(j), but is directed at assuring the integrity of the judgment for breach of contract." *Slattery*, 583 F.3d at 825. Furthermore, the Federal Circuit also found that "the FDIC does not automatically lose its governmental status when it acts as receiver for a bank that it has seized in its governmental role." *Id.* at 827 ("What is 'the Federal Deposit Corporation [sic] as receiver' other than part of the United States?") (quoting *FDIC v. Hartford Insurance Co. of Illinois*, 877 F.2d 590, 592 (7th Cir. 1989)).

Here, similar to the case of Meritor Savings Bank in *Slattery*, Carteret's seizure and the receivership administration costs were a result of the Government's breach of contract. Therefore, the Government is liable for the receivership deficit. Because the Government as breaching party should not benefit from its breach, and the FDIC as receiver is the government, AmBase is entitled to damages net of any receivership deficit and outside the statutory distribution scheme as advanced by the Government in 12 U.S.C. § 1821(d)(11). Accordingly, this Court need not review the receivership deficit to determine "those costs which are legitimately part of the receivership deficit," *AmBase*, 61 Fed. Cl. at 802, because the issue is

---

[5] Section 1821(d)(11) of the Federal Deposit Insurance Act, as amended ("FDI Act"), establishes the priority of distribution of funds held by the receiver for an insured institution and gives preference first to the receiver's expenses, then to depositors and creditors of the institution, and then to the shareholders.

moot where damages are awarded to Plaintiffs "net of any receivership claims," *Slattery*, 583 F.3d at 825.

Regarding AmBase's argument for direct recovery of the damages award despite the derivative nature of this suit, we find the issue moot because this Court is awarding damages net of any receivership deficit and outside the statutory distribution scheme as advanced by the Government in 12 U.S.C. § 1821(d)(11).

## V.  LIQUIDATION SURPLUS

As this Court found earlier in *AmBase*, 61 Fed. Cl. at 798-99, actions taken by the FDIC as receiver, including the disposition of any liquidation surplus resulting from Carteret's seizure and subsequent resolution and liquidation of assets, are justiciable before this Court and not precluded by the limitation on judicial review afforded by 12 U.S.C. § 1821(d)(13)(D) because non-justiciability would be contrary to Congress' intent in enacting these provisions as part of FIRREA.  *Slattery*, 583 F.3d at 827 (citing *Auction Co. v. FDIC*, 141 F.3d 1198, 1199 (D.C. Cir. 1998)).  *See also Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1274 (10th Cir. 1994)).

Thus, this Court accordingly turns to the issue of the disposition of the liquidation surplus, if any, resulting from Carteret's seizure and held by the receivership.  The Court finds that where AmBase has been awarded the lost value of Carteret as of the time of, or *before* the breach, Plaintiffs necessarily cannot recover for any event incurred as a consequence of, or *after* the breach.  Because expectancy damages are intended to make the non-breaching party whole by "providing the benefits expected to be received had the breach <u>not</u> occurred," *Fifth Third Bank*, 518 F.3d at 1374 (emphasis added), any award of additional benefits resulting <u>from</u> the breach would result in duplicative payment of damages and a "windfall to the non-breaching party."  *Slattery*, 583 F.3d at 820 (quoting *American Capital Corp. v. United States*, 472 F.3d 859, 870 (Fed. Cir. 2006)).  The Court finds this reasoning analogous to the denial of wounded bank damages in addition to a lost value award and, therefore, Plaintiffs are not entitled to any liquidation surplus held by the receivership, should any surplus be determined.

## <u>VI.  TAX GROSS-UP AWARD</u>

A tax gross-up is appropriate in order to make the non-breaching party whole and to reflect after-tax harm.  *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1356 (Fed. Cir. 2005).  AmBase argues that a tax on damages tied to the value of Carteret would amount to a tax on "lost monies that would not have been taxable."  *Id.*  Accordingly, because this Court has awarded damages based on the lost value of Carteret, Plaintiffs are entitled to a tax gross-up in an amount to be determined if and when any taxes should be imposed on the damages award, although "if logic and pure common sense governed, it would make far greater sense for the Government to simply not tax Plaintiffs."  *Suess v. United States*, 74 Fed. Cl. 510, 515 (2006).

As this Court has said in numerous opinions with regard to the *Winstar* cases, the real injustice of this opinion is that it does not include any interest or  attorneys' fees award. Sovereign immunity does not allow the Court to grant these amounts.  In dollar terms Plaintiffs will receive about one third of the value of what they have lost by the breach.  This is unfair and unjust but the Congress, not the Court, must address this injustice.  Unfortunately, the courts, at least at this juncture, are not the fora that can make the damaged parties whole. This represents one of those gaps in our Nation's system of the rule of law. Our great Constitution's Framers were men of extraordinary vision. They understood that while a framework for the protection of rights under law had been established in 1789, its complete fulfillment was an ongoing project for the ages. Through statute and executive action our Nation has moved toward that goal. This is a case where the movement should continue through the legislative process.

## VII.  CONCLUSION

For the reasons set forth above, Plaintiffs are **AWARDED** $205,013,000.00 dollars in lost value expectancy damages, plus tax gross-up if applicable in an amount to be determined at time of assessment.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/Loren A. Smith</u>
**LOREN A. SMITH**
Senior Judge